1  ELLIS GEORGE CIPOLLONE
   O'BRIEN ANNAGUEY LLP
2  Dennis S. Ellis (State Bar No. 178196)
     dellis@egcfirm.com
3  2121 Avenue of the Stars, 30th Floor
   Los Angeles, California 90067
4  Telephone: (310) 274-7100
   Facsimile: (310) 275-5697
5
6  *Interim Lead Class Counsel*

7               UNITED STATES DISTRICT COURT

8             NORTHERN DISTRICT OF CALIFORNIA

9                SAN FRANCISCO DIVISION

10

11 *In re Wells Fargo Mortgage*          Case No. 3:22-cv-00990-JD
   *Discrimination Litigation.*
12                                        Honorable James Donato

13                                        **AMENDED AND CONSOLIDATED
                                          CLASS ACTION COMPLAINT
14                                        FOR:**

15                                             **1. VIOLATION OF THE EQUAL
                                               CREDIT OPPORTUNITY ACT,
16                                             15 U.S.C. § 1691, *ET SEQ.***
                                               **2. RACE DISCRIMINATION IN
17                                             VIOLATION OF THE FAIR
                                               HOUSING ACT OF 1968, 42
18                                             U.S.C. § 3601, *ET SEQ.***
                                               **3. RACE DISCRIMINATION IN
19                                             VIOLATION OF 42 U.S.C. § 1981**
                                               **4. VIOLATION OF THE UNRUH
20                                             CIVIL RIGHTS ACT,
                                               CALIFORNIA CIVIL CODE § 51**
21                                             **5. VIOLATION OF THE
                                               CALIFORNIA UNFAIR
22                                             COMPETITION LAW**

23                                        **DEMAND FOR JURY TRIAL**

24

25

26

27

28

Plaintiffs Aaron Braxton, Paul Martin, Gia Gray, Bryan Brown, Elretha Perkins, Christopher Williams, Ifeoma Ebo and Terah Kuykendall-Montoya, individually and as representatives of a nationwide class of similarly situated applicants for original purchase mortgage, refinance and other home mortgage loans (collectively, "Plaintiffs" or the "Class"), allege as follows:

## I.   NATURE OF ACTION

1.     The benefits of homeownership have long been the cornerstone of the American Dream, allowing people, regardless of economic status, to accumulate wealth by gaining access to credit, building equity, and reducing housing costs.[1]

2.     These benefits, however, have for far too long been unattainable for a disproportionate number of non-white Americans, and more difficult for such Americans to maintain once achieved.  For example, historically, Black Americans have been repeatedly and systematically denied access to the financial benefits of homeownership through pernicious and pervasive race-based policies and practices. These included, for example, the Federal Housing Administration's refusal to insure mortgages in and near minority neighborhoods—a practice now referred to as "redlining"—at the same time that the FHA subsidized builders who mass-produced entire subdivisions for white Americans.

3.     The passage of civil rights legislation in the 1960s, together with amendments to that legislation in the ensuing decades, was supposed to remedy that historical injustice by eliminating race-based gatekeeping practices like redlining and restrictive covenants.  Despite the promise of this legislation, many minorities continue to face discrimination in the realm of home ownership and continue to find themselves hampered by lingering vestiges of this country's explicitly racist past.

4.     Over the past few years, historically low interest rates created unprecedented opportunities for prospective homeowners to obtain original purchase

---

[1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=1c78499623b5.

mortgage loans to buy their first homes and for existing homeowners to refinance their mortgages or access equity in their homes on much more favorable terms. Original purchase mortgage loans at low interest rates allow potential homeowners to acquire suitable homes with manageable monthly payments.  Refinanced mortgages and other home loan products allow homeowners to reduce their monthly payments (as well as the overall interest due during the life of their loan) and access equity while still building wealth through their homes.  Not surprisingly, millions of Americans sought to purchase a new home at a low interest rate, refinance existing loans or obtain additional home loan products.

5.       But far too many would find the door to these opportunities closed for no other reason than their racial or ethnic background.  More specifically, non-white applicants for home loans from the defendants in this case—Wells Fargo Bank, N.A., Wells Fargo & Co., and Wells Fargo Home Mortgage (collectively, "Defendants" or "Wells Fargo")—had their applications intentionally and disproportionately denied, faced unjustified delays in the processing of their applications, and/or were given less favorable terms than similarly qualified white Americans.  This was the result of Wells Fargo systematically engaging in a new form of redlining that harmed Plaintiffs and the Class based on their race and ethnicity.

6.       In 2020, for instance, according to an analysis of nationwide data published under the Home Mortgage Disclosure Act, Wells Fargo approved approximately 67.1% of white borrowers who applied for a mortgage, compared to only 51.8% of Black and/or African American applicants.

7.       When Wells Fargo approves non-white borrowers' mortgage applications, it often does so on substantially worse terms than those offered to white borrowers.  Again, take the case of Black applicants:  nationwide, in 2020, the average interest rate Wells Fargo charged to Black borrowers was 3.34%, versus 3.23% for white borrowers.  The difference is statistically significant at over 17

standard deviations.[2]

8.      Wells Fargo also frequently imposes higher costs on non-white borrowers relative to the size of their loans.  For example, in 2020, Black borrowers nationwide had to spend, on average, 2.0% of their Wells Fargo loan value on costs and fees, versus 1.7% for white borrowers.  The disparity is statistically significant at 9 standard deviations.

9.      With respect to refinancing, Wells Fargo **denied the applications of over 50%** of the Black applicants seeking to refinance in 2020, and **denied the applications of just under 50%** of the Black applicants seeking to refinance in 2021.  No other major lending institution refused to refinance the homes of Black applicants at such stunning rates.

10.      Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in 2020 than it had in 2010.[3]  That year, while Wells Fargo approved 71% of the residential refinancing applications submitted by white Americans, it approved only **47%** of residential refinance applications submitted by Black applicants, **53%** of residential refinancing applications submitted by applicants identified as Hispanic and/or Latino, and **67%** of residential refinancing applications submitted by Asian American applicants.  When compared to other lenders, which had approval rates of **71%**, **79%**, and **85%**, respectively, for the same racial groups, Wells Fargo's statistics are stark.  This clear disparity in outcomes is especially significant in light of data compiled by the National Community Reinvestment Coalition showing that

---

[2] When evaluating statistical disparities like the one described above, statisticians use a tool called the "standard deviation."  The more standard deviations, the more the observed result deviates from the expected result and the less likely the disparity is due to random chance.  Courts and statisticians consider a disparity "statistically significant"—meaning that there is a 95% level of confidence that random chance did not cause the disparity—at 1.96 standard deviations.  In this case, the difference in approvals is statistically significant at *over 29 standard deviations.*
[3] *Id.*

AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

in 2020, origination rates for non-white Americans including Black Americans across all lending institutions reflected a significant *increase*, from 53.7% to 59.4%.[4]

11.     The story in 2021 was the same, with Wells Fargo approving a much lower percentage of Black refinancing applicants than any other lender.[5]  Wells Fargo approved only 58% of Black applicants compared to other lenders, which approved 74% of Black homeowner applicants.[6]  And the disparity between Black and white refinancing approval rates was 21% at Wells Fargo, nearly double the disparity (13%) for all other for other lenders.[7]  And while Wells Fargo's Black homeowner refinancing approval rate improved slightly from 2020, the same was true for all other lenders, due to broader economic conditions.[8]  By comparison, other major lenders approved much higher rates of Black homeowner refinancing applicants in 2021:  JP Morgan Chase & Co. approved 87% of Black homeowner applicants (only 6% less than White applicants), Rocket Mortgage LLC approved 81% of Black homeowner applicants (only 7% less than White applicants), and Bank of America Corporation approved 75% of Black homeowner applicants (only 11% less than White applicants).[9]

12.     Overall, the data released under the federal Home Mortgage Disclosure Act shows unequivocally that Wells Fargo rejects a disproportionate number of non-white applicants.[10]  Wells Fargo also makes the application process

---

[4] https://ncrc.org/ncrc-2020-home-mortgage-report-examining-shifts-during-covid/
[5] https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-persistent-racial-gap-in-mortgage-refinancing.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

more difficult for non-white applicants on a national scale.[11]  For example, Wells Fargo customers report loan officers stating that Wells Fargo's refinancing calculation tools consider certain "areas" with large Black populations to be ineligible for rapid valuations.[12]  Non-white applicants are further subjected to delays, feigned mistakes, and other obstacles, leading many to withdraw their applications and others to wait indefinitely while Wells Fargo refuses to act.

13.     Wells Fargo also charges higher costs and interest rates to non-white customers who obtain refinancing.  For example, in 2020, Wells Fargo charged the average national Black and/or African American refinancing recipient 3.18% versus 3.11% for white refinancing recipients, and charged Black and/or African American customers an average of $5,335 in costs and fees versus $4,193 for white borrowers, for an average cost of borrowing of 2.6% for Black and/or African American customers versus 1.8% for white borrowers.  All these disparities are statistically significant.

14.     In light of this, Wells Fargo's stated commitment to "help[] ensure that all people across our workforce, our communities, and our supply chain feel valued and respected and have equal access to resources, services, products, and opportunities to succeed"[13] rings hollow.  Instead, Wells Fargo pervasively denies non-white homeowners' refinancing applications and consistently delays the applications it does not deny, in many cases ultimately forcing such homeowners into foreclosure.[14]

15.     Much responsibility for the breadth of Wells Fargo's discriminatory treatment of non-white mortgage and refinancing applicants lies with its decision to employ centralized, universal, race-infected lending algorithms to differentially

---

[11] *Id.*

[12] *Id.*

[13] https://www.wellsfargo.com/about/diversity/diversity-and-inclusion/.

[14] https://www.nclc.org/images/pdf/special_projects/covid-19/IB_Covid_Black_Forbearance_Foreclosure.pdf.

assess, delay and ultimately reject residential lending applications.  By using these algorithms and by failing to properly monitor and correct the lending algorithms, Wells Fargo engages in a practice of "***digital redlining***" that Wells Fargo knows intentionally and disproportionately discriminates against applicants based on their race and ethnicity.

16.     Used properly, automated underwriting technology can help individual loan officers who are properly trained and familiar with the legal environment in which banks operate make sound, individualized underwriting decisions that protect the interests of borrowers, banks, investors, insurers and the federal government, taking into account race-neutral data points and employing formulae based on those data points to decide whether the proposed loan is in the best interest of the bank and the borrower.

17.     But that is not how Wells Fargo utilized its automated underwriting technology.  Quite the contrary: during a period of time that included the COVID-19 pandemic, Wells Fargo systematically jettisoned or otherwise ignored well-established internal fair lending checks and balances in favor of implementing a centralized "pioneering automated underwriting" system—sometimes referred to as CORE—without sufficient, or sometimes any, human supervision or involvement.

