**MCGUIREWOODS LLP**
AVA E. LIAS-BOOKER *(Pro Hac Vice)*
aliasbooker@mcguirewoods.com
ALICIA A. BAIARDO (SBN 254228)
abaiardo@mcguirewoods.com
JASMINE K. GARDNER *(Pro Hac Vice)*
jgardner@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, California 94111
Telephone: (415) 844-9944
Facsimile: (415) 844-9922

**WINSTON & STRAWN LLP**
AMANDA L. GROVES (SBN 187216)
agroves@winston.com
KOBI K. BRINSON *(Pro Hac Vice)*
kbrinson@winston.com
STACIE C. KNIGHT *(Pro Hac Vice)*
sknight@winston.com
333 S. Grand Avenue, 38th Floor
Los Angeles, California 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

*Attorneys for Defendant Wells Fargo Bank, N.A.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Wells Fargo Mortgage Discrimination Litigation* | CASE NO. 3:22-cv-00990-JD |
| | The Hon. James Donato |
| | **NOTICE OF PENDENCY OF OTHER ACTION FILED BY SHAIA SIMMONS IN THE NORTHERN DISTRICT OF FLORIDA** |

Pursuant to Local Rule 3-13, Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co. ("Defendants") provide notice to this Court of a new action now pending in the Northern District of Florida: *Simmons v. Wells Fargo Bank, N.A. et al.*, 4:24-cv-00089-AW-MAF (N.D. Fla.) ("*Simmons* Action"). The *Simmons* action rehashes the same allegations as to Plaintiff Simmons's loan as pleaded in this Court, the same subject matter at issue and substantially the same parties as the above-captioned action.

Shaia Beckwith Simmons ("Plaintiff Simmons") filed the *Simmons* Action in the Northern District of Florida on February 22, 2024.[1]  Pursuant to Local Rule 3-13(b)(2), a true and correct copy of the Complaint in the *Simmons* Action is attached hereto as **Exhibit A**. Simmons alleges she filed the *Simmons* Action "out of an abundance of cation because she has reason to believe the consolidated class action may not cover her individual claims related to Wells Fargo's [allegedly] racially discriminatory treatment."

The only Plaintiff in the *Simmons* Action, Shaia Beckwith Simmons, is also an "illustrative" Plaintiff in this action, a member of this action's putative class, and a former putative class representative prior to the consolidation of cases here. The allegations she asserts in the *Simmons* Action are the same allegations that she relies upon in this action as "harm . . . typical of the class."

As a result, on March 8, 2024, Defendants filed a Motion to Dismiss the *Simmons* Action based upon the "first-to-file" rule. Alternatively, Defendants moved for the Simmons Actions to be transferred to this Court based upon both the "first-to-file" rule and 28 U.S.C. § 1404(a) (the "Motion"). A true and correct copy of the Motion is attached hereto as **Exhibit B**. Defendants' Motion is currently pending before the Honorable Allen Winsor in the Northern District of Florida.

### **DUPLICATION OF THE CURRENT PROCEEDINGS AND *SIMMONS* ACTION**

The allegations that form the basis of the *Simmons* Action have been asserted twice before in complaints filed with this Court.

---

[1] Despite inviting Defendants to accept service on February 29, 2024, Plaintiff served Defendants the same day.

On April 14, 2022, Plaintiff Simmons was named as a putative class representative in the *Williams* Amended Complaint filed against Defendants in the Northern District of California. *Williams v. Wells Fargo, N.A.*, 3:22-cv-00990-JD, ECF No. 22) (N.D. Cal.). In the *Williams* Amended Complaint, Plaintiff Simmons alleged she was subjected to the same racial discrimination by Wells Fargo's mortgage lending processes as she alleges in the newly filed *Simmons* Action. Ex. A ¶¶ 33-42 *cf. Williams*, ECF No. 22, ¶¶ 36-43. The *Williams* Amended Complaint included Plaintiff Simmons' "individual and class complaints" against Defendants. *Williams*, ECF No. 22, ¶ 29. In the *Williams* Amended Complaint, Plaintiff Simmons asserted four claims against Defendants for violation of: (1) the Equal Credit Opportunity Act ("ECOA"), (2) 42 U.S.C. § 1981, (3) 42 U.S.C. § 1982, and (4) the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. These four claims, based upon the same factual allegations, are also asserted against Defendants in the newly filed *Simmons* Action (along with others). Ex. A ¶¶ 44-62 *cf. Williams*, ECF No. 22, ¶¶ 52-74. Indeed, the same law firm that represented Simmons in *Williams*, Ben Crump, PLLC, also filed the latest *Simmons* Action. Ex. A at 24 *cf. Williams*, ECF No. 22, at 19.

In January 2023, this Court consolidated *Williams* with five other putative class action lawsuits into *In re Mortgage Lending Discrimination*, pending before this Court. ECF No. 102. Following consolidation, an amended and consolidated complaint ("Consolidated Amended Complaint") was filed on March 24, 2023 with Dennis Ellis of Ellis George named as Interim Lead Counsel. ECF No. 114.

The Consolidated Amended Complaint identifies Plaintiff Simmons as a member of the putative class under Federal Rule of Civil Procedure 23, describes Plaintiff Simmons' experience as being "typical of the class" of consumers purportedly injured in this litigation, and includes allegations specific to Plaintiff Simmons and her loan that mirror those alleged in the *Simmons* Action. Consolidated Amended Complaint, at Heading I ("Plaintiffs 'Harm is Typical of the Class"); ¶ 139-144 (describing how Simmons' allegations are illustrative of the putative class' purported harm).

The Consolidated Amended Complaint defines its proposed class as: "all Minority Applicants in the United States who, from January 1, 2018 through the present (the "Class

Period"), submitted an application for a original purchase or other home mortgage loan or to refinance or modify a home mortgage loan through Defendants that was (i) denied; (ii) approved at higher interest rates or subject to less favorable terms as compared to similarly situated non-Minority Applicants; or (iii) processed at a rate slower than the average processing time of applications submitted by similarly situated non-Minority Applicants." *Id*. ¶ 155. Likewise, in the *Simmons* Action, Plaintiff Simmons purports to recover based on her injuries as a result of Defendants' "racially discriminatory residential mortgage and lending policies and practices." Ex. A ¶ 6. Tellingly, in both cases, the same claims for violation of: (1) the Equal Credit Opportunity Act, (2) 42 U.S.C. § 1981 and (3) the Fair Housing Act, among others, are brought against Defendants. *Compare* Consolidated Amended Complaint, ¶¶ 175-193, *with* Ex. A ¶¶ 41-62.

**THE ALLEGATIONS ASSERTED BY SIMMONS IN THE *SIMMONS* ACTION ARE THE SAME ALLEGATIONS SHE ASSERTS IN THE CONSOLIDATED AMENDED COMPLAINT**

In the *Simmons* Action, Plaintiff Simmons alleges she was subjected to the same racial discrimination by Wells Fargo's mortgage lending processes as she alleges in the *In re Mortgage Lending Discrimination* matter pending before this Court. Ex. A ¶¶ 33-42 *cf*. Consolidated Amended Complaint ¶¶ 140-144.

In both cases, Plaintiff Simmons alleges she was injured as part of Defendants' nationwide policy of conducting "mortgage origination, approvals, interest rate determinations, fees, costs, refinancing, underwriting, deferment, forbearance, default, loan steering, and foreclosure policies and practices [in a manner] that intentionally and disproportionately discriminate against and harm Black and/or African American home loan applicants and home mortgage borrowers." *Id*. ¶ 6 *cf*. Consolidated Amended Complaint ¶¶ 5, 15, 23, 126-130.

As in the instant action, Plaintiff Simmons asserts in her duplicative action that these policies are part of a "nationwide set of uniform" discriminatory policies enacted by Defendants and implemented across the United States. Ex. A ¶¶ ¶¶ 47, 52, 56, 61 *cf*. Consolidated Amended Complaint ¶ 143. Plaintiff contends that her experience is part of Defendants' "long history of racial discrimination and . . . corporate culture replete with harmful racial stereotypes and biased

views about Black and/or African American customers." Ex. A ¶¶ 7 *cf.* Consolidated Amended Complaint ¶¶84-90. Based on these allegations, Simmons bring claims against Defendants in both the *Simmons* Action and in *In re Mortgage Lending Discrimination* for violation of: (1) ECOA, (2) 42 U.S.C. § 1981 and (3) the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. The *Simmons* Action also includes claims for: (1) 42 U.S.C. § 1982, (2) intentional infliction of emotional distress, (3) breach of contract, (4) promissory estoppel, (5) fraudulent inducement, and (6) negligent misrepresentation.

Simmons alleges she filed the *Simmons* Action "out of an abundance of cation because she has reason to believe the consolidated class action may not cover her individual claims related to Wells Fargo's [allegedly] racially discriminatory treatment." Ex. A ¶ 30.

## COORDINATION OF THE DUPLICATIVE PROCEEDINGS IS WARRANTED

At a minimum, the *Simmons* Action is substantially similar in both form and substance to this action. More appropriately, the *Simmons* Action is encompassed within the currently-pled action that derives from same underlying factual allegations. Because the instant action has already progressed significantly into discovery, mutual transfer to a Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407 is not required or appropriate. However, to the extent the Florida court does not dismiss the case, coordination of the *Simmons* Action with the instant action—or even consolidation of the actions—on overlapping disputes between the parties, will prevent unnecessarily repetitive motions practice, duplicative discovery, and will prevent potentially inconsistent obligations in various forums between these parties.

Dated:  March 8, 2024

**MCGUIREWOODS LLP**

/s/ *Alicia A. Baiardo*

AVA E. LIAS-BOOKER (Pro Hac Vice)
aliasbooker@mcguirewoods.com
ALICIA A. BAIARDO (SBN 254228)
abaiardo@mcguirewoods.com
JASMINE K. GARDNER (Pro Hac Vice)
jgardner@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, CA 94111-3821
Telephone: 415.844.9944

NOTICE OF PENDENCY OF OTHER ACTION FILED BY SHAIA SIMMONS IN THE NORTHERN
DISTRICT OF FLORIDA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WINSTON & STRAWN LLP**

AMANDA L. GROVES (SBN 187216)
agroves@winston.com
KOBI K. BRINSON (Pro Hac Vice)
kbrinson@winston.com
STACIE C. KNIGHT (Pro Hac Vice)
sknight@winston.com
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
Telephone: 213.615.1700

*Attorneys for Defendants*

NOTICE OF PENDENCY OF OTHER ACTION FILED BY SHAIA SIMMONS IN THE NORTHERN
DISTRICT OF FLORIDA

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2024, I electronically filed the foregoing document entitled **NOTICE OF PENDENCY OF OTHER ACTION IN THE NORTHERN DISTRICT OF FLORIDA** with the Clerk of the Court for the United States District Court, Northern District of California using the CM/ECF system and served a copy of same upon all counsel of record via the Court's electronic filing system.

Dated: March 8, 2024                    By: */s/ Alicia A. Baiardo*
                                                  Alicia A. Baiardo

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

SHAIA BECKWITH SIMMONS,

              Plaintiff,

    v.

WELLS FARGO BANK, N.A. and
WELLS FARGO & CO.,

            Defendants.

CASE NO:

**COMPLAINT**

Class Action

Jury Trial Demanded

## COMPLAINT

Plaintiff Shaia Beckwith Simmons ("Simmons"), by and through her attorneys, hereby files this Complaint against Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co. (collectively "Wells Fargo" or the "Firm"), and states as follows:

### JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. In addition, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d), as the amount in controversy exceeds $75,000, Plaintiff is a citizen of Florida, and Defendants are citizens of South Dakota, Delaware, and California.

2.      Venue is proper in the Northern District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District. Venue is proper in the Tallahassee Division of the Northern District of Florida because a substantial part of the events or omissions giving rise to the claims occurred in the county of Gadsden.

## PARTIES

3.      Defendant Wells Fargo & Co. is a publicly-traded, global financial services firm and Fortune 500 corporation incorporated in Delaware and has its principal place of business in San Francisco, California. As of September 30, 2023, Wells Fargo has assets of approximately $1.9 trillion, loans of $942 billion, deposits of $1.3 trillion and stockholders' equity of $182 billion.[1] Wells Fargo provides a wide variety of financial products and services to its global and domestic clients, who include corporations, governments, financial institutions and individuals, including home mortgages. Wells Fargo claims to serve at least one out of three households in the United States.[2]

4.      Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota with its principal place of business in San Francisco, California, and a subsidiary of Wells Fargo & Co.

---

[1] https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2023/third-quarter-10q.pdf
[2] https://newsroom.wf.com/English/news-releases/news-release-details/2021/Wells-Fargo-launches-Banking-Inclusion-Initiative-to-accelerate-unbanked-households-access-to-affordable-

5.     Plaintiff Shaia Beckwith Simmons is African American and a citizen and resident of Florida. As described below, Plaintiff Simmons obtained a home mortgage with Wells Fargo and was subjected to Wells Fargo's racially discriminatory policies and practices.

## FACTUAL ALLEGATIONS

6.     As stated above, Wells Fargo is one of the largest banks in the country and one of the top residential mortgage providers in the United States. Across the country, Wells Fargo applies mortgage origination, approvals, interest rate determinations, fees, costs, refinancing, underwriting, deferment, forbearance, default, loan steering, and foreclosure policies and practices that intentionally and disproportionately discriminate against and harm Black and/or African American home loan applicants and home mortgage borrowers. Simmons was injured by Wells Fargo's racially discriminatory residential mortgage and lending policies and practices.

7.     Wells Fargo has a long history of racial discrimination and maintains a corporate culture replete with harmful racial stereotypes and biased views about Black and/or African American customers.

---

transactional-accounts/default.aspx#:~:text=Wells%20Fargo%20%26%20Company%20(NYSE%3A,of%20banking%2C%20investment%20and%20mortgage

8. Wells Fargo discriminates against Black and/or African American customers throughout its lending process, from application—where Wells Fargo disproportionately denies credit to Black and/or African American applicants—to origination—where Wells Fargo disproportionately charges higher interest rates, imposes higher fees and costs, and offers worse terms to Black and/or African Americans compared to non-Black, non-African Americans—to refinancing— where Wells Fargo disproportionately denies Black and/or African Americans the opportunity to modify or lower their interest rates—and servicing—where Black and/or African American borrowers are subjected to additional racial discrimination.

9. Wells Fargo has faced a number of recent lawsuits and settlements challenging these practices and disparities. For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software for minority homeowners which resulted in them paying more for their home loans than white borrowers. *Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court) ($3.5 million verdict). Wells Fargo has also paid hundreds of millions of dollars to avoid litigating its discriminatory home lending practices. Indeed, Wells Fargo agreed to a settlement valued at over $440 million of a lawsuit challenging the Firm's redlining practices, resulting in a disproportionate number of foreclosures in

African American neighborhoods in Shelby County and the City of Memphis. *City of Memphis and Shelby County, et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 2:09-CV-02857 (W.D. Tenn.). Wells Fargo also settled a lawsuit for $37 million led by the National Fair Housing Alliance alleging that Wells Fargo took better care of foreclosed properties that it owned in white neighborhoods than those in African American and Latino communities. *National Fair Housing Alliance, et al. v. Wells Fargo Bank N.A., et al.*, HUD Case No. 09-12-0708-8 (U.S. Department of Housing & Urban Development Office of Fair Housing & Equal Opportunity).

10.     Wells Fargo has also faced and settled numerous lawsuits challenging its "reverse redlining" practices of charging higher rates and imposing less favorable terms for minority home borrowers than for white home borrowers. For instance, in 2013, Wells Fargo paid $175 million to settle a lawsuit brought by the United States Department of Justice alleging that the Firm charged higher rates to its African American and Latino borrowers. *United States v. Wells Fargo Bank, NA*, Case No. 1:12-cv-01150 (D.D.C.).

11.     In 2019, Wells Fargo paid $10 million to settle a similar claim brought by the City of Philadelphia. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019). Philadelphia alleged that Wells Fargo simply swapped the evil of redlining—refusing to lend to minority communities— for the similarly pernicious reverse redlining—lending to minority borrowers, but

saddling them with more expensive loans with worse terms than those extended to white borrowers. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019), Dkt. 1 (Complaint) ¶¶ 5–21. Philadelphia alleged that "since at least 2004 . . . Wells Fargo has systematically engaged in a continuous and unbroken discriminatory pattern and practice of issuing higher cost or more onerous mortgage loans to minority borrowers in Philadelphia when more favorable and less expensive loans were being offered to similarly situated non-minority borrowers." *Id.* ¶ 5 (E.D. Pa.). Philadelphia's statistical analysis revealed that African American borrowers were more than twice as likely to "receive a high-cost or high-risk loan" than a white borrower even when controlling for credit score. *Id.* ¶ 14. Indeed, the discrimination worsened as the credit score increased—especially creditworthy "African-Americans with FICO scores over 660 were 2.570 times more likely to receive a high-cost or high-risk loan from Wells Fargo as a white borrower." *Id.* The predictable result of Wells Fargo's foisting high-cost, high-risk loans on African Americans was an explosion of foreclosures in minority communities, where loans were "4.710 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood." *Id.* ¶ 12. This precipitated what "many leading commentators describe[d] as the 'greatest loss of wealth for people of color in modern US history.'" *Id.* ¶ 18.

12.     Other cities and counties have sued Wells Fargo for its discriminatory home lending practices. The City of Baltimore filed a lawsuit against Wells Fargo under the Fair Housing Act, in the U.S. District Court for the District of Maryland, Baltimore Division. The plaintiffs, alleging that Wells Fargo had engaged in predatory and discriminatory lending practices that had led to foreclosures harming the city, asked the court for declaratory and injunctive relief and damages. City of Baltimore v. Wells Fargo Bank, N.A., Case No. 08-cv-00062 (D. Md.).

13.     The city of Miami brought a lawsuit under the Fair Housing Act against Wells Fargo. In its suit, Miami alleged that Wells Fargo Bank engaged in discriminatory lending practices and that, as a result of these practices, Miami suffered an appreciable loss of property tax revenue as well as an attendant increase in the costs of municipal services the city provided. These increased costs, the city alleged, were a result of Wells Fargo's discriminatory lending practices. City of Miami v. Wells Fargo Bank, N.A., Case No. 13-cv-24508 (S.D. Fla):

14.     The city of Los Angeles filed a suit asserting two claims for (1) violating the federal Fair Housing Act, and (2) common-law restitution. According to the City, Defendants engaged in discriminatory lending practices that resulted in a disparate number of foreclosures in minority areas of Los Angeles. Specifically, the City alleged that Defendants have engaged in "redlining" and "reverse

redlining." The City of L.A. v. Wells Fargo Bank, N.A., Case No. 13-cv-9007 (C.D. Cal.):

15.     Cook County filed a Fair Housing Act suit against Wells Fargo, alleging that Wells Fargo engaged in discriminatory lending practices against minority borrowers. Cook County alleged that Wells Fargo issued predatory subprime mortgage loans to Cook County residents that over the years went into default and drove the mortgaged properties into foreclosure. According to the County, the scheme was and remains concentrated in heavily minority neighborhoods. Cook Cnty. v. Wells Fargo Bank, N.A., Case No. 14-cv-9548 (N.D. Ill.).

16.     The City of Miami Gardens filed suit against Wells Fargo, alleging that Wells Fargo violated the Fair Housing Act by steering Black and Hispanic borrowers into highercost loans than similarly situated white borrowers. City of Miami Gardens v. Wells Fargo Bank, N.A., Case No. 14-cv-22203 (S.D. Fla.):

17.     Wells Fargo found new avenues to discriminate against Black and/or African American customers with changes to the home mortgage market. Nationwide, homeowners had the opportunity to take advantage of historically low interest rates through refinancing, which occurs when a homeowner applies for credit related to their residential real estate to change the terms of an earlier loan. Over the last two years, U.S. homeowners refinanced almost $5 trillion in

mortgages, generating untold savings. This could have been an opportunity for African American homeowners to build wealth and secure their families' futures. Wells Fargo, however, systematically and intentionally shut Black and/or African American customers out of this major wealth event. According to an analysis of 2020 Home Mortgage Disclosure Act data, Wells Fargo approved 33.7% of refinancing applications from Black and/or African American applicants, compared with 49.1% from white applicants. Wells Fargo denied Black and/or African Americans borrowers' applications outright 36.1% of the time, versus 20.3% of the time for white borrowers. These disparities are statistically significant at over 31 standard deviations.

18.  And just as it does with home purchase loans, Wells Fargo charges higher costs and interest rates to Black and/or African American customers who obtain refinancing. In 2020, Wells Fargo charged the average national Black and/or African American refinancing recipient 3.18% versus 3.11% for white refinancing recipients, and charged Black and/or African American customers an average of $5,335 in costs and fees versus $4,193 for white borrowers, for an average cost of borrowing of 2.6% for Black and/or African American customers versus 1.8% for white borrowers. All these disparities are statistically significant.

19.  Wells Fargo's failure to extend refinancing and other home loans to Black and/or African American customers has even drawn the attention of

members of Congress. Senators Elizabeth Warren and Ron Wyden recently wrote a letter to Wells Fargo's Chief Executive Officer Charles Scharf excoriating the Bank for its "shocking disparity" in its approval ratings of Black and/or African American refinancing applicants.[3] The Senators stated that Wells Fargo's recent actions were consistent with "Wells Fargo's long history of scamming and mistreating consumers of color."[4] Furthermore, the Senators believed "Wells Fargo's treatment of Black borrowers is deeply concerning, no matter how one looks at the data" and concluded, "Wells Fargo appears to be simply unable or unwilling to stop preying upon customers of color."[5]

20.    Just recently, the Consumer Financial Protection Bureau ("CFPB") issued a notice to Wells Fargo regarding problems with its use of mortgage rates discounts. In the CFPB's review it found "statistically significant disparities" in the rates in which Black borrowers got pricing exceptions compared with other customers.

