**MCGUIREWOODS LLP**
Ava E. Lias-Booker (*Admitted pro hac vice*)
alias-booker@mcguirewoods.com
Melissa O. Martinez (*Admitted pro hac vice*)
mmartinez@mcguirewoods.com
Alicia A. Baiardo (SBN: 254228)
abaiardo@mcguirewoods.com
Jasmine K. Gardner (*Admitted pro hac vice*)
jgardner@mcguirewoods.com
Two Embarcadero Center
Suite 1300
San Francisco, CA  94111-3821
Telephone:  415.844.9944
Facsimile:  415.844.9922

**WINSTON & STRAWN LLP**
Amanda L. Groves (SBN: 187216)
agroves@winston.com
Kobi K. Brinson (*Admitted pro hac vice*)
kbrinson@winston.com
Stacie C. Knight (*Admitted pro hac vice*)
sknight@winston.com
Winston & Strawn LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

*Attorneys for Defendant Wells Fargo Bank, N.A.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re Wells Fargo Mortgage Discrimination Litigation* | CASE NO. 3:22-CV-00990-JD |
| | The Hon. James Donato |
| | **DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO DISQUALIFY PLAINTIFFS' EXPERT AND REQUEST FOR EVIDENTIARY HEARING** |
| | Date: May 23, 2024 |
| | Time: 10:00 a.m. |
| | Courtroom: 11 |

1  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

2      PLEASE TAKE NOTICE that on May 23, 2024 at 10:00 a.m., or as soon thereafter as

3  counsel may be heard, in Courtroom 11, 19th Floor, before the Honorable James Donato, Defendant

4  Wells Fargo Bank, N.A. ("Wells Fargo") will and hereby does move for an Order disqualifying

5  Dante Jackson ("Mr. Jackson") as an expert witness for Plaintiffs because: (1) Mr. Jackson

6  previously worked as an underwriter for Wells Fargo for several years; (2) is bound by numerous

7  confidentiality agreements with Wells Fargo; (3) gained access to Wells Fargo's confidential and

8  proprietary information related to its underwriting policies, procedures, and systems during the

9  course of his employment, which is not only relevant, but are in fact central, to the current litigation;

10  (4) has publicly displayed his vehement disdain for Wells Fargo such that allowing him to testify as

11  an expert would undermine the integrity of the judicial system; and (5) fundamental fairness dictates

12  his disqualification.

13      This motion is based upon this Notice of Motion and Motion, the accompanying

14  Memorandum of Points and Authorities, the Declaration of Shelly L. Johnson and exhibits thereto,

15  all pleadings and papers on file in this action, oral argument as permitted by the Court, and any such

16  other matters that the Court deems appropriate. Wells Fargo requests an evidentiary hearing.

                               Respectfully submitted,

17

18  DATED: April 12, 2024                 **MCGUIREWOODS LLP**

19                          By:   */s/ Ava Lias-Booker*
                                  Ava E. Lias-Booker (*admitted pro hac vice*)
20                                alias-booker@mcguirewoods.com
                                  Alicia A. Baiardo
21                                abaiardo@mcguirewoods.com
                                  Melissa O. Martinez (*admitted pro hac vice*)
22                                mmartinez@mcguirewoods.com
                                  Jasmine K. Gardner (*admitted pro hac vice*)
23                                jgardner@mcguirewoods.com
                                  Two Embarcadero Center, Suite 1300
24                                San Francisco, CA  94111-3821
                                  Telephone: (415) 844-9944
25                                Facsimile: (415) 844-9922

26

27

28
                                          i

**WINSTON & STRAWN LLP**
*/s/ Amanda L. Groves*
Amanda L. Groves
agroves@winston.com
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Kobi K. Brinson (*admitted pro hac vice*)
kbrinson@winston.com
Stacie C. Knight (*admitted pro hac vice*)
sknight@winston.com
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Telephone: (704) 350-7700
Facsimile: (704) 350-7800

***Attorneys for Defendant***
***Wells Fargo Bank, N.A.***

ii

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO
DISQUALIFY PLAINTIFFS' EXPERT
CASE NO. 3:22-cv-00990-JD

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTUAL BACKGROUND ............................................................................... 2

     A.    Mr. Jackson Worked As A Contract Underwriter Then Held Various Underwriting And Officer Positions At Wells Fargo From 2001 Through 2007 And Agreed To Keep Wells Fargo's Confidential Information, Proprietary Information, And Trade Secrets Confidential. ..................................... 2

     B.    In 2013, Wells Fargo Hired Mr. Jackson Again As An Underwriter And Mr. Jackson Signed Two Additional Agreements Related To Confidentiality. .............. 3

     C.    While Working At Wells Fargo, Mr. Jackson Gained Knowledge Of, And Had Access To, Wells Fargo's Confidential And Proprietary Information And Trade Secrets Related To Underwriting. ............................................................ 5

     D.    Mr. Jackson Seeks To Opine On Wells Fargo's Underwriting Process, Which Necessarily Involves The Use And Disclosure Of Wells Fargo's Confidential And Proprietary Information. ................................................................ 7

     E.    Plaintiffs Failed To Disclose That Mr. Jackson Was Employed By Wells Fargo In 2013 Or Confer with Wells Fargo Despite Being On Notice That He Was Privy To Wells Fargo's Proprietary Information At The Heart Of This Case. ................................................................................................................. 8

     F.    Mr. Jackson Is Biased. ............................................................................................ 9

III.  ARGUMENT ....................................................................................................... 10

     A.    The Court Should Disqualify Mr. Jackson Because Mr. Jackson Signed Confidentiality Agreements With Wells Fargo And, Pursuant To Those Agreements, He Acquired Confidential And Proprietary Information About Wells Fargo's Underwriting Process That Is Central To The Instant Case. .......... 10

          1.    Wells Fargo Had A Confidential Relationship With Mr. Jackson. ............... 14

          2.    Wells Fargo Disclosed Confidential Information To Mr. Jackson That Is Not Only Relevant, But Is Critical To, The Instant Litigation. ................................................................................................. 15

     B.    The Need To Disqualify Mr. Jackson Is Heightened In This Case Because He Is Neither Neutral Nor Unbiased. ....................................................................... 17

     C.    The Principles of Fundamental Fairness and Prejudice Require Mr. Jackson's Disqualification. ...................................................................................... 18

     D.    If The Court Does Not Disqualify Mr. Jackson, Wells Fargo Seeks A Short Extension of the Discovery Deadline For The Limited Purpose Of Deposing Mr. Jackson. ........................................................................................................... 19

IV.   CONCLUSION ................................................................................................... 20

iii

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4
*Alien Technology Corp v. Intermec, Inc.*,
5
   No. 3:06-CV-51, 2007 WL 4261972 (D.N.D. Nov. 30, 2007) .................................... 4, 14, 17

6
*Bell Northern Research, LLC v. ZTE Corp.*,
   No. 18cv1789-CAB(BLM), 2019 WL 1590472 (S.D. Cal. April 12, 2019) .................. 12, 20
7

8
*Brett ex rel. Brett v. Hillerich & Bradsby Co.*,
   No. CIV-99-981-C, 2001 WL 36162670 (W.D. Okla. Oct. 5, 2001) .................................... 13

9
*Broadcom Corp. v. Emulex Corp.*,
10
   No. SACV0901058JVSANX, 2010 WL 11465478 (C.D. Cal. Apr. 5, 2010).....................12

11
*Brunstad v. Medtronic, Inc.*,
   No. 14-v-255-jdp, 2015 WL1962104 (W.D. Wis. Apr. 30, 2015).........................................13
12

13
*CarboMedics, Inc. v. ATS Med., Inc.*,
   No. 06-CV-4601 PJS/JJG, 2008 WL 5500760 (D. Minn. Apr. 16, 2008) .......................... 13

14
*Chichilnisky v. Trustees of Columbia Univ. in City of New York*,
15
   No. 91-CV-4617 (MJL), 1994 WL 658428 (S.D.N.Y. Nov. 22, 1994)................................17

16
*Cordy v. Sherwin-Williams Co.*,
   156 F.R.D. 575 (D.N.J. 1994) .............................................................................................. 18
17

18
*El Ansari v. Graham*,
   No. 17-CV-3963 (VEC), 2019 WL 3526714 (S.D.N.Y. Aug. 2, 2019) ............................... 17

19
*In re Incretin Mimetics Products Liability Litigation*,
20
   No. 13md2452 AJB (MDD), 2015 WL 1499167 (S.D. Cal. Apr. 1, 2015)
   ......................................................................................................................................*passim*

21
*Kane v. Chobani, Inc.*,
22
   No. 12-cv-02425-LHK, 2013 WL 3991107 (N.D. Cal. Aug. 2, 2013)..................................15

23
*Lake Cherokee Hard Drive Techs., LLC v. Bass Computers, Inc.*,
   No. 2:10-CV-216-JRG, 2012 WL 708354 (E.D. Tex. Mar. 5, 2012) .................................. 13
24

25
*Lippe v. Bairnco Corp.*,
   288 B.R. 678 (S.D.N.Y. 2003) ............................................................................................ 18

26
*Marvin Lumber & Cedar Co. v. Norton Co.*,
27
   113 F.R.D. 588 (D. Minn. 1986) ......................................................................................... 11

28

iv

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO
DISQUALIFY PLAINTIFFS' EXPERT
CASE NO. 3:22-cv-00990-JD

*Pellerin v. Honeywel Intern Inc.*,
   No. 11cv1278-BEN (CAB), 2012 WL 112539 (S.D. Cal. Jan. 12, 2012) ......................*passim*

*Sensormatic Elecs. Corp. v. WG Sec. Prods.*,
   No. 2:04-CV-167, 2006 WL 5111116 (E.D. Tex. Feb. 9, 2006) ............................................. 13

*Simons v. Freeport Memorial Hospital*,
   No. 06 C 50134, 2008 WL 5111157 (N.D. Ill. Dec. 4, 2008) ................................................ 18

*Space Systems/Loral v. Martin Marietta*,
   No. 95-20122 SW, 1995 WL 686369 (N.D. Cal. Nov. 15, 1995) ...................................*passim*

*United States v. Quicken Loans Inc.*,
   239 F. Supp. 3d 1014 (E.D. Mich. 2017) ............................................................................. 5

*Veazy v. Hubbard*,
   No. 08-00293 HG-LEK, 2008 WL 5188847 (D. Haw. Dec. 11, 2008) ................................. 19

*WesternGeco LLC v. ION Geophysical Corp.*,
   No. 09-cv-1827, 2010 WL 2266610 (S.D. Tex. June 2, 2010) ............................................. 13

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO
DISQUALIFY PLAINTIFFS' EXPERT
CASE NO. 3:22-cv-00990-JD

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

This is one of the rare cases in which the law unequivocally requires disqualification of a party's expert.  Mr. Dante Jackson is a former Wells Fargo employee and officer who agreed to protect the company's confidential and proprietary information.  In his role as a former employee and officer of the bank, Mr. Jackson was privy to confidential and proprietary information, policies and procedures, and systems directly relating and, in fact, central to the subject matter of this lawsuit: loan underwriting.  He is now using that insider knowledge as a paid expert in direct violation of the terms of his confidentiality agreements with Wells Fargo.

Mr. Jackson had not one, but three tenures at Wells Fargo.  He started as a contract underwriter.  And during both of his full-fledged employment periods with the bank, Mr. Jackson signed agreements in which he promised not to disclose Wells Fargo's confidential and proprietary trade secrets and information.  He further agreed, in writing, not to use any proprietary information for his own gain after he left the bank.  Yet that is precisely what he has done.  Here, he seeks to take the stand, cloaked with the authority of an expert, and use his knowledge of Wells Fargo's confidential and proprietary information, policies and procedures, and systems, against his former employer, thus violating the agreements he signed.  Mr. Jackson cannot compartmentalize and lock away his confidential and proprietary knowledge for the purposes of this lawsuit.  As courts nationwide have observed in similar cases, the human brain simply does not work that way.  Likewise, the need to disqualify Mr. Jackson is heightened, as he is neither neutral nor unbiased.  Mr. Jackson has made his disdain for Wells Fargo abundantly clear through podcasts and YouTube videos, claiming Wells Fargo employees "don't care" about certain customers and asking customers to contact him to give him data about being unfairly denied a mortgage—claiming this data is needed to punch them in the face.  These public statements have plainly established his inability to remain objective in his evaluation of the facts—a key skill for any expert witness.  The Court should disqualify Mr. Jackson.

The prejudice to Wells Fargo of having a former officer testifying against it as an expert witness severely outweighs any potential prejudice to Plaintiffs.  As part of the meet and confer

process in advance of this Motion, Wells Fargo offered Plaintiffs additional time to replace Mr. Jackson with an expert untainted with insider knowledge.  Plaintiffs rebuffed Wells Fargo's offer. Instead, they sought to proceed with Mr. Jackson's deposition and push Wells Fargo into the untenable position of accepting Mr. Jackson as a designated expert and potentially waiving its rights to disqualify him.  Accordingly, to the extent the Court denies the instant Motion, Wells Fargo seeks leave to extend the expert discovery deadline for the sole purpose of deposing Mr. Jackson.

## II.   FACTUAL BACKGROUND

### A.   Mr. Jackson Worked As A Contract Underwriter Then Held Various Underwriting And Officer Positions At Wells Fargo From 2001 Through 2007 And Agreed To Keep Wells Fargo's Confidential Information, Proprietary Information, And Trade Secrets Confidential.

From 2001 to 2004, Mr. Jackson was a contract underwriter for Silicon Valley Staffing, which, at the time, had a contract to perform loan underwriting for Wells Fargo.  *See* **Declaration 1**, Declaration of Shelly L. Johnson, ¶ 3.  On August 17, 2004, Wells Fargo sent an offer of employment to Mr. Jackson as HCFG Underwriter 4, which Mr. Jackson accepted that same day. *See id.*, ¶ 4.  As part of his employment with Wells Fargo, Mr. Jackson signed several agreements in which he agreed to keep Wells Fargo's confidential and proprietary information confidential. Specially, on the same day Wells Fargo hired him, on August 17, 2004, Mr. Jackson signed the Team Member Acknowledgement, which states that he "received, or under[stood] that he will be provided, the Handbook for Wells Fargo Team Members" and affirmed that he "read and will adhere to the Code of Ethics and Business Conduct and the Information Security Policy."  *See id.*, ¶ 5; *see also* **Exhibit A**[1], Team Member Acknowledgement.

The Code of Ethics and Business Conduct included in the Handbook for Wells Fargo Team Members effective as of June 2004, and which Mr. Jackson received, includes a section entitled ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  **Exhibit B**, 2004 Handbook at 105-106. ▮▮▮▮▮▮▮▮▮▮▮▮ section informs Wells Fargo employees that they have a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] The lettered exhibits herein refer to the exhibits to **Declaration 1**, Declaration of Shelly L. Johnson.

2

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████

6 ███████████████████████████████████████ *Id.* at 106 (emphasis

added).

On August 18, 2004, Mr. Jackson signed the Information Security Briefing Checklist.

**Exhibit C**, Information Security Briefing Checklist.   In signing this document, Mr. Jackson

████████████████████████████████████████████████ and that he agreed to follow the ██████████████

████████████████████████████ *Id.* at 4, 9.  This same document ████████████████

████████████████████████████████████████ *Id.* at 1. ████████████

████████████████████████████████████████████ *Id.*

On August 23, 2004, Wells Fargo hired Mr. Jackson for the position of Underwriter 4.

**Declaration 1**, Declaration of S. Johnson, ¶ 8.  On March 13, 2006, Mr. Jackson was promoted

within Wells Fargo and given the officer title designation of an Assistant Vice President.  *Id.* at ¶ 9.

A few months later, he was promoted to Vice President within Wells Fargo's Credit Risk

Management Department—also an officer title designation—and he remained in that position until

he left Wells Fargo in 2007.  *Id.* at ¶¶ 10, 12.  Officer titles provide Wells Fargo employees with the

authority to act on behalf of Wells Fargo and, because officers have specific rights, responsibilities,

and authorities, the officer title is required to be used with discretion.  *Id.* at 11.  As an officer, Mr.

Jackson was required to comply the Code of Ethics and Wells Fargo policies and standards.  *Id.*

> **B.**     **In 2013, Wells Fargo Hired Mr. Jackson Again As An Underwriter And
> Mr. Jackson Signed Two Additional Agreements Related To
> Confidentiality.**

In 2013, Mr. Jackson again applied for employment at Wells Fargo.  On January 10, 2013,

Wells Fargo extended Mr. Jackson an offer of employment as a Consumer Loan Underwriter 5 (the

1  "Offer of Employment"). *Id.* at ¶ 13; *see also* **Exhibit D**, January 10, 2013 Offer of Employment.

2  The Offer of Employment states, "[w]hen you start work, you'll receive access to the Handbook for

3  Wells Fargo Team Members . . . . On your first day, please be sure to bring acceptable documents

4  for establishing your employment eligibility as outlined in the Conditions of Employment at the end

5  of this letter." *Id.* at 2.  The Conditions of Employment attached to the Offer of Employment states

6  that, "[t]o protect Wells Fargo's intellectual property and human capital, all new hires are required

7  to complete a corporate Trade Secrets Agreement." *Id.*  The Trade Secrets Agreement requires that

8  employees protect Wells Fargo trade secrets and confidential and proprietary information, and sets

9  forth an agreement for non-solicitation and assignment of inventions made or conceived during the

10  course of employment.  **Exhibit E**, Trade Secret and Confidential Agreement at 1-3.

11         Mr. Jackson signed the Wells Fargo Agreement Regarding Trade Secrets, Confidential

12  Information, Non-Solicitation and the Assignment of Inventions on February 7, 2013. *Id.* at 3.  This

13  agreement provides:

14  ███████████████████████████████████████████

15  ███████████████████████████████████████████

16  ███████████████████████████████████████████

17  ███████████████████████████████████████████

18  *Id.* at 1.   Trade Secrets include, among others, ██████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████  In signing the Trade Secret and Confidential Agreement, Mr. Jackson "acknowledge[d] that

26  [he had] read, under[stood], and received a copy of this Agreement and will abide by its terms." *Id.*

27  at 3.

28         On February 7, 2013, Mr. Jackson also signed a Team Member Acknowledgement, which

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO
DISQUALIFY PLAINTIFFS' EXPERT
CASE NO. 3:22-cv-00990-JD

attested that he had been provided the Wells Fargo Team Member Handbook operative at that time, and that he would adhere to the terms of the Handbook. **Exhibit F**, Feb. 7, 2013 Team Member Acknowledgement. Similar to the Handbook for Wells Fargo Team Members in effect in the 2004-2007 timeframe, the 2013 Handbook for Wells Fargo Team Members includes multiple sections on confidential and proprietary information. **Exhibit G**, 2013 Handbook at 40-42. The January 2013 Handbook for Wells Fargo Team Members states, ███████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████. at 42 (emphasis added).

### C.  While Working At Wells Fargo, Mr. Jackson Gained Knowledge Of, And Had Access To, Wells Fargo's Confidential And Proprietary Information And Trade Secrets Related To Underwriting.

In Mr. Jackson's role as a contract underwriter and in his various underwriter and officer positions at Wells Fargo, Mr. Jackson was privy to trade secrets, confidential information, and proprietary systems regarding underwriting. *See generally* **Declaration 1**, Declaration of S. Johnson. Lenders like Wells Fargo may develop their own confidential and proprietary underwriting systems and policies and procedures to underwrite loans consistent with the requirements of the government sponsored enterprises ("GSEs"), *e.g.*, Fannie Mae and Freddie Mac. *United States v. Quicken Loans Inc.*, 239 F. Supp. 3d 1014, 1019-20 (E.D. Mich. 2017). In an unrelated case in which he was proffered as an expert witness, Mr. Jackson testified at length about his extensive knowledge of Wells Fargo's confidential and proprietary policies and procedures relating to loan underwriting–knowledge that he gained while employed at Wells Fargo. *See generally* Deposition Transcript of D. Jackson dated January 5, 2017 in support of Motion in Limine to Exclude the Proposed Expert Testimony of Dante Jackson, *First Horizon National Corporation et al. v. Houston Casualty Company et a*l., No. 2:15-cv-2235 (W.D. Tenn. Apr. 14, 2017), ECF No. 291-7 ("Jackson Tran.").

He explained that Wells Fargo's internal underwriting guidelines are indeed proprietary:

> **Q:**   And when you talk about internal underwriting guidelines for different loan products, ***would those be proprietary guidelines that are owned by Wells Fargo at that time***?
> **A:**   ***Yes***.

5

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO DISQUALIFY PLAINTIFFS' EXPERT
CASE No. 3:22-cv-00990-JD

**Q:** Okay.  And in order to formulate Wells Fargo' proprietary underwriting guidelines for, let's say, GSE-conforming loans, you would have to look at the GSE's underwriting standards and requirements in order to do that, correct?

**A:** Yes.

**Q:** The idea is that the --- Well Fargo's proprietary guidelines will incorporate the requirements of the GSEs, right?

**A:** Yes –

**Q:** Okay.

**A:** -- for the GSE product.

*See id.* at 59:3-22 (emphasis added); *id.* at 123:1-10 ("**Q:** We touched on this earlier, but what do you mean by a 'proprietary set of underwriting guidelines'? **A:** So a lender could have their own underwriting guidelines that, while not superseding the investors' guidelines, it's how – what their risk appetite is. So their risk appetite typically would be more stringent than an investor's. Could be.").

When asked about his involvement in the development of underwriting guidelines and training materials at Wells Fargo, Mr. Jackson testified that he was part of the "credit policy team and the wholesale underwriting manager team" and he "would collaborate with [his] other underwriter managers around the country, and, you know, [they] would sit down and kind of hash out, you know, what's acceptable, what's not acceptable, what [their] risk appetite would be for a particular loan or particular program." *Id.* at 56:24- 57:2-14.  From 2004 to 2006, he was involved with formulating and implementing Wells Fargo's "corporate underwriting policies and procedures," *id.* at 49:8-100, and was "one of the underwriters responsible for the nonprime books of business . . . [s]o . . . [he] reviewed credit policy; trained the underwriters on how to underwrite nonprime loans . . .; and also conducted monthly audits on the underwriters and their underwriting." *See id.* at 49:12-24.  He explained that he was responsible for auditing underwriters and making sure "they're complying with guidelines and taking acceptable risk." *Id.* at 50:11-15.

Mr. Jackson further testified that, as "a senior underwriter team lead for a particular underwriting team[, he] . . . had a $1 million . . . . single signature authority on loans . . . [meaning he] could originate and sign off on loans – actually . . . [he] could underwrite loans up to a million dollars without a second signature." *Id.* at 48:4-11.

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO
DISQUALIFY PLAINTIFFS' EXPERT
CASE NO. 3:22-cv-00990-JD

1    In short, Mr. Jackson possesses—and is aware that he possesses—proprietary and

2 confidential information regarding Wells Fargo's underwriting methods, guidelines, and policies

3 and procedures, which he claimed to have helped develop and implement.

4           **D.      Mr. Jackson Seeks To Opine On Wells Fargo's Underwriting Process,
                      Which Necessarily Involves The Use And Disclosure Of Wells Fargo's**
5                     **Confidential And Proprietary Information.**

6    The introduction section of Mr. Jackson's report summarizes the nature of Mr. Jackson's

7 opinion in this case as follows:

8        In this rebuttal report, I evaluate Dr. Courchane's analysis of Wells Fargo's
         underwriting policies and procedures and her analysis of the loan files, *which do not*
9        *reflect Wells Fargo's stated policy* that it applies similar policies, processes and
         procedures to each individual loan or financing application regardless of the loan
10       product.

11       This rebuttal report will also address *inconsistencies in Wells Fargo's origination*
12       *policies with industry standards*, which result in differences in Wells Fargo's
         processes from those of other lenders.  These deviations from accepted underwriting
13       approaches show a pattern or practice that Wells Fargo has of treating protected class
14       borrowers unfairly. ████████████████████████████████████████████████

15       ████████████████████████████████████████████  *Wells Fargo's*
         *distinct process and reporting policies* has resulted in more Minority Applicant
16       incompletes and withdrawals than other lenders.

17 Rebuttal Report of Dante Jackson dated March 22, 2024 ("Jackson Report") at 1(emphasis added).

18 In other words, Mr. Jackson seeks to offer an opinion regarding Wells Fargo's underwriting

19 methods, systems and its policies and procedures.

20   The opinion that Mr. Jackson seeks to offer is inextricably tied to the confidential and

21 proprietary information he learned while employed by Wells Fargo.  Indeed, during his tenure with

22 Wells Fargo, underwriters utilized confidential and proprietary underwriting tools and systems to

23 complete risk assessments in connection with underwriting loan applications.  Upon his return to

24 Wells Fargo in 2013, Wells Fargo was using a proprietary system put in place by 2009 known as

25 the "Risk Engine," which uses a set of logic to answer business questions that is able to execute and

26 affect production outcomes.  *Id.*  Mr. Jackson would have underwritten loans and managed and

27

28

1   trained teams utilizing Wells Fargo's confidential and proprietary risk engine and its predecessor
2   systems.

3       Further, during Mr. Jackson's tenure, Wells Fargo implemented the use of its confidential
4   and proprietary mortgage application platform, "CORE" (Common Opportunities Results and
5   Experience).  Wells Fargo uses "CORE" as its mortgage loan processing system.  *Id*.  CORE is a
6   dynamic web-based system that reduces the complexity of the underwriting process to have all
7   underwriting tools on the same platform, allowing Wells Fargo Home Lending team members to
8   process a loan from origination to funding.  *Id*. Moreover, Mr. Jackson's opinion explicitly discusses
9   Wells Fargo's proprietary CORE system, Jackson Report at 1, 8, 12, to which Mr. Jackson became
10  privy while employed by Wells Fargo.

11          **E.    Plaintiffs Failed To Disclose That Mr. Jackson Was Employed By Wells
12                  Fargo In 2013 Or Confer with Wells Fargo Despite Being On Notice That
                    He Was Privy To Wells Fargo's Proprietary Information At The Heart
13                  Of This Case.**

14      Although Plaintiffs did not designate Mr. Jackson as an expert witness in this case until
15  March 22, 2024, Plaintiffs retained Mr. Jackson months earlier, in or around December of 2023.  D.
16  Jackson Engagement Agreement ("Jackson Engagement Letter").  When Plaintiffs finally disclosed
17  Mr. Jackson's designation as an expert in this case, they produced a copy of Mr. Jackson's CV that
18  omitted his 2013 employment at Wells Fargo.  Jackson Report at Appendix B at 2-3.  Plaintiffs
19  sought to underplay Mr. Jackson's work history and experience with Wells Fargo's underwriting
20  policies and procedures, as further evidenced by the summary of Mr. Jackson's work experience in
21  Mr. Jackson's report.  *See* Jackson Report at 2.  Pursuant to subpoena, Plaintiffs produced Mr.
22  Jackson's expert fee invoices.  He has incurred roughly $75,000 for his services in this case.

23      Upon learning of Mr. Jackson's expert witness designation, Wells Fargo moved quickly to
24  uncover the nature and extent of Mr. Jackson's employment at the bank, which was hampered by
25  his omission of his 2013 employment.  Accordingly, it was not until recently that Wells Fargo
26  learned of Mr. Jackson's intimate familiarity with Wells Fargo's underwriting systems and policies
27  and procedures through the various positions he has held at Wells Fargo over the years, and of all
28  of the agreements Mr. Jackson signed that either include or reference restrictions on Mr. Jackson's

1  ability to disclose Wells Fargo's confidential and proprietary information and trade secrets.

2     Although several months passed between Plaintiffs' retaining Mr. Jackson and designating

3  Mr. Jackson as an expert witness, it appears that they never inquired whether Mr. Jackson was bound

4  by any confidentiality agreements even though they were aware of his former employment at Wells

5  Fargo.  This failure is remarkable given that Mr. Jackson's testified, in a deposition in the only other

6  case in which he appeared as an expert witness, that he was privy to Wells Fargo's confidential and

7  proprietary systems and information that goes directly to the issues in this case and his proffered

8  testimony specifically.

9     As part of the meet and confer process, Wells Fargo provided Plaintiffs copies of the

10  applicable agreements on April 10, 2024, promptly after discovering and reviewing them, cancelled

11  Mr. Jackson's deposition, and offered Plaintiffs additional time to find a replacement expert witness

12  not bound by similar agreements.

13            **F.      Mr. Jackson Is Biased.**

14     Mr. Jackson has been very public about his disdain for Wells Fargo and has solicited bank

15  customers to contact him.  He maintains a podcast via YouTube, known as the Deacon Board

16  Podcast,[2] through which he uploads videos on various topics.  At least three videos that Mr. Jackson

17  has previously uploaded included negative commentary related to Wells Fargo generally, and Wells

18  Fargo's loan approval process specifically.

19     Most notably, on March 21, 2022, over a year before Plaintiffs purportedly retained Mr.

20  Jackson in this litigation, Mr. Jackson uploaded an episode of his podcast labeled "Banks ain't sh*%

21  but H*^% & Tricks."  On April 11, 2024, attorneys at McGuireWoods watched this podcast on

22  YouTube at the following address: https://www.youtube.com/watch?v=DV4xtrPvZXI.  However,

23  within an hour of watching the video and shortly after counsel for Wells Fargo alerted Plaintiffs of

24  this impending motion, the video was mysteriously "removed by the uploader."  The same applies

25  for another episode where Mr. Jackson discussed Wells Fargo, labeled "He Wanted Smoke and Got

26

27  _____

28  [2] An alternative title for this podcast is "BWB Banking While Black."

It."[3]                 In       any       event,       they       are       still       available       at
https://www.listennotes.com/search/?q=%22The+Deacon+Board+Podcast%22&scope=episode.
McGuireWoods has downloaded these podcasts and is able to make them available to the Court and
all counsel in any acceptable format.  Upon learning that these podcast episodes have been removed,
counsel for Wells Fargo sent correspondence to Plaintiffs' counsel advising them of this fact and
requesting that they instruct Mr. Jackson to refrain from removing, deleting, or destroying any
further episodes of his podcast or other materials he has posted online or in the public domain that
may reference Wells Fargo.

   In these podcasts, he and others generally discussed the perceived difficulty in obtaining
mortgages and loans and how "the system" is designed to exclude Black people.  Mr. Jackson
expressly stated that he "sat in a room" with several Wells Fargo employees and that "they don't
care" about certain customers.  Later in the podcast, Mr. Jackson solicited his listeners, "[i]f
anyone's been denied a mortgage from Wells Fargo, unfairly denied a mortgage at Wells Fargo, any
bank, let me know . . . I need data."  This data, he claims, is important to **punch them in the face**.

### III.    ARGUMENT

   **A.    The Court Should Disqualify Mr. Jackson Because Mr. Jackson Signed
           Confidentiality Agreements With Wells Fargo And, Pursuant To Those
           Agreements, He Acquired Confidential And Proprietary Information
           About Wells Fargo's Underwriting Process That Is Central To The
           Instant Case.**

   This Court has long recognized that "disqualification may be appropriate . . . when a party
retains expert witnesses who previously worked for an adversary and who acquired confidential
information during the course of their employment."  *Space Systems/Loral v. Martin Marietta*, No.
95-20122 SW, 1995 WL 686369, at *2 (N.D. Cal. Nov. 15, 1995); *see also Pellerin v. Honeywel
Intern Inc.*, No. 11cv1278-BEN (CAB), 2012 WL 112539 at *2 (S.D. Cal. Jan. 12, 2012) (holding
same).  To disqualify an expert witness based on a prior relationship with an adversary, the moving
party must show (1) the adversary had a "confidential relationship with the expert" and (2) "the

---

[3] Previously available at: https://www.youtube.com/watch?v=PuudNoJ7r4I.

adversary disclose[d] confidential information to the expert that is relevant to the current litigation." *Space Systems/Loral*, 1995 WL 686369, at *2; *see also Pellerin*, 1995 WL 686369, at *2.  If there is any doubt as to the balance of interests related to the disqualification of an expert, it "is to be resolved in favor of disqualification."  *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 592 (D. Minn. 1986).

California federal courts routinely disqualify former employees from serving as an expert witness for an adversary when the moving party establishes the existence of a confidentiality agreement with the former employee and that the moving party shared confidential information with the former employee that is relevant to the issues in the case.  For example, in *Space Systems/Loral*, this Court granted the defendant's motion to disqualify its former employee and consultant, Muhlfelder, from serving as an expert witness in a lawsuit alleging patent "infringement of two of [the plaintiff's] patents by [the defendant's] Series 7—and Hughes' HS-601 satellite technology." 1995 WL 686369 at *1-2.  "As an initial matter, Muhlfelder's employment and consulting activities for [the defendant] required him to sign numerous confidentiality agreements promising not to disclose any trade secrets or other confidential information."  *Id.*  The confidentiality agreement was necessary because, through his employment at the defendant corporation, "Muhlfelder was privy to substantial confidential information from [the defendant] that is relevant to the issues in the case." *Id.*  In fact, "Muhlfelder had significant involvement in designing the attitude control systems for the Series 3000, 4000, 5000, and 7000 satellites" and "[h]e was also the named inventor of several [of the defendant's] patents relating to attitude control."  *Id.*  "After his retirement, Muhlfelder's consulting activities for [the defendant] and its customers allowed him access to confidential attitude control technology."  *Id*.  Accordingly, the Court held that Muhlfelder was disqualified from serving as the plaintiff's expert witness.

Similarly, in *Pellerin*, the Court held that the defendants' former employee, Mr. Fleming, was disqualified from testifying as an expert for the plaintiff.  In that case, "Mr. Fleming [was] a

former employee of the division of the defendant responsible for the manufacture of its earplug products" and the plaintiff retained him as an expert witness in support of their trade secret misappropriation claim against the defendant. *Pellerin*, 1995 WL 686369, at *1. In applying the two-part test for disqualification, the Court reasoned, first, that, "it is undisputed that Mr. Fleming was a former employee of defendants and in relation to his employment entered into confidentiality agreements with the defendants that bind him to keep confidential information he obtained during his employment." *Id.* With respect to the second factor, the Court explained that "Defendants have offered testimony by way of declaration that Mr. Fleming received confidential information that is pertinent to this litigation." Based on this, the Court found "that both prongs of the test have been met." *Id.*

*Space Systems/Loral* and *Pellerin* have been extensively cited in California, including in *Bell Northern Research, LLC v. ZTE Corp.* In that case, the Court disqualified a former consultant from testifying as an expert witness because he signed a Consulting Agreement requiring him to maintain confidential and secret information. No. 18cv1789-CAB(BLM), 2019 WL 1590472, at *8 (S.D. Cal. April 12, 2019). The court held that "[t]he Consulting Agreement remains in effect and prohibits Dr. Madisetti from serving as an expert for BNR in this litigation." *Id.*

Similarly, the Court in *Broadcom Corp. v. Emulex Corp.* also disqualified a former employee, Mr. Chan, from serving as a litigation consultant after finding that the two-part test had been satisfied. No. SACV0901058JVSANX, 2010 WL 11465478 at *5 (C.D. Cal. Apr. 5, 2010). As a condition of his employment, Mr. Chan was required to sign a confidentiality agreement preventing him from disclosing any "information relating to [Gadzoox's] research and development, . . . inventions, works of authorship, formulas, creations and discoveries." *Id.* Several years after Mr. Chan's departure, Gadzoox declared bankruptcy and plaintiff Broadcom purchased Gadzook's intellectual property in January 2003. *Id.* Defendant Emulex Corp hired Mr. Chan to serve as a litigation consultant in defending from a patent litigation suit asserted by Broadcom. *Id.* The Court first reasoned that "it is undisputed that Chan signed a confidentiality agreement with Gadzoox, agreeing not to disclose any information related to research and development." *Id.* at *2. The Court then held that Mr. Chan "received confidential information related to the development of the

relevant technology and participated in privileged communications during patent prosecution." *Id.* Thus, the Court found that Mr. Chan "received confidential information related this the [sic] litigation while employed at Gadzoox." *Id.* at *3.

Courts nationwide follow suit in disqualifying former employees with knowledge of confidential and proprietary information from testifying against their ex-employers as expert witnesses. *See, e.g.*, *Brunstad v. Medtronic, Inc.*, No. 14-v-255-jdp, 2015 WL1962104, at *2 (W.D. Wis. Apr. 30, 2015) (granting motion to disqualify former employee because "MiniMed had a confidential relationship with Causey, who worked under the terms of a written confidentiality agreement, and during the course of his work, Causey undoubtedly acquired a great deal of confidential information relevant to the current litigation."); *Lake Cherokee Hard Drive Techs., LLC v. Bass Computers, Inc.*, No. 2:10-CV-216-JRG, 2012 WL 708354, at *3 (E.D. Tex. Mar. 5, 2012) (disqualifying former employee who signed a confidentiality agreement from testifying as an expert witness against his former employer because former employee had confidential information relevant to the litigation); *WesternGeco LLC v. ION Geophysical Corp.*, No. 09-cv-1827, 2010 WL 2266610, at *7 (S.D. Tex. June 2, 2010) (disqualifying a former employee as an expert because the employee gained relevant confidential information related to the litigation); *CarboMedics, Inc. v. ATS Med., Inc.*, No. 06-CV-4601 PJS/JJG, 2008 WL 5500760, at *3 (D. Minn. Apr. 16, 2008) (disqualifying defendants' former employee from testifying as an expert witness because the employee entered into a confidentiality agreement with its former employer and the former employer disclosed confidential information to the former employee); *Sensormatic Elecs. Corp. v. WG Sec. Prods.*, No. 2:04-CV-167, 2006 WL 5111116, at *9 (E.D. Tex. Feb. 9, 2006) (disqualifying a former employee from testifying as an expert witness because they signed a confidentiality agreement with their employer and possessed confidential information regarding key issues in the litigation based on their prior employment); *Brett ex rel. Brett v. Hillerich & Bradsby Co.*, No. CIV-99-981-C, 2001 WL 36162670, at *1 (W.D. Okla. Oct. 5, 2001) ("The Court finds it inconceivable that Mr. MacKay could testify generally about bat safety in litigation surrounding the Air Attack 2, when his expertise at H & B (made confidential by agreement) is so intertwined with the technology at issue.").

1   Here, like the moving parties in *Space Systems/Loral*, *Pellerin*, *Broadcom Corp.*, and the

2   host of cases nationwide, Wells Fargo can satisfy the two-part test for Mr. Jackson's disqualification.

3   **1.   Wells Fargo Had A Confidential Relationship With Mr. Jackson.**

4   First, there is no doubt that Wells Fargo had a confidential relationship with Mr. Jackson.

5   During both of his employment periods with the bank, Mr. Jackson signed agreements in which he

6   promised not to disclose Wells Fargo's confidential and proprietary trade secrets and information.

7   In 2004, Mr. Jackson signed the Team Member Acknowledgement, which incorporated The

8   Code of Ethics and Business Conduct set forth in the Handbook for Wells Fargo Team Members.

9   **Exhibit A**, Team Member Acknowledgement; **Exhibit B**, 2004 Handbook.  The Code of Ethics and

10  Business Conduct informs Wells Fargo employees that they have a ███████████████████████

11  ████████████████████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████████████████

17  ███████████████████████████████████████████ *Id.* at 106 (emphasis added).

18  Similarly, in 2013, Mr. Jackson signed the Trade Secrets Agreement, which requires that

19  employees protect Wells Fargo trade secrets and confidential and proprietary information.  **Exhibit**

20  **E**, Trade Secret and Confidential Agreement at 1-3.  Trade Secrets include, among others, ███████

21  ████████████████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████████████████

26  ████████████████████████████████ *Id.* (emphasis added).

27  Also in 2013, Mr. Jackson signed a Team Member Acknowledgement, which attested that

28  he had been provided the Wells Fargo Team Member Handbook operative at that time, and that he

1  would adhere to the terms of the Handbook. **Exhibit F**, Feb. 7, 2013 Team Member

2  Acknowledgement. Similar to the Handbook for Wells Fargo Team Members in effect in the 2004-

3  2007 timeframe, the 2013 Handbook states, ███████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████

5  ████████████████████████████     *Id.* at 42 (emphasis added).

6          Each of these agreements bind Mr. Jackson to keep confidential and proprietary information

7  he obtained during his employment and prohibits Mr. Jackson from using that information for his

8  own or another's gain. *See Kane v. Chobani, Inc.*, No. 12-cv-02425-LHK, 2013 WL 3991107 (N.D.

9  Cal. Aug. 2, 2013) (disqualifying consulting group from testifying as experts because consulting

10  group signed confidentiality agreement with party the expert sought to testify against).

11                    **2.    Wells Fargo Disclosed Confidential Information To Mr. Jackson**
                              **That Is Not Only Relevant, But Is Critical To, The Instant**
12                            **Litigation.**

13          Wells Fargo also satisfies the second prong to disqualify Mr. Jackson because Wells Fargo

14  disclosed confidential and proprietary information to him that is relevant to the instant litigation.

15  As Mr. Jackson conceded through sworn testimony in an unrelated matter and as he boasts on his

16  podcast, he became intimately familiar with Wells Fargo's confidential and proprietary underwriting

17  process while employed by the bank. *See* Jackson Tran. at 48-57; *id.* at 59:3-22 (admitting that

18  Wells Fargo's policies are "proprietary" and "owned by Wells Fargo"). From 2004 to 2006, he was

19  involved with Wells Fargo's "underwriting policies and procedures", *id.* at 49:8-100, and was "one

20  of the underwriters responsible for. . . train[ing] the underwriters on how to underwrite nonprime

21  loans." *See id.* at 49:12-24. He also "conducted monthly audits on the underwriters and their

22  underwriting." *Id.*

23          This confidential and proprietary information is not only relevant to the current litigation,

24  but it goes to the heart of Plaintiffs' claims and Wells Fargo's defenses. Plaintiffs' primary claim

25  is that Wells Fargo discriminated against minority loan applicants in mortgage underwriting. Mr.

26  Jackson directly opines on Wells Fargo's underwriting policies and procedures, and boldly claims

27  without any support that, "when underwritten correctly even using Wells Fargo's internal

28

underwriting guidelines, each [of the named Plaintiffs'] loan should have moved forward with an approval." Jackson Report at 3. He further rebuts Wells Fargo's expert witness, Dr. Marsha Courchane ("Dr. Courchane") and opines that her opinions "do not reflect Wells Fargo's stated policy that it applies similar policies, processes and procedures to each individual loan or financing application regardless of the loan product." *Id.* at 1. Mr. Jackson also "addresses [the alleged] inconsistencies in Wells Fargo's origination policies with industry standards, which [allegedly] result in differences in Wells Fargo's processes from those of other lenders." *Id.* He opines that "[t]hese [alleged] deviations from accepted underwriting approaches show a pattern or practice that Wells Fargo has of treating protected class borrowers unfairly" and that "Wells Fargo's distinct process and reporting policies has resulted in more Minority Applicant incompletes and withdrawals than other lenders." *Id.*

Mr. Jackson also admitted that he has confidential and proprietary knowledge relevant to Wells Fargo's defenses, including its use, and incorporation of, the minimum guidelines set forth by the GSEs into its own policies and procedures. Jackson Tran. 123:1-10 ("**Q:** We touched on this earlier, but what do you mean by a 'proprietary set of underwriting guidelines'? **A:** So a lender could have their own underwriting guidelines that, while not superseding the investors' guidelines, it's how – what their risk appetite is. So their risk appetite typically would be more stringent than an investor's. Could be.").

Moreover, Mr. Jackson's report explicitly discusses Wells Fargo's proprietary CORE system, which was in place when he worked at Wells Fargo in 2013. *See, e.g.*, Jackson Report at 1, 8, 12; *see also* **Declaration 1**.

Further, he is using his insider knowledge for his own gain—in direct violation of the 2004 and 2013 Handbooks. To date, Mr. Jackson has made roughly $75,000 as an expert for Plaintiffs.

In short, the confidential and proprietary information about Wells Fargo's underwriting policies, procedures, and systems that Mr. Jackson acquired while employed by Wells Fargo is relevant to the issues in this litigation. Any argument that Mr. Jackson is somehow capable of compartmentalizing the confidential and proprietary information he learned about Wells Fargo's underwriting policies, procedures, and systems during his employment, such that his opinion in this

16

case is not influenced by that information, fails.  In *Alien Technology Corp.*, for example, a former

employee was disqualified from serving as an expert witness because the ex-employer "show[ed] it

had a confidential relationship" with the former employee and that "it disclosed confidential and

privileged information to" to the former employee.  No. 3:06-CV-51, 2007 WL 4261972, at *2

(D.N.D. Nov. 30, 2007).  In addressing the argument that the former employee worked on a different

product, the Court explained that:

> [w]hile Gen-1 and Gen-2 may be very different and while [the former employee]
> may not think at this time any knowledge he gained at [the plaintiff] will be
> relevant, the danger is that ***no one may know how the information he learned from
> [the [plaintiff] may affect his opinion and [the former employee] may
> inadvertently use confidential information. The human brain does not
> compartmentalize information in this manner***.

*Id.* at *2 (emphasis added).  In other words, the Court recognized that a party cannot definitively

assert that a former employee's proffered expert testimony will not use confidential information

when the objecting party has demonstrated that it shared confidential information that is relevant to

the proffered expert testimony.  *See generally id.*  Indeed, the moving party need not show that the

former employee would be rendering an opinion about the exact product that was the subject of his

prior work for the moving party.  *See generally id.*; *see also Pellerin*, 2012 WL 112539, at *3

(holding that it was unrealistic to believe that former employee could parse his knowledge of the

confidential information he had obtained and only rely the information provided in litigation).

Mr. Jackson possesses confidential and proprietary information about Wells Fargo's

underwriting policies, procedures, and systems that he will not be able to separate from the

information he solely acquired as a result of the services he is providing Plaintiffs in this litigation.

He should be disqualified.

**B.     The Need To Disqualify Mr. Jackson Is Heightened In This Case Because
He Is Neither Neutral Nor Unbiased.**

Bias may be appropriate grounds for disqualifying an expert witness entirely where the bias

is "of an extraordinary degree."  *El Ansari v. Graham*, No. 17-CV-3963 (VEC), 2019 WL 3526714,

at *8 (S.D.N.Y. Aug. 2, 2019); *Chichilnisky v. Trustees of Columbia Univ. in City of New York*, No.

91-CV-4617 (MJL), 1994 WL 658428, at *2 (S.D.N.Y. Nov. 22, 1994); *Lippe v. Bairnco Corp.*,

288 B.R. 678, 688 (S.D.N.Y. 2003).  As explained above, prior to Plaintiffs' retaining Mr. Jackson

in this case, on March 13, 2022, Mr. Jackson released an episode of his podcast labeled "Banks ain't sh*% but H*^% & Tricks" in which he said that Wells Fargo employees "don't care," asked "[i]f anyone's been denied a mortgage from Wells Fargo, unfairly denied a mortgage at Wells Fargo, any bank, let me know . . . I need data," and said that they have to ***punch them in the face***.  Mr. Jackson regularly leverages his insider knowledge of Wells Fargo's confidential and proprietary underwriting policies, procedures, and systems in these podcasts, deeming himself as an insider expert who understands how "the system" is designed to exclude Black people.  He uses his knowledge of the confidential and proprietary information to turn a profit.  Consequently, the need to disqualify Mr. Jackson is underscored in this case because he is not only divulging—or at risk of divulging—Wells Fargo's confidential and proprietary information in violation of various confidentiality agreements, but also because Mr. Jackson seems to have a personal vendetta against Wells Fargo.

## C.    The Principles of Fundamental Fairness and Prejudice Require Mr. Jackson's Disqualification.

"In addition to the two-prong test, the court should balance competing policy objectives in determining whether an expert should be disqualified."  *Cordy v. Sherwin-Williams Co.*, 156 F.R.D. 575, 580 (D.N.J. 1994) (disqualifying expert who had previously received confidential information from opposing side).  "The policy objectives that favor disqualification include the court's interest in preventing conflicts of interest and in maintaining judicial integrity."  *Id*.  Considerations of fundamental fairness include whether the adverse party would be prejudiced by disqualification.  *Simons v. Freeport Memorial Hospital*, No. 06 C 50134, 2008 WL 5111157, at *5–6 (N.D. Ill. Dec. 4, 2008); *see Pellerin*, 2012 WL 112539, at *3 (excluding an expert witness when the party opposing exclusion made no showing of how it would be prejudiced).

Here, Wells Fargo would be severely prejudiced in having a former employee with confidential and proprietary knowledge and publicly displayed vitriol against the bank (and the mortgage industry in general) take the stand cloaked with the authority of an expert witness (in direct violation of his various agreements with Wells Fargo).  Mr. Jackson has already breached his agreements with Wells Fargo.  By designating Mr. Jackson and forcing Wells Fargo to file this

motion, Plaintiffs have further destroyed the confidentiality that Wells Fargo and Mr. Jackson bargained for.  Indeed, it is unclear how Wells Fargo could adequately depose or cross-examine Mr. Jackson without risking breaching its own agreements.

In contrast, Plaintiffs would not be prejudiced in taking some limited time to find a replacement rebuttal expert.  In fact, that is precisely the solution to this quagmire that Wells Fargo offered to Plaintiffs.  Plaintiffs cannot claim—and Mr. Jackson's CV certainly does not suggest— that he is the only known expert in the field of underwriting.  In fact, this is only Mr. Jackson's second expert engagement.  His area of expertise is "not unique nor so obscure that there are no other individuals with credentials in the same field."  *See Veazy v. Hubbard*, No. 08-00293 HG-LEK, 2008 WL 5188847, at *8 (D. Haw. Dec. 11, 2008) (finding disqualification would not prejudice the party opposing disqualification).  Indeed, there are numerous professional organizations for underwriters nationwide, including the National Association of Mortgage Underwriters.  Accordingly, fundamental fairness favors disqualification.

        **D.**    **If The Court Does Not Disqualify Mr. Jackson, Wells Fargo Seeks A Short Extension of the Discovery Deadline For The Limited Purpose Of Deposing Mr. Jackson.**

After Plaintiffs designated Mr. Jackson as an expert witness on March 22, 2024, Wells Fargo noticed Mr. Jackson's deposition for April 11, 2024.  Wells Fargo was able to find the various confidentiality agreements that are the subject of the instant motion shortly before the deposition, hindered by the fact that Mr. Jackson submitted a misleading CV omitting his 2013 stint at the bank. To avoid any argument by Plaintiffs that Wells Fargo waived its right to object to Mr. Jackson or to enforce its confidentiality agreements with Wells Fargo, Wells Fargo cancelled the deposition and promptly prepared the instant Motion.  *See In re Incretin Mimetics Products Liability Litigation*, No. 13md2452 AJB (MDD), 2015 WL 1499167, at *3 (S.D. Cal. Apr. 1, 2015) ("Plaintiffs argue that Defendants' motions to disqualify are untimely and that Defendants waived any objection to Dr. Fleming by not immediately moving to disqualify him after receipt of his designation as an expert for Plaintiffs"); *Bell Northern Res.* LLC, 2019 WL 1590472, at *4-5 (litigating whether one

party had waived disqualification challenge to consultant possessing confidential knowledge from prior relationship).

Based on the foregoing, should the Court decide not to wholly disqualify Mr. Jackson from serving as an expert witness in this case, Wells Fargo respectfully requests a brief extension of the discovery deadline for the sole purpose of deposing Mr. Jackson. Wells Fargo requests leave to issue additional requests for the production of documents and things, so that Wells Fargo can obtain any and all podcast episodes or other materials Mr. Jackson has posted online or in the public domain that may reference Wells Fargo including any efforts to destroy or any that were improperly destroyed. Such an accounting of the spoilation is necessary to avoid any further prejudice to Wells Fargo.

## IV.   CONCLUSION

For the foregoing reasons, Defendant Wells Fargo Bank, N.A. respectfully requests that the Court grant is motion to disqualify Plaintiffs' rebuttal expert Dante Jackson.

DATED:      April 12, 2024         **MCGUIREWOODS LLP**

By:      */s/ Ava Lias-Booker*
Ava E. Lias-Booker (*admitted pro hac vice*)
alias-booker@mcguirewoods.com
Alicia A. Baiardo
abaiardo@mcguirewoods.com
Jasmine K. Gardner (*admitted pro hac vice*)
jgardner@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, CA  94111-3821
Telephone: (415) 844-9944
Facsimile: (415) 844-9922

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WINSTON & STRAWN LLP**
*/s/ Amanda L. Groves*

Amanda L. Groves
agroves@winston.com
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Kobi K. Brinson *(admitted pro hac vice)*
kbrinson@winston.com
Stacie C. Knight *(admitted pro hac vice)*
sknight@winston.com
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Telephone: (704) 350-7700
Facsimile: (704) 350-7800

*Attorneys for Defendant Wells Fargo Bank, N.A.*

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO
DISQUALIFY PLAINTIFFS' EXPERT
CASE NO. 3:22-cv-00990-JD

1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 12, 2024, the foregoing was filed electronically in this Court's Electronic Case Filing system ("ECF"); thereby upon completion the ECF system automatically generated a Notice of Electronic Filing ("NEF") as service through CM/ECF to registered e-mail addresses of parties of record in the case.


*/s/ Ava Lias-Booker*
Ava Lias-Booker

CERTIFICATE OF SERVICE