1   ELLIS GEORGE LLP
    Dennis S. Ellis (State Bar No. 178196)
2     dellis@ellisgeorge.com
    2121 Avenue of the Stars, 30th Floor
3   Los Angeles, California 90067
    Telephone: (310) 274-7100
4   Facsimile: (310) 275-5697

5   *Interim Lead Class Counsel*

6

7

8                          **UNITED STATES DISTRICT COURT**

9                        **NORTHERN DISTRICT OF CALIFORNIA**

10

11

12

13  *In re Wells Fargo Mortgage Discrimination*        Case No. 3:22-cv-00990-JD
    *Litigation.*
14                                                     **PLAINTIFFS' NOTICE OF MOTION
                                                       AND MOTION FOR CLASS
15                                                     CERTIFICATION; AND
                                                       MEMORANDUM OF POINTS AND
16                                                     AUTHORITIES IN SUPPORT THEREOF**

17                                                     Date:  June 27, 2024
                                                       Time:  10:00 a.m.
18                                                     Courtroom:  11

19                                                     [Declarations of Dennis S. Ellis with
                                                       Supporting Evidence, Amanda Kurzendoerfer,
20                                                     Michael Wallace, Leana Golubchik, Dante
                                                       Jackson, and [Proposed] Order filed
21                                                     concurrently herewith]

22

23

24

25

26

27

28

2407626                                                                Case No. 3:22-cv-00990-JD

1 **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2     **PLEASE TAKE NOTICE THAT** on June 27, 2024, at 10:00 a.m., or as soon thereafter

3 as counsel may be heard, in the courtroom of the Honorable James Donato, located in the United

4 States Courthouse, Northern District of California, Courtroom 11, 450 Golden Gate Avenue, San

5 Francisco, CA 94102, Plaintiffs Bryan Brown, Aaron Braxton, Paul Martin, Gia Gray, Elretha

6 Perkins, Terah Kuykendall-Montoya, Ifeoma Ebo, and Christopher Williams ("Plaintiffs") will

7 and hereby do move this Court for an order certifying the class and subclasses defined in this

8 Notice of Motion and Motion (the "Motion") against Defendant Wells Fargo Bank, N.A. ("Wells

9 Fargo") pursuant to Federal Rule of Civil Procedure 23 regarding Wells Fargo's violations of the

10 Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, California's Unruh Civil

11 Rights Act, and California's Unfair Competition Law.  Specifically, Plaintiffs move to certify the

12 following class and subclasses based on Wells Fargo's discrimination:

13     Pursuant to Federal Rule of Civil Procedure 23(b)(3), damages subclasses consisting of:

14 •   Minority Applicants who applied for a refinance and were approved by an external AUS or Wells Fargo's ECS, but who were ultimately denied during the Class
15        Period.

16 •   Minority Applicants who applied for a home purchase and were approved by an external AUS or Wells Fargo's ECS, but who were ultimately denied during the
17        Class Period.

18 •   Minority Applicants who applied for a HELOC and were approved by Wells Fargo's AUS for home equity products, but who were ultimately denied during the
19        Class Period.

20     Pursuant to Federal Rule of Civil Procedure 23(b)(2), an injunction/restitution class

21 consisting of:

22 •   Minority Applicants who paid fees to process their mortgage loan applications with Wells Fargo during the Class Period, who had their applications denied.
23

24     Pursuant to Federal Rule of Civil Procedure 23(c)(4)), two subclasses on the issue of

liability:
25

26 •   Whether Wells Fargo is liable to Minority Applicants who were discriminated against based on Wells Fargo's use of its CORE/ECS policy to process their home mortgage loans.
27

28 •   Whether Wells Fargo is liable to minority borrowers who received mortgage loans from Wells Fargo, during the Class Period, who were discriminated against by

receiving higher interest rates compared to similarly situated White borrowers.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declarations of Dennis S. Ellis with Supporting Evidence, Amanda Kurzendoerfer, Michael Wallace, Leana Golubchik, and Dante Jackson filed concurrently herewith, all of the pleadings, files, and records in this proceeding, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court at the hearing on this Motion.

DATED:  April 25, 2024                    ELLIS GEORGE LLP
                                          Dennis S. Ellis

                                   By:    _/s/ Dennis S. Ellis_____
                                          Dennis S. Ellis
                                          Interim Lead Class Counsel

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INDEX OF EXHIBITS ............................................................................................................... ix

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................................1

I.      STATEMENT OF ISSUES TO BE DECIDED .............................................................1

II.     PRELIMINARY STATEMENT ......................................................................................1

III.    STATEMENT OF FACTS................................................................................................3

      A.   Common Opportunities, Results, and Experiences—"CORE"................................3

      B.   Wells Fargo's ECS Model Begins to Show Deterioration at the Outset of COVID and Wells Fargo Does Nothing. ..................................................................5

      C.   The Bloomberg Article Highlights Wells Fargo's Rejection of Black Applicants...............................................................................................................5

      D.   Wells Fargo's Data Shows that its Approval Rate Disparities are Statistically Significant Even After Controlling for Key Underwriting Variables...............................................................................................................7

      E.   Plaintiffs' Claims................................................................................................10

          1.   The Proposed Classes.................................................................................11

          2.   The Named Plaintiffs .................................................................................12

IV.     LEGAL STANDARD .....................................................................................................12

V.      THE MOTION FOR CLASS CERTIFICATION SHOULD BE GRANTED. ..................13

      A.   The Rule 23(a) Factors of Numerosity, Typicality, and Adequacy Factors Are Easily Satisfied and Ascertainablity is Easily Shown.......................................13

      B.   Commonality (Rule 23(a)(2)) and Predominance (Rule 23(b)(3)) ........................15

          1.   Common Issues Predominate for Plaintiffs' Disparate Impact Claims.....................................................................................................18

          2.   Plaintiffs Have Established a Prima Facie Case of Discrimination Based on Common Evidence. ....................................................................20

      C.   Plaintiffs' Damages Models Can be Applied on a Class-Wide Basis.....................24

      D.   A Class Action is Superior to Other Available Methods of Adjudication. ..............27

      E.   Plaintiffs Suffered an Injury-In-Fact Sufficient to Confer Article III Standing...............................................................................................................27

      F.   Plaintiffs are Entitled to Certify a 23(b)(2) Restitution and Injunction Class..........28

1

## TABLE OF CONTENTS
### (Continued)

2

Page

3

G.     The Court Should Certify Subclasses on Liability Pursuant to Rule 23(c)(4)
and Allow Damages to be Adjudicated Individually. .................................................29

VI.     THE COURT SHOULD APPOINT MR. ELLIS AS LEAD CLASS COUNSEL..............30

VII.     CONCLUSION ..........................................................................................................30

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013) ...............................................................................................13, 16, 18

*Ballou v. McElvain,*
    29 F.4th 413 (9th Cir. 2022)...................................................................................18, 19, 20

*Barefield v. Chevron, U.S.A., Inc.,*
    1988 WL 188433 (N.D. Cal. 1988).........................................................................21, 23, 24, 27

*Bebault v. DMG Mori USA, Inc.,*
    No. 18-CV-02373-JD, 2020 WL 2065646 (N.D. Cal. Apr. 29, 2020)......................................15

*Borum v. Brentwood Vill, LLC,*
    324 F.R.D 1 (D.D.C. 2018) ..................................................................................................28

*Briseno v. ConAgra Foods, Inc.,*
    844 F.3d 1121 (9th Cir. 2017)..............................................................................................15

*Bumpus v. Realogy Brokerage Grp. LLC,*
    2022 WL 867256 (N.D. Cal. Mar. 23, 2022) ..........................................................................13

*Bynum v. D.C.,*
    214 F.R.D. 27 (D.D.C. 2003) ...............................................................................................14

*Chen-Oster v. Goldman, Sachs & Co.,*
    2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) ......................................................................3, 24

*Chi. Tchrs. Union Loc. No. 1 v. Bd. of Educ.,*
    797 F.3d 429 (7th Cir. 2015).............................................................................................20, 21

*Comcast Corp. v. Behrend,*
    569 U.S. 27 (2013) ...............................................................................................................25

*Crawford v. Honig,*
    37 F.3d 485 (9th Cir. 1994)...................................................................................................15

*Di Donato v. Insys Therapeutics, Inc.,*
    333 F.R.D. 427 (D. Ariz. 2019) ............................................................................................18

*Doran v. 7-Eleven, Inc.,*
    524 F.3d 1034 (9th Cir. 2008)...............................................................................................28

*Ellis v. Costco Wholesale Corp.,*
    285 F.R.D. 492 (N.D. Cal. 2012) .................................................................................. *passim*

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Evers v. Dwyer*,

4
    358 U.S. 202 (1958) ..................................................................................................28

5

*Fortenberry v MV Transp., Inc.*,
    984 F. Supp. 2d 1062 (E.D. Cal. 2013) ....................................................................30

6

*Gamble v. City of Escondido*,

7
    104 F.3d 300 (9th Cir. 1997)....................................................................................19

8

*Gay v. Waiters' & Dairy Lunchmen's Union, Loc. 30*,
    549 F.2d 1330 (9th Cir. 1977)..................................................................................14

9

10

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) ................................................................................................14

11

*Hanlon v. Chrysler Corp.*,

12
    150 F.3d 1011 (9th Cir. 1998)............................................................................14, 27

13

*Hanon v. Dataproducts Corp.*,
    976 F.2d 497 (9th Cir. 1992)....................................................................................14

14

15

*Harris v. Med. Trans. Mgmt., Inc.*,
    77 F.4th 746 (D.C. Cir. 2023) ................................................................................30

16

*Havens Realty Corp. v. Coleman*,

17
    455 U.S. 363 (1982) ................................................................................................28

18

*Heath v. Google LLC*,

19
    345 F. Supp. 3d 1152 (N.D. Cal. 2018) .................................................3, 19, 20, 24

20

*In re Capacitors Antitrust Litig. (No. III)*,
    2018 WL 5980139 (N.D. Cal. Nov. 14, 2018)....................................................2, 16

21

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,

22
    308 F.R.D. 606 (N.D. Cal. 2015) ............................................................................29

23

*Int'l Bhd. of Teamsters v. U.S.*,
    431 U.S. 324 (1977) ................................................................................................19

24

25

*Just Film, Inc. v. Buono*,
    847 F.3d 1108 (9th Cir. 2017)..................................................................................16

26

*Kohen v. Pac. Inv. Mgmt. Co.*,

27
    571 F.3d 672 (7th Cir. 2009)....................................................................................29

28

*Lambert v. Saul*,
    980 F.3d 1266 (9th Cir. 2020)..................................................................................24

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Leyva v. Medline Indus. Inc.*,
4
    716 F.3d 510 (9th Cir. 2013)....................................................................................25

5

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ...............................................................................................28

6

*Lytle v. Nutramax Lab'ys, Inc.*,
7
    2024 WL 1710663, __ F.4th __ (9th Cir. Apr. 22, 2024) .........................................27

8

*Maldonado v. Apple, Inc.*,
    333 F.R.D. 175 (N.D. Cal. 2019) ............................................................................15
9

10

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    672 F.3d 482 (7th Cir. 2012).................................................................................30

11

*Meek v Skywest, Inc.*,
12
    562 F. Supp. 3d 488 (N.D. Cal. 2021) ...............................................................13, 17

13

*Milan v. Clif Bar & Co.*,
    340 F.R.D. 591 (N.D. Cal. 2021); ................................................................... *passim*
14

15

*Nguyen v. Nissan N. Am., Inc.*,
    932 F.3d 811 (9th Cir. 2019)........................................................................25, 26, 27

16

*Norcia v. Samsung Telecomms. Am., LLC*,
17
    2018 WL 4772302 (N.D. Cal. Oct. 1, 2018) ............................................................29

18

*Oja v. Farmers Grp. Inc.*,
    600 F.3d 1201 (9th Cir. 2010)..................................................................................19
19

20

*Old West End Ass'n v. Buckeye Fed. Sav. & Loan*,
    675 F. Supp. 1100 (N.D. Ohio 1987) .......................................................................25

21

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
22
    31 F.4th 651 (9th Cir. 2022)...........................................................................13, 16, 21

23

*Opperman v. Path, Inc.*,
    2016 WL 3844326 (N.D. Cal. July 15, 2016) ..........................................................27
24

25

*Paige v. Cal.*,
    233 F. App'x 646 (9th Cir. 2007).............................................................................23

26

*Parra v. Bashas', Inc.*,
27
    291 F.R.D. 360 (D. Ariz. 2013) ..............................................................................28

28

*Plaintiffs #1-21 v. Cnty. of Suffolk*,
    2021 WL 11629176 (E.D.N.Y. Aug. 4, 2021) ...........................................................2

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page(s)**

3

*Prince George's Cnty. v. Wells Fargo & Co.*,
   397 F. Supp. 3d 752 (D. Md. 2019) ...................................................................27

4

*Purple Mountain Tr. v. Wells Fargo & Co.*,
   2022 WL 3357835 (N.D. Cal. Aug. 15, 2022)....................................................16

5

6

*Ramirez v. Greenpoint Mortg. Funding, Inc.*,
   268 F.R.D. 627 (N.D. Cal. 2010) ...............................................1, 3, 20, 24

7

*Ramirez v. GreenPoint Mortg. Funding, Inc.*,
   633 F. Supp. 2d 922 (N.D. Cal. 2008) ...............................................................18

8

9

*Robichaud v. Speedy PC Software*,
   2013 WL 818503 (N.D. Cal. Mar. 5, 2013) ......................................................15

10

*Ruiz Torres v. Mercer Canyons Inc.*,
   835 F.3d 1125 (9th Cir. 2016) ............................................................................14

11

12

*Schertzer v. Bank of Am., N.A.*,
   489 F. Supp. 3d 1061 (S.D. Cal. 2020) .............................................................30

13

14

*Singh v. Wells Fargo Bank, N.A.*,
   2009 WL 2365881 (N.D. Cal. July 30, 2009) ...................................................25

15

16

*Staton v. Boeing Co*,
   327 F.3d 938 (9th Cir. 2002)..............................................................................14

17

*Stockwell v. City & Cnty. of S.F.*,
   749 F.3d 1107 (9th Cir. 2014)........................................................................1, 17

18

19

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*,
   17 F.4th 950 (9th Cir. 2021)...........................................................................18, 19

20

21

*Tex. Dep't. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
   576 U.S. 519 (2015) ..............................................................................18, 19, 24

22

23

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ...............................................................................16, 21

24

*U.S. v. City of N.Y.*,
   276 F.R.D. 22 (E.D.N.Y. 2011) .........................................................................20

25

26

*U.S. v. Matusoff Rental Co.*,
   494 F. Supp. 2d 740 (S.D. Ohio 2007)...............................................................27

27

28

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996)..........................................................................13, 30

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Valladares v. Specialized Loan Serv., LLC*,
    2023 WL 8435575 (E.D. Cal. Dec. 5, 2023) ........................................................................25

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..........................................................................................................16, 26

*White v. Square, Inc.*,
    891 F.3d 1174 (9th Cir. 2018) ..............................................................................................28

**STATE CASES**

*Collins v. eMachines, Inc.*,
    202 Cal. App. 4th 249 (2011) ................................................................................................29

*Day v. AT&T Corp.*,
    63 Cal. App. 4th 325 (1998) ..................................................................................................29

*Norwest Mortg., Inc. v. Super. Ct. (Conley)*,
    72 Cal. App. 4th 214 (1999) ..................................................................................................30

*Rutledge v. Hewlett-Packard Co.*,
    238 Cal. App. 4th 1164 (2015) ..............................................................................................29

**FEDERAL STATUTES**

12 U.S.C. § 1707 ......................................................................................................................10

15 U.S.C. § 1691 ......................................................................................................................10

42 U.S.C. § 1981 ..........................................................................................................2, 10, 25

42 U.S.C. § 2000e-2(k)(1)(B)(i) ...............................................................................................23

Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.* ("ECOA") ................................10, 18, 25

Fair Housing Act, 12 U.S.C. § 1707, *et seq.* ("FHA") ............................................................. *passim*

Home Mortgage Disclosure Act, 12 U.S.C. § 2801, *et seq.* ("HMDA") ..................................4, 6, 7

**STATE STATUTES**

Cal. Unfair Competition Law, Bus. & Prof. Code § 17200, *et seq.* ("UCL") .............................2, 10

Cal. Unruh Civil Rights Act, Cal Civ. Code § 51, *et seq.* ..........................................................2, 10

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

## RULES

Fed. R. Civ. P. 23 ................................................................................................2, 13

Fed. R. Civ. P. 23(a) .................................................................................13, 14, 15

Fed. R. Civ. P. 23(a)(1) .................................................................................13, 14

Fed. R. Civ. P. 23(a)(2) ........................................................................................16

Fed. R. Civ. P. 23(a)(3) ........................................................................................14

Fed. R. Civ. P. 23(a)(4) ........................................................................................15

Fed. R. Civ. P. 23(b)(2) .............................................................................2, 1, 12, 13

Fed. R. Civ. P. 23(b)(3) .................................................................................. *passim*

Fed. R. Civ. P. 23(c)(4) .............................................................................2, 1, 12, 30

Fed. R. Civ. P. 23(c)(4)(A) .............................................................................13, 30

Fed. R. Civ. P. 23(g) ............................................................................................31

## REGULATIONS

12 C.F.R. § 1003 ...............................................................................................1, 14

12 CFR § 1003.1(b)(1)(iii)) ..................................................................................22

88 Fed. Reg. 19450-01, 19485-86 (Mar. 31, 2023) .........................................24

**INDEX OF EXHIBITS**

| Exhibit | Description | Citation |
|---------|-------------|----------|
| 12 | Marked as Exhibit 12 in the deposition of Peter Strawser | pp. 5, 11 |
| 17 | Marked as Exhibit 17 in the deposition of Peter Strawser | p. 17 |
| 20 | Marked as Exhibit 20 in the deposition of Peter Strawser | p. 14 |
| 23 | Marked as Exhibit 23 in the deposition of Peter Strawser | pp. 3, 4, 17, 21 |
| 45 | Marked as Exhibit 45 in the deposition of Agus Sudjianto | pp. 3, 4, 17 |
| 49 | Marked as Exhibit 49 in the deposition of Agus Sudjianto | pp. 2, 5, 26 |
| 54 | Marked as Exhibit 54 in the deposition of Agus Sudjianto | p. 5 |
| 55 | Marked as Exhibit 55 in the deposition of Saba Dossani | p. 6 |
| 87 | Marked as Exhibit 87 in the deposition of Deborah Knutson-Smith | p. 6 |
| 96 | Marked as Exhibit 96 in the deposition of Deborah Knutson-Smith | p. 7 |
| 261 | Marked as Exhibit 261 in the deposition of John Keller | pp. 3, 21 |
| 411 | Marked as Exhibit 411 in the deposition of Joel Brodsky | p. 22 |
| 549 | Marked as Exhibit 549 in the deposition of Paul Macomber | pp. 3, 21 |
| 668 | Marked as Exhibit 668 in the deposition of Carlyn Irwin | p. 12 |
| 686 | Marked as Exhibit 686 in the deposition of Kristin Lennox | p. 5 |
| 706 | Marked as Exhibit 706 in the deposition of Marsha Courchane | p. 9 |
| 708 | Marked as Exhibit 708 in the deposition of Marsha Courchane | p. 9 |
| 709 | Marked as Exhibit 709 in the deposition of Marsha Courchane | p. 8 |
| WF-00030816 | ██████████████ | pp. 14, 17 |
| WF-00076207 | ██████████████ | p. 4 |
| WF-00076304 | Wells Fargo's slide deck dated August 16, 2021 | p. 3 |
| WF-00142657 | ██████████████ | p. 20 |

| WF-00142688 | ████████████████████ | p. 20 |
|---|---|---|
| BROWN0000112-BROWN0000113 | Upfront Fee Payment Confirmation October 22, 2020 | pp. 12, 29 |
| A | Deposition Transcript of Bryan Martinez | pp. 1, 17, 21 |
| B | Deposition Transcript of Peter Strawser | pp. 1, 4, 5, 17, 21, 26 |
| C | Deposition Transcript of Agus Sudjianto | pp. 2, 3, 5, 17, 25, 26 |
| D | Deposition Transcript of Saba Dossani | p. 6 |
| E | Deposition Transcript of Bryan Brown | p. 15 |
| F | Deposition Transcript of Deborah Knutson-Smith | pp. 6, 7, 25 |
| H | Deposition Transcript of Ifeoma Ebo | pp. 12, 15 |
| I | Deposition Transcript of Elretha Perkins | p. 15 |
| J | Deposition Transcript of Aaron Braxton | p. 15 |
| L | Deposition Transcript of John Keller | p. 21 |
| M | Deposition Transcript of Paul Martin | p. 15 |
| N | Deposition Transcript of Gia Gray | p. 15 |
| O | Deposition Transcript of Terah Kuykendall-Montoya | pp. 12, 15 |
| P | Deposition Transcript of Christopher Williams | p. 15 |
| R | Deposition Transcript of Joel Brodsky | pp. 4, 10 |
| V | Deposition Transcript of Dr. Leana Golubchik | p. 2 |
| W | Deposition Transcript of Carlyn Irwin | p. 28 |
| X | Deposition Transcript of Dr. Amanda Kurzendoerfer | pp. 9, 30 |
| Y | Deposition Transcript of Marsha Courchane | pp. 8, 9, 21 |
| Z | Wells Fargo's Objections and Responses to Gia Gray's Special Interrogatories, Set Three | p. 6 |
| WF-03837493 | ██████████████████ | p. 18 |

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.     STATEMENT OF ISSUES TO BE DECIDED**

Whether pursuant to Rule 23(b)(2), (3), and (c)(4)[1] the Court should certify the class and subclasses as defined in the notice of motion and, *infra*, at Part III.E.1.

**II.     PRELIMINARY STATEMENT**

It is undisputed that defendant Wells Fargo Bank, N.A. ("Wells Fargo") uses a "pioneering automated underwriting system" known by the acronym CORE, which stands for "Common Opportunities Results Experiences," to evaluate every mortgage loan application.  (Ellis Decl., Ex. B, p. 2254,[2] Ex. A, p. 2245.)  Wells Fargo's use of CORE, its Risk Engine and associated Enhanced Credit Scoring ("ECS") model from January 1, 2018, through December 31, 2022, the Class Period ("Class Period"), placed loan applicants into a risk class of A1, A2, C1 and C2, resulting in disparate impact to Minority Applicants[3] who were less likely to be approved than similarly situated White applicants by a statistically significant margin.  (ECF No. 114 ¶¶ 101-113.)  This claim presents a straightforward case for class certification based on a predominance of common facts and questions of law.  *See, e.g., Ramirez v. Greenpoint Mortg. Funding, Inc.*, 268 F.R.D. 627, 641 (N.D. Cal. 2010) (certifying class under ECOA/FHA for disparate impact, relying on statistics showing disparities); *Ellis v. Costco Wholesale Corp.*, 285 F.R.D. 492, 537-39, 545 (N.D. Cal. 2012) ("*Ellis III*") (same); *see also Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1113, 1116 (9th Cir. 2014) ("[T]he district court erred in denying class certification" as to "whether the policy has an impermissible disparate impact on the basis of age necessarily has a single answer").

During the Class Period, Wells Fargo's Risk Engine began to fail, resulting in Wells Fargo placing its key ECS model (11960) in the "Yellow (Watch)" category because it showed significant deterioration, losing its ability to distinguish between "good" and "bad" loan applicants, based on

---

[1] All "Rule" references are to the Federal Rules of Civil Procedure.

[2] "p." refers to the supporting evidence page, which is consecutively numbered as part of the Ellis Decl.

[3] "Minority Applicants" refers to loan applicants falling within any one of the ethnic or racial aggregate categories and subcategories set forth in "Regulation C" (12 C.F.R. pt. 1003), other than "White, Not Hispanic or Latino."  (ECF No. 114 ¶ 153, Amended and Consolidated Class Action Complaint ("Complaint").)

their perceived credit risk levels.  (Ellis Decl., Ex. C, pp. 2278, 2280; Ex. V, p. 2474-75.)  Wells Fargo ignored these clear warning signs and did nothing.  Worse, Wells Fargo continued to rely on the ECS model even after its Fair Lending Model Development group determined that the ECS model was "disparate[ly] impact[ing]" minorities.  (*Id.*, Ex. 49,[4] p. 1084.)  Incredibly, Wells Fargo refused to take this model offline and it remains in use to this very day.  (*Id.*, Ellis Decl., Ex. C, p. 2280.)  Wells Fargo's actions, and inactions, amounted to intentional and willful discrimination.  Through its CORE underwriting system and the failing ECS model, Wells Fargo today, as it did during the Class Period, relies on an underwriting policy and process that disproportionately, ***without a legitimate race-neutral basis***, assigns Minority Applicants to lower credit risk classes that results in them being less likely to be approved for mortgage loans than similarly-situated White Applicants, and Wells Fargo knows it.  (Kurzendoerfer Decl., Ex. A at 21.)

As shown throughout this Motion, in addition to its recalcitrant adherence to its inseparable CORE/ECS underwriting system as a matter of policy, Wells Fargo employed other mortgage loan policies that also intentionally conspired to adversely impact Minority Applicants.  Wells Fargo must admit the impact of these policies, but it may attempt to provide a business justification for them and/or dispute the impact of others.  However, a resolution of these factual and legal issues is neither required, nor allowed, ***on this motion***.  "[C]lass certification is not summary judgment by another name."  *In re Capacitors Antitrust Litig. (No. III)*, 2018 WL 5980139, at *3 (N.D. Cal. Nov. 14, 2018).  "The plaintiffs' burden is to present enough evidence to warrant adjudication of their claims on a class basis, not to win their case."  *Id.*

Wells Fargo's continued use of a system that by its own analyses and admission favored Whites is tantamount to an intentional and willful decision to treat minorities differently, which on its face constitutes disparate treatment under the law.  *See Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 11629176 (E.D.N.Y. Aug. 4, 2021) (deliberate indifference to known discriminatory policies amounts to disparate treatment).  That decision by Wells Fargo, and whether it resulted in the illegal treatment of the putative class Plaintiffs in this case, forms the center of this litigation.  But the

---

[4] All "Ex, #" references and "WF" Bates # documents are attached to the Ellis Decl. maintaining their original deposition # or Bates # designations.

"practical significance" of it cannot be overstated.  The lost opportunities of potential wealth building derived from homeownership and access to favorable financing will, unfortunately, have generational consequences for these families that even this lawsuit cannot fully address.

This Court should follow the other district courts in the Ninth Circuit to confront similar claims and certify the proposed classes.  *See, e.g.*, *Heath v. Google LLC*, 345 F. Supp. 3d 1152, 1174 (N.D. Cal. 2018); *Ramirez*, 268 F.R.D. at 643; *Ellis III*, 285 F.R.D. at 545.  The prerequisites for class certification are established beyond reasonable dispute by the evidence adduced during discovery.  *See, infra*, Part V.  Critically, Plaintiffs' discrimination claims have sufficient commonality and predominate over any issues subject to individual proof, as Plaintiffs' expert has found statistically significant unexplained disparities related to the proposed subclasses.  *Cf. Chen-Oster v. Goldman Sachs & Co.,* 325 F.R.D 55, 81-83 (S.D.N.Y 2018) ("Plaintiffs' statistical evidence of gender disparities is the type of generalized proof that satisfies the predominance requirement."); *Ellis III*, 285 F.R.D. at 537-39, 545.  Plaintiffs' Motion should be granted.

**III.**   **STATEMENT OF FACTS**

**A.**   **Common Opportunities, Results, and Experiences—"CORE".**

During the Class Period, Wells Fargo processed home loan applications through a "dynamic, web-based system" known as "CORE."  (Ellis Decl., Ex. 23, p. 942.)  The only exception to this (which is immaterial) was a portion of home equity applications that until 2019 were processed through a system known as Automated Credit Application Processing System ("ACAPS").  (*Id*., Ex. 549, p. 1568-69.)  Wells Fargo's "CORE decisioning" platform (*id*., Ex. 23, p. 941-43) works in conjunction with an integrated "Risk Engine," which comprises Wells Fargo's proprietary "automated underwriting system" (*id*., Ex. 261, p. 1240).  The Risk Engine also ran home loan applicants through proprietary Wells Fargo ECS models.  (*Id*.)  These ECS models, which are virtually identical in their operation and usage, generated scores that were used to assign ***each application*** to a Wells Fargo "credit risk class."  (*Id.*, Ex. 45, p. 1052-55.)  The ECS model results and the assigned risk classes necessarily affected essential aspects of Wells Fargo's loan decisioning policy and process, including the determination of risk-related messages displayed to the underwriter in CORE.  (*Id.*, p. 967-1071; Ex. 261, p. 1235-48; Ex. 45, p. 967-1071; WF-00076304,

p. 2086-2183.)  Wells Fargo's risk classes for conventional loans (A1, A2, C1, C2) and government loans (G1, G2, G3) correspond to the proprietary/other AUS results reported in its Home Mortgage Disclosure Act, 12 U.S.C. § 2801, *et seq*. ("HMDA") data for conventional and government loans, respectively.  (Kurzendoerfer Decl., Ex. A at 8.)[5]

As far back as 2018, Wells Fargo knew its CORE/ECS system, the policies embedded therein and its underwriting practices were adversely impacting certain protected classes in "statistically significant ways," but did nothing to change its policy of using it to process every mortgage loan application it received.  (Ellis Decl., Ex. 45, p. 1052-55; WF-0076207-233, p. 2058-85; Ex. 23, p. 906-43.)  Beginning in 2020, after the onset of the pandemic, these statistically significant findings even met Wells Fargo's "practically significant" threshold after controlling for key underwriting variables, reducing to adverse impact ratios ("AIR") below .90, which Wells Fargo acknowledged as an issue of concern.  (Kurzendoerfer Decl., Ex. A at 3-5.)  To manage the AIRs, Wells Fargo's policy was to move away from individual underwriters making determinations and rely more consistently on the controls of its CORE/ECS automated underwriting system.  (Ellis Decl., Ex. 23, p. 906-43.)[6]  In fact, in this period Wells Fargo claims that, for conforming loan applications, it relied on its ECS model for conventional loans—model 11960—only to approve applications that would otherwise be denied.  (*Id*., Ex. B, p. 2258.)  But this purported "beneficial" use of the ECS model, which disproportionately benefited White applicants, ended when Fannie Mae terminated the program under which it purchased loans on the basis of an ECS model approval. (*Id*.)  Nevertheless, Wells Fargo continued using its own ECS model as part of its credit decisioning process for conforming as well as non-conforming loans, to separate those that allegedly posed a

---

[5] With respect to home equity decisioning, Wells Fargo also used a third-party automated decision engine known as "Zoot AI."  (*Id*.)  This automated decisioning was also responsible for whether an applicant would be granted a credit policy exception—all of which was displayed to the underwriters through CORE.  (*Id*. at 7-8.)  Thus, exceptions were handled in a uniform and consistent manner, as well.  (*Id*., Ex. B, p. 2251-52.)

[6] Further, Wells Fargo's most senior management instructed Dr. Joel Brodsky, its Senior Vice President and Manager of Quantitative Analytics, after the 2020 observations of disparate impact to "go tweak the model and see how it changes," which Dr. Brodsky "didn't want to do" because "the model was fine the way it was."  But Dr. Brodsky "███████" (rightly) that management "████████████████████████████████████," and he did as he was told. (Ellis Decl., Ex. R, p. 2448-49.)

1  credit risk, despite this alleged prior benefit being unavailable.  (*See id.*, Ex. C, p. 2266.)

2  **B.**    **Wells Fargo's ECS Model Begins to Show Deterioration at the Outset of COVID**

3  **and Wells Fargo Does Nothing.**

4  Wells Fargo's ECS model began demonstrating an ineffectiveness due to COVID

5  forbearances and the lack of reporting of late payments and was moved into a "Yellow (Watch)"

6  status at the end of 2020.  (Ellis Decl., Ex. 54, p. 1100-07; Ex. C, p. 2278.)  In early 2021, Wells

7  Fargo's Fair Lending Analyses of its ECS model 11960 "identified disparate impact for various

8  protected classes."  (*Id.*, Exs. 49, 686, pp. 1074, 1716-42.)  Wells Fargo identified that the "[l]ikely

9  drivers of the disparities with the most potential to affect practically significant results" were

10 average months in file, recent inquiries, and major derogatories.  (*Id.*, Ex. 49, p. 1074.)

11 Plaintiffs' expert, Dr. Leana Golubchik—a professor and computer scientist at USC—has

12 examined Wells Fargo's ECS model and determined that the model is adapted using a "Reject

13 Inference" technique which is used to generate a scorecard and send messages to the underwriters.

14 (Golubchik Decl., Ex. A at 12.)  Dr. Golubchik opines that Wells Fargo's ECS model is a supervised

15 machine learning model, capable of showing "algorithmic bias."  (*Id.* at 4.)  She opines that it was

16 not good practice for Wells Fargo to continue to use its ECS model when it showed performance

17 issues (*i.e.*, deterioration), and given its continued use "it is reasonable to conclude that the model's

18 disparate risk classification of protected class applicants could contribute to some disparities

19 observed in Wells Fargo's approval rates based on race."  (*Id.* at 12-13.)

20 Mr. Agus Sudjianto, the Head of Wells Fargo's Model Risk Department, testified that he

21 was also aware of the deterioration of the performance of the model over time and its impact on

22 Wells Fargo's CORE decisioning process.  (Ellis Decl., Ex. C, p. 2279-80.)  Hence, it is undeniable

23 that during the Class Period Wells Fargo had a policy to utilize its CORE/ECS underwriting system,

24 which was known to cause disparate impact, to process the mortgage loans of the Minority

25 Applicants who seek class certification here.  (*Id.*, Ex. B, p. 2255; Ex. 49, p.1074.)

26 **C.**    **The Bloomberg Article Highlights Wells Fargo's Rejection of Black Applicants.**

27 In March 2022, the public learned what Wells Fargo had long been aware of, and

28 intentionally ignored, its CORE/ECS underwriting policies and procedures had been disparately

impacting Minority Applicants during the 2020 "refinancing boom." For most homeowners, these historically low interest rates presented a once-in-a-lifetime opportunity for wealth-building. On March 10, 2022, in an article entitled "Wells Fargo Denied More than Half Its Black Applicants in Refinancing Boom," Bloomberg reported, after an extensive investigation, it discovered that during the height of the refinance boom of 2020, Wells Fargo rejected more than half of its Black applicants. (Ellis Decl., Ex. 55, p. 1173.)

Wells Fargo's approval rate for Black refinancing applicants in 2020 was 47% as compared to 72% for White applicants—by far the largest disparity among major lending institutions, who on average approved 71% of their Black applicants for the same type of refinancing product.[7] Bloomberg also observed that the approval rates for (Non-White) Hispanics was equally dismal; finding that Wells Fargo only approved 53% of those applicants while other major lenders approved 79%. (*Id.*, p. 1174.) Wells Fargo knew months in advance that Bloomberg would be publishing an article on the racial disparities in Wells Fargo's 2020 refinancing approval rates. (*Id.*, Ex. 87, p. 1187-92; Ex. F, p. 2303-04.) Bloomberg shared with Wells Fargo its statistical findings based on publicly available data that Wells Fargo reports to the Consumer Financial Protection Bureau ("CFPB") pursuant to HMDA and the CFPB's related regulations. Wells Fargo's Business Insights & Analytics ("BIA") team, supervised by Saba Dossani, confirmed Bloomberg's statistical findings were accurate, which is why it reported that "Wells Fargo did not dispute Bloomberg's statistical findings" nor the analysis methodology validated by their own internal data. (*Id.*, Ex. D, p. 2289.)

Prior to the publication of the Bloomberg article, Wells Fargo's leadership had, in Dossani's words, not been "paying attention" to the fact that Wells Fargo was a stark outlier in denial and withdrawal rates. (*Id.*, p. 2290.) Debbie Knutson-Smith, one of Dossani's direct reports on the BIA team and head of the bank's "Diverse Insights & Analytics," testified at her deposition that she and Ms. Dossani "shared that viewpoint that [Wells Fargo's] leadership had not done enough to be

---

[7] After the granting of Plaintiffs' motion to compel (ECF Nos. 133, 160), and filing a subsequent motion to compel the same (ECF No. 167), Wells Fargo provided details of their approval rates during the Class Period. (Ellis Decl., Ex. Z, p. 2529-37.) Wells Fargo's raw approval rates between White applicants and Minority Applicants were grisly; arguably even worse than Bloomberg reported for the 2020 refinance product, as they are even wider for other loan products during the Class Period.

1    prepared to deal with the reporting by Bloomberg of Wells Fargo's approval and denial rates." (*Id.*,

2    Ex. F, p. 2309.)  In that moment, at least, they resolved to tell Kristy Fercho, then Wells Fargo's

3    head of home lending, the truth about whether Wells Fargo had been "helping customers at the same

4    rate across race." (*Id.*, p. 2314.)  The answer to that question was unequivocally no; Wells Fargo

5    was not helping its minority customers and treating them fairly—and Wells Fargo executives

6    privately conceded as much.  To the question of whether this was the reality, Ms. Knutson-Smith

7    privately responded to Ms. Dossani, "it is." (*Id.*, p. 2313-14.)

8        Tim Seagren, another member of the BIA team, decided that he would "embrace candor."

9    (*Id.*, Ex. 96, p. 1193-1203.)  Mr. Seagren vented that he and others had been "raising [their] hand"

10   on this issue for a while but "no one seem[ed] to listen or we all continue[d] to ignore [it]." (*Id.*)

11   Bloomberg's statistical findings were not, in Seagren's view, the result of COVID-related

12   disruptions. (*Id.*)  Rather, Mr. Seagren candidly acknowledged Bloomberg's statistical findings

13   reflected a "long-term systemic issue at WF." (*Id.*)  When Wells Fargo "only prioritize[s]

14   nonconforming loans and the most affluent/profitable customers . . . [it] shouldn't be overly

15   surprised by [its] results." (*Id.*)

16       **D.    Wells Fargo's Data Shows that its Approval Rate Disparities are Statistically**
17       **Significant Even After Controlling for Key Underwriting Variables.**

18       Plaintiffs retained statistical and economic expert Dr. Amanda Kurzendoerfer, to analyze

19   whether there are differences in Wells Fargo's mortgage approval rates by race and ethnicity that

20   are not explained by key underwriting factors.   (Kurzendoerfer Decl., Ex. A at 17.)   Dr.

21   Kurzendoerfer ran regression models subject to appropriate controls to assess whether there are

22   differences by race and ethnicity in approval rates and investigated Wells Fargo's classification of

23   applicants in terms of credit risk using Wells Fargo's proprietary CORE/ECS underwriting system.

24   (*Id.* at 15-16.)  Dr. Kurzendoerfer opines that her "analysis supports a conclusion that race and

25   ethnicity contributed to the approval rate disparities produced by Wells Fargo's home loan

26   decisioning process, i.e., that the decisioning process was not race-neutral." (*Id.* at 3.)

27       Indeed, Dr. Kurzendoerfer found statistically significant results in nearly every aspect of her

28   review, regardless of loan product, across racial and ethnic lines for Minority Applicants.

1  Importantly, Dr. Kurzendoerfer's findings also establish the causal connection between Wells

2  Fargo's CORE/ECS underwriting system and the disparities she observed.  Conditioned on being

3  assigned to a given credit risk class (i.e., A1, A2, C1, C2), Minority Applicants have lower approval

4  rates on average than White mortgage loan applicants at Wells Fargo.  Dr. Kurzendoerfer was thus

5  able to establish that approval rates decline for Minority Applicants, as they are assigned to lower

6  credit risk classes than Whites, and that even within those credit risk classes Minority Applicants

7  within the same FICO bins, DTIs, LTVs, etc. were still less likely to be approved than White

8  applicants.  (*Id.* at ¶ 16.)  Depending on loan type, Dr. Kurzendoerfer found that Minority Applicants

9  experience the following statistically significant conditional approval rate differences compared to

10  White applicants:  Black applicants: 3.3 to 4.3 percentage points; Hispanic applicants: 2.9 to 6.7

11  percentage points; Asian applicants: 0.4 to 6.3 percentage points; Other applicants: 3.1 to 5.9

12  percentage points; Joint applicants: 0.9 to 3.2 percentage points.[8]

13      Wells Fargo retained its mortgage industry and regulatory expert Dr. Marsha Courchane,

14  Ph.D.  Dr. Courchane has been retained as an expert by Wells Fargo eight times previously and has

15  served as a defense expert for many of the major banks.  (Ellis Decl., Ex. Y, pp. 2511, 2517-18.)

16  Dr. Courchane agreed that there were some statistically significant disparities that resulted in

17  disparate impact to Minority Applicants in Wells Fargo's own calculations of its approval rates.

18  (*Id.*, p. 2506.)  Like Dr. Kurzendoerfer, Dr. Courchane also found that the marginal effects of Wells

19  Fargo's approval disparities were statistically significant.  (*Id.*, Ex. 709, p. 1969-74.)  Thus,

20  everyone, absolutely everyone, who has looked at the data has concluded that approval disparities

21  exist for Minority Applicants based on race and ethnicity that cannot be explained.

22      Wells Fargo and Dr. Courchane have adopted the mantra that the statistically significant

23  disparities observed by Plaintiffs only buys them an individual file-by-file loan application review.

24  Dr. Kurzendoerfer adroitly debunks that notion, as she testified in deposition that her regression

25  model is designed to show that the disparities are real, material, and in fact her results are more

---

[8] Dr. Kurzendoerfer's analysis thus establishes that the racial disparities observed have a causal relationship to Plaintiffs' contention that Wells Fargo's CORE/ECS model underwriting policy is the root cause of the disparate impact to Minority Applicants.  (*Id.* at 5.)

1    meaningful as they are devoid of human bias.  (Ellis Decl., Ex. X, p. 2495-97.)   As Dr.

2    Kurzendoerfer correctly observes, every loan file is going to assert a non-discriminatory basis for

3    the denial.  (*Id.*, p. 2498-2500.)   That does not explain the disparities she found, even after

4    controlling for underwriting factors, which Wells Fargo believes are key.  (*Id.*, p. 2493-94.)

5          Dr. Kurzendoerfer testified during deposition that statistical analysis "provides information

6    that an individual file review simply can't do because you have to look at millions of files."  (*Id.*, p.

7    2495.)  Dr. Courchane agrees that the first stage of analyzing whether there are racial and ethnic

8    disparities requires "modeling or the analytics" before engaging in an individual file review.  (*Id.*,

9    Ex. Y, p. 2508-09.)   Nonetheless, Wells Fargo is certain to suggest that Plaintiffs' statistics are

10   meaningless without a peer-to-peer loan file comparison.  (*Id.*)  But Wells Fargo's practiced review

11   process is fundamentally flawed, absolutely not what the regulators require, and fails to reveal

12   whether Wells Fargo is engaged in unlawful discrimination.

13         The regulators require the lender to compare marginal files that have been approved with

14   other marginal files that have been denied, just as Dr. Courchane agreed was proper under oath

15   during deposition.  (*Id.*, Exs. 706, 708, Y, pp. 1743-92, 1821-24, 2507-09.)  Marginal files are, as

16   the name suggests, files that could have gone either way (*i.e.*, approvals or denials could be equally

17   supportable), largely because the files straddle the line on the objective criteria.  (*Id.*, Ex. 706, p.

18   1770) ("A principal goal is to identify cases where similarly qualified prohibited basis and control

19   group applicants had different credit outcomes, because the agencies have found that discrimination,

20   including differences in granting assistance during the approval process, is more likely to occur with

21   respect to applicants who are not either clearly qualified or unqualified, *i.e.*, 'marginal' applicants.")

22   In conducting an individual file review, the goal is not to discern whether the lending institution had

23   a valid reason for denying a marginal denied file.  Certainly, the file will show a facially legitimate

24   reason to deny a marginal file; by definition, these are files that could have gone either way, and the

25   file is never going to list "race discrimination" as the reason for the denial.  (*Id.*, Ex. Y, p. 2523-27.)

26   As such, looking at an individual marginal file and deeming the denial reason legitimate is a fool's

27   errand.  That analysis tells you nothing.

28         Instead of following guidance from the federal regulators (and its own oft-used expert) and

comparing marginal applications from various groups, Wells Fargo looks for "████████" examples. (*Id.*, Ex. R, p. 2441-43.)  Thus, Wells Fargo would find applications from Black applicants that were declined even though the objective creditworthiness factors would seem to suggest that it was a very strong application that could have been approved and compare them to applications from White applicants who were approved even though the White applicants' objective creditworthiness factors were very poor.  However, Dr. Kurzendoerfer observed disparities even when analyzing data from closely related loan applicants.  (Kurzendoerfer Decl., Ex. A at 45.)

Therefore, the issue is not whether a fresh file-by-file review of each of the 119,100 proposed class members is needed or should be allowed, but rather whether Wells Fargo's improper "extreme cases" ***loan review policy*** affected the proposed class members in a common way by not identifying the disparate impact they were suffering as a result of being processed through Wells Fargo's CORE/ECS underwriting system.  And, whether Wells Fargo's improper loan review process it practiced during the Class Period and proposes here, is itself a discriminatory policy intended to conceal or further, the differential outcomes of Minority Applicants processed through its CORE/ECS underwriting system.  Certainly, Wells Fargo offers no explanation for why its proposed "individual file review" would favor White applicants and "explain" the disparities observed by Dr. Kurzendoerfer and its own expert.

### E.    Plaintiffs' Claims

Plaintiffs bring claims for violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.* ("ECOA"), the Fair Housing Act, 12 U.S.C. § 1707, *et seq.* ("FHA"), 42 U.S.C. § 1981 ("Section 1981"), California's Unruh Civil Rights Act, and California's Unfair Competition Law ("UCL").  The crux of these claims is that Wells Fargo discriminated against the Minority Applicants by subjecting them to its discriminatory loan policies; primarily the uniform and consistent processing of their mortgage loans through its CORE/ECS underwriting system, which was disproportionally assigning them to lower credit risk classes leading to lower approvals. Initially, Plaintiffs defined the classes as "all Minority Applicants in the United States who, from January 1, 2018, through the present (the "Class Period"), submitted an application for an original purchase or other home mortgage loan or to refinance or modify a home mortgage loan through

Defendants that was (i) denied; (ii) approved at higher interest rates or subject to less favorable terms as compared to similarly situated non-Minority Applicants; or (iii) processed at a rate slower than the average processing time of applications submitted by similarly situated non-Minority Applicants."  (ECF No. 114 ¶ 155.)  These classes were referred to as the "denial class," "higher rate class," "less favorable terms class," and "delayed class."  (*Id.* ¶¶ 161-162.)

### 1. <u>The Proposed Classes</u>

Plaintiffs seek to focus their damages classes on those Minority Applicants who objectively demonstrated their creditworthiness by an agency (Fannie Mae or Freddie Mac) or government AUS or Wells Fargo's own ECS model.  As was discussed earlier in the case, although the applications of these Minority Applicants are processed in the same manner regardless of the loan product applied for (Ellis Decl., Ex. 12, p. 12-20), the manner in which their economic damages are calculated differs slightly based on the loan product.[9]  The Court observed this would likely be the case early in these proceedings.  (ECF No. 164 at 5:25-6:14.)  Hence, Plaintiffs refine their "denial class" and seek to certify the following damages subclasses pursuant to Rule 23(b)(3):[10]

- Minority Applicants who applied for a refinance and were approved[11] by an external AUS or Wells Fargo's ECS, but who were ultimately denied during the Class Period.
- Minority Applicants who applied for a home purchase and were approved by an external AUS or Wells Fargo's ECS, but who were ultimately denied during the Class Period.
- Minority Applicants who applied for a HELOC, were approved by Wells Fargo's AUS for home equity products, but ultimately denied during the Class Period.

Plaintiffs also seek to certify an injunction/restitution under Rule 23(b)(2) as follows:

---

[9] Plaintiffs' damages expert, Mike Wallace, has developed methodologies that can estimate damages for each class member on a class-wide basis, based on the loan product they sought—*i.e.*, refinance (rate/term or cash-out), home purchase, or HELOC.  (Wallace Decl., Ex. A at 27-33, 37-41, 46-48.)

[10] Plaintiffs are not pursuing the delayed or less favorable terms subclasses at this time.  (ECF No. 114 ¶¶ 161-162.)

[11] As used in Plaintiffs' class definitions, for ease of expression "approved" is a catch-all term for a variety of AUS results as reported by Wells Fargo in its HMDA data.  For example, Fannie Mae's AUS ("Desktop Underwriter") uses the term "approve," Freddie Mac's AUS ("Loan Prospector" a/k/a "Loan Product Advisor") uses the term "accept," Wells Fargo's ECS model uses "A1" and "A2" ("A" standing for approve or accept), and the AUS used by Wells Fargo for HELOC applications used the term "approval recommended."  (*See* Kurzendoerfer Decl., Ex. A at 7-8.) Plaintiffs "approved" classes only considers applications with at least one of the following codes as External AUS approval: 1–Approve/Eligible, 2–Approve/Ineligible, 8–Accept, 14–Eligible, 18–Accept/Eligible, 19–Accept/Ineligible, and 20–Accept/Unable to Determine, and those from Wells Fargo's ECS that are A1, A2, or approval recommended.  (*Id.*, at 20 n.67, and Ex. A thereto).

- Minority Applicants who paid fees to process their mortgage loan applications with Wells Fargo during the Class Period, who had their applications denied.

Plaintiffs seek to certify two subclasses on the issue of liability under Rule 23(c)(4):

- Whether Wells Fargo is liable to Minority Applicants who were discriminated against based on Wells Fargo's use of its CORE/ECS policy to process their home mortgage loans.
- Whether Wells Fargo is liable to minority borrowers who received mortgage loans from Wells Fargo, during the Class Period, who were discriminated against by receiving higher interest rates compared to similarly situated White borrowers.[12]

### 2.   **The Named Plaintiffs**

The following named Plaintiffs are to act as the class representatives for the classes:

- Bryan Brown, Elretha Perkins and Terah Kuykendall-Montoya for the Rule 23(b)(3) damages subclasses.  Mr. Brown, Ms. Perkins and Ms. Kuykendall-Montoya are minorities who were denied by Wells Fargo, despite being approved by an external AUS or Wells Fargo's ECS model. (Wallace Decl., Ex. B at 3 n.5.)
- Bryan Brown, Ifeoma Ebo, and Terah Kuykendall-Montoya for the Rule 23(b)(2) injunction/restitution class.  Ms. Ebo and Ms. Kuykendall-Montoya are minorities that were denied by Wells Fargo, who according to their loan documents, paid upfront application and appraisal fees that were not returned.  (Wallace Decl., Ex. A at 50-51; Ellis Decl. Exs. H, O, pp. 2325, 2403-04.)  Mr. Brown has produced documentation showing that he paid "upfront fees" to process his loan application (Ellis Decl., BROWN00001113, p. 2240-41), but Wells Fargo's production does not.
- Aaron Braxton, Paul Martin, Gia Gray, Bryan Brown, Elretha Perkins, Christopher Williams, Ifeoma Ebo, and Terah Kuykendall-Montoya for the Rule 23(c)(4) liability subclasses.  Each of the foregoing plaintiffs are minorities who were not approved by Wells Fargo for the loans they sought and who have expressed their willingness, desire and capacity to faithfully represent the putative class.[13]

## IV.   **LEGAL STANDARD**

This Court has stated the standards that apply to its consideration of a motion for class certification pursuant to Rule 23.  *See, e.g., Milan v. Clif Bar & Co.,* 340 F.R.D. 591 (N.D. Cal. 2021); *Meek v Skywest, Inc.*, 562 F. Supp. 3d 488 (N.D. Cal. 2021).  Rule 23 governs class actions and is intended "to select the method best suited to adjudication of the controversy fairly and

---

[12] Dr. Kurzendoerfer created a separate pricing regression model, which found that Wells Fargo's mortgage loan pricing shows statistically significant differences in interest rates for Black, Hispanic, and Asian borrowers compared to White borrowers.  This analysis controls for credit risk factors and obtains differences that span 2.0-3.7 basis points. (Kurzendoerfer Decl., Ex. A at 5.)

[13] Plaintiffs' underwriting expert, Dante Jackson, who has three decades of experience reviewing loan files like those of Plaintiffs, has opined that each proposed representative Plaintiff should have had their loan application approved by the Wells Fargo underwriting department and been allowed to continue in the loan application process despite Wells Fargo's (erroneous) denial.  (Jackson Decl., Ex. A at 10-20.)

1    efficiently." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (cleaned up).

2    "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification

3    stage." *Id.* at 466; *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651,

4    667 (9th Cir. 2022). While the class certification analysis "must be rigorous and may entail some

5    overlap with the merits of the plaintiff's underlying claim," merits questions ***may only be considered***

6    to the extent they are "relevant to determining whether the Rule 23 prerequisites for class

7    certification are satisfied." *Amgen*, 568 U.S. at 465-66 (cleaned up).

8        Rule 23(b)(2) requires that "the party opposing the class has acted or refused to act on

9    grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory

10   relief is appropriate respecting the class as a whole." *Bumpus v. Realogy Brokerage Grp. LLC*, 2022

11   WL 867256, at *10 (N.D. Cal. Mar. 23, 2022). Rule 23(b)(3) demands that "questions of law or

12   fact common to class members predominate" and is "superior to other available methods for fairly

13   and efficiently adjudicating the controversy." *Olean*, 31 F.4th at 663-64. "Even if the common

14   questions do not predominate over the individual questions so that class certification of the entire

15   action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common

16   issues under Rule 23(c)(4)(A) and proceed with class treatment of [those] particular issues."

17   *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

18   **V.    THE MOTION FOR CLASS CERTIFICATION SHOULD BE GRANTED.**

19       **A.    The Rule 23(a) Factors of Numerosity, Typicality, and Adequacy Factors Are
20              Easily Satisfied and Ascertainablity is Easily Shown.**

21       The proposed class easily meets the numerosity requirement of Rule 23(a)(1). Numerosity

22   requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P.

23   23(a)(1); *Gay v. Waiters' & Dairy Lunchmen's Union, Loc. 30,* 549 F.2d 1330, 1332 & n.3 (9th Cir.

24   1977). Here, Wells Fargo's lending data shows that it processed nearly 2.7 million applications

25   during the Class Period and denied more than 300,000 applicants that would qualify as minorities

26   under Regulation C (12 C.F.R. § 1003), which forms the basis of the definition of "Minority

27   Applicant" in the Complaint. (ECF No. 114 ¶ 127.) After narrowing the damages class to those

28   Minority Applicants who have shown their creditworthiness through an external AUS or Wells

1    Fargo's ECS, Plaintiffs anticipate the defined classes will include at least 119,100 members.  (*See*

2    Kurzendoerfer Decl., Ex. A at 44.)  The issue of numerosity cannot credibly be disputed.

3          With respect to Rule 23(a)(3), the purpose of the typicality requirement "is to assure that the

4    interest of the named representative aligns with the interests of the class."  *Hanon v. Dataproducts*

5    *Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  To establish typicality, the representative plaintiffs must

6    "possess the same interest" as the class, and their injuries must "arise from the same course of

7    conduct that gives rise to the other class members' claims."  *Gen. Tel. Co. of Sw. v. Falcon,* 457

8    U.S. 147, 156 (1982) (quoting *Bynum v. D.C.*, 214 F.R.D. 27, 35 (D.D.C. 2003); *see also Ruiz Torres*

9    *v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016).  Representative claims are "typical"

10   if they are "reasonably co-extensive with those of class members; they do not have to be

11   substantially identical."  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  Nor

12   is it necessary that every named plaintiff have suffered every form of discrimination challenged by

13   the case.  Rather, plaintiffs need only show that in the aggregate, they cover the waterfront of abuses

14   alleged.  *Staton v. Boeing Co,* 327 F.3d 938, 958 (9th Cir. 2002).

15         Each of the representative Plaintiffs' claims arises from the same course of conduct as the

16   class-wide claims.  *See Falcon,* 457 U.S. at 157 n.13.  Plaintiffs have received the same

17   discriminatory treatment and suffered the same civil rights violations as the putative class members:

18   denial of their mortgage loan requests because of racial discrimination caused by Wells Fargo's use

19   of the CORE system.[14]  Even if the Court finds an issue with a particular class representative, it

20   should allow Plaintiffs to substitute other suitable representative plaintiffs.  *See, e.g., Robichaud v.*

21   *Speedy PC Software*, 2013 WL 818503, at *8 (N.D. Cal. Mar. 5, 2013).  In fact, the Complaint

22   identifies such "Typicality Plaintiffs," all of whom were deposed by Wells Fargo (with the exception

23   of one who is deceased since filing).  (ECF No. 114 ¶¶ 139-152; Ellis Decl. ¶ 6.)

24         Plaintiffs fulfill Rule 23(a)(4) of adequacy, as Plaintiffs' interests are the same as those of

25   _____

26   [14] Through its digital redlining, Wells Fargo considered all but one Plaintiffs' property's location
     (A. Braxton), in its CORE/ECS system when determining whether to approve or deny the loan, in

27   addition to other racially biased "underwriting" factors.  Indeed, Wells Fargo knew that it had
     "HIGH" inherent risks of redlining due to its use of geolocations and other race proxy

28   considerations.  (Ellis Decl., Ex. 20, p. 898; WF-00030816-28, p. 2018.)

the proposed classes and do not conflict with the rest of the classes' interests.  *See Maldonado v. Apple, Inc.,* 333 F.R.D. 175, 187 (N.D. Cal. 2019); *see also Crawford v. Honig,* 37 F.3d 485, 487 (9th Cir. 1994).  Plaintiffs easily clear both hurdles.  Plaintiffs also are well-versed in the case and understand and are prepared to undertake the responsibilities that come with being class representatives.  (*See* Ellis Decl., Ex. J, p. 2341; Ex. E p. 2295-96; Ex. N, p. 2398; Ex. M, p. 2391; Ex. H, p. 2326-27; Ex. I, p. 2332-34; Ex. O, p. 2401; Ex. P, p. 2410-11.)  With assistance from counsel already deemed competent by this Court, Plaintiffs will prosecute this action vigorously on behalf of the class.  (*See* ECF No. 111, Order Appointing Dennis S. Ellis as ILC.)

Finally, the Ninth Circuit does not recognize ascertainability as an implicit requirement under Rule 23(a), however, courts (including this one) have found this to be part of the plaintiffs' burden on class certification.  *Compare Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1133 (9th Cir. 2017) ("Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification."); *with Bebault v. DMG Mori USA, Inc.,* No. 18-CV-02373-JD, 2020 WL 2065646, at *4 (N.D. Cal. Apr. 29, 2020) (finding ascertainability satisfied where members "can be readily identified by records").  Nevertheless, the class members are easily identifiable through HMDA and Wells Fargo data, which has already allowed Plaintiffs and their experts to identify each putative class member, their property location (in the case of refinancings), and other key characteristics related to their loan application. (Kurzendoerfer Decl., Ex. A at 9-12.)

**B.**    **Commonality (Rule 23(a)(2)) and Predominance (Rule 23(b)(3))**

Through their review of more than 160,000 documents, analysis of more than 2.5 million rows of data, depositions of 26 Wells Fargo witnesses, and the hiring of four experts at a cost exceeding $3 million dollars to assist with assessing all of this data and information (Ellis Decl., ¶ 6), Plaintiffs have produced sufficient evidence on this motion to establish commonality that predominates over any issues.  As this Court previously recognized, while the standards for establishing commonality under Rule 23(a)(2) and predominance under Rule 23(b)(3) differ, the line between the two is "fuzzy" in light of the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011) establishing a "'rigorous' commonality standard."  *Capacitors*, 2018

WL 5980139, at *3 (citing *Dukes*, 564 U.S. at 350-51) (cleaned up).  "Courts have consequently found it appropriate to assess Rule 23(a)(2) commonality and Rule 23(b)(3) predominance together."  *Id.* (citing *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017)).

To satisfy commonality under Rule 23(a)(2), plaintiffs must show their claims "depend upon a common contention" of fact or law such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes,* 564 U.S. at 350-51.  For Rule 23(b)(3), plaintiffs must also show the proposed classes are "sufficiently cohesive to warrant adjudication by representation" such that common issues predominate over questions affecting only individual members.  *Amgen*, 568 U.S. at 469.  Plaintiffs need not prove each element of their claim is susceptible to class-wide proof.  *Id.*  "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members."  *Olean*, 31 F.4th at 668 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

***This Court*** has readily found commonality in similar instances where the plaintiffs allege a "common course of conduct."  *Purple Mountain Tr. v. Wells Fargo & Co.*, 2022 WL 3357835, at *3 (N.D. Cal. Aug. 15, 2022) (finding commonality where construction laborers' pension trust alleged Wells Fargo engaged in a common course of conduct against its investors); *Meek*, 562 F. Supp. 3d at 499-501 (finding commonality, in part, where the defendant's business practices were at issue); *Milan*, 340 F.R.D. at 598 (finding commonality where the plaintiffs all relied on the same challenged statements by the defendant).

Here, Plaintiffs will rely, *inter alia*, on statistical data that demonstrates a disparate impact for Plaintiffs and other Minority Applicants who were processed through Wells Fargo's CORE/ECS underwriting system.  Like the Ninth Circuit held in *Stockwell*, 749 F.3d at 1115-6, where ***both parties will rely on statistical data***, the commonality factor is satisfied, as the quality of that data will fail or succeed to the class as a whole.  The common facts related to Wells Fargo's use of its CORE/ECS system will be at the forefront of the dispute.  Specifically, every applicant is processed through Wells Fargo's CORE/ECS system.  (Ellis Decl., Ex. A, p. 2245; Ex. B, pp. 2254, 2256-57,

2259-60.)   And the CORE/ECS system impacts the applicants' credit risk classification, thus influencing application outcomes.  (*Id.*, Ex. C, pp. 2267-68, 2275-76.)

The CORE/ECS credit risk class rankings act as a gold star or scarlet letter for the loan applicant, whereby loan officers and loan underwriters treat these loan applicants different based on their rankings.  The ECS is designed to "▮▮▮▮▮▮" which of these applicants will go 90 days past due in the first 36 months of their loan.  (*Id.*, p. 2271.)  Carrying the scarlet letters of a lower credit risk ranking relative to other loan applicants, places minorities in a less desirable applicant pool to loan officers and underwriters alike.  These applicants receive higher level underwriting review, and their underwriters receive risk warning messaging related to their rankings.  (*Id.*, Ex. 45, p. 973.)  This ***CORE/ECS underwriting system is the primary policy*** that Plaintiffs challenge.

Making matters worse, ***Wells Fargo circumvents otherwise statistically significant approval rate disparities based on its internal policy*** that an AIR of .90 or greater is not "practically significant."  (Kurzendoerfer Decl., Ex. A, at C-18 – C-21; Ellis Decl., Ex. WF-00030816, pp. 2017-22; Ex. 23, p. 908-15.)

Wells Fargo then instituted a ***policy where it discontinued manual underwriting for C1 and C2 applicants***.  (Kurzendoerfer Decl., Ex. B, Rebuttal Report at 13).  As can be seen by the opinion of Dr. Kurzendoerfer, this resulted in more minorities being unable to continue in the loan process where they might have otherwise been approved through manual underwriting.  (*Id.*, at 13-14).  Dr. Kurzendoerfer identifies 12,934 of such C1 and C2 class members who might have been approved through manual underwriting.  (*Id.*, at 14, Fig. 7.)

Wells Fargo also maintained a ***policy of using market classification, and property location during its underwriting process***, which has been shown to partially explain Wells Fargo's approval disparities. (*Id.*, Ex. A, Report at 3-5).

Historically, a property's location in minority neighborhoods tend to appraise at a lower value than properties in White neighborhoods due to redlining, and Wells Fargo had a policy that it would reject biased appraisals.  (Ellis Decl., Ex. 17, p. 628.)  Thus, loan applicants were allowed to appeal their initial appraisal, but Wells Fargo discovered a ***policy*** of "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" during the class period.  (*Id.*, WF-03837493, p. 2539.)

1   Finally, members of Wells Fargo's BIA observed that Wells Fargo lacked the loan offerings that

2   would best help minorities obtain home ownership.  (*Id*., Ex. T, p. 2461.)  Consequently, Wells

3   Fargo had a ***policy of prioritizing loan programs for affluent customers*** while curtailing loan

4   programs that would help minorities, compounded its deliberate indifference and amounted to

5   disparate treatment.

6        All of these contributing policies to its CORE/ECS model underwriting policy resulted in

7   differential treatment of Minority Applicants, however, the Court need not resolve any of these

8   issues at this stage.  *See Amgen*, 568 U.S. at 468-69; *Ballou v. McElvain*, 29 F.4th 413, 424 (9th Cir.

9   2022); *Di Donato v. Insys Therapeutics, Inc*., 333 F.R.D. 427, 434 (D. Ariz. 2019).

10            **1.    <u>Common Issues Predominate for Plaintiffs' Disparate Impact Claims.</u>**

11        Violations of the FHA and ECOA may be proven both by a showing of intentional

12   discrimination and under a disparate impact theory.  *See Tex. Dep't. of Hous. & Cmty. Affairs v.*

13   *Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 524, 539-40 (2015); *Ramirez v. GreenPoint Mortg.*

14   *Funding, Inc.*, 633 F. Supp. 2d 922, 926-27 (N.D. Cal. 2008).  With respect to the latter, the Ninth

15   Circuit has recently clarified the standards for proving disparate impact claims in light of the

16   Supreme Court's decision in *Inclusive Communities* and its three-step burden-shifting approach.

17   *See, e.g., Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th

18   950, 960-61 (9th Cir. 2021).  "For a plaintiff to make out a prima facie case of disparate impact, [the

19   plaintiff] must demonstrate:  (1) the existence of a policy, not a one-time decision, that is outwardly

20   neutral; (2) a significant, adverse, and disproportionate effect on a protected class; and (3) robust

21   causality that shows, beyond mere evidence of statistical disparity, that the challenged policy, and

22   not some other factor or policy, caused the disproportionate effect."  *Id.* at 962.  "If the plaintiff is

23   able to establish a prima facie case, 'the burden shifts to the defendant to either rebut the facts

24   underpinning the prima facie case or to demonstrate a legally sufficient, nondiscriminatory reason

25   for the practices causing the disparate impact.'"  *Id.* at 960-61 (quoting *Oja v. Farmers Grp. Inc.*,

26   600 F.3d 1201, 1203 (9th Cir. 2010)).  If the defendant satisfies this burden, then "the burden shifts

27   back to the plaintiff to show the availability of an alternative practice that has less discriminatory

28   impact yet is still equally effective in serving the defendant's legitimate goals."  *Id.* at 961.  Such

determinations are not appropriate here or even at the summary judgment stage, because "valid and non-discriminatory [reasons] raises numerous questions of fact precluding summary judgment." *Ballou*, 29 F.4th at 424 (holding that defendant's non-discriminatory reasons for taking adverse employment action against plaintiff were questions of fact for the jury).

Courts certifying class actions under a disparate impact theory typically apply the *Teamsters* framework adopted in *International Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 362 (1977). *See, e.g., Ellis III*, 285 F.R.D. at 539 (collecting cases); *see also Heath,* 345 F. Supp. 3d at 1166-67 (applying *Teamsters* framework to a collective employment discrimination action).[15]  Under this approach, which Plaintiffs follow here, liability and damages are bifurcated.  *Heath,* 345 F. Supp. 3d 1166-67.  In the liability phase, plaintiffs are "not required to offer evidence that each person for whom it will seek relief was a victim of the [defendant's] discriminatory policy."  *Id.* at 1167 (citation omitted).  Rather, plaintiffs must establish the policy itself resulted in a disparate impact that affected a protected class.  *Id.* at 1166-67; *Sw. Fair Hous.*, 17 F.4th at 961-62.

If liability is established, then there will be a remedial phase in which "individual class members will present claims for relief" and "[d]efendant will have an opportunity to present individualized defenses with respect to each class member."  *Ellis III*, 285 F.R.D. at 539.  "It is only in this second phase that the court determines whether each individual plaintiff was a victim of the discriminatory practice."  *Heath*, 345 F. Supp. 3d at 1167; *Chi. Tchrs. Union Loc. No. 1 v. Bd. of Educ.*, 797 F.3d 429, 442-43 (7th Cir. 2015) ("It may be necessary to hold separate hearings to determine what relief each class member or sub-class is entitled . . . but the question of whether the [policy] discriminates against African Americans, either by disparate impact or treatment, can be adjudicated class-wide"); *U.S. v. City of N.Y.*, 276 F.R.D. 22, 34 (E.D.N.Y. 2011) ("Individual issues arise in disparate impact and pattern-or-practice disparate treatment cases only if the class establishes the employer's liability and the litigation proceeds to the remedial phase.")

---

[15] Although *Teamsters* is a Title VII case, courts may look to Title VII as guidance for disparate impact claims under the FHA.  *Gamble v. City of Escondido*, 104 F.3d 300, 304 (9th Cir. 1997) ("We apply Title VII discrimination analysis in examining Fair Housing Act ('FHA') discrimination claims"); *Inclusive Comtys,* 576 U.S. at 533-34 (recognizing Title VII provides important guidance as to how the FHA should be interpreted); *Sw. Fair Hous.*, 17 F.4th at 960 (same).

In *Ramirez*, 268 F.R.D. at 630-31, 643, the Court certified a class of plaintiffs—a group of minority borrowers—who were charged higher interest rates for home mortgage loans. With respect to whether common questions predominate, the Court found that because the plaintiffs' statistical evidence of disparate impact on minority borrowers could be challenged by "regression analyses that assess the effect of competing variables" to rebut their prima facie case, "the defense applies across the class. Common questions, therefore, appear to predominate." *Id.* at 640.

Similarly, in *Heath*, 345 F. Supp. 3d at 1174, the Court denied the defendant's motion to decertify the class in an employment discrimination case because although the plaintiffs' "interview experiences were not identical to one another and . . . they were not all subject to the same allegedly discriminatory aspect of the challenged policy [that] does not negate Plaintiffs' substantial showing that they were similarly subject to [the defendant's] common hiring practice." As in *Ramirez* and *Heath*, a showing of disparate impact is what is needed for certification, not satisfaction of the remedial phase showing precisely which Minority Applicants were discriminated against. A showing of disparate impact through Wells Fargo's policies is enough. *Ellis III*, 285 F.R.D. at 539.[16]

## 2. Plaintiffs Have Established a Prima Facie Case of Discrimination Based on Common Evidence.

Plaintiffs rely on common statistical proof for certification of the class. "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Olean*, 31 F.4th at 668 (quoting *Tyson Foods*, 577 U.S. at 453); *see also Chi. Tchrs.*

---

[16] It is a question of fact for the jury to determine whether Wells Fargo's purported business justification for its ECS model is legitimate or a subterfuge for discrimination. *Ballou*, 29 F.4th at 424. Wells Fargo identified variables in its ECS model ██████████████████████████████ ████████████████████████████. (Ellis Decl., WF-00142657, p. 2187-92.) However, the week leading up to the publication of the Bloomberg article, Wells Fargo's executives were consumed with their denial rate story and altered the findings that the ECS model variables were proxies for race and reported instead that the ECS model had no race proxies and thus there was no need to further test it. (*Id.*, WF-00142688, p. 2214.) Plaintiffs are entitled to the jury's verdict on this alleged business justification and whether Wells Fargo acted intentionally and willfully, entitling Plaintiffs to punitive damages. *See Barefield v. Chevron, U.S.A., Inc.*, 1988 WL 188433, at *3 (N.D. Cal. 1988) (classes' right to punitive damages present a common question).

1 *Union.,* 797 F.3d at 444-45 (certifying Rule 23(b)(3) class in disparate impact case because it would

2 be more efficient to answer the question of whether the defendant's selection process was

3 discriminatory "once for all plaintiffs rather than in piecemeal litigation.")  Here, requiring

4 individual trials on liability regarding the minor issues related to a Minority Applicant's loan file

5 would likely mean that there would be no trials at all, because the cost of proving Wells Fargo's

6 system is causing a disparate impact would far exceed any individual class member's damages.  *Id.*

7        Wells Fargo had a policy embedded in its unrelenting application of its ECS model, of

8 foregoing reliance on the AUSs of the GSEs and simply using FICO scores, as was alleged in the

9 Complaint, such that it continued to use its preferred CORE/ECS system after the onset of COVID

10 where that system began to deteriorate and went into a yellow watch status. As opined by Dr.

11 Golubchik, it is a better policy to discontinue use of such a supervised machine learning model once

12 it starts to show such deterioration.  (Golubchik Decl., Ex. A at 12.)  The evidence will show that

13 Wells Fargo made the policy decision to process ***every class member's*** mortgage application

14 through its CORE/ECS system despite its failings.[17]  (Ellis Decl., Ex. 23 p. 942; Ex. 261, p. 1239;

15 Ex. A, p. 2245; Ex. B, pp. 2254, 2256-57, 2259-60 ; Ex. L, p. 2374-84.)  Hence, Wells Fargo

16 subjected Minority Applicants to its uniform policy decision of using its own proprietary ECS model

17 to evaluate and rank their mortgage applications, rather than using other AUSs available in the

18 market, and perhaps more importantly, GSE's AUSs.  Even Wells Fargo's oft-used expert has not

19 independently found a business justification for this policy.  (*Id.*, Ex. Y, p. 2519-22.)  Wells Fargo's

20 claim that Plaintiffs must comb through 119,100 loan files to eliminate any legitimate basis for the

21 denial does not defeat class certification.  Plaintiffs are entitled to establish the impact of Wells

22 Fargo's policies on a class wide basis, and whether the facts here support a finding of intentional

23 and willful discrimination.  *See Chi. Tchrs. Union*, 797 F.3d at 440-41; *Teamsters*, 431 U.S. at 336.

24        Dr. Kurzendoerfer reviewed data from approximately 2.7 million loan applications

25 submitted during the Class Period (2018 to 2022) and found, among other things:  (1) statistically

26 significant disparities in approval rates between Minority Applicants and White Applicants that

27 ───────────────

28 [17] With the exception that at the very beginning of the class period until 2019, Wells Fargo processed HELOC applications through its ACAPS model.  (Ellis Decl., Ex. 549, p. 1568-71.)

cannot be explained by key underwriting factors; (2) the CORE/ECS underwriting system disproportionately assigned Minority Applicants to credit risk classes with higher denial rates, which, in turn, contributed to higher denial rates for Minority Applicants overall; and (3) property location (which historically has been associated with redlining) is one of the drivers of the disparity between Minority Applicants and White Applicants.  (Kurzendoerfer Decl., Ex. A at 3-5, 9.)

To similarly situate White Applicants and Minority Applicants, Dr. Kurzendoerfer performed a regression analysis that controlled for the "key underwriting factors" concerning the applicant's creditworthiness, ability to repay, loan characteristics and payment history.  (*Id.* at 29-40.)  For example, Dr. Kurzendoerfer controlled for the underwriting factors identified and collected by the CFPB pursuant to the HMDA—*i.e.* the factors the government collects to "assist in identifying possible discriminatory lending practices and enforcing antidiscrimination statutes" (12 CFR § 1003.1(b)(1)(iii))—such as credit scores, combined LTV, DTI, whether the applicant was approved by an external AUS, and information about the loan terms, among other information. (Kurzendoerfer Decl., Ex. A. at 29.)  Dr. Kurzendoerfer also controlled for non-public data about the applicants' loan payment histories that was produced by Wells Fargo in this lawsuit, such as the applicant's bankruptcy and foreclosure history, whether they had payments that were more than 90 days late in the last 24 months, prior deed-in-lieu and short sale indicators, the applicant's principal, interest, taxes and insurance reserves to measure the applicant's post-closing liquidity, and a qualifying housing ratio to measure the applicant's housing payments to their monthly income, among other information (the "Wells Fargo Controls").  (*Id.* at 33.)  She further controlled for factors internally used by Wells Fargo as part of its fair lending analytics to inform its business leaders and legal counsel about fair lending risks (the "Wells Fargo Fair Lending Controls").  (*Id.* at 35; Ellis Decl., Ex. 411, p. 1287-1381.)  She also performed additional sensitivity testing such as removing applications denied for incompleteness and using controls based on the applicant's metropolitan area or date of the application to ensure that broad differences in market conditions and time frames do not affect the results.  (Kurzendoerfer Decl., Ex. A at 34.)  With very few exceptions, she found statistically significant disparities for Minority Applicants across all sensitivities.  (*Id.*)

Dr. Kurzendoerfer's regression analysis found disparities between Minority Applicants and

similarly situated White Applicants of greater than 5 standard deviations from zero (at a minimum) for each subclass and cannot be explained by key underwriting factors.  (*Id*. at 3-5.)  *See Paige v. Cal.*, 233 F. App'x 646, 648 (9th Cir. 2007) (holding that standard deviations greater than 1.96 are generally relied upon in the Ninth Circuit to determine statistical significance for disparate impact cases because of the low likelihood that such disparities have resulted from chance).  Her analysis breaks down the disparities for each subclass, and further breaks it down by race and ethnicity to allow for further refinement along those lines if required.  (Kurzendoerfer Decl., Ex. A at 43.)  In sum, her report demonstrates that Wells Fargo's policy decision to use its CORE/ECS system to evaluate and rank every mortgage application caused Minority Applicants to be rejected at statistically significant disproportionate rates compared to similarly situated White Applicants during the Class Period.  Thus, the policy and "process was not race-neutral."  (*Id*. at 3.)

The Civil Rights Act of 1991 explicitly recognizes in the context of certain discrimination cases, "if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one . . . practice."  42 U.S.C. § 2000e-2(k)(1)(B)(i).  Though this provision relates to employment cases, the Department of Housing and Urban Development recently found that it can and should also apply in the mortgage context, and such finding can and should be afforded *Chevron* deference.  *See* Reinstatement of HUD's Discriminatory Effects Standard, 88 Fed. Reg. 19450-01, 19485-86 (Mar. 31, 2023) (to be codified at 24 C.F.R. Part 100) ("In HUD's experience, identifying the specific practice that caused the alleged discriminatory effect will depend on the facts of a particular situation and therefore must be determined on a case-by-case basis.  As has been recognized in the employment context under Title VII . . . the elements of a decision-making process may not be capable of separation for analysis, in which case it may be appropriate to challenge the decision-making process as a whole.  For example, in a reverse redlining case, there may be multiple acts or policies that together result in a discriminatory effect." (cleaned up)); *Lambert v. Saul,* 980 F.3d 1266, 1273 (9th Cir. 2020) (holding that the agency's response to a public comment during a rule-making process was entitled to *Chevron* deference).  By contrast, the disaggregation approach, which has previously been rejected, essentially breaks down a policy into so many sub-parts that no

1  disparate impact could ever be observed. *See Ellis III*, 285 F.R.D. at 523, n.25; *Chen-Oster*, 2022

2  WL 814074, at *27 ("What Defendants ask the Court to do is akin to requiring that plaintiffs identify

3  which question on an exam is discriminatory rather than making a claim as to the full exam.

4  Defendants cite no precedent requiring such disaggregation.").

5      Wells Fargo will likely argue that, under the Supreme Court's holding in *Inclusive*

6  *Communities*, "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff

7  cannot point to a defendant's policy or policies causing that disparity," 576 U.S. at 542, and contend

8  that Plaintiffs' statistical evidence is not enough here, especially since Plaintiffs do not seek

9  separately to define each discriminating policy.  But, Plaintiffs' claims track precisely the

10  requirements laid out in *Inclusive Communities*, and Dr. Kurzendoerfer establishes robust causality

11  between the CORE/ECS policy and the alleged harm to the proposed subclasses.  Plaintiffs do not

12  point the Court to statistical evidence and contend that the numbers tell the full story.  Rather,

13  statistical evidence shows that Wells Fargo's consistent policy and practice of processing every loan

14  application through its conjoined CORE/ECS underwriting system caused the disparate impact on

15  Minority Applicants.  (Kurzendoerfer Decl., ¶ 21.)  And just like the Courts in *Ramirez* and *Heath*,

16  this Court should also find that common questions predominate because both parties will rely on

17  statistical data and Wells Fargo's policies and conduct are at the center of the dispute; namely, its

18  inseparable uniform reliance on CORE and its embedded ECS model.

19      **C.      Plaintiffs' Damages Models Can be Applied on a Class-Wide Basis.**

20      Consistent with the allegations of the Complaint, Plaintiffs have established damages

21  methodologies that calculate the pecuniary harm to those class members that were denied mortgage

22  loans despite their creditworthiness.  While a class action may be certified on liability alone, with

23  individual proceedings to determine damages, *see Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 515

24  (9th Cir. 2013), a party seeking to prove damages on a class-wide basis must certify a damages class

25  under Rule 23(b)(3) by demonstrating that "damages are capable of measurement on a class wide

26  basis," *Comcast*, 569 U.S. at 34.  This requires presenting a damages model that "measure[s] only

27  those damages attributable to" the theory of liability.  *Id.* at 35.

28      Plaintiffs have limited their damages subclasses to those members who have established their

creditworthiness but were still denied mortgage loans based on Wells Fargo's use of its CORE/ECS underwriting system.  *See Valladares v. Specialized Loan Serv., LLC*, 2023 WL 8435575, at *9 (E.D. Cal. Dec. 5, 2023) ("ECOA's original purpose is to require that financial institutions and other firms engaged in the extension of credit make that credit equally available to all credit-worthy customers without regard to [their ethnicity and race]." (cleaned up)); *Old West End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100, 1103 (N.D. Ohio 1987) (FHA protected "buyers [who] were creditworthy"); *Singh v. Wells Fargo Bank, N.A.*, 2009 WL 2365881, at *4 (N.D. Cal. July 30, 2009) (FHA protects "qualified" applicants).  Wells Fargo's uniform use of its CORE/ECS system disparately impacted these Minority Applicants, as defined by the ECOA, FHA and Section 1981, causing them cognizable economic harm.  (Ellis Decl., Ex. C, pp. 2272-73, 2279-80 (ECS model deterioration); Ex. F, p. 2313-14 (not helping loan applicants equally across race)).

In *Nguyen v. Nissan North America, Inc.*, 932 F.3d 811 (9th Cir. 2019), the Ninth Circuit reversed the district court's denial of class certification in a case alleging that Nissan manufactured cars with a defective clutch.  The district court found that plaintiff's benefit of the bargain damages model was problematic because class members may have received varying levels of value from the clutch, depending on when or whether it malfunctioned.  The Ninth Circuit held that the defective clutch itself was the injury, regardless of whether the defect affected performance in each class member's car differently or at all.  In its holding, the Ninth Circuit indicated that, at the class certification stage, a class plaintiff need only demonstrate a nexus between the theory of liability and the damages model—questions regarding the accuracy of the damages model are merits issues to be resolved at a later time.  *Id.* at 820.

> Having determined that recovery based on the benefit of the bargain is cognizable under Plaintiff's causes of action, we must now determine whether this damages model flows from his theory of liability. . . .
> . . . .
> . . . Plaintiff's legal theory is not based on the *performance* of the allegedly defective clutch system, but instead *the system* itself, which he claims is defective.  Had Plaintiff alleged that performance problems constituted the defect and caused his and the class members' injuries, then the benefit of the bargain would not be the appropriate measure of damages because, as the district court noted, class members might have received varying levels of value based on if and when they experienced a sticky clutch problem.  But Plaintiff's theory is that Nissan knowingly designed a defective clutch system and did not inform consumers of the defect.

*Id.* at 819 (emphasis in original).

The decision in *Nguyen* offers sufficient guidance to this Court.  While *Nguyen* is a consumer product case, it is remarkably similar to the issues presented here.  Under *Dukes* and *Inclusive Communities*, Plaintiffs' theory of the case must relate to Wells Fargo's discriminatory policy.  It does.  Wells Fargo's continued use of its CORE/ECS system, ECS model (11960) and related policies discriminated against the class and subclasses.  (Kurzendoerfer Decl., ¶ 21; *see also* Ellis Decl., Ex. 49, p. 1072-89; Ex. B, p. 2255; Ex. C, p. 2272-73.)  Wells Fargo will likely argue that Plaintiffs must undertake the task of determining which of the more than 4,000 "business rules" that are part of the CORE/ECS system drove the disparities, but that is not what is required of Plaintiffs; certainly not at this stage of the proceedings.  Just as the *Nguyen* plaintiffs based their theory of liability on a defect in the entire system, Plaintiffs here allege similarly that the entire Wells Fargo CORE underwriting system is likewise defective, or in words appropriate for this case, discriminatory.  (ECF No. 114 ¶¶ 17-20; 100-119.)  Consistent with this theory, Plaintiffs' damages experts prepared mathematical formulas to calculate the damages caused by Wells Fargo's wrongful denial of mortgage loan applications, including variables such as increased interest rates, which also take into account relevant mitigating factors.  (Wallace Decl., Ex. A at 35-45.)

Plaintiffs' damages expert, Mr. Wallace, quantifies in an easily manageable way the economic damages suffered by each of the class members based on their out-of-pocket losses related to their increased loan payments, and/or the loss of lower interest rates they would have received if their loans were approved.[18]  *See Prince George's Cnty. v. Wells Fargo & Co.*, 397 F. Supp. 3d 752, 760 (D. Md. 2019) (county plaintiffs properly alleged out-of-pocket losses in processing foreclosures due to Wells Fargo's predatory lending tactics); *see also U.S. v. Matusoff Rental Co.*, 494 F. Supp. 2d 740, 749 (S.D. Ohio 2007) (compensatory damages may be awarded under the FHA related to damages caused by the defendant's practices).  While Wells Fargo's damages expert may quibble over details or point out what the methodology developed by Plaintiffs' expert cannot

---

[18] This is not even required at this stage. *Lytle v. Nutramax Lab'ys, Inc.*, 2024 WL 1710663, at *13, __ F.4th __ (9th Cir. Apr. 22, 2024) (holding there is no general requirement that an expert must apply their damages model to the proposed class in order to demonstrate that damages are susceptible to common proof, provided that the model is otherwise reliable).

determine (*i.e.*, who within the proposed class was discriminated against), nothing advanced by Wells Fargo undermines the applicability of the damages models to the entire class.  (Wallace Decl., ¶¶ 7, 19.)  Certification of a Rule 23(b)(3) damages class is appropriate, even if "individualized damages issues" remain to be resolved in the remedial phase.[19]  (*See Nguyen*, 932 F. 3d at 817.)

### D.     A Class Action is Superior to Other Available Methods of Adjudication.

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023.  This case can be tried with the common issue of liability to be determined, and damages measured pursuant to a mathematical formula developed by Plaintiffs' damages expert. (*See* Wallace Decl., ¶ 7.)  It is "superior" for Plaintiffs to address the common aspects of their case jointly, as opposed to in 119,100 separate trials where each Minority Applicant has to prove that Wells Fargo's denial of their mortgage application was unjustified.

### E.     Plaintiffs Suffered an Injury-In-Fact Sufficient to Confer Article III Standing.

Wells Fargo may argue that a review of each denied applicants' loan file is required to determine whether applications were denied for a discriminatory reason.  This has no impact on whether Plaintiffs suffered an injury under Article III as a result of Wells Fargo's discrimination. Such an "argument is based upon two faulty assumptions—one pertaining to the nature of plaintiffs' [discrimination] claim and the other to the proof in that regard." *Parra v. Bashas', Inc.*, 291 F.R.D. 360, 391 (D. Ariz. 2013); *Borum v. Brentwood Vill, LLC*, 324 F.R.D 1, 11 (D.D.C. 2018) (Rule 23 requires "membership in the class, not likelihood of success on the merits").  Plaintiffs must show they suffered an injury-in-fact that is fairly traceable to the challenged conduct and has some likelihood of redressability.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The Supreme Court has instructed federal courts to take a broad view of constitutional standing in civil rights cases.  *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 (9th Cir. 2008).  "[D]iscrimination itself . . .

---

[19] Should the Court certify the Rule 23(b)(3) subclasses, certification of punitive damages would necessarily follow.  "Because the purpose of punitive damages is not to compensate the victim, but to punish and deter the defendant, any claim for such damages hinges, not on facts unique to each class member, but on the defendant's conduct toward the class as a whole." *Barefield,* 1988 WL 188433 at *3; *Opperman v. Path, Inc*., 2016 WL 3844326, at *17 (N.D. Cal. July 15, 2016).

1    can cause serious non-economic injuries to those persons who are denied equal treatment."  *White*

2    *v. Square, Inc.*, 891 F.3d 1174, 1177 (9th Cir. 2018) (cleaned up).

3              Here, each member of the proposed class and subclass has suffered an injury sufficient to

4    confer Article III standing, and Wells Fargo's proposed review of individual loan files is both

5    unnecessary and an obfuscation at this stage of the proceedings.  A party alleging discrimination

6    has consistently been found to have an injury-in-fact sufficient to confer standing.  *See Evers v.*

7    *Dwyer*, 358 U.S. 202, 204 (1958) (per curiam) (That the plaintiff was subjected to discrimination

8    for the purpose of instituting the litigation did not defeat his standing); *Havens Realty Corp. v.*

9    *Coleman*, 455 U.S. 363, 373-74 (1982) (A "tester" plaintiff posing as a renter for purposes of

10   housing discrimination litigation still suffered an injury under Article III.).  Wells Fargo's constant

11   refrain that each application is considered individually cannot change the result of its policy of using

12   CORE and its ECS model—to create "Common Opportunities Results Experiences"—that each and

13   every class member was injured in the same way as the result thereof.[20]

14             **F.      Plaintiffs are Entitled to Certify a 23(b)(2) Restitution and Injunction Class.**

15             The Complaint states a claim based on California's UCL:  Section 17200 *et seq.* of the

16   California Business and Professions Code.  (ECF No. 114 ¶¶ 200-210.)  Among other things,

17   Plaintiffs allege that Wells Fargo's use of its CORE system to process and underwrite all mortgage

18   loans constitutes an unfair, unlawful and fraudulent business practice under the statute.  (*Id.* ¶¶ 205-

19   207.)  This claim is proper based on the facts of this case.  *See. e.g.*, *Collins v. eMachines, Inc.,* 202

20   Cal. App. 4th 249, 255 (2011); *Rutledge v. Hewlett-Packard Co.*, 238 Cal. App. 4th 1164, 1174

21   (2015); *Norcia v. Samsung Telecomms. Am., LLC*, 2018 WL 4772302, at *1 (N.D. Cal. Oct. 1, 2018)

22   (recognizing that an omission can be actionable even though it does not relate to a safety concern).

---

[20] Wells Fargo's damages expert agrees that discrimination causes harm in all cases, even those
where the plaintiff participates in a process that does not afford him or her the same opportunity of
being selected as others.  (Ellis Decl., Ex. W, p. 2484-87.)  Nevertheless, even assuming the class
contains some members who lack standing at this stage of the proceedings, class certification is still
proper.  *See, e.g., Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 677 (7th Cir. 2009) ("[A] class will
often include persons who have not been injured by the defendant's conduct . . . [But] [s]uch a
possibility or indeed inevitability does not preclude class certification."); *In re Cathode Ray Tube
(CRT) Antitrust Litig.*, 308 F.R.D. 606, 615 (N.D. Cal. 2015) ("Even if some individuals are thus
able to join the class and then are later determined to not have valid claims against a proper
defendant, this does not preclude class certification.").

Restitution to the appropriate class members based on the UCL is easily determined and managed.  It is simply the return of money that the class members parted with as a result of Wells Fargo's discriminatory, unfair, unlawful and fraudulent use of its CORE/ECS underwriting system.  *See Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 338-39 (1998) (explaining that the UCL operates to provide restitution to the victim of unfair competition, by returning to that person those measurable amounts which are wrongfully taken by means of the unfair practice).  Wells Fargo charged upfront loan application fees and appraisal fees to Minority Applicants who were effectively participating in a "rigged game," in which they had no chance or an unfair chance to be approved for a loan.  (*See, e.g.,* Wallace Decl., Ex. A at 2-3; Ellis Decl., BROWN0000113, p. 2240-41.)  Wells Fargo then pocketed these fees, which it was only able to acquire based on its unfair, unlawful and fraudulent business practices.  Wells Fargo should be required to return these fees to those class members (*i.e.*, provide restitution), and the Court should enjoin Wells Fargo from utilizing the practices that resulted in these Plaintiffs parting with those fees in the first instance.  Plaintiffs respectfully request that the Court certify a class of all Minority Applicants who paid fees to process their mortgage loan with Wells Fargo during the class period, and who had their applications denied.[21]

### G.   The Court Should Certify Subclasses on Liability Pursuant to Rule 23(c)(4) and Allow Damages to be Adjudicated Individually.

At a minimum, Plaintiffs have established a right to certification of an issue subclass on liability under Rule 23(c)(4), which allows the Court to certify a case "as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4)(A), based on Wells Fargo's continued use of its

---

[21] There are approximately 328,000 class members in this proposed class of all denied Minority Applicants during the Class Period. (Kurzendoerfer Decl., Ex. A at 11.)  Plaintiffs' UCL claim can reach this conduct as Plaintiffs allege that Wells Fargo's conduct emanated from California.  (ECF 114, ¶ 204:  "Defendants' conduct described herein and its discriminatory policies were made, disseminated and orchestrated from Defendants' place of business in California.")  Wells Fargo generally denied this allegation, without contesting whether its practices emanated from California.  (ECF, 122, ¶ 204.)  Plaintiffs' allegations (and Wells Fargo's insufficient denial) are sufficient to bring its UCL claims on behalf of the entire proposed class.  *Cf. Fortenberry v MV Transp., Inc.*, 984 F. Supp. 2d 1062, 1068-69 (E.D. Cal. 2013); *Schertzer v. Bank of Am., N.A.*, 489 F. Supp. 3d 1061, 1084-85 (S.D. Cal. 2020); *accord Norwest Mortg., Inc. v. Super. Ct. (Conley)*, 72 Cal. App. 4th 214, 224-25 (1999).  Plaintiffs have established evidence in support of their allegations, *inter alia*, deposing Ms. Knutsen-Smith in Oakland, California near her office where she headed BIA, and Dr. Joel Brodsky, who is central to these issues and is likewise located in Berkeley, California, where he heads Quantitative Analytics.  (Ellis Decl., ¶ 8.)

CORE/ECS system, which by its own admission was in a "Yellow (Watch)" status and causing disparate impact to these Minority Applicants. *See Valentino*, 97 F.3d at 1234 ("Even if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues."); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th Cir. 2012) (in employment case, endorsing the use of a Rule 23(c)(4) issue class to determine the disparate impact of a challenged corporate policy, with "separate trials . . . to determine which class members were actually adversely affected . . . and if so what loss each class member sustained"); *Harris v. Med. Trans. Mgmt., Inc.*, 77 F.4th 746, 756-57 (D.C. Cir. 2023) (collecting cases).

The Court should also certify an issue class on Wells Fargo's liability to Minority Applicants who received higher interest rates on their loans compared to similarly situated White borrowers. Dr. Kurzendoerfer has determined that Wells Fargo's loan pricing shows statistically significant differences in interest rates for Black, Hispanic, and Asian borrowers compared to White borrowers. Her analysis controls for credit-risk factors and obtains differences that span 2.0-3.7 basis points. (Kurzendoerfer Decl., Ex. A at 3-5.)  Wells Fargo's expert claimed any pricing analysis must look at daily rate sheets, which total in the thousands, so Dr. Kurzendoerfer did that to verify the work and found even greater disparities.  (Ellis Decl., Ex. X, p. 2491-92.)

## VI.   THE COURT SHOULD APPOINT MR. ELLIS AS LEAD CLASS COUNSEL.

The Court appointed Mr. Ellis as Interim Lead Class Counsel.  (*See* ECF No. 111.)  Mr. Ellis has acted as Lead Counsel for Plaintiffs for nearly a year, taking primary responsibility for this case, and coordinating all counsel.  Plaintiffs and Mr. Ellis thus respectfully request that, pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the Court appoint Mr. Ellis as Lead Class Counsel to represent the classes to be certified pursuant to this Motion through trial.

## VII.   CONCLUSION

Plaintiffs respectfully request that the Court grant the Motion for Class Certification.

1   DATED:  April 25, 2024                ELLIS GEORGE LLP

2                                         By:    _/s/ Dennis S. Ellis_____
3                                                   Dennis S. Ellis
                                          Interim Lead Class Counsel
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-31-                Case No. 3:22-cv-00990-JD

PLAINTIFFS' MOTION FOR CLASS CERTIFICATION