1  MCGUIREWOODS LLP
   Alicia A. Baiardo (SBN: 254228)
2  abaiardo@mcguirewoods.com
   Two Embarcadero Center, Suite 1300
3  San Francisco, CA  94111-3821
   Telephone:  415-844-944
4  Facsimile: 415-844-9922

5  MCGUIREWOODS LLP
   Ava E. Lias-Booker (*Admitted pro hac vice*)
6  alias-booker@mcguirewoods.com
   500 East Pratt Street, Suite 1000
7  Baltimore, MD 21202-3169
   Telephone:  410-659-4430
8  Facsimile: 410-659-4558

9  WILMER CUTLER PICKERING
   HALE AND DORR LLP
10 Seth P. Waxman (*Pro hac vice pending*)
   seth.waxman@wilmerhale.com
11 2100 Pennsylvania Avenue NW
   Washington DC 20037
12 Telephone: 202-663-6000
   Facsimile: 202-663-6363

13

14 WILMER CUTLER PICKERING
   HALE AND DORR LLP
15 Alan Schoenfeld (*Pro hac vice pending*)
   alan.schoenfeld@wilmerhale.com
16 7 World Trade Center
   250 Greenwich Street
17 New York, New York 10007
   Telephone: 212-230-8800
18 Facsimile: 212-230-8888

*Attorneys for Defendants Wells Fargo Bank, N.A.*

WINSTON & STRAWN LLP
Amanda L. Groves (SBN 187216)
agroves@winston.com
333 S. Grand Ave.
Los Angeles, CA 90071-1543
Telephone: 213-615-1700
Facsimile:  213-615-1750

WINSTON & STRAWN LLP
Kobi K. Brinson (*Admitted pro hac vice*)
kbrinson@winston.com
300 South Tryon Street
Charlotte, NC  28202
Telephone: 704-350-7700
Facsimile:  704-350-7800

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Wells Fargo Mortgage Discrimination Litigation* | CASE NO. 3:22-CV-00990-JD<br><br>The Hon. James Donato<br><br>**DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND MICHAEL WALLACE** |

**TO THE COURT, THE PARTIES, AND THEIR COUNSEL**:

    **PLEASE TAKE NOTICE** that on June 27, 2024, or as soon thereafter as counsel may be heard, in Courtroom 11, 19th Floor, before the Honorable James Donato, Defendant Wells Fargo Bank, N.A. ("Wells Fargo") will, and hereby does, move to exclude certain testimony of Amanda Kurzendoerfer and Michael Wallace under Federal Rule of Evidence 702.[1]

    Wells Fargo requests that the Court exclude the testimony of Amanda Kurzendoerfer concerning (1) Wells Fargo's Enhanced Credit Score (ECS) as described in paragraphs 10, 48-49, 52-53, and 78-81 of her affirmative report and paragraphs 19-24 of her rebuttal report; (2) redlining, as described in paragraphs 10 and 82 of her affirmative report; and (3) her methodology for identifying applicants approved by external automated underwriting systems and the opinions relying on that methodology, as described in paragraphs 10, 45, 65-68, 72-74, 86, and 88-89 of her affirmative report and paragraphs 24 and 30 of her rebuttal report.  Wells Fargo additionally requests that the Court exclude the testimony of Michael Wallace regarding (1) his model's ability to calculate damages for improperly denied applications on a classwide basis as described in paragraphs 5, 8-22, and 116 of his affirmative report, and (2) his damages formulas as described in paragraphs 8-22 of his affirmative report.

    Wells Fargo bases this motion on the accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this action, oral argument as permitted by the Court, and any such other matters that the Court deems appropriate.

---

    [1] Wells Fargo files this combined motion pursuant to the Court's order authorizing a combined motion to exclude.  *See* Dkt. 222.

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

1    Dated:  May 23, 2024                    MCGUIREWOODS LLP

2

3                                            By:/s/ Alicia A. Baiardo
                                                Alicia A. Baiardo
4                                               Ava E. Lias-Booker

5

6                                            WINSTON & STRAWN LLP

7

8                                            By:/s/ Amanda L. Groves
                                                Amanda L. Groves
9                                               Kobi K. Brinson

10                                           WILMER CUTLER PICKERING
                                             HALE AND  DORR LLP
11

12

13                                           By:/s/ Seth P. Waxman
                                                Seth P. Waxman
14                                              Alan Schoenfeld

15                                           *Attorneys for Defendant Wells Fargo Bank, N.A.*

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN
TESTIMONY OF AMANDA KURZENDOERFER AND

## **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................... 1

II.     BACKGROUND ..................................................................................................... 3

        A.      Dr. Kurzendoerfer ..................................................................................... 3

        B.      Mr. Wallace ................................................................................................ 5

III.    LEGAL STANDARD ............................................................................................. 7

IV.     ARGUMENT .......................................................................................................... 8

        A.      Dr. Kurzendoerfer's Opinions About ECS Are Not The Product Of Reliable
                Principles And Methods ............................................................................. 8

        B.      Dr. Kurzendoerfer Offers Opinions That Are Not Within Her Economic
                Expertise And Are Therefore Unreliable ................................................ 11

                1.      Dr. Kurzendoerfer Does Not Have The Underwriting And Fair
                        Lending Expertise To Opine On Alternatives To Wells Fargo's Use
                        Of ECS And Those Opinions Are Unreliable ............................. 12

                2.      Dr. Kurzendoerfer Does Not Have The Fair Lending Expertise To
                        Opine About Redlining, Rendering Those Opinions Unreliable ............... 13

                3.      Dr. Kurzendoerfer's Opinions About Which Applications
                        Government Underwriting Systems Considered To Satisfy Their
                        Underwriting Factors Are Not Based On Her Economic Expertise
                        And Are Not The Product Of Reliable Principles And Methods. .............. 14

        C.      Mr. Wallace's Damages Formulas And His Opinion That Classwide
                Damages Can Be Reasonably Calculated Are Junk Science ................................. 20

                1.      Mr. Wallace's Damages Formulas Hinge On The Unsupported and
                        Unrealistic Assumption That Denied Applicants Were Unable to
                        Receive Subsequent Loans, Rendering Them Junk Science ..................... 20

                2.      Mr. Wallace Lacks A Basis To Assume That Improper Denials Can
                        Be Identified, Rendering His Opinion Unreliable ....................................... 23

V.      CONCLUSION ...................................................................................................... 25

i

1

# <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Federal Cases**

4

*In re Bextra & Celebrex Marketing Sales Practices & Product Liability Litigation,*
5
    524 F. Supp. 2d 1166 (N.D. Cal. 2007) ............................................................... 7, 19

6

*In re Capacitors Antitrust Litig.,*
    2020 WL 870927 (N.D. Cal. Feb. 21, 2020) .......................................... 11, 13, 14, 15
7

*In re Capacitors Antitrust Litigation,*
8
    2021 WL 5407452 (N.D. Cal. Nov. 18, 2021) .......................................................... 13

9

*Claar v. Burlington Northern R.R. Co.,*
    29 F.3d 499 (9th Cir. 1994) ......................................................................................... 9
10

11

*Daubert v. Merrell Dow Pharmaeuticals, Inc.,*
    509 U.S. 579 (1993) .................................................................................................... 22
12

*Domingo ex rel. Domingo v. T.K.,*
13
    289 F.3d 600 (9th Cir. 2002) ....................................................................................... 8

14

*DZ Reserve v. Meta Platforms, Inc.,*
    2022 WL 912890 (N.D. Cal. Mar. 29, 2022) ............................................................. 7
15

16

*General Electric v. Joiner,*
    522 U.S. 136 (1997) ................................................................................................ 7, 10
17

*In re Google Play Store Antitrust Litigation,*
18
    2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) ............................................... 10, 24, 25

19

*Guidroz-Brault v. Missouri Paific R.R. Co.,*
    254 F.3d 825 (9th Cir. 2001) ................................................................................. 20, 24
20

21

*In re Incretin-Based Therapies Products Liability Litigation,*
    524 F. Supp. 3d 1007 (S.D. Cal. 2021) ...................................................................... 19
22

*Kamakahi v. American Society for Reproductive Medicine,*
23
    305 F.R.D. 164 (N.D. Cal. 2015) ............................................................................... 25

24

*Koger v. Costco Wholesale Corp.,*
    2023 WL 8188842 (N.D. Cal. Nov. 27, 2023) ........................................................... 12
25

26

*Lawrence v. Raymond Corp.,*
    2011 WL 3418324 (N.D. Ohio Aug. 4, 2011) ........................................................... 11
27

*LD v. United Behavioral Health,*
28
    2023 WL 2806323 (N.D. Cal. Mar. 31, 2023) ............................................................ 7

ii

*In re Live Concert Antitrust Litigation*,
     863 F. Supp. 2d 966 (C.D. Cal. Mar. 23, 2012) ................................................................. 11

*Lucas v. MGM Resorts International*,
     2024 WL 1199514 (D. Nev. Mar. 19, 2024) ..................................................................... 18

*Lytle v. Nutramax Laboratories, Inc.*,
     99 F.4th 557 (9th Cir. 2024) ............................................................................................... 7

*Mission Viejo Florist, Inc. v. Orchard Supply Co.*,
     2019 WL 13045054 (C.D. Cal. Feb. 28, 2019) ................................................................. 24

*National Fair Housing Alliance v. Bank of America, N.A.*,
     2023 WL 2633636 (D. Md. Mar. 24, 2023) ................................................................ 13, 14

*Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*,
     31 F.4th 651 (9th Cir. 2022) ......................................................................................... 7, 19

*Open Text S.A. v. Box, Inc.*,
     2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ...................................................................... 9

*Persian Gulf Inc. v. BP West Coast Products LLC*,
     632 F. Supp. 3d 1108 (S.D. Cal. 2022) ...................................................................... 20, 24

*Pooshs v. Phillip Morris USA, Inc.*,
     287 F.R.D. 543 (N.D. Cal. 2012) ............................................................................... 8, 10

*Rodman v. Otsuka America Pharmaceutical Inc.*,
     564 F. Supp. 3d 879 (N.D. Cal. 2020) ............................................................................. 16

*Southwest Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement District*,
     17 F.4th 950 (9th Cir. 2021) ............................................................................................. 14

*Stephens v. Union Pacific R.R. Co.*,
     935 F.3d 852 (9th Cir. 2019) ..................................................................................... 14, 15

*Toomey v. Nextel Communications, Inc.*,
     2004 WL 5512967 (N.D. Cal. Sept. 23, 2004) ................................................................ 20

**Statutes & Rules**

Federal Rule of Evidence 702 ...................................................................................... 7, 15

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.     INTRODUCTION**

        To carry their burden at class certification, Plaintiffs must come forward with a common method of proving that a discriminatory policy had a disproportionate impact on minority loan applicants, causing them to be denied loans for which they would have been approved if they had been white.  Attempting to meet this burden, Plaintiffs put forward two putative experts, Amanda Kurzendoerfer and Michael Wallace, who offer several of Plaintiffs' hoped-for opinions without any scientific basis to back them up.  Their actual analysis says nothing about whether a discriminatory policy disproportionately impacted loan approvals for minority applicants, nor about whether any proposed class members were improperly denied loans, let alone on the basis of race or ethnicity or in connection with any policy.  Nor does their analysis show that Plaintiffs have a method capable of determining economic damages flowing from a policy's discriminatory impact on putative class members' loan applications on a classwide basis.

        Dr. Kurzendoerfer's reports are riddled with problems, but this motion focuses on the biggest issues that render some of her opinions unreliable and therefore inadmissible.  First, Dr. Kurzendoerfer did not perform any analysis capable of supporting several of her opinions.  She opines that Wells Fargo's use of "[ECS] disproportionately assigned minority applicants to credit classes with higher denial rates and thus contributed to higher [loan] denial rates for minority applicants overall."  Dkt. 205-12, Declaration of Amanda Kurzendoerfer in Support of Pls' Mot. for Class Cert. (Kurzendoerfer Decl.),[2] Ex. A, ¶¶ 10, 49, 53, 78-81; Kurzendoerfer Decl., Ex. B, ¶¶ 19-24.  However, her analysis of ECS was limited to reviewing uncontrolled raw data and drawing inferences based on sorting and filtering that data.  She did not test those inferences or control for underwriting factors that could explain the distributions she observed in the raw data.  They are therefore not based on reliable scientific grounds.  Second, Dr. Kurzendoerfer offers opinions on underwriting and fair lending topics that impermissibly stray beyond her economic expertise.  She

---

        [2] Resubmitted as Ex. 46 to the Declaration of Amanda Groves filed concurrently.

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

opines on Wells Fargo's business justifications for using its internal underwriting system, Kurzendoerfer Decl., Ex. B, ¶ 19, on what trends are associated with redlining, *id.* ¶¶ 10, 82; Kurzendoerfer Decl., ¶ 14, and on when government underwriting systems consider applications to satisfy their underwriting factors, Kurzendoerfer Decl., Ex. A, ¶¶ 45, 65-68, 72-74, 86, 88—all opinions that are no more than guesswork based on her background.

For his part, Mr. Wallace offers a damages model with numerous flaws, including that his formulas rely on unsupported assumptions and key variables that are unknown and speculative. He offers no opinion about how unknown variables like the loan term cutoff date may be determined, and instead offers multiple damages estimates—ranging from $357 million to $4.9 billion (Declaration of Alicia Baiardo in Support of Daubert Mots. (Baiardo Decl.), Ex. 2 (Irwin Decl.), ¶ 9)—based on a list of loan term cutoff options that he pulls out of thin air. Mr. Wallace's formulas are excludable because they assume none of the proposed class members who were denied a loan from Wells Fargo subsequently obtained a loan from a different lender. There is no basis for this assumption, and it is contrary to common sense that applicants who supposedly were qualified for a loan from Wells Fargo could not and did not obtain loans from another lender. As a result of these assumptions, Mr. Wallace's damages model calculates full damages for applicants who have suffered little to no economic harm.

Mr. Wallace also opines that his formulas calculate damages for class members whose applications were improperly denied on a classwide basis. Dkt. 205-14, Declaration of Michael Wallace in Support of Pls' Mot. for Class Cert. (Wallace Decl.),[3] Ex. B, ¶¶ 5, 8-22, 116. In fact, his model calculates damages for all individuals in a proposed class identified by Dr. Kurzendoerfer, who simply identified all minority applicants denied loans after receiving positive initial eligibility assessments. Dr. Kurzendoerfer did not identify class members based on a likelihood that their applications were denied because of a discriminatory policy (as opposed to standard underwriting grounds)—indeed, the class includes thousands of individuals whose applications were not subject

---

[3] Resubmitted as Ex. 45 to the Declaration of Amanda Groves filed concurrently.

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

to ECS, one application that is part of the "policy" Plaintiffs identify in their class certification motion. Thus, Mr. Wallace's model calculates damages for individuals who have suffered no discrimination. Neither expert offers a method of identifying class members whose applications were improperly denied because of a discriminatory policy without an application-by-application review of individual loan files. Mr. Wallace's opinion that his model can calculate damages stemming from improper denials on a classwide basis is unsupported and should be excluded.

The Court should exclude certain testimony of Dr. Kurzendoerfer and Mr. Wallace.

## II.     BACKGROUND

### A.     Dr. Kurzendoerfer

Plaintiffs rely on Dr. Kurzendoerfer's reports to show that disparities in approval rates exist, and that Wells Fargo's automated underwriting system (AUS), ECS, produced those disparities by disproportionately assigning minority loan applicants to lower credit risk classes. Dr. Kurzendoerfer is an economist and a full-time litigation expert. Kurzendoerfer Decl., Ex. A, ¶¶ 1-2. She has no experience in underwriting or in home mortgage fair lending. Baiardo Decl., Ex. 1 (Kurzendoerfer Dep.), 148:11-149:19.

Dr. Kurzendoerfer's affirmative report includes three distinct analyses.

***Data Observations***. Dr. Kurzendoerfer reviews Wells Fargo data relating to the initial eligibility assessment that an AUS performs on a loan application based on the applicant's profile and desired loan. That assessment determines whether the desired loan would be eligible for sale on the secondary market or insurance by government agencies, assuming that the other prerequisites for approval are satisfied. She also reviews Wells Fargo data on loan application decisions, which are made by Wells Fargo underwriters following the initial AUS assessment, based upon numerous underwriting factors. She summarizes, without any modeling or controls, race and ethnicity patterns in (1) eligibility assessments made by external AUSs and Wells Fargo's internal AUS (ECS), and (2) Wells Fargo's loan application decisions. She testified that this exercise was simply "summarizing" uncontrolled data without checking that she was making apples-to-apples comparisons. Kurzendoerfer Dep., 54:4-14.

*Regression*.  Dr. Kurzendoerfer performs a regression analysis of Wells Fargo's loan approvals and denials.  Her regression controls for a limited set of underwriting factors and purports to show statistically significant differences in approval rates by race and ethnicity.  *See, e.g.*, Kurzendoerfer Decl., Ex. A, ¶ 10, § VI.A.  It is not tied to any Wells Fargo policy, so it cannot be used to support conclusions about whether any policy had a discriminatory impact, or whether any individual was improperly denied a loan.  *See* Kurzendoerfer Dep., 193:13-16 ("Q. So your regression analysis is not tied to a particular Wells Fargo policy, isn't that correct?  A. Correct.").

*Class Count*.  The last part of Dr. Kurzendoerfer's report purports to calculate the number of applications in Plaintiffs' damages class that "received at least one approval" from an AUS "but that were ultimately denied by Wells Fargo."  Kurzendoerfer Decl., Ex. A, ¶ 86.  She calculates a subclass of denied minority refinance loan applications (77,937), a subclass of denied minority home equity line of credit (HELOC) loan applications (23,287), and a subclass of denied minority home mortgage loan applications (17,877)—119,100 applications in total.  *Id.*

Though Dr. Kurzendoerfer claims to identify applications that "received at least one approval" from an AUS, Kurzendoerfer Decl., Ex. A, ¶ 86, AUSs do not approve or deny loans; they simply make eligibility recommendations.  *See* Baiardo Decl., Ex. 5 (Courchane Decl.), Ex. A, ¶¶ 37, 57.  So, Dr. Kurzendoerfer's class count is a count of applications that received certain AUS outcome codes.  Kurzendoerfer Decl., Ex. A, ¶ 86.  Her counsel instructed her on which AUS outcome categories to include in her count.  *See* Kurzendoerfer Dep., 252:8-254:11; 258:1-15.  Using that method, Dr. Kurzendoerfer included applicants in the proposed class whose desired loans were deemed by AUSs to be ineligible for sale on the secondary market or insurance by government agencies.  Courchane Decl., ¶ 12.  These ineligible loan applications account for approximately 23% of the class.  *Id.*, Ex. B, ¶ 128.

Dr. Kurzendoerfer's class count does not attempt to identify a class of individuals who were likely denied because of a discriminatory policy maintained by Wells Fargo.  *See* Kurzendoerfer Dep., 274:20-275:8 ("Q. But my question to you that I need an answer to is, your list of proposed class members includes applications that your own models predict would likely have been denied

4

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

regardless of their race, correct? … A. Yes.  And the reason that I did that is because it's not a predictive model."). Though Plaintiffs argue the "CORE/ECS system" was a discriminatory policy, Dkt. 204 at 1 (Class Cert. Mot.), the class count includes thousands of applications that were never classified by ECS, and only received AUS eligibility determinations from external, non-Wells Fargo AUSs. *See* Courchane Decl., Ex. B, App'x. 8.  The class also includes individuals who were denied for reasons that had nothing to do with race or ethnicity, such as applications that were denied because they were incomplete. Kurzendoerfer Dep., 268:10-15.  Dr. Kurzendoerfer cannot say what portion of the class of 119,100 applicants was improperly denied, if any—she cannot even say that 15% of the denied applicants would have been approved had they been white. *Id.* at 278:6-279:18. Despite these issues, Dr. Kurzendoerfer opines that those 119,100 applications constitute the damages classes, *id.*, and Mr. Wallace uses that total, without modification, to calculate damages, *see* Wallace Decl., Ex. B, ¶ 35.

**Rebuttal**.  In her rebuttal report to Dr. Marsha Courchane, Wells Fargo's fair lending and underwriting expert, Dr. Kurzendoerfer opines that not using ECS was a less discriminatory alternative to Wells Fargo's use of ECS.  Kurzendoerfer Decl., Ex. B, ¶ 19.  She also opines that among applicants within the same credit score band, ECS places minority applicants into disproportionately lower credit risk classes, and that ECS "approves" minority applicants at a disproportionately lower rate as compared to external AUSs.  *See id.* ¶¶ 20-24.

### B.    Mr. Wallace

Mr. Wallace purports to offer an opinion on classwide damages (including for each of the three subclasses) stemming from loan applications that were "improperly denied."  Wallace Decl., Ex. B, ¶ 8; *see also id.* ¶¶ 5-22.  To calculate classwide damages from "improper" denials, Mr. Wallace applied certain formulas to the 119,100 minority applications selected by Dr. Kurzendoerfer without regard to whether they were improperly denied.  Wallace Decl., Ex. B, ¶ 35, Fig. 1.  Based on these calculations, Mr. Wallace opines that Wells Fargo's allegedly improper denials caused somewhere between $357 million and $4.9 billion in damages across the classes. Irwin Decl., Ex. A, Fig. 1.  Yet as Plaintiffs concede in their class certification motion,

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

1   Mr. Wallace's damages model "cannot determine [] who within the class was discriminated

2   against."  Class Cert. Mot. 26-27.  Despite claiming to calculate damages for improper denials in

3   his report, Mr. Wallace acknowledged during his deposition that he was not offering an opinion "on

4   which of the putative class members were improperly denied."  Baiardo Decl., Ex. 4 (Wallace Dep.),

5   40:12-41:1.  Nevertheless, Mr. Wallace still seeks to offer the opinion that his model can be applied

6   to "reasonably calculate" "[t]he economic impact of Wells Fargo's improper denial of the loan

7   applications" "on a class-wide … basis."  Wallace Decl., Ex. B, ¶ 5.

8          Mr. Wallace presents damages calculations that assume all putative class members would

9   have held their loans for their full term if they had been approved.  Wallace Decl., Ex. B, ¶¶ 64, 67,

10  82, 100.  But borrowers may prepay, refinance, relocate, or default on their loans—all of which

11  affect the loan term.  *See* Irwin Decl., Ex. A, ¶ 58.  His damages calculations also assume that, once

12  denied by Wells Fargo, the applicant would not or could not obtain a loan from another lender for

13  the entire loan period.[4]  On a thirty-year loan, for example, Mr. Wallace's damages calculations

14  assume that the applicant would have suffered thirty years of damages and that the applicant would

15  not have obtained a loan from another bank at any point during that period.  However, empirical

16  research shows that mortgage applicants generally apply to multiple lenders and search for the best

17  terms.  Irwin Decl., Ex. A, ¶ 47.  Mr. Wallace himself acknowledges that "putative class members

18  who were denied by Wells Fargo might have received a loan somewhere else."  Wallace Dep., 51:12-

19  17.

20         In addition to his full-term calculations, Mr. Wallace also provides various damages period

21  "cutoffs."   He provides three-year, five-year, seven-year, and nine-year cutoffs for all three

22

23  _____

24         [4] Mr. Wallace considers subsequent-loan data for the approximately 7% of the class for
    whom he has subsequent-loan data.  Irwin Decl., ¶ 11.  In all but one instance (a named plaintiff
25  from whom discovery was taken), those individuals obtained their subsequent loan from Wells
    Fargo.  *Id.* ¶ 13.  Mr. Wallace does not have data on subsequent loans issued by other lenders, so he
26  did not consider subsequent loans issued by non-Wells Fargo lenders.  *Id.* ¶¶ 11-12.  For the
    remaining class members, his damages calculations assume that the applicant did not obtain another
27  loan at any point during the loan period.

28

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN
TESTIMONY OF AMANDA KURZENDOERFER AND

subclasses.[5]  Wallace Decl., Ex. B, ¶ 22.  Mr. Wallace opines that this approach "enables a cutoff to the damages period based on facts or assumptions about the length of time a class member would have held onto the … loan had it not been improperly denied by Wells Fargo, as determined by the Court or trier-of-fact."  *Id.* ¶ 70.  He does not explain which cutoff, if any, is appropriate for the class as a whole or for any particular applicant.  Nor does he explain why it is reasonable to assume that an applicant could not and did not obtain a loan elsewhere during the cutoff damages periods.  Nor does he explain how the factfinder would apply any cutoff (or any time period in between his cutoffs) without engaging in an individualized inquiry into whether and when and on what terms every putative class member got a subsequent loan.

## III.    LEGAL STANDARD

A party offering expert testimony to support class certification must show by a preponderance of the evidence that the testimony satisfies Rule 702.  Fed. R. Evid. 702; *see also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 n.7 (9th Cir. 2022) (en banc) ("In a class proceeding, defendants may challenge the reliability of an expert's evidence under *Daubert* … and Rule 702.").[6]  The Court must "scrutinize[] the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *LD v. United Behav. Health*, 2023 WL 2806323, at *2 (N.D. Cal. Mar. 31, 2023).  "[T]he question for the Court at this stage is to decide whether [an expert] will use a generally accepted method … or whether his approach is 'junk science' akin to predicting criminality by feeling the bumps on a person's head."  *DZ Reserve v. Meta Platforms, Inc.*, 2022 WL 912890, at *8 (N.D. Cal. Mar. 29, 2022) (Donato, J.), *aff'd in part*, 96 F.4th 1223 (9th Cir. 2024).  Courts therefore may exclude an expert's "opinion evidence … [that] is connected to existing data only by the *ipse dixit* of the expert,"

---

[5] Mr. Wallace also provides a one-year cutoff for first-time homebuyers within the home purchase loan subclass.  Wallace Decl., Ex. B, ¶ 22.

[6] Because "discovery has closed and an expert's analysis is complete and her tests fully executed," there is "no reason for a district court to delay its assessment of ultimate admissibility at trial" and a "full" *Daubert* analysis is required.  *Lytle v. Nutramax Lab'ys, Inc.*, 99 F.4th 557, 577 (9th Cir. 2024).

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN
TESTIMONY OF AMANDA KURZENDOERFER AND

*Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997), or that "cherry-pick[s]" the data on which it is premised, *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007).

## IV.  ARGUMENT

### A.  Dr. Kurzendoerfer's Opinions About ECS Are Not The Product Of Reliable Principles And Methods

Dr. Kurzendoerfer fails to use accepted economic principles and methods to reach her opinions that (1) ECS disproportionately assigned minority applicants to lower credit risk classes that correspond to higher loan denial rates (Kurzendoerfer Decl., Ex A, ¶¶ 10, 48, 52; Kurzendoerfer Decl., Ex. B., ¶¶ 19-24), and (2) ECS's credit risk class assignments contributed to loan approval rate disparities (Kurzendoerfer Decl., Ex. A, ¶¶ 10, 49, 53, 78-81).  The Court should exclude them. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (affirming exclusion of expert report where "[t]he reasoning between steps in [the expert's] theory" were not "based on objective, verifiable evidence and scientific methodology of the kind traditionally used by experts in the field").

As Dr. Kurzendoerfer herself explains, under established economic principles, an expert evaluating the effect of race or ethnicity on loan application outcomes should hold constant "key underwriting factors," Kurzendoerfer Decl., Ex. A, ¶ 34, as those factors may provide "alternative explanations for the data on which [s]he bases [her] findings."  *Pooshs v. Phillip Morris USA, Inc.*, 287 F.R.D. 543, 546 (N.D. Cal. 2012) ("A methodology may not be reliable if an expert 'fail[s] to address and exclude alternative explanations for the data on which he bases his findings....'").  Dr. Kurzendoerfer did not apply that basic economic principle in offering several opinions concerning ECS credit risk class assignments. In her affirmative report, she evaluated ECS credit risk class assignments by filtering raw data and performing basic arithmetic to portray differences in outcomes by race and ethnicity, without applying any controls or modeling to exclude the possibility that other underwriting factors could explain those differences.  She characterizes this analysis as "providing descriptive analyses of approval rates and credit risk classification by race," Kurzendoerfer Decl.,

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

Ex. A, ¶ 39, or, as she alternatively put it, "summarizing" the uncontrolled raw data, Kurzendoerfer Dep., 54 54:11-15 ("I'm demonstrating—summarizing the data that show that minority applicants are more likely to be classified into higher risk classes, just raw data.").  The problem with this analysis is that her opinions about ECS credit risk class assignments go well beyond summarizing trends in raw data.

Dr. Kurzendoerfer offers opinions about the effect of race and ethnicity on ECS credit risk class assignments and the effect of ECS credit risk class assignments on approval rates (*see* Kurzendoerfer Decl., Ex. A, ¶¶ 10, 48, 52) without testing those conclusions—even though she states that an expert undertaking that evaluation must hold constant other factors, such as the underwriting factors used in ECS and loan approval determinations.  *See id.* ¶ 34.  And she admits that an analysis of "raw uncontrolled numbers"—the supposed analysis she performed on ECS data—cannot show "whether there's a statistical difference not driven by underwriting factors." Kurzendoerfer Dep., 144:13-16.  Dr. Kurzendoerfer therefore has not made an "effort to rule out other possible causes" of the race and ethnicity trends she observed.  *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (affirming exclusion of experts who "failed to explain the basis for their conclusions," noting neither "made any effort to rule out other possible causes for the injuries plaintiffs complain of, even though they admitted that this step would be standard procedure"); *Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) (Donato, J.) (excluding expert testimony where the expert's method does not show how the data drives the conclusion); *see* Kurzendoerfer Decl., Ex. A, ¶¶ 10, 48, 52.

Dr. Kurzendoerfer also did not perform an analysis capable of supporting her opinions that ECS credit risk class assignments contributed to racial and ethnic disparities in loan approval rates. *See* Kurzendoerfer Decl., Ex. A, ¶¶ 10, 49, 53, 78-81.  While Dr. Kurzendoerfer performed a logistic regression to look at the effect of race and ethnicity on loan approval rates, she did not perform a similar analysis to look at the effect of ECS credit risk class assignments on loan approval rates. *See id*. ¶¶ 34-37, § VI.A (performing a regression to show race/ethnicity loan approval rate disparities by controlling for underwriting factors and then identifying marginal effects of race or

ethnicity on loan approval rates that remained after controlling for underwriting factors).  Moreover, her use of a regression model that controlled for at least some underwriting factors as a basis for her opinions concerning the effect of race and ethnicity on loan approval rates highlights the unreliability of her untested opinions concerning the effect of ECS on approval rates.  And as discussed above, Dr. Kurzendoerfer did not otherwise apply an analysis to the ECS data that attempted "to address and exclude alternative explanations for the data on which [s]he bases [her] findings."  *Pooshs*, 287 F.R.D. at 546 (citation omitted).  Thus, the only thing linking race and ethnicity to ECS outcomes and linking ECS outcomes to approval rate disparities is her own say-so.  *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *10 (N.D. Cal. Aug. 28, 2023) (Donato, J.) (excluding opinion offered "with no real analysis or data," and noting courts are not required to "admit opinion evidence that is connected to existing data only by the ipse dixit of the expert" (citing *Gen. Elec.*, 522 U.S. at 146)).

        Dr. Kurzendoerfer similarly failed to explain the basis for her rebuttal report opinions that among applicants within the same credit score band, ECS places minority applicants into disproportionately lower credit risk classes, and that ECS "approves" minority applicants at a disproportionately lower rate as compared to external AUSs.  Kurzendoerfer Decl., Ex. B, ¶¶ 19-24.  Like her other ECS opinions, these opinions are largely based on her filtering raw data and performing simple arithmetic to calculate various race and ethnicity-based outcome rates.  While she does separately apply controls for credit score and AUS outcome, she does not control for other key underwriting factors that could drive the race and ethnicity trends in the raw data.  *See, e.g.*, Kurzendoerfer Dep., 120:10-13, 132:7-10 (did not perform a regression to support analysis portrayed in figures 2-4 of paragraphs 20-24 of her rebuttal report); *id.* at 132:2-6, 136:2-5 (did not compare "similarly situate[d] applicants with respect to all key legitimate underwriting factors" to support analysis portrayed in figures 2-4 of paragraphs 20-24 of her rebuttal report).  For example, she does not control for debt-to-income ratio (DTI) or combined loan-to-value ratios (LTV)—two underwriting variables that she controls for in every regression analysis in her affirmative report.  *See id.* at 130:13-19 ("Q. In your affirmative report, you did not think that FICO score sufficed to

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

similarly situate applicants, correct?   A. Correct. Q. Every model looked at other legitimate underwriting factors, debt-to-income, for example, and combined loan-to-value ratios, correct? A. Correct.").   DTI affects ECS outcomes but not credit score outcomes, Courchane Decl., ¶ 11, and Kurzendoerfer testified (regarding other opinions) that "[she] knows that minority applicants disproportionately have lower credit scores and higher DTI."  Kurzendoerfer Dep.. 205:19-206:1. Despite her acknowledgment that DTI could easily explain the differences she observed in ESC outcomes based on race and ethnicity, she failed to account for DTI, among other critical underwriting variables.   Her rebuttal report opinions concerning ECS are therefore also not the product of a reliable method.  *See In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 973-976 (C.D. Cal. Mar. 23, 2012) (excluding regression analysis of plaintiff's economic expert where it failed to account for admittedly relevant factors, rendering the analysis "so incomplete as to be inadmissible as irrelevant" (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 n.10 (1986)); *Lawrence v. Raymond Corp.*, 2011 WL 3418324, at *8 (N.D. Ohio Aug. 4, 2011) (excluding opinion of expert whose "lack of detail and reliance on obviously incomplete data and testing has left the Court with insufficient ability to gauge the reliability of his methods or his application of those methods to reach his conclusion"), *aff'd*, 501 F. App'x 515 (6th Cir. 2012).

Dr. Kurzendoerfer's opinions in paragraphs 10, 48-49, 52-53, and 78-81 of her affirmative report and paragraphs 19-24 of her rebuttal report should be excluded.

**B.     Dr. Kurzendoerfer Offers Opinions That Are Not Within Her Economic Expertise And Are Therefore Unreliable**

Dr. Kurzendoerfer offers opinions on three subjects that are well beyond her domain as an economic expert: business justifications for Wells Fargo's underwriting system, trends associated with redlining, and whether government underwriting systems consider applications to satisfy their underwriting factors.   These are opinions on underwriting and fair lending.  They are "topics for which" Dr. Kurzendoerfer "possesses no specialized knowledge," making her testimony unreliable. *In re Capacitors Antitrust Litig.*, 2020 WL 870927, at *1 (N.D. Cal. Feb. 21, 2020) (Donato, J.).

CASE NO. 3:22-cv-00990-JD

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

The Court should exclude her opinions in paragraphs 10, 19, 45, 65-68, 72-74, 82, 86, and 88-89 of her affirmative report and paragraphs 19, 24, and 30 of her rebuttal report.

### 1. Dr. Kurzendoerfer Does Not Have The Underwriting And Fair Lending Expertise To Opine On Alternatives To Wells Fargo's Use Of ECS And Those Opinions Are Unreliable

The Court should exclude Dr. Kurzendoerfer's opinion that Wells Fargo's underwriting and fair lending compliance expert failed to consider whether Wells Fargo could have employed a "less discriminatory alternative[]" to the ECS model by relying only on "standard credit scores" instead of ECS-generated credit risk assignments.[7]  Kurzendoerfer Decl., Ex. B, ¶ 19.  This opinion should be excluded because Dr. Kurzendoerfer lacks the expertise to opine on the adequacy of either Wells Fargo's or its expert's assessment of non-discriminatory business justifications for or alternatives to its underwriting policies.

Dr. Kurzendoerfer is an economist—not a fair lending expert or a mortgage underwriter. She has no experience or specialized expertise relevant to assessing the necessity or adequacy of business justifications offered as part of a home mortgage fair lending analysis, nor the feasibility of any supposedly less discriminatory alternatives.   She has never conducted a fair lending regulatory examination of a mortgage lender, Kurzendoerfer Dep., 149:12-14, and none of her purported "fair lending and disparate impact expertise" relates to home mortgage underwriting, *id.* at 149:15-19.  Dr. Kurzendoerfer also has no training or education in underwriting and has never been employed by a home mortgage lender.  *Id.* at 148:11-149.  She is therefore unqualified to opine on whether Wells Fargo or its expert have offered sufficient justifications for the use of ECS, or whether there are "less discriminatory alternatives" to ECS.  *See, e.g.*, *Koger v. Costco Wholesale Corp.*, 2023 WL 8188842, at *4 (N.D. Cal. Nov. 27, 2023) (Donato, J.) (excluding opinions of plaintiff's expert having "little to do with … any … topics within his field of expertise").

---

[7] As Wells Fargo's underwriting and fair lending compliance expert Dr. Courchane explains, under agency examination procedures for the monitoring and enforcement of fair lending practices, "[w]hen there is evidence of disparate impact of a policy, a business justification for the policy may be reviewed, and examiners may consider evidence that a search for less discriminatory alternatives was undertaken."  Courchane Decl., Ex. A, ¶ 93.

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

1       Even if Dr. Kurzendoerfer had the expertise to opine on the sufficiency of Wells Fargo's fair

2   lending analysis, her critique of Dr. Courchane's decision not to further assess alternatives to the

3   ECS model is flawed.  By her own admission, Dr. Kurzendoerfer's statistical analysis purporting to

4   show disparities in loan approval rates was not linked to any single Wells Fargo policy—much less

5   to the ECS model specifically.  *See* Kurzendoerfer Dep., 193:13-16.  So, she herself has not offered

6   any reason to assess "alternatives" to ECS.  This is particularly so when Plaintiffs do not identify

7   ECS alone as the challenged policy.  *See* Class Cert. Opp. at 16-17.  The Court should exclude the

8   opinions reflected in paragraph 19 of Dr. Kurzendoerfer's rebuttal report.

9
10
        **2.**       **Dr. Kurzendoerfer Does Not Have The Fair Lending Expertise To Opine About Redlining, Rendering Those Opinions Unreliable**

11       Dr. Kurzendoerfer is unqualified to opine about redlining, yet she offers opinions on that

12   topic in paragraphs 10 and 82 of her affirmative report.  *See* Kurzendoerfer Decl., Ex. A, ¶ 10

13   ("Property location, although not a key underwriting factor, and one that historically has been

14   associated with redlining, accounts for some of the differences in approval rates between minority

15   applicants and white applicants."); Kurzendoerfer Decl., ¶ 14 ("I found that the census tract in which

16   property is located is related to lower approval rates for Black and Hispanic applicants.  Differential

17   approval rates by property location have historically been associated with redlining." (referring to

18   paragraph 82 of her affirmative report)).  As discussed above, Dr. Kurzendoerfer's subject matter

19   expertise is in economic and statistical analysis—not fair lending in the mortgage industry.  *See*

20   *supra* at 12.  Redlining is a fair lending topic, and whether various trends Dr. Kurzendoerfer

21   observes in the data are "associated" or not with redlining is not an application of her economic

22   expertise, and thus is not based on any "scientific, technical, or other specialized knowledge" that

23   she possesses. *In re Capacitors Antitrust Litig.*, 2020 WL 870927, at *3.  The Court should exclude

24   this testimony that is "outside [her] domain."  *In re Capacitors Antitrust Litig.*, 2021 WL 5407452,

25   at *5 (N.D. Cal. Nov. 18, 2021) (Donato, J.).

26       Even if Dr. Kurzendoerfer had the requisite expertise (which she does not), the statistical

27   analysis she performed does not show redlining, or even differential approval rates by location.  She

28

did not compare majority minority census tracts to majority white census tracts, she just looked at approval rates by location. *See* Kurzendoerfer Decl., Ex. A, ¶ 82. She also did not conduct a statistical regression analysis accounting for approval rates in connection with the racial or ethnic make-up of a location. *See id.* ¶ 61 (noting her regression specifications "control for different factors and provide different interpretations of the relationship between race and approval"). By comparison, in *National Fair Housing Alliance v. Bank of America, N.A.*, the expert not only reviewed census data "comparing majority white and majority minority neighborhoods," but also conducted multiple regression analyses—controlling for approximately 40 variables other than race—analyzing white and non-white census tract data "to measure the strength of race as an explanatory factor in the outcome of the plaintiffs' investigation." 2023 WL 2633636, at *3-4 (D. Md. Mar. 24, 2023) (internal quotes omitted); *see also id.* at *7 ("A disparity is sufficiently significant if it demonstrates a statistically and practically significant discrepancy between 'valid ... comparative populations.'" (quoting *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2343 n.17 (2021)); *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 963-64 & n.11 (9th Cir. 2021) ("Significance in the context of disparate-impact claims is not limited to statistical significance; practical significance which examines whether minor statistical disparities have any discriminatory effect in practice, also plays a role.").

Here, Dr. Kurzendoerfer has offered an opinion on a topic outside her specialized expertise, and the related analysis she performed is unreliable. The Court should exclude the opinions in paragraphs 10 and 82 of Dr. Kurzendoerfer's report.

### 3. Dr. Kurzendoerfer's Opinions About Which Applications Government Underwriting Systems Considered To Satisfy Their Underwriting Factors Are Not Based On Her Economic Expertise And Are Not The Product Of Reliable Principles And Methods.

A key element of Dr. Kurzendoerfer's analysis is her use of an application's so-called "approval" by a government automated underwriting system (which she calls an "external AUS") as a proxy for whether an application satisfies the underwriting factors that government investors and agencies consider. But her methodology for identifying applications "approved" by an external

14

AUS amounts to nothing more than unsubstantiated guesswork about how government investors or agencies apply underwriting criteria—a topic entirely outside her economic expertise.  Because an expert's opinion cannot rely on "mere[] assumptions and speculation," *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019), or offer opinions for which the expert "possesses no specialized knowledge," *In re Capacitors Antitrust Litig.*, 2020 WL 870927, at *1, the Court should exclude Dr. Kurzendoerfer's methodology for identifying external AUS "approvals" and the opinions relying on that methodology in paragraphs 10, 45, 65-68, 72-74, 86, 88-89 of her affirmative report, and paragraphs 24 and 30 of her rebuttal report.

Dr. Kurzendoerfer's method for identifying the loan applications that she deems "approved" by an external AUS is not based on any specialized expertise.  To start, she decided that an application's external AUS result—which is merely an initial eligibility recommendation—indicates whether an application received "External AUS approval."  Kurzendoerfer Decl., Ex. A, ¶ 45 n.67.  But she gives no explanation for treating external AUS results as indicating whether a government investor or agency has actually "approved" a given loan application.  *See id.*  And her only source for determining which AUS results indicate such approval is Fannie Mae's Selling Guide, which provides mortgage originators (such as Wells Fargo) guidance on the results coding that Fannie Mae applies to loan applications evaluated by its AUS.  *See id.*  Having no training or education in underwriting and having never been employed by Fannie Mae or Freddie Mac (the "GSEs"), or for that matter any lender (Kurzendoerfer Dep., 148:11-149:1), Dr. Kurzendoerfer lacks the relevant expertise to determine whether a given AUS result means that a loan application satisfies all the factors considered by government underwriters.  *See, e.g.*, *In re Capacitors Antitrust Litig.*, 2020 WL 870927, at *2 (excluding analysis based on expert's application of "criteria recognized by antitrust agencies as indicative of anticompetitive conduct" where the expert lacked the "scientific, technical, or other specialized knowledge" that would render his application of the agencies' criteria relevant and reliable under Fed. R. Evid. 702).  Thus, her method of treating certain external AUS results codes as indicating AUS "approval" is baseless.  *See Stephens*, 935 F.3d at 856.  It is also contradicted by her single cited source.  As the Fannie Mae Selling Guide reflects,

1  Fannie Mae's AUS provides only an "underwriting *recommendation*." *See* Baiardo Decl., Ex. 6

2  (emphasis added). Even when relying on the results of Fannie Mae's AUS, lenders must consider

3  whether the details of a specific loan application "would justify additional investigation or would

4  provide grounds for a decision that is different from the recommendation that [the AUS] delivered."

5  *Id.*

6  Dr. Kurzendoerfer's method for identifying which codes are approvals, *see* Kurzendoerfer

7  Decl., Ex. A, ¶ 45 n.67, is supported only by a cursory interpretation of Fannie Mae's

8  "Approve/Eligible" and "Approve/Ineligible" codes, which is just her personal, inexpert reading of

9  the Fannie Mae Selling Guide. *See id.*[8] Glaringly, Dr. Kurzendoerfer fails to offer any reliable

10  justification for why the "Approve/Ineligible" code should be considered an "approval" when, as

11  Dr. Kurzendoerfer herself acknowledges, an "Approve/Ineligible" result means that the loan

12  application does not satisfy Fannie Mae's *own* mortgage loan eligibility criteria. *See id.* These

13  codes result where an applicant's credit history is considered acceptable, but other aspects of the

14  application fail to satisfy a GSE's underwriting requirements, rendering the loan application under

15  consideration ineligible for sale to the relevant GSE.[9] This can happen, for instance, where an

16  applicant with an excellent credit history but low income applies for a large loan, resulting in a debt-

17  to-income ("DTI") ratio that exceeds a GSE's risk appetite. Dr. Kurzendoerfer acknowledges these

18  additional underwriting factors elsewhere in her report (citing scholarship), *see* Kurzendoerfer

19  Decl., Ex. A, ¶ 66 ("It is well-established that underwriters evaluate credit score, CLTV [combined

---

21  [8] Dr. Kurzendoerfer relies on the "External AUS approval" codes identified in footnote 67
22  of her report for her regression models as well as her analysis of "raw" approval rates. *See*
   Kurzendoerfer Dep., 161:10-162:2.

23  [9] As explained in Fannie Mae's Selling Guide, "[l]oan casefiles may receive an Ineligible
24  recommendation for a variety of reasons," including because "[t]he loan does not comply with stated
   product requirements or policies that apply to DU loans," or "[t]he loan complies with stated product
25  requirements or policies, but has a combination of product features or risk factors that place the loan
   outside of Fannie Mae's current acquisition preferences and constraints for DU loans." Baiardo
26  Decl., Ex. 7. Freddie Mac's Selling Guide similarly explains that "Accept" reflects a determination
   that "the Borrower's creditworthiness is acceptable," *id.*, Ex. 8, while "Ineligible" reflects that a
27  loan is ineligible for sale to Freddie Mac without further manual underwriting review. *Id.*, Ex. 9.

CASE NO. 3:22-cv-00990-JD

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN
TESTIMONY OF AMANDA KURZENDOERFER AND

loan to value ratio], and DTI."), and she admits that she did not consider them when relying on external AUS results, *see* Kurzendoerfer Dep., 84:3-7 ("Q. In examining the home equity credit grade or AUS recommendation, did you examine the attributes that those systems consider in arriving at their results?  A. I did not.").  Dr. Kurzendoerfer's interpretation of these "ineligible" codes as representing GSE "approvals" therefore further compounds the unreliability of her method of using AUS results to proxy an application's satisfaction of GSEs' underwriting criteria, because it reflects a conclusion that admittedly exceeds—if not directly contradicts—the one source she considered.  *See, e.g.*, *Rodman v. Otsuka Am. Pharm. Inc.*, 564 F. Supp. 3d 879, 890-891 (N.D. Cal. 2020) (excluding expert testimony for "extrapolat[ing] conclusions beyond the scope of her sources" where expert concluded that a drug label failed to adequately warn of the risk of disease associated with the drug's use, despite conceding that the cited data did not allow for a determination of the true incidence rate of disease).

Even if Dr. Kurzendoerfer had the expertise to offer an opinion on the import of "Approve/Ineligible" and "Accept/Ineligible" results, her inclusion of these results in her data is methodologically flawed and unreliable because these codes are assigned to applications that lack GSE salability and she did nothing to control for the effect of GSE salability on the likelihood of loan approval by Wells Fargo.  Whether a loan can be sold to Fannie Mae or Freddie Mac is an important underwriting consideration for originating lenders like Wells Fargo, because selling a loan to a GSE can eliminate the risk to the originating lender in the event of borrower default.  *See* Courchane Decl., Ex. A, ¶ 33.  Despite acknowledging that GSE salability is "important" to Wells Fargo's risk assessment, *see* Kurzendoerfer Dep., 165:20-166:7, Dr. Kurzendoerfer admits that she "did not consider the salability or insurability of the loans" in her analysis, and that her regression analysis "does not control for whether an agency loan application is actually eligible to be sold to Fannie Mae or Freddie Mac," *id.* at 167:9-20.  Her inclusion of "Accept/Ineligible" and "Approve/Ineligible" results in her population of external AUS "approval" applications therefore has the effect of skewing her supposed "control" datasets to include applications that Wells Fargo

17

is more likely to deny[10] based on concededly legitimate risk assessment considerations completely independent of the applicant's race or ethnicity.

These methodological flaws infect a number of Dr. Kurzendoerfer's conclusions, as she relies on her classification of external AUS "approvals" for multiple aspects of her affirmative analysis. *First*, she evaluates Wells Fargo's approval rates by race and ethnicity for a set of loan applications she identifies as having been "approved" by an external AUS to opine that "differences in raw approval rates" between minority and non-minority applicants "cannot be explained by differences in [external AUS] approval outcomes."  Kurzendoerfer Decl., Ex. A, ¶ 45; *id.* Fig. 8.  *Second*, she includes external AUS approval as a control in her regression analysis, using it as a proxy for an applicant's satisfaction of the "factors considered by government automated underwriting systems," *id.* ¶¶ 65-68, and concluding that "for the majority of race and ethnicity and loan group combinations, there are differences in approval rates by race and ethnicity [] that cannot be explained by characteristics evaluated by External AUS," *id.* ¶ 68.[11]  *Third*, she includes "minority applications decisioned before 2023 that received at least one approval from an External

---

[10] As Dr. Courchane explains in her rebuttal report, a significant proportion of applications deemed "ineligible" by an external AUS are denied—for instance, of the applications actioned prior to 2023 that Dr. Kurzendoerfer analyzed, Wells Fargo denied "91.6% of conventional, conforming refinance loans receiving DU's 'approve/ineligible' recommendation."  Courchane Decl., Ex. B, ¶ 98, App'x Table A3.1.

[11] While the quoted conclusion is reflected in Dr. Kurzendoerfer's regression analysis applying only "HMDA controls," see Kurzendoerfer Decl., Ex. A, ¶¶ 67-68, Dr. Kurzendoerfer incorporates her identified "HMDA controls," which include external AUS approval, *see id.* ¶ 66, in her regression analysis applying both "HMDA and Wells Fargo controls" as well, *see id.* ¶¶ 72-74.  For her "HMDA and Wells Fargo controls" regression, she similarly concludes that "statistically significant differences persist across the majority of sensitivity, loan group, and race and ethnicity combinations."  *Id.* ¶ 74; *see also id.* ¶ 88 ("My analysis shows statistically significant differences in Wells Fargo mortgage approval rates that are not attributable to key underwriting factors.  These differences persist when controlling for HMDA variables, when controlling for additional variables produced by Wells Fargo, and across a range of sensitivity analyses.").  Dr. Kurzendoerfer similarly relies on "External AUS approvals" to show purportedly "disproportionate[]" differences in "approval" rates by Wells Fargo's ECS model in her rebuttal report.  *See* Kurzendoerfer Decl., Ex. B, ¶ 24; *id.* Fig. 5.

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

AUS … but that were ultimately denied by Wells Fargo" in her proposed class. *Id.* ¶ 86. Each of these conclusions is subject to exclusion due to Dr. Kurzendoerfer's methodological flaws.

As to Dr. Kurzendoerfer's proposed class count, *see* Kurzendoerfer Decl., Ex. A, ¶ 86, her methodology of including applications that received "Accept/Ineligible" and "Approve/Ineligible" results should be excluded for the independent reason that she included applications with these codes based upon Plaintiffs' counsels' instruction, rather than her independent (unreliable) assessment. *See* Kurzendoerfer Dep., 258:1-15 ("Q. Did plaintiffs' counsel also tell you to count those ineligible results as approvals? A. Plaintiffs' counsel told me that these are the criteria for the class. Q. And that included the ineligibles? A. Yes."). Counsel cannot pick an expert's methodology. *See Lucas v. MGM Resorts Int'l*, 2024 WL 1199514, at *5 (D. Nev. Mar. 19, 2024) (excluding plaintiff's expert's opinions on losses because the opinions were derived from a methodology that was "supplied to her by [plaintiff's] counsel"). Nor can experts "cherry-pick" favorable data. *See In re Incretin-Based Therapies Prods. Liability Litig.*, 524 F. Supp. 3d 1007, 1036, 1038–39 (S.D. Cal. 2021), *aff'd* 2022 WL 898595 (9th Cir. Mar. 28, 2022); *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d at 1176. Determined by counsels' instruction, Dr. Kurzendoerfer's class count is not an expert's attempt to identify individuals who were likely affected by a discriminatory policy. *See* Kurzendoerfer Dep., 274:30-275:8 ("Q. But my question to you that I need an answer to is, your list of proposed class members includes applications that your own models predict would likely have been denied regardless of their race, correct? A. Yes. And the reason that I did that is because it's not a predictive model."). It not only includes applications ineligible for sale on the secondary market or insurance by government agencies, but also applications that were not subject to ECS's eligibility assessment (even though Plaintiffs argue "CORE/ECS" was a discriminatory policy). *See also* Courchane Decl., Ex. B, App'x 8 (subclasses include thousands of applications that did not receive eligibility determinations from ECS).

Dr. Kurzendoerfer's methodology for identifying external AUS "approvals," and her opinions relying on that methodology, should be excluded.

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

**C.**     **Mr. Wallace's Damages Formulas And His Opinion That Classwide Damages Can Be Reasonably Calculated Are Junk Science**

The Court should exclude Mr. Wallace's damages formulas and his opinion that the "economic impact of Wells Fargo's" alleged "improper denial of the loan applications can be reasonably calculated on a class-wide … basis." *See, e.g.*, Wallace Decl., Ex. B, ¶¶ 5, 8-22, 116.

When assessing a damages model, courts must consider "factors that may undercut the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs such as false positives" and must "resolve disputes raised by the parties" about a model's reliability. *Olean*, 31 F.4th at 683.  Here, Mr. Wallace's classwide damages opinion and damages formulas hinge upon the "unsupported and unrealistic assumptions" that almost every applicant that Wells Fargo denied could not secure a subsequent loan from another lender and that improper denials can be *identified* on a classwide basis.  *Toomey v. Nextel Commc'ns, Inc.*, 2004 WL 5512967, at *12 (N.D. Cal. Sept. 23, 2004) (excluding damages opinion that "rests on unsupported and unrealistic assumptions" that expert acknowledged at deposition).  They should be excluded.

**1.**     **Mr. Wallace's Damages Formulas Hinge On The Unsupported and Unrealistic Assumption That Denied Applicants Were Unable to Receive Subsequent Loans, Rendering Them Junk Science**

Mr. Wallace's damages model rests on an untested, speculative assumption unmoored from the real world and Plaintiffs' theory of the case: that denied applicants could not, and did not, obtain loans elsewhere.

This assumption is not tied to reality or data.  Applicants seeking a home loan often shop around for the best rates and terms.  *See* Irwin Decl., Ex. A, ¶¶ 44-52.  Mr. Wallace acknowledges that loan applicants often apply for loans from multiple lenders and that "putative class members who were denied by Wells Fargo might have received a loan somewhere else."  Wallace Dep., 51:12-17.  In fact, three named plaintiffs, including a proposed member of the damages class (Terah Kuykendall-Montoya), received loans from other lenders.  *See* Courchane Decl., Ex. A, ¶ 151 (Ms. Kukendall-Montoya obtained a mortgage seven months after her Wells Fargo application was denied for underwriting reasons); ¶¶ 155, 157 (Paul Martin received a loan with another lender four months

20

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

after he applied with Wells Fargo); ¶ 166 (Christopher Williams obtained a loan from another lender).  Mr. Wallace's model unjustifiably assumes that almost all the putative class members attempted to submit one and only one application (to Wells Fargo and no one else), or that if they applied elsewhere, they must have been denied.  This unsupported and unrealistic assumption makes it impossible for his formulas to reliably calculate economic damages on a classwide basis.  *See Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1167 (S.D. Cal. 2022) (excluding opinion "based on [an] assumption" that was contrary to "all of the allegations and evidence"); *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 830 (9th Cir. 2001) (expert opinion may not be based on "assumption" with "no support … in the record").

Consider the likely scenario that many of the applicants in the proposed class obtained a loan from another lender soon (within days, weeks, or months) after being denied by Wells Fargo. Economic damages for those applicants are likely to be nonexistent or miniscule.  Mr. Wallace did not consider that scenario, even though it follows from Plaintiffs' very theory of the case, which hinges on the unsubstantiated notion that the putative class members were "creditworthy" and "qualified" but were nevertheless denied due to Wells Fargo's allegedly discriminatory lending practices.  *See* Class Cert. Mot. 24-25 (Plaintiffs "have limited their damages subclasses to those members who have established their creditworthiness but were still denied mortgage loans based on Wells Fargo's use of its CORE/ECS underwriting system.").  Instead, Mr. Wallace's formulas treat those applicants as having suffered injury, and for *the full term* of the loan.  *See* Irwin Decl., ¶ 9 (observing that Mr. Wallace's full-term damages estimate is nearly $4.9 billion).  Mr. Wallace's assumption that creditworthy applicants would not or could not obtain a loan elsewhere for years or decades is unsupported by the evidence.

Mr. Wallace responds that this methodological flaw is not a problem for two reasons.  *First*, he says that for "thousands of putative class members" for whom he had subsequent-loan data, he "terminated [his] damages calculation at the date of the subsequent loan."[12]  Wallace Decl., ¶ 13;

---

[12] Mr. Wallace has data on this limited portion of the classes because these applicants were

21

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

1   Wallace Dep., 51:18-21 ("So where there's evidence that they've received a subsequent loan, that's

2   factored into the model."). He admits, in other words, that damages stop at that point. But the

3   "thousands" of loan applicants that he supposedly accounted for make up less than 7% of the

4   putative classes. Irwin Decl., ¶¶ 11-12. For the remaining members of the classes, Mr. Wallace

5   calculated damages based on the assumption that not one putative class member received a loan

6   from another bank. *Id.* Mr. Wallace says this, too, is acceptable because "the damages formulas

7   [he] proffered can account for any new information on subsequent loans if and when it becomes

8   available in future phases of this proceeding." Wallace Decl., ¶ 13; Wallace Dep., 75:7–10. But

9   discovery has closed, and Plaintiffs offer no plan for offering this evidence at trial, much less a

10  method that would avoid individualized, one-by-one review of each applicant's loan history. This

11  shows that Mr. Wallace cannot calculate damages "on a class-wide basis" and renders the model

12  unreliable. Wallace Decl., ¶ 5. Mr. Wallace says his approach is appropriate because he did not

13  want to "speculate whether the putative class member received a subsequent loan." *Id.* ¶ 13. But

14  as noted, Mr. Wallace's approach requires an even greater and more counterintuitive speculation:

15  that class members who were allegedly "creditworthy" and "qualified" did not or could not receive

16  a loan from another lender. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993)

17  (expert opinion must be based on more than "unsupported speculation").

18       *Second*, Mr. Wallace says that his model accounts for the possibility that applicants received

19  loans elsewhere by using damages "cutoff[s]," Wallace Decl., ¶ 13. In his report, Mr. Wallace

20  "presented calculations for 3-year, 5-year, 7-year, and 9-year cutoff periods."[13] *Id.*; *see also* Wallace

21  Decl., Ex. B, ¶ 22. But these damages cutoffs are divorced from common sense, and he has not

22  offered any evidence to support his choice of these cutoff periods. *See* Irwin Decl., Ex. A, ¶¶ 54-

23  _____

24  later approved by Wells Fargo and Wells Fargo provided this data in discovery. Irwin Decl., ¶ 13;

25  Wallace Decl., ¶ 13. Mr. Wallace has no data about whether the remaining class members obtained
    a loan elsewhere.

26       [13] Mr. Wallace also provides a one-year cutoff for a small fraction of the proposed

27  subclasses, limited to first-time homebuyers within the home purchase subclass and only then for
    the "home appreciation" portion of damages. Wallace Decl., Ex. B, ¶ 22.

28

CASE NO. 3:22-cv-00990-JD

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN
TESTIMONY OF AMANDA KURZENDOERFER AND

57.  As any home purchaser knows, loan applicants often shop around for and apply for loans from different institutions at the same time in search of the best rate and terms.  *Id.* ¶¶ 44-51.  Named Plaintiffs Paul Martin and Christopher Williams (representing the putative liability subclasses) did exactly that—they shopped around at different banks simultaneously and were approved for loans by other lenders mere months after applying for loans at Wells Fargo.  *See* Baiardo Decl., Ex. 10 (Martin Dep.), 97:16-98:18 (Mr. Martin contacted Kinecta Federal Credit Union and Wells Fargo around the same time in March 2020); Courchane Decl., Ex. A, ¶¶ 155-57 (Mr. Martin refinanced his home with Kinecta in July 2020); Baiardo Decl., Ex. 11 (Williams Dep.), 78:8-10, 199:8-200:16 (Mr. Williams applied at Wells Fargo in May 2019 and received a PNC HELOC in August 2019). Denied applicants may very well have been approved by another lender only days, weeks, or months after Wells Fargo's denial.  This is especially true if the classes are composed of "creditworthy" and "qualified" applicants, as Plaintiffs claim (Class Cert. Mot. 24-25)—these applicants should have no trouble obtaining a loan elsewhere.  There is no rational reason to assume that an applicant was not and could not be approved elsewhere for at least three years (or five, seven, or nine years).  And even if these were in fact reasonable cutoffs, Mr. Wallace offers no method for choosing between these various cutoffs.  *See* Irwin Decl., Ex. A, ¶¶ 55-56.  These opinions are not sufficiently reliable to submit to the jury.

Mr. Wallace's formulas cannot reliably calculate economic damages and must be excluded. At minimum, the Court should exclude his opinion that economic damages for improper denials can be calculated on a classwide basis.

### 2. Mr. Wallace Lacks A Basis To Assume That Improper Denials Can Be Identified, Rendering His Opinion Unreliable

Mr. Wallace's model calculates damages for all minority applicants who were denied loans, regardless of the reason for the denial.  His model is misaligned not only with Plaintiffs' theory that Wells Fargo  owes damages for denials attributable to discrimination, *see* Class Cert. Opp. IV.B, but also with his own opinion that damages for *improper* denials can be calculated on a classwide basis. *See, e.g.*, Wallace Decl., Ex. B, ¶¶ 5, 8-22, 116.  Because none of his formulas include any variable

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN TESTIMONY OF AMANDA KURZENDOERFER AND

tied to improper denial,[14] they can only be used to calculate damages for improper denials if the improper denials are first identified.  However, Mr. Wallace does not offer an opinion on which of the putative class members were improperly denied loans based on their race.  Wallace Dep., 40:12-41:1 ("Q. Are you offering an opinion on which of the putative class members were improperly denied for refinance based on their race?" A. No. I don't believe I was asked to form any opinions on that, and I have not.").  And none of Plaintiffs' other experts has proposed a method for identifying improperly denied loans on a classwide basis, without an individual review of every loan file.

Mr. Wallace's opinion that damages can be calculated for improper denials on a classwide basis is not justified by Dr. Kurzendoerfer's analysis because she, too, does not identify improper denials.  Dr. Kurzendoerfer, who opines on purported racial disparities in loan results and identifies a class of all minorities who were denied (119,100 individuals), admits she does not have a way to identify whether any applicant was *improperly* denied, let alone a common classwide basis.  *See, e.g.*, Kurzendoerfer Dep., 278:6-279:7, 280:18-20.  As discussed, a large proportion of these 119,100 individuals were denied loans for underwriting reasons that have nothing to do with their race, and thus they are not owed any damages under Plaintiffs' liability theory.  *See supra* 4-5; Irwin Decl., Ex. A, Fig. 5 (applications in class with potential credit-related, and non-credit related, loan disqualifiers).  And the vast majority of the proposed classes received *favorable* ratings from ECS, which is incongruent with their theory of liability that Wells Fargo's "CORE/ECS system" had a disparate impact by disproportionately assigning minority applicants to *worse* credit risk classes.  Class Cert. Opp. at 16-17; Courchane Decl., Ex. B, App'x 8.  Mr. Wallace acknowledges that

---

[14] His formulas for the refinance and HELOC subclasses represent damages as the sum of the present value of the monetary difference between the terms of an applicant's existing mortgage/HELOC and the terms of the loan they applied for.  Wallace Decl., Ex. B, ¶¶ 10, 12, 18. His formulas for the home mortgage subclass represents damages as the sum of the present value of the monetary difference between the terms at the time of application and the terms as of January 2024 (which has a higher interest rate).  *Id.* ¶ 14.  For first time home buyers, Mr. Wallace also calculates damages based on lost equity appreciation as implied by the Case-Shiller Home Price Index.  *Id.* ¶ 15.

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN
TESTIMONY OF AMANDA KURZENDOERFER AND

Dr. Kurzendoerfer has not identified individuals who were discriminated against and that he does not know how her analysis could be used to determine improper denials.  Wallace Dep., 102:13-21 ("A. So I don't believe – I'm not aware and I can't testify for Dr. Kurzendoerfer, but I'm not aware she has identified specifically individuals who were discriminated against.  I believe she has identified the probability that they would have been approved if they were white, given the same circumstance for each individual.  And how that will ultimately be applied by the court, I don't know.").

Because Mr. Wallace's opinion that the damages for improper denials can reasonably be calculated on a classwide basis is "based on [an] assumption[] … that [is] not supported by the evidence," the opinion should be excluded as unreliable.  *Google Play Store*, 2023 WL 5532128, at *9; *Persian Gulf Inc.*, 632 F. Supp. 3d at 1167; *Guidroz-Brault*, 254 F.3d at 830.  It should also be excluded as irrelevant, as "[c]ourts reject or exclude expert testimony that fails to connect damages calculations to the theory of liability."  *Mission Viejo Florist, Inc. v. Orchard Supply Co.*, 2019 WL 13045054, at *2 (C.D. Cal. Feb. 28, 2019).  Here, neither Mr. Wallace nor any other expert has identified the individuals improperly denied, much less the individuals improperly denied because of Wells Fargo's "CORE/ECS system."  And yet, baselessly, he opines that damages due to such unidentifiable individuals can be shown with common proof.  It is "not explained, and is certainly not obvious," how Plaintiffs' experts could identify improper denials through classwide proof, so Mr. Wallace does not provide "a sufficient basis" to accept his claim that damages can be calculated on a classwide basis.  *Google Play Store*, 2023 WL 5532128, at *9; *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 182 (N.D. Cal. 2015) ("[B]cause his analysis does not reliably support his conclusion that impact or damages are subject to classwide proof," expert's reports are irrelevant and subject to exclusion).

V.     **CONCLUSION**

For these reasons, Wells Fargo respectfully requests that the Court grant its motion to exclude certain testimony of Amanda Kurzendoerfer and Michael Wallace.

Respectfully submitted,

25

1   Dated:  May 23, 2024                      MCGUIRE WOODS LLP

2

3                                            By:/s/ Alicia A. Baiardo
                                                 Alicia A. Baiardo
4                                                Ava E. Lias-Booker

5

6                                            WINSTON & STRAWN LLP

7

8                                            By:/s/ Amanda L. Groves
                                                 Amanda L. Groves
9                                                Kobi K. Brinson

10                                           WILMER CUTLER PICKERING
                                             HALE AND DORR LLP
11

12

13                                           By:/s/ Seth P. Waxman
                                                 Seth P. Waxman
14                                               Alan Schoenfeld

15                                           *Attorneys for Defendant Wells Fargo Bank, N.A.*

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO. 3:22-cv-00990-JD

DEFENDANT WELLS FARGO BANK, N.A.'S NOTICE OF MOTION AND MOTION TO EXCLUDE CERTAIN
TESTIMONY OF AMANDA KURZENDOERFER AND