# Exhibit 1

1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3     - - - - - - - - - - - - -x

4       IN RE: WELLS FARGO     :

5       MORTGAGE               :

6       DISCRIMINATION         :   Civil Action No.

7       LITIGATION.            :   3:22-cv-00990-JD

8                              :

9     - - - - - - - - - - - - -x

                                 Tuesday, April 9, 2024

10                                    Washington, D.C.

11

12

13    Videotaped Deposition of:

14              AMANDA KURZENDOERFER, Ph.D.,

15    called for oral examination by counsel for Wells

16    Fargo, pursuant to notice, at the law offices of

17    McGuire Woods, LLP, 888 16th Street, Northwest, Suite

18    500, Washington, D.C. 20036, before Christina S.

19    Hotsko, RPR, CRR, of Veritext Legal Solutions, a

20    Notary Public in and for the District of Columbia,

21    beginning at 10:06 a.m., when were present on behalf

22    of the respective parties:

                                           Page  1

```
 1    that's based on a similarly situated analysis,

 2    correct?

 3            MR. BLISS:  Objection.  Vague.

 4            THE WITNESS:  I have an entire section of

 5    the report that's devoted to regression analysis    11:07:46

 6    that similarly situates applicants.  So I have

 7    much to say about applicants that are similarly

 8    situated.  But --

 9    BY MS. LIAS-BOOKER:

10       Q.  But you --                                   11:07:58

11       A.  -- this is ECS analysis, and --

12       Q.  Which is --

13       A.  -- I'm demonstrating -- summarizing the

14    data that show that minority applicants are more

15    likely to be classified into higher risk classes,  11:08:07

16    just raw data.  And then conditional on being in

17    those risk classes, they're less likely to be

18    approved.

19            So in that sense, the applicants are

20    similarly situated because I can look at the        11:08:20

21    proportion of white borrowers, white applicants

22    and black applicants, Hispanic applicants, Asian
```

Page 54

1   class?

2        A.  No, I did not.

3        Q.  In examining the home equity credit grade

4   or AUS recommendation, did you examine the

5   attributes that those systems consider in arriving        11:42:51

6   at their results?

7        A.  I did not.

8             MR. BLISS:  Objection to form.

9             (Kurzendoerfer Deposition Exhibit 695

10            marked for identification and attached to    11:43:48

11            the transcript.)

12   BY MS. LIAS-BOOKER:

13        Q.  Dr. Kurzendoerfer, let me show you what's

14   been marked as Deposition Exhibit 695.

15            Do you recognize that document?           11:43:55

16        A.  I do.

17        Q.  Okay.  And for the record, that is the

18   home lending conventional original custom ECS

19   score model number 1190, document version 7.0.

20   And the Bates number at the bottom of the page       11:44:09

21   starts at WF00079826, correct?

22        A.  It's model 11960.  But yes.

Page 84

1    report is not responding to anything that

2    Dr. Courchane says about the distribution of

3    credit risk classes by race, correct?

4         A.  That's a specific question.  But she does

5    introduce business justification for the          13:14:24

6    ECS model.

7         Q.  But I'm asking solely about distribution

8    of credit risk class by race.

9         A.  Right.

10        Q.  Okay.  So figures 2 through 4 of your      13:14:32

11   rebuttal are not based on any regression analysis;

12   is that right?

13        A.  That's correct.

14        Q.  Okay.  And you also don't report whether

15   any of the results shown in figures 2 through 4     13:14:49

16   are statistically significant, correct?

17        A.  I don't report them.  I've since checked

18   and I know that a number of them are.

19        Q.  But in your rebuttal --

20             THE REPORTER:  Are or are not?           13:15:08

21             THE WITNESS:  Are.

22

                                                Page 120

1    guidance.

2         A.  Correct.

3         Q.  Is there --

4         A.  Wells Fargo's approach.

5             MR. BLISS:  Objection to form.          13:24:19

6    BY MS. LIAS-BOOKER:

7         Q.  Is there a particular document you relied

8    on?

9         A.  I relied on their fair lending model

10   development documents.                           13:24:25

11        Q.  Okay.  Now, in figures 2 through 4,

12   though -- okay.

13            In your affirmative report, you did not

14   think the FICO score sufficed to similarly situate

15   applicants, correct?                             13:24:57

16        A.  Correct.

17        Q.  Every model looked at other legitimate

18   underwriting factors, debt-to-income, for example,

19   and combined loan-to-value ratios, correct?

20        A.  Correct.                                13:25:05

21            MR. BLISS:  Objection to form.

22

                                              Page 130

```
 1    need an answer to my question.

 2            And my question was, and figures 2

 3    through 4 in your rebuttal report do not similarly

 4    situate applicants with respect to all key

 5    legitimate underwriting factors, do they?      13:26:10

 6        A.  Correct.

 7        Q.  Okay.  Turning to figure 5 of your

 8    rebuttal report, that is also not based on any

 9    regression analysis, correct?

10        A.  Correct.                               13:26:51

11        Q.  And you don't report whether any of the

12    results shown in figure 5 are statistically

13    significant, correct?

14        A.  I have not reported statistical

15    significance for this chart.  That's correct.   13:27:06

16        Q.  And for this one, you didn't perform any

17    test of whether any of the results shown in that

18    figure are statistically significant?

19        A.  I don't think so.  But based on my

20    experience in statistics and knowing the size of  13:27:15

21    counts here, I would suspect that the differences

22    are statistically significant.
```

Page 132

```
 1    the Wells Fargo ECS model.

 2         Q.  And you made no attempt to similarly

 3    situate applicants in figure 5, correct?

 4         A.  I'm just reporting differences in

 5    approval rates.  No.                      13:29:58

 6         Q.  Thank you.

 7              In figure 5, do you treat external AUS

 8    results of approved ineligible as an approval?

 9         A.  Yes, I do.

10         Q.  In paragraph 19 of your rebuttal report,  13:30:07

11    you write -- and I'm quoting -- Dr. Courchane

12    failed to consider Wells Fargo's alternative of

13    not using a disparately impactful custom scoring

14    model in addition to standard credit scores.

15              Did I state that correctly?            13:30:48

16         A.  Yes.

17         Q.  And by standard credit scores, did you

18    mean something like FICO scores?

19         A.  Yes.

20         Q.  Do you think that automated underwriting  13:31:14

21    systems play the same role in underwriting as

22    credit scores?
```

Page 136

1   applicants; is that right?

2       A.  Yes.  That's correct.

3       Q.  Okay.  So do you take this as evidence

4   that there is no discrimination against Asian

5   applicants for nonconforming loans?                13:38:01

6       A.  No.

7       Q.  Okay.  And why not?  Because the --

8   figure 7 is just raw numbers?

9       A.  Correct.

10      Q.  To understand whether there is a          13:38:07

11  disparate impact, you can't look only at approval

12  rates by race.  You agree with me?

13      A.  To understand whether there's a

14  statistical difference not driven by underwriting

15  factors, then yes, I agree that you can't look at    13:38:25

16  the raw uncontrolled numbers.

17      Q.  Don't you need to similarly situate

18  applicants in order to understand if there's a

19  disparate impact?

20      A.  I'm looking at statistical differences,     13:38:36

21  not specifically disparate impact.  So that's -- I

22  would restate that as we need to similarly situate

Page 144

1    specific characteristics of the loan and

2    creditworthiness?

3          A.  Yes, as I list specifically -- more

4    specifically in paragraph 65.

5          Q.  Okay.                              13:42:31

6          A.  Applicant or co-applicant credit score,

7    et cetera.

8          Q.  Now -- and forgive me if I asked this

9    already, but how did you determine what the key

10   underwriting -- oh, skip that.               13:42:41

11          What experience do you have in

12   underwriting?

13          A.  I'm not an underwriter.

14          Q.  Any training in underwriting?

15          A.  No.                               13:42:55

16          Q.  Any education in underwriting?

17          A.  No.

18          Q.  Ever been employed by a home mortgage

19   lender?

20          A.  No.                               13:42:58

21          Q.  Ever been employed by Fannie Mae or

22   Freddie Mac?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1          A.  No.

2          Q.  Do you know what a regulatory exam is as

3     it relates to a financial institution?

4          A.  Yes.

5          Q.  And how do you know that?  Just from an        13:43:06

6     article or book you've read?

7          A.  Just from my -- yes, reading and

8     research.

9          Q.  Have you ever conducted a fair lending

10    regulatory exam of a mortgage lender?               13:43:15

11         A.  No.

12         Q.  Have you ever represented a mortgage

13    lender in a fair lending regulatory exam?

14         A.  No.

15         Q.  Now, in your CV, you claim to be an         13:43:23

16    expert in fair lending and disparate impact

17    analysis.  So I'm assuming that none of that

18    included home mortgage underwriting, correct?

19         A.  No underwriting.

20         Q.  And am I correct that your fair lending      13:43:46

21    experience is limited to the Citibank case?

22         A.  Citibank case and another case that is

Page 149

1    Q.  And you did nothing to determine why

2  incomplete applications had such an impact on the

3  size of the results that you report.

4    A.  I'm not sure what I could have done.  I

5  don't know --                                13:56:09

6    Q.  I'm just asking, did you do anything?

7    A.  I didn't do anything.

8    Q.  Okay.

9    A.  No.

10    Q.  Your HMDA control specification controls   13:56:15

11  for external AUS outcome; is that right?

12    A.  Yes.

13    Q.  So does your HMDA and Wells Fargo control

14  specification, correct?

15    A.  Correct.                               13:56:30

16    Q.  And in footnote 67 in your report on

17  page 20, I believe, you list the codes you

18  consider to be an approval by an external AUS; is

19  that right?

20    A.  Yes.                                   13:56:49

21    Q.  Okay.  And are these the same codes you

22  used to determine approval by an external AUS in

Page 161

1    your regression models?

2         A.   Yes.

3         Q.   And you consider both approve eligible

4    and approve ineligible to be approvals; is that

5    right?                                          13:57:15

6         A.   I do because they meet the credit risk

7    standards of the GSEs.

8         Q.   And you consider -- but one is approve

9    eligible and the other one is approve ineligible;

10   is that right?                                   13:57:33

11        A.   Yes.

12        Q.   And you consider both accept eligible and

13   accept ineligible to be approvals, correct?

14        A.   I consider them to be approvals in that

15   they satisfy the credit risk standards of the    13:57:40

16   GSEs.

17        Q.   In deciding to treat approve ineligible

18   and accept ineligible results as approvals, did

19   you consider how those results affect the

20   sellability or insurability of these loans?       13:58:03

21        A.   That's not what I was trying to do in the

22   analysis.

```
1    risk standards.

2         Q.  Were you aware, when you were drafting

3    this report, that Fannie Mae treats loans

4    underwritten with desktop underwriter differently

5    from what it calls manually underwritten loans?    13:59:43

6         A.  Yes.

7         Q.  And deciding to treat approve in eligible

8    results as approvals, did you consider how the

9    difference between desktop underwriter and

10   manually underwritten loans affects the risk       13:59:58

11   Wells Fargo carries in the event of a borrower's

12   default?

13        A.  Like I said previously, I didn't analyze

14   risk.

15        Q.  And are you aware of the fact the          14:00:09

16   difference between an agency and a nonagency loan

17   is that an agency loan gets sold to Fannie Mae or

18   Freddie Mac, right?

19        A.  Yes.

20        Q.  If someone applies for an agency loan,     14:00:20

21   whether or not the loan can actually be sold to

22   Fannie Mae or Freddie Mac, it is very important
```

Page 165

1    from an underwriting perspective, isn't it?

2           MR. BLISS:  Objection.  Vague.

3    BY MS. LIAS-BOOKER:

4         Q.  If someone -- you understood what I

5    asked?                                    14:00:38

6         A.  It's important from Wells Fargo's,

7    perhaps, risk assessment.  But from an

8    underwriting perspective, as to whether it should

9    be used to gauge whether someone is deserving of a

10   loan or not based on their credit standards, I...   14:00:57

11        Q.  Doesn't underwriting go to risk?  It goes

12   to the bank's risk, right?  Isn't that why we

13   underwrite loans?

14        A.  And to provide credit.

15        Q.  Yes.  But one of the elements is risk to   14:01:02

16   the bank, correct?

17        A.  Correct.

18        Q.  Okay.  The difference between a

19   government loan and a conventional loan is that a

20   government loan gets insured by FHA, VA, or USDA.   14:01:09

21           Are you aware of that?

22        A.  Yes.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1    analysis that minority applicants are more likely

2    to be assigned to a lower credit risk class, and,

3    conditional on that, are likely to have lower

4    approval rates.

5          So that is a policy that I've analyzed.      14:48:00

6    I've analyzed overlays in my rebuttal report.

7    Those two things are separate and distinct from

8    the regression analysis, which is simply to

9    attribute -- which is to look at key underwriting

10   factors and to understand whether they can explain   14:48:15

11   the disparities in approval rates, and they can't.

12   BY MS. LIAS-BOOKER:

13       Q.  So your regression analysis is not tied

14   to a particular Wells Fargo policy; isn't that

15   correct?                                         14:48:27

16       A.  Correct.

17          MR. BLISS:  Objection to form.  Vague.

18   BY MS. LIAS-BOOKER:

19       Q.  You mentioned several times today about

20   the C1/C2 policy.  And in footnote 92 in your       14:49:46

21   report you noted the existence of two policy --

22   oh, sorry.

                                              Page 193

1    AUS returned an accept result?

2        A.  I don't recall.

3        Q.  Did you review any loan applications?

4        A.  I reviewed --

5            MR. BLISS:  Objection.  Asked and          15:03:22

6    answered.

7            THE WITNESS:  I reviewed the data.  I did

8    not review loan files.

9    BY MS. LIAS-BOOKER:

10       Q.  Wells Fargo has a lot of credit          15:03:32

11   policies -- big thick binders of credit policies,

12   correct?

13       A.  I believe so.

14       Q.  Is there any particular reason why you

15   chose the three in your rebuttal report to          15:03:46

16   discuss?

17       A.  These seemed --

18           MR. BLISS:  Objection.

19           THE WITNESS:  These seemed obviously

20   related to minority applicants because, based on    15:03:53

21   my work so far, I know that minority applicants

22   disproportionately have lower credit scores and

Page 205

```
 1   higher DTI.

 2   BY MS. LIAS-BOOKER:

 3        Q.  You weren't directed to look at those

 4   particular policies by counsel?

 5             MR. BLISS:  Objection to form.          15:04:14

 6             THE WITNESS:  I was --

 7             MR. BLISS:  Objection.  Rule 26 as well.

 8             MS. LIAS-BOOKER:  What's the Rule 26

 9   objection?

10             MR. BLISS:  Work product.              15:04:29

11             MS. LIAS-BOOKER:  Oh.  So you're

12   instructing her not to answer?  I think we can --

13             MR. BLISS:  No, you can answer.  I'll let

14   her answer.

15             MS. LIAS-BOOKER:  Yeah, yeah, yeah.     15:04:45

16             MR. BLISS:  I think it's work product,

17   but I'll let her answer.  Or it could be.

18             THE WITNESS:  I looked through the

19   overlay spreadsheet, scrolled through it, and

20   discussed with counsel the overlays.            15:04:54

21   BY MS. LIAS-BOOKER:

22        Q.  Were any of the named plaintiffs' loan
```

Page 206

```
 1    BY MS. LIAS-BOOKER:

 2         Q.  You identify proposed classes or

 3    subclasses as minority applications decisioned

 4    before 2023 that received at least one approval

 5    from an external AUS for -- from Wells Fargo's ECS     16:17:32

 6    model or home equity automated decision engine but

 7    that were ultimately denied by Wells Fargo.

 8              And I'm specifically looking at

 9    paragraph 86 of your report.

10         A.  That's not a definition that I created,       16:17:59

11    but yes, that's the definition of the class.

12         Q.  And that definition was created by the

13    lawyers --

14         A.  That's my understanding.

15         Q.  -- for the plaintiffs.  Okay.                 16:18:10

16              Now, in footnote 109, you state that --

17    you state what counts as an approval for purposes

18    of the proposed class definition, correct?

19         A.  Correct.

20         Q.  Okay.  And you include G1 and G2 results      16:18:35

21    as approvals; is that right?

22         A.  That's correct.
```

Page 252

1      Q.  And those are results of the Wells Fargo

2   government ECS model, correct?

3      A.  That's correct.

4      Q.  You don't count G3 or manual results as

5   approvals, though; is that right?                    16:18:53

6      A.  That's correct.

7      Q.  Is that distinction based on a policy

8   difference in how they are treated?

9      A.  That distinction is based on the data.  I

10  can see that approval rates are higher for G1 and     16:19:03

11  G2, so that means they're more associated with an

12  application being approved than G3.

13     Q.  And is that the sole basis for the

14  distinction you draw?

15     A.  That's my basis.                               16:19:19

16     Q.  Do you have any basis for treating G1s

17  and G2s as approvals but G3s and manuals as

18  denials?

19     A.  My basis is on the approval rates.

20     Q.  And that was not tied or based on any        16:19:41

21  policy document for Wells Fargo, just simply the

22  approval rate numbers.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

1     A.   These were chosen to establish a baseline

2   level of creditworthiness, and so it's based on --

3   purely on approval rates.

4     Q.   That you picked.  You drew the line --

5         MR. BLISS:  Objection to form.          16:20:06

6   BY MS. LIAS-BOOKER:

7     Q.   -- right, in terms of what you were going

8   to include and not include, correct?

9     A.   I presented the information --

10    Q.   Okay.                                  16:20:14

11    A.   -- to the lawyers.

12    Q.   And a decision was made to include those

13   groups --

14    A.   That's correct.

15    Q.   -- and not others.                     16:20:19

16        Okay.  Now, you also include G70, G80,

17   and G90 as approvals.

18        Those are Wells Fargo home equity credit

19   grades; is that right?

20        MR. BLISS:  Where are you looking?  I'm   16:20:43

21   sorry, I'm not -- are we still on footnote -- oh,

22   I see.  109.

Page  254

```
 1        Q.  You consider external AUS results that
 2   say that an application is ineligible for the
 3   program applied for as an approval, right?
 4        A.  That's one of the --
 5            MR. BLISS:  Objection to form.          16:24:03
 6            THE WITNESS:  That's one of the approval
 7   codes.  Those could occur in conjunction with
 8   ineligible.  Yes.
 9   BY MS. LIAS-BOOKER:
10        Q.  Did plaintiffs' counsel also tell you to  16:24:11
11   count those ineligible results as approvals?
12        A.  Plaintiffs' counsel told me that these
13   are the criteria for the class.
14        Q.  And that included the ineligibles?
15        A.  Yes.                                     16:24:28
16        Q.  Do you know how many non-Hispanic white
17   applicants would meet the proposed class
18   definition but for the fact that they are not
19   minorities?
20            MR. BLISS:  Objection to form.          16:24:43
21            THE WITNESS:  I have looked at that
22   number.
```

Page 258

```
 1    is calculated?

 2        A.  I don't know that it is or that it's not.

 3    But if the -- those models are saying that the

 4    borrower is approved based on creditworthiness,

 5    and yet there's no benefit to the borrower, that    16:33:27

 6    seems like a disconnect to me.  Not that it

 7    couldn't happen, but I don't -- I haven't looked

 8    at the correlation between those two things.

 9        Q.  I'll come back to that.

10            Does your proposed class exclude           16:33:39

11    applications that were denied because they were

12    incomplete?

13            MR. BLISS:  Objection to form.  Lack of

14    foundation.

15            THE WITNESS:  No.                           16:33:52

16            MR. BLISS:  And mischaracterizes the

17    evidence -- or the testimony.

18    BY MS. LIAS-BOOKER:

19        Q.  Your proposed class --

20            MS. LIAS-BOOKER:  Give me one second.       16:34:02

21    BY MS. LIAS-BOOKER:

22        Q.  Okay.  Your proposed class does not
```

Page 268

```
 1    in your report yield a predicted probability of

 2    approval for each application based on the factors

 3    controlled for by that model, correct?

 4         A.  Correct.

 5         Q.  Did you limit inclusion in your list of        16:40:02

 6    proposed class members to applications that your

 7    models predicted had a better than 50 percent

 8    probability of approval?

 9         A.  No.

10         Q.  So your list of proposed class members         16:40:15

11    includes applications that your own models predict

12    would -- likely would have been denied, regardless

13    of race, correct?

14              MR. BLISS:  Objection to form.

15              THE WITNESS:  That's not the purpose of        16:40:28

16    the model.  It's not -- the purpose of the model

17    is not to predict.  It's to identify marginal

18    effects for race.

19    BY MS. LIAS-BOOKER:

20         Q.  But my question to you that I need an           16:40:41

21    answer to is, your list of proposed class members

22    includes applications that your own models predict
```

Page 274

1    would likely have been denied, regardless of their

2    race, correct?

3            MR. BLISS:  Objection to form -- form.

4            THE WITNESS:  Yes.  And --

5            MR. BLISS:  Mischaracterizes -- sorry, go      16:41:05

6    ahead.

7            THE WITNESS:  Yes.  And the reason that I

8    did that is because it's not a predictive model.

9    BY MS. LIAS-BOOKER:

10        Q.  But the logic [sic] regression report you     16:41:18

11   did yielded a predicted probability of approval

12   for each application, correct?

13        A.  It does.

14        Q.  Okay.  Please turn to table A7.2 of

15   Dr. Courchane's rebuttal report.  And looking         16:41:33

16   at -- I think it's at page 73.

17            Do you see the predicted probabilities of

18   approval for named plaintiff Bryan Brown?

19        A.  I do.

20        Q.  Okay.  And depending on whether the          16:42:06

21   number is based on figure 24 or figure 34 of your

22   report, Dr. Courchane says that the probability of

Page 275

```
 1    than it would have been had they been white

 2    applications?

 3            MR. BLISS:  Objection to form.

 4            THE WITNESS:  In aggregate, yes.

 5    BY MS. LIAS-BOOKER:                          16:44:38

 6        Q.  Based on the marginal effects you report

 7    in figure 34, are you able to say what percent of

 8    the black refinance applications in your proposed

 9    class would have been approved if they had been

10    white, according to your model?             16:44:50

11        A.  No.

12        Q.  Can you say confidently that at least

13    half of the proposed class would have been

14    approved had they been write based on these

15    marginal effects?                           16:45:05

16        A.  I can't say --

17            MR. BLISS:  Objection to form.

18    BY MS. LIAS-BOOKER:

19        Q.  Can you say that as to at least

20    25 percent?                                 16:45:11

21            MR. BLISS:  Objection to form.

22            THE WITNESS:  I cannot quantify that.
```

Page 278

```
 1    BY MS. LIAS-BOOKER:

 2         Q.  How about at least as to 15 percent?

 3              MR. BLISS:  Objection to form.

 4              THE WITNESS:  I don't think you can

 5    answer that question.  You would have to make        16:45:32

 6    assumptions about at what probability should a

 7    minority applicant have been approved.

 8    BY MS. LIAS-BOOKER:

 9         Q.  So you can't tell us today whether at

10    least 15 percent would have been approved?          16:45:43

11              MR. BLISS:  Objection to form.

12    BY MS. LIAS-BOOKER:

13         Q.  Is that your testimony?

14         A.  If we were to make certain assumptions

15    about what thresholds would -- should constitute    16:45:52

16    an approval, then I could do that calculation.

17         Q.  But you have not done that, correct?

18         A.  Correct.

19         Q.  Does your report identify which proposed

20    class members would have been approved if they had  16:46:03

21    been white?

22              MR. BLISS:  Objection to form.
```

Page 279

```
 1              CERTIFICATE OF NOTARY PUBLIC
 2              I, CHRISTINA S. HOTSKO, the officer before
 3   whom the foregoing deposition was taken, do hereby
 4   certify that the witness whose testimony appears in
 5   the foregoing deposition was duly sworn by me; that
 6   the testimony of said witness was taken by me in
 7   stenotypy and thereafter reduced to typewriting under
 8   my direction; that said statement is a true record of
 9   the proceedings; that I am neither counsel for,
10   related to, nor employed by any of the parties to the
11   action in which this statement was taken; and,
12   further, that I am not a relative or employee of any
13   counsel or attorney employed by the parties hereto,
14   nor financially or otherwise interested in the
15   outcome of this action.
16   Dated: 4/12/2024
17
18
19              CHRISTINA S. HOTSKO
20          Notary Public in and for the
                District of Columbia
21
     My commission expires:
22   1 January 2027
```

                                        Page 342