18.     The problem became worse when multiple loan processors and underwriters were terminated or otherwise left the bank's residential lending operations and were not replaced.  Instead, the CORE "pioneering automated underwriting system" was increasingly centralized to facilitate at-home work by originators, processors, and underwriters.  The coding and machine learning endemic to the CORE algorithmic underwriting platform were—byte by byte—stuffed chock-full of Wells Fargo-generated geographic, demographic, race-stratified liquidity, appraisal, and other "overlays" that Wells Fargo knew served no legitimate underwriting basis but, instead, functioned as signals for race discrimination in Wells Fargo's residential lending decisions.

19.     These and other "overlays" pervasively infecting Wells Fargo's CORE algorithms became even more invidious with each successive denial, which taught the algorithm these denials were appropriate.  This ultimately served Wells Fargo's purpose of segregating the creditworthiness of prospective applicants based on protected characteristics such as their race and ethnicity, and differentiated Wells Fargo's assessments from those of the other major lending institutions.

20.     Moreover, Wells Fargo loan processors supposedly responsible for shepherding applications through the bank's systems, who were previously expected to process 30 applications per month, were later forced by Wells Fargo's CORE platform to process more than 50 and sometimes nearly 100 per month.  They were also rendered powerless to supervise the process, override the algorithm, or otherwise intervene on the side of basic compliance with fair housing laws.

21.     Non-white applicants are not less creditworthy than white applicants. To the contrary, when fairly evaluated, the applications of non-white applicants should have resulted in equal treatment.  For example, Wells Fargo knowingly incorporates, without adjustment, appraisals that have been shaped by years of race-based valuation standards or appraisals affected by race-based criteria.  Homes in majority Black neighborhoods are worth an average of 23% less than homes in neighborhoods with "very few or no Black residents" and of similar home quality.[15]

22.     In September 2021, the Federal Home Loan Mortgage Corporation released the results of a five-year study based on more than 12 million appraisals.[16] The study found that "Appraisers' opinions of value are more likely to fall below the contract price in Black and Latino census tracts, and the extent of the gap increases

---

[15] https://www.brookings.edu/research/devaluation-of-assets-in-black-neighborhoods/?utm_source=newsletter&utm_medium=email&utm_campaign=sendto_newslettertest_business&stream=top#_ga=2.213288596.1000901909.1649553887-1080662765.1648140872.

[16] https://www.freddiemac.com/research/insight/20210920-home-appraisals.

as the percentage of Black or Latino people in the tract increases."[17]  Wells Fargo's discrimination has not only led to delays in the application process for Black applicants but has forced those who received below-market appraisals from Wells Fargo to abandon the process with Wells Fargo and turn elsewhere.

23.     Plaintiffs, and members of the proposed Class, are the victims of Wells Fargo's pervasive misconduct:  non-white applicants for home loans from across the country whose applications to obtain a home mortgage, refinance their existing home loans or access equity in their homes have been systematically delayed or denied because Wells Fargo discriminates against them.  Tens of thousands have been victimized both by Wells Fargo's intentional, knowing and systematic race discrimination and the disparate impact of its practices, violating the contractual, commercial and civil rights of Class members and causing millions (and perhaps billions) of dollars in damages to the Class.  Individually and as representatives of the Class (defined below), Plaintiffs bring this action to enjoin Wells Fargo's present-day redlining and related discriminatory practices, to make good to the Class all damages resulting from its violations of civil rights laws, and to restore to the Class any amounts to which they otherwise would have been entitled, together with such other equitable and remedial relief as the Court may deem appropriate.

## II.     JURISDICTION AND VENUE

24.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343 because Plaintiffs assert federal causes of action, because Plaintiffs assert civil rights causes of action, because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

25.     Personal jurisdiction is appropriate over Defendants because Wells

---

[17] *Id.*

Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California, Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State, and Wells Fargo & Co. has its corporate headquarters in San Francisco, California.

26.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, Wells Fargo Bank, N.A.'s principal place of business is in this district, and Wells Fargo & Co. has its corporate headquarters in this district.

### III.   PARTIES

#### *Aaron Braxton*

27.     Plaintiff Aaron Braxton, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

28.     Mr. Braxton is one victim of Wells Fargo's discriminatory policies and practices.  He is a financially successful and eminently creditworthy Black playwright, performer, and math and science teacher with a Master's degree from the University of Southern California.[18]  He has authored several award-winning plays, including *DID YOU DO YOUR HOMEWORK?*, which broke the Beverly Hills Playhouse's record for longest running play (nine months).[19]  He has also written several films and television pilots and acted in several film, television, and theatre projects.[20]

29.     In addition, for two decades, Mr. Braxton was a Wells Fargo mortgage customer.  He purchased his home in 2000, in a historically Black

---

[18] https://www.imdb.com/name/nm1347914/bio?ref_=nm_ov_bio_sm.
[19] *Id.*
[20] *Id.*

neighborhood located in South Los Angeles near the campus of the University of Southern California, and financed his purchase with a Wells Fargo home mortgage insured by the FHA.  Mr. Braxton always made his mortgage payments and paid his bills on time, and he had a good credit score.

30.     Despite his successful career and creditworthiness, when Mr. Braxton sought to refinance his home mortgage loan in August of 2019, Wells Fargo consistently obstructed the process.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo was focused more on his race and the location of his home within a historically Black Los Angeles neighborhood, and used the fact of his race and the location of his home to delay, obstruct, and deny him the full benefits of historically low home mortgage interest rates.  Wells Fargo did this even though, having paid his loans for more than 18 years, Mr. Braxton had equity in his home far greater than the amount remaining on his FHA-insured loan.

31.     Mr. Braxton was given the runaround to such an extent that it took him over nine months to refinance his federally backed mortgage loan (and 12 months to refinance his home equity loan) at an above-market interest rate of around 4%.  This was after various Wells Fargo representatives kept telling him they lost his paperwork, made incomplete inquiries and needed to request more information, delayed their responses, and even placed him into an unsolicited debt-trap deferred payment program without his permission.  It was only after Mr. Braxton notified the Department of Housing and Urban Development ("HUD") that Wells Fargo approved the refinancing of his federally backed FHA loans (indeed, Wells Fargo approved the application the very next day).  Of course, for the prolonged period that Mr. Braxton was waiting for Wells Fargo to refinance his loans, he was paying the higher rates associated with his original loans.

### *Paul Martin*

32.     Plaintiff Paul Martin, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

33.     Mr. Martin has been a Hollywood entertainment executive at Sony Pictures for 14 years.  In 2020, he sought to refinance his home in the Ladera Heights neighborhood of Los Angeles, which has a higher proportion of affluent Black residents than most Los Angeles neighborhoods.  His multimillion-dollar home was previously owned by WNBA superstar Lisa Leslie and NBA player Aaron Afflalo.

34.     But Wells Fargo demanded that Mr. Martin first apply for a home equity line of credit (HELOC), before they would consider him for a loan refinance. Ultimately, Wells Fargo refused to provide Mr. Martin with the HELOC or refinance Mr. Martin's loan.  The bank would not do either unless he could get his home appraised for $2 million.  Wells Fargo's appraiser refused to come inside Mr. Martin's home, and appraised it at just shy of $2 million based on comparisons with homes in less affluent, Black-populated neighborhoods, apparently conflating all areas with a high concentration of Black residents.  Mr. Martin went to another lender, who appraised the home at $2.4 million and promptly refinanced his loan.

*Gia Gray*

35.     Plaintiff Gia Gray, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Danville, California.  Dr. Gray is a physician.

36.     Dr. Gray is another victim of Wells Fargo's discriminatory policies and practices.  She is in the top quintile of income earners.  The same was true when she applied to refinance her loans with Wells Fargo.  Dr. Gray's FICO score is above 800.

37.     Dr. Gray, together with her husband, owns income properties in Stockton, California and Chicago, Illinois, and a primary residence in Danville, California.  The couple had Wells Fargo mortgages for all three of their homes, and, save for a balance of approximately $1,000 on a credit card, the couple has and had no other debt.  The couple never missed a mortgage payment and always paid on

1   time.  They began the refinancing process for their homes in February 2020.

2        38.        The Grays were denied refinancing on their two income properties

3   outright; Wells Fargo refused to even accept an application for these homes.  Wells

4   Fargo would not return their calls with inquiries on refinancing these two properties.

5   When the couple did manage to get a hold of the assistant or loan officer, they were

6   told that the Stockton, California property was in a bad area, and that the Chicago,

7   Illinois property, although in a good area, was high risk, and that Wells Fargo was

8   not looking to refinance high-risk areas.  Frustrated by Wells Fargo's ambivalence

9   and inaction, the couple gave up on refinancing these properties in December 2020,

10  nearly a year after they started the process.  Wells Fargo did refinance Ms. Gray's

11  California property, which is in a predominantly white area of California.

<em>Bryan Brown</em>

13       39.        Plaintiff Bryan Brown, who is a Black homeowner, is a natural person

14  and a citizen of the State of Connecticut and resides in Bristol, Connecticut.

15       40.        Mr. Brown is another victim of Wells Fargo's discriminatory policies

16  and practices.  For the past two decades, Mr. Brown has been a CAD designer at a

17  prominent engineering company in Connecticut, and has invested in residential

18  properties in Bristol and Plymouth, Connecticut.

19       41.        Mr. Brown is a long-time Wells Fargo mortgage customer.  Having

20  purchased his multi-unit home in December 2010 with a Wells Fargo home

21  mortgage, he has always made his mortgage payments, paid his bills on time, and

22  maintained a good credit score.

23       42.        In October 2020, Mr. Brown sought to refinance his loan to convert

24  his conventional 30-year loan to a 15-year fixed mortgage and to obtain a lower

25  interest rate.

26       43.        Despite his investment properties, longstanding employment, and

27  creditworthiness, when Mr. Brown sought to refinance his home mortgage, Wells

28  Fargo subjected him to long periods of non-responsiveness, arbitrary requests for

additional documents, and multiple calls to his employer requesting verification of his employment.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo denied Mr. Brown's application to refinance after a four-month runaround.  Wells Fargo did this even though, having paid his loan for more than ten years, Mr. Brown had equity in his home that was almost equal to the amount remaining on his loan.

44.     To this day, Mr. Brown's interest rate remains at 4.75%.

*Elretha Perkins*

45.     Plaintiff Elretha Perkins is a Black female homeowner with a 720 credit score, and is a natural person and citizen of North Carolina.  She owns homes in both Eden, North Carolina and Dacula, Georgia.  Her Dacula, Georgia home was financed through Wells Fargo.  She has been a Wells Fargo customer for nearly 20 years.

46.     Ms. Perkins is also one of the many Americans impacted by Wells Fargo's discriminatory scheme.  She is a successful small business owner with more than 40 years' experience in North Carolina's childcare and transportation industries.  She is a business leader, a graduate of North Carolina A&T State University—a prominent Historically Black College—and a leader within her local African American community.  In addition to her personal successes, she has raised extremely successful children who are active in Georgia's film and entertainment industry.

47.     Despite Ms. Perkins consistently making payments on her home loan and her exemplary credit score and creditworthiness, her refinance application was subjected to delay, pretextual excuses and overt acts of discrimination by Wells Fargo, including mandating that in order for her to refinance her HELOC, she would have to apply for and be granted a modification under a "hardship" program as if the loan was distress—even though she was not facing any financial hardship or need to modify the loan under a loss mitigation program.  Wells Fargo required her to

approach third-party entities to simply make payments on her HELOC, ultimately giving her the runaround to such an extent that she has had to submit the same tax and income documents multiple times and face more delays from Wells Fargo in the processing of her refinance request.

### *Christopher Williams*

48.     Plaintiff Christopher Williams is a Black male and a citizen of Georgia.  As described below, Mr. Williams applied for a HELOC with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

49.     When he applied for his mortgage loan, he was highly creditworthy, as reflected in his high FICO score of over 750.  Based on this, Mr. Williams believed he should have qualified for Wells Fargo's prime interest rate, which would have saved him substantial money over time on his home mortgage.  However, consistent with Wells Fargo's pattern of discrimination against Black applicants, Wells Fargo offered him an interest rate nearly three points higher than the prime interest rate offered by Wells Fargo, which is disproportionately and discriminatorily offered to white applicants.

50.     Believing it to be a mistake, Mr. Williams spoke to Wells Fargo's home lending department to have his credit report rechecked and for his interest rate to be lowered.  Instead, Wells Fargo refused to reconsider his credit score or his interest rate.  Wells Fargo agreed to revisit its refusal to extend the loan to Mr. Williams on favorable terms.  However, in a letter dated September 5, 2019, Wells Fargo articulated for the first time, that it did not use solely FICO credit scores to determine home interest rates, but instead used "a unique scoring model, which considers more than credit scores to evaluate applications."

51.     Indeed, the "other" factors used by Wells Fargo to determine interest rates for home loans serve to intentionally exclude Black applicants from affordable and lower-risk loans, force Black applicants to pay higher interest rates and other

fees than similarly situated white borrowers, and have a disparate impact based on race.

*Ifeoma Ebo*

52.     Plaintiff Ifeoma Ebo is a Black American and citizen of New York and thus is a member of a protected class.

53.     In late 2021, Ms. Ebo began the process of searching for a new home to purchase.  That search ended in October 2021, when Ms. Ebo found a property located in Kings County, New York—more specifically, the East Flatbush neighborhood of Brooklyn—and entered into a contract to purchase it for the price of $900,000.  Thereafter, Ms. Ebo submitted an application for a mortgage loan to Wells Fargo in connection with the purchase of the property.

54.     At the time Ms. Ebo applied for the loan, Ebo had a credit score of approximately 800, an annual income of approximately $178,000, and no significant debt.

55.     On November 1, 2021, Ms. Ebo received preapproval from Wells Fargo for a mortgage loan in the amount of $883,698 (the "Loan"), which would be used to purchase the Property.  According to Wells Fargo, Ms. Ebo's preapproval was to expire on February 24, 2022.

56.     After Ms. Ebo's Application was preapproved, Ms. Ebo began working with Wells Fargo to receive final approval for the Loan.

57.     Per Wells Fargo's requests, Ms. Ebo submitted all necessary documentation to verify her qualifications for the Loan.  Ms. Ebo timely provided Wells Fargo with documentation such as W-2 forms, paystubs, bank account statements, and similar documents.

58.     On December 29, 2021, Ms. Ebo received a "Commitment Letter" from Wells Fargo.  According to the Commitment Letter, Ms. Ebo's Application was approved, and she only needed to submit some additional documentation "in order to complete the final underwriting and funding of" her Loan.

59.     In January and February 2022, Wells Fargo informed Ms. Ebo that it required additional documentation to complete the underwriting process relative to Ms. Ebo's Application.

60.     Notably, some of the additional documentation that Wells Fargo requested in January and February 2022 had already been submitted by Ms. Ebo (e.g., recent paystubs from Ms. Ebo's employers).

61.     Other documentation requested by Wells Fargo in January and February 2022 was unnecessary, unduly burdensome, and irrelevant to Ms. Ebo's qualifications for the loan.  For example, in one instance, Wells Fargo requested a written explanation as to why Ms. Ebo made a monthly credit card payment in the amount of $290 on her own credit card. In another instance, Wells Fargo requested a bank statement for a bank account that did not even exist.

62.     As Wells Fargo's duplicative and unnecessary requests for documentation continued into February 2022, Ms. Ebo expressed her concern to Wells Fargo that she would not be able to complete the loan application process by the time that her preapproval expired on February 24, 2022.  Nevertheless, as of February 24, 2022, Ms. Ebo's loan still had yet to receive final approval.

63.     In March 2022, Wells Fargo continued to request additional documentation, much of which was duplicative of documentation that Ms. Ebo had already provided to Wells Fargo several times previously.

64.     In sum, Ms. Ebo was highly qualified to receive a mortgage loan from Wells Fargo, and complied with all of Wells Fargo's reasonable requests for documentation to substantiate her qualifications.  Yet, as of March 22, 2022—nearly a month after the loan approval process should have concluded—Ms. Ebo still had not received final approval for her loan.

65.     On or about March 22, 2022, the seller of the Property canceled the Contract due to the fact that Wells Fargo had still not approved Ms. Ebo's Loan, and it was unclear when (or if) that approval would ever come.  That same day, Ms. Ebo

1  informed Wells Fargo of the seller's decision.  Accordingly, Ms. Ebo did not, and

2  will never, receive the loan.

3  *Terah Kuykendall-Montoya*

4  66.  Plaintiff Terah Kuykendall-Montoya is a Latino/Hispanic American

5  and thus is a member of a protected class.

6  67.  Ms. Kuykendall-Montoya, with her husband, applied to Wells Fargo

7  for a mortgage loan in or about late June/early July 2021 to refinance their existing

8  Wells Fargo mortgage loan (made in 2014 with a remaining balance of

9  approximately $86,000) to obtain some additional cash (about $30,000 from their

10  equity in order to make some home repairs).  At the time, her house was valued at

11  approximately $175,000, a value later determined by a subsequent appraisal.

12  68.  When she completed the mortgage refinance application with Wells

13  Fargo, her FICO score as reported through Equifax substantially exceeded the

14  minimum 620 needed to obtain a conventional mortgage loan, and the family had

15  more than adequate income to repay the increased loan amount.

16  69.  In late July 2021, Wells Fargo denied Ms. Kuykendall-Montoya's

17  refinance application on a pretextual basis.  Thereafter, in mid-August 2021, she

18  obtained a mortgage prequalification with another lender.  That mortgage was later

19  approved and closed, repaying her prior Wells Fargo mortgage.

20  *Wells Fargo Entities*

21  70.  Defendant Wells Fargo Bank, N.A. is a nationally chartered bank

22  with its principal place of business located in San Francisco, California, and is

23  chartered in Wilmington, Delaware.  It has 19,234 employees across all its locations,

24  including several in the Northern District of California, and generates nearly $70

25  billion in sales annually.

26  71.  Defendant Wells Fargo Home Mortgage, Inc. is a home lending

27  company that is part of the "Wells Fargo banking family."  It operates about 725

28  mortgage stores nationally and originates and services one-to-four-family residential

first and junior-lien mortgages and home equity loans.  On average, it originates approximately $300 billion of loans per year.  It is incorporated in the State of Delaware, and has its principal place of business in Des Moines, Iowa.  Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California office locations.

72.     Defendant Wells Fargo & Co. is a nationwide, diversified financial holding company and bank holding company incorporated in the State of Delaware with its principal place of business in San Francisco, California.  Wells Fargo provides banking, insurance, investment, and mortgage and consumer finance services through storefronts, the Internet, and other distribution channels across the United States and internationally.  It is the parent company of Wells Fargo Bank, N.A.

## IV.   FACTUAL ALLEGATIONS

### A.     The History of Discrimination, Including in Housing

73.     This country has a shameful history of racial discrimination, of which housing discrimination has always been a central and profoundly damaging part.

74.     In 1924, the National Association of Realtors Code of Ethics mandated that a realtor should "never be instrumental in introducing into a neighborhood members of any race whose presence will be clearly detrimental to any property values in the neighborhood."[21]  In other words, realtors were instructed that it was unethical to integrate neighborhoods.  This had a particularly pernicious effect on Black, Latino and Asian American communities.

75.     Pursuant to this policy and so many others like it, realtors and developers would routinely preserve specific properties for white Americans while designating properties in other areas for non-white Americans.  These designations would be found in rules, restrictions, and covenants attached to the properties.

---

[21] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

76.     Legislation introduced during the New Deal purporting to help homeowners nationwide, in fact, codified racism into housing.  The Home Owners' Loan Corporation and the Federal Housing Administration graded residential areas from "A-D," with "A" being the most likely to receive federal loan insurance and "D" being the least likely.  Areas with "Colored" and "Oriental" people were automatically given "D" ratings.[22]

77.     Federal Housing Administration underwriting manuals issued in 1938 sought to prevent the "infiltration of inharmonious racial groups" and directed underwriters to refuse to insure mortgages that would lead to "a change in social or racial occupancy."[23]

78.     "Today many of the nation's largest historically segregated black neighborhoods, such as those in the South Bronx and South Central Los Angeles, remain severely disadvantaged and have become majority-Latino, making Latinos also vulnerable to the adverse consequences of segregated spaces."[24]  And Los Angeles County has the dubious distinction of having provided the template for redlining and racially restrictive covenants with respect to Blacks and Latinos across the country.[25]  Such practices continue to this day but in a more pernicious and discreet form—through algorithms that can be blamed for discriminatory lending.[26]

_____

[22] *Id.*

[23] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[24] Justin P. Steil et al., THE SOC. STRUCTURE OF MORTG. DISCRIMINATION (Aug. 9, 2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6084476/pdf/nihms978243.pdf.

[25] Gene Slater, *Op-Ed: How Los Angeles pioneered the residential segregation that helped divide America*, L.A. TIMES (Sep. 10, 2021), https://www.latimes.com/opinion/story/2021-09-10/racial-covenants-los-angeles-pioneered ("No place has played a more central role in the creation of residential segregation than Los Angeles.").

[26] City National Bank avoided marketing and underwriting mortgages in majority Black and Latino neighborhoods in Los Angeles County.  *DOJ announces a $31*

At bottom, redlining has equally affected the Black and Latino population in Los Angeles County and the country.[27]

79.     Asian Americans are not immune.  Asian Americans have been subject to centuries of discrimination, starting with the Page Exclusion Act of 1875, the Chinese Exclusion Act of 1882, and Executive Order 9066.

80.     The California Alien Land Law of 1913 (also known as the Webb–Haney Act) prohibited "aliens ineligible for citizenship" from owning agricultural land or holding long-term leases for it.  As a result, many California farmers of Asian descent were forced to relinquish their farms and move elsewhere.

81.     In Oakland, racialized zoning and restrictive covenants directed 80% of the city's Black population to West Oakland following World War II.[28] Redlining made it impossible for these residents to obtain loans to improve their properties.  Instead of helping, the city eventually, in the 1960s, demolished large swaths of West Oakland, purportedly to build new homes, but the replacement projects languished and most residents were simply forced out with nowhere to go.[29]

82.     Similarly, title reports for San Francisco area homes built in the 1930s

---

*million redlining settlement with LA-based City National Bank*, NPR (Jan. 12, 2023, 2:03 p.m.), https://www.npr.org/2023/01/12/1148751006/redlining-city-national-bank-doj-settlement.  The CFPB is not only focused on weeding out explicit forms of redlining "but also cases where computer algorithms may cause banks to discriminate against Black and Latino borrowers."  *Id.*

[27] Manal J. Aboelata, MPH, *Policy Briefing: Healing LA Neighborhoods*, available at https://www.preventioninstitute.org/sites/default/files/publications/Healing%20Los%20Angeles%20Neighborhoods%20Policy%20Brief%20February%202019%19%28002%29.pdf (last visited Mar. 2, 2023) ("[R]edlining and the lending practices that followed denied goods and services to entire neighborhoods and swaths of cities, predominantly those inhabited by African Americans, Latinos, and other so-called 'undesirable' people.").

[28] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[29] *Id.*

list restrictions that "no person of any other race other than the Caucasian or white race" may own or occupy the property, except for "domestic servants of a different race domiciled with the homeowner or tenant."[30]  Similar provisions would often prohibit ownership or occupancy by residents of "African, Mongolian, or Japanese" descent.[31]

83.     The pervasive discrimination against non-white homeowners and those wishing to become homeowners sadly persists to this day, and Wells Fargo's treatment of non-white home loan applicants during the recent mortgage boom is just the latest setback for these long-maligned citizens.

**B.     Wells Fargo Has an Established History of Discrimination**

84.     Wells Fargo's discriminatory behavior described herein is completely in line with Wells Fargo's history of discrimination in lending.  Indeed, the genesis of its latest discriminatory practices seems to have followed the end of the policies it put in place after an earlier series of lawsuits.

85.     In 2012, Wells Fargo agreed to pay $184 million to settle claims with the U.S. Department of Justice that the bank pushed Black and Hispanic homeowners to obtain subprime mortgages and then charged them higher fees and interest rates.[32]

86.     In 2015, the City of Oakland sued Wells Fargo over its racially discriminatory banking practices in seeking to originate mortgage loans on predatory terms in minority neighborhoods and then "subsequent[ly] [refusing] to extend credit to minority borrowers seeking to refinance previously issued

---

[30] https://www.mercurynews.com/2019/02/26/for-whites-only-shocking-language-found-in-property-docs-throughout-bay-area/.

[31] *Id.*

[32] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

unnecessarily expensive loans."[33]  And "when a minority borrower who previously received a predatory loan sought to refinance the loan," they "discover[ed] that Wells Fargo refused to extend credit at all, or on equal terms as refinancing similar loans issued to [w]hite borrowers."[34]  Even when refinancing applications were approved, the loans turned from a "fixed-rate loan into an adjustable-rate loan that the lender knows the borrower cannot afford should interest rates rise … [and] the likely result of such practices is to cause homeowners who are otherwise…comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan."[35]

87.    The City of Oakland also performed a decade-long regression analysis of Wells Fargo loans in Oakland, which controlled for objective variables like "credit history, loan to value ratio, and the ratio of loan amount to income." The City of Oakland found that, controlling for these factors, "an African-American borrower is 2.583 times more likely to result in foreclosure than a more favorable and less expensive loan issued to a [W]hite borrower in Oakland."[36]  This corroborated other national studies finding that Black American borrowers were "124% more likely to receive a subprime refinance loan" than their White counterparts.[37]

88.    Moreover, the City of Oakland alleged that Wells Fargo employed systematic policies like "giving loan officers and others responsible for mortgage lending large financial incentives to issue loans to African-Americans and Hispanics that are costlier than better loans for which they qualify" and "failing to monitor" for racial disparities after "Wells Fargo had notice of widespread product placement

---

[33] *City of Oakland v. Wells Fargo Bank, N.A.*, 3:15-cv-04321, Dkt. No. 1, at 2 (N.D. Cal. Sept. 21, 2015).
[34] *Id*. at 4.
[35] *Id.* at 20.
[36] *Id*. at 20-21.
[37] *Id*. at 15.

disparities based on race and national origin."[38]  Wells Fargo also systematically "fail[ed] to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history."[39]  This led District Judge Edward M. Chen to conclude that "Oakland has identified specific employment practices in addition to the mere delegation of discretion."[40]

89.    The City of Oakland is not the only municipality that has sought to hold Wells Fargo accountable for its discriminatory conduct.  Cook County (Chicago) sued Wells Fargo for predatory lending practices that stripped minority homeowners of their home equity.[41]  "Publicly available loan origination data indicates that the percentage of high-cost and other nonprime loans issued by Wells Fargo in Cook County to minority borrowers well exceeded the County's percentage of minority home owners—typically by a factor of two to three."[42]  And the disproportionately White employees at Wells Fargo were given "discretion to steer prime-eligible minority borrowers into nonprime loans."[43]  "Wells Fargo subjected minority borrowers to equity stripping to a greater extent than it did nonminority borrowers with similar credit histories."[44]  And "minority borrowers were particularly susceptible to Wells Fargo's predatory practices because they were more likely than nonminority borrowers to lack access to low-cost credit, relationships with banks and other traditional depository institutions, and adequate comparative financial information."[45]

---

[38] *Id*. at 33.

[39] *Id*. at 9.

[40] *City of Oakland v. Wells Fargo Bank, N.A.*, No. 15-CV-04321-EMC, 2018 WL 3008538, at *15 (N.D. Cal. June 15, 2018), *aff'd in part, rev'd in part on other grounds City of Oakland v. Wells Fargo & Co.,* 14 F.4th 1030 (9th Cir. 2021).

[41] *Cty. of Cook, Illinois v. Wells Fargo & Co*., 14-C-9548-GF (N.D. Ill.).

[42] *Cty. of Cook, Illinois v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 980 (N.D. Ill. 2018).

[43] *Id*.

[44] *Id*.

[45] *Id*.

90.     In 2019, Wells Fargo settled a lawsuit by the City of Philadelphia alleging that it purposefully made it difficult for minorities to refinance their mortgages.[46]  The court in that case identified seven Wells Fargo policies that contributed to the discrimination against minorities:  (1) knowing about lending practices that either created higher-risk and higher-cost loans to minorities compared to comparably credit-situated white borrowers or failing to adequately monitor the bank's practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management; (2) failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history; (3) failing to prudently underwrite hybrid adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s; (4) failing to prudently underwrite refinancing loans, thereby substituting unaffordable mortgage loans for existing mortgages that borrowers were well-suited for and that allowed them to build equity; (5) failing to monitor and implement necessary procedures within its Internal Audit, Corporate Risk, Human Resources, Law Department, and Board of Directors throughout the Community Banking segment, which includes the retail mortgage banking business responsible for the unlawful activities set forth herein, to ensure compliance with federal fair lending laws; (6) failing to abide by its own "Vision & Values," which purportedly guides its business practices and relationships with customers; and (7) failing to ensure that its decentralized organizational structure was capable of properly monitoring mortgage lending activities within Community Banking.

## C.     Historically Low Interest Rates Prevail

91.     Before the Federal Reserve's recent series of rate hikes, interest rates were near an all-time low in the United States, and prospective home buyers sought favorable purchase money mortgages, and homeowners who held mortgage loans at

---

[46] https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-litigation/.

higher rates (meaning a great number of homeowners) sought to refinance their loans at lower rates.  Purchasing a home during this time period allowed new homeowners to pay very low monthly payments in relation to the value of their home.  Obtaining a refinance during this time allowed homeowners to significantly reduce their monthly payments and to owe less mortgage interest over the life of the loan.

92.     The same low interest rates spurred dramatic increases in applications for original purchase mortgage loans, resulting in similarly substantial disparities in the proportion of non-white applicants who were denied loans or otherwise offered substantially worse terms.

**D.     Wells Fargo's Home Loan Application Process**

Part 1: Gathering of Key Geographic, Financial and Demographic Data and Submission of Form 1003 Through "Blend"

93.     On November 27, 2017, as part of its explicit policy to "leverage the ideas in Silicon Valley and beyond" in mortgage underwriting, then-Wells Fargo CEO Tim Sloan announced the bank's partnership with San Francisco startup Blend Labs to develop a new online mortgage application and related tools.

94.     Wells Fargo's idea of "leverag[ing] the ideas in Silicon Valley" involves, first, obtaining a prospective refinance applicant's personal information, including name, phone number, email address, and the last four digits of the prospective applicant's Social Security number.  Applicants are, thus, required to have and utilize email to participate in the process, including checking Wells Fargo's loan tracker system for updates and requests for additional information. When, during the pandemic, visiting loan officers in person became infeasible, applicants without technical sophistication were disadvantaged.

95.     At this preliminary stage, Wells Fargo's algorithm obtains the first data points that are subsequently utilized in its discriminatory decisions:  names, phone numbers (including area codes), email addresses and Social Security numbers

that can then be tied to other data and used in other formulae within Wells Fargo's systems.

96.     Next, Wells Fargo sends the applicant, via electronic mail, a dedicated link through Blend, the digital banking platform developed by Wells Fargo in conjunction with Blend Labs.  That link enables the applicant to complete a Uniform Residential Loan Application (Form 1003) and submit that application to Wells Fargo.

97.     It is here that Wells Fargo collects more information for its lending algorithm.  The information collected on this form includes the borrower's name, alternate names, Social Security number, date of birth, citizenship status, names of co-borrowers, marital status, number and ages of dependents, home, mobile and work phone numbers, the subject property address, property value, status of property, intended occupancy and monthly expenses, former addresses, mailing addresses, employment information, income information, asset information, liabilities and expenses, and military service.

98.     Next, a Wells Fargo loan officer conducts a follow-up telephone or in-person interview with the applicant to obtain additional information that cannot be submitted online, including the financial acknowledgment form and the Demographic Information Addendum, which specifically asks about ethnicity, race, and gender.

99.     Here, Wells Fargo's process places particular emphasis on race.  If the interview is conducted in person, the loan officer must visually observe the applicant and consider the applicant's surname in an effort to determine the applicant's race.  Here, too, Wells Fargo's algorithm receives key demographic and financial data that it then utilizes in its lending decisions.

<u>Part 2: Running "Blend" Data Through Automated CORE "Pioneering Underwriting System" Systematically Infected with Racially Biased Algorithms and Overlays</u>

100.     Having obtained all of the geographic, demographic, and other data necessary through Blend and the submission of the Form 1003, the Wells Fargo loan originator does the equivalent of pressing "send," submitting the Form 1003 to Wells Fargo's CORE automated underwriting system for a decision.  Former non-control group employees of Wells Fargo with knowledge of these systems recount that, after operating as described herein—running both Desktop Underwriter ("DU") and Loan Prospector ("LP") simultaneously—CORE's decision would come back as A1 or A2, meaning the loan was approved; C1, meaning the loan had to go through a manual underwriting process; or C2, meaning the applicant was deemed "not loanable" and the application was denied.  During the COVID-19 era, Black refinance applicants were systematically slotted by CORE into the C1 and C2 categories.

101.     The idea of something that operates generally like CORE is, of course, nothing new or unique.  Used properly, automated underwriting systems can evaluate the risk profile of a loan and recommend its approval or denial with respect to race-neutral criteria to human underwriters and loan processors who can, on average, comfortably handle 30 files per month, who are specially trained in the bank's fair lending compliance programs and procedures, and who can ensure that the guidelines and mechanics of the algorithm are operating in accordance with these requirements.

102.     But the consequences can be immediate and pernicious when CORE-like systems are programmed with racial overlays and are otherwise not properly used or supervised by employees with training in fair lending practices.  The director of the Consumer Financial Protection Bureau (the "CFPB") describes these

types of banking algorithms as "black boxes behind brick walls."[47]  "When consumers and regulators do not know how decisions are made by the algorithms, consumers are unable to participate in a fair and competitive market free from bias."[48]

103.    This was certainly the case at Wells Fargo.  As recognized by a group of United States Senators, the operations and impact of Wells Fargo's CORE automated underwriting system are both new and unique in their treatment of Black applicants.  The chairman of the Senate Finance Committee, who wanted to investigate the bank for "potentially illegal discrimination," demanded that the bank produce to the Committee the data and algorithms it uses to evaluate applicants.[49]

104.    Matters became worse at Wells Fargo when its understaffed underwriting departments made a series of deliberate and intentional choices to centralize lending decisions.  These decisions, some of which were ostensibly made to facilitate working from home, took human supervision and fair-lending compliance out of the process.  Seemingly trumpeting the effect of these decisions, Wells Fargo went so far as to make an internal announcement that it would place increasing and undue reliance on machine learning processes in an automated underwriting system.  But that system was increasingly infected with explicit and implicit racial signals (so-called "overlays") that had, as their proximate and likely result, the disparate impact reflected in the statistical analyses set forth in this Amended Complaint during the time periods at issue herein.

105.    These Wells Fargo-specific overlays are manifestations of the same

---

[47] https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/.
[48] *Id.*
[49] *Wells Fargo Pressed by Senators on Race Disparity in Refinancing*, Yahoo! Finance, accessible at: https://finance.yahoo.com/news/wells-fargo-pressed-senators-race-171439115.html.

-29-

unbroken history of business policies and practices that create an "artificial, arbitrary, and unnecessary" barrier to fair-housing opportunities for non-white home purchasers and owners. These include, among others:

106.   ***Geographic Indicators***.  Among the overlays utilized by Wells Fargo's CORE automated underwriting processes are geographic indicators, the effect of which is modern-day redlining. Borrowers seeking to refinance properties in Black-majority neighborhoods are deemed by the algorithm to be more of a lending risk than similarly situated white borrowers seeking to refinance property in non-Black-majority neighborhoods. Wells Fargo's algorithm effectuates this racial signaling by comparing address data provided in the borrower's Form 1003 to low and moderate income census tract data within Wells Fargo's internal systems, identifying borrowers with property in Black-majority neighborhoods as more of a lending risk than borrowers with property in white-majority neighborhoods. None of this is required by legitimate, race-neutral underwriting criteria.

107.   ***Post-Close Liquidity Requirements***.  Another overlay utilized by Wells Fargo's underwriting system are racially discriminatory requirements for post-close liquidity and severe restrictions on the sources of that liquidity. Before March 2020—and consistent with Fannie Mae and Freddie Mac underwriting guidelines—Wells Fargo generally required borrowers to be able to show 12 months of post-close reserves in order to close their loans. When COVID-19 hit, however, Wells Fargo programmed its system to only approve borrowers who could show 18 months of post-close liquidity for W-2 wage earners, and 24 months for self-employed K-1 borrowers. Wells Fargo further changed the definition of post-close liquidity to allow only 50% of the post-close liquidity to come from retirement accounts—often the greatest source of liquidity for borrowers.

108.   Not only was this huge increase not required by legitimate, race-neutral underwriting criteria, but it was a change that Wells Fargo knew would have a racially disparate impact. For example, an April 2020 JP Morgan Chase Institute

report found that for every dollar in liquid assets held by White Americans, Black Americans held 32 cents.[50]  While Black families have, on average, $2,000 or less in liquid savings, the typical White family has more than four times that amount.[51]

109.     ***Demographic Indicators***.  Another criteria utilized by Wells Fargo is, indeed, race itself.  For example, Wells Fargo's automated underwriting processes use Bayesian Improved Surname Geocoding ("BISG"),[52] a method that applies Bayes' Rule to predict the race or ethnicity of an individual utilizing the individual's surname and geocoded location, when that information is not otherwise provided. This process, which necessitates an internal determination by the Wells Fargo algorithm of which neighborhoods are associated with which racial group, works as follows:[53]

(i)        first, by calculating the prior probability of an individual – $i$ – being of a certain racial group $r$ given their surname:

$$Pr(R_i = r | S_i = s)$$

(ii)       next, by updating that probability with the probability of the individual $i$ living in a geographic location $g$ that is associated with a particular racial group $r$:

$$Pr(G_i = g | R_i = r)$$

(iii)      and finally, by using Bayes' Theorem to determine the probability that a particular borrower actually belongs to a particular racial or ethnic group.

$$Pr(R_i = r | S_i = s, G_i = g) = \frac{Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}{\sum_{i=1}^{n} Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}$$

---

[50] https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-race-report.pdf.

[51] *Id.*

[52] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation.cfm?file=309619.pdf.

[53] https://cran.r-project.org/web/packages/eiCompare/vignettes/bisg.html.

110.     By utilizing BISG in its automated underwriting processes, Wells Fargo's formulae utilize demographic criteria, including race, "imputed from databases of names and addresses" that associate neighborhoods with races to supplement Form 1003's race disclosures and assist in the overall racial assessment that allows the algorithm, improperly, to rely on race in the risk determination process.

111.     ***Uncorrected and Racially Biased Appraisals***.  Wells Fargo also considers uncorrected historical and current appraisal data from geographically differentiated locations in its refinance evaluation process.  Race-stratified differentials in appraisal data are well known to Wells Fargo and others in the banking industry.  Indeed, according to a March 23, 2022 report in *The Washington Post* citing Brookings Institution data, "homes in Black neighborhoods" (which, as already discussed, Wells Fargo identifies) routinely appraise at "23 percent less, on average, than those in comparable White neighborhoods – despite having similar neighborhood and property characteristics and amenities."[54]  Freddie Mac has similarly "found that 12.5 percent of appraisals for home purchases in Black neighborhoods and 15.4 percent in Latino neighborhoods came in below the contract price, compared with 7.4 percent of appraisals in white neighborhoods."[55]  The below-market appraisals intentionally skew the loan-to-value calculations against Black homeowners and prospective homeowners and serve as a tool for racial discrimination.

112.     Wells Fargo's automated underwriting system does not correct appropriately for these racial disparities in appraisals, and instead places undue reliance on an uncorrected data point that systematically undervalues properties in neighborhoods populated by non-white homeowners.  Wells Fargo's failure to

---

[54] https://www.washingtonpost.com/business/2022/03/23/home-appraisal-racial-bias/.

[55] *Id.*

correct for this well-known disparity in property values is not acceptable based on any legitimate underwriting criteria.

113.    ***Unjustified Increased FICO Requirements***.  Another algorithmic overlay utilized by the Wells Fargo CORE system is increased credit score requirements.  On information and belief, Wells Fargo imposed a higher minimum credit score than that required for an FHA loan or a Fannie Mae-backed loan. Accordingly, if Fannie Mae required a minimum credit score of 600, Wells Fargo would require a minimum score of 620.  The racial impact of this change, which was not justified by legitimate underwriting criteria, is clear.  In February 2021, it was reported that one in five Black consumers have FICO scores below 620, while one out of every 19 White consumers are in the sub-620 category.[56]

114.    A study by the Board of Governors of the Federal Reserve System analyzing federal mortgage data identified no "evidence [a]s to whether these tighter standards reduce loan risk to justify the disparate impact on minority denials they are associated with."[57]  And after controlling for relevant underwriting factors (debt-to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest standards on their white applicants [like Wells Fargo] tend to have the largest unexplained excess denials of minority applicants," including Black applicants.[58]

**E.    Awareness of Racial Bias Infecting Residential Lending Algorithms**

115.    In 2021, six Wells Fargo employees and officers with doctorate degrees published a study warning about the dangers of banking algorithms used by

---

[56] https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/.

[57] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo (July 2021), at 12, n.20, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663.

[58] *Id*. at 12.

Wells Fargo and its peers.  The study was published on arXiv, an open-access Cornell University archive of scholarly articles in the fields of computer science, quantitative finance, statistics, and economics, among others.[59]

116.    The authors of the study noted that "despite 'years of intense scrutiny, lending discrimination still persist[s]'" and that the arrival of flexible and automated AI/ML [artificial intelligence/machine learning] algorithms and "the availability of alternative sources of data are… exacerbating" this discrimination.[60]

117.    The potential sources of bias and discrimination are multifold. According to the study, historical data can often be skewed against specific groups, particularly where information on a protected group is limited.[61]  Moreover, biases in historical data can be exacerbated with the use of machine learning because algorithms, which automate feature engineering, can ignore the presence of surrogate variables for protected attributes.[62]

118.    In addition to data bias, the automated nature of machine learning algorithms "miss[es] the potential for correlated surrogate variables causing proxy discrimination."[63]  "Data bias together with poor optimization of algorithms can cause severe harm to protected groups."[64]

119.    Notably, the study concludes that the use of "black-box algorithms that are not well-understood" have "potential for serious harm" in the consumer lending space, and thus the models "must be continually monitored for disparate

---

[59] https://arxiv.org/.

[60] *Bias, Fairness, and Accountability with AI and ML Algorithms*, Nengfeng Zhou, Zach Zhang, Vijayan N. Nair, Harsh Singhal, Jie Chen, and Agus Sudjianto, Corporate Model Risk, Wells Fargo (May 6, 2021), available at: https://arxiv.org/ftp/arxiv/papers/2105/2105.06558.pdf, at page 4.

[61] *Id*. at 5.

[62] *Id*.

[63] *Id*. at 6.

[64] *Id*. at 7.

impact testing."[65]  A "[s]eparate fair lending group conducts periodic backtesting and trend analysis to validate that credit underwriting systems do not discriminate against applicants on a prohibited basis."[66]

**F.**   **Wells Fargo's COVID-19 Era Understaffing and Failure to Correct for Discriminatory Automated Lending Decisions**

120.   Wells Fargo is no doubt well aware that properly functioning banks, including its competitors, correct for biases within automated underwriting processes by employing trained underwriters and fair lending teams that are supposed to prevent the racially pernicious consequences that can arise from the unrestrained functioning of automated processes, which, if left unchecked, can systematically identify minority borrowers as undue credit risks.

121.   But Wells Fargo did not do this.  Instead, Wells Fargo made a business decision to centralize and emphasize automated processes at the expense of individualized lending decisions.  Wells Fargo's loan originators, processors, and underwriters were overworked—sometimes handling as many as ***three times*** the normal monthly volume expected of loan processors and underwriters—and systematically disincentivized to "check the work" of the CORE system.  Other changes were also made, such as to remove the ability of staff to make changes within Wells Fargo's automated system that would result in a greater likelihood of an application being approved.

122.   Given the racially signaled functioning of Wells Fargo's algorithm, the effect of this was clear:  nobody was available to provide a check on the racially biased lending decisions taking place at Wells Fargo, which resulted in delays, denials, and the systematic application of higher interest rates to non-white borrowers to an extent that, in many cases, far exceeded anything in the industry.

---

[65] *Id*. at 13.

[66] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation. cfm?file=309619.pdf.

**G.      Wells Fargo's Knowledge of the Disparate Impact on Racial and Ethnic Minorities**

123.      Not providing a human check on its lending practices did not, however, mean that Wells Fargo was unaware of the discriminatory impact of its practices.  On the contrary, senior Wells Fargo executives were fully aware of their disparate impact.

124.      For example, throughout the relevant time period, Wells Fargo generated a "Diversity Market Segments Report" that was distributed companywide via electronic mail distribution on a monthly basis.  Comprised of Wells Fargo's nationwide lending statistics, the report included, among other things, the racial breakdown of Wells Fargo's lending, the percentage of loans being made in certain locations and by certain originators and offices, whether Wells Fargo met the Community Reinvestment Act[67] requirements, and the percentage of loans that were made to first-time homebuyers.  These reports were reviewed and discussed during monthly regional calls in which employees were congratulated on their efforts as reflected therein.

125.      Despite these monthly reports providing a real-time exposé of the significant adverse effect of its overlays on Black and other non-white applicants, Wells Fargo did nothing.

**H.      Wells Fargo's Algorithm Has a Disparate Impact on Minority Homebuyers and Homeowners**

126.      The above practices, policies, and procedures are arbitrary and artificial and unnecessary for legitimate underwriting.  The vast difference between refinancing approval rates of Wells Fargo for non-white homeowners and

---

[67] The Community Reinvestment Act, enacted in 1977, requires the Federal Reserve and other federal banking regulators to encourage financial institutions to help meet the credit needs of the communities in which they do business, including low- and moderate-income neighborhoods.

prospective homeowners as compared to any other lending institution's approval rates negates any possible legitimate objective.

127.    As noted, the above intentional practices also have a disproportionately adverse effect on non-white individuals seeking to buy a home or seeking other home loan products.  Persons falling within any one of the ethnic or racial aggregate categories and subcategories set forth in "Regulation C" (12 C.F.R. 1003), other than "White, Not Hispanic or Latino" are members of a protected class.

128.    Wells Fargo's practices directly harmed prospective homeowners within the Class by preventing them from obtaining favorable loan terms in order to buy a home at prevailing market rates, causing them to either accept higher rates throughout their mortgage, or fail to obtain a mortgage from Wells Fargo altogether.

129.    Wells Fargo's practices directly harmed existing homeowners within the Class by forcing them to pay higher interest rates while applications were pending, by forcing them to pay higher interest rates when applications were completed, and/or by denying refinancing and other home loan applications.  In the absence of these policies, these homeowners would not have had to pay higher rates or face rejection of their refinancing applications.

130.    The disparity between Wells Fargo's treatment of white homeowner and prospective homeowner applicants and non-white homeowner and prospective homeowner applicants is significant and, in some respects, shocking.

131.    In 2020, for instance, Wells Fargo approved approximately 67.1% of white borrowers who applied for a mortgage, compared to only 51.8% of Black and/or African American applicants.

132.    HMDA data discloses that Wells Fargo **_denied over 50%_** of the Black homeowners seeking to refinance in 2020, and **_denied just under 50%_** of the Black homeowners seeking to refinance in 2021.  No other major lending institution denied the refinancing applications of Black Americans at such stunning rates.  The numbers tell a shameful story for which there is no legitimate business explanation.

133.     HMDA data from eight million refinancing applications filed in 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as white borrowers in the lowest-income bracket."[68]  White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[69]



**Higher Income, Same Approval**
Wells Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for all but the highest-income Black applicants.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

134.     Non-white applicants in supposedly less desirable—or majority-minority—Metropolitan Statistical Areas ("MSAs") fared worse.  For example, in Fulton County, where the population was 43.6% Black in 2020,[70] Wells Fargo approved fewer than 43% of refinancing applications completed by Black

---

[68] *Id.*
[69] *Id.*
[70] https://data.census.gov/cedsci/table?g=0500000US13121&tid=ACSDP5Y2020 .DP05.

homeowners, the lowest approval rate among major lenders.[71]  In the Chicago/Naperville/Evanston/Arlington Heights MSA, Wells Fargo approved and originated loans for less than 48% of all loan applications completed by Latino and Hispanic prospective borrowers, compared with an approval and origination rate of almost 81% for JP Morgan Chase.[72]  And in the Los Angeles/Long Beach/Glendale MSA, Wells Fargo approved and originated loans for less than 68% of loan applications completed by Asian American prospective borrowers, compared with an approval and origination rate of over 85% across all other lending institutions.[73]

135.    These numbers were mirrored in the nationwide data.  In 2020, Wells Fargo approved only *47%* of residential refinance applications submitted by Black applicants, *53%* of residential refinance applications submitted by applicants identified as Hispanic and/or Latino, and *67%* of residential refinance applications submitted by Asian-American applicants, compared with *71%*, *79%*, and *85%* approval rates across all other lenders.

136.    And even for those Black applicants whose loans were ultimately approved, they faced delays that white applicants living in predominately white neighborhoods did not, causing them damages through continued higher mortgage rates as they awaited loan approval.  In some cases, Wells Fargo officers simply told Black applicants living in predominately Black neighborhoods that "perhaps the area is not eligible" for quick evaluations of refinancing applications.[74]

137.    And because Wells Fargo designed an application process that is disproportionately difficult for minority homeowners to complete, and because it engages in a practice of "soft denials," where loan officers leave applicants hanging or encourage them to look elsewhere, 27% of all Black homeowners who began a

---

[71] https://ffiec.cfpb.gov/data-browser/data/2020
[72] *Id.*
[73] *Id.*
[74] *Id.*

refinance application with Wells Fargo withdrew it.[75]  On information and belief, if Black applicants who were unable to complete the mortgage loan process are added to those who did, Wells Fargo approved less than one-third of the Black Americans who sought a refinancing loan in 2020.

138.    In direct contradiction of the data and its hidden practices and uniform policies, Wells Fargo publicly professes a commitment to diversity and equality.  However, Wells Fargo intentionally and uniformly fails to disclose to minority applicants that it engages in redlining because Wells Fargo knows this is material information that would cause minority applicants to seek mortgage and refinancing loans from its competitors.  Wells Fargo collects significant application fees and appraisal fees as part of each original purchase mortgage loan and refinancing application, even if the application is ultimately denied.  Wells Fargo does not want to lose this revenue source, which is partly why it intentionally fails to disclose its redlining practices to minority applicants.  Plaintiffs and the Class would not have agreed to pay these fees had Wells Fargo properly disclosed its redlining practices.

## I.    PLAINTIFFS' HARM IS TYPICAL OF THE CLASS

139.    The uniformity of Wells Fargo's discriminatory practices in connection with its algorithm and otherwise means that Plaintiffs' experiences are emblematic of the experiences of minority Americans all over the country.  As Wells Fargo executive Peter Strawser declared in documents submitted to this Court, Wells Fargo's underwriters "are in the same organization within Wells Fargo" and apply "similar policies, processes and procedures to each individual loan or financing application."[76]

140.    Shaia Beckwith Simmons is an African American resident of Florida.

---

[75] *Id.*

[76] Declaration of Peter Strawser, *Braxton v. Wells Fargo Bank, N.A.*, No. 4:22-cv-1748 (N.D. Cal. Aug. 26, 2022) (ECF No. 53-1).

Ms. Simmons obtained a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

141.    Ms. Simmons is a well-qualified African American borrower who obtained a home mortgage loan from Wells Fargo in 2009 and refinanced it at a lower interest rate in 2013.  Ms. Simmons is a model homeowner who has timely made her monthly payments without incident.

142.    During the COVID-19 pandemic, as required by the CARES Act, Wells Fargo offered existing home mortgage borrowers the option to defer their payments.  Ms. Simmons accepted Wells Fargo's deferment option, which allowed her to restructure her loan to defer monthly payments during the pandemic and instead make those monthly payments at the end of her loan.

143.    After several months of approved deferments, Ms. Simmons promptly resumed making her mortgage payments in full, as she had done for decades without issue.  Yet, consistent with its nationwide discriminatory practices, Wells Fargo maliciously and unlawfully instituted foreclosure proceedings against Ms. Simmons without prior notice, asserting without justification that Ms. Simmons was in default for failure to make mortgage payments during her deferment.

144.    Consistent with its nationwide practices of predatory lending to extract wealth from Black Americans, Wells Fargo presented Ms. Simmons with an ultimatum:  she could renegotiate her loan, potentially at a higher interest rate that would cost her many thousands of dollars over the remaining life of the loan, or Wells Fargo would persist with the unjustified foreclosure to take her home away from her and resell it in a booming market.  Ms. Simmons refused to renegotiate her loan and is resisting the wrongful foreclosure, which remains pending.

145.    Winfred Thomas is a minority homeowner who owns equity in a home located in Hogansville, Georgia.  In December 2020, Mr. Thomas applied to Wells Fargo to refinance his Wells Fargo mortgage, and his application was denied in 2021.  Shortly thereafter, Mr. Thomas applied to refinance his Wells Fargo

1    mortgage with Veteran's United Home Loans.  Mr. Thomas's application was

2    approved by Veteran's United Home Loans for an interest rate 3.2% lower than the

3    5.5% rate he had been paying to Wells Fargo.

4        146.    Michelle Sims is a minority homeowner who owns equity in a home

5    located in Desoto, Texas.  In December of 2021, Ms. Sims applied for a Wells Fargo

6    home refinance and her application was denied in early 2022.

7        147.    Alfred Pope is a minority homeowner who owns equity in a home

8    located in Chesapeake, Virginia.  Mr. Pope applied for a Wells Fargo home

9    refinancing in September of 2021, and his application was denied.

10       148.    Chantelle Harris is a minority homeowner who owns equity in a

11   house located in Somerset, New Jersey.  Ms. Harris applied for a Wells Fargo

12   refinance in July of 2021, and her refinance was denied despite having been a Wells

13   Fargo customer for more than 10 years with a credit score over 700 and consistent

14   income.

15       149.    Sharita Fanning is Black and a well-qualified home borrower. Indeed,

16   Fanning has owned her home since 1997 and never missed a mortgage payment.

17       150.    In 2021, Ms. Fanning sought to take advantage of the considerable

18   equity in her home as a long-time Wells Fargo customer. At the time, Ms. Fanning's

19   home was valued at over $240,000; her mortgage was less than $25,000; and she

20   sought a loan of only $15,000 for modest home improvements against her home

21   equity. Wells Fargo told Ms. Fanning instead that she must refinance her home and

22   more than double her mortgage to approximately $55,000, and she agreed to do so.

23   Rather than grant her refinancing application in a timely manner, and pursuant to its

24   discriminatory practices, Wells Fargo refused to accept Ms. Fanning's application

25   and demanded more and more information, including information she previously

26   provided. At least four separate Wells Fargo loan officers contacted Ms. Fanning for

27   documents she already submitted. Wells Fargo eventually refused to approve her

28   application, forcing her to start the process all over again. Ms. Fanning applied again

and experienced the same tactics; Wells Fargo questioned Ms. Fanning's credibility and documentation. Only after she was forced to attain counsel did Wells Fargo finally approve her refinancing, and even then, after extensive delays and on worse terms because of her race. Wells Fargo has also provided Ms. Fanning with inaccurate and misleading information and refused to answer basic questions regarding her loan.

151.    As a result of Wells Fargo's racially discriminatory lending practices, Ms. Fanning incurred substantial costs, delays, and inconveniences. Among other things, she and her son were forced to leave her home for repairs and incur additional housing and other costs and suffer emotional distress as a result of Wells Fargo's actions.

152.    The stories of non-white Americans whose applications were delayed or denied are legion.  Each of these non-white Americans, who are members of the putative Class, have had experiences that are typical of the Plaintiffs, regardless of their race and ethnicity.  Thus, their claims are all substantially similar and congruent, regardless of their individual race or ethnicity, such that the Plaintiffs are qualified to represent their interests as they have claims and interests typical of those putative Class members.

## V.    CLASS ALLEGATIONS

153.    Plaintiffs bring this action on behalf of themselves and a potential class of similarly situated Wells Fargo residential original purchase mortgage, refinance and other home mortgage loan applicants falling within any one of the ethnic or racial aggregate categories and subcategories set forth in "Regulation C" (12 C.F.R. 1003), other than "White, Not Hispanic or Latino" (hereinafter, "Minority Applicants").

154.    Each and every claim alleged in this case is also alleged on behalf of every member of the Class.

### A.     Class Definition

155.     The Class includes all Minority Applicants in the United States who, from January 1, 2018 through the present (the "Class Period"), submitted an application for a original purchase or other home mortgage loan or to refinance or modify a home mortgage loan through Defendants that was (i) denied; (ii) approved at higher interest rates or subject to less favorable terms as compared to similarly situated non-Minority Applicants; or (iii) processed at a rate slower than the average processing time of applications submitted by similarly situated non-Minority Applicants.  Excluded from the Class are (a) Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, (b) counsel representing Plaintiffs and their staff, and (c) any judicial officers assigned to this case and their staff.

156.     Class certification is authorized under Federal Rule of Civil Procedure 23 and applies to claims for injunctive and equitable relief, including restitution, under Rule 23(b)(2), for monetary damages under Rule 23(b)(3), and for liability issues under Rule 23(c)(4).

157.     The number of persons who fall within the definitions of the Class are so numerous and geographically dispersed as to make joinder of all members of the Class or Subclass in their individual capacities impracticable, inefficient, and unmanageable, and without class-wide relief, each member of the Class would effectively be denied his, her, or their rights to prosecute and obtain legal and equitable relief based on the claims and allegations averred in the Complaint.

158.     Plaintiffs, as detailed below, can fairly and adequately represent the proposed Class.  In the alternative, Plaintiffs can act as the representatives of the below subclasses.

### B.     Proposed Subclasses

159.     Additionally, or in the alternative, pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs bring this action on behalf of the following subclasses:

160.    **The Denial Subclass:** All Members of the Class whose applications were denied but would have been approved had such applications been submitted by similarly situated non-Minority Applicants.

161.    **The Delayed, Higher Rate or Less Favorable Terms Subclass:** All Members of the Class whose applications were (a) processed at a rate slower than that of the average processing time of applications submitted by non-Minority Applicants; or (b) whose applications were eventually approved, but at higher interest rates or subject to less favorable terms than similarly situated non-Minority Applicants.

162.    Depending on the evidence developed during discovery, Plaintiffs reserve the right to amend the definitions of the Classes and Subclasses and/or seek the certification of further subclasses based on race, ethnicity or the type of transactions at issue (e.g., original purchase mortgage loans, refinancing or modification).

**C.     Numerosity and Ascertainability**

163.    **Numerosity**.  While the exact numbers of the members of the Class and Subclasses are unknown to Plaintiffs at this time, membership in the Class and Subclasses may be ascertained from the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class and Subclasses include thousands of members.  Therefore, the Class and Subclasses are sufficiently numerous that joinder of all members of the Class and Subclasses in a single action is impracticable under Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims through a class action will be of benefit to the parties and the Court.

164.    **Ascertainability**.  The names and addresses of the members of the Class and Subclasses are in Defendants' possession and/or contained in Defendants' records.  Notice can be provided to the members of the Class and Subclasses through direct mailing, email, publication, or otherwise using techniques and a form

1  of notice similar to those customarily used in consumer class actions arising under

2  state and federal law.

3  **D.    Commonality and Predominance**

4  165.    This matter involves common questions of law and fact which

5  predominate over any question solely affecting individual Class Members.

6  166.    The common questions of law and fact include, but are not limited to:

7  • Whether Defendants systematically discriminated against Class
   Members on account of their race or ethnicity;

8
9  • Whether Defendants' underwriting algorithms and machine
   learning programs were racially biased and led to unfairly
   discriminatory credit policies that harmed Minority Applicants;

10
11  • Whether the disparate impact of Defendants' underwriting
    algorithm and machine learning programs on Minority
12  Applicants was known to Defendants during the relevant time
    period, leading to the uniform disparate treatment of those
13  Minority Applicants;

14  • Whether Minority Applicants' residential loan applications were
    processed at a rate slower than the average processing time for
15  applications submitted by non-Minority Applicants;

16  • Whether Minority Applicants' residential loan applications were
    denied when a similarly situated non-Minority Applicant would
17  have been approved;

18  • Whether Minority Applicants' resulting residential loans were
    made at higher interest rates as compared to similarly situated
19  non-Minority Applicants;

20  • Whether Defendants selected disproportionately white areas for
    rapid refinancing evaluation and disproportionately Minority
21  Applicant areas for increased scrutiny;

22  • Defendants' knowledge of their practices and the discriminatory
    impact on Minority Applicants;

23  • Whether Defendants' lending policies and practices had an
    unlawful disparate impact against Minority Applicants;

24
25  • Defendants' consumer disclosures and omissions;

26  • Defendants' internal approval processes;

27  • Defendants' appraisal policies; and

28

- Whether Defendants engaged in discriminatory practices with malice or reckless indifference to the federally protected rights of Minority Applicants.

167. **Predominance**. Class action status is warranted under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to the members of the Class and Subclasses predominate over any questions affecting only individual members. The interests of the members of the Class and Subclasses in individually controlling the prosecution of separate actions are theoretical and not practical. Prosecution of this action through multiple Class Representatives would be superior to individual lawsuits. Plaintiffs are not aware of any potential difficulty in the management of this litigation that should preclude its maintenance as a class action.

**E.    Typicality and Adequacy**

168. Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were injured as a result of substantially similar conduct by Defendants.

169. Plaintiffs are adequate Class Representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent, and Plaintiffs have retained counsel that will represent separate subclasses if any conflicts arise based on race, ethnicity, or the type of transaction at issue. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

**F.    Superiority**

170. A class action is the superior method for the fair and efficient adjudication of this matter because the damages and other harms suffered by Plaintiffs and the other Class Members are small compared to the burden and expense of individual litigation. Thus, it would be impractical, if not impossible, for

individual plaintiffs to seek redress against Defendants for the harms suffered.

171.    Individual litigation of these harms would also be inefficient for the court system and would create a risk of inconsistent or contradictory rulings and judgments.

172.    No unusual circumstances exist that would make this matter more difficult to manage than a typical class action.

**G.    Injunctive Relief**

173.    Plaintiffs also seek to represent a class under Rule 23(b)(2) to obtain final injunctive relief forcing Wells Fargo to cease and desist its current discriminatory practices.

**H.    Issue Certification**

174.    As an alternative to Rule 23(b)(2) and/or 23(b)(3), Plaintiffs seek issue certification under Rule 23(c)(4) of liability issues common to Class members.

<u>**COUNT I**</u>

**VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

**15 U.S.C. § 16901, *et seq.***

175.    Plaintiffs, on behalf of themselves and all those similarly situated, incorporate by reference each and every paragraph above as though fully realleged herein.

176.    The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

177.    The Equal Credit Opportunity Act applies to applications for residential loans for original purchase mortgages and mortgage refinancing) like those of the Plaintiffs and others similarly situated.  Plaintiffs and those similarly situated applied for credit by seeking to finance their home purchases or refinance their existing home loans.

178.    Defendants are creditors because they regularly extend, renew, and

continue issuances of credit.

179.    Defendants' consistent delays, roadblocks, feigned difficulties, and denials of residential loan applications submitted by Minority Applicants constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

180.    Plaintiffs and all those similarly situated were harmed by Defendants' conduct.

181.    On behalf of themselves and the Class they seek to represent, Plaintiffs request the relief set forth below.

**<u>COUNT II</u>**

**RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, 42 U.S.C. § 3601, *et seq.***

182.    Plaintiffs incorporate by reference each and every paragraph above as though fully realleged herein.

183.    The Fair Housing Act makes it unlawful to discriminate against designated classes of individuals in residential real estate transactions, including residential lending.

184.    Plaintiffs and others similarly situated sought to engage in residential real estate transactions with Defendants.

185.    Plaintiffs and others similarly situated are members of a protected class under the Fair Housing Act.

186.    Defendants discriminated against Plaintiffs and others similarly situated by not approving residential loan applications on the same timeline as those of similarly qualified applicants who were not members of a protected class, by causing applicants to withdraw their applications due to roadblocks and feigned difficulties, or by denying residential loan applications.

187.    Defendants refused to transact business with Plaintiffs and those similarly situated during the Class Period and at the same time did transact business with White, Not Hispanic or Latino applicants with similar qualifications.

188.     Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for residential loan applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were charged higher interest rates than similarly qualified applicants, and/or because their applications were denied.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

189.     Plaintiffs incorporate by reference each and every paragraph above as though fully realleged herein.

190.     Under 42 U.S.C. § 1981, persons are guaranteed the same right to make and enforce contracts, regardless of race.  The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, as well as all other aspects of a contractual relationship.

191.     By seeking to refinance their home loans and submitting an application to Defendants, Plaintiffs and others similarly situated sought to "make and enforce" contracts with Defendants.

192.     Plaintiffs and those similarly situated were denied their right to make and enforce contracts when Defendants offered to them terms less favorable than those offered to members of a different race, delayed or frustrated their application process, and/or by denied their applications.

193.     Plaintiffs and those similarly situated were harmed by Defendants' denial of their rights to make and enforce contracts.

## COUNT IV

### VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,
### CALIFORNIA CIVIL CODE §51

194.     Plaintiffs incorporate by reference each and every paragraph above as though fully realleged herein.

195.     The Unruh Civil Rights Act provides that all persons within the State of California are free and equal no matter their race and are entitled to full and equal treatment in all business establishments.

196.     The Unruh Civil Rights Act thus prohibits discrimination of any kind against any person in any business establishment.

197.     Defendants are California based business establishments under the Unruh Civil Rights Act.

198.     Plaintiffs and other individuals similarly situated were denied full and equal treatment as required by the Unruh Civil Rights Act when Defendants refused to offer them residential loans on the same terms as non-Minority Applicants.

199.     Plaintiffs and other individuals similarly situated were harmed by Defendants' refusal to transact business with them.

## COUNT V

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

200.     Plaintiffs incorporate by reference each and every paragraph above as though fully realleged herein.

201.     The California Unfair Competition Law (the "UCL") prohibits "unfair competition" which is defined as "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Because the definition is framed in the disjunctive, a business act or practice need only meet one of the three criteria in order to be considered unfair competition.  The UCL was intentionally framed in broad, sweeping language because it was impossible to contemplate the "innumerable new schemes which the fertility of man's invention would contrive."

202.     The UCL provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction" and that "[t]he court may make such orders or judgments…as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

1   Cal. Bus. & Prof. Code § 17203(a).

2        203.    Defendants are "persons" within the UCL's definition, which includes

3   any 'natural persons, corporations, firms, partnerships, joint stock companies,

4   associations and other organizations of persons." Cal. Bus. & Prof. Code § 17201.

5        204.    Defendants' conduct described herein and its discriminatory policies

6   were made, disseminated, and orchestrated from Defendants' principal place of

7   business in California.

8        205.    Defendants' conduct described herein constitutes an "unlawful"

9   business practice, as the business acts described above constitute predicate

10   violations of the laws identified herein; namely, the Equal Credit Opportunity Act,

11   the Fair Housing Act, 42 U.S.C. § 1981, and the Unruh Civil Rights Act.

12        206.    Defendants' conduct described herein also constitutes a "fraudulent"

13   business practice. Defendants uniformly fail to disclose and inform Minority

14   Applicants that Defendants engage in redlining that will negatively impact Minority

15   Applicants' chances of having their loan or refinance application approved, the

16   terms of their loans, and/or the time it will take for their application to be reviewed

17   and approved. Defendants had a duty to disclose this information because: (1) it is

18   material and important information that would impact a Minority Applicant's

19   decision to apply for a mortgage or seek to refinance an existing mortgage with

20   Defendants over other banks and lenders; (2) Defendants have exclusive knowledge

21   of their redlining practices; and (3) these practices could not be reasonably

22   discovered by Minority Applicants. This information is also contrary to Minority

23   Applicants' reasonable expectations that Defendants would not engage in illegal

24   redlining and discrimination. By failing to disclose this information, Minority

25   Applicants were fraudulently induced to pay application and related fees to

26   Defendants that the Minority Applicants would not have paid had they known the

27   true information.

28        207.    Defendants' conduct described herein also constitutes an "unfair

business" practice, as it is likely to deceive the public and it has far less utility than its potential harm.  In direct contradiction of its public pronouncements regarding a commitment to diversity and equality, Wells Fargo employed practices and policies that led to racial and ethnic bias against Minority Applicants, which resulted in disparate approval rates for residential loan applications.  Wells Fargo effectively engaged in "digital redlining" and knew this was material information that would cause Minority Applicants to submit their original purchase mortgage loan and refinance applications to its competitors.  Wells Fargo collects significant application fees and appraisal fees as part of each original purchase mortgage loan and refinancing application, even if the application is ultimately denied.  Wells Fargo did not want to lose this revenue source, which is partly why it did not disclose its true practices to Minority Applicants and provided false statements and/or half-truths with respect to its commitment to diversity and equality in its mortgage lending practices.  Plaintiffs and the Minority Applicants would not have agreed to apply for residential loans with Wells Fargo, or pay the associated application and appraisal fees, had Wells Fargo properly disclosed and reported all material facts related to its residential loan application process.

208.    Defendants' mortgage refinancing business is a business activity under the UCL.

209.    Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for residential loan applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were charged higher interest rates than similarly qualified applicants, and/or because their applications were denied.

210.    Plaintiffs and the Class are entitled to restitution of all fees paid by them based on Defendants' unlawful, fraudulent, and unfair business practices, as well as injunctive relief to protect the public from these practices in the future, as the

damage caused thereby is difficult (if not impossible) to calculate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Certify the 23(b)(2), 23(b)(3) or 23(c)(4) classes outlined above;

b.  Designate Plaintiffs as Class Representatives and designate undersigned counsel as lead Class Counsel;

c.  Find that Defendants' acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh Civil Rights Act, and the California UCL;

d.  Find that Defendants have engaged in a pattern and practice of racial discrimination resulting in the harm to Plaintiffs and class members as described above;

e.  Award Plaintiffs and all others similarly situated restitutionary relief, together with compensatory and punitive damages;

f.  Order Defendants to reform loans and/or extend loans to Minority Applicants on the same terms afforded to non-Minority Applicants.

g.  Award Plaintiffs and all others similarly situated injunctive and equitable relief;

h.  Award Plaintiffs and all others similarly situated prejudgment interest and attorney's fees, costs, and disbursements; and

i.  Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable.


DATED:  March 24, 2023                    ELLIS GEORGE CIPOLLONE
                                          O'BRIEN ANNAGUEY LLP
                                               Dennis S. Ellis


                                          By:    /s/ Dennis S. Ellis
                                                    Dennis S. Ellis
                                          Interim Lead Class Counsel

**APPROVED AS TO FORM**

DATED:  March 24, 2023                    FRANK, SIMS & STOLPER LLP
                                               Jason M. Frank
                                               Scott H. Sims
                                               Andrew D. Stolper

                                          By:    /s/ Jason M. Frank
                                                    Jason M. Frank
                                          Attorneys for Plaintiffs Aaron Braxton, Gia
                                          Gray, Bryan Brown and Paul Martin


**APPROVED AS TO FORM**

DATED:  March 24, 2023                    BEN CRUMP, PLLC
                                               Benjamin L. Crump
                                               Nabeha Shaer

                                          By:    /s/ Benjamin L. Crump
                                                    Benjamin L. Crump
                                          Attorneys for Plaintiffs Christopher Williams,
                                          Sam Albury and Shaia Beckwith Simmons

1

**APPROVED AS TO FORM**

2

DATED:  March 24, 2023       SANI LAW, APC

3                                     Sam Sani

4                              By:    */s/ Sam Sani*

5                                      Sam Sani

6                           Attorney for Plaintiffs Christopher Williams,
Sam Albury and Shaia Beckwith Simmons

7

**APPROVED AS TO FORM**

8

DATED:  March 24, 2023       STOWELL & FRIEDMAN, LTD.

9                                    Linda D. Friedman
                                   Suzanne E. Bish

10

11                            By:    */s/ Linda D. Friedman*

12                                    Linda D. Friedman
                          Attorneys for Plaintiffs Christopher Williams,
Sam Albury, Shaia Beckwith Simmons

13

**APPROVED AS TO FORM**

14

DATED:  March 24, 2023       EVANGELISTA WORLEY LLC

15                                    James M. Evangelista

16                              *By:*    */s/ James M. Evangelista*

17                                    James M. Evangelista

18                           Attorney for Plaintiffs Ifeoma Ebo, Terah
Kuykendall-Montoya

19

20

**APPROVED AS TO FORM**

21

DATED:  March 24, 2023       MILBERG COLEMAN BRYSON PHILLIPS

22                           GROSSMAN, PPLC
                                   Alex R. Straus

23                                    Jennifer Kraus Czeisler

24                              By:    */s/ Alex R. Straus*

25                                    Alex R. Straus

26                           Attorneys for Plaintiffs Ifeoma Ebo, Terah
Kuykendall-Montoya

27

28

**APPROVED AS TO FORM**

DATED:  March 24, 2023

DANN LAW FIRM
    Marc E. Dann
    Brian D. Flick

By:    /s/ Marc E. Dann
            Marc E. Dann
Attorneys for Plaintiffs Ifeoma Ebo and Terah
Kuykendall-Montoya

**APPROVED AS TO FORM**

DATED:  March 24, 2023

ZIMMERMAN LAW OFFICES, P.C.
    Thomas A. Zimmerman, Jr.

By:    /s/ Thomas A. Zimmerman, Jr.
            Thomas A. Zimmerman, Jr.
Attorney for Plaintiffs Ifeoma Ebo and Terah
Kuykendall-Montoya

**APPROVED AS TO FORM**

DATED:  March 24, 2023

GUSTAFSON GLUEK PLLC
    Daniel Nordin
    Abou B. Amara, Jr.

By:    /s/Abou B. Amara, Jr.
            Abou B. Amara, Jr.
Attorneys for Plaintiffs Elretha Perkins and
Laronica Johnson

**ATTORNEY ATTESTATION**

**Attestation under N.D. Cal. L.R. 5-1(h)**:  the ECF filer of this document attests that all of the other signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document.

*/s/ Dennis S. Ellis*
Dennis S. Ellis