21.    Wells Fargo engages in predatory lending practices to force Black and/or African American borrowers to accept less favorable terms and in rare instances where Black and/or African American receive favorable terms,

---

[3]Letter from Senators Elizabeth Warren and Ron Wyden, March 16, 2022 https://www.warren.senate.gov/imo/media/doc/2022.3.16%20Letter%20to%20Wells%20Fargo%20on%20Refinancing%20Discrimination.pdf
[4] *Id.*
[5] *Id.*

pressuring Black and/or African American borrowers to increase their rates by improperly treating Black and/or African American borrowers' loans in default and instituting improper foreclosures.

22.     Wells Fargo continued to pursue new discriminatory and predatory lending practice during the COVID-19 pandemic.

23.     The Coronavirus Aid, Relief, and Economic Security Act of 2020 (the "CARES Act") provided a variety of emergency financial relief due to the unprecedented economic interruptions of the pandemic, including a moratorium on foreclosures and requiring certain mortgage lenders to offer a forbearance program for those experiencing economic hardship. CARES Act § 4022(b).

24.     Under the CARES Act, certain federally-backed mortgage borrowers could obtain up to 360 days of forbearance of mortgage payments by requesting forbearance and "affirming that the borrower was experiencing a financial hardship during the COVID-19 emergency." CARES Act § 4022(b)(1)-(2).

25.     However, through its unscrupulous practices, Wells Fargo used CARES Act deferrals as a mechanism to extract wealth from Black homeowners, generating delinquencies and foreclosures by deliberately targeting Black homeowners for easy entry into forbearance but obfuscating the repayment requirements after the end of forbearance.

26.     Rather than eliminate the discrimination, Wells Fargo devoted enormous resources to barring its own top executives, the public, and shareholders from learning about the racial discrimination against its customers. For example, Wells Fargo's internal reports routinely dismiss significant racially disparate outcomes as "practically" not significant. It also hires outside law firms paid for by Wells Fargo to conduct investigations or "audits" of serious discrimination allegations only to deny them and to support a false public narrative that it remains committed to inclusivity and its stated, but not practiced, policies of non-discrimination.

27.     Wells Fargo discriminates against its African American employees just as readily as it does its customers. In 2016, Wells Fargo was charged with systemic discrimination against minority Financial Advisors including by African American Financial Advisors in the class action lawsuit *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014). Wells Fargo eventually settled the *Slaughter* litigation for over $35 million. *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014), Dkt. 99-1.

28.     On February 17, 2022, Christopher Williams filed a class-action complaint challenging Wells Fargo's racially discriminatory lending practices. (*Williams v. Wells Fargo, N.A.*, 22-cv-00990, Compl., Dkt. 1). After *Williams* was filed, four other class action lawsuits were filed similarly challenging Wells

Fargo's discriminatory mortgage practices. *Braxton v. Wells Fargo Bank, N.A.*, 22-cv-01748 (N.D. Cal. 2022); *Pope v. Wells Fargo Bank, N.A.*, 22-cv-01793 (N.D. Cal. 2022); *Ebo v. Wells Fargo Bank, N.A.*, 22-cv-02535 (N.D. Cal. 2022); *Perkins v. Wells Fargo, N.A.*, 22-cv-03455 (N.D. Cal. 2022); *Thomas v. Wells Fargo & Co.*, No. 3:22-cv-01931-JD (S.D.N.Y. 2022).

29.     Counsel for *Williams* previously included Simmons' as a named putative class representative in an Amended Complaint on April 14, 2022, that included both her individual and class complaints, and which Wells Fargo Answered. (*Williams*, Dkts. 22, 50-51). The Court consolidated all five lawsuits against Wells Fargo, requiring a Consolidated Complaint to be filed, and appointed Interim Class Counsel for the consolidated matter. (*Williams,* Dkts. 75, 102, 111). Interim Class Counsel filed a consolidated class complaint which did not include Simmons as a Class Representative but included her allegations in the Amended Consolidated Complaint as a Class Member. (Dkt. 114).

30.     While Simmons believes her claims are tolled pursuant to the *American Pipe* Tolling doctrine, she files this complaint out of an abundance of caution because she has reason to believe the consolidated class action may not cover her individual claims related to Wells Fargo's racially discriminatory treatment.

## PLAINTIFF WAS INJURED BY DEFENDANTS' DISCRIMINATORY POLICIES AND PRACTICES

31.     Plaintiff Shaia Beckwith Simmons is a public relations expert, community advocate, motivational speaker, and a school principal, with a Bachelor's in Business Administration and Management and a Master's in Educational Leadership and Administration from Florida A&M University. She and her husband, a Division I football coach, are pillars of their local community.

32.     Simmons is a well-qualified African American home borrower who obtained a home mortgage loan in 2009 that Wells Fargo later purchased, and refinanced it with Wells Fargo for a lower interest rate in 2013.

33.     During the COVID-19 pandemic, as required by the CARES Act, Wells Fargo offered existing home mortgage borrowers the option to defer their payments.

34.     Wells Fargo solicited Simmons to seek forbearance by telephone, and because her family experienced a temporary reduction in income during the pandemic, Simmons accepted. Simmons's telephone conversation enrolled her in a three-month forbearance program.

35.     Simmons understood Wells Fargo's forbearance program to be a simple deferment, which allowed her to restructure her loan to tack payments she missed during the forbearance period on at the end of her loan. A Wells Fargo

representative repeatedly confirmed her understanding over the phone that she would make up for the missed payments at the end of her loan.

36. Toward the end of her first three months of forbearance, Wells Fargo again initiated a call to Simmons asking whether she wished to extend forbearance, and she again agreed. Wells Fargo would repeat this process two more times, resulting in Simmons deferring 12 months of mortgage payments during forbearance.

37. At the end of the forbearance period, Simmons promptly resumed making her mortgage payments in full, as she had done for many years.

38. Contrary to its repeated assertions to Simmons, Wells Fargo immediately treated the deferred payments during the forbearance period as a delinquency, rather than deferring them.

39. Yet consistent with its nationwide discriminatory practices and treatment, Wells Fargo maliciously instituted foreclosure proceedings against Simmons in February 2022, asserting that Simmons was in default for failure to make mortgage payments during her forbearance, and causing Simmons severe emotional distress.

40. Consistent with its nationwide practices of predatory lending to extract wealth from Black and/or African American customers, Wells Fargo pressured Simmons to modify her loan, potentially at a higher interest rate that

would cost her many thousands of dollars over the remaining life of the loan, as her means to avoid the malicious foreclosure to take her home away from her and resell it in a booming market.

41.     Simmons declined to modify her loan and resisted the wrongful foreclosure until it was dismissed in August 2022.

42.     Though Simmons was eventually able to defer her forbearance payments to the end of the loan through a partial claim mortgage, she ended up owing more in fees and costs due to Wells Fargo's wrongful and discriminatory actions.

43.     Wells Fargo's unlawful actions have caused Simmons emotional distress and financial harm, in an amount to be proven at trial.

## COUNT I

## EQUAL CREDIT OPPORTUNITY ACT

44.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

45.     The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

46.     As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiff was an applicant for credit.

47.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

48.     Plaintiff was subjected to and harmed by Defendant's systemic and individual discrimination.

49.     Defendants' unlawful conduct resulted in considerable harm to Plaintiff.

## COUNT II

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

50.     Plaintiff realleges each and every paragraph above and incorporate them by reference as though fully stated herein.

51.     Under 42 U.S.C. § 1981, persons of all races are guaranteed the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

52.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in

a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination in the making and modification of contracts in violation of 42 U.S.C. § 1981.

53. Plaintiff was subjected to and harmed by Defendants' systemic and individual discrimination.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1982

54. Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

55. Under 42 U.S.C. § 1982, all citizens are guaranteed the same right to inherit, purchase, lease, sell, hold, and convey real and personal property, regardless of race.

56. As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination and disparately impacts Black and/or African American applicants and borrowers in violation of 42 U.S.C. § 1982.

57.     Plaintiff was subjected to and harmed by Defendants' systemic and individual discrimination.

## COUNT IV

### RACE DISCRIMINATION IN VIOLATION OF
### THE FAIR HOUSING ACT OF 1968, 42 U.S.C § 3601 *et seq.*

58.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

59.     The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

60.     Defendants' business includes engaging in residential real estate-related transactions.

61.     As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage servicing practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American borrowers that constitutes illegal intentional race discrimination and disparately impacts Black and/or African American mortgage borrowers in violation of the Fair Housing Act of 1968.

62.     Plaintiff was subjected to and harmed by Defendants' systemic and individual discrimination.

## COUNT V

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

63.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

64.     Defendants' actions directed toward Plaintiff were outrageous, beyond the bounds of decency, and odious and intolerable in a civilized community.

65.     By their actions directed toward Plaintiff, Defendants knew or should have known that emotional distress was likely to result.

66.     By their actions directed toward Plaintiff, Defendants recklessly or deliberately caused Plaintiff to suffer emotional distress.

67.     The emotional distress Defendants caused Plaintiff to suffer was severe.

## COUNT VI

### BREACH OF CONTRACT

68.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

69.     Plaintiff and Defendants entered into valid and enforceable oral and written contracts and agreements under which Defendants promised to place

Plaintiff's mortgage into temporary forbearance and to allow Plaintiff to defer making certain payments until after the end of the original loan period.

70.     Plaintiff performed under these contracts and agreements.

71.     Defendants materially breached these contracts and agreements by treating Plaintiff's deferred payments as delinquent and instituted foreclosure proceedings against her.

72.     Plaintiff was damaged by Defendants' breaches.

## **COUNT VII**

### **PROMISSORY ESTOPPEL**
### **(Pleaded in the Alternative to Count VI)**

73.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

74.     Defendants promised Plaintiff that her mortgage would be put into temporary forbearance whereby she would be allowed to defer making certain payments until after the end of the original loan term.

75.     Defendants reasonably expected or should have expected that Plaintiff would act in reliance on their promise by ceasing to make payments during the forbearance period.

76.     Plaintiff did in fact act in reliance on Defendants' promise by ceasing to make payments during the forbearance period.

77.     Injustice can be avoided only by enforcing Defendants' promise.

## COUNT IX

### FRAUDULENT INDUCEMENT

78.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

79.     Defendants falsely represented to Plaintiff that her mortgage would be put into temporary forbearance whereby she would be allowed to defer making certain payments until after the end of the original loan term.

80.     Defendants knew that the foregoing material representation was false and never intended to allow this deferral.

81.     Defendants intended that Plaintiff act on its material representation by ceasing to make payments during the forbearance period.

82.     Plaintiff ceased making payments during the forbearance period in reliance on Defendants' material representation.

83.     Defendants' material representation caused Plaintiff to suffer damages.

## COUNT X

### NEGLIGENT MISREPRESENTATION

84.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

85.     Defendants falsely represented to Plaintiff that her mortgage would be put into temporary forbearance whereby she would be allowed to defer making certain payments until after the end of the original loan term.

86.     Defendants made the foregoing material representation in the course of their business, profession, and employment, and in the course of a transaction in which they had pecuniary interests.

87.     Defendants made the foregoing material representation for the guidance of Plaintiff in her mortgage transactions with Defendants.

88.     Defendants failed to exercise reasonable care or competence in obtaining the information conveyed in this material representation or in communicating it to Plaintiff.

89.     Plaintiff justifiably relied on Defendants' material representation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court find against Defendants as follows:

a.      Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act; and other state law claims;

b.      Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against Black and/or African American applicants and

borrowers;

c.      Award Plaintiff compensatory and punitive damages;

d.      Award Plaintiff prejudgment interest and attorneys fees, costs and

disbursements, as provided by law;

e.      Award Plaintiff such other make whole equitable, injunctive and legal

relief as this Court deems just and proper to end the discrimination

and fairly compensate Plaintiff.

f.      Award Plaintiff such other relief as this Court deems just and proper.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiff hereby demand a jury trial as provided by Rule 38(a) of the Federal

Rules of Civil Procedure and Civil Local Rule 3-6.

Respectfully submitted,

BEN CRUMP, PLLC

By:/s/ Natalie Jackson
Natalie Jackson, Esq. (FL Bar #0646075)
Sue-Ann Robinson, Esq. (FL Bar #29462)
121 S. Orange Ave., Ste 1500
Orlando, FL 32801
Tel: (800) 713-1222
court@bencrump.com
natalie@bencrump.com
sueann@bencrump.com

*Attorneys for Plaintiff*

# EXHIBIT B

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

SHAIA BECKWITH SIMMONS,

        Plaintiff,

                                      CASE NO. 4:24-cv-00089-AW-MAF

v.

WELLS FARGO BANK, N.A. and
WELLS FARGO & CO.,

        Defendant.

_____

## DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)

      Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co. (together, "Defendants") respectfully move this Court to dismiss or transfer this case to the Northern District of California pursuant to the "first-to-file" rule given that Plaintiff Shaia Beckwith Simmons ("Plaintiff") has already filed a case in the Northern District of California on this same set of underlying facts and that case remains pending. Alternatively, transfer of this case to the Northern District of California is also warranted pursuant to 28 U.S.C. § 1404(a). Defendants provide the following Memorandum of Law in Support thereof.

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT

### I.   Introduction

Plaintiff's Complaint entails factual allegations and claims already the subject of a series of cases pending before the Northern District of California alleging that Wells Fargo discriminates against minority applicants in the residential home lending process. Plaintiff claims she is a well-qualified homeowner that suffered discrimination through Defendants' mortgage lending processes, and that Wells Fargo improperly instituted foreclosure proceedings on her property after offering her a CARES Act deferment which modified her loan. Plaintiff already asserted these allegations twice against the same Defendants in actions pending with the Northern District of California.

Plaintiff first made these assertions in 2022 as a putative class representative. That lawsuit was subsequently consolidated with five other putative class actions that also alleged Defendants engaged in racially discriminatory behavior with respect to their residential mortgage and refinance practices and is pending before the Honorable Judge James Donato in the Northern District of California. The amended consolidated complaint, filed in 2023, identifies Plaintiff as a member of a putative class under Federal Rule of Civil Procedure 23 and asserts specific allegations regarding Plaintiff's same loan and foreclosure as those at issue in this action. Defendants even deposed Plaintiff on February 6, 2024—just before she filed

this action—regarding the allegations she set forth in the amended consolidated complaint in the Northern District of California and how they were illustrative of the class' experience.

Despite her substantive involvement in the consolidated putative class action, Plaintiff has now filed a duplicative lawsuit in the Northern District of Florida. Allowing Plaintiff to litigate the same case in two parallel jurisdictions would waste judicial resources, be needlessly burdensome to Defendants, and potentially lead to inconsistent results. Consequently, this case should be dismissed or alternatively transferred to the Northern District of California.

## II.    Statement of Facts

### A. Plaintiff's Northern District of Florida Complaint

Repeating the allegations raised by Plaintiff in the Northern District of California, Plaintiff alleges she was subjected to racial discrimination by Wells Fargo's mortgage lending processes, and Wells Fargo improperly instituted foreclosure proceedings on her property after offering her a Coronavirus Aid, Relief, and Economic Security Act of 2020 ("CARES Act") deferment which modified her loan.  ECF No. 1 ¶¶ 33-42. Plaintiff alleges that she was injured as part of Defendants' nationwide policy of conducting "mortgage origination, approvals, interest rate determinations, fees, costs, refinancing, underwriting, deferment, forbearance, default, loan steering, and foreclosure policies and practices [in a

3

manner] that intentionally and disproportionately discriminate against and harm Black and/or African American home loan applicants and home mortgage borrowers." *Id.* ¶ 6. Plaintiff asserts that these policies are part of a "nationwide set of uniform" discriminatory policies enacted by Defendants and implemented across the United States. *See id.* ¶¶ 47, 52, 56, 61. Plaintiff contends that her experience is part of Defendants' "long history of racial discrimination and . . . corporate culture replete with harmful racial stereotypes and biased views about Black and/or African American customers." *Id.* ¶ 7.

### B. Plaintiff's 2022 Northern District of California Complaint

As Plaintiff acknowledges in the Complaint, on February 17, 2022, Christopher Williams filed a putative class action complaint in the Northern District of California against Defendants regarding these same allegedly racially discriminatory lending practices. *Id.* ¶ 28. (*Williams v. Wells Fargo, N.A.*, 3:22-cv-00990-JD, ECF No. 1) ("*Williams*"). After *Williams* was filed, five other putative class action lawsuits were filed similarly alleging that Wells Fargo's mortgage practices were racially discriminatory. *Id.*

On April 14, 2022, Plaintiff was named as a putative class representative in the *Williams* Amended Complaint which included both her "individual and class complaints" against Defendants. *Id.* ¶ 29 (*Williams*, ECF No. 22, attached hereto as

**Exhibit A**).[1] In the *Williams* Amended Complaint, Plaintiff alleged that venue was proper in the Northern District of California because "a substantial part of the events or omissions giving rise to the claim occurred in [that] District, as the discriminatory policies emanated and were executed from Wells Fargo's headquarters in [that] District." *Williams*, ECF No. 22, ¶ 2.

Similar to Plaintiff's allegations here, Plaintiff alleged that she "obtained a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process." *Id.* at ¶ 7. She further alleged that "consistent with its nationwide discriminatory practices, Wells Fargo maliciously and unlawfully instituted foreclosure proceedings against [her]." *Id.* at ¶ 40. Based on these allegations, she asserted four claims against Defendants: (1) violation of the Equal Credit Opportunity Act ("ECOA"), (2) violation of 42 U.S.C. § 1981, (3) violation of 42 U.S.C. § 1982, and (4) violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq*.

In filing the *Williams* Amended Complaint, Plaintiff stated that she was bringing the action "on behalf of [herself] and a class of Black and/or African American applicants or borrowers who applied for, received, or maintained credit from Defendants related to residential real estate and who were subjected to

---

[1] The same firm that represented Plaintiff in *Williams*, Ben Crump, PLLC, represents Plaintiff in the filing of this action.

discrimination by Defendants due to their race," pursuant to Federal Rules of Civil Procedure 23. *Id*. at ¶ 44.

### C. Plaintiff Is a Putative Class Member in the Action Pending Before the Northern District of California

Thereafter, *Williams* and the five other putative class actions lawsuits were consolidated into one action in the Northern District of California as *In re Wells Fargo Mortgage Discrimination Litigation*; 3:22-cv-00990-JD ("California Litigation"). ECF No. 1 ¶ 29. Following consolidation, an amended and consolidated complaint ("California Consolidated Complaint") was filed on March 24, 2023. *Id*. (California Consolidated Complaint, CA ECF No. 114, attached hereto as **Exhibit B**).

The California Consolidated Complaint identifies Plaintiff as a member of the putative class under Federal Rule of Civil Procedure 23 and includes allegations that mirror those alleged here.  CA ECF No. 114, ¶¶ 140-144. The California Consolidated Complaint describes Ms. Simmons' experience as being "typical of the class". *Id*. at Heading I ("Plaintiffs' Harm is Typical of the Class"); ¶ 139 ("The uniformity of Wells Fargo's discriminatory practices in connection with its algorithm and otherwise means that Plaintiffs' experiences are emblematic of the experiences of minority Americans all over the country…"; ¶¶ 140-144 (describing how Simmons' experience is illustrative of the class' experience); ¶ 152 ("…Each of these non-white Americans, who are members of the Putative Class, have had experiences

that are typical of the Plaintiffs, regardless of race and ethnicity. Thus, their claims are all substantially similar and congruent, regardless of their individual race or ethnicity, such that the Plaintiffs are qualified to represent their interest as they have claims and interests typical of those putative Class members.") For example, in the California Consolidated Complaint, Plaintiff alleges that "consistent with its nationwide discriminatory practices," Defendants "maliciously and unlawfully instituted foreclosure proceedings" against her—the same allegations brought in this case. *Compare Id.* ¶ 143 *with* ECF No. 1, ¶ 39. In support of the claims alleged, the California Consolidated Complaint states that Plaintiff's alleged experience is typical of the putative class members. *Id*. at 40. As is the case here, the California Consolidated Complaint asserts claims against Defendants for violation of: (1) the ECOA, (2) 42 U.S.C. § 1981, and (3) the Fair Housing Act, among others. *Compare* CA ECF No. 114, ¶¶ 175-193, *with* ECF No. 1, ¶¶ 41-62.

Plaintiff is an "illustrative" member of the putative class in the California Litigation. *See* CA ECF No. 114, ¶¶ 139-144, 152. The putative class is defined in the California Consolidated Complaint as encompassing "all Minority Applicants in the United States who, from January 1, 2018 through the present (the "Class Period"), submitted an application for a original purchase or other home mortgage loan or to refinance or modify a home mortgage loan through Defendants that was (i) denied; (ii) approved at higher interest rates or subject to less favorable terms as

compared to similarly situated non-Minority Applicants; or (iii) processed at a rate slower than the average processing time of applications submitted by similarly situated non-Minority Applicants." *Id*. ¶155. Ben Crump, PLLC, the same firm that brought this action, also represents Plaintiff in the California Litigation and defended Plaintiff in her February 2024 deposition. *Id*. at 55.

Despite this extensive and on-going involvement in litigation in the Northern District of California, Plaintiff brings a duplicative lawsuit here regarding the same loan, arising from the same facts, with claims that overlap with those that are actively being litigated in the California Litigation pending in the Northern District of California. While she claims it is in an abundance of caution due to concerns related to the tolling of her claims [ECF No. 1, Complaint ¶ 29], the California Consolidated Complaint still includes her as a putative and indeed "illustrative" class member.

### III.     <u>Argument</u>

This Court should dismiss or transfer this case to the Northern District of California pursuant to the "first-to-file" rule. Alternatively, this Court should transfer this case to the Northern District of California pursuant to 28 U.S.C. § 1404(a) because venue there is proper, is in the best interest of justice, and is a more convenient forum.

## A. This Court Should Dismiss or Transfer Plaintiff's Complaint Pursuant to the "First-to-File" Rule

"The 'first-to-file rule' developed as a doctrine of federal comity." *In re Checking Account Overdraft Litigation*, 859 F. Supp. 2d 1313, 1324 (S.D. Fla. 2012). The Eleventh Circuit follows the "first-to-file" rule, and "[w]here two actions involving overlapping issues and parties are pending in two federal courts, there is a strong presumption across the federal circuits that favors the forum of the first-filed suit." *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135-36 (11th Cir. 2005). In the Eleventh Circuit, "the party objecting to jurisdiction in the first-filed forum [must] carry the burden of proving 'compelling circumstances' to warrant an exception to the first-filed rule." *Id.* at 1135.

When the rule applies, "the proper course of action [is] for the court to transfer the case to the [first-filed] court to determine which case should, in the interests of sound judicial administration and judicial economy, proceed." *In re Checking Account Overdraft Litig.*, 859 F. Supp. 2d at 1324 (quoting *Cadle v. Whataburger of Alice, Inc.*, 174 F.3d 599, 606 (5th Cir. 1999)). Importantly, "a transfer of a case under the first-filed rule does not depend on the presence or absence of 28 U.S.C. § 1404(a) considerations." *Savage v. Seterus, Inc.*, 2020 WL 230982, at *3 (S.D. Fla. Jan. 15, 2020). However, when a Plaintiff files the same case against the same defendant, the Court may dismiss the case rather than transfer the case pursuant to the "first-to-file" rule. *See Portman v. Wilson*, No. 10-CV-169-KSF, 2010 WL

9

2870050, at *5 (E.D. Ky. 2010) (holding that "the interests of justice would be served by dismissing [plaintiff's claims]," and that "[h]e will suffer no prejudice, because he has already asserted the same claims in" the other pending action).

Application of the "first-to-file" rule requires an evaluation of three factors: chronology of the actions, similarity of the issues, and similarity of the parties. *See McLeod v. Maidenform Brands, Inc.*, 2014 WL 644633, at *1 (N.D. Fla. Feb. 19, 2014). "Notably, the 'first-to-file' rule *doesn't* require that 'the parties and issues involved be identical'; it requires only that 'they are sufficiently similar or substantially overlap.'" *Elliott*, 549 F. Supp. 2d at 1339 (citing *Vital Pharms.*, 2020 WL 6162794, at *1). This rule is also applicable in the context of multiple class actions complaints. *Davis v. Technology Credit Union, et al.*, 5:22-cv-02206-DAP, ECF No. 16 (S.D. Ohio May 5, 2023) (dismissing claims under "first-to-file rule" where plaintiff brought individual claims against overlapping defendants because earlier-filed putative class action squarely covered the plaintiff's claims and allegations); *Hilton v. Apple Inc.*, No. C-13-2167 EMC, 2013 WL 5487317, at *7 (N.D. Cal. Oct. 1, 2013) (stating that courts need not find complete identity between class representatives to apply the "first-to-file rule"; only similarity between the putative classes is required). Because Plaintiff originally brought suit and is now an illustrative putative class member in the California Litigation, which arises from the same facts and circumstances as those alleged here (and in fact asserts the same

factual allegations regarding Plaintiff's loan), dismissal of Plaintiff's Complaint or its transfer to the Northern District of California is warranted.

### 1. Chronology of the Actions Favors Dismissal or Transfer

The California Litigation precedes Plaintiff's Complaint. Simmons chose to add herself as a named plaintiff in the *Williams* First Amended Complaint on April 14, 2022. The California Consolidated Complaint was filed on March 24, 2023. *See id.* ¶ 28; California Litigation, CA ECF No. 114. Plaintiff's Florida Complaint was filed on February 22, 2024. Using either date, the California Litigation was filed before this action.

### 2. Similarity of Issues Favors Dismissal or Transfer

Plaintiff's Northern District of Florida Complaint and the allegations in the California Litigation involve almost identical factual issues. Plaintiff's Northern District of Florida Complaint posits that she was subjected to racial discrimination in the mortgage lending processes, and endured improper foreclosure proceedings on her property after being offered a false deferment which modified her loan. ECF No. 1 ¶¶ 33-42. Plaintiff asserts that her experience is emblematic of a "nationwide set of uniform" discriminatory policies enacted by Defendants and implemented across the United States. *See id.* ¶¶ 47, 52, 56, 61. Likewise, the California Litigation targets the same conduct, even referencing Plaintiff's same loan, same efforts to modify her loan, and Defendants' subsequent efforts to foreclose her same property.

*See* California Litigation, CA ECF No. 114 ¶ 23. In fact, Plaintiff's Northern District of Florida Complaint acknowledges this overlap directly. ECF No. 1 ¶ 29. Thus, the two actions concern substantially overlapping—if not identical—conduct and factual circumstances.

### 3. Similarity of Parties Favors Dismissal or Transfer

Plaintiff's Complaint and the California Litigation involve similar parties. When analyzing the "first-to-file" rule in the context of class actions, a court may find that the "first-to-file" rule precludes a later action where the second-filed action's plaintiff[2] is subsumed into the first-filed action's putative class. *Davis v. Technology Credit Union, et al.*, 5:22-cv-02206-DAP ECF No. 16 (S.D. Ohio May 5, 2023). The California Litigation, as consolidated, is a putative class action representing a class of minorities allegedly injured by Defendants' same racially discriminatory lending practices. ECF No. 1 ¶ 28; *see* California Litigation, CA ECF No. 114. As set forth in the California Consolidated Complaint, Plaintiff contends in specific alleged detail not only that she is a putative class member but she is also

---

[2] While Plaintiff's Complaint states on the caption "Class Action," her pleading does not qualify as a class action because it does not set out any proposed class definition or facts showing claim may be so maintained. N.D. Fla. Loc. R. 23.1 ("A pleading that asserts a claim on behalf of or against a class must set out the proposed definition of the class and must allege facts showing that the claim or defense may be so maintained."); *Rivers v. Escambia Cnty. Jail*, 2005 WL 2176863, at *2 (N.D. Fla. Sept. 6, 2005) ("Although plaintiff states his desire to maintain this lawsuit as a class action, the allegations of his complaint fail to address the prerequisites for certification as a class action.") (citing Fed. R. Civ. P. 23 and N.D. Fla. Loc. R. 23.1).

illustrative of the class' experience. *Id*. Additionally, both pleadings target conduct by Wells Fargo Bank N.A and Wells Fargo & Co. Therefore, there is substantial similarity between the parties in both litigation tracks.

Because all factors favor application of the "first-to-file" rule, transfer to the first-filed action in the Northern District of California or dismissal of Plaintiff's Complaint is warranted.

### 4. No Compelling Circumstances Warrant Exception to the "First-to-File Rule" in this Matter

Where the "first-to-file" rule applies, dismissal is proper unless the plaintiff can demonstrate an exception such as compelling circumstances. The party objecting to exclusive jurisdiction in the first-filed forum has the burden of proving "compelling circumstances" to warrant an exception to the first-filed rule. *Rojas v. American Honda Motor Co.*, 2019 WL 6342616, at *2 (S.D. Fla. Nov. 26, 2019); *Chapman v. Progressive Am. Ins. Co.*, 2017 WL 3124186, at *1 (N.D. Fla. July 24, 2017). Plaintiff cannot prove any compelling circumstances that warrant avoidance of the "first-to-file" rule. Thus, the "first-to-file" rule compels dismissal or transfer of Plaintiff's Complaint to the Northern District of California.

### B. Alternatively, Transfer of Plaintiff's Complaint to the Northern District of California is Warranted Under 28 U.S.C. § 1404(a)

"The Court need not address Defendant's argument for transfer pursuant to 28 U.S.C. § 1404 because application of the 'first-to-file' rule is dispositive." *Laskaris*

*v. Fifth Third Bank,* No. 13-20529-CIV-KING, 2013 WL 4496549, at *2 (S.D. Fla. May 14, 2013). Nevertheless, to the extent the case is not dismissed or transferred pursuant to the "first-to-file" rule, in the interests of expediency, convenience, and fairness, the Court should also transfer the case to the Northern District of California pursuant to 28 U.S.C. § 1404(a).

A federal court may, "in the interest of justice" and "[f]or the convenience of the parties and witnesses" "transfer any civil action to another district or division where it might have been brought." 28 U.S.C. § 1404(a). The decision of whether to transfer a case under § 1404(a) requires a two-step analysis. First, the Court must determine whether the action may have been brought originally in the proposed transferee court. *Potter v. Ashford University*, 2020 WL 3420826, at *2 (N.D. Fla. Apr. 22, 2020) (citing § 1404(a)). Second, if the answer to the first step is yes, then the Court must determine whether a transfer is justified based on "(1) the convenience of the parties; (2) the convenience of witnesses; and (3) the interests of justice." *Harvard v. Inch*, 408 F. Supp. 3d 1255, 1260 (N.D. Fla. 2019); *Potter*, 2020 WL 3420826, at *2. The party seeking the transfer has the burden to show that a transfer is warranted. *Id*. Accordingly, "[t]he burden is on the movant to establish that the suggested forum is more convenient." *In re Ricoh*, 870 F.2d 570, 573 (11th Cir. 1989). Ultimately, the "decision to transfer a case to another district is left to the sound discretion of the trial court." *Brown v. Conn. Gen. Life Ins. Co*., 934 F.2d

14

1193, 1197 (11th Cir. 1991). As discussed in further detail below, this Court should exercise its discretion to transfer this case pursuant to § 1404(a) in the interest of justice and based on convenience.

### 1. Plaintiff's Action Could Have Originally Been Brought in the Northern District of California

First, "the movant must establish that the plaintiff could have brought the action in the proposed transferee district." *Harvard*, 408 F. Supp. 3d at 1260 (citing § 1404(a)). To do this, "the moving party must demonstrate that venue, personal jurisdiction, and subject matter jurisdiction would have been proper in the proposed transferee district." *Baker v. Major League Baseball Props., Inc.*, No. 3:08cv114/MCR, 2009 WL 1098482, at *2 (N.D. Fla. Apr. 22, 2019). Defendants satisfy their burden to show that all three of these requirements are met.

Plaintiff already filed suit in the proposed transferee district. When Plaintiff added herself as a named plaintiff in the *Williams* First Amended Complaint and alleged the same facts alleged here, Plaintiff contended venue was appropriate in the Northern District of California "because both Defendants reside in this District and a substantial part of the events or omission giving rise to the claim occurred in this District, as the discriminatory policies emanated and were executed from Wells Fargo's headquarters in this District."[3] Similarly, the California Consolidated

---

[3] *Williams*, ECF No. 22, ¶ 2.

15

Complaint which names Plaintiff and includes the same facts that Plaintiff relies on in this action also concedes that the Northern District of California is the proper jurisdiction and venue.[4]

Even without Plaintiff's admissions, venue, personal jurisdiction, and subject matter jurisdiction are proper in the Northern District of California. Venue is proper in a judicial district where (1) any defendant resides, if all defendants are residents of the state in which the district is located, or (2) a substantial part of the events or omissions giving rise to the claim occurred. *See* 28 U.S.C. § 1391(b). Here, Defendants both reside within the jurisdiction of the Northern District of California. A federal court in the Northern District of California would have subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1332(d). *Id*. ¶ 1. Plaintiff's allegations also make clear that more than a substantial part of the events giving rise to the Complaint occurred in the Northern District of California. Plaintiff alleges that Defendants engaged in a systematic, widespread, and coordinated pattern of lending discrimination across the United States that originated from the corporate headquarters in California. ECF No. 1 ¶ 6. Plaintiff alleges that her experiences were not unique to herself or even Florida but rather were "consistent with its nationwide discriminatory practices and treatment" of all similarly situated borrowers. *Id*. ¶ 39. Thus, Plaintiff's own allegations concern discrimination at the hands of general

---

[4] California Litigation, ECF No. 114, ¶¶ 24-26.

corporate representatives, directly implicating the policies, procedures, and actions originating in the Northern District of California. Consequently, consistent with Plaintiff's own allegations before another federal court, the claims here could have been brought (and were already brought) in the Northern District of California.

### 2. Transfer to the Northern District of California is Warranted in the Interests of Justice

In evaluating whether to transfer a case pursuant to § 1404(a), the Eleventh Circuit provides a list of at least nine factors for district courts to evaluate. These factors include:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity with the governing law; (8) the weight accorded a plaintiff's choice of forum; and (9) trial efficiency and the interests of justice, based on the totality of the circumstances.

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005). "In determining whether to transfer a case, there is no single dispositive factor." *Brandywine Commc'ns Tech., LLC v. Cisco Sys., Inc.*, No. 6:11-CV-1843-ORL-36DAB, 2012 WL 8281188, at *2 (M.D. Fla. Mar. 26, 2012) (citing *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1137 (11th Cir. 2005)). Moreover, each factor will not necessarily be relevant in every case. *See, e.g.*, *Florida v. Jackson*, No.

3:10-CV-503-RV-MD, 2011 WL 679556, at *2 (N.D. Fla. Feb. 15, 2011). As discussed below, the relevant[5] factors overwhelmingly favor transfer to the Northern District of California.

### 1. Trial Efficiency and the Interests of Justice, Based on the Totality of the Circumstances

Based on the totality of circumstances, transfer to the Northern District of California serves the ultimate purpose of § 1404(a). Because the "interest of justice" factor is a distinct component of the § 1404(a) analysis, it "may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result." *Id.* (citing *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220 (7th Cir. 1986)). Notably, "[t]he interest of justice may be served by transferring a case to facilitate its consolidation with other cases arising from the same conduct." *Lincoln National Life Ins. v. Aon Re*, 2004 WL 115211 at *1 (D. Conn. Jan. 21, 2004) (citing *Wyndham Associates v. Bintliff*, 398 F.2d 614, 619 (2d Cir.1968)); *Central Money Mortg. Co., Inc. v. Holman*, 122 F. Supp. 2d 1345, 1347 (M.D. Fla. 2000) (granting transfer because the interests of justice would be best served by enabling consolidation of multiple cases pending between parties).

The California Litigation, pending in the Northern District of California, concerns the same facts and claims as those alleged here. *See Fairfax Dental*

---

[5] Because they are not relevant to the Court's analysis, Defendants do not discuss factors two, three and seven.

*(Ireland) Ltd. v. S.J. Filhol Ltd.*, 645 F. Supp. 89, 92 (E.D.N.Y. 1986) ("[T]he pendency of a related case in the proposed transferee forum is a powerful reason to grant a motion for a change of venue.").

If transferred, the Honorable Judge James Donato, currently overseeing the California Litigation, can order the consolidation of Plaintiff's case with the California Litigation. *See, e.g., Talent Tree Crystal, Inc. v. DRG, Inc.*, No. 1:04-CV-875, 2005 WL 3312554, at *5 (W.D. Mich. Dec. 7, 2005) ("A transfer will promote judicial economy by obviating the need to pursue two actions involving the same [subject] in distant forums. In the event the two cases are consolidated, it would allow a single court to provide a final adjudication of the parties' ... dispute. Even if the cases are not consolidated, judicial economy is served by placing related claims before the same court."). Thus, transfer will assist the necessary and proper consolidation of complex and related cases before a single federal judge, and ultimately save countless judicial resources, litigant expenses, attorneys' fees, and time. *See Hawkins v. Gerber Products Co.*, 924 F. Supp. 2d 1208, 1214 (S.D. Cal. 2013) (granting transfer to a district where "five similar cases against Defendants have already been consolidated and are currently pending" because transfer "would serve the interest of justice due to the possible consolidation of discovery and the conservation of time, energy and money, and the avoidance of the possibility of inconsistent judgments"). Thus, this factor supports transfer.

## 2. Locus of Operative Facts

"In determining the locus of operative facts, the court must look at the site of events from which the claim arises." *Trans Am Worldwide, LLC v. JP Superior Solutions, LLC*, 2018 WL 3090394, at *9 (N.D. Fla. Apr. 30, 2018) (citation omitted).

Plaintiff does not allege that her experience was an isolated incident involving a specific employee or branch in Florida. Rather, Plaintiff alleges her experience was the result of a comprehensive policy decision by Defendants' corporate entity to discriminate against Black and African American borrowers nationwide. *See* ECF No. 1 ¶¶ 6-9, 47, 52, 56, 61; *Jones v. Walgreen Co.*, 463 F. Supp. 2d 267, 277-78 (D. Conn 2006) (upholding transfer to district of defendant's corporate headquarters where plaintiff alleged pervasive corporate policy of discrimination even where plaintiff was discriminated against in a different district). Further, Plaintiff has failed to allege *any* relevant events that occurred in this District. *See Bennett Eng'g Grp., Inc. v. Ashe Indus., Inc.*, No. 6:10-CV-1697-ORL-28, 2011 WL 836988, at *2 (M.D. Fla. Mar. 8, 2011) ("In deciding the proper venue, 'only the events that directly give rise to a claim are relevant.'" (quoting *Jenkins Brick Co. v. Bremer*, 321 F.3d 1366, 1371 (11th Cir. 2003))). Plaintiff does not allege that she interacted with any employees or branches in Florida in connection with her claims. Thus, this factor supports transferring Plaintiff's case.

### 3.  Convenience of the Witnesses

The convenience of the witnesses also favors transfer. Other than Plaintiff herself, the Complaint does not identify any witnesses that live, reside, or operate out of Florida. Plaintiff does not identify a branch she communicated with in Florida, any specific employees that discriminated against her, or any individuals with authority or knowledge of the alleged facts that live in Florida.

### 4.  Availability of Process to Compel the Attendance of Unwilling Witnesses

The availability of process to compel the attendance of unwilling witnesses is a neutral factor here.  Federal Rule of Civil Procedure 45(c) governs a court's ability to compel witnesses to appear.  Witnesses can be compelled to appear within (1) one hundred miles of where that person works or lives or (2) within the state where that person works or lives if the person is a party or would not incur substantial expense. Fed. R. Civ. P. 45(c)(1). As explained above, Plaintiff does not point to any events occurring in Florida specifically and Wells Fargo has operations throughout the country.

### 5.  Relative Means of the Parties

This factor still does not heavily support retention of this case in Florida. Courts may consider the relative means—including financial means—of the parties in ruling to retain or transfer a case. *Combs*, 461 F. Supp. 3d at 1215. This factor is important to the decision to transfer to the extent transfer would "dramatically

21

increase the costs associated with" the litigation, *Jones*, 463 F. Supp. 2d at 278, and will support retention only where the non-movant provides specific evidence of undue burden. *Wechsler v. Macke Int'l Trade, Inc.*, 1999 WL 1261251, at *8 (S.D.N.Y. Dec. 27, 1999) ("[P]laintiff's unsupported assertion that plaintiff's means are 'extremely limited' does not suffice to show that transfer would be unduly burdensome.").

Here, Plaintiff's allegations do not indicate that financial means warrants retention of the case. Plaintiff does not—and cannot—identify any costs that will dramatically increase if transfer is granted. Nor can Plaintiff provide any specific evidence that her burden in litigating this action in California will be undue compared to litigation in Florida. To the contrary, if this case is transferred to California, it will likely be consolidated with the California Litigation, augmenting Plaintiff's aggregate resources in litigating her case and diffusing the burdens of discovery among other parties. Thus, this factor supports transfer.

### 6. The Weight Accorded a Plaintiff's Choice of Forum

Under these particular facts, Plaintiff's choice of forum merits little weight and does not overcome the overwhelming reasons to transfer this case. Ordinarily, a plaintiff's choice of forum is given considerable deference. *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) (a plaintiffs' choice of forum should not be disturbed unless it is "clearly outweighed by other considerations"). However,

"where the operative facts underlying the cause of action did not occur within the forum chosen by the Plaintiff, the choice of forum is entitled to less consideration." *Jackson*, 2011 WL 679556, at *3; *Martinez v. Shulkin*, 2017 WL 10821303, at *1 (N.D. Fla. Aug. 2, 2017) (granting transfer where plaintiff's chosen forum had almost nothing to do with overall allegations).

As discussed above, Plaintiff's Complaint does not contend that Defendants allegedly discriminatory home lending policies and practices derived from or were specific to Florida. Instead, Plaintiff's residence is the only discernible connection to the state of Florida. This fact alone, however, is insufficient to keep this case in Florida. *See e.g.*, *AGSouth Genetics LLC v. Terrell Peanut Co.*, No. 3:09-cv-93 (CDL), 2009 WL 4893588, at *2 (M.D. Ga. Dec. 9, 2009) (granting motion to transfer when, *inter alia*, the plaintiff's residence in the chosen forum was the only real connection between the case and that forum). Especially in light of the Plaintiff's alleged status as a putative class member in the California Litigation. Therefore, this factor, at a minimum, does not support retention of this case in Plaintiff's original[6] choice of forum.

---

[6] To the extent relevant, Plaintiff's coordination with consolidated class counsel in the California Litigation and self-identification as a member of the putative class indicates that her *actual* original choice of forum is indeed the Northern District of California and not Florida.

## Conclusion

For the reasons set forth above, this matter must be dismissed or transferred to the Northern District of California pursuant to the "first-to-file" rule. Alternatively, in the interest of expediency, convenience, and fairness, this case should be transferred to the Northern District of California pursuant to 28 U.S.C. § 1404(a) to be heard alongside the California Litigation. Indeed, the California Consolidated Complaint includes Plaintiff by name, and the facts she alleges there are the same facts that she alleges here. And Plaintiff concedes that she is a putative class member in the California Litigation. Accordingly, Defendants respectfully request dismissal or transfer of Plaintiff's Complaint.

Alternatively, to the extent this Court does not otherwise dismiss and/or transfer this matter, the case should not be permitted to proceed as a class action. Indeed, while Plaintiff references that this is a "Class Action" in the title of her Complaint, the Complaint otherwise has none of the hallmarks of a putative class action claim. Pursuant to Local Rule 23.1, "[a] pleading that asserts a claim on behalf of or against a class must set out the proposed definition of the class and must allege facts showing that the claim or defense may be so maintained." Plaintiff fails

to satisfy even these most basic requirements, and any assertion that this case may proceed as a putative class should be stricken.

WHEREFORE, Defendants request that this Court dismiss this case, or alternatively transfer the matter to the Northern District of California. Defendants further request that the references to a class be stricken, and that this Court grant such other and further relief as this Court deems just and proper.

### Certificate of Compliance with Local Rule 7.1(F)

Counsel for Defendants hereby certifies that this Motion contains 5,605 words as calculated by Microsoft Word, excluding the case style, signature block, and certificate of service.

This the 8th day of March, 2024.

MCGUIREWOODS LLP

By: _/s/ Emily Y. Rottmann_
Emily Y. Rottmann
FL Bar No. 93154
erottmann@mcguirewoods.com
Bank of America Tower
50 N. Laura Street, Suite 3300
Jacksonville, Florida 32202
Telephone: (904) 798-3224
Fax: (904) 798-3263

_Counsel for Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co._

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on March 8, 2024, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

*/s/ Emily Y. Rottmann*
Attorney

**DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)**

# EXHIBIT A

*Williams, et al. v. Wells Fargo, N.A., et al.*
**Case No. 3:22-cv-00990-JD**

**ECF No. 1 – *Williams* Amended Complaint**

BENJAMIN L. CRUMP (Pro hac vice to be requested)
BEN CRUMP, PLLC
633 Pennsylvania Avenue Northwest
Floor 2
Washington D.C. 20004
(800) 713-1222
court@bencrump.com

LINDA D. FRIEDMAN (Appearing pro hac vice)
SUZANNE E. BISH (Pro hac vice to be requested)
STOWELL & FRIEDMAN LTD.
303 W. Madison St.
Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Lfriedman@sfltd.com

SAM SANI (SBN 2733993) (Local Counsel)
SANI LAW, APC
15720 Ventura Blvd.
Suite 405
Encino, CA 91436
Telephone:     (310) 935-0405
Facsimile:     (310) 935-0409
ssani@sanilawfirm.com

Attorneys for Plaintiffs
CHRISTOPHER WILLIAMS, SAM ALBURY, AND SHAIA BECKWITH SIMMONS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER WILLIAMS, SAM ALBURY, and SHAIA BECKWITH SIMMONS, individually and on behalf of all others similarly situated, | CASE NO: 3:22-cv-00990-JD |
| | **AMENDED COMPLAINT** |
| Plaintiffs, | Class Action |
| v. | Jury Trial Demanded |
| WELLS FARGO BANK, N.A. and WELLS FARGO & CO., | Hon. James Donato |
| Defendant. | |

AMENDED
COMPLAINT

464456

## AMENDED COMPLAINT
### CLASS ACTION

Plaintiffs Christopher Williams ("Williams"), Sam Albury ("Albury"), and Shaia Beckwith Simmons ("Simmons"), on behalf of themselves and all others similarly situated, by and through their attorneys, hereby file this Amended Complaint against Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co. (collectively "Wells Fargo" or the "Firm"), and state as follows:

### JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. In addition, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5,000,000, and at least one member of the class is a citizen of a different state than any defendant. Plaintiff Williams is a citizen of Georgia, Plaintiff Albury is a citizen of Nevada, Plaintiff Simmons is a citizen of Florida, and neither Defendant is a citizen of Georgia, Nevada, or Florida. Defendant Wells Fargo & Co. is incorporated in Delaware and its principal place of business is in San Francisco, California, as set forth further below. Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota and with its principal place of business in San Francisco, California.

2.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because both Defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District, as the discriminatory policies emanated and were executed from Wells Fargo's headquarters in this District. Venue is proper in the San Francisco Division of the Northern District of California because a substantial part of the events or omissions giving rise to the claims occurred in the county of San Francisco.

## **PARTIES**

3.     Defendant Wells Fargo & Co. is a publicly-traded, global financial services firm and Fortune 500 corporation incorporated in Delaware and has its principal place of business in San Francisco, California. As of December 31, 2020, Wells Fargo has assets of approximately $1.9 trillion, loans of $887.6 billion, deposits of $1.4 trillion and stockholders' equity of $185 billion.[1] Wells Fargo provides a wide variety of financial products and services to its global and domestic clients, who include corporations, governments, financial institutions and individuals, including home mortgages. Wells Fargo claims to serve at least one out of three households in the United States.[2]

4.     Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota with its principal place of business in San Francisco, California, and a subsidiary of Wells Fargo & Co.

5.     Plaintiff Christopher Williams is African American and a citizen of Georgia. As described below, Williams applied for a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

6.     Plaintiff Sam Albury is African American and a citizen of Nevada. As described below, Albury applied for a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

7.     Plaintiff Shaia Beckwith Simmons is African American and a citizen of Florida. As described below, Plaintiff Simmons obtained a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

---

[1] https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2020/10k.pdf
[2] https://newsroom.wf.com/English/news-releases/news-release-details/2021/Wells-Fargo-launches-Banking-Inclusion-Initiative-to-accelerate-unbanked-households-access-to-affordable-transactional-accounts/default.aspx#:~:text=Wells%20Fargo%20%26%20Company%20(NYSE%3A,of%20banking%2C%20investment%20and%20mortgage

## **FACTUAL ALLEGATIONS**

8. As stated above, Wells Fargo is one of the largest banks in the country and one of the top residential mortgage providers in the United States. Across the country, Wells Fargo applies mortgage origination, approvals, interest rate determinations, fees, costs, refinancing, underwriting, deferment, forbearance, default, and foreclosure policies and practices that intentionally and disproportionately discriminate against and harm Black and/or African American home loan applicants and home mortgage borrowers. Williams, Albury, and Simmons were injured by Wells Fargo's racially discriminatory residential mortgage policies and practices.

9. Wells Fargo has a long history of racial discrimination and maintains a corporate culture replete with harmful racial stereotypes and biased views about Black and/or African American customers.

10. Wells Fargo discriminates against Black and/or African American customers throughout its lending process, from application—where Wells Fargo disproportionately denies credit to Black and/or African American applicants—to origination—where Wells Fargo disproportionately charges higher interest rates, imposes higher fees and costs, and offers worse terms to Black and/or African Americans compared to non-Black, non-African Americans—to refinancing—where Wells Fargo disproportionately denies Black and/or African Americans the opportunity to modify or lower their interest rates—and servicing—where Black and/or African American borrowers are subjected to additional racial discrimination.

11. Wells Fargo engages in redlining by approving white applicants for mortgage loans at substantially higher rates than Black and/or African American applicants. In 2020, for instance, according to an analysis of nationwide data published under the Home Mortgage Disclosure Act, Wells Fargo approved approximately 67.1% of white borrowers who applied for a mortgage, compared to only 51.8% of Black and/or African American applicants.

12. When evaluating statistical disparities like the one described above, statisticians use a tool called the "standard deviation" to assess the likelihood that the disparity is due to chance. The more standard deviations, the more the observed result deviates from the expected result and the less likely that the disparity is due to random chance. Courts and statisticians consider a disparity "statistically significant"—that there is a 95% level of confidence that random chance did not cause the disparity—at 1.96 standard deviations. In this case, the difference in approvals is statistically significant at *over 29 standard deviations*.

13. When Wells Fargo approves Black and/or African American borrowers' mortgage applications, it does so on substantially worse terms than offered to non-Black, non-African American borrowers. Nationwide, in 2020, the average interest rate Wells Fargo charged to Black and/or African American borrowers was 3.34%, versus 3.23% to white borrowers. The difference is statistically significant at over 17 standard deviations.

14. Wells Fargo also imposes higher costs on Black and/or African American borrowers relative to the size of their loans. In 2020, Black and/or African American borrowers nationwide had to spend, on average, 2.0% of their Wells Fargo loan value on costs and fees, versus 1.7% for white borrowers. The disparity is statistically significant at 9 standard deviations.

15. Wells Fargo has faced a number of recent lawsuits and settlements challenging these practices and disparities. For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software for minority homeowners which resulted in them paying more for their home loans than white borrowers. *Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court) ($3.5 million verdict). Wells Fargo has also paid hundreds of millions of dollars to avoid litigating its discriminatory home lending practices. Indeed, Wells Fargo agreed to a settlement valued at over $440 million of a lawsuit challenging the Firm's redlining practices,

resulting in a disproportionate number of foreclosures in African American neighborhoods in Shelby County and the City of Memphis. *City of Memphis and Shelby County, et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 2:09-CV-02857 (W.D. Tenn.). Wells Fargo also settled a lawsuit for $37 million led by the National Fair Housing Alliance alleging that Wells Fargo took better care of foreclosed properties that it owned in white neighborhoods than those in African American and Latino communities. *National Fair Housing Alliance, et al. v. Wells Fargo Bank N.A., et al.*, HUD Case No. 09-12-0708-8 (U.S. Department of Housing & Urban Development Office of Fair Housing & Equal Opportunity).

16.     Wells Fargo has also faced and settled numerous lawsuits challenging its "reverse redlining" practices of charging higher rates and imposing less favorable terms for minority home borrowers than for white home borrowers. For instance, in 2013, Wells Fargo paid $175 million to settle a lawsuit brought by the United States Department of Justice alleging that the Firm charged higher rates to its African American and Latino borrowers. *United States v. Wells Fargo Bank, NA*, Case No. 1:12-cv-01150 (D.D.C.).

17.     In 2019, Wells Fargo paid $10 million to settle a similar claim brought by the City of Philadelphia. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019). Philadelphia alleged that Wells Fargo simply swapped the evil of redlining—refusing to lend to minority communities—for the similarly pernicious reverse redlining—lending to minority borrowers, but saddling them with more expensive loans with worse terms than those extended to white borrowers. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019), Dkt. 1 (Complaint) ¶¶ 5–21. Philadelphia alleged that "since at least 2004 . . . Wells Fargo has systematically engaged in a continuous and unbroken discriminatory pattern and practice of issuing higher cost or more onerous mortgage loans to minority borrowers in Philadelphia when more favorable and less expensive loans were being offered to similarly

situated non-minority borrowers." *Id.* ¶ 5 (E.D. Pa.). Philadelphia's statistical analysis revealed that African American borrowers were more than twice as likely to "receive a high-cost or high-risk loan" than a white borrower even when controlling for credit score. *Id.* ¶ 14. Indeed, the discrimination worsened as the credit score increased—especially creditworthy "African-Americans with FICO scores over 660 were 2.570 times more likely to receive a high-cost or high-risk loan from Wells Fargo as a white borrower." *Id.* The predictable result of Wells Fargo's foisting high-cost, high-risk loans on African Americans was an explosion of foreclosures in minority communities, where loans were "4.710 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood." *Id.* ¶ 12. This precipitated what "many leading commentators describe[d] as the 'greatest loss of wealth for people of color in modern US history.'" *Id.* ¶ 18.

18. Wells Fargo has found new avenues to discriminate against Black and/or African American customers with recent changes to the home mortgage market. Nationwide, homeowners have had the opportunity to take advantage of historically low interest rates through refinancing, which occurs when a homeowner applies for credit related to their residential real estate to change the terms of an earlier loan. Over the last two years, U.S. homeowners refinanced almost $5 trillion in mortgages, generating untold savings.[3] This could have been an opportunity for African American homeowners to build wealth and secure their families' futures.

19. Wells Fargo, however, systematically and intentionally shut Black and/or African American customers out of this major wealth event. According to an analysis of 2020 Home Mortgage Disclosure Act data, Wells Fargo approved 33.7% of refinancing applications from Black and/or African American applicants, compared with 49.1% from white applicants. Wells

---

[3] https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/

AMENDED
COMPLAINT
- 7 -

Fargo denied Black and/or African Americans borrowers' applications outright 36.1% of the time, versus 20.3% of the time for white borrowers. These disparities are statistically significant at over 31 standard deviations.

20.     And just as it does with home purchase loans, Wells Fargo charges higher costs and interest rates to Black and/or African American customers who obtain refinancing. In 2020, Wells Fargo charged the average national Black and/or African American refinancing recipient 3.18% versus 3.11% for white refinancing recipients, and charged Black and/or African American customers an average of $5,335 in costs and fees versus $4,193 for white borrowers, for an average cost of borrowing of 2.6% for Black and/or African American customers versus 1.8% for white borrowers. All these disparities are statistically significant.

21.     Wells Fargo's failure to extend refinancing and other home loans to Black and/or African American customers has even drawn the attention of members of Congress. Senators Elizabeth Warren and Ron Wyden recently wrote a letter to Wells Fargo's Chief Executive Officer Charles Scharf excoriating the Bank for its "shocking disparity" in its approval ratings of Black and/or African American refinancing applicants.[4] The Senators stated that Wells Fargo's recent actions were consistent with "Wells Fargo's long history of scamming and mistreating consumers of color."[5] Furthermore, the Senators believed "Wells Fargo's treatment of Black borrowers is deeply concerning, no matter how one looks at the data" and concluded, "Wells Fargo appears to be simply unable or unwilling to stop preying upon customers of color."[6]

22.     Wells Fargo discriminates against its African American employees just as readily as it does its customers. In 2016, Wells Fargo was charged with systemic discrimination against

---

[4] Letter from Senators Elizabeth Warren and Ron Wyden, March 16, 2022
https://www.warren.senate.gov/imo/media/doc/2022.3.16%20Letter%20to%20Wells%20Fargo%20on%20Refinancing%20Discrimination.pdf
[5] *Id.*
[6] *Id.*

minority Financial Advisors including by African American Financial Advisors in the class action lawsuit *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014). Wells Fargo eventually settled the *Slaughter* litigation for over $35 million. *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014), Dkt. 99-1.

23.     In determining home loans, interest rates, points, and other credit and contractual terms, Wells Fargo intentionally uses factors to determine eligibility for home loan rates, terms, and conditions that facilitate redlining and reverse redlining against and disfavor Black and/or African American applicants.

24.     Many traditional techniques for determining creditworthiness, such as FICO score, debt-to-income ratio, and work history, have been demonstrated to cause an unlawful disparate impact against Black borrowers and/or African Americans. Wells Fargo, however, employs an even more discriminatory "unique scoring model" that eschews even these traditionally discriminatory origination and underwriting techniques. Wells Fargo thereby intentionally discriminates and creates an unlawful disparate impact against Black and/or African American mortgage applicants, including applicants for refinancing.

25.     Additionally, pursuant to its Firm-wide discriminatory culture, Wells Fargo unduly scrutinizes and is unduly skeptical of the application materials submitted by Black and/or African American applicants, causing undue delays and rejections of Black and/or African American mortgage applicants, including applicants for refinancing.

26.     In the rare case Wells Fargo offers mortgage loans to Black and/or African American customers on reasonable terms, Wells Fargo engages in predatory lending practices to force Black and/or African American borrowers out of those terms, including pressuring Black and/or African American borrowers to increase their rates by improperly treating Black and/or African American borrowers' loans in default and instituting improper foreclosures.

27.     The racially discriminatory policies and practices at Wells Fargo are uniform and national in scope and create an artificial, arbitrary, and unnecessary barrier to fair housing opportunities for Black and/or African American borrowers. Class members who applied for loans at Wells Fargo offices across the country and were harmed by these same policies and practices are relying on Plaintiffs and this lawsuit to protect their rights. Wells Fargo's policies are practices are implemented with discriminatory intent and/or disproportionately impact Black and/or African Americans borrowers.

**PLAINTIFFS WERE INJURED BY DEFENDANTS'**
**DISCRIMINATORY POLICIES AND PRACTICES**

**Christopher Williams**

28.     Williams is African American. Williams was a well-qualified African American home borrower. When he applied for his mortgage loan, Williams was highly creditworthy, as reflected in his high FICO score of over 750. Based on this, Williams believed he should have qualified for Wells Fargo's prime interest rate, which would have saved him substantial money over time on his home mortgage. However, consistent with Wells Fargo's pattern of discrimination against African American borrowers, Wells Fargo offered Williams an interest rate nearly three points higher than the prime interest rate offered by Wells Fargo, which is disproportionately and discriminatorily offered to white applicants.

29.     Believing it to be a mistake, Williams spoke to Wells Fargo's home lending department to have his credit report rechecked and for his interest rate to be lowered. Instead, the Firm refused to reconsider his credit score or his interest rate.

30.     Wells Fargo agreed to revisit its refusal to extend the loan to Williams on favorable terms. However, in a letter dated September 5, 2019, Wells Fargo finally articulated for the first time, that it did not use solely FICO credit scores to determine home interest rates, but

instead used "a unique scoring model, which considers more than credit scores to evaluate applications."

31. Indeed, the "other" factors used by Wells Fargo to determine interest rates for home loans serve to intentionally exclude Black and/or African American borrowers from affordable and lower-risk loans, force Black and/or African American borrowers to pay higher interest rates and other fees that similarly situated white borrowers, and have a disparate impact based on race. Williams applied for and received a home loan from another bank at its prime interest rate.

32. Williams identified his race to Wells Fargo during the application process.

**Sam Albury**

33. Plaintiff Albury is African American. Albury is a well-qualified African American home borrower. When he applied for his mortgage, Albury was gainfully employed, had already owned two properties, and was highly creditworthy. In or around June 2020, Albury agreed to purchase a new home in Las Vegas, Nevada. To do so, Albury agreed to close on the property in 35 days and paid the buyer a considerable amount of earnest money. Despite being warned not to use Wells Fargo by his realtor, Albury believed he would receive a prime mortgage due to his preexisting banking relationship with Wells Fargo.

34. However, consistent with Wells Fargo's pattern of discrimination against Black and/or African American borrowers across the country, Wells Fargo offered Albury an interest rate higher than the prime interest rate offered by Wells Fargo to white applicants. Wells Fargo also unduly scrutinized his application and subjected him to baseless inquiries regarding his finances and work history. Worried that Wells Fargo would not approve his mortgage application in time for the scheduled closing, Albury answered all of Wells Fargo's baseless inquiries.

35.     Wells Fargo continued to string Albury along until, just days before his scheduled closing, Wells Fargo denied his application in full. Wells Fargo's actions forced Albury to walk away from his home purchase, thereby forfeiting thousands of dollars in earnest money.

**Shaia Beckwith Simmons**

36.     Plaintiff Shaia Beckwith Simmons is a public relations expert, community advocate, and motivational speaker, with a Bachelor's in Business Administration and Management and a Master's in Educational Leadership and Administration from Florida A&M University. She and her husband, the head coach of Florida A&M's Division I football team, are pillars of their local community.

37.     Simmons is a well-qualified African American home borrower who obtained a home mortgage loan from Wells Fargo in 2009 and refinanced it for a lower interest rate in 2013.

38.     Simmons is a model homeowner and has timely made her monthly payments without incident. During the COVID-19 pandemic, as required by the CARES Act, Wells Fargo offered existing home mortgage borrowers the option to defer their payments. Simmons accepted Wells Fargo's deferment option, which allowed her to restructure her loan to defer monthly payments during the pandemic and instead make those monthly payments at the end of her loan.

39.     After several months of approved deferments, Simmons promptly resumed making her mortgage payments in full, as she had done for decades without issue.

40.     Yet consistent with its nationwide discriminatory practices, Wells Fargo maliciously and unlawfully instituted foreclosure proceedings against Simmons without prior notice, asserting without justification that Simmons was in default for failure to make mortgage payments during her deferment.

41.     Consistent with its nationwide practices of predatory lending to extract wealth from Black and/or African American customers, Wells Fargo presented Simmons with an

AMENDED
COMPLAINT
- 12 -

ultimatum: she could renegotiate her loan, potentially at a higher interest rate that would cost her many thousands of dollars over the remaining life of the loan, or Wells Fargo would persist with the unjustified foreclosure to take her home away from her and resell it in a booming market.

42.    Simmons refused to renegotiate her loan and is resisting the wrongful foreclosure, which remains pending.

43.    Wells Fargo's unlawful actions have caused Simmons emotional distress, and the pendency of the wrongful foreclosure and filing of a lis pendens against her property have damaged Simmons's credit rating, causing further injury.

## CLASS ALLEGATIONS

44.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class of Black and/or African American applicants or borrowers who applied for, received, or maintained credit from Defendants related to residential real estate and who were subjected to discrimination by Defendants due to their race. Plaintiffs seek certification of a liability and injunctive and declaratory relief class under Rule 23(b)(2) and 23(c)(4), and/or certification of a broader class under Rule 23(b)(3). All requirements of class certification are met by the proposed class.

45.    The class of Black and/or African American participants in Wells Fargo's home lending process is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

46.    There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

47.    The claims alleged by Plaintiffs are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3).

AMENDED
COMPLAINT
- 13 -

48.     Plaintiffs will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

49.     The issue of determining liability regarding whether Defendant's policies and practices result in a pattern or practice of intentional discrimination and/or have a disparate impact against African Americans is appropriate for issue certification under Rule 23(c)(4). Other common issues are also appropriate for certification.

50.     Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with regard to the class as a whole.  Fed. R. Civ. P. 23(b)(2).

51.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

## COUNT I

## EQUAL CREDIT OPPORTUNITY ACT

52.     Plaintiffs, on behalf of themselves and all those similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

53.     The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

54.     As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiffs were applicants for credit.

55.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of

AMENDED
COMPLAINT
- 14 -

systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

56.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendant's systemic and individual discrimination.

57.     Defendants' unlawful conduct resulted in considerable harm to Plaintiffs and all those similarly situated.

58.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

<u>**COUNT II**</u>

**RACE DISCRIMINATION IN VIOLATION
OF 42 U.S.C. § 1981**

59.     Plaintiffs, on behalf of themselves and all those similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

60.     Under 42 U.S.C. § 1981, persons of all races are guaranteed the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

61.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination in the making and modification of contracts in violation of 42 U.S.C. § 1981.

AMENDED
COMPLAINT
- 15 -

62.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

63.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

**COUNT III**

**RACE DISCRIMINATION IN VIOLATION
OF 42 U.S.C. § 1982**

64.     Plaintiffs reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

65.     Under 42 U.S.C. § 1982, all citizens are guaranteed the same right to inherit, purchase, lease, sell, hold, and convey real and personal property, regardless of race.

66.     As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination and disparately impacts Black and/or African American applicants and borrowers in violation of 42 U.S.C. § 1982.

67.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

68.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

1

**COUNT IV**

2

3

**RACE DISCRIMINATION IN VIOLATION OF
THE FAIR HOUSING ACT OF 1968, 42 U.S.C § 3601 *et seq.***

4          69.     Plaintiffs reallege each and every paragraph above and incorporate them by

5     reference as though fully stated herein.

6          70.     The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business

7     includes engaging in residential real estate-related transactions from discriminating against any

8

9     person in making available such a transaction on the basis of race.

10          71.     Defendants' business includes engaging in residential real estate-related

11     transactions.

12          72.     As set forth above, Defendants maintained a nationwide set of uniform,

13     discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in

14     a pattern or practice of systemic race discrimination against Black and/or African American

15

16     mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination and

17     disparately impacts Black and/or African American mortgage loan applicants and borrowers in

18     violation of the Fair Housing Act of 1968.

19          73.     Plaintiffs and all those similarly situated were subjected to and harmed by

20     Defendants' systemic and individual discrimination.

21          74.     On behalf of themselves and the class they seek to present, Plaintiffs request the

22     relief set forth below.

23

**PRAYER FOR RELIEF**

24          WHEREFORE, Plaintiffs respectfully request that this Court find against Defendants

25     as follows:

26

27          a.     Certify this case as a class action;

28

AMENDED
COMPLAINT
- 17 -

b.      Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c.      Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act;

d.      Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against Black and/or African American applicants and borrowers;

e.      Order Plaintiffs and all others similarly situated offered mortgage loans at non-discriminatory rates, and otherwise make Plaintiffs whole;

f.      Award Plaintiffs and all others similarly situated compensatory and punitive damages;

i.      Award Plaintiffs and all others similarly situated prejudgment interest and attorneys fees, costs and disbursements, as provided by law;

j.      Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs and all others similarly situated.

k.      Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

# **DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure and Civil Local Rule 3-6.

Respectfully submitted,

BEN CRUMP, PLLC

BENJAMIN CRUMP (Pro hac vice to be requested)
633 Pennsylvania Avenue Northwest
Floor 2
Washington D.C. 20004
Tel: (800) 713-1222
court@bencrump.com

STOWELL & FRIEDMAN, LTD.

By: */s/ Linda D. Friedman*
LINDA D. FRIEDMAN (Appearing pro hac vice)
SUZANNE E. BISH (Pro hac vice to be requested)
**STOWELL & FRIEDMAN LTD.**
303 W. Madison St.
Suite 2600
Chicago, Illinois 60606
Phone: (312) 431-0888
Lfriedman@sfltd.com

SANI LAW FIRM

SAM SANI (local counsel)
**SANI LAW FIRM**
15720 Ventura Blvd.
Suite 405
Encino, CA 94612
Tel: (310) 935-0405
ssani@sanilawfirm.com

*Attorneys for Plaintiffs Williams, Albury, Simmons, individually and on behalf of all others similarly situated*

**DEFENDANTS' MOTION TO DISMISS OR ALTERNATIVELY
TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)**

# EXHIBIT B

*In re Wells Fargo Mortgage Discrimination Litigation*
**Case No. 3:22-cv-00990-JD**

**CA ECF No. 114 –** *California Consolidated Complaint*

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Dennis S. Ellis (State Bar No. 178196)
  dellis@egcfirm.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

*Interim Lead Class Counsel*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Wells Fargo Mortgage Discrimination Litigation.* | Case No. 3:22-cv-00990-JD |
| | Honorable James Donato |
| | **AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT FOR:** |
| | **1. VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691, *ET SEQ.*** |
| | **2. RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, 42 U.S.C. § 3601, *ET SEQ.*** |
| | **3. RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981** |
| | **4. VIOLATION OF THE UNRUH CIVIL RIGHTS ACT, CALIFORNIA CIVIL CODE § 51** |
| | **5. VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW** |
| | **DEMAND FOR JURY TRIAL** |

Plaintiffs Aaron Braxton, Paul Martin, Gia Gray, Bryan Brown, Elretha Perkins, Christopher Williams, Ifeoma Ebo and Terah Kuykendall-Montoya, individually and as representatives of a nationwide class of similarly situated applicants for original purchase mortgage, refinance and other home mortgage loans (collectively, "Plaintiffs" or the "Class"), allege as follows:

## I.    NATURE OF ACTION

1.    The benefits of homeownership have long been the cornerstone of the American Dream, allowing people, regardless of economic status, to accumulate wealth by gaining access to credit, building equity, and reducing housing costs.[1]

2.    These benefits, however, have for far too long been unattainable for a disproportionate number of non-white Americans, and more difficult for such Americans to maintain once achieved.  For example, historically, Black Americans have been repeatedly and systematically denied access to the financial benefits of homeownership through pernicious and pervasive race-based policies and practices. These included, for example, the Federal Housing Administration's refusal to insure mortgages in and near minority neighborhoods—a practice now referred to as "redlining"—at the same time that the FHA subsidized builders who mass-produced entire subdivisions for white Americans.

3.    The passage of civil rights legislation in the 1960s, together with amendments to that legislation in the ensuing decades, was supposed to remedy that historical injustice by eliminating race-based gatekeeping practices like redlining and restrictive covenants.  Despite the promise of this legislation, many minorities continue to face discrimination in the realm of home ownership and continue to find themselves hampered by lingering vestiges of this country's explicitly racist past.

4.    Over the past few years, historically low interest rates created unprecedented opportunities for prospective homeowners to obtain original purchase

---

[1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=1c78499623b5.

mortgage loans to buy their first homes and for existing homeowners to refinance their mortgages or access equity in their homes on much more favorable terms. Original purchase mortgage loans at low interest rates allow potential homeowners to acquire suitable homes with manageable monthly payments. Refinanced mortgages and other home loan products allow homeowners to reduce their monthly payments (as well as the overall interest due during the life of their loan) and access equity while still building wealth through their homes. Not surprisingly, millions of Americans sought to purchase a new home at a low interest rate, refinance existing loans or obtain additional home loan products.

5.    But far too many would find the door to these opportunities closed for no other reason than their racial or ethnic background. More specifically, non-white applicants for home loans from the defendants in this case—Wells Fargo Bank, N.A., Wells Fargo & Co., and Wells Fargo Home Mortgage (collectively, "Defendants" or "Wells Fargo")—had their applications intentionally and disproportionately denied, faced unjustified delays in the processing of their applications, and/or were given less favorable terms than similarly qualified white Americans. This was the result of Wells Fargo systematically engaging in a new form of redlining that harmed Plaintiffs and the Class based on their race and ethnicity.

6.    In 2020, for instance, according to an analysis of nationwide data published under the Home Mortgage Disclosure Act, Wells Fargo approved approximately 67.1% of white borrowers who applied for a mortgage, compared to only 51.8% of Black and/or African American applicants.

7.    When Wells Fargo approves non-white borrowers' mortgage applications, it often does so on substantially worse terms than those offered to white borrowers. Again, take the case of Black applicants: nationwide, in 2020, the average interest rate Wells Fargo charged to Black borrowers was 3.34%, versus 3.23% for white borrowers. The difference is statistically significant at over 17

1    standard deviations.[2]

2        8.    Wells Fargo also frequently imposes higher costs on non-white

3    borrowers relative to the size of their loans.  For example, in 2020, Black borrowers

4    nationwide had to spend, on average, 2.0% of their Wells Fargo loan value on costs

5    and fees, versus 1.7% for white borrowers.  The disparity is statistically significant

6    at 9 standard deviations.

7        9.    With respect to refinancing, Wells Fargo **denied the applications of**

8    **over 50%** of the Black applicants seeking to refinance in 2020, and **denied the**

9    **applications of just under 50%** of the Black applicants seeking to refinance in 2021.

10   No other major lending institution refused to refinance the homes of Black

11   applicants at such stunning rates.

12       10.    Wells Fargo was the only major lender in the United States that

13   approved a smaller share of refinancing applications from Black homeowners in

14   2020 than it had in 2010.[3]  That year, while Wells Fargo approved 71% of the

15   residential refinancing applications submitted by white Americans, it approved only

16   **47%** of residential refinance applications submitted by Black applicants, **53%** of

17   residential refinancing applications submitted by applicants identified as Hispanic

18   and/or Latino, and **67%** of residential refinancing applications submitted by Asian

19   American applicants.  When compared to other lenders, which had approval rates of

20   **71%**, **79%**, and **85%**, respectively, for the same racial groups, Wells Fargo's

21   statistics are stark.  This clear disparity in outcomes is especially significant in light

22   of data compiled by the National Community Reinvestment Coalition showing that

---

23   [2] When evaluating statistical disparities like the one described above, statisticians

24   use a tool called the "standard deviation."  The more standard deviations, the more
     the observed result deviates from the expected result and the less likely the disparity

25   is due to random chance.  Courts and statisticians consider a disparity "statistically

26   significant"—meaning that there is a 95% level of confidence that random chance
     did not cause the disparity—at 1.96 standard deviations.  In this case, the difference

27   in approvals is statistically significant at *over 29 standard deviations.*

28   [3] *Id.*

in 2020, origination rates for non-white Americans including Black Americans across all lending institutions reflected a significant *increase*, from 53.7% to 59.4%.[4]

11.     The story in 2021 was the same, with Wells Fargo approving a much lower percentage of Black refinancing applicants than any other lender.[5]  Wells Fargo approved only 58% of Black applicants compared to other lenders, which approved 74% of Black homeowner applicants.[6]  And the disparity between Black and white refinancing approval rates was 21% at Wells Fargo, nearly double the disparity (13%) for all other for other lenders.[7]  And while Wells Fargo's Black homeowner refinancing approval rate improved slightly from 2020, the same was true for all other lenders, due to broader economic conditions.[8]  By comparison, other major lenders approved much higher rates of Black homeowner refinancing applicants in 2021:  JP Morgan Chase & Co. approved 87% of Black homeowner applicants (only 6% less than White applicants), Rocket Mortgage LLC approved 81% of Black homeowner applicants (only 7% less than White applicants), and Bank of America Corporation approved 75% of Black homeowner applicants (only 11% less than White applicants).[9]

12.     Overall, the data released under the federal Home Mortgage Disclosure Act shows unequivocally that Wells Fargo rejects a disproportionate number of non-white applicants.[10]  Wells Fargo also makes the application process

---

[4] https://ncrc.org/ncrc-2020-home-mortgage-report-examining-shifts-during-covid/
[5] https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-persistent-racial-gap-in-mortgage-refinancing.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

more difficult for non-white applicants on a national scale.[11]  For example, Wells Fargo customers report loan officers stating that Wells Fargo's refinancing calculation tools consider certain "areas" with large Black populations to be ineligible for rapid valuations.[12]  Non-white applicants are further subjected to delays, feigned mistakes, and other obstacles, leading many to withdraw their applications and others to wait indefinitely while Wells Fargo refuses to act.

13.     Wells Fargo also charges higher costs and interest rates to non-white customers who obtain refinancing.  For example, in 2020, Wells Fargo charged the average national Black and/or African American refinancing recipient 3.18% versus 3.11% for white refinancing recipients, and charged Black and/or African American customers an average of $5,335 in costs and fees versus $4,193 for white borrowers, for an average cost of borrowing of 2.6% for Black and/or African American customers versus 1.8% for white borrowers.  All these disparities are statistically significant.

14.     In light of this, Wells Fargo's stated commitment to "help[] ensure that all people across our workforce, our communities, and our supply chain feel valued and respected and have equal access to resources, services, products, and opportunities to succeed"[13] rings hollow.  Instead, Wells Fargo pervasively denies non-white homeowners' refinancing applications and consistently delays the applications it does not deny, in many cases ultimately forcing such homeowners into foreclosure.[14]

15.     Much responsibility for the breadth of Wells Fargo's discriminatory treatment of non-white mortgage and refinancing applicants lies with its decision to employ centralized, universal, race-infected lending algorithms to differentially

---

[11] *Id.*

[12] *Id.*

[13] https://www.wellsfargo.com/about/diversity/diversity-and-inclusion/.

[14] https://www.nclc.org/images/pdf/special_projects/covid-19/IB_Covid_Black_Forbearance_Foreclosure.pdf.

assess, delay and ultimately reject residential lending applications.  By using these algorithms and by failing to properly monitor and correct the lending algorithms, Wells Fargo engages in a practice of "***digital redlining***" that Wells Fargo knows intentionally and disproportionately discriminates against applicants based on their race and ethnicity.

16.     Used properly, automated underwriting technology can help individual loan officers who are properly trained and familiar with the legal environment in which banks operate make sound, individualized underwriting decisions that protect the interests of borrowers, banks, investors, insurers and the federal government, taking into account race-neutral data points and employing formulae based on those data points to decide whether the proposed loan is in the best interest of the bank and the borrower.

17.     But that is not how Wells Fargo utilized its automated underwriting technology.  Quite the contrary: during a period of time that included the COVID-19 pandemic, Wells Fargo systematically jettisoned or otherwise ignored well-established internal fair lending checks and balances in favor of implementing a centralized "pioneering automated underwriting" system—sometimes referred to as CORE—without sufficient, or sometimes any, human supervision or involvement.

18.     The problem became worse when multiple loan processors and underwriters were terminated or otherwise left the bank's residential lending operations and were not replaced.  Instead, the CORE "pioneering automated underwriting system" was increasingly centralized to facilitate at-home work by originators, processors, and underwriters.  The coding and machine learning endemic to the CORE algorithmic underwriting platform were—byte by byte—stuffed chock-full of Wells Fargo-generated geographic, demographic, race-stratified liquidity, appraisal, and other "overlays" that Wells Fargo knew served no legitimate underwriting basis but, instead, functioned as signals for race discrimination in Wells Fargo's residential lending decisions.

19.     These and other "overlays" pervasively infecting Wells Fargo's CORE algorithms became even more invidious with each successive denial, which taught the algorithm these denials were appropriate.  This ultimately served Wells Fargo's purpose of segregating the creditworthiness of prospective applicants based on protected characteristics such as their race and ethnicity, and differentiated Wells Fargo's assessments from those of the other major lending institutions.

20.     Moreover, Wells Fargo loan processors supposedly responsible for shepherding applications through the bank's systems, who were previously expected to process 30 applications per month, were later forced by Wells Fargo's CORE platform to process more than 50 and sometimes nearly 100 per month.  They were also rendered powerless to supervise the process, override the algorithm, or otherwise intervene on the side of basic compliance with fair housing laws.

21.     Non-white applicants are not less creditworthy than white applicants.  To the contrary, when fairly evaluated, the applications of non-white applicants should have resulted in equal treatment.  For example, Wells Fargo knowingly incorporates, without adjustment, appraisals that have been shaped by years of race-based valuation standards or appraisals affected by race-based criteria.  Homes in majority Black neighborhoods are worth an average of 23% less than homes in neighborhoods with "very few or no Black residents" and of similar home quality.[15]

22.     In September 2021, the Federal Home Loan Mortgage Corporation released the results of a five-year study based on more than 12 million appraisals.[16]  The study found that "Appraisers' opinions of value are more likely to fall below the contract price in Black and Latino census tracts, and the extent of the gap increases

---

[15] https://www.brookings.edu/research/devaluation-of-assets-in-black-neighborhoods/?utm_source=newsletter&utm_medium=email&utm_campaign=sendto_newslettertest_business&stream=top#_ga=2.213288596.1000901909.1649553887-1080662765.1648140872.

[16] https://www.freddiemac.com/research/insight/20210920-home-appraisals.

as the percentage of Black or Latino people in the tract increases."[17]  Wells Fargo's discrimination has not only led to delays in the application process for Black applicants but has forced those who received below-market appraisals from Wells Fargo to abandon the process with Wells Fargo and turn elsewhere.

23.    Plaintiffs, and members of the proposed Class, are the victims of Wells Fargo's pervasive misconduct:  non-white applicants for home loans from across the country whose applications to obtain a home mortgage, refinance their existing home loans or access equity in their homes have been systematically delayed or denied because Wells Fargo discriminates against them.  Tens of thousands have been victimized both by Wells Fargo's intentional, knowing and systematic race discrimination and the disparate impact of its practices, violating the contractual, commercial and civil rights of Class members and causing millions (and perhaps billions) of dollars in damages to the Class.  Individually and as representatives of the Class (defined below), Plaintiffs bring this action to enjoin Wells Fargo's present-day redlining and related discriminatory practices, to make good to the Class all damages resulting from its violations of civil rights laws, and to restore to the Class any amounts to which they otherwise would have been entitled, together with such other equitable and remedial relief as the Court may deem appropriate.

## II.    JURISDICTION AND VENUE

24.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343 because Plaintiffs assert federal causes of action, because Plaintiffs assert civil rights causes of action, because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

25.    Personal jurisdiction is appropriate over Defendants because Wells

---

[17] *Id.*

1  Fargo Bank, N.A. transacts business in the State of California and has its principal

2  place of business in San Francisco, California, Wells Fargo Home Mortgage, Inc.

3  originates loans to California customers from its California offices and maintains a

4  systematic and continuous presence in the State, and Wells Fargo & Co. has its

5  corporate headquarters in San Francisco, California.

6       26.     Venue is proper in the Northern District of California pursuant to 28

7  U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a

8  substantial part of the events or omissions giving rise to the claim occurred in this

9  district, Wells Fargo Bank, N.A.'s principal place of business is in this district, and

10  Wells Fargo & Co. has its corporate headquarters in this district.

11                      **III.   PARTIES**

12                          *Aaron Braxton*

13       27.     Plaintiff Aaron Braxton, who is a Black homeowner, is a natural

14  person and a citizen of the State of California and resides in Los Angeles,

15  California.

16       28.     Mr. Braxton is one victim of Wells Fargo's discriminatory policies

17  and practices.  He is a financially successful and eminently creditworthy Black

18  playwright, performer, and math and science teacher with a Master's degree from

19  the University of Southern California.[18]  He has authored several award-winning

20  plays, including *DID YOU DO YOUR HOMEWORK?*, which broke the Beverly

21  Hills Playhouse's record for longest running play (nine months).[19]  He has also

22  written several films and television pilots and acted in several film, television, and

23  theatre projects.[20]

24       29.     In addition, for two decades, Mr. Braxton was a Wells Fargo

25  mortgage customer.  He purchased his home in 2000, in a historically Black

---

[18] https://www.imdb.com/name/nm1347914/bio?ref_=nm_ov_bio_sm.

[19] *Id.*

[20] *Id.*

neighborhood located in South Los Angeles near the campus of the University of Southern California, and financed his purchase with a Wells Fargo home mortgage insured by the FHA. Mr. Braxton always made his mortgage payments and paid his bills on time, and he had a good credit score.

30. Despite his successful career and creditworthiness, when Mr. Braxton sought to refinance his home mortgage loan in August of 2019, Wells Fargo consistently obstructed the process. Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo was focused more on his race and the location of his home within a historically Black Los Angeles neighborhood, and used the fact of his race and the location of his home to delay, obstruct, and deny him the full benefits of historically low home mortgage interest rates. Wells Fargo did this even though, having paid his loans for more than 18 years, Mr. Braxton had equity in his home far greater than the amount remaining on his FHA-insured loan.

31. Mr. Braxton was given the runaround to such an extent that it took him over nine months to refinance his federally backed mortgage loan (and 12 months to refinance his home equity loan) at an above-market interest rate of around 4%. This was after various Wells Fargo representatives kept telling him they lost his paperwork, made incomplete inquiries and needed to request more information, delayed their responses, and even placed him into an unsolicited debt-trap deferred payment program without his permission. It was only after Mr. Braxton notified the Department of Housing and Urban Development ("HUD") that Wells Fargo approved the refinancing of his federally backed FHA loans (indeed, Wells Fargo approved the application the very next day). Of course, for the prolonged period that Mr. Braxton was waiting for Wells Fargo to refinance his loans, he was paying the higher rates associated with his original loans.

### *Paul Martin*

32. Plaintiff Paul Martin, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

33.     Mr. Martin has been a Hollywood entertainment executive at Sony Pictures for 14 years.  In 2020, he sought to refinance his home in the Ladera Heights neighborhood of Los Angeles, which has a higher proportion of affluent Black residents than most Los Angeles neighborhoods.  His multimillion-dollar home was previously owned by WNBA superstar Lisa Leslie and NBA player Aaron Afflalo.

34.     But Wells Fargo demanded that Mr. Martin first apply for a home equity line of credit (HELOC), before they would consider him for a loan refinance. Ultimately, Wells Fargo refused to provide Mr. Martin with the HELOC or refinance Mr. Martin's loan.  The bank would not do either unless he could get his home appraised for $2 million.  Wells Fargo's appraiser refused to come inside Mr. Martin's home, and appraised it at just shy of $2 million based on comparisons with homes in less affluent, Black-populated neighborhoods, apparently conflating all areas with a high concentration of Black residents.  Mr. Martin went to another lender, who appraised the home at $2.4 million and promptly refinanced his loan.

## *Gia Gray*

35.     Plaintiff Gia Gray, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Danville, California.  Dr. Gray is a physician.

36.     Dr. Gray is another victim of Wells Fargo's discriminatory policies and practices.  She is in the top quintile of income earners.  The same was true when she applied to refinance her loans with Wells Fargo.  Dr. Gray's FICO score is above 800.

37.     Dr. Gray, together with her husband, owns income properties in Stockton, California and Chicago, Illinois, and a primary residence in Danville, California.  The couple had Wells Fargo mortgages for all three of their homes, and, save for a balance of approximately $1,000 on a credit card, the couple has and had no other debt.  The couple never missed a mortgage payment and always paid on

time.  They began the refinancing process for their homes in February 2020.

38.     The Grays were denied refinancing on their two income properties outright; Wells Fargo refused to even accept an application for these homes.  Wells Fargo would not return their calls with inquiries on refinancing these two properties.  When the couple did manage to get a hold of the assistant or loan officer, they were told that the Stockton, California property was in a bad area, and that the Chicago, Illinois property, although in a good area, was high risk, and that Wells Fargo was not looking to refinance high-risk areas.  Frustrated by Wells Fargo's ambivalence and inaction, the couple gave up on refinancing these properties in December 2020, nearly a year after they started the process.  Wells Fargo did refinance Ms. Gray's California property, which is in a predominantly white area of California.

### *Bryan Brown*

39.     Plaintiff Bryan Brown, who is a Black homeowner, is a natural person and a citizen of the State of Connecticut and resides in Bristol, Connecticut.

40.     Mr. Brown is another victim of Wells Fargo's discriminatory policies and practices.  For the past two decades, Mr. Brown has been a CAD designer at a prominent engineering company in Connecticut, and has invested in residential properties in Bristol and Plymouth, Connecticut.

41.     Mr. Brown is a long-time Wells Fargo mortgage customer.  Having purchased his multi-unit home in December 2010 with a Wells Fargo home mortgage, he has always made his mortgage payments, paid his bills on time, and maintained a good credit score.

42.     In October 2020, Mr. Brown sought to refinance his loan to convert his conventional 30-year loan to a 15-year fixed mortgage and to obtain a lower interest rate.

43.     Despite his investment properties, longstanding employment, and creditworthiness, when Mr. Brown sought to refinance his home mortgage, Wells Fargo subjected him to long periods of non-responsiveness, arbitrary requests for

additional documents, and multiple calls to his employer requesting verification of his employment.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo denied Mr. Brown's application to refinance after a four-month runaround.  Wells Fargo did this even though, having paid his loan for more than ten years, Mr. Brown had equity in his home that was almost equal to the amount remaining on his loan.

44.     To this day, Mr. Brown's interest rate remains at 4.75%.

### *Elretha Perkins*

45.     Plaintiff Elretha Perkins is a Black female homeowner with a 720 credit score, and is a natural person and citizen of North Carolina.  She owns homes in both Eden, North Carolina and Dacula, Georgia.  Her Dacula, Georgia home was financed through Wells Fargo.  She has been a Wells Fargo customer for nearly 20 years.

46.     Ms. Perkins is also one of the many Americans impacted by Wells Fargo's discriminatory scheme.  She is a successful small business owner with more than 40 years' experience in North Carolina's childcare and transportation industries.  She is a business leader, a graduate of North Carolina A&T State University—a prominent Historically Black College—and a leader within her local African American community.  In addition to her personal successes, she has raised extremely successful children who are active in Georgia's film and entertainment industry.

47.     Despite Ms. Perkins consistently making payments on her home loan and her exemplary credit score and creditworthiness, her refinance application was subjected to delay, pretextual excuses and overt acts of discrimination by Wells Fargo, including mandating that in order for her to refinance her HELOC, she would have to apply for and be granted a modification under a "hardship" program as if the loan was distress—even though she was not facing any financial hardship or need to modify the loan under a loss mitigation program.  Wells Fargo required her to

approach third-party entities to simply make payments on her HELOC, ultimately giving her the runaround to such an extent that she has had to submit the same tax and income documents multiple times and face more delays from Wells Fargo in the processing of her refinance request.

### *Christopher Williams*

48.     Plaintiff Christopher Williams is a Black male and a citizen of Georgia.  As described below, Mr. Williams applied for a HELOC with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

49.     When he applied for his mortgage loan, he was highly creditworthy, as reflected in his high FICO score of over 750.  Based on this, Mr. Williams believed he should have qualified for Wells Fargo's prime interest rate, which would have saved him substantial money over time on his home mortgage.  However, consistent with Wells Fargo's pattern of discrimination against Black applicants, Wells Fargo offered him an interest rate nearly three points higher than the prime interest rate offered by Wells Fargo, which is disproportionately and discriminatorily offered to white applicants.

50.     Believing it to be a mistake, Mr. Williams spoke to Wells Fargo's home lending department to have his credit report rechecked and for his interest rate to be lowered.  Instead, Wells Fargo refused to reconsider his credit score or his interest rate.  Wells Fargo agreed to revisit its refusal to extend the loan to Mr. Williams on favorable terms.  However, in a letter dated September 5, 2019, Wells Fargo articulated for the first time, that it did not use solely FICO credit scores to determine home interest rates, but instead used "a unique scoring model, which considers more than credit scores to evaluate applications."

51.     Indeed, the "other" factors used by Wells Fargo to determine interest rates for home loans serve to intentionally exclude Black applicants from affordable and lower-risk loans, force Black applicants to pay higher interest rates and other

fees than similarly situated white borrowers, and have a disparate impact based on race.

*Ifeoma Ebo*

52.     Plaintiff Ifeoma Ebo is a Black American and citizen of New York and thus is a member of a protected class.

53.     In late 2021, Ms. Ebo began the process of searching for a new home to purchase.  That search ended in October 2021, when Ms. Ebo found a property located in Kings County, New York—more specifically, the East Flatbush neighborhood of Brooklyn—and entered into a contract to purchase it for the price of $900,000.  Thereafter, Ms. Ebo submitted an application for a mortgage loan to Wells Fargo in connection with the purchase of the property.

54.     At the time Ms. Ebo applied for the loan, Ebo had a credit score of approximately 800, an annual income of approximately $178,000, and no significant debt.

55.     On November 1, 2021, Ms. Ebo received preapproval from Wells Fargo for a mortgage loan in the amount of $883,698 (the "Loan"), which would be used to purchase the Property.  According to Wells Fargo, Ms. Ebo's preapproval was to expire on February 24, 2022.

56.     After Ms. Ebo's Application was preapproved, Ms. Ebo began working with Wells Fargo to receive final approval for the Loan.

57.     Per Wells Fargo's requests, Ms. Ebo submitted all necessary documentation to verify her qualifications for the Loan.  Ms. Ebo timely provided Wells Fargo with documentation such as W-2 forms, paystubs, bank account statements, and similar documents.

58.     On December 29, 2021, Ms. Ebo received a "Commitment Letter" from Wells Fargo.  According to the Commitment Letter, Ms. Ebo's Application was approved, and she only needed to submit some additional documentation "in order to complete the final underwriting and funding of" her Loan.

59.     In January and February 2022, Wells Fargo informed Ms. Ebo that it required additional documentation to complete the underwriting process relative to Ms. Ebo's Application.

60.     Notably, some of the additional documentation that Wells Fargo requested in January and February 2022 had already been submitted by Ms. Ebo (e.g., recent paystubs from Ms. Ebo's employers).

61.     Other documentation requested by Wells Fargo in January and February 2022 was unnecessary, unduly burdensome, and irrelevant to Ms. Ebo's qualifications for the loan.  For example, in one instance, Wells Fargo requested a written explanation as to why Ms. Ebo made a monthly credit card payment in the amount of $290 on her own credit card. In another instance, Wells Fargo requested a bank statement for a bank account that did not even exist.

62.     As Wells Fargo's duplicative and unnecessary requests for documentation continued into February 2022, Ms. Ebo expressed her concern to Wells Fargo that she would not be able to complete the loan application process by the time that her preapproval expired on February 24, 2022.  Nevertheless, as of February 24, 2022, Ms. Ebo's loan still had yet to receive final approval.

63.     In March 2022, Wells Fargo continued to request additional documentation, much of which was duplicative of documentation that Ms. Ebo had already provided to Wells Fargo several times previously.

64.     In sum, Ms. Ebo was highly qualified to receive a mortgage loan from Wells Fargo, and complied with all of Wells Fargo's reasonable requests for documentation to substantiate her qualifications.  Yet, as of March 22, 2022—nearly a month after the loan approval process should have concluded—Ms. Ebo still had not received final approval for her loan.

65.     On or about March 22, 2022, the seller of the Property canceled the Contract due to the fact that Wells Fargo had still not approved Ms. Ebo's Loan, and it was unclear when (or if) that approval would ever come.  That same day, Ms. Ebo

1    informed Wells Fargo of the seller's decision.  Accordingly, Ms. Ebo did not, and

2    will never, receive the loan.

3                          *Terah Kuykendall-Montoya*

4         66.    Plaintiff Terah Kuykendall-Montoya is a Latino/Hispanic American

5    and thus is a member of a protected class.

6         67.    Ms. Kuykendall-Montoya, with her husband, applied to Wells Fargo

7    for a mortgage loan in or about late June/early July 2021 to refinance their existing

8    Wells Fargo mortgage loan (made in 2014 with a remaining balance of

9    approximately $86,000) to obtain some additional cash (about $30,000 from their

10   equity in order to make some home repairs).  At the time, her house was valued at

11   approximately $175,000, a value later determined by a subsequent appraisal.

12        68.    When she completed the mortgage refinance application with Wells

13   Fargo, her FICO score as reported through Equifax substantially exceeded the

14   minimum 620 needed to obtain a conventional mortgage loan, and the family had

15   more than adequate income to repay the increased loan amount.

16        69.    In late July 2021, Wells Fargo denied Ms. Kuykendall-Montoya's

17   refinance application on a pretextual basis.  Thereafter, in mid-August 2021, she

18   obtained a mortgage prequalification with another lender.  That mortgage was later

19   approved and closed, repaying her prior Wells Fargo mortgage.

20                          *Wells Fargo Entities*

21        70.    Defendant Wells Fargo Bank, N.A. is a nationally chartered bank

22   with its principal place of business located in San Francisco, California, and is

23   chartered in Wilmington, Delaware.  It has 19,234 employees across all its locations,

24   including several in the Northern District of California, and generates nearly $70

25   billion in sales annually.

26        71.    Defendant Wells Fargo Home Mortgage, Inc. is a home lending

27   company that is part of the "Wells Fargo banking family."  It operates about 725

28   mortgage stores nationally and originates and services one-to-four-family residential

first and junior-lien mortgages and home equity loans. On average, it originates approximately $300 billion of loans per year. It is incorporated in the State of Delaware, and has its principal place of business in Des Moines, Iowa. Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California office locations.

72. Defendant Wells Fargo & Co. is a nationwide, diversified financial holding company and bank holding company incorporated in the State of Delaware with its principal place of business in San Francisco, California. Wells Fargo provides banking, insurance, investment, and mortgage and consumer finance services through storefronts, the Internet, and other distribution channels across the United States and internationally. It is the parent company of Wells Fargo Bank, N.A.

## IV.  FACTUAL ALLEGATIONS

### A.  The History of Discrimination, Including in Housing

73. This country has a shameful history of racial discrimination, of which housing discrimination has always been a central and profoundly damaging part.

74. In 1924, the National Association of Realtors Code of Ethics mandated that a realtor should "never be instrumental in introducing into a neighborhood members of any race whose presence will be clearly detrimental to any property values in the neighborhood."[21]  In other words, realtors were instructed that it was unethical to integrate neighborhoods. This had a particularly pernicious effect on Black, Latino and Asian American communities.

75. Pursuant to this policy and so many others like it, realtors and developers would routinely preserve specific properties for white Americans while designating properties in other areas for non-white Americans. These designations would be found in rules, restrictions, and covenants attached to the properties.

---

[21] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

76.     Legislation introduced during the New Deal purporting to help homeowners nationwide, in fact, codified racism into housing.  The Home Owners' Loan Corporation and the Federal Housing Administration graded residential areas from "A-D," with "A" being the most likely to receive federal loan insurance and "D" being the least likely.  Areas with "Colored" and "Oriental" people were automatically given "D" ratings.[22]

77.     Federal Housing Administration underwriting manuals issued in 1938 sought to prevent the "infiltration of inharmonious racial groups" and directed underwriters to refuse to insure mortgages that would lead to "a change in social or racial occupancy."[23]

78.     "Today many of the nation's largest historically segregated black neighborhoods, such as those in the South Bronx and South Central Los Angeles, remain severely disadvantaged and have become majority-Latino, making Latinos also vulnerable to the adverse consequences of segregated spaces."[24]  And Los Angeles County has the dubious distinction of having provided the template for redlining and racially restrictive covenants with respect to Blacks and Latinos across the country.[25]  Such practices continue to this day but in a more pernicious and discreet form—through algorithms that can be blamed for discriminatory lending.[26]

---

[22] *Id.*

[23] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[24] Justin P. Steil et al., THE SOC. STRUCTURE OF MORTG. DISCRIMINATION (Aug. 9, 2018), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6084476/pdf/nihms978243.pdf.

[25] Gene Slater, *Op-Ed: How Los Angeles pioneered the residential segregation that helped divide America*, L.A. TIMES (Sep. 10, 2021), https://www.latimes.com/opinion/story/2021-09-10/racial-covenants-los-angeles-pioneered ("No place has played a more central role in the creation of residential segregation than Los Angeles.").

[26] City National Bank avoided marketing and underwriting mortgages in majority Black and Latino neighborhoods in Los Angeles County.  *DOJ announces a $31*

At bottom, redlining has equally affected the Black and Latino population in Los Angeles County and the country.[27]

79.  Asian Americans are not immune.  Asian Americans have been subject to centuries of discrimination, starting with the Page Exclusion Act of 1875, the Chinese Exclusion Act of 1882, and Executive Order 9066.

80.  The California Alien Land Law of 1913 (also known as the Webb–Haney Act) prohibited "aliens ineligible for citizenship" from owning agricultural land or holding long-term leases for it.  As a result, many California farmers of Asian descent were forced to relinquish their farms and move elsewhere.

81.  In Oakland, racialized zoning and restrictive covenants directed 80% of the city's Black population to West Oakland following World War II.[28] Redlining made it impossible for these residents to obtain loans to improve their properties.  Instead of helping, the city eventually, in the 1960s, demolished large swaths of West Oakland, purportedly to build new homes, but the replacement projects languished and most residents were simply forced out with nowhere to go.[29]

82.  Similarly, title reports for San Francisco area homes built in the 1930s

_____

*million redlining settlement with LA-based City National Bank*, NPR (Jan. 12, 2023, 2:03 p.m.), https://www.npr.org/2023/01/12/1148751006/redlining-city-national-bank-doj-settlement.  The CFPB is not only focused on weeding out explicit forms of redlining "but also cases where computer algorithms may cause banks to discriminate against Black and Latino borrowers."  *Id.*

[27] Manal J. Aboelata, MPH, *Policy Briefing: Healing LA Neighborhoods*, available at https://www.preventioninstitute.org/sites/default/files/publications/Healing%20Los%20Angeles%20Neighborhoods%20Policy%20Brief%20February%202019%20%28002%29.pdf (last visited Mar. 2, 2023) ("[R]edlining and the lending practices that followed denied goods and services to entire neighborhoods and swaths of cities, predominantly those inhabited by African Americans, Latinos, and other so-called 'undesirable' people.").

[28] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[29] *Id.*

-21-
AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT

list restrictions that "no person of any other race other than the Caucasian or white race" may own or occupy the property, except for "domestic servants of a different race domiciled with the homeowner or tenant."[30]  Similar provisions would often prohibit ownership or occupancy by residents of "African, Mongolian, or Japanese" descent.[31]

83.     The pervasive discrimination against non-white homeowners and those wishing to become homeowners sadly persists to this day, and Wells Fargo's treatment of non-white home loan applicants during the recent mortgage boom is just the latest setback for these long-maligned citizens.

**B.     Wells Fargo Has an Established History of Discrimination**

84.     Wells Fargo's discriminatory behavior described herein is completely in line with Wells Fargo's history of discrimination in lending.  Indeed, the genesis of its latest discriminatory practices seems to have followed the end of the policies it put in place after an earlier series of lawsuits.

85.     In 2012, Wells Fargo agreed to pay $184 million to settle claims with the U.S. Department of Justice that the bank pushed Black and Hispanic homeowners to obtain subprime mortgages and then charged them higher fees and interest rates.[32]

86.     In 2015, the City of Oakland sued Wells Fargo over its racially discriminatory banking practices in seeking to originate mortgage loans on predatory terms in minority neighborhoods and then "subsequent[ly] [refusing] to extend credit to minority borrowers seeking to refinance previously issued

---

[30] https://www.mercurynews.com/2019/02/26/for-whites-only-shocking-language-found-in-property-docs-throughout-bay-area/.

[31] *Id.*

[32] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

1  unnecessarily expensive loans."[33]  And "when a minority borrower who previously

2  received a predatory loan sought to refinance the loan," they "discover[ed] that

3  Wells Fargo refused to extend credit at all, or on equal terms as refinancing similar

4  loans issued to [w]hite borrowers."[34]  Even when refinancing applications were

5  approved, the loans turned from a "fixed-rate loan into an adjustable-rate loan that

6  the lender knows the borrower cannot afford should interest rates rise … [and] the

7  likely result of such practices is to cause homeowners who are

8  otherwise…comfortably making payments on a modest existing mortgage, to be

9  unable to make payment on a new, unaffordable loan."[35]

10       87.    The City of Oakland also performed a decade-long regression

11  analysis of Wells Fargo loans in Oakland, which controlled for objective variables

12  like "credit history, loan to value ratio, and the ratio of loan amount to income."

13  The City of Oakland found that, controlling for these factors, "an African-American

14  borrower is 2.583 times more likely to result in foreclosure than a more favorable

15  and less expensive loan issued to a [W]hite borrower in Oakland."[36]  This

16  corroborated other national studies finding that Black American borrowers were

17  "124% more likely to receive a subprime refinance loan" than their White

18  counterparts.[37]

19       88.    Moreover, the City of Oakland alleged that Wells Fargo employed

20  systematic policies like "giving loan officers and others responsible for mortgage

21  lending large financial incentives to issue loans to African-Americans and Hispanics

22  that are costlier than better loans for which they qualify" and "failing to monitor" for

23  racial disparities after "Wells Fargo had notice of widespread product placement

---

[33] *City of Oakland v. Wells Fargo Bank, N.A.*, 3:15-cv-04321, Dkt. No. 1, at 2 (N.D. Cal. Sept. 21, 2015).
[34] *Id*. at 4.
[35] *Id.* at 20.
[36] *Id*. at 20-21.
[37] *Id*. at 15.

disparities based on race and national origin."[38]  Wells Fargo also systematically "fail[ed] to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history."[39]  This led District Judge Edward M. Chen to conclude that "Oakland has identified specific employment practices in addition to the mere delegation of discretion."[40]

89. The City of Oakland is not the only municipality that has sought to hold Wells Fargo accountable for its discriminatory conduct.  Cook County (Chicago) sued Wells Fargo for predatory lending practices that stripped minority homeowners of their home equity.[41]  "Publicly available loan origination data indicates that the percentage of high-cost and other nonprime loans issued by Wells Fargo in Cook County to minority borrowers well exceeded the County's percentage of minority home owners—typically by a factor of two to three."[42]  And the disproportionately White employees at Wells Fargo were given "discretion to steer prime-eligible minority borrowers into nonprime loans."[43]  "Wells Fargo subjected minority borrowers to equity stripping to a greater extent than it did nonminority borrowers with similar credit histories."[44]  And "minority borrowers were particularly susceptible to Wells Fargo's predatory practices because they were more likely than nonminority borrowers to lack access to low-cost credit, relationships with banks and other traditional depository institutions, and adequate comparative financial information."[45]

---

[38] *Id*. at 33.

[39] *Id*. at 9.

[40] *City of Oakland v. Wells Fargo Bank, N.A.*, No. 15-CV-04321-EMC, 2018 WL 3008538, at *15 (N.D. Cal. June 15, 2018), *aff'd in part, rev'd in part on other grounds City of Oakland v. Wells Fargo & Co.,* 14 F.4th 1030 (9th Cir. 2021).

[41] *Cty. of Cook, Illinois v. Wells Fargo & Co.*, 14-C-9548-GF (N.D. Ill.).

[42] *Cty. of Cook, Illinois v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 980 (N.D. Ill. 2018).

[43] *Id*.

[44] *Id*.

[45] *Id*.

90.     In 2019, Wells Fargo settled a lawsuit by the City of Philadelphia alleging that it purposefully made it difficult for minorities to refinance their mortgages.[46]  The court in that case identified seven Wells Fargo policies that contributed to the discrimination against minorities:  (1) knowing about lending practices that either created higher-risk and higher-cost loans to minorities compared to comparably credit-situated white borrowers or failing to adequately monitor the bank's practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management; (2) failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history; (3) failing to prudently underwrite hybrid adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s; (4) failing to prudently underwrite refinancing loans, thereby substituting unaffordable mortgage loans for existing mortgages that borrowers were well-suited for and that allowed them to build equity; (5) failing to monitor and implement necessary procedures within its Internal Audit, Corporate Risk, Human Resources, Law Department, and Board of Directors throughout the Community Banking segment, which includes the retail mortgage banking business responsible for the unlawful activities set forth herein, to ensure compliance with federal fair lending laws; (6) failing to abide by its own "Vision & Values," which purportedly guides its business practices and relationships with customers; and (7) failing to ensure that its decentralized organizational structure was capable of properly monitoring mortgage lending activities within Community Banking.

**C.     Historically Low Interest Rates Prevail**

91.     Before the Federal Reserve's recent series of rate hikes, interest rates were near an all-time low in the United States, and prospective home buyers sought favorable purchase money mortgages, and homeowners who held mortgage loans at

---

[46] https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-litigation/.

higher rates (meaning a great number of homeowners) sought to refinance their loans at lower rates. Purchasing a home during this time period allowed new homeowners to pay very low monthly payments in relation to the value of their home. Obtaining a refinance during this time allowed homeowners to significantly reduce their monthly payments and to owe less mortgage interest over the life of the loan.

92. The same low interest rates spurred dramatic increases in applications for original purchase mortgage loans, resulting in similarly substantial disparities in the proportion of non-white applicants who were denied loans or otherwise offered substantially worse terms.

**D.    Wells Fargo's Home Loan Application Process**

Part 1: Gathering of Key Geographic, Financial and Demographic Data and Submission of Form 1003 Through "Blend"

93. On November 27, 2017, as part of its explicit policy to "leverage the ideas in Silicon Valley and beyond" in mortgage underwriting, then-Wells Fargo CEO Tim Sloan announced the bank's partnership with San Francisco startup Blend Labs to develop a new online mortgage application and related tools.

94. Wells Fargo's idea of "leverag[ing] the ideas in Silicon Valley" involves, first, obtaining a prospective refinance applicant's personal information, including name, phone number, email address, and the last four digits of the prospective applicant's Social Security number. Applicants are, thus, required to have and utilize email to participate in the process, including checking Wells Fargo's loan tracker system for updates and requests for additional information. When, during the pandemic, visiting loan officers in person became infeasible, applicants without technical sophistication were disadvantaged.

95. At this preliminary stage, Wells Fargo's algorithm obtains the first data points that are subsequently utilized in its discriminatory decisions: names, phone numbers (including area codes), email addresses and Social Security numbers

that can then be tied to other data and used in other formulae within Wells Fargo's systems.

96.     Next, Wells Fargo sends the applicant, via electronic mail, a dedicated link through Blend, the digital banking platform developed by Wells Fargo in conjunction with Blend Labs.  That link enables the applicant to complete a Uniform Residential Loan Application (Form 1003) and submit that application to Wells Fargo.

97.     It is here that Wells Fargo collects more information for its lending algorithm.  The information collected on this form includes the borrower's name, alternate names, Social Security number, date of birth, citizenship status, names of co-borrowers, marital status, number and ages of dependents, home, mobile and work phone numbers, the subject property address, property value, status of property, intended occupancy and monthly expenses, former addresses, mailing addresses, employment information, income information, asset information, liabilities and expenses, and military service.

98.     Next, a Wells Fargo loan officer conducts a follow-up telephone or in-person interview with the applicant to obtain additional information that cannot be submitted online, including the financial acknowledgment form and the Demographic Information Addendum, which specifically asks about ethnicity, race, and gender.

99.     Here, Wells Fargo's process places particular emphasis on race.  If the interview is conducted in person, the loan officer must visually observe the applicant and consider the applicant's surname in an effort to determine the applicant's race.  Here, too, Wells Fargo's algorithm receives key demographic and financial data that it then utilizes in its lending decisions.

Part 2: Running "Blend" Data Through Automated CORE "Pioneering Underwriting System" Systematically Infected with Racially Biased Algorithms and Overlays

100.    Having obtained all of the geographic, demographic, and other data necessary through Blend and the submission of the Form 1003, the Wells Fargo loan originator does the equivalent of pressing "send," submitting the Form 1003 to Wells Fargo's CORE automated underwriting system for a decision.  Former non-control group employees of Wells Fargo with knowledge of these systems recount that, after operating as described herein—running both Desktop Underwriter ("DU") and Loan Prospector ("LP") simultaneously—CORE's decision would come back as A1 or A2, meaning the loan was approved; C1, meaning the loan had to go through a manual underwriting process; or C2, meaning the applicant was deemed "not loanable" and the application was denied.  During the COVID-19 era, Black refinance applicants were systematically slotted by CORE into the C1 and C2 categories.

101.    The idea of something that operates generally like CORE is, of course, nothing new or unique.  Used properly, automated underwriting systems can evaluate the risk profile of a loan and recommend its approval or denial with respect to race-neutral criteria to human underwriters and loan processors who can, on average, comfortably handle 30 files per month, who are specially trained in the bank's fair lending compliance programs and procedures, and who can ensure that the guidelines and mechanics of the algorithm are operating in accordance with these requirements.

102.    But the consequences can be immediate and pernicious when CORE-like systems are programmed with racial overlays and are otherwise not properly used or supervised by employees with training in fair lending practices.  The director of the Consumer Financial Protection Bureau (the "CFPB") describes these

1   types of banking algorithms as "black boxes behind brick walls."[47]  "When

2   consumers and regulators do not know how decisions are made by the algorithms,

3   consumers are unable to participate in a fair and competitive market free from

4   bias."[48]

5        103.     This was certainly the case at Wells Fargo.  As recognized by a group

6   of United States Senators, the operations and impact of Wells Fargo's CORE

7   automated underwriting system are both new and unique in their treatment of Black

8   applicants.  The chairman of the Senate Finance Committee, who wanted to

9   investigate the bank for "potentially illegal discrimination," demanded that the bank

10   produce to the Committee the data and algorithms it uses to evaluate applicants.[49]

11        104.     Matters became worse at Wells Fargo when its understaffed

12   underwriting departments made a series of deliberate and intentional choices to

13   centralize lending decisions.  These decisions, some of which were ostensibly made

14   to facilitate working from home, took human supervision and fair-lending

15   compliance out of the process.  Seemingly trumpeting the effect of these decisions,

16   Wells Fargo went so far as to make an internal announcement that it would place

17   increasing and undue reliance on machine learning processes in an automated

18   underwriting system.  But that system was increasingly infected with explicit and

19   implicit racial signals (so-called "overlays") that had, as their proximate and likely

20   result, the disparate impact reflected in the statistical analyses set forth in this

21   Amended Complaint during the time periods at issue herein.

22        105.     These Wells Fargo-specific overlays are manifestations of the same

---

[47] https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/.

[48] *Id.*

[49] *Wells Fargo Pressed by Senators on Race Disparity in Refinancing*, Yahoo! Finance, accessible at: https://finance.yahoo.com/news/wells-fargo-pressed-senators-race-171439115.html.

unbroken history of business policies and practices that create an "artificial, arbitrary, and unnecessary" barrier to fair-housing opportunities for non-white home purchasers and owners.  These include, among others:

106.  ***Geographic Indicators***.  Among the overlays utilized by Wells Fargo's CORE automated underwriting processes are geographic indicators, the effect of which is modern-day redlining.  Borrowers seeking to refinance properties in Black-majority neighborhoods are deemed by the algorithm to be more of a lending risk than similarly situated white borrowers seeking to refinance property in non-Black-majority neighborhoods.  Wells Fargo's algorithm effectuates this racial signaling by comparing address data provided in the borrower's Form 1003 to low and moderate income census tract data within Wells Fargo's internal systems, identifying borrowers with property in Black-majority neighborhoods as more of a lending risk than borrowers with property in white-majority neighborhoods.  None of this is required by legitimate, race-neutral underwriting criteria.

107.  ***Post-Close Liquidity Requirements***.  Another overlay utilized by Wells Fargo's underwriting system are racially discriminatory requirements for post-close liquidity and severe restrictions on the sources of that liquidity.  Before March 2020—and consistent with Fannie Mae and Freddie Mac underwriting guidelines—Wells Fargo generally required borrowers to be able to show 12 months of post-close reserves in order to close their loans.  When COVID-19 hit, however, Wells Fargo programmed its system to only approve borrowers who could show 18 months of post-close liquidity for W-2 wage earners, and 24 months for self-employed K-1 borrowers.  Wells Fargo further changed the definition of post-close liquidity to allow only 50% of the post-close liquidity to come from retirement accounts—often the greatest source of liquidity for borrowers.

108.  Not only was this huge increase not required by legitimate, race-neutral underwriting criteria, but it was a change that Wells Fargo knew would have a racially disparate impact.  For example, an April 2020 JP Morgan Chase Institute

report found that for every dollar in liquid assets held by White Americans, Black Americans held 32 cents.[50]  While Black families have, on average, $2,000 or less in liquid savings, the typical White family has more than four times that amount.[51]

109.  ***Demographic Indicators***.  Another criteria utilized by Wells Fargo is, indeed, race itself.  For example, Wells Fargo's automated underwriting processes use Bayesian Improved Surname Geocoding ("BISG"),[52] a method that applies Bayes' Rule to predict the race or ethnicity of an individual utilizing the individual's surname and geocoded location, when that information is not otherwise provided. This process, which necessitates an internal determination by the Wells Fargo algorithm of which neighborhoods are associated with which racial group, works as follows:[53]

(i)       first, by calculating the prior probability of an individual – $i$ – being of a certain racial group $r$ given their surname:

$$Pr(R_i = r | S_i = s)$$

(ii)       next, by updating that probability with the probability of the individual $i$ living in a geographic location $g$ that is associated with a particular racial group $r$:

$$Pr(G_i = g | R_i = r)$$

(iii)       and finally, by using Bayes' Theorem to determine the probability that a particular borrower actually belongs to a particular racial or ethnic group.

$$Pr(R_i = r | S_i = s, G_i = g) = \frac{Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}{\sum_{i=1}^{n} Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}$$

[50] https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-race-report.pdf.

[51] *Id.*

[52] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation.cfm?file=309619.pdf.

[53] https://cran.r-project.org/web/packages/eiCompare/vignettes/bisg.html.

110.     By utilizing BISG in its automated underwriting processes, Wells Fargo's formulae utilize demographic criteria, including race, "imputed from databases of names and addresses" that associate neighborhoods with races to supplement Form 1003's race disclosures and assist in the overall racial assessment that allows the algorithm, improperly, to rely on race in the risk determination process.

111.     ***Uncorrected and Racially Biased Appraisals***.  Wells Fargo also considers uncorrected historical and current appraisal data from geographically differentiated locations in its refinance evaluation process.  Race-stratified differentials in appraisal data are well known to Wells Fargo and others in the banking industry.  Indeed, according to a March 23, 2022 report in *The Washington Post* citing Brookings Institution data, "homes in Black neighborhoods" (which, as already discussed, Wells Fargo identifies) routinely appraise at "23 percent less, on average, than those in comparable White neighborhoods – despite having similar neighborhood and property characteristics and amenities."[54]  Freddie Mac has similarly "found that 12.5 percent of appraisals for home purchases in Black neighborhoods and 15.4 percent in Latino neighborhoods came in below the contract price, compared with 7.4 percent of appraisals in white neighborhoods."[55]  The below-market appraisals intentionally skew the loan-to-value calculations against Black homeowners and prospective homeowners and serve as a tool for racial discrimination.

112.     Wells Fargo's automated underwriting system does not correct appropriately for these racial disparities in appraisals, and instead places undue reliance on an uncorrected data point that systematically undervalues properties in neighborhoods populated by non-white homeowners.  Wells Fargo's failure to

---

[54] https://www.washingtonpost.com/business/2022/03/23/home-appraisal-racial-bias/.

[55] *Id.*

1  correct for this well-known disparity in property values is not acceptable based on

2  any legitimate underwriting criteria.

3      113.    ***Unjustified Increased FICO Requirements***.   Another algorithmic

4  overlay utilized by the Wells Fargo CORE system is increased credit score

5  requirements.   On information and belief, Wells Fargo imposed a higher minimum

6  credit score than that required for an FHA loan or a Fannie Mae-backed loan.

7  Accordingly, if Fannie Mae required a minimum credit score of 600, Wells Fargo

8  would require a minimum score of 620.   The racial impact of this change, which

9  was not justified by legitimate underwriting criteria, is clear.   In February 2021, it

10  was reported that one in five Black consumers have FICO scores below 620, while

11  one out of every 19 White consumers are in the sub-620 category.[56]

12      114.    A study by the Board of Governors of the Federal Reserve System

13  analyzing federal mortgage data identified no "evidence [a]s to whether these tighter

14  standards reduce loan risk to justify the disparate impact on minority denials they

15  are associated with."[57]   And after controlling for relevant underwriting factors (debt-

16  to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that

17  "[l]enders who impose the strictest standards on their white applicants [like Wells

18  Fargo] tend to have the largest unexplained excess denials of minority applicants,"

19  including Black applicants.[58]

20  **E.    Awareness of Racial Bias Infecting Residential Lending Algorithms**

21      115.    In 2021, six Wells Fargo employees and officers with doctorate

22  degrees published a study warning about the dangers of banking algorithms used by

---

[56] https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/.

[57] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo (July 2021), at 12, n.20, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663.

[58] *Id*. at 12.

1  Wells Fargo and its peers.  The study was published on arXiv, an open-access

2  Cornell University archive of scholarly articles in the fields of computer science,

3  quantitative finance, statistics, and economics, among others.[59]

4       116.    The authors of the study noted that "despite 'years of intense scrutiny,

5  lending discrimination still persist[s]'" and that the arrival of flexible and automated

6  AI/ML [artificial intelligence/machine learning] algorithms and "the availability of

7  alternative sources of data are… exacerbating" this discrimination.[60]

8       117.    The potential sources of bias and discrimination are multifold.

9  According to the study, historical data can often be skewed against specific groups,

10  particularly where information on a protected group is limited.[61]  Moreover, biases

11  in historical data can be exacerbated with the use of machine learning because

12  algorithms, which automate feature engineering, can ignore the presence of

13  surrogate variables for protected attributes.[62]

14       118.    In addition to data bias, the automated nature of machine learning

15  algorithms "miss[es] the potential for correlated surrogate variables causing proxy

16  discrimination."[63]  "Data bias together with poor optimization of algorithms can

17  cause severe harm to protected groups."[64]

18       119.    Notably, the study concludes that the use of "black-box algorithms

19  that are not well-understood" have "potential for serious harm" in the consumer

20  lending space, and thus the models "must be continually monitored for disparate

---

[59] https://arxiv.org/.

[60] *Bias, Fairness, and Accountability with AI and ML Algorithms*, Nengfeng Zhou, Zach Zhang, Vijayan N. Nair, Harsh Singhal, Jie Chen, and Agus Sudjianto, Corporate Model Risk, Wells Fargo (May 6, 2021), available at: https://arxiv.org/ftp/arxiv/papers/2105/2105.06558.pdf, at page 4.

[61] *Id*. at 5.

[62] *Id*.

[63] *Id*. at 6.

[64] *Id*. at 7.

impact testing."[65]  A "[s]eparate fair lending group conducts periodic backtesting and trend analysis to validate that credit underwriting systems do not discriminate against applicants on a prohibited basis."[66]

## F.     Wells Fargo's COVID-19 Era Understaffing and Failure to Correct for Discriminatory Automated Lending Decisions

120.     Wells Fargo is no doubt well aware that properly functioning banks, including its competitors, correct for biases within automated underwriting processes by employing trained underwriters and fair lending teams that are supposed to prevent the racially pernicious consequences that can arise from the unrestrained functioning of automated processes, which, if left unchecked, can systematically identify minority borrowers as undue credit risks.

121.     But Wells Fargo did not do this.  Instead, Wells Fargo made a business decision to centralize and emphasize automated processes at the expense of individualized lending decisions.  Wells Fargo's loan originators, processors, and underwriters were overworked—sometimes handling as many as ***three times*** the normal monthly volume expected of loan processors and underwriters—and systematically disincentivized to "check the work" of the CORE system.  Other changes were also made, such as to remove the ability of staff to make changes within Wells Fargo's automated system that would result in a greater likelihood of an application being approved.

122.     Given the racially signaled functioning of Wells Fargo's algorithm, the effect of this was clear:  nobody was available to provide a check on the racially biased lending decisions taking place at Wells Fargo, which resulted in delays, denials, and the systematic application of higher interest rates to non-white borrowers to an extent that, in many cases, far exceeded anything in the industry.

---

[65] *Id*. at 13.
[66] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation. cfm?file=309619.pdf.

**G.** **Wells Fargo's Knowledge of the Disparate Impact on Racial and Ethnic Minorities**

123.     Not providing a human check on its lending practices did not, however, mean that Wells Fargo was unaware of the discriminatory impact of its practices.  On the contrary, senior Wells Fargo executives were fully aware of their disparate impact.

124.     For example, throughout the relevant time period, Wells Fargo generated a "Diversity Market Segments Report" that was distributed companywide via electronic mail distribution on a monthly basis.  Comprised of Wells Fargo's nationwide lending statistics, the report included, among other things, the racial breakdown of Wells Fargo's lending, the percentage of loans being made in certain locations and by certain originators and offices, whether Wells Fargo met the Community Reinvestment Act[67] requirements, and the percentage of loans that were made to first-time homebuyers.  These reports were reviewed and discussed during monthly regional calls in which employees were congratulated on their efforts as reflected therein.

125.     Despite these monthly reports providing a real-time exposé of the significant adverse effect of its overlays on Black and other non-white applicants, Wells Fargo did nothing.

**H.** **Wells Fargo's Algorithm Has a Disparate Impact on Minority Homebuyers and Homeowners**

126.     The above practices, policies, and procedures are arbitrary and artificial and unnecessary for legitimate underwriting.  The vast difference between refinancing approval rates of Wells Fargo for non-white homeowners and

---

[67] The Community Reinvestment Act, enacted in 1977, requires the Federal Reserve and other federal banking regulators to encourage financial institutions to help meet the credit needs of the communities in which they do business, including low- and moderate-income neighborhoods.

1  prospective homeowners as compared to any other lending institution's approval
2  rates negates any possible legitimate objective.

3      127.    As noted, the above intentional practices also have a
4  disproportionately adverse effect on non-white individuals seeking to buy a home or
5  seeking other home loan products.  Persons falling within any one of the ethnic or
6  racial aggregate categories and subcategories set forth in "Regulation C" (12 C.F.R.
7  1003), other than "White, Not Hispanic or Latino" are members of a protected class.

8      128.    Wells Fargo's practices directly harmed prospective homeowners
9  within the Class by preventing them from obtaining favorable loan terms in order to
10  buy a home at prevailing market rates, causing them to either accept higher rates
11  throughout their mortgage, or fail to obtain a mortgage from Wells Fargo altogether.

12      129.    Wells Fargo's practices directly harmed existing homeowners within
13  the Class by forcing them to pay higher interest rates while applications were
14  pending, by forcing them to pay higher interest rates when applications were
15  completed, and/or by denying refinancing and other home loan applications.  In the
16  absence of these policies, these homeowners would not have had to pay higher rates
17  or face rejection of their refinancing applications.

18      130.    The disparity between Wells Fargo's treatment of white homeowner
19  and prospective homeowner applicants and non-white homeowner and prospective
20  homeowner applicants is significant and, in some respects, shocking.

21      131.    In 2020, for instance, Wells Fargo approved approximately 67.1% of
22  white borrowers who applied for a mortgage, compared to only 51.8% of Black
23  and/or African American applicants.

24      132.    HMDA data discloses that Wells Fargo ***denied over 50%*** of the Black
25  homeowners seeking to refinance in 2020, and ***denied just under 50%*** of the Black
26  homeowners seeking to refinance in 2021.  No other major lending institution
27  denied the refinancing applications of Black Americans at such stunning rates.  The
28  numbers tell a shameful story for which there is no legitimate business explanation.

133.     HMDA data from eight million refinancing applications filed in 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as white borrowers in the lowest-income bracket."[68]  White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[69]



Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

134.     Non-white applicants in supposedly less desirable—or majority-minority—Metropolitan Statistical Areas ("MSAs") fared worse.  For example, in Fulton County, where the population was 43.6% Black in 2020,[70] Wells Fargo approved fewer than 43% of refinancing applications completed by Black

---

[68] *Id.*

[69] *Id.*

[70] https://data.census.gov/cedsci/table?g=0500000US13121&tid=ACSDP5Y2020.DP05.

homeowners, the lowest approval rate among major lenders.[71]  In the Chicago/Naperville/Evanston/Arlington Heights MSA, Wells Fargo approved and originated loans for less than 48% of all loan applications completed by Latino and Hispanic prospective borrowers, compared with an approval and origination rate of almost 81% for JP Morgan Chase.[72]  And in the Los Angeles/Long Beach/Glendale MSA, Wells Fargo approved and originated loans for less than 68% of loan applications completed by Asian American prospective borrowers, compared with an approval and origination rate of over 85% across all other lending institutions.[73]

135.    These numbers were mirrored in the nationwide data.  In 2020, Wells Fargo approved only *47%* of residential refinance applications submitted by Black applicants, *53%* of residential refinance applications submitted by applicants identified as Hispanic and/or Latino, and *67%* of residential refinance applications submitted by Asian-American applicants, compared with *71%*, *79%*, and *85%* approval rates across all other lenders.

136.    And even for those Black applicants whose loans were ultimately approved, they faced delays that white applicants living in predominately white neighborhoods did not, causing them damages through continued higher mortgage rates as they awaited loan approval.  In some cases, Wells Fargo officers simply told Black applicants living in predominately Black neighborhoods that "perhaps the area is not eligible" for quick evaluations of refinancing applications.[74]

137.    And because Wells Fargo designed an application process that is disproportionately difficult for minority homeowners to complete, and because it engages in a practice of "soft denials," where loan officers leave applicants hanging or encourage them to look elsewhere, 27% of all Black homeowners who began a

---

[71] https://ffiec.cfpb.gov/data-browser/data/2020
[72] *Id.*
[73] *Id.*
[74] *Id.*

1  refinance application with Wells Fargo withdrew it.[75]  On information and belief, if

2  Black applicants who were unable to complete the mortgage loan process are added

3  to those who did, Wells Fargo approved less than one-third of the Black Americans

4  who sought a refinancing loan in 2020.

5        138.    In direct contradiction of the data and its hidden practices and

6  uniform policies, Wells Fargo publicly professes a commitment to diversity and

7  equality.  However, Wells Fargo intentionally and uniformly fails to disclose to

8  minority applicants that it engages in redlining because Wells Fargo knows this is

9  material information that would cause minority applicants to seek mortgage and

10  refinancing loans from its competitors.  Wells Fargo collects significant application

11  fees and appraisal fees as part of each original purchase mortgage loan and

12  refinancing application, even if the application is ultimately denied.  Wells Fargo

13  does not want to lose this revenue source, which is partly why it intentionally fails to

14  disclose its redlining practices to minority applicants.  Plaintiffs and the Class would

15  not have agreed to pay these fees had Wells Fargo properly disclosed its redlining

16  practices.

17  **I.      PLAINTIFFS' HARM IS TYPICAL OF THE CLASS**

18        139.    The uniformity of Wells Fargo's discriminatory practices in

19  connection with its algorithm and otherwise means that Plaintiffs' experiences are

20  emblematic of the experiences of minority Americans all over the country.  As

21  Wells Fargo executive Peter Strawser declared in documents submitted to this

22  Court, Wells Fargo's underwriters "are in the same organization within Wells

23  Fargo" and apply "similar policies, processes and procedures to each individual loan

24  or financing application."[76]

25        140.    Shaia Beckwith Simmons is an African American resident of Florida.

26  _____

27  [75] *Id*.

[76] Declaration of Peter Strawser, *Braxton v. Wells Fargo Bank, N.A.*, No. 4:22-cv-

28  1748 (N.D. Cal. Aug. 26, 2022) (ECF No. 53-1).

Ms. Simmons obtained a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

141.     Ms. Simmons is a well-qualified African American borrower who obtained a home mortgage loan from Wells Fargo in 2009 and refinanced it at a lower interest rate in 2013.  Ms. Simmons is a model homeowner who has timely made her monthly payments without incident.

142.     During the COVID-19 pandemic, as required by the CARES Act, Wells Fargo offered existing home mortgage borrowers the option to defer their payments.  Ms. Simmons accepted Wells Fargo's deferment option, which allowed her to restructure her loan to defer monthly payments during the pandemic and instead make those monthly payments at the end of her loan.

143.     After several months of approved deferments, Ms. Simmons promptly resumed making her mortgage payments in full, as she had done for decades without issue.  Yet, consistent with its nationwide discriminatory practices, Wells Fargo maliciously and unlawfully instituted foreclosure proceedings against Ms. Simmons without prior notice, asserting without justification that Ms. Simmons was in default for failure to make mortgage payments during her deferment.

144.     Consistent with its nationwide practices of predatory lending to extract wealth from Black Americans, Wells Fargo presented Ms. Simmons with an ultimatum:  she could renegotiate her loan, potentially at a higher interest rate that would cost her many thousands of dollars over the remaining life of the loan, or Wells Fargo would persist with the unjustified foreclosure to take her home away from her and resell it in a booming market.  Ms. Simmons refused to renegotiate her loan and is resisting the wrongful foreclosure, which remains pending.

145.     Winfred Thomas is a minority homeowner who owns equity in a home located in Hogansville, Georgia.  In December 2020, Mr. Thomas applied to Wells Fargo to refinance his Wells Fargo mortgage, and his application was denied in 2021.  Shortly thereafter, Mr. Thomas applied to refinance his Wells Fargo

1  mortgage with Veteran's United Home Loans. Mr. Thomas's application was

2  approved by Veteran's United Home Loans for an interest rate 3.2% lower than the

3  5.5% rate he had been paying to Wells Fargo.

4        146. Michelle Sims is a minority homeowner who owns equity in a home

5  located in Desoto, Texas. In December of 2021, Ms. Sims applied for a Wells Fargo

6  home refinance and her application was denied in early 2022.

7        147. Alfred Pope is a minority homeowner who owns equity in a home

8  located in Chesapeake, Virginia. Mr. Pope applied for a Wells Fargo home

9  refinancing in September of 2021, and his application was denied.

10        148. Chantelle Harris is a minority homeowner who owns equity in a

11  house located in Somerset, New Jersey. Ms. Harris applied for a Wells Fargo

12  refinance in July of 2021, and her refinance was denied despite having been a Wells

13  Fargo customer for more than 10 years with a credit score over 700 and consistent

14  income.

15        149. Sharita Fanning is Black and a well-qualified home borrower. Indeed,

16  Fanning has owned her home since 1997 and never missed a mortgage payment.

17        150. In 2021, Ms. Fanning sought to take advantage of the considerable

18  equity in her home as a long-time Wells Fargo customer. At the time, Ms. Fanning's

19  home was valued at over $240,000; her mortgage was less than $25,000; and she

20  sought a loan of only $15,000 for modest home improvements against her home

21  equity. Wells Fargo told Ms. Fanning instead that she must refinance her home and

22  more than double her mortgage to approximately $55,000, and she agreed to do so.

23  Rather than grant her refinancing application in a timely manner, and pursuant to its

24  discriminatory practices, Wells Fargo refused to accept Ms. Fanning's application

25  and demanded more and more information, including information she previously

26  provided. At least four separate Wells Fargo loan officers contacted Ms. Fanning for

27  documents she already submitted. Wells Fargo eventually refused to approve her

28  application, forcing her to start the process all over again. Ms. Fanning applied again

and experienced the same tactics; Wells Fargo questioned Ms. Fanning's credibility and documentation. Only after she was forced to attain counsel did Wells Fargo finally approve her refinancing, and even then, after extensive delays and on worse terms because of her race. Wells Fargo has also provided Ms. Fanning with inaccurate and misleading information and refused to answer basic questions regarding her loan.

151.     As a result of Wells Fargo's racially discriminatory lending practices, Ms. Fanning incurred substantial costs, delays, and inconveniences. Among other things, she and her son were forced to leave her home for repairs and incur additional housing and other costs and suffer emotional distress as a result of Wells Fargo's actions.

152.     The stories of non-white Americans whose applications were delayed or denied are legion. Each of these non-white Americans, who are members of the putative Class, have had experiences that are typical of the Plaintiffs, regardless of their race and ethnicity. Thus, their claims are all substantially similar and congruent, regardless of their individual race or ethnicity, such that the Plaintiffs are qualified to represent their interests as they have claims and interests typical of those putative Class members.

## V.     CLASS ALLEGATIONS

153.     Plaintiffs bring this action on behalf of themselves and a potential class of similarly situated Wells Fargo residential original purchase mortgage, refinance and other home mortgage loan applicants falling within any one of the ethnic or racial aggregate categories and subcategories set forth in "Regulation C" (12 C.F.R. 1003), other than "White, Not Hispanic or Latino" (hereinafter, "Minority Applicants").

154.     Each and every claim alleged in this case is also alleged on behalf of every member of the Class.

**A.      Class Definition**

155.      The Class includes all Minority Applicants in the United States who, from January 1, 2018 through the present (the "Class Period"), submitted an application for a original purchase or other home mortgage loan or to refinance or modify a home mortgage loan through Defendants that was (i) denied; (ii) approved at higher interest rates or subject to less favorable terms as compared to similarly situated non-Minority Applicants; or (iii) processed at a rate slower than the average processing time of applications submitted by similarly situated non-Minority Applicants.  Excluded from the Class are (a) Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, (b) counsel representing Plaintiffs and their staff, and (c) any judicial officers assigned to this case and their staff.

156.      Class certification is authorized under Federal Rule of Civil Procedure 23 and applies to claims for injunctive and equitable relief, including restitution, under Rule 23(b)(2), for monetary damages under Rule 23(b)(3), and for liability issues under Rule 23(c)(4).

157.      The number of persons who fall within the definitions of the Class are so numerous and geographically dispersed as to make joinder of all members of the Class or Subclass in their individual capacities impracticable, inefficient, and unmanageable, and without class-wide relief, each member of the Class would effectively be denied his, her, or their rights to prosecute and obtain legal and equitable relief based on the claims and allegations averred in the Complaint.

158.      Plaintiffs, as detailed below, can fairly and adequately represent the proposed Class.  In the alternative, Plaintiffs can act as the representatives of the below subclasses.

**B.      Proposed Subclasses**

159.      Additionally, or in the alternative, pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs bring this action on behalf of the following subclasses:

160.     **The Denial Subclass:** All Members of the Class whose applications were denied but would have been approved had such applications been submitted by similarly situated non-Minority Applicants.

161.     **The Delayed, Higher Rate or Less Favorable Terms Subclass:**  All Members of the Class whose applications were (a) processed at a rate slower than that of the average processing time of applications submitted by non-Minority Applicants; or (b) whose applications were eventually approved, but at higher interest rates or subject to less favorable terms than similarly situated non-Minority Applicants.

162.     Depending on the evidence developed during discovery, Plaintiffs reserve the right to amend the definitions of the Classes and Subclasses and/or seek the certification of further subclasses based on race, ethnicity or the type of transactions at issue (e.g., original purchase mortgage loans, refinancing or modification).

**C.     Numerosity and Ascertainability**

163.     **Numerosity**.  While the exact numbers of the members of the Class and Subclasses are unknown to Plaintiffs at this time, membership in the Class and Subclasses may be ascertained from the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class and Subclasses include thousands of members.  Therefore, the Class and Subclasses are sufficiently numerous that joinder of all members of the Class and Subclasses in a single action is impracticable under Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims through a class action will be of benefit to the parties and the Court.

164.     **Ascertainability**.  The names and addresses of the members of the Class and Subclasses are in Defendants' possession and/or contained in Defendants' records.  Notice can be provided to the members of the Class and Subclasses through direct mailing, email, publication, or otherwise using techniques and a form

of notice similar to those customarily used in consumer class actions arising under state and federal law.

**D. Commonality and Predominance**

165. This matter involves common questions of law and fact which predominate over any question solely affecting individual Class Members.

166. The common questions of law and fact include, but are not limited to:

- Whether Defendants systematically discriminated against Class Members on account of their race or ethnicity;

- Whether Defendants' underwriting algorithms and machine learning programs were racially biased and led to unfairly discriminatory credit policies that harmed Minority Applicants;

- Whether the disparate impact of Defendants' underwriting algorithm and machine learning programs on Minority Applicants was known to Defendants during the relevant time period, leading to the uniform disparate treatment of those Minority Applicants;

- Whether Minority Applicants' residential loan applications were processed at a rate slower than the average processing time for applications submitted by non-Minority Applicants;

- Whether Minority Applicants' residential loan applications were denied when a similarly situated non-Minority Applicant would have been approved;

- Whether Minority Applicants' resulting residential loans were made at higher interest rates as compared to similarly situated non-Minority Applicants;

- Whether Defendants selected disproportionately white areas for rapid refinancing evaluation and disproportionately Minority Applicant areas for increased scrutiny;

- Defendants' knowledge of their practices and the discriminatory impact on Minority Applicants;

- Whether Defendants' lending policies and practices had an unlawful disparate impact against Minority Applicants;

- Defendants' consumer disclosures and omissions;

- Defendants' internal approval processes;

- Defendants' appraisal policies; and

- Whether Defendants engaged in discriminatory practices with malice or reckless indifference to the federally protected rights of Minority Applicants.

167. **Predominance**. Class action status is warranted under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to the members of the Class and Subclasses predominate over any questions affecting only individual members. The interests of the members of the Class and Subclasses in individually controlling the prosecution of separate actions are theoretical and not practical. Prosecution of this action through multiple Class Representatives would be superior to individual lawsuits. Plaintiffs are not aware of any potential difficulty in the management of this litigation that should preclude its maintenance as a class action.

**E. Typicality and Adequacy**

168. Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were injured as a result of substantially similar conduct by Defendants.

169. Plaintiffs are adequate Class Representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent, and Plaintiffs have retained counsel that will represent separate subclasses if any conflicts arise based on race, ethnicity, or the type of transaction at issue. Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

**F. Superiority**

170. A class action is the superior method for the fair and efficient adjudication of this matter because the damages and other harms suffered by Plaintiffs and the other Class Members are small compared to the burden and expense of individual litigation. Thus, it would be impractical, if not impossible, for

individual plaintiffs to seek redress against Defendants for the harms suffered.

171. Individual litigation of these harms would also be inefficient for the court system and would create a risk of inconsistent or contradictory rulings and judgments.

172. No unusual circumstances exist that would make this matter more difficult to manage than a typical class action.

**G.    Injunctive Relief**

173. Plaintiffs also seek to represent a class under Rule 23(b)(2) to obtain final injunctive relief forcing Wells Fargo to cease and desist its current discriminatory practices.

**H.    Issue Certification**

174. As an alternative to Rule 23(b)(2) and/or 23(b)(3), Plaintiffs seek issue certification under Rule 23(c)(4) of liability issues common to Class members.

<u>**COUNT I**</u>

**VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

**15 U.S.C. § 16901, *et seq.***

175. Plaintiffs, on behalf of themselves and all those similarly situated, incorporate by reference each and every paragraph above as though fully realleged herein.

176. The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

177. The Equal Credit Opportunity Act applies to applications for residential loans for original purchase mortgages and mortgage refinancing) like those of the Plaintiffs and others similarly situated.  Plaintiffs and those similarly situated applied for credit by seeking to finance their home purchases or refinance their existing home loans.

178. Defendants are creditors because they regularly extend, renew, and

continue issuances of credit.

179. Defendants' consistent delays, roadblocks, feigned difficulties, and denials of residential loan applications submitted by Minority Applicants constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

180. Plaintiffs and all those similarly situated were harmed by Defendants' conduct.

181. On behalf of themselves and the Class they seek to represent, Plaintiffs request the relief set forth below.

## COUNT II

### RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, 42 U.S.C. § 3601, *et seq.*

182. Plaintiffs incorporate by reference each and every paragraph above as though fully realleged herein.

183. The Fair Housing Act makes it unlawful to discriminate against designated classes of individuals in residential real estate transactions, including residential lending.

184. Plaintiffs and others similarly situated sought to engage in residential real estate transactions with Defendants.

185. Plaintiffs and others similarly situated are members of a protected class under the Fair Housing Act.

186. Defendants discriminated against Plaintiffs and others similarly situated by not approving residential loan applications on the same timeline as those of similarly qualified applicants who were not members of a protected class, by causing applicants to withdraw their applications due to roadblocks and feigned difficulties, or by denying residential loan applications.

187. Defendants refused to transact business with Plaintiffs and those similarly situated during the Class Period and at the same time did transact business with White, Not Hispanic or Latino applicants with similar qualifications.

188.     Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for residential loan applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were charged higher interest rates than similarly qualified applicants, and/or because their applications were denied.

## COUNT III

## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

189.     Plaintiffs incorporate by reference each and every paragraph above as though fully realleged herein.

190.     Under 42 U.S.C. § 1981, persons are guaranteed the same right to make and enforce contracts, regardless of race.  The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, as well as all other aspects of a contractual relationship.

191.     By seeking to refinance their home loans and submitting an application to Defendants, Plaintiffs and others similarly situated sought to "make and enforce" contracts with Defendants.

192.     Plaintiffs and those similarly situated were denied their right to make and enforce contracts when Defendants offered to them terms less favorable than those offered to members of a different race, delayed or frustrated their application process, and/or by denied their applications.

193.     Plaintiffs and those similarly situated were harmed by Defendants' denial of their rights to make and enforce contracts.

## COUNT IV

## VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,
## CALIFORNIA CIVIL CODE §51

194.     Plaintiffs incorporate by reference each and every paragraph above as though fully realleged herein.

195.     The Unruh Civil Rights Act provides that all persons within the State of California are free and equal no matter their race and are entitled to full and equal treatment in all business establishments.

196.     The Unruh Civil Rights Act thus prohibits discrimination of any kind against any person in any business establishment.

197.     Defendants are California based business establishments under the Unruh Civil Rights Act.

198.     Plaintiffs and other individuals similarly situated were denied full and equal treatment as required by the Unruh Civil Rights Act when Defendants refused to offer them residential loans on the same terms as non-Minority Applicants.

199.     Plaintiffs and other individuals similarly situated were harmed by Defendants' refusal to transact business with them.

## COUNT V

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

200.     Plaintiffs incorporate by reference each and every paragraph above as though fully realleged herein.

201.     The California Unfair Competition Law (the "UCL") prohibits "unfair competition" which is defined as "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Because the definition is framed in the disjunctive, a business act or practice need only meet one of the three criteria in order to be considered unfair competition.  The UCL was intentionally framed in broad, sweeping language because it was impossible to contemplate the "innumerable new schemes which the fertility of man's invention would contrive."

202.     The UCL provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction" and that "[t]he court may make such orders or judgments…as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

1   Cal. Bus. & Prof. Code § 17203(a).

2       203.    Defendants are "persons" within the UCL's definition, which includes

3   any 'natural persons, corporations, firms, partnerships, joint stock companies,

4   associations and other organizations of persons." Cal. Bus. & Prof. Code § 17201.

5       204.    Defendants' conduct described herein and its discriminatory policies

6   were made, disseminated, and orchestrated from Defendants' principal place of

7   business in California.

8       205.    Defendants' conduct described herein constitutes an "unlawful"

9   business practice, as the business acts described above constitute predicate

10  violations of the laws identified herein; namely, the Equal Credit Opportunity Act,

11  the Fair Housing Act, 42 U.S.C. § 1981, and the Unruh Civil Rights Act.

12      206.    Defendants' conduct described herein also constitutes a "fraudulent"

13  business practice. Defendants uniformly fail to disclose and inform Minority

14  Applicants that Defendants engage in redlining that will negatively impact Minority

15  Applicants' chances of having their loan or refinance application approved, the

16  terms of their loans, and/or the time it will take for their application to be reviewed

17  and approved. Defendants had a duty to disclose this information because: (1) it is

18  material and important information that would impact a Minority Applicant's

19  decision to apply for a mortgage or seek to refinance an existing mortgage with

20  Defendants over other banks and lenders; (2) Defendants have exclusive knowledge

21  of their redlining practices; and (3) these practices could not be reasonably

22  discovered by Minority Applicants. This information is also contrary to Minority

23  Applicants' reasonable expectations that Defendants would not engage in illegal

24  redlining and discrimination. By failing to disclose this information, Minority

25  Applicants were fraudulently induced to pay application and related fees to

26  Defendants that the Minority Applicants would not have paid had they known the

27  true information.

28      207.    Defendants' conduct described herein also constitutes an "unfair

business" practice, as it is likely to deceive the public and it has far less utility than its potential harm.  In direct contradiction of its public pronouncements regarding a commitment to diversity and equality, Wells Fargo employed practices and policies that led to racial and ethnic bias against Minority Applicants, which resulted in disparate approval rates for residential loan applications.  Wells Fargo effectively engaged in "digital redlining" and knew this was material information that would cause Minority Applicants to submit their original purchase mortgage loan and refinance applications to its competitors.  Wells Fargo collects significant application fees and appraisal fees as part of each original purchase mortgage loan and refinancing application, even if the application is ultimately denied.  Wells Fargo did not want to lose this revenue source, which is partly why it did not disclose its true practices to Minority Applicants and provided false statements and/or half-truths with respect to its commitment to diversity and equality in its mortgage lending practices.  Plaintiffs and the Minority Applicants would not have agreed to apply for residential loans with Wells Fargo, or pay the associated application and appraisal fees, had Wells Fargo properly disclosed and reported all material facts related to its residential loan application process.

208.    Defendants' mortgage refinancing business is a business activity under the UCL.

209.    Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for residential loan applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were charged higher interest rates than similarly qualified applicants, and/or because their applications were denied.

210.    Plaintiffs and the Class are entitled to restitution of all fees paid by them based on Defendants' unlawful, fraudulent, and unfair business practices, as well as injunctive relief to protect the public from these practices in the future, as the

damage caused thereby is difficult (if not impossible) to calculate.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

a.   Certify the 23(b)(2), 23(b)(3) or 23(c)(4) classes outlined above;

b.   Designate Plaintiffs as Class Representatives and designate undersigned counsel as lead Class Counsel;

c.   Find that Defendants' acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh Civil Rights Act, and the California UCL;

d.   Find that Defendants have engaged in a pattern and practice of racial discrimination resulting in the harm to Plaintiffs and class members as described above;

e.   Award Plaintiffs and all others similarly situated restitutionary relief, together with compensatory and punitive damages;

f.   Order Defendants to reform loans and/or extend loans to Minority Applicants on the same terms afforded to non-Minority Applicants.

g.   Award Plaintiffs and all others similarly situated injunctive and equitable relief;

h.   Award Plaintiffs and all others similarly situated prejudgment interest and attorney's fees, costs, and disbursements; and

i.   Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

# **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable.

DATED:  March 24, 2023

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Dennis S. Ellis

By: ___*/s/ Dennis S. Ellis*___
Dennis S. Ellis
Interim Lead Class Counsel

**APPROVED AS TO FORM**

DATED:  March 24, 2023

FRANK, SIMS & STOLPER LLP
Jason M. Frank
Scott H. Sims
Andrew D. Stolper

By: ___*/s/ Jason M. Frank*___
Jason M. Frank
Attorneys for Plaintiffs Aaron Braxton, Gia
Gray, Bryan Brown and Paul Martin

**APPROVED AS TO FORM**

DATED:  March 24, 2023

BEN CRUMP, PLLC
Benjamin L. Crump
Nabeha Shaer

By: ___*/s/ Benjamin L. Crump*___
Benjamin L. Crump
Attorneys for Plaintiffs Christopher Williams,
Sam Albury and Shaia Beckwith Simmons

**APPROVED AS TO FORM**

DATED:  March 24, 2023                    SANI LAW, APC
                                          Sam Sani

                                          By:  ___/s/ Sam Sani_____
                                                    Sam Sani
                                          Attorney for Plaintiffs Christopher Williams,
                                          Sam Albury and Shaia Beckwith Simmons

**APPROVED AS TO FORM**

DATED:  March 24, 2023                    STOWELL & FRIEDMAN, LTD.
                                          Linda D. Friedman
                                          Suzanne E. Bish

                                          By:  ___/s/ Linda D. Friedman_____
                                                    Linda D. Friedman
                                          Attorneys for Plaintiffs Christopher Williams,
                                          Sam Albury, Shaia Beckwith Simmons

**APPROVED AS TO FORM**

DATED:  March 24, 2023                    EVANGELISTA WORLEY LLC
                                          James M. Evangelista

                                          *By:*  ___/s/ James M. Evangelista_____
                                                    James M. Evangelista
                                          Attorney for Plaintiffs Ifeoma Ebo, Terah
                                          Kuykendall-Montoya

**APPROVED AS TO FORM**

DATED:  March 24, 2023                    MILBERG COLEMAN BRYSON PHILLIPS
                                          GROSSMAN, PPLC
                                          Alex R. Straus
                                          Jennifer Kraus Czeisler

                                          By:  ___/s/ Alex R. Straus_____
                                                    Alex R. Straus
                                          Attorneys for Plaintiffs Ifeoma Ebo, Terah
                                          Kuykendall-Montoya

1  **APPROVED AS TO FORM**

2  DATED:  March 24, 2023          DANN LAW FIRM
3                                            Marc E. Dann
                                             Brian D. Flick
4
5                                   By:   ___/s/ Marc E. Dann_____
                                              Marc E. Dann
6                                   Attorneys for Plaintiffs Ifeoma Ebo and Terah
7                                   Kuykendall-Montoya

8  **APPROVED AS TO FORM**

9  DATED:  March 24, 2023          ZIMMERMAN LAW OFFICES, P.C.
                                             Thomas A. Zimmerman, Jr.
10
11                                  By:   ___/s/ Thomas A. Zimmerman, Jr.___
                                              Thomas A. Zimmerman, Jr.
12                                  Attorney for Plaintiffs Ifeoma Ebo and Terah
13                                  Kuykendall-Montoya

14  **APPROVED AS TO FORM**

15  DATED:  March 24, 2023         GUSTAFSON GLUEK PLLC
                                             Daniel Nordin
16                                           Abou B. Amara, Jr.
17
18                                  By:   ___/s/Abou B. Amara, Jr._____
                                              Abou B. Amara, Jr.
19                                  Attorneys for Plaintiffs Elretha Perkins and
20                                  Laronica Johnson

21

22

23

24

25

26

27

28

# ATTORNEY ATTESTATION

**Attestation under N.D. Cal. L.R. 5-1(h)**:  the ECF filer of this document attests that all of the other signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document.

*/s/ Dennis S. Ellis*
Dennis S. Ellis

-58-
AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT