# Exhibit 5

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

*In re Wells Fargo Mortgage Discrimination Litigation*

Case No. 3:22-cv-00990-JD

The Hon. James Donato

**DECLARATION OF MARSHA J. COURCHANE, Ph.D. IN SUPPORT OF DEFENDANT WELLS FARGO BANK, N.A.'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

I, Marsha J. Courchane, Ph.D., declare:

1.      I am a Vice President at Charles River Associates and the Practice Leader of the Financial Economics Practice. I hold a Ph.D., M.A., and B.A. in Economics from Northwestern University. I have been retained by McGuireWoods LLP, counsel for Defendant Wells Fargo N.A. in this action. I understand that Winston & Strawn LLP is co-counsel to McGuireWoods.

2.      I have personal knowledge of the facts stated in this declaration and, if called upon, could and would testify to the same. I submit this declaration in support of Wells Fargo's Opposition to Plaintiffs' Motion for Class Certification.

3.      Attached as Exhibit A is a true and correct copy of my expert report in this action ("Expert Report"). If called upon, I could and would testify to the opinions in said report.

4.      Attached as Exhibit B is a true and correct copy of my expert report rebutting Dr. Amanda R. Kurzendoerfer's affirmative report in this action ("Rebuttal Report"). If called upon, I could and would testify to the opinions in said report.

5.      Dr. Kurzendoerfer's rebuttal report in this case ("Kurzendoerfer Rebuttal, attached as Exhibit B to the Declaration of Amanda Kurzendoerfer in Support of Plaintiffs' Motion for Class Certification ("Kurzendoerfer Decl.," ECF No. 204-19)) expresses opinions absent from her affirmative report and which I did not have an opportunity to address in my own rebuttal report. Her declaration in support of Plaintiffs' class certification motion likewise contains new opinions that I did not have an opportunity to address in my rebuttal report.

6.      Section V.B of Dr. Kurzendoerfer's rebuttal report includes new analyses of ECS that do not correspond to any analysis in my own affirmative report. She introduces three charts (Figures 2–4) that purport to show that the ECS model is more likely to assign minority applicants to lower Credit Risk Classes than White applicants within the same 10-point credit score band. (Kurzendoerfer Rebuttal ¶¶ 4, 19.) She also introduces a bar graph (Figure 5) comparing what she calls the "approval rates" of ECS and external AUSs by race and ethnicity. She reproduces Figures 2–5 in her declaration. (Kurzendoerfer Decl. ¶¶ 19–21.)

7.      Dr. Kurzendoerfer's rebuttal does not state that any of the results shown in Figures 2–4 are statistically significant. I understand that she testified at her deposition that only

1  "a number of" the results were statistically significant. In reality, based on the supporting

2  materials Dr. Kurzendoerfer provided, the differences between White and minority applicants

3  shown in Figures 2–4 are statistically significant at the 0.05 level for only about 60 percent of

4  the data points. The rest of the differences shown in Figures 2–4 are not statistically significant.

5         8.      For example, after saying that Black and Hispanic applicants with FICO scores

6  between 730 and 740 were more likely to be assigned a credit risk class of A2 vs. A1 than White

7  applicants, Dr. Kurzendoerfer states, "The pattern also holds for Asian applicants at credit scores

8  greater than 670–680." (Kurzendoerfer Rebuttal ¶ 20.) But the difference between White and

9  Asian applicants when it comes to A2 vs. A1 ECS results is not statistically significant for the

10  670–680 FICO band, or indeed any FICO band below 700. Nor is it statistically significant at

11  the 820–860 FICO band.

12         9.      Appendix Tables 1–3 show the values reflected in Figures 2–4 of Dr.

13  Kurzendoerfer's rebuttal report, along with the p-values for the difference between each

14  minority group and Whites at each FICO band, based on the supporting materials produced with

15  Dr. Kurzendoerfer's report.

16        10.     It is not clear from Dr. Kurzendoerfer's rebuttal report why she controls for only

17  one variable—FICO score—in comparing ECS results in Figures 2–4. FICO is not enough to

18  similarly situate applicants, especially in mortgage lending. For example, as discussed in my

19  affirmative report, an applicant's debt-to-income ratio (DTI) is a crucial variable considered by

20  both Fannie Mae and Freddie Mac. (Expert Report ¶¶ 38–39.) Dr. Kurzendoerfer herself seems

21  to be aware of DTI's importance in explaining racial and ethnic differences in approval rates, as

22  she controls for DTI in every regression analysis in her affirmative report. She does not suggest

23  that it is improper to consider DTI. Crucially, DTI affects ECS outcome but not FICO score

24  (which is based solely on credit history rather than the terms of the loan being applied for).

25  Dr. Kurzendoerfer's approach does not allow one to determine whether the differences she

26  observes (only some of which are statistically significant) result from DTI rather than how ECS

27  treats credit history, and so the simplistic comparison of ECS to FICO score that Dr.

28  Kurzendoerfer provides is not instructive.

3

DECLARATION OF MARSHA J. COURCHANE, Ph.D. IN SUPPORT OF DEFENDANT WELLS FARGO BANK, N.A.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

11.     Dr. Kurzendoerfer also does not quantify the differences or provide any measure of practical significance. As I stated in my rebuttal report, measures of practical significance are important because statistical significance is often a function of the size of the data set and may not reflect meaningful differences. (Rebuttal Report ¶¶ 68, 75.)

12.     Figure 5 of Dr. Kurzendoerfer's rebuttal report compares the results of external AUSs to ECS results, but Dr. Kurzendoerfer disclosed at her deposition that it treats Approve/Ineligible and Accept/Ineligible results as "approvals" by an external AUS. As I explained in my own rebuttal report, that reflects a misunderstanding of those AUS results. (Rebuttal Report ¶¶ 42, 58.) "Ineligible" results indicate that the loan does not meet the agency's eligibility criteria and so cannot be sold as a conforming loan or insured as a government-backed loan. One of the loan characteristics that can result in an Approve/Ineligible result, for example, is excessive DTI, a factor that ECS considers. As shown in Appendix Table 4, excluding Approve/Ineligible and Accept/Ineligible results from Dr. Kurzendoerfer's Rebuttal Figure 5 significantly reduces the gap between favorable external AUS and ECS results for each race and ethnicity. Dr. Kurzendoerfer focuses on the size of that gap, saying it is smallest for White applicants. (Kurzendoerfer Rebuttal ¶ 23.) But excluding Approve/Ineligible and Accept/Ineligible results shows that the gap is actually smallest for *Asian* applicants (10.2 percentage points, versus 11.9 percentage points for White applicants).

13.     Dr. Kurzendoerfer's rebuttal report does not remedy any of the problems I identified with her analysis of ECS in her affirmative report. As I stated, ECS uses 12 neutral variables to predict mortgage borrower performance, 11 of which are standard credit history variables that are commonly used to predict credit performance throughout the consumer credit industry, and the other of which is debt-to-income ratio, which is required to be considered in underwriting under GSE and government agency guidelines. (Rebuttal Report ¶ 83.) As I noted, Dr. Kurzendoerfer cites no evidence that those neutral credit risk indicators are discriminatory. (*Id.*) Similar to her affirmative report, Dr. Kurzendoerfer's rebuttal report does not assert or provide evidence that any of the attributes ECS considers are potentially discriminatory, nor does she disagree that they are of value in predicting mortgage borrower performance.

14.     Dr. Kurzendoerfer's rebuttal report criticizes my affirmative report for not considering Wells Fargo's "alternative" of not using ECS in addition to standard credit scores. (Kurzendoerfer Rebuttal ¶ 19.) But as I testified at my deposition, I could not provide a business justification without knowing first which policy Plaintiffs asserted was discriminatory. Nor could I analyze potential less discriminatory alternatives toward advancing a policy's business justification without knowing which policy was at issue. Plaintiffs had not identified a policy that they claimed led to the statistical disparities on which they based their allegations when I wrote my affirmative report. My understanding is that Dr. Kurzendoerfer admitted at her deposition that her statistical analysis of Wells Fargo's denial rates also was not tied to any policy.

15.     Dr. Kurzendoerfer never identifies the business justification for using ECS, so it is not clear how she can suggest using credit scores alone as a less discriminatory means of achieving that business justification. My understanding, moreover, was that when ECS was used in underwriting agency loans, it was used in conjunction with Desktop Underwriter (DU) and Loan Product Advisor (LPA), not as a substitute FICO score. As explained in my affirmative report, the salability of loans to Fannie Mae and Freddie Mac depends on the results of DU and LPA, respectively. (Expert Report ¶ 33.) Until July 17, 2021, however, Fannie Mae would purchase loans based on ECS's credit risk class, even if DU indicated it was not eligible. (*Id.* ¶ 106 n. 92.) Dr. Kurzendoerfer does not identify any loan application that was denied due to its ECS credit risk class, as opposed to DU or LPA's credit risk class. The effect of not using ECS at all, as Dr. Kurzendoerfer suggests, would have been to *reduce* the number of agency loans that could be approved (assuming they otherwise met the GSEs' underwriting criteria). Dr. Kurzendoerfer's suggestion also fails because, as I also noted in my affirmative report, Wells Fargo determined that ECS predicts loan performance better than FICO score alone. (*Id.* ¶ 108.)

16.     Dr. Kurzendoerfer's rebuttal opinion also criticizes me for not analyzing the impact of a September 19, 2020 policy concerning underwriting of applications with a hybrid credit risk class of C1 or C2, and in her declaration she states that "as many as" 12,934 proposed class members were "potentially" affected by that policy. (Kurzendoerfer Rebuttal ¶ 25;

Kurzendoerfer Decl. ¶ 22.) That policy concerns the hybrid credit risk class, not ECS result, and it affected only agency loans. As I noted in my affirmative report, ECS was no longer used to determine salability of agency loans after July 17, 2021. (Expert Report ¶ 106 n. 92.) There was no reason for me to address that policy in my affirmative report, as Plaintiffs had not identified it as a possible cause of the statistical disparities alleged in the complaint.

17.     Dr. Kurzendoerfer does not say how she calculated how many proposed class members were potentially affected by the September 19, 2020 policy. But given that a hybrid credit risk of C1 or C2 requires receiving an unfavorable result from both DU and LPA (and, until July 17, 2021, from ECS as well), while membership in the proposed class requires a favorable result from at least one of them, there should be no one in the proposed class affected by this policy (leaving aside applications that Dr. Kurzendoerfer mistakenly counts as having been "approved" by DU, despite DU's indication that the loan is ineligible for sale to Fannie Mae). Moreover, Dr. Kurzendoerfer notes that 92.3% of application with a hybrid credit risk class of C1/C2 were denied before the policy was implemented and 97.5% were denied after it was implemented. (Kurzendoerfer Rebuttal ¶ 26, Figure 7.) That suggests that the vast majority of applications with that hybrid credit risk class would have been denied even without the policy Dr. Kurzendoerfer analyzes here. Consequently, it is not enough to simply count up the number of class members with a hybrid credit risk class of C1/C2, as their application would more likely than not have been denied even in the absence of this policy.

18.     Dr. Kurzendoerfer's suggestion that this policy had a disparate impact on minority applicants is also flawed. She performs no regression or other analysis to similarly situate applicants to support that conclusion. She notes that a greater percentage of minority applications had a hybrid credit risk class of C1/C2 than White applications. She says that minority applications with a hybrid credit risk class of C1/C2 were denied at a higher rate than White C1/C2 applications both before and after September 19, 2020, but that does show the effect of the policy. As Dr. Kurzendoerfer's Rebuttal Figure 7 shows, the denial rate for White applications with a C1/C2 hybrid credit risk class jumped 6.8 points from 89.9% to 96.7% when the policy was implemented, more than twice the change in minority denial rates (3.3 points

6

from 94.9% to 98.2%). Dr. Kurzendoerfer does not perform the sort of analyses that would be required to assess whether this policy had a disparate impact (namely, some sort of regression that both (1) similarly situated applicants and (2) isolated the effect of this policy from other reasons for denial), and even her back-of-the-envelope analysis does not support a conclusion that this policy had a disparate impact.

19.     Dr. Kurzendoerfer's declaration states that census tract "is related" to lower approval rates for Black and Hispanic applicants, and that different approval rates by property location is "associated with" redlining. (Kurzendoerfer Decl. ¶ 14.) But her analysis does not show differential approval rates by location. Moreover, she misidentifies what redlining is. Redlining involves not lending in majority-minority neighborhoods. To examine redlining, one would have to look at approval rates in connection with the racial make-up of the property's location.  Tying approval rates to location alone (without examining the racial make-up of that location), as Dr. Kurzendoerfer does, does nothing to suggest redlining. Dr. Kurzendoerfer does not examine the impact of majority-minority census tracts.

20.     Dr. Kurzendoerfer's declaration also criticizes my modification of her model specification in my rebuttal report. (Kurzendoerfer Decl. ¶ 25.) She is incorrect to suggest that I simply added variables to her specification. She also treated some variables in ways that did not make sense in light of what the variables measured and their relation to policy. For example, the CLTV bins she chose did not align with GSE policy, which has a clear threshold related to the requirement of mortgage insurance at 80% but does not require that for lower CLTV amounts. Some of the changes I made were to correct those errors.

21.     The variables I did add were variables that I knew from years of experience were important in underwriting. Her declaration does not identify any variable that should not have been in my revision of her specification. She says only that those variables were absent from the model Wells Fargo uses in its internal fair lending analyses. (Kurzendoerfer Decl. ¶ 25.) But as I stated in my rebuttal report, Wells Fargo's model was intended to identify areas for further investigation, such as loan file review. (Rebuttal Report ¶ 79.) It was not intended to do what Dr. Kurzendoerfer's model attempts to do—identify discrimination without the need for any loan

file review. In my decades of experience, every regulator has recognized the necessity of supplementing statistical analyses with loan file reviews. (*Id.* ¶¶ 60–63, 87.)

22.     Dr. Kurzendoerfer's criticism also disregards the fact that my revision of her specification resulted in a better goodness of fit as measured using Pseudo R-squared and AUC statistics. (Rebuttal Report ¶ 87.) She also fails to mention that my modification of her specification greatly reduced the incidence of results large enough to be of practical significance, using measures regularly accepted by regulators. (*Id.* ¶¶ 87–88, Table A5.1.)

23.     As indicated in my rebuttal report, the vast majority of the applications Dr. Kurzendoerfer identified as members of the proposed classes actually received a favorable score from the Wells Fargo systems she used to determine class membership (i.e., ECS and two home equity grades). (Rebuttal Report App'x Table A8.1.) Of the 119,100 proposed class members, only 17,308 did *not* receive a favorable score from the Wells Fargo systems, using Dr. Kurzendoerfer's method for identifying AUS "approvals." (*Id.*) Most of those—15,373 applications—were actually deemed "ineligible" for the loan product applied for by the external AUS, leaving only 1,935 applications that received a favorable result from an external AUS but not from ECS. (*Id.*) Moreover, 1,172 of those 1,935 applications received no ECS result at all. Only 763 of the 119,100 proposed class members remain after excluding "ineligible" external AUS results, favorable Wells Fargo results, and applications on which ECS was not run at all.

24.     Appendix Table 5 to this declaration summarizes the opinions I expressed in my affirmative report concerning the named Plaintiffs in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of May, 2024.

By: _____

Marsha J. Courchane, Ph.D.

**Appendix Tables to Declaration in Support of Defendant Wells Fargo Bank, N.A.'s Opposition to Plaintiffs' Motion for Class Certifications**
**Marsha J. Courchane, Ph.D.**

In the Matter of
*In re Wells Fargo Mortgage Discrimination Litigation*
United States District Court, Northern District of California, San Francisco Division
Case No. 3:22-cv-00990-JD

May 23, 2024

*Confidential; Subject to a Protective Order*

| | |
|---|---|
| Table 1 | Dr. Kurzendoerfer Figure 2: Applications with Credit Risk Class A2 as a Percent of Applications with Credit Risk Class A1 or A2 - With P-Values |
| Table 2 | Dr. Kurzendoerfer Figure 3: Applications with Credit Risk Class C1 as a Percent of Applications with Credit Risk Class A2 or C1 - With P-Values |
| Table 3 | Dr. Kurzendoerfer Figure 4: Applications with Credit Risk Class C2 as a Percent of Applications with Credit Risk Class C1 or C2 - With P-Values |
| Table 4 | Dr. Kurzendoerfer Figure 5: External AUS and WF ECS Recommendations by Race and Ethnicity |
| Table 5 | Summary of Wells Fargo's Decisions on Plaintiffs' Applications |

**Notes:**
- The figures cited are from Dr. Kurzendoerfer's rebuttal report.
- All analyses are based on the data in "HMDA with pricing flags.parquet" as included in Dr. Kurzendoerfer's rebuttal report supporting documents.
- All tables include only decisioned applications (HMDA Action 1, 2, or 3) and include only conventional loans. Open-end lines of credit, applications received in 2023, and applications from applicants with an "Unknown" race/ethnicity are excluded from all tables.
- Tables 1 through 3 exclude applications missing credit score.
- Tables 1 through 3 do not show results for credit score bins for scores < 620 because Dr. Kurzendoerfer's Figures 2-4 do not include those credit score ranges.

| Table 1. Dr. Kurzendoerfer Figure 2: Applications with Credit Risk Class A2 as a Percent of Applications with Credit Risk Class A1 or A2 - With P-Values | | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | White | Black | | | Hispanic | | | Asian | | | Joint | | | | | |
| Credit Score Bin | Percent | Percent | Diff. | P-Value | Percent | Diff. | P-Value | Percent | Diff. | P-Value | Percent | Diff. | P-Value | | | |
| 620-629 | 84.0% | 87.2% | 3.2% | 0.174 | 86.7% | 2.7% | 0.201 | 84.4% | 0.4% | 0.934 | 81.9% | -2.1% | 0.491 | | | |
| 630-639 | 80.5% | 84.7% | 4.2% | 0.060 | 85.4% | 4.9% | 0.008 | 88.2% | 7.7% | 0.053 | 82.7% | 2.2% | 0.458 | | | |
| 640-649 | 80.2% | 84.1% | 3.8% | 0.044 | 85.5% | 5.3% | 0.001 | 81.1% | 0.9% | 0.783 | 82.1% | 1.9% | 0.435 | | | |
| 650-659 | 78.3% | 83.0% | 4.7% | 0.006 | 83.3% | 5.0% | 0.001 | 77.6% | -0.6% | 0.821 | 79.8% | 1.5% | 0.490 | | | |
| 660-669 | 75.5% | 82.0% | 6.5% | 0.000 | 79.9% | 4.4% | 0.001 | 74.5% | -1.0% | 0.652 | 75.8% | 0.3% | 0.858 | | | |
| 670-679 | 72.9% | 79.6% | 6.7% | 0.000 | 78.2% | 5.4% | 0.000 | 74.7% | 1.9% | 0.352 | 72.2% | -0.6% | 0.709 | | | |
| 680-689 | 69.0% | 75.0% | 6.0% | 0.000 | 73.6% | 4.6% | 0.000 | 70.4% | 1.4% | 0.417 | 70.5% | 1.5% | 0.319 | | | |
| 690-699 | 66.0% | 73.3% | 7.3% | 0.000 | 74.7% | 8.7% | 0.000 | 67.9% | 1.9% | 0.175 | 65.6% | -0.3% | 0.802 | | | |
| 700-709 | 64.6% | 72.5% | 7.9% | 0.000 | 73.1% | 8.5% | 0.000 | 69.2% | 4.7% | 0.000 | 63.9% | -0.7% | 0.577 | | | |
| 710-719 | 63.5% | 70.6% | 7.1% | 0.000 | 72.7% | 9.2% | 0.000 | 68.1% | 4.6% | 0.000 | 62.6% | -0.9% | 0.431 | | | |
| 720-729 | 62.1% | 69.3% | 7.2% | 0.000 | 70.6% | 8.6% | 0.000 | 67.4% | 5.4% | 0.000 | 60.4% | -1.7% | 0.093 | | | |
| 730-739 | 60.0% | 69.1% | 9.1% | 0.000 | 71.9% | 12.0% | 0.000 | 66.1% | 6.2% | 0.000 | 58.8% | -1.2% | 0.208 | | | |
| 740-749 | 55.1% | 64.7% | 9.6% | 0.000 | 68.2% | 13.1% | 0.000 | 61.9% | 6.8% | 0.000 | 51.3% | -3.8% | 0.000 | | | |
| 750-759 | 48.1% | 58.9% | 10.7% | 0.000 | 63.8% | 15.7% | 0.000 | 58.1% | 10.0% | 0.000 | 43.1% | -5.1% | 0.000 | | | |
| 760-769 | 39.7% | 51.9% | 12.2% | 0.000 | 57.9% | 18.2% | 0.000 | 50.7% | 11.0% | 0.000 | 34.4% | -5.3% | 0.000 | | | |
| 770-779 | 31.2% | 43.4% | 12.2% | 0.000 | 49.8% | 18.6% | 0.000 | 42.7% | 11.5% | 0.000 | 27.4% | -3.8% | 0.000 | | | |
| 780-789 | 22.2% | 35.1% | 12.9% | 0.000 | 40.5% | 18.3% | 0.000 | 32.4% | 10.1% | 0.000 | 19.7% | -2.6% | 0.000 | | | |
| 790-799 | 14.9% | 24.8% | 9.9% | 0.000 | 29.9% | 15.0% | 0.000 | 23.5% | 8.5% | 0.000 | 12.8% | -2.1% | 0.000 | | | |
| 800-809 | 9.3% | 13.6% | 4.3% | 0.000 | 19.1% | 9.7% | 0.000 | 15.2% | 5.9% | 0.000 | 8.5% | -0.8% | 0.017 | | | |
| 810-819 | 6.7% | 8.6% | 1.9% | 0.001 | 13.0% | 6.2% | 0.000 | 10.4% | 3.7% | 0.000 | 6.2% | -0.5% | 0.288 | | | |
| 820-859 | 3.8% | 5.1% | 1.3% | 0.202 | 5.2% | 1.4% | 0.130 | 4.7% | 0.9% | 0.246 | 4.5% | 0.7% | 0.543 | | | |

**Notes:**

- Green highlighting indicates results that are statistically *insignificant* at the 95% confidence level (P-value of 0.05 or less).

- Percents are the share of applications with a credit risk class of "A2" over the number of applications with a credit risk class of "A1" or "A2."

- Credit risk class is determined by the "DS Risk Class" field.

- P-values are calculated using a Chi-Squared test.

| Table 2. Dr. Kurzendoerfer Figure 3: Applications with Credit Risk Class C1 as a Percent of Applications with Credit Risk Class A2 or C1 - With P-Values | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | White | Black | | | Hispanic | | | Asian | | | Joint | | |
| Credit Score Bin | Percent | Percent | Diff. | P-Value | Percent | Diff. | P-Value | Percent | Diff. | P-Value | Percent | Diff. | P-Value |
| 620-629 | 57.0% | 64.0% | 7.0% | 0.001 | 63.0% | 6.0% | 0.002 | 58.5% | 1.4% | 0.745 | 58.4% | 1.4% | 0.635 |
| 630-639 | 56.9% | 62.0% | 5.1% | 0.008 | 58.3% | 1.4% | 0.392 | 60.2% | 3.3% | 0.332 | 60.0% | 3.1% | 0.235 |
| 640-649 | 55.7% | 60.4% | 4.8% | 0.004 | 57.9% | 2.2% | 0.134 | 52.8% | -2.8% | 0.353 | 56.7% | 1.0% | 0.641 |
| 650-659 | 53.6% | 55.3% | 1.8% | 0.260 | 58.3% | 4.7% | 0.000 | 57.7% | 4.1% | 0.094 | 52.3% | -1.3% | 0.532 |
| 660-669 | 51.0% | 56.5% | 5.5% | 0.000 | 55.3% | 4.4% | 0.000 | 57.3% | 6.3% | 0.002 | 50.7% | -0.2% | 0.888 |
| 670-679 | 48.5% | 56.0% | 7.5% | 0.000 | 53.0% | 4.5% | 0.000 | 51.2% | 2.7% | 0.133 | 47.8% | -0.7% | 0.675 |
| 680-689 | 46.7% | 51.8% | 5.1% | 0.000 | 51.5% | 4.8% | 0.000 | 49.8% | 3.1% | 0.050 | 48.4% | 1.7% | 0.226 |
| 690-699 | 45.3% | 48.4% | 3.0% | 0.005 | 50.1% | 4.7% | 0.000 | 45.0% | -0.4% | 0.792 | 44.3% | -1.0% | 0.440 |
| 700-709 | 43.4% | 48.4% | 4.9% | 0.000 | 48.9% | 5.5% | 0.000 | 42.8% | -0.6% | 0.614 | 42.6% | -0.8% | 0.480 |
| 710-719 | 40.2% | 46.6% | 6.4% | 0.000 | 45.6% | 5.4% | 0.000 | 39.9% | -0.3% | 0.803 | 36.1% | -4.1% | 0.000 |
| 720-729 | 35.3% | 43.2% | 7.9% | 0.000 | 43.8% | 8.6% | 0.000 | 34.9% | -0.4% | 0.705 | 32.5% | -2.8% | 0.007 |
| 730-739 | 31.5% | 38.7% | 7.1% | 0.000 | 41.0% | 9.5% | 0.000 | 31.0% | -0.5% | 0.514 | 26.3% | -5.2% | 0.000 |
| 740-749 | 25.8% | 32.0% | 6.3% | 0.000 | 34.5% | 8.7% | 0.000 | 25.7% | -0.1% | 0.877 | 21.9% | -3.9% | 0.000 |
| 750-759 | 20.8% | 27.6% | 6.8% | 0.000 | 29.0% | 8.2% | 0.000 | 21.5% | 0.7% | 0.255 | 16.3% | -4.5% | 0.000 |
| 760-769 | 15.6% | 21.0% | 5.4% | 0.000 | 21.8% | 6.2% | 0.000 | 16.7% | 1.1% | 0.046 | 12.7% | -2.9% | 0.000 |
| 770-779 | 10.1% | 15.0% | 4.8% | 0.000 | 16.1% | 6.0% | 0.000 | 12.0% | 1.9% | 0.000 | 8.3% | -1.8% | 0.008 |
| 780-789 | 6.2% | 10.0% | 3.8% | 0.000 | 9.8% | 3.6% | 0.000 | 7.6% | 1.4% | 0.000 | 4.4% | -1.7% | 0.003 |
| 790-799 | 3.5% | 5.3% | 1.9% | 0.002 | 4.6% | 1.1% | 0.002 | 4.3% | 0.8% | 0.007 | 3.2% | -0.3% | 0.626 |
| 800-809 | 2.0% | 2.8% | 0.8% | 0.205 | 2.4% | 0.4% | 0.277 | 2.2% | 0.2% | 0.587 | 2.7% | 0.6% | 0.245 |
| 810-819 | 0.8% | 1.7% | 0.9% | 0.207 | 1.1% | 0.2% | 0.565 | 0.8% | -0.1% | 0.884 | 1.0% | 0.2% | 0.737 |
| 820-859 | 0.3% | 0.0% | -0.3% | 0.796 | 0.0% | -0.3% | 0.768 | 0.0% | -0.3% | 0.732 | 0.0% | -0.3% | 0.822 |

**Notes:**

- Green highlighting indicates results that are statistically *insignificant* at the 95% confidence level (P-value of 0.05 or less).

- Percents are the share of applications with a credit risk class of "C1" over the number of applications with a credit risk class of "C1" or "A2."

- Credit risk class is determined by the "DS Risk Class" field.

- P-values are calculated using a Chi-Squared test.

11

| Table 3. Dr. Kurzendoerfer Figure 4: Applications with Credit Risk Class C2 as a Percent of Applications with Credit Risk Class C1 or C2 - With P-Values | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | White | Black | | | Hispanic | | | Asian | | | Joint | | |
| Credit Score Bin | Percent | Percent | Diff. | P-Value | Percent | Diff. | P-Value | Percent | Diff. | P-Value | Percent | Diff. | P-Value |
| 620-629 | 72.5% | 78.9% | 6.4% | 0.000 | 79.4% | 6.9% | 0.000 | 81.4% | 8.9% | 0.000 | 72.9% | 0.4% | 0.810 |
| 630-639 | 71.0% | 78.5% | 7.4% | 0.000 | 77.6% | 6.6% | 0.000 | 74.6% | 3.5% | 0.080 | 70.5% | -0.5% | 0.747 |
| 640-649 | 67.8% | 73.6% | 5.8% | 0.000 | 73.3% | 5.5% | 0.000 | 76.4% | 8.6% | 0.000 | 67.6% | -0.2% | 0.881 |
| 650-659 | 64.9% | 73.0% | 8.1% | 0.000 | 69.2% | 4.3% | 0.000 | 67.6% | 2.6% | 0.138 | 65.1% | 0.1% | 0.935 |
| 660-669 | 62.2% | 67.2% | 5.0% | 0.000 | 67.0% | 4.8% | 0.000 | 62.8% | 0.6% | 0.706 | 58.7% | -3.5% | 0.019 |
| 670-679 | 57.5% | 62.3% | 4.8% | 0.000 | 62.7% | 5.2% | 0.000 | 59.2% | 1.6% | 0.312 | 55.6% | -2.0% | 0.197 |
| 680-689 | 52.9% | 59.0% | 6.1% | 0.000 | 58.5% | 5.6% | 0.000 | 55.7% | 2.8% | 0.060 | 44.3% | -8.6% | 0.000 |
| 690-699 | 46.6% | 54.1% | 7.5% | 0.000 | 53.2% | 6.7% | 0.000 | 50.3% | 3.7% | 0.009 | 42.1% | -4.4% | 0.003 |
| 700-709 | 41.5% | 48.2% | 6.7% | 0.000 | 47.6% | 6.1% | 0.000 | 45.9% | 4.4% | 0.001 | 34.1% | -7.4% | 0.000 |
| 710-719 | 34.8% | 39.0% | 4.2% | 0.000 | 41.4% | 6.6% | 0.000 | 37.6% | 2.7% | 0.039 | 29.4% | -5.4% | 0.001 |
| 720-729 | 29.0% | 33.9% | 5.0% | 0.000 | 34.3% | 5.4% | 0.000 | 31.5% | 2.6% | 0.039 | 22.1% | -6.9% | 0.000 |
| 730-739 | 22.5% | 26.8% | 4.2% | 0.000 | 27.6% | 5.1% | 0.000 | 23.2% | 0.7% | 0.565 | 19.2% | -3.3% | 0.033 |
| 740-749 | 17.4% | 20.8% | 3.4% | 0.007 | 22.5% | 5.1% | 0.000 | 18.9% | 1.5% | 0.184 | 15.0% | -2.5% | 0.116 |
| 750-759 | 13.0% | 16.6% | 3.7% | 0.003 | 15.6% | 2.6% | 0.003 | 11.6% | -1.4% | 0.187 | 10.7% | -2.3% | 0.165 |
| 760-769 | 10.0% | 8.9% | -1.1% | 0.422 | 12.9% | 2.9% | 0.002 | 10.2% | 0.3% | 0.804 | 9.5% | -0.5% | 0.771 |
| 770-779 | 7.6% | 6.1% | -1.5% | 0.349 | 6.2% | -1.4% | 0.147 | 5.3% | -2.3% | 0.032 | 4.3% | -3.3% | 0.096 |
| 780-789 | 4.4% | 7.4% | 3.0% | 0.088 | 8.5% | 4.1% | 0.001 | 2.2% | -2.2% | 0.039 | 3.6% | -0.8% | 0.742 |
| 790-799 | 4.0% | 5.2% | 1.2% | 0.656 | 5.2% | 1.3% | 0.487 | 2.0% | -2.0% | 0.184 | 0.0% | -4.0% | 0.189 |
| 800-809 | 4.4% | 11.8% | 7.4% | 0.180 | 2.2% | -2.2% | 0.498 | 1.7% | -2.7% | 0.337 | 0.0% | -4.4% | 0.338 |
| 810-819 | 0.0% | 0.0% | 0.0% | . | 0.0% | 0.0% | . | 14.3% | 14.3% | 0.050 | 0.0% | 0.0% | . |
| 820-859 | 0.0% | . | . | . | . | . | . | . | . | . | . | . | . |

**Notes:**

- Green highlighting indicates results that are statistically *insignificant* at the 95% confidence level (P-value of 0.05 or less).

- Percents are the share of applications with a credit risk class of "C2" over the number of applications with a credit risk class of "C1" or "C2."

- Credit risk class is determined by the "DS Risk Class" field.

- P-values are calculated using a Chi-Squared test.

| Table 4. Dr. Kurzendoerfer Figure 5: External AUS and WF ECS Recommendations by Race and Ethnicity | | | | | | |
|---|---|---|---|---|---|---|
| Race / Ethnicity | Dr. Kurzendoerfer's External AUS "Approval" Percentages | | External AUS Favorable Results, Excluding Ineligible | | WF ECS Favorable Results | |
| | # | % | # | % | # | % |
| White | 672,942 | 94.5% | 635,189 | 89.2% | 550,752 | 77.3% |
| Black | 64,171 | 82.6% | 57,446 | 73.9% | 41,031 | 52.8% |
| Hispanic | 124,414 | 85.5% | 110,984 | 76.2% | 84,028 | 57.7% |
| Asian | 72,370 | 93.8% | 66,754 | 86.5% | 58,877 | 76.3% |
| Joint | 60,578 | 94.7% | 56,940 | 89.1% | 47,931 | 75.0% |
| Other | 3,215 | 84.8% | 2,889 | 76.2% | 2,218 | 58.5% |

**Notes:**

- Only applications with both an external AUS result and a Wells Fargo ECS result are included.

- Dr. Kurzendoerfer's external AUS "approval" definition includes applications with an "Ineligible" result.

- Favorable WF ECS results include Risk Class codes of "A1," "A2," "APPROVAL," "ACCEPT," "G1" and "G2."

**Appendix Table 5**

The following chart summarizes the decisions that Wells Fargo made regarding each named Plaintiff's application, according to my loan file review. I found no information in the files to suggest that any of Wells Fargo's actions or decisions were affected by an applicant's race, ethnicity, or the demographic composition of the neighborhood where the property was located.

| Named Plaintiff | Wells Fargo Decisioning |
|---|---|
| Aaron Braxton | • Mr. Braxton did not apply to refinance his mortgage. Instead, he was evaluated by Wells Fargo for a payment assistance program in August 2019 and for a permanent loan modification starting in late 2019.<br>• Mr. Braxton's application for assistance contained documentation that was incomplete or incorrectly completed and presented questions or discrepancies which needed clarification. Five months after application submission, Mr. Braxton still had not provided all the required documentation.<br>• In April 2020, Wells Fargo put Mr. Braxton's loan in a COVID-19 forbearance program because he was not current on the loan and was under active loss mitigation review based on his stated financial hardship. Wells Fargo removed Mr. Braxton from the forbearance program because he did not want to be in it. Wells Fargo then resumed processing his modification request, and after requesting additional documentation, approved him for a modification.<br>• Mr. Braxton submitted a complaint to Wells Fargo which included complaining about the loss mitigation process and customer service experience. Wells Fargo's response regarding the loss mitigation process accurately reflected the legitimate reasons for each documentation request made.<br>• Mr. Braxton also complained about Wells Fargo reporting his loan's status to credit bureaus, but his complaints about inaccurate credit reporting were incorrect because he was actually delinquent.<br>• Nothing in Wells Fargo's control prevented Mr. Braxton from bringing his loan current or continuing to make regular payments during the forbearance period. Further, given his actual delinquency, not having his delinquency reported to credit bureaus was beneficial to Mr. Braxton. |
| Bryan Brown | • Mr. Brown's refinance application was declined based on an excessive DTI ratio.<br>• Mr. Brown failed to satisfy agency requirements and Wells Fargo guidelines for documenting income from rental properties.<br>• Mr. Brown failed to respond to Wells Fargo's multiple requests for documents in a timely manner.<br>• Wells Fargo still extended Mr. Brown's rate lock at no cost to him, despite the delays.<br>• His application had to be re-underwritten due to the passage of time.<br>• Based on updated and verified information regarding his income, Mr. Brown's DTI ratio was too high for approval. |
| Gia Gray | • Dr. Gray's March 2020 application to refinance her loan on her personal residence was approved based on the determination that she had good credit history, income, and assets. |

| Named Plaintiff | Wells Fargo Decisioning |
|---|---|
| | • There is no evidence that Dr. Gray applied to refinance either of her investment properties, only inquired about refinancing them. In response to Dr. Gray's questions, Wells Fargo explained that investment property loans were still offered, but that interest rates had increased because investment property loans were considered higher risk at that time (early in the pandemic).<br>• There is no indication that Wells Fargo characterized Dr. Gray's investment properties as being in "high risk" or "bad areas." Wells Fargo originated a substantial number of loans in the census tracts where Dr. Gray's investment properties were located. |
| Ifeoma Ebo | • Wells Fargo's documentation requests to verify Ms. Ebo's employment and income history were necessary and proper, and the delays in the underwriting process were outside of Wells Fargo's control.<br>• Ms. Ebo's employment history led to difficulties in documenting two years of work history and income, as required by FHA guidelines.<br>• Ms. Ebo wanted to keep her existing residence while buying a new home, which required more information about the existing residence.<br>• She was relying on prospective rental income to qualify for the mortgage when there was no previous rental history.<br>• There were also concerns about the verification of the filing of her 2020 federal tax return.<br>• There was a title issue affecting the property that Ms. Ebo had to resolve.<br>• Ms. Ebo did not respond to document requests in a timely manner and provided incomplete or incorrect documentation. The delays caused multiple rounds of employment re-verification due to FHA requirements.<br>• Ms. Ebo's inability to satisfy all approval conditions delayed her loan closing, which was later cancelled at her request. |
| Terah Kuykendall-Montoya | • Although not disclosed on the application, Wells Fargo found that the Montoyas had a Chapter 7 bankruptcy discharged less than four years prior to the loan application, so a refinance was not permitted under Fannie Mae or Freddie Mac underwriting guidelines. The fact that Ms. Kuykendall-Montoya was able to obtain a mortgage later (after four years had elapsed since the bankruptcy) does not render her loan denial "pretextual." Rather, Wells Fargo applied the exact same neutral underwriting requirements with respect to bankruptcies that the later lender applied.<br>• The co-borrower had insufficient credit history to generate a credit score, so the application could not be evaluated by Fannie Mae's AUS.<br>• Moreover, the loan would have exceeded the fee limit to be a "Qualified Mortgage Loan" under the "Ability to Repay" requirements of Regulation Z, making it ineligible for sale to Fannie Mae or Freddie Mac. |
| Paul Martin | • Wells Fargo did not refuse to provide a loan to Mr. Martin. Instead, it conditionally approved Mr. Martin's application for a HELOC and reapproved it after review of the documentation he submitted. However, Mr. Martin disputed a |

| Named Plaintiff | Wells Fargo Decisioning |
|---|---|
| | third-party appraisal because he allegedly had a full appraisal performed earlier, which estimated the property value to be higher. Wells Fargo reviewed the third-party appraisal and found it was supported by reasonable comparables. Because of federal rules mandating the independence of appraisals, Wells Fargo had no power to overrule or revise that appraisal.<br>• Wells Fargo still approved Mr. Martin's HELOC application based on the estimate it received—the disputed appraised value was not an obstacle to approval of a HELOC in the amount that Mr. Martin applied for. |
| Elretha Perkins | • Contrary to the allegations that Ms. Perkins consistently made payments on her existing home loans and had an exemplary credit score, her existing HELOC with Wells Fargo was not in good standing when she applied to refinance in mid-September 2021, and her credit score was adversely affected by a series of delinquencies on that HELOC during the first half of 2020. Ms. Perkins' refinance application was denied because her existing HELOC had reached maturity and the full balance was due and unpaid; therefore it was not eligible for refinance.<br>• Ms. Perkins was responsible for the delays in the application process as she failed to response to the initial request for documentation until after the deadlines, which resulted in a denial due to an incomplete application. After later receiving the documents, and re-underwriting the loan, Ms. Perkins was denied again because of the late payments on credit accounts and insufficient benefit to the borrower. |
| Christopher Williams | • Wells Fargo conditionally approved Mr. Williams for his requested credit line amount. The credit report Wells Fargo obtained showed his credit score as 686, which was influenced by an unpaid medical collection account. There is no evidence that Mr. Williams had a credit score over 750 at the time Wells Fargo underwrote and priced Mr. Williams' HELOC application.<br>• The only credit score Wells Fargo used in pricing Mr. Williams HELOC was a standard credit bureau FICO score.<br>• Mr. Williams was not satisfied with the pricing he was offered based on his credit score and decided to cancel his application. |

# EXHIBIT A



**Expert Report**

**Marsha J. Courchane, Ph.D.**

In the Matter of

*In re Wells Fargo Mortgage Discrimination Litigation*

United States District Court, Northern District of California, San Francisco Division

No. 3:22-cv-00990-JD

February 29, 2024

*Confidential; Subject to a Protective Order*

Expert Report of Marsha J. Courchane
February 29, 2024

# Table of Contents

**1. Qualifications** .................................................................................................. 1

**2. Subject of this Expert Report** ........................................................................ 3

**3. Summary of Opinions** ..................................................................................... 5

**4. An Overview of the Mortgage Underwriting Process** .................................. 7

    4.1.   Differences Among Lenders ...................................................................... 7

    4.2.   Conventional and Government Markets ................................................... 9

    4.3.   Primary and Secondary Mortgage Markets ........................................... 10

    4.4.   Standards Set by the GSEs ...................................................................... 13

    4.5.   Automated Underwriting System Recommendations ............................ 13

    4.6.   The Use of Credit Scores in Mortgage Underwriting ............................ 16

**5. Wells Fargo's Policies and Procedures** ........................................................ 21

    5.1.   Wells Fargo's Underwriting Policies and Procedures ............................ 21

    5.2.   Wells Fargo's Pricing Policies and Procedures ...................................... 24

**6. Reporting Underwriting and Pricing Outcomes with HMDA** ..................... 30

    6.1.   Outcomes from HMDA ............................................................................ 31

    6.2.   Average Rate Spreads from HMDA ........................................................ 31

**7. Fair Lending Enforcement and Monitoring** ................................................. 32

    7.1.   The Fair Housing Act .............................................................................. 32

    7.2.   The Equal Credit Opportunity Act ......................................................... 32

    7.3.   Government Monitoring Information for Race and Ethnicity .................. 33

**8. Fair Lending Examination Procedures and Fair Lending Analytics** ........... 34

    8.1.   Industry Practices for Fair Lending Statistical Analyses of Underwriting and Pricing ..... 35

    8.2.   Wells Fargo's Fair Lending Analytics .................................................... 37

    8.3.   Disparate Impact and Business Justification ......................................... 39

    8.4.   Wells Fargo's Adherence to Industry Standards ................................... 41

**9. The Appraisal Process** ................................................................................. 42

**10. Analysis of the Plaintiffs' Mortgage Loan Applications** ........................... 46

    10.1.   Aaron Braxton ........................................................................................ 48

Expert Report of Marsha J. Courchane
February 29, 2024

10.2.   Bryan Brown ...........................................................................................................50

10.3.   Gia Gray ................................................................................................................52

10.4.   Ifeoma Ebo ...........................................................................................................56

10.5.   Terah Kuykendall-Montoya ..................................................................................59

10.6.   Paul Martin ...........................................................................................................62

10.7.   Elretha Perkins .....................................................................................................64

10.8.   Christopher Williams ............................................................................................65

**Appendix 1.  Documents Considered** ............................................................... **69**

**Appendix 2:  Plaintiff Loan Application Information** ....................................... **80**

**Appendix 3:  References for Analysis of Plaintiffs' Credit Applications** ............................ **82**

**Appendix 4:  Courchane CV** ............................................................................. **109**

Expert Report of Marsha J. Courchane
February 29, 2024

## 1.      Qualifications

1.        My name is Marsha J. Courchane.  I am a Vice President at Charles River Associates and the Practice Leader of the Financial Economics Practice.  I have been retained by McGuire Woods, LLP, counsel for Defendants in this action.  I understand that Winston & Strawn LLP is co-counsel to McGuire Woods.

2.        Since 1994, I have been extensively involved in research and analyses pertaining to residential mortgage markets.  I worked at the Office of the Comptroller of the Currency ("OCC") for five years, from 1994 to 1999, during which time, among other duties, I developed and reviewed statistical models that were used to evaluate residential mortgage underwriting decisions and the pricing of mortgage credit to determine whether the models met professional standards in statistics and econometrics.  Much of my work at the OCC pertained to fair lending compliance examinations of national banks regulated by the OCC.

3.        I also previously worked for Freddie Mac, one of the two largest government-sponsored enterprises ("GSEs") that purchase mortgages and issue mortgage securities in secondary mortgage markets.  During my employment at Freddie Mac, from 1999 to 2003, I had several areas of expertise, including serving as Director of Financial Strategy and Research.  I provided policy related research to Freddie Mac and worked with academic experts to research topics in secondary mortgage markets.  I also directed the group that provided fair lending oversight for Freddie Mac, including its automated underwriting system ("AUS"), Loan Prospector ("LP").

4.        Since 2003, I have served as a consultant for many of the nation's most prominent financial institutions, often concerning their mortgage lending operations.  A large part of my consulting work involves preparing financial institutions for examinations by federal banking regulators, including fair lending reviews, and providing advice concerning compliance with the Fair Housing Act and Equal Credit Opportunity Act ("ECOA") with respect to mortgage underwriting, pricing, loss mitigation, and servicing of loans held in portfolio by

Expert Report of Marsha J. Courchane
February 29, 2024

the lender.  Much of that practice involves developing and reviewing statistical models pertaining to the availability and pricing of credit in residential mortgage markets, and analyzing how those models reflect on an institution's compliance with fair lending laws.  As part of this work, I regularly review mortgage loan files and am familiar with the documentation used in originating, pricing, and closing conventional and government-backed mortgage loans.  I have provided testimony in several previous matters pertaining to mortgage markets, as well as in matters involving credit scoring, including the impact on credit scores of information reported by credit furnishers. My work has also included expert testimony on issues related to servicing and loan modifications under the Home Affordable Modification Program ("HAMP") and other programs. This work has included analysis of detailed loan payment history data, as well as data specific to loss mitigation and loan modification processes. In addition, I have provided expert testimony on the origination and servicing of Federal Housing Administration ("FHA") loans that focused on underwriting and loan outcomes, including loans that went to foreclosure and reports on appraisal bias. My work also includes reviewing loan servicing files from various banks and mortgage companies. I have also provided expert testimony in an appraisal bias matter.

5.      I hold a Ph.D., M.A., and B.A. in Economics from Northwestern University. My fields of study include, among others, real estate finance, mortgage lending, and consumer credit.  My research publications have appeared or have been accepted for publication in a number of leading peer-reviewed journals, including *Applied Economics*, the *Atlantic Economic Journal*, the *International Real Estate Review*, the *Journal of Economics and Business*, the *Journal of Real Estate Research*, *Housing Policy Debate*, the *Journal of Housing Economics*, the *Journal of Real Estate Finance and Economics*, *Property Management*, and *Real Estate Economics*.  I am or have been on the editorial boards of the Jo*urnal of Real Estate Research*, the *Journal of Housing Research*, the *Journal of Real Estate Literature*, and the *International Journal of Housing Markets and Analysis*.

6.      I served as the Executive Vice President of the American Real Estate and Urban Economics Association, the premier academic organization for real estate economics and

Expert Report of Marsha J. Courchane
February 29, 2024

finance scholars, from 2008 through 2019.  I served on the Board of Directors of the American

Real Estate Society from 2008 through 2013.  I was a Counselor of Real Estate ("CRE") from

2013 through 2023.  I am also a Fellow of the Homer Hoyt/Weimer Advanced Studies

Institute, which fosters academic scholarship to improve decision-making in real estate and

land economics.  My current CV is attached as Appendix 4.

7.      In forming my opinions for this report, I relied on the sources and documents

listed in Appendix 1.  I also relied upon my education, training, academic research, and

professional industry experience in the fields of mortgage lending and consumer finance.  I

reserve the right to supplement and/or amend this report if additional information or data

become available to me.

8.      Charles River Associates bills my time at $985 an hour in 2024.  My

compensation is not contingent on the outcome of this matter or my opinions.  Staff in the

Financial Economics Practice of Charles River Associates assisted me, at my direction, with

this report.

## 2.      Subject of this Expert Report

9.      I submit this report at the request of counsel for Wells Fargo Bank, N.A. ("Wells

Fargo" or "Defendant") in this matter. Counsel requested that I provide an overview of the

mortgage industry, with a focus on industry standards and regulatory expectations regarding

mortgage underwriting, pricing, fair lending risk management and monitoring, and the

appraisal process.  I was also asked to opine on the underwriting and/or pricing decisions

made with respect to the mortgage loan applications from the named Plaintiffs.

10.     The Amended and Consolidated Class Action Complaint ("Amended Complaint")

alleges that Plaintiffs Aaron Braxton, Paul Martin, Gia Gray, Bryan Brown, Elretha Perkins,

Christopher Williams, Ifeoma Ebo and Terah Kuykendall-Montoya, and other members of the

proposed class are "victims of Wells Fargo's pervasive misconduct" in that their mortgage

loan applications were systematically delayed or denied because Wells Fargo discriminated

Expert Report of Marsha J. Courchane
February 29, 2024

against them.  The Plaintiffs allege systematic race discrimination, disparate impact and redlining.[1]

11.      The Plaintiffs base their allegations, in part, on their perception of a past settlement involving Wells Fargo in 2012, which pertained to subprime loans originated before the collapse of the mortgage market in 2008.[2]  The Plaintiffs involved in the current Amended Complaint did not apply for any subprime loans.  Since that time, the industry has tightened underwriting standards and offers primarily loans that meet the standards of the secondary mortgage market (Freddie Mac, Fannie Mae, and the Department of Housing and Urban Development ("HUD")).[3]

12.      The Amended Complaint also cites information relating to lawsuits brought by the City of Oakland, CA in 2015, suing Wells Fargo for alleged "racially discriminatory banking practices," and Cook County, IL alleging equity stripping by Wells Fargo with respect to minority borrowers.[4]  In both cases, the federal court sided with Wells Fargo.  In the Oakland, CA case, the Court found on March 16, 2022, that "Plaintiff City of Oakland shall take nothing by way of its First Amended Complaint, or be afforded any relief whatsoever."[5]  Similarly, in the Cook County matter, the Court determined that "Judgment is entered in favor of Defendants Wells Fargo & Co., et al., and against Plaintiff County of Cook. Plaintiff shall take no relief," filed December 19, 2022.[6]  Thus, in neither of these cases did the court hold Wells Fargo liable for racial discrimination or equity stripping with respect to minority borrowers.

---

[1] Amended Complaint, ¶ 23.

[2] *Ibid.*, ¶ 85.

[3] Freddie Mac and Fannie Mae are also referred to as "FMAC" and "FNMA," respectively.

[4] Amended Complaint, ¶¶ 86, 89.

[5] No. 15-cv-04321, Dkt. 195, filed 03/16/22 in the Northern District of California.

[6] No. 14-cv-09548, Dkt. 730, filed 12/19/22 in the Northern District of Illinois.

Expert Report of Marsha J. Courchane
February 29, 2024

13.　　I understand the minority groups at issue are non-white borrowers.[7]  Specifically, the Amended Complaint proposes a class of "similarly situated Wells Fargo residential original purchase mortgage, refinance and other home mortgage loan applicants falling within any one of the ethnic or racial aggregate categories and subcategories set forth in Regulation C (12 C.F.R. 1003), other than White, Not Hispanic or Latino," which they refer to as "Minority Applicants."[8]  The Amended Complaint defines the class as including "all Minority Applicants in the United States who, from January 1, 2018 through the present," meet certain criteria.[9] The focus is on three outcomes comparing Minority Applicants to similarly situated non-Minority Applicants: (1) those denied but who would have been approved if non-Minority; (2) those approved with less favorable terms or at higher interest rates than non-Minorities; (3) those processed at a slower rate than the non-Minority average.[10]

## 3.　　Summary of Opinions

14.　　In my opinion, Wells Fargo's fair lending compliance practices meet industry standards.  The analytics provided by its Fair Lending Analytics ("FLA") team reflect the requirements of the federal financial regulatory institutions, including the OCC, the Federal Reserve Board ("FRB"), and the Consumer Financial Protection Bureau ("CFPB").  My review of the Plaintiffs' documentation, and deposition transcripts found no evidence that lending decisions made by Wells Fargo were based on protected class status, such as race, ethnicity, or geographic location.

15.　　My review of the underwriting and pricing practices and procedures of Wells Fargo during the time period from 2018 to present finds that Wells Fargo follows industry standards with respect to its processes governing (i) how loan applications are processed and

---

[7] To avoid confusion between loans insured by the FHA and FHA-protected borrowers, I will refer to African American and Hispanic mortgage borrowers as protected minority borrowers.  I will use the acronym "FHA" to refer to Federal Housing Administration's government-insured mortgage loans.

[8] Amended Complaint, ¶ 153. Internal quotation marks omitted.

[9] *Ibid.,* ¶ 155.

[10] *Ibid*.

Expert Report of Marsha J. Courchane
February 29, 2024

underwritten, (ii) the types of documentation that are required from borrowers, (iii) the
pricing of different types of loan products, (iv) the use of loan-level pricing adjustments, and
(v) the use of independent third-party appraisers.

16.     Wells Fargo, as one of the nation's largest mortgage lenders, is subject to
regulatory oversight with respect to its mortgage practices by several federal regulatory
agencies, including the OCC, the FRB, and the CFPB.  In addition, as a lender who sells agency
(conventional) mortgages in the secondary market, it is required to meet the standards set by
the Federal Housing Finance Agency ("FHFA") with respect to the loans sold to Freddie Mac
and Fannie Mae, the standards set by HUD for its government-insured FHA loans, and the
standards set by the U.S. Department of Veterans Affairs for Veteran's Administration ("VA")
loans.

17.     Based on the documents that I have reviewed, and my experience, I am of the
opinion that Wells Fargo's fair lending monitoring, its testing of risk scoring models, its
development and use of custom scoring models/decisioning systems, and its use of third-
party appraisals are consistent with industry practices.

18.     Based on my detailed review of the documentation and data produced regarding
the loans of each of the eight named Plaintiffs, I am of the opinion that the decisions were
based on factors other than protected class status.  In each individual Plaintiff's case, I found
that Wells Fargo's underwriting or pricing decision (as applicable), was appropriate based on
the applicable Wells Fargo, GSE, and/or government agency policies and guidelines and were
not based on applicant's race, ethnicity, or the demographic composition of the
neighborhood in which the Plaintiff's property was located.  In cases where Wells Fargo
allegedly made repeated requests for documentation, those requests were justified because
of the Plaintiff's failure to provide complete or correct documents that Wells Fargo required
as a condition of loan approval, and to provide them on a timely basis.  Likewise, delays in the
process were caused by failures of the Plaintiffs to fulfill legitimate and necessary loan
approval conditions on a timely basis.  I also found no indications that racial or ethnic

Expert Report of Marsha J. Courchane
February 29, 2024

discrimination by Wells Fargo played a role in appraisals of a Plaintiffs' property values, nor were any of the named Plaintiffs adversely affected by a proprietary Wells Fargo credit scoring model or AUS.

19.    Further, I found that the situations of the eight named Plaintiffs were distinct and idiosyncratic.  They were not similarly situated.  Reaching a conclusion regarding alleged discrimination for each named Plaintiff required detailed analysis of their specific circumstances and the lending policies and guidelines specific to their individual situations.  On this basis, and based on my experience, it is my opinion that evaluating whether Wells Fargo discriminated against any of the members of the proposed class would require a separate analysis of the specific facts and circumstances present in each individual lending decision for each loan at issue and the specific policies applicable to each class member's situation.

## 4.    An Overview of the Mortgage Underwriting Process

20.    In order to understand the opinions that I have come to in this matter, I provide below background on the composition of the mortgage industry, and its standards and practices.  The thirty years in which I have been actively involved in fair lending compliance, first at the OCC, then at Freddie Mac, and finally in my role as a consultant, have provided me with a broad perspective on the industry and its changes over time.

### 4.1.    Differences Among Lenders

21.    Mortgage loans offer individuals access to credit for one of the most important purchases they will ever make – their home. The mortgage lending industry in the United States is among the most well-developed financial markets in the world. By 2023 Q3, 66 percent of householders in the United States were homeowners.[11]  Homeownership rates for

---

[11] Federal Reserve Bank of St. Louis, "Housing and Homeownership:  Homeownership Rate," *FRED Economic Data*, available at: https://fred.stlouisfed.org/release/tables?rid=296&eid=784188#snid=784189, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

almost all races and ethnicities increased from 2019 to 2022.[12]  While the share of non-Hispanic white homeowners was higher than for other racial and ethnic groups (at 74.4%), there were no significant differences in the rate of increase in homeownership rates for non-Hispanic whites compared to any minority group.[13]

22.	Over the period from 2016 to 2022, the non-Hispanic white homeownership rate increased by 2.5 percentage points, while that for African Americans increased by 3.4 percentage points and that for Hispanic or Latino borrowers increased by 2.6 percentage points.[14]

23.	Mortgage loans allow people to purchase their homes while providing only a relatively small share of the purchase price from their own funds. The rest of the money needed to purchase the home is borrowed from a mortgage lender under specific repayment terms and conditions using the home as collateral for the mortgage loan. In turn, mortgage lenders earn income from origination and servicing fees and by the difference (or "spread") between their cost of funds and the interest rates or note rates on the mortgage loans.

24.	In the United States, in 2022, there were 4,451 lenders that reported home mortgage originations under the requirements specified by the Home Mortgage Disclosure Act ("HMDA").[15]  Of these lenders, 1,945 (or 43.7 percent) were small (assets less than $1 billion) and large bank "depository" institutions, 1,455 were credit unions (32.7 percent), 93

[12] U.S. Census Bureau, "Rate of Homeownership Higher Than Before Pandemic in All Regions," July 25, 2023, available at https://www.census.gov/library/stories/2023/07/younger-householders-drove-rebound-in-homeownership.html.

[13] Ibid.

[14] Op. Cit., U.S. Census.

[15] CFPB, Data Point:  2022, Mortgage Market Activity and Trends, September 2023, at 57, available at: https://files.consumerfinance.gov/f/documents/cfpb_data-point-mortgage-market-activity-trends_report_2023-09.pdf, last accessed 02/28/2024.  This count includes closed-end applications and originations, excluding reverse mortgages.  HMDA was enacted in 1977 and implemented under the FRB's Regulation C. Rule-making authority for Regulation C moved to the CFPB in 2011. HMDA data is available at: www.ffiec.gov/hmda.

Expert Report of Marsha J. Courchane
February 29, 2024

were mortgage companies (2.1 percent) affiliated with a depository institution, and 958 were independent mortgage companies (21.5 percent) often referred to as mortgage banks.[16]

25.    Of the 6.977 million closed-end mortgage originations in 2022, only 24.4 percent were originated by large banks, such as Wells Fargo.[17]  More than half of all originations (57 percent) were originated by independent mortgage companies.[18]  The 25 HMDA-reporting institutions with the highest total originations originated 37.4 percent of the mortgage loans in 2022.[19]

26.    Depository institutions may opt to hold mortgages in their own portfolios of assets. In other words, they may retain the mortgage loans rather than sell them to investors. They can also sell them on the secondary market.  Many non-depository institutions do not hold or retain portfolios of mortgage loans but rather they sell the mortgages, once originated, as either a single asset that combines the mortgage loan and its servicing rights, or as two separate assets including the loan itself as one asset and the servicing rights as a second asset. I discuss this at greater length below.

## 4.2.    Conventional and Government Markets

27.    Conventional loans are any loans that are not originated under specific government-insured or guaranteed mortgage loan programs, such as FHA or VA loans.[20] Conventional, conforming loans (also called "agency" loans) are those that conform to loan program, underwriting and pricing standards set by Fannie Mae or Freddie Mac, the two GSEs.  Among other standards, conforming loans are subject to mortgage loan amount limits,

---

[16] *Ibid.*, at 60, Table 5A.  A depository institution is one that takes deposits from its customers in the forms of savings and checking accounts and certificates of deposit, among other things. A non-depository institution, which serves as a mortgage banker, must fund mortgages from sources other than deposits, such as a warehouse line of credit from a bank.

[17] *Ibid.*, at 60, Table 5A.

[18] *Ibid*.

[19] *Ibid.*, at 65-67, Table 6A.

[20] See CFPB, *Conventional Loans*, available at:  https://www.consumerfinance.gov/owning-a-home/loan-options/conventional-loans/, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

which typically change annually.  In 2024, that limit is $766,550 in most counties in the U.S. but is higher in certain high cost counties.[21]  During the 2018 – 2023 time period, the limit increased yearly from $453,100 in 2018 to $726,200 in 2023.[22]  Conventional loans that do not conform to GSE mortgage loan limits are called "jumbo" loans.

28.     Each of the GSEs and government agencies publish highly detailed manuals of policies and guidelines for underwriting loans, which are revised from time to time, that mortgage lenders must comply with in order to originate loans under their respective programs.[23]  Those policies and guidelines include requirements for credit evaluation; requirements for verification and documentation of such applicant information as income and employment history, liquid assets, debts, and sources of funds; and requirements for collateral valuation (i.e., appraisals).

### 4.3.    Primary and Secondary Mortgage Markets

29.     The distinction between primary and secondary mortgage markets is critical to understanding the underwriting, funding, and pricing of residential mortgages. The primary mortgage market consists of the lenders who originate loans to borrowers – such as homeowners. The lenders extend credit to retail customers who use the real estate property as collateral to secure the loan. The primary market includes depository banks and savings and loan companies, mortgage companies, realtors, real estate brokers, and borrowers.

30.     Once mortgage loans are originated, a lending institution needs either to service the loans internally or to arrange for a third party to provide servicing. The servicing function includes collecting the principal and interest payments from borrowers and maintaining

---

[21] *Ibid.*

[22] See FHFA maximum conforming loan limit announcements, available at: https://www.fhfa.gov/DataTools/Downloads/Pages/Conforming-Loan-Limit.aspx, last accessed 02/28/2024.

[23] See Fannie Mae Single-Family Selling Guide, available at: https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/; Freddie Mac Single-Family Seller Servicer Guide, available at: https://guide.freddiemac.com/app/guide/browse; HUD Single Family Housing Policy Handbook 4000.1, available at: https://www.hud.gov/program_offices/housing/sfh/handbook_4000-1; and VA Lenders Handbook – VA Pamphlet 26-7, available at https://www.benefits.va.gov/warms/pam26_7.asp, all last accessed 02/02/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

contact with borrowers. While the originating institution and the servicing institution may be the same party, often they are not.  In many cases, the mortgage lender who originated the loan chooses not to service the loan, selling the servicing rights to another party.

31.     The originating mortgage lender may also choose not to hold the mortgage loan as an asset and may instead sell the loan into the secondary mortgage market through a process called "securitization." Sales into secondary mortgage markets, typically made in groups of loans called "pools," provide mortgage lenders with funding (or "liquidity") necessary to make additional mortgage loans to other would-be homeowners. The mortgages that are securitized in the pool are mortgage-backed securities ("MBS"). As noted, a pool of loans may be securitized with the servicing rights intact or the servicing rights released (to be sold separately).

32.     The secondary mortgage market is a market in which already funded mortgages, or pools of mortgages, can be bought and sold. Secondary market participants include the GSEs, the Government National Mortgage Association ("Ginnie Mae"), depository institutions, private institutional investors, and capital markets including "Wall Street" investment banks. By regulation, the GSEs are limited to purchasing only loans at or below a particular conforming loan limit.  The loans that Freddie Mac and Fannie Mae purchase are conventional, conforming loans. The loans that are larger than those eligible for purchase by Fannie Mae and Freddie Mac are called jumbo loans.  In 2023, the GSE share of the agency single family mortgage business was 62.4 percent, down from 75.5 percent a decade earlier.[24] Its share of the purchase money market stood at 64.8 percent and the share of the refinance market was 57.5 percent.[25]  From 2018 to 2022, the GSE share varied from 66.8 percent (2018) to a high of 75.8 percent (2020 and 2021).[26]

---

[24] See *Inside Mortgage Finance*, issue 2024:01, January 5, 2024, at 3.

[25] *Ibid.*

[26] *Ibid.*

Expert Report of Marsha J. Courchane
February 29, 2024

33.     Upon purchasing the loans, the GSEs assume the credit risk on those loans, as long as they have been originated to GSE standards.  This means that once the loans are sold by the originating lender to the GSEs, in accord with GSE standards, that the originating lender will not bear any costs from default by the borrower.  If, however, the loans sold to the GSEs do not conform to GSE standards, the GSEs can require the originator to repurchase the loans.[27]  When loans receive an "Accept" from the GSE AUS systems, the representations and warranties offered to the GSEs by the lenders assure the GSEs that the underwriting and documentation meets the GSE standards.[28]  In this situation, the GSEs cannot require the lenders to repurchase the loans or take other recourse against the lender if default later occurs provided that the loan complies with other relevant GSE requirements.  The framework for representation and warranties offered by the GSEs was updated from 2013 to 2016 in order to provide more transparency to lenders.[29]

34.     There are regulatory and market-determined restrictions on the types and the quality of loans that the GSEs purchase. One restriction is that, for those loans purchased by the GSEs that exceed 80 percent of the value of the residential property, certain "credit enhancements" must also be provided, in particular private mortgage insurance ("PMI"). The purpose of PMI is to protect lenders against loss if the homeowner defaults on monthly principal and interest payments. PMI should not be confused with mortgage life insurance, which pays off a mortgage in the event of death or disability, or with homeowners' insurance,

---

[27] See Laurie S. Goodman and Jun Zhu, "Reps and Warrants:  Lessons from the GSEs Experience," *Urban Institute*, October 24, 2013, available at:  https://www.urban.org/sites/default/files/publication/24096/412934-Reps-and-Warrants-Lessons-from-the-GSEs-Experience.PDF, last accessed 02/28/2024.

[28] See, for example, Freddie Mac, *Seller/Servicer Guide*, Section 5903.5, "Representation and Warranty Relief and Additional Requirements," available at:  https://guide.freddiemac.com/app/guide/section/5903.5, for information on relief from reps and warrants with respect to income and tax documentation, for example, and Section 5101.8, "Representation and Warranty Relief for Creditworthiness," available at: https://guide.freddiemac.com/app/guide/section/5101.8, last accessed 02/27/2024.  See also Freddie Mac, "Selling Representation and Warranty Framework," available at:  https://sf.freddiemac.com/working-with-us/selling-delivery/delivery-options-pricing/selling-representation-and-warranty-framework, last accessed 02/28/2024.  Fannie Mae's requirements are similar.

[29] See FHFA, "Representation and Warranty Framework," available at: https://www.fhfa.gov/PolicyProgramsResearch/Policy/Pages/Representation-and-Warranty-Framework.aspx, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

which protects the homeowner from loss, theft, fire, or other disaster. In other words, PMI insures lenders against loss, even though it is paid by borrowers. In turn, PMI allows borrowers to take out mortgage loan amounts that exceed 80 percent of the value of the home, using less of their own funds as a down payment. Moreover, because such mortgages can qualify for sale in the secondary market, the use of PMI may improve the loan terms and conditions available to borrowers.

35.     FHA, a government-insured mortgage loan program, also requires that mortgages be insured because the financing is typically raised privately. The insurance associated with the program is provided by Ginnie Mae. Ginnie Mae guarantees that investors who purchase the MBS pools that are backed by federally insured (FHA) or guaranteed (VA) loans will receive timely payment of principal and interest. Ginnie Mae's share of the agency single-family MBS market was 37.6 percent in 2023.[30]

### 4.4.    Standards Set by the GSEs

36.     Fannie Mae and Freddie Mac have been instrumental over time in setting loan standards for the origination of mortgage loans. These standards are myriad, but include key features such as loan limits, credit score limits, the amount of reserves that must be held by the borrower, escrow requirements, verification, and documentation requirements, and, in some cases, ability-to-repay requirements. Many of these requirements are embedded in each entity's automated underwriting systems. These systems have historically been referred to as Desktop Underwriter ("DU") for Fannie Mae and Loan Prospector ("LP") for Freddie Mac. Currently, Freddie Mac has an enhanced AUS called Loan Product Advisor ("LPA").

### 4.5.    Automated Underwriting System Recommendations

37.     The AUS systems developed by the GSEs are useful because they can provide quick decisions about a loan's eligibility for sale to the GSE, by considering the overall loan risks posed by the borrower's credit and the collateral of the loan. The use of a GSE's AUS

---

[30] *Op. Cit.* Inside Mortgage Finance, January 3, 2024.

Expert Report of Marsha J. Courchane
February 29, 2024

system does not lead automatically to an underwriting decision by the given lender, such as a recommendation to deny or approve a given loan. Rather, the AUS result indicates whether the parameters of the loan meet the GSE's conforming loan requirements and whether the credit information input for the applicant meet the GSE's underwriting standards. The AUS results also list various conditions that an approval AUS result is subject to, such as satisfactory verification of income, employment, funds to close, and aspects of credit history, among other things. Thus, even when an AUS is used, mortgage underwriting is not fully automated and is not fully determined by the AUS result. Instead, various additional steps must be completed by underwriters before a final underwriting decision may be rendered.

38.     The AUS result from Freddie Mac's LPA system provides a Risk Class of "Accept" or "Caution." Applications receiving an "Accept" Risk Class comply with all the requirements of Chapter 5101 of Freddie Mac's Single-Family Seller/Servicer Guide. LPA does not reject loans, but instead refers the loans that do not receive a Risk Class of Accept for a potential manual underwriting process.[31] If the mortgage application receives a Risk Class of Accept, it means only that LPA determined the borrower has acceptable creditworthiness with respect to Freddie Mac's willingness to purchase the loan from the originator, based on the applicant and loan information input by the lender. The AUS Accept is not an underwriting approval decisioning. Each loan must still be underwritten to comply with the lender's underwriting standards and requirements. A Freddie Mac AUS Risk Class of Caution may indicate excessive layering of risk such as a combination of a low credit score and high loan-to-value ("LTV") and debt-to-income ("DTI") ratios. Freddie Mac's Exhibit 25 provides some detail about minimum indicator credit scores and how they impact eligibility for sale to Freddie Mac.[32] Regardless of the LPA Risk Class provided, each loan originated will be subject to the given lender's underwriting standards and requirements.

---

[31] See Freddie Mac, *Seller/Servicer Guide*, section 5101.1, "General information for using Loan Product Advisor," available at: https://guide.freddiemac.com/app/guide/section/5101.1, last accessed 01/24/2024.

[32] See Freddie Mac, *Seller/Servicer Guide,* Exhibit 25, "Mortgages with Risk Class and/or Minimum Indicator Score Requirements," available at:  https://guide.freddiemac.com/app/guide/exhibit/25, to download Exhibit 25.

Expert Report of Marsha J. Courchane
February 29, 2024

39.     Fannie Mae's system, DU, considers several factors to assess the creditworthiness of mortgage borrowers.  These include "credit histories, delinquencies, installment accounts, revolving credit balances and usage, public records, foreclosures, collections, and inquiries."[33]  DU also assesses other non-credit risk factors such as the borrower's equity, the LTV ratio, reserves, the loan's purpose (purchase, refinance or home improvement), term, amortization type, occupancy type, DTI ratio, housing expense ratio, property type and variable income.[34]

40.     DU also provides asset validation and verification and cash flow assessment and can be used with nontraditional credit references.[35]

41.     The output from DU is similar to that from LPA:  it provides an Approve/Eligible (Section B3-2-05), Approve/Ineligible (Section B3-2-06), Refer with Caution (B3-2-07) or Out of Scope (Section B3-2-08) result.[36]  Loans with a result of "Approve/Eligible" meet both Fannie Mae's borrower credit risk and loan eligibility standards.  Loans with a result of "Approve/Ineligible" meet Fannie Mae's borrower credit risk standards but the loan parameters are not eligible for sale of the loan to Fannie Mae. Loans with a result of "Refer with Caution" represent a level of risk that is not acceptable to Fannie Mae for DU loans,

---

[33] Fannie Mae, *Selling Guide*, Section B3-2-03, "Risk Factors Evaluated by DU," available at:  https://selling-guide.fanniemae.com/Selling-Guide/Origination-through-Closing/Subpart-B3-Underwriting-Borrowers/Chapter-B3-2-Desktop-Underwriter-DU-/1032994121/B3-2-03-Risk-Factors-Evaluated-by-DU-12-13-2023.htm, last accessed 02/28/2024.

[34] *Ibid*.

[35] See Fannie Mae, *Selling Guide*, Section B3-5.4-02, "Number and Types of Nontraditional Credit References," available at https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B3-5-Underwriting-Borrowers/Chapter-B3-5-Credit-Assessment/Section-B3-5-4-Nontraditional-Credit-History/1032990671/B3-5-4-02-Number-and-Types-of-Nontraditional-Credit-References-02-01-2023.htm, last accessed 02/28/2024, in the Selling Guide. "Non-traditional" refers to credit references other than credit history information from the three major credit bureaus, such as rental and utility payment history information.

[36] The loan may be ineligible for sale for a variety of reasons including additional layering of risk, not meeting stated product requirements or due to a combination of risk factors outside Fannie Mae's current preferences. See Fannie Mae, *Selling Guide*, Section B3-2-06, "Approve/Ineligible Recommendations," available at https://selling-guide.fanniemae.com/Selling-Guide/Origination-through-Closing/Subpart-B3-Underwriting-Borrowers/Chapter-B3-2-Desktop-Underwriter-DU-/1032990951/B3-2-06-Approve-Ineligible-Recommendations-02-01-2023.htm, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

although that result can sometimes be resolved by updating information and resubmitting the loan to DU or by manually underwriting the loan.  An "Out of Scope" result indicates that DU is unable to underwrite the particular product, mortgage, or borrower.

42.      Neither Fannie Mae nor Freddie Mac requires that applications receiving a "Refer with Caution" or "Caution" AUS result be manually underwritten.  Each lender sets its own policies regarding whether or not, and in what circumstances, it will manually underwrite agency loans based on its own evaluation of the costs, risks, and benefits of doing so.  Alternatively, it may choose to deny the loan, based on its own internal policies and procedures.

43.      Wells Fargo describes its processes with respect to GSE AUS results in its Risk Engine External Strategies document.[37]

## 4.6.   The Use of Credit Scores in Mortgage Underwriting

44.      Credit scores reflect a borrower's creditworthiness. Lenders and the GSEs use credit scores to establish minimum credit thresholds for mortgage loan products.  Credit scores serve as inputs to risk-based pricing.  The three primary consumer reporting agencies ("CRAs" or "credit bureaus") in the U.S. are Equifax, Experian, and TransUnion.[38]  These three major repositories have been operating across the U.S. under the rules established by the Fair Credit Reporting Act, passed in 1970 and amended in 1996.[39]  Mortgage lenders may use one or more of these scores in assessing a borrower's creditworthiness.  Many mortgage lenders use a "tri-merge" credit report, combining information from all three credit bureaus.

45.      The CRAs collect, organize, and report information regarding the creditworthiness of an individual.  The data include information as to the identity of the

---

[37] See, for example, WF-04846664.

[38] Innovis also supplies credit reports, but they do not provide credit scores (see www.innovis.com).

[39] See Mark Furletti, "An Overview and History of Credit Reporting," Federal Reserve Bank of Philadelphia, June 2002, available at:  https://www.philadelphiafed.org/-/media/frbp/assets/consumer-finance/discussion-papers/CreditReportingHistory_062002.pdf, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

individual (*e.g.*, name, current address, previous address(es), social security number, date of birth, employer), detailed information reported by credit grantors (also referred to as "furnishers") concerning an individual's current and past use of credit accounts (or "tradelines"), information from public records (e.g., bankruptcies, foreclosures, civil judgments), information reported by collection agencies, and information relating to credit inquiries made by the consumer or by companies interested in offering credit to the consumer.  The furnishers include, among others, financial institutions such as banks and credit unions, retailers, and finance companies.

46.     The consumer credit report presents the individual's credit-related information in a standardized format to potential credit grantors.  The credit account information for an individual includes the status of the account (*e.g.*, whether it is open or closed (by request of credit grantor or individual), in collection, charged off, etc.), the type of credit account (real estate/mortgage, revolving (including credit cards), installment loans (including automobile loans)), payment performance history (such as whether it is current or delinquent (30, 60, 90, 120, 150 days delinquent)), or other major derogatory status (foreclosure, charge off, collection, judgment, bankruptcy, or repossession).  The account information may also include codes that indicate the information is under dispute, or special remarks codes providing additional information (such as indicating that a loan has been modified or is in a forbearance plan).

47.     The payment performance on the account is used to gauge both an individual's willingness and ability to repay any outstanding balances or future loans.  As noted by researchers at the FRB describing credit scoring practices: "With respect to payment performance, accounts were sorted into one of three categories: accounts with "no derogatory" (no record of late payment), those with evidence of a "minor derogatory" (a late payment of 30-59, 60-89, or 90-119 days), and those with evidence of a "major derogatory." Credit accounts categorized as major derogatory include any account that is delinquent 120

Expert Report of Marsha J. Courchane
February 29, 2024

days or more and all credit accounts reported as associated with bankruptcy, foreclosure, repossession, civil judgment, collection, charge-off, and so forth."[40]

48.     A credit scoring model uses the data and information in a credit report to develop a credit score, which reflects an estimate of the consumer's likelihood of defaulting on a credit obligation.  The intent of the credit score is to summarize the available information into a composite number that allows one to rank the credit risk of a particular individual consumer.  Many creditors rely exclusively on a consumer's credit score in making a credit decision, as opposed to actually reading a credit report.  Those include, for example, some credit card issuers and indirect automobile finance lenders, who rely on credit tiers for credit granting decisions, but not on detailed credit report information.  However, other creditors, particularly mortgage lenders, will consider both the credit score and the presence of detailed credit information, such as derogatories, when making credit decisions. Thus, an applicant with a credit score greater than a minimum threshold for approval might nevertheless be denied due to other detailed information in their credit report (such as the recency of a past bankruptcy or foreclosure, or recent delinquent payments on existing loans).

49.     Credit scores have been used for over 30 years.  The scores will vary depending not only on the information in a particular credit report, but also because of the particular statistically based model used to combine and weight the various factors and their associated values to produce the credit score.  FICO™ scores were developed by Fair, Isaac and Company and were first made available to the three CRAs, in 1991.[41]  Credit scores are often generically referred to as FICO scores, although other credit scores are available from the credit bureaus (such as the VantageScore) and multiple versions of FICO scores are in use.

---

[40] See Robert B. Avery, Paul S. Calem, Glenn B. Canner, and Raphael W. Bostic, 2003, "An Overview of Consumer Data and Credit Reporting," *Federal Reserve Bulletin*, vol. 89, at 56, available at: http://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf, last accessed 02/28/2024.

[41] See FICO, "FICO History," available at https://www.fico.com/en/history, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

50.       A FICO score developed for Equifax has been known as a Beacon score.  A recent FICO score developed for Experian is the FICO Score 8.[42]  The FICO scores developed for TransUnion have been known as Empirica or TransRisk scores.  VantageScore credit scores are developed using the same scoring algorithm for all three CRAs and using information from all three CRAs.  The recent FICO and VantageScore models have score ranges from 300 or 350 to 850.

51.       Typically, the factors used in the scoring models and the weights they have in the determination of the credit score result from measuring the statistical relationship between the factor at an initial date and the consumer's subsequent credit performance over time.  Credit scoring models can be designed to produce differing probabilities of risk.  For example, some are designed to estimate the likelihood that a borrower will default by becoming 60 or 90 days past due in a particular period of time.  Some models, such as mortgage risk models, will estimate the likelihood that the property will go to foreclosure or that the collateral will be transferred to the holder of the credit risk from the borrower.

52.       Score ranges can also vary across models and models can vary in terms of factors included, weights, and the estimation model.  Any one lender may rely on bureau scores, VantageScores, or custom scores.  Models can be developed with a specific industry focus, for example, for mortgage lending.  It is most useful to think about creditworthiness as a tier of risk (superprime, prime, near prime, subprime, for example) rather than as a single numerical value, which can change over time.  Creditors will often rely on such "tiers," rather than the particular numerical score, in making credit decisions and will often rely on several factors in addition to credit risk scores or tiers. Historically, models have been developed such that a 20-point change in score represents a particular threshold change in risk.  Most models can be used to supply risk factor statements that help customers understand their own credit riskiness (such as the factors most negatively affecting their credit score).

---

[42] See Experian, "FICO," available at: https://www.experian.com/help/fico-score-disclosure.html, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

53.      While score ranges vary across models, Experian provides the following FICO

score-based risk classification:  Exceptional (21%): 800–850; Very Good (25%): 740–799; Good

(21%):  670–739; Fair (17%):  580–669; Poor (16%):  300–579.[43]

54.      The classification of score bands into risk tiers is quite common across credit

models and the establishment of risk-based pricing by credit grantors may reflect an

institution's belief about which score ranges represent particular categories of risk.  For

example, some creditors may view scores less than 640 as subprime while others may use

620 or 600 as the cut off for the subprime risk tier.

55.      Each of the three CRAs provide reports to consumers upon request.  They also

provide credit reports to others for certain purposes, such as upon a consumer's application

for credit.  At any point in time, the various scores available for a given consumer can differ.

There are several reasons for this, including:  (1) the information reported by furnishers may

be different because some report to all CRAs and some may not; (2) the date within a month

at which CRAs receive and post information varies across the CRAs; (3) the CRAs may adopt

different rules for determining when information is "stale" or out-of-date; (4) different

algorithms may be used for each CRA's determination of a credit score; (5) different rules may

be developed to determine whether the information relates to a particular individual with

respect to variations in name or address.

56.      The GSEs have specific requirements regarding which of the commercially

available credit score versions may be used in underwriting and how to determine the

"representative" or "indicative" credit score to be used in underwriting when multiple scores

are obtained for the applicant and/or co-applicant.[44]  For assessing mortgage applicant credit

---

[43]See  Experian, "What Is a Good Credit Score?," available at:  https://www.experian.com/blogs/ask-experian/credit-education/score-basics/what-is-a-good-credit-score/, last accessed 02/28/2024.

[44] See Fannie Mae, *Selling Guide*, Section B3-5.1-01, "Credit Scores," available at:  https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B3-Underwriting-Borrowers/Chapter-B3-5-Credit-Assessment/, and Section B3-5.2-01, "Requirements for Credit Reports," available at:  https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B3-Underwriting-Borrowers/Chapter-B3-5-

Expert Report of Marsha J. Courchane
February 29, 2024

risk, many home mortgage lenders originating home purchase mortgages or refinancing existing mortgages also choose among the specific FICO Score versions.  These include FICO Score 2 or Experian/Fair Isaac Risk Model v2, which is based on Experian data; FICO Score 5 or Equifax Beacon 5.0, which is based on Equifax data; and FICO Score 4 or TransUnion FICO Risk Score 04, which is based on TransUnion data.[45]  These scoring models have dominated the mortgage market because their use has been required for all mortgages sold to Fannie Mae and Freddie Mac.[46]

## 5.    Wells Fargo's Policies and Procedures

## 5.1.   Wells Fargo's Underwriting Policies and Procedures

57.    The underwriting of a mortgage loan application requires many detailed steps. Wells Fargo uses "CORE" as its mortgage loan processing system.  CORE stands for "Common Opportunities, Results, and Experiences" and, per the glossary in the overview of the Wells Fargo underwriting process, CORE is a "[d]ynamic web-based system that allows Wells Fargo Home Lending team members to process a loan from origination to funding."[47] This system facilitates the workflow for processing applications and is further described in a flowchart for the Home Lending Underwriting Service (RAU-7423).[48]  Contrary to allegations in Plaintiffs' Amended Complaint, CORE is not an "algorithmic underwriting platform," is not based on "machine learning," and does not take into account demographic or race-based underwriting criteria.[49]  As such, CORE cannot be used as a basis for the determination of disparate impact.

---

Credit-Assessment/Section-B3-5-2-Credit-Reports/1032995651/B3-5-2-01-Requirements-for-Credit-Reports-08-02-2023.htm, last accessed 02/28/2024.  Also see Freddie Mac, *Seller/Servicer Guide*, Section 5203.1, "Credit Reports," available at: https://guide.freddiemac.com/app/guide/section/5203.1, last accessed 02/28/2024.

[45] Experian, "What Are the Different Credit Scoring Ranges," available at: https://www.experian.com/blogs/ask-experian/infographic-what-are-the-different-scoring-ranges/, last accessed 02/28/2024.

[46] *Ibid.*

[47] See WF-00035281, page 27 (WF-00035307).

[48] See WF-00026980.pdf.

[49] Amended Complaint, ¶¶ 17-19.

Expert Report of Marsha J. Courchane
February 29, 2024

Rather, CORE is best understood as a workflow automation platform that facilitates the underwriting and processing of an application.

58.     Like most large financial institutions underwriting mortgages, Wells Fargo has comprehensive underwriting manuals.  Wells Fargo's guidelines are typical of those in the industry, and necessarily subsume guidance from the GSEs (for saleable agency conventional loans) and the government (for FHA and VA loans, for example). There are separate underwriting guidelines for Agency/Conforming, Non-Conforming, FHA, and VA loans.  These guidelines are updated periodically.  Underwriting at Wells Fargo, like in the mortgage industry more broadly, is generally a function of "The 5 Cs" of credit.  These include credit, capacity, capital, collateral, and characteristics.[50]  Each of these five Cs is associated with risk factors and each also may have "compensating" factors.[51]  Wells Fargo also has detailed guidelines governing the underwriting of home equity lines of credit ("HELOCs").[52]

59.     The evaluation of a mortgage application involves a lender's assessment of the borrower(s)' creditworthiness.  To make this assessment, lenders consider several categories of risk factors. Examples of those factors used by Wells Fargo for its Agency/Conforming mortgage applications to indicate elevated risk are provided here:[53]

- Credit Risk Factors:  bankruptcy, foreclosure, collections or judgments over $500, revolving, installment or housing debt delinquencies, limited credit history and excessive use of credit.

---

[50] See Wells Fargo, Agency / Conforming Underwriting Guidelines, WF-00003206.pdf, at 22.  "Capacity" refers to cash flow, or the ability to repay a loan taking into income and debts. "Capital" refers to assets, such as savings and investments. "Collateral" refers to the type and value of the real estate property securing the proposed loan.

[51] See, for example, Wells Fargo, Agency / Conforming Underwriting Guidelines, 2018, WF-00002270, at 91-92 (WF-00002362 - WF-00002363).

[52] See, for example, WF-00025604, WF-00031039, WF-00031262, WF-00031507, and WF-00143317.

[53] WF-00002270, at 92 - 96, (WF-00002363 - WF-00002367).

Expert Report of Marsha J. Courchane
February 29, 2024

- Capacity Risk Factors:  insufficient income, substantial increase in housing expense, employment instability.

- Cash/Capital Risk Factors:  high LTV or combined LTV, limited assets, reserves or savings, source of down payment (e.g., gifts to borrowers).

- Collateral Risk Factors:  unsupported appraisal value, high-rise condo, property near commercial properties, unacceptable zoning restrictions, deferred maintenance.

- Other Characteristics Risk Factors:  cash out for debt consolidation, short term adjustable-rate mortgages ("ARMs"), refinance of a subprime loan, application information does not seem reasonable.

60.      Wells Fargo will consider credit, capacity, capital, collateral and other characteristic risk factors with each loan it underwrites.  Some of the risks (capacity, cash/capital, other characteristics) may be offset in connection with certain applications by compensating factors.  However, in accord with GSE standards, for the Agency/Conforming mortgage applications, there are no compensating factors for credit and collateral risks.  Compensating factors may include rate/term refinance, other occupants not on note, substantial cash reserves, potential for increased earnings, high level of residual income, and history of satisfactory payment of similar levels of debt.

61.      The Agency/Conforming underwriting guidelines also provide information on how to assess qualifying ratios, employment and non-employment income, job stability, requirements for income and asset documentation, and property appraisals.  The guidelines also offer detail on requirements specific to various loan purposes (purchase, refinance, relocation).  In addition, they provide information on settlement and title requirements.

62.      The Agency/Conforming guidelines comprise, depending on year, approximately 457 pages, and there are also extensive guidelines for the other loan types.  The voluminous requirements for underwriting highlight how it is essential to evaluate different loan products

Expert Report of Marsha J. Courchane
February 29, 2024

separately when testing for any discrimination risk.  For example, regulators typically use different underwriting models for evaluating discrimination risk in conventional loans and government loans, while including controls for loan size (to account for conforming loan limits) and loan purpose, among other controls.

63.       For agency mortgages (e.g., conventional, conforming), Wells Fargo typically will submit the applications through Freddie Mac's LP or LPA or through Fannie Mae's DU, described above.  Applications that receive a "Refer/Caution" would require underwriting with a satisfactory result in order to be approved.[54]  Loans that do not receive an "Accept" or "Approve" result from a GSE AUS system will require additional review by the originating institution and may or may not be saleable to the GSEs.

64.       Regardless of whether or not the loans are agency mortgages, government mortgages (FHA or VA) or non-conforming mortgage products, there is no automated underwriting system used by Wells Fargo, or, in my experience, in the rest of the industry, that provides an automatic approval or denial to a mortgage loan application.  In addition, none of Wells Fargo's underwriting guidelines, for any product, are based on prohibited factors.

## 5.2.    Wells Fargo's Pricing Policies and Procedures

65.       The underwriting processes described above lead to a determination of whether a loan is approved or not.  For loans that are approved, there is also a determination of the loan price, or interest rate.  To determine the offered price on a given mortgage loan at Wells Fargo, the loan officer and underwriting would access daily rate sheets for the particular loan product under consideration.

### a)  Rate Sheets

66.       Wells Fargo produced pricing rate sheets for business days from January 2, 2018, through April 19, 2023, excluding holidays.  Generally, Wells Fargo had different rate sheets

---

[54] See Wells Fargo, Section 5. Manual Underwriting of the Borrower, WF-00012530 – WF-00012632.

Expert Report of Marsha J. Courchane
February 29, 2024

for conventional, conforming loans, non-conforming loans, government loans, Home
Affordable Refinance Program ("HARP") loans, high-balance loans, jumbo loans and HELOC
loans.  These rate sheets are explained in more detail below.

### b)  Loan Level Pricing Adjustments

67.        Each rate sheet type could also be subject to loan-level pricing adjustments –
typically adjustments based on credit score, loan term, loan program, and interactions with
categories of LTV and other pricing factors.  These are detailed below in Section 7.

### c)  Regulatory Guidance for Comparisons of Mortgage Loan Pricing across Borrowers

68.        Several factors contribute to observed variations in a mortgage loan's price, and
regulators understand that these must be accounted for to appropriately analyze pricing
across borrowers.[55]  For example, credit risk, loan parameters, down payment levels,
prepayment risk, the cost of funds and sale of mortgage loans to the secondary market, and
servicing costs can all impact mortgage loan prices.  Furthermore, pricing tends to change on
a daily basis.  If any of these factors are ignored, any measured disparity between groups of
borrowers could simply result from the omitted factors rather than from disparate pricing
based on protected class.  That is why the FRB has stressed that when examining differences
across racial or ethnic groups, the comparison of average outcomes requires adjustments for
borrower- and loan-related factors plus the specific lending institution used by the borrower.
It is not sufficient to rely only on racial disparities found in public HMDA data to infer
discriminatory outcomes.

69.        The approach taken by the regulatory institutions with respect to the fair lending
analysis of pricing outcomes follows the approach first recommended and detailed by the
FRB, to whom HMDA data was previously submitted, shortly after the pricing information was

---

[55] Robert B. Avery, Glenn B. Canner, and Robert E. Cook, 2005, "New Information Reported under HMDA and Its
Application in Fair Lending Enforcement," *Federal Reserve Bulletin,* vol. 91, at 368 - 370, available at:
https://www.federalreserve.gov/pubs/bulletin/2005/3-05hmda.pdf, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

included in HMDA.  This guidance stands today, particularly with respect to using multivariate statistical approaches to estimate any potential pricing disparities.

70.      In 2007, Sandra Braunstein, the Director of the Division of Consumer and Community Affairs at the FRB, provided a statement to the U.S. House of Representatives detailing the FRB's approach to fair lending analysis. Her comments offer a clear roadmap as to the regulatory guidance provided to detect any evidence of lending discrimination in pricing, and generally.  She proffered this guidance:[56]

*"During a targeted pricing review, the Federal Reserve collects additional information, including potential pricing factors that are not available in the HMDA data, to determine whether any pricing disparity by race or ethnicity is fully attributable to legitimate factors, or whether any portion of the pricing disparity may be attributable to illegal discrimination. To perform these reviews, we use analytical techniques that account for the increasing complexity of the mortgage market. Two industry changes in particular - the proliferation of product offerings and the increased use of risk-based pricing - have significantly increased the complexity of fair lending reviews.  It is not uncommon for a lender to offer many different products, each with its own pricing based on the borrower's credit risk.*

*To effectively detect discrimination in the expanding range of products and credit risk categories, the Federal Reserve increasingly uses statistical techniques. When performing a pricing review, we typically obtain extensive proprietary, loan-level data on all mortgage loans originated by the lender, including prime loans (i.e., not just higher-priced loans reported under HMDA). To determine how to analyze these data, we study the lender's specific business model, pricing policies, and product offerings. With respect to product*

---

[56] See Sandra Braunstein, *Fair Lending and the Home Mortgage Disclosure Act*, before the Subcommittee on Oversight and Investigations, Committee on Financial Services, U.S. House of Representatives, July 25, 2007, at 7, available at: https://www.federalreserve.gov/newsevents/testimony/braunstein20070725a.htm, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

*offerings, we take great care in defining the products or class of products we analyze,*
*since each product may have different pricing that must be considered in the analysis.*

*On the basis of our review of the lender's policies, we determine which factors from the*
*lender's data should be considered.  We then create a statistical model that takes into*
*account those factors and is tailored to that specific lender.  We typically will test for*
*discrimination in particular geographic markets, such as MSAs. It is important to look at*
*specific markets because relatively small unexplained pricing disparities at the national*
*level can mask much larger disparities in individual markets."*

71.     To measure any disparities among borrowers of differing races and ethnicities,
the specific pricing that was used for each borrower at the time of application, the multiple
channels through which loans were originated, and the impact of macroeconomic changes
over time on mortgage interest rates should all be considered.[57]  In addition, differences in
the pricing of individual products at a given institution, including any differences in pricing
resulting from mortgage loan insurance required by Freddie Mac and Fannie Mae and the
government (for its FHA loans) should be considered.  Without appropriate consideration
given to these variables, any pricing analysis conducted is insufficient to determine that the
pricing used by Wells Fargo leads to disparities between similarly situated non-Hispanic white
and minority borrowers.

72.     In large banks and most other mortgage lenders, mortgages are priced using
automated pricing engines or rate sheets.  For Wells Fargo, from 2018 through April 2023,
daily rate sheets were available that covered the pricing for various mortgage loan products.
As explained below, these vary over time, as well as by product.  Some of the pricing

---

[57] Robert B. Avery, Kenneth P. Brevoort, and Glenn B. Canner, 2006, "Higher-Priced Home Lending and the 2005
HMDA Data," *Federal Reserve Bulletin*, vol. 92, at A141, available at:
https://www.federalreserve.gov/pubs/bulletin/2006/hmda/default.htm, last accessed 02/28/2024. The FRB
authors emphasize that over time a number of factors can influence the reporting of loans above a rate spread
threshold, including the relationship between short term and long-term interest rates, changes in borrower credit
risk profiles, and business practices with respect to offering a range of products.

Expert Report of Marsha J. Courchane
February 29, 2024

decisions reflect sales to the secondary market, and some reflect internal price setting by Wells Fargo.

### d)  Wells Fargo's Rate Sheets

73.      To review the factors included in Wells Fargo's pricing decisions, I reviewed the pricing workbooks provided, focusing on the first available pricing rate sheet in each year from 2018, 2019, 2020, 2021, 2022, and 2023 as representative examples.[58]

74.      To take a typical example, the pricing workbook for January 2, 2018 included individual worksheets for agency loans (conforming pricing, conforming conventional LIBOR ARMs), non-conforming loans (fixed rate, and ARMs), government loans (government hybrid ARMs and fixed rate), HARP loans (Freddie Mac to Freddie Mac or Fannie Mae to Fannie Mae), high balance (fixed rate, ARMs and hybrid ARMs), daily ARM index for 7/1 and 10/1 ARMs, and various price adjusters, for all types of loans.[59]  The pricing for HELOCs is provided on separate rate sheets, some of which I reviewed, and is also subject to various adjustments based on credit factors and loan parameters.[60]

75.      The conventional conforming rate sheets and HARP rate sheets included different rates for lock periods (15-, 20-, 45-, 60-, 75-, or 90-day periods), term (30, 20, 15, and 10 year periods), relocation loan or not, and ARM type (5/1, 7/1, and 10/1). The government and high-balance rate sheets also included adjustments for lock period, but only 30-year or 15-year term.

76.      Each pricing workbook also contained a worksheet of loan level pricing adjustments, often referred to as "LLPAs".  For example, conforming and conforming high balance price adjusters for the retail business channel included LTV categories that are interacted with occupancy status, number of units, condominium, manufactured homes,

---

[58] See WF-00020001 - WF-00021512.

[59] See Rate Sheet 01/02/2018, WF-000200001.

[60] HELOC rate sheets obtained included WF-05171814.xlsm, WF-05171815.xlsm, and WF-05171816.xlsm.

Expert Report of Marsha J. Courchane
February 29, 2024

credit scores, total LTV, amortization type, escrow waiver, extended rate lock, super conforming and high balance loan amounts, and some specific Fannie Mae marketing programs.  Conforming A-minus adjusters had interactions with LTV and credit score.

77.     Government adjusters also had several factors that are interacted with LTV categories, including credit score, property type, manufactured home in some states, special government programs (e.g., FHA streamline refinance), loan amount, rate lock period, and other market programs. The rate sheets for 01/02/2018 (WF-00200001), 01/02/2019 (WF-00020260.xls), 01/02/2020 (WF-00020534), 01/04/2021 (WF-000220786), 01/03/2022 (WF-00021076) and 01/03/2023 (WF-00021421) all had similar layouts, pricing factors, and loan level pricing adjustments, with a few exceptions.  For example, as of 09/01/2020 (WF-00020702), conforming ARM pricing was suspended temporarily and reinstated on 11/23/2020 (WF-00020759).  As of 08/02/2021 (WF-0020963), a pricing grid was added for the conforming "Dream. Plan. Home." program.

78.     Non-conforming adjusters included customer assets under management with Wells Fargo, ACH payment, loan type (e.g., purchase money or cash-out refinance), loan amount, property units, state adjusters, lock period adjusters, and FICO/LTV interactions.

79.     HELOC rate sheets provided state-level grids for variable and fixed-rate HELOCs with FICO/LTV grids by term length, and adjusters for line balances, relationships based on account type, relationships based on assets under management, non-owner occupancy, or vacation home.

80.     In my experience, Wells Fargo's pricing structure is consistent with standard pricing structures in the mortgage market and reflects how mortgage loans are priced in the secondary market.  The pricing structure for conforming loans also largely mirrors the structure of Fannie Mae and Freddie Mac loan-level pricing adjustment matrices.[61]  These

---

[61] For current loan-level pricing adjustment matrices for Fannie Mae, see *Selling Guide*, "Matrix: Loan-Level Pricing Adjustment," available at: https://selling-guide.fanniemae.com/Selling-Guide/Selling-Securitizing-Delivering-

Expert Report of Marsha J. Courchane
February 29, 2024

industry-standard pricing structures contain nothing based on a borrower's race, ethnicity, or other legally protected characteristic, and do not consider the neighborhood in which a property is located or the demographic characteristics of the neighborhood.

### 6.      Reporting Underwriting and Pricing Outcomes with HMDA

81.      The HMDA data contain detailed information on mortgage loan applications and originations.  However, not all information collected and reported by the financial institution for the purposes of either underwriting or pricing is publicly available.  For example, application date, action date, credit score, and automated underwriting system result are not made publicly available in an attempt to protect the privacy of individual mortgage applicants and borrowers.

82.      While HMDA data can be used to examine outcomes for individual lenders with respect to denial rates, average pricing, types of products, and many other related characteristics in general terms, because the HMDA data provides only a limited set of factors related to underwriting and pricing of residential loans and does not include many of the detailed loan and borrower characteristics that are factored into lender, GSE, or agency underwriting and pricing guidelines, the HMDA data alone cannot be used to draw conclusions regarding lending discrimination.  Because a finding of discrimination requires comparisons of similarly situated individuals, the lack of complete information about the loan product or the borrower prevents such conclusions from being drawn.

83.      In particular, Plaintiffs' allegations regarding denial rate disparities in the raw HMDA data cannot be a basis for drawing conclusions about discrimination because they do not account for the many legitimate, nondiscriminatory credit risk and other factors that affect underwriting outcomes (including factors outside of a lender's control).  Similarly,

---

Loans/Subpart-C1-General-Info-Execution-Options-Loan-Delivery/Chapter-C1-1-Execution-Options-Overview/2590399191/Matrix-Loan-Level-Price-Adjustment-May-2023.htm and for Freddie Mac (which refers to them as "Credit Fees"), see *Seller/Servicer Guide*, Exhibit 19, "Credit Fees," available at: https://guide.freddiemac.com/euf/assets/pdfs/Exhibit_19.pdf, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

publicly available HMDA data cannot be used to draw conclusions about pricing discrimination, as it does not contain all of the specific details of any institution's rate sheets.

## 6.1.    Outcomes from HMDA

84.      The publicly available HMDA data provides the aggregate action rates for a HMDA-filing institution with respect to applications for home mortgages.  The actions include originated, approved but not accepted, withdrawn, incomplete, or denied. [62]  The percentage of actions in each category are directly related to how lenders categorize applications.  The definition of what constitutes an "application" and procedures for processing applications differ among lenders, and those differences affect the denial rates observed in public HMDA data.[63]  Additionally, the rates at which mortgages are approved and/or originated will be impacted by the overall credit standards and other policies set by a given mortgage lender, the credit characteristics of applicants, and the types of mortgage products offered, among other factors.  As one example, lenders with tighter credit standards will typically deny a larger proportion of borrowers, other factors being equal.  Because minimum credit scores are higher, generally, for the loans sold to the GSEs than for FHA loans, the proportion of a lender's conventional loans compared to overall loans could also impact approval or denial rates.

## 6.2.    Average Rate Spreads from HMDA

85.      Information on an individual loan's annual percentage rate ("APR") is not available in HMDA.  Rather, the pricing data in HMDA are provided in terms of a "rate spread"

---

[62] See FFIEC, "A Guide to HMDA Reporting," 2023 Edition, available at https://www.ffiec.gov/hmda/pdf/2023Guide.pdf, last accessed 02/28/2024.  Guides for previous years are available at https://www.ffiec.gov/hmda/guide.htm; there is no difference in how actions are categorized for the 2018 through 2023 time period.

[63] In particular, the HMDA and its implementing regulation, Regulation C, do not prescribe in specific terms what constitutes an "application" for purposes of HMDA reporting.  Instead, Regulation C generally defines an "application" as "an oral or written request for a covered loan that is made in accordance with procedures used by a financial institution for the type of credit requested." 12 CFR § 1003.2(b), available at https://www.law.cornell.edu/cfr/text/12/1003.2, last accessed 02/28/2024.  As a result, what constitutes a HMDA-reportable mortgage application may differ among lenders.

Expert Report of Marsha J. Courchane
February 29, 2024

between the APR reported on the loan and a survey-based estimate of APRs on generally comparable loans.[64] While one can use the publicly available HMDA data to measure average rate spread differences, by lender, by year and by product, it cannot be used to determine whether an individual loan was priced according to a lender's specific rate sheets and policies or whether discrimination played a role in pricing.

## 7.     Fair Lending Enforcement and Monitoring

86.     Financial institutions originating home mortgage loans are subject to prohibitions on discrimination denoted in both the Fair Housing Act and the ECOA.  I discuss these briefly below to provide background.

### 7.1.    The Fair Housing Act

87.     The Fair Housing Act of 1968 prohibits discrimination in the sale or rental of housing, and in residential real estate-related transactions and brokerage services, based on protected classes, including race, color, religion, sex, familial status and national origin.[65]

### 7.2.    The Equal Credit Opportunity Act

88.     As noted by the Department of Justice, Civil Rights Division,[66] ECOA[67] "prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age, because an applicant receives income from a public

---

[64] See CFPB, "Rate Spread Calculator," available at:  https://ffiec.cfpb.gov/tools/rate-spread, last accessed 02/28/2024.

[65] The Fair Housing Act, 42.U.S.C. §§ 3601-3619, was enacted as Title VIII of the Civil Rights Act of 1968.  The complete text is available at:  https://www.law.cornell.edu/uscode/text/42/chapter-45/subchapter-I, last accessed 02/28/2024.  The section pertaining to discrimination in residential real estate transactions is § 3605.

[66] See ECOA,  https://www.justice.gov/crt/equal-credit-opportunity-act-3, last accessed 02/28/2024.

[67] See Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., available at: https://www.govinfo.gov/content/pkg/USCODE-2011-title15/html/USCODE-2011-title15-chap41-subchapIV.htm, last accessed 02/28/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

assistance program, or because an applicant has in good faith exercised any right under the

Consumer Credit Protection Act."

89.     Regulatory fair lending supervision may reference violations of either the Fair

Housing Act or ECOA in its examination of lending practices.[68]

90.     In the decades since the Fair Housing Act was enacted, mortgage markets and

the associated analysis of potential discrimination in residential mortgage markets have

changed. Academic research on mortgage market disparities increasingly suggests that

market-wide and lender-level differences in minority outcomes cannot be simply attributed

to differential treatment based on race or ethnicity.[69]

### 7.3.     Government Monitoring Information for Race and Ethnicity

91.     After the passage of the Financial Institutions Reform, Recovery, and

Enforcement ACT ("FIRREA")[70] in 1989, the scope of the collection of HMDA data was

expanded to include individual loan level data, including information on race and ethnicity.  In

2004, the HMDA data set was expanded to include some information on mortgage pricing –

specifically whether or not APRs exceeded a rate spread threshold and lien status.[71]  HMDA

data collected prior to 2018 lacked most of the important characteristics of credit quality and

mortgage loans that affect underwriting and pricing, and the use of the public data set was

insufficient to identify whether or not individual lenders had engaged in disparate treatment

of minorities.[72]  After 2018, additional information was collected in HMDA on certain loan

---

[68] For Wells Fargo's ECOA overview and policies, see, for example, WF-04836537 - WF-04836553.

[69] See Marsha J. Courchane and Stephen L. Ross, "Evidence and Actions on Mortgage Market Disparities:  Research, Fair Lending Enforcement, and Consumer Protection, *Housing Policy Debate*, 2018, DOI: 10.1080/10511482.2018.1524446.

[70] The Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), available at: https://www.congress.gov/bill/101st-congress/house-bill/1278/text, last accessed 01/30/2024.

[71] See FFIEC, "A Guide to HMDA Reporting," 2004 Edition, available at https://www.ffiec.gov/hmda/pdf/2004guide.pdf, last accessed 02/29/2024.
[72] See FFIEC, "A Guide to HMDA Reporting," 2013 Edition, available at https://www.ffiec.gov/hmda/pdf/2013guide.pdf, last accessed 02/28/2024.  This guide was in effect until 2018.

Expert Report of Marsha J. Courchane
February 29, 2024

products and characteristics, allowing for enhanced oversight by the regulatory agencies.[73] Even that data, however, is insufficient for drawing conclusions regarding discrimination and is customarily supplemented with additional individual loan-level information when regulators conduct fair lending examinations because not all of the factors relevant to underwriting and pricing outcomes are typically captured electronically by the financial institutions, and various factors related to underwriting are not readily quantifiable (such as verification of income, assets, or employment history).

## 8.    Fair Lending Examination Procedures and Fair Lending Analytics

92.    The Federal Financial Institutions Examination Council ("FFIEC") published revised interagency fair lending examination procedures in 2009.[74]  The OCC published the most recent version of its Comptroller's Handbook for Consumer Compliance, focusing on fair lending supervisions for national banks, in January 2023.[75]  These publications offer guidance for both regulatory examiners and financial institutions with respect to fair lending examinations and the identification of fair lending risk in residential mortgage lending. The guidelines cover overt discrimination, disparate treatment and disparate impact in underwriting, pricing, redlining, and marketing, among other topics.  An appendix to the guidelines also covers the consideration of automated underwriting and credit scoring, including, for example, how to determine if borrowers are similarly situated.[76]

---

[73] See FFIEC, "A Guide to HMDA Reporting," 2018 Edition, available at https://www.ffiec.gov/hmda/pdf/2018guide.pdf, last accessed 02/28/2024.

[74] FFIEC, *Interagency Fair Lending Examination Procedures*, August 2009, available at: https://www.ffiec.gov/pdf/fairlend.pdf , last accessed 02/28/2024 and Appendix, available at: https://www.ffiec.gov/pdf/fairappx.pdf, last accessed 02/28/2024.  These guidelines applied to financial institutions regulated by the OCC, the Federal Deposit Insurance Corporation, the FRB, the Office of Thrift Supervision (no longer in existence), and the National Credit Union Association.  Unless updated by the individual agency, they still apply.

[75] OCC, *Comptroller's Handbook: Consumer Compliance: Fair Lending (Version 1.0)*, January 2023, available at: https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/fair-lending/pub-ch-fair-lending.pdf, last accessed 02/28/2024.

[76] *Op. Cit.*, Interagency Fair Lending Examination Procedures, at footnote 63; *Appendix*, at 12.

Expert Report of Marsha J. Courchane
February 29, 2024

93.    The CFPB's fair lending examination procedures[77] with respect to ECOA offer five baseline review modules used by CFPB examiners to conduct supervision of compliance management systems, fair lending origination risks (e.g., marketing, underwriting, and redlining), fair lending servicing risks (e.g., training and monitoring, limited English proficiency, loss mitigation), and fair lending model risks (e.g., usage and validation of models).  These procedures also include examination for evidence of overt discrimination, disparate treatment, and disparate impact.  When there is evidence of disparate impact of a policy, a business justification for the policy may be reviewed, and examiners may consider evidence that a search for less discriminatory alternatives was undertaken.

94.    Wells Fargo, as a large, national bank, is examined under the supervision guidelines of both the OCC and the CFPB.  These examinations are comprehensive and rigorous and if evidence of a pattern or practice of discrimination is identified, the regulators would refer the matter to the Department of Justice for review.

## 8.1.    Industry Practices for Fair Lending Statistical Analyses of Underwriting and Pricing

95.    As mentioned above, the OCC, FRB and other regulatory agencies rely on statistical analysis of the HMDA data and additional data (often referred to as "HMDA+" data) to evaluate whether any observed underwriting or pricing disparities are or are not attributable to legitimate factors.  Typically, underwriting analyses will employ a logistic analysis to estimate the likelihood that a borrower is accepted or denied for a particular loan product given the loan product requested and their relevant credit and loan characteristics.  In addition, they will customarily conduct file reviews among similarly situated borrowers when outcomes may differ from predictions.[78]  The statistical analyses will be developed for each financial institution based on its own internal underwriting and pricing guidelines.

---

[77] CFPB, Examination Procedures:  *ECOA Baseline Review*, available at:
https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf, last accessed 02/28/2024.

[78] *Op. Cit.*, Interagency Fair Lending Examination Procedures: *Appendix*, at 12.

Expert Report of Marsha J. Courchane
February 29, 2024

96.     The *FFIEC Fair Lending Examination Procedures*, August 2009, also state that: "Scoping may disclose the existence of circumstances -- such as the use of credit scoring or a large volume of residential lending -- which, under an agency's policy, call for the use of regression analysis or other statistical methods of identifying potential discrimination with respect to one or more loan products."[79]

97.     To analyze underwriting outcomes for a lender's mortgage lending activity, regulators often develop logistic statistical regressions with a binary dependent variable taking the value of 1 for a denied application and the value of 0 for an approved application. Approved applications include both originated loans and applications approved but not accepted by the applicant.  The objective of such statistical analysis is to evaluate whether or not a disparity in denial rates in the raw HMDA data can be explained by differences in credit qualifying characteristics and loan parameters among applicants that are readily available in the lender's data. This analysis typically excludes applications that were withdrawn by the applicant or closed due to being incomplete because such applications did not receive a credit decision and generally were cancelled because of the credit applicant's action or failure to act.  The explanatory variables included in these denial rate regressions include various categorical variables representing applicant and loan characteristics considered by the lender during the underwriting process and recorded in the lender's electronic data.  The explanatory variables are selected based upon a review of a given lender's underwriting guidelines, along with typical investor guidelines.[80]

98.     To analyze pricing outcomes, FFIEC's procedures state that: "Depending on the intensity of the examination and the size of the borrower population to be reviewed, the analysis of decisions on pricing and other terms and conditions may involve a comparative file review, statistical analysis, a combination of the two, or other specialized technique used by

---

[79] *Op. Cit.*, at 1.

[80] The development of statistical analysis was beyond the scope of this affirmative report.

Expert Report of Marsha J. Courchane
February 29, 2024

an agency."[81]  Typically, the analysis of pricing differences follows a generally similar procedure to the underwriting analysis, using multivariate linear regression to evaluate whether there is evidence of differences in average pricing among borrower demographic groups after attempting to account for the impact on pricing of differences among loans in the myriad loan-level pricing adjustment factors discussed above.  If disparities are identified, a file review of the pricing outliers and matches to similarly situated borrowers will often be conducted.[82]

### 8.2.    Wells Fargo's Fair Lending Analytics

99.        Federal financial regulatory agencies expect that consumer lenders will regularly monitor their lending activities for risk of potential unlawful discrimination, with a fair lending monitoring program that is commensurate with the size, complexity, and sophistication of the financial institution.  I reviewed the information produced in this matter regarding Wells Fargo's fair lending monitoring analysis program for residential lending to evaluate whether that program is consistent with industry standard practices.

100.        Wells Fargo conducts several types of fair lending analyses in accordance with its Independent Monitoring, Testing and Validation policy.  These are described in its Fair Lending Testing and Monitoring Manual[83] and in its FLA Manual.[84]  The Fair Lending Testing and Monitoring Manual describes the monitoring process with the FLA and Corporate Risk Model Development teams, the calendar for frequency of reviews, the data analytics process, and loan/file reviews, among other things.

---

[81] *Op. Cit., Interagency Fair Lending Examination Procedures*, at 20.

[82] While the fair lending regulatory agencies do not disclose thresholds for underwriting or pricing disparities that necessitate a referral to the Department of Justice, in my experience they evaluate marginal effects and odds ratios and file reviews for underwriting determinations and pricing differences in excess of five basis points to determine outlier reviews.

[83] See Fair Lending Testing and Monitoring Manual, 9/30/2019, WF-04814307.

[84] See, for example, Fair Lending Analytics Manual, 12/4/2020, WF-04814365.

Expert Report of Marsha J. Courchane
February 29, 2024

101.     As described in the FLA Manual, "The FLA team uses a variety of analytical and diagnostic tools to identify, analyze, assess, and evaluate fair lending risks, including loan review and business practice analysis, simple analytics such as means, and advanced analytics such as statistical modeling."[85]  Reviews are conducted annually, but may vary over time, depending on risks.  "Reviews may evaluate potential risk across any aspect of the credit product lifecycle: marketing, lending distribution, credit, pricing, or servicing, and may include a quantitative analysis of marketing and credit strategies, policies, and models."[86]

102.     While the FLA team chooses to engage in some types of reviews on a risk-based basis, other reviews are required to take place annually, including the Wells Fargo Home Lending ("WFHL") analysis of credit and pricing policies with "high" fair lending risk, including any geographically based policies.[87]  Models are developed or re-fit periodically, and analyzed at different levels, such as in aggregate, at the Metropolitan Statistical Area ("MSA") level, and for each fulfillment center.

103.     As noted in the Analytics Manual, logistic analysis is most commonly used for the analysis of binary dependent variables (such as approve/decline), testing for whether protected class applicants have a higher likelihood of denial.  Underwriting policies and guidelines are used to select control variables in the logistic analysis.[88]  When outcomes for minorities are less favorable than for non-minority borrowers, for example, the statistical analysis generally is supplemented with matched-pair file reviews, based on samples of minority and non-minority borrowers who appear to be similarly situated based on the available data in order to consider additional relevant information that could not be accounted for in the statistical analysis.[89]

---

[85] *Ibid.*, at 3, WF-04814367.

[86] *Ibid.*, at 4, WF-04814368.

[87] *Ibid.*, at 8, WF-04814372.

[88] *Ibid.,* at 12, WF-04814376.

[89] *Ibid.,* at 14, WF-04814378.  See also Brodsky Deposition at 100:17–101:4. See also LeMaire Deposition at 45:3-9, 53:15-23, 64, and 70.

Expert Report of Marsha J. Courchane
February 29, 2024

104.     Fair lending tests of pricing outcomes use ordinary least squares regression models to estimate the impact of the independent or control variables on the dependent variable, such as the APR.  Examples of the reviews conducted quarterly by Wells Fargo include the "All-in-Price" modeling which looks at disparities by protected class on an aggregate, MSA and branch level, for example.[90]

105.     The types of analytics conducted by Wells Fargo are typical of those employed by all of the financial regulatory agencies when conducting fair lending examinations, as well as by other financial institutions and outside experts who conduct such analysis on behalf of financial institutions.

### 8.3.    Disparate Impact and Business Justification

106.     As noted above, when a disparate impact is identified, the financial institution may provide a non-discriminatory business justification for the use of the policy leading to the disparate impact.  Wells Fargo does provide such business justification documents.  One example is its fair lending business justification of the Home Mortgage Conventional Model – HLECS V1 CON (model number 11960), which generates an acquisition credit risk score for borrowers applying for both a conventional first lien loan and, when needed, a simultaneous 2nd home equity loan.[91]  The model provided an objective and numerical evaluation of the applicant's credit risk, with higher scores indicating lower risk.  The score determines a Wells Fargo Risk Class (CRC) with four categories:  A1 (250 – 333), A2 (220 – 249), C1 (200 – 219) and C2 (76 – 199).[92]  The score is not the sole basis used for approvals, as all underwriting decisioning must go through an underwriter.  It is "one of many factors used when

---

[90] See WF-01277012 (2Q 2019), WF-01277033 (AIP Appendix, 2Q 2019), WF-01277060 (AIP Appendix, 3Q 2019), WF-01277108 (AIP Appendix, 4Q 2019 – 4Q 2020) for examples of all-in-price fair lending models and output.

[91] See HL Conventional Orig Custom ECS Score (Model Number 11960), Fair Lending Business Justification, WF-00632434 – WF-00632454.  This was sent from the Business to FLA on 9/21/2022.  The ECS model is not used to make an approval decision, but only to assign a risk score.

[92] An update in policy (CAP 11719290) no longer sent applications with C1 and C2 classes to manual underwriting after 09/19/2020 (WF-00035253).  In addition, loan applications received after 07/17/2021 that had approvals based only on ECS credit risk class, with Cautions or Refers from DU and LPA, were no longer saleable to Fannie Mae (WF-00035367).

Expert Report of Marsha J. Courchane
February 29, 2024

underwriting a loan such as the customer's credit score (FICO), payment history, income/employment, assets, collateral, loan terms, etc."[93]   Wells Fargo's review, through its Retail Credit Decisioning Team, found the model to be statistically sound and empirically derived.  The model follows a traditional "logistic regression" approach and is not a "machine learning" algorithm.

107.     The HLECS V1 CON model uses primarily credit bureau attributes such as number of trade lines, average months in file, number of bankcard trades, fraction revolving balance, maximum balance/credit ratio on all trades, and total debt ratio.  Primary and secondary applicants are scored individually, with the average score (rounded) used to determine the final application score.  With respect to the model specification and fit, the highest marginal contribution comes from the total debt ratio in the individual logistic model.  Average months on file and months since most recent delinquency provide positive marginal contributions, with the other attributes providing negative marginal contributions.[94]  As expected, utilization, credit history and derogatory attributes are all important factors.

108.     Score performance was benchmarked against the FICO decision score at the time of origination, with 70% of the sample used for development and 30% for in-time validation.  These are typical decisions for the development of score models.  The review by Wells Fargo found the model to be both robust and stable. The model comparisons were evaluated using common statistical measures.  For example, the Kolmogorov-Smirnov ("KS") statistic for the HLECSV1 CON model was 0.477, outperforming the KS of the earlier model, ECS 5.0 (at 0.446).  This indicates the model is better able to separate good credits and bad credits in terms of performance.

---

[93] *Op. Cit*. HL Conventional Orig Custom ECS Score (Model Number 11960), Fair Lending Business Justification, at 1, WF-00632436.

[94] *Ibid.*, at 4, WF-00632439.

Expert Report of Marsha J. Courchane
February 29, 2024

109.     The model included no demographic or geographic data for compliance reasons.[95]  To address potential fair lending risk considerations, the developers removed CLTV from the model (increasing the importance of DTI) and capped the highest DTI level at 45% and above, since that range is associated with over-extension of credit.  The model also used ratios, rather than dollar amount variables, consistent with OCC guidance (OCC 97-24).[96] Average months on file was used rather than age of oldest trade, which was considered to have the potential to proxy for age.  Finally, potentially less disparate alternatives were evaluated by removing average months on file, inquiries in the last six months and trade lines 90 days derogatory, both individually and together.  Additional tests were provided by Wells Fargo, which are consistent with standards for testing alternative models.  None of these alternatives outperformed the chosen model.[97]  This sort of analysis reflects a standard industry approach for evaluating and mitigating potential fair lending risk in scoring models.

## 8.4.    Wells Fargo's Adherence to Industry Standards

110.     My review of the Wells Fargo fair lending analytic materials found that their practices with respect to developing and monitoring their fair lending models are generally consistent with industry guidance.  As with other large banks, FLA are conducted by a "second line" oversight function, which reviews the models being used by the "first line" (i.e., the line of business), but is firewalled from the model development process.  This second line is able to assess a model's implications with respect to protected classes, while the first line (development) lacks access to any protected class information in the development process.

---

[95] *Ibid.*, at 8, WF-00632443.

[96] Office of the Comptroller of the Currency, "Credit Scoring Models:  Examination Guidance," available at: https://www.occ.treas.gov/news-issuances/bulletins/1997/bulletin-1997-24.html, and the Appendix, available at: https://www.occ.treas.gov/news-issuances/bulletins/1997/bulletin-1997-24a.pdf, last accessed 01/29/2024.

[97] *Op. Cit.* HL Conventional Orig Custom ECS Score (Model Number 11960), Fair Lending Business Justification., at 12-18, WF-00632447 – WF-00632453. See also WF-001433317, and WF-00143052, Exhibit 412 to Joel Brodsky's Deposition.

Expert Report of Marsha J. Courchane
February 29, 2024

There will generally also be a "third line," which audits the findings of the "second line." Wells Fargo's procedures follow this approach.[98]

## 9.    The Appraisal Process

111.    Mortgage loans offer individual borrowers access to credit (or liquidity) for one of the most important purchases they are likely to make – their home.  Mortgages represent legal claims to property.  The holders of the mortgages bear both credit risk (the risk of payment default) and interest rate risk (the risk of prepayment of the mortgages when interest rates are less favorable).  Historically, most primary mortgage market lenders (those who originate the mortgage loans) held the mortgage loans in their own portfolios, but, increasingly over the last twenty years, securitization, or pooling the loans for sale to investors in the secondary market, such as the GSEs, has become important.  Regardless of which party holds the ultimate risks inherent in the mortgages, there are costs of bearing those risks, in addition to the costs of the mortgage origination operations.  The cost of a mortgage to the borrower relates directly to the estimated risks of the mortgage loan.  In any economic environment in which house prices may be falling or may fall in the future, if appraised values are inflated, the loans originated for the borrower may exceed the collateral value and the borrower is likely to suffer more (in terms of lost equity) if prices decline.

112.    The expected relationship between purchase price and appraised value of a home is important.  Both the price and the appraised value are indicators of the underlying value of the property – but the "value" cannot be observed directly.  The contract purchase price reflects the seller's valuation of the property (perhaps obtained after consultation with a realtor who examined comparable properties in the neighborhood and recent sales prices for those properties).  While the seller may have good information about the condition of the property, they may have incomplete information about market trends in house prices.  The contract purchase price also reflects the borrower's valuation of the property – what they

---

[98] See Brooks Deposition at 11:9-12:6.

Expert Report of Marsha J. Courchane
February 29, 2024

hope the property is worth –not only at the time of purchase, but as a reflection of its continued worth in the future.  The borrower may lack complete information about the condition of the home, the neighborhood, and any anticipated changes in house prices.  The appraisal reflects a third valuation and is, arguably, the most important to all parties as it is expected to be provided by an independent, unbiased, professionally trained individual.  The appraiser has available different information than the buyer or seller and has training in comparing properties and assessing value.  Professional appraiser judgments may differ, and errors may occur, however, and given a distribution of independent appraiser valuations, one would expect some that are above the true market value and some that are below the true market value.

113.     Hence, the price and the appraised value depend on the true underlying value plus an error term, and both reflect differences in the information available to the parties involved in the transaction.  Ideally, if both the price and appraised value are unbiased, one would expect to see that the difference between the two values was, on average, zero.

114.     Appraisal standards and practices are described in The *Uniform Standards of Professional Appraisal Practice* (USPAP*), which sets the generally recognized ethical and performance standards for the appraisal profession in the United States, including for residential real estate appraisals.[99]  USPAP was adopted by Congress in 1989 and includes standards for all types of appraisal services, including real estate.  Compliance is required for state-licensed and state-certified appraisers involved in federally related real estate transactions (i.e., transactions regulated by a federal financial institutions regulatory agency).

115.     Each of Wells Fargo's underwriting guidance manuals contains information for the evaluation of the collateral or property through appraisals.  For example, for 2020

---

Expert Report of Marsha J. Courchane
February 29, 2024

Agency/Conforming loans, the guidelines include an overview of the process, including a description of the lender's role, report requirements, appraisal methods (cost approach, income approach, market value approach) and a discussion of appraiser independence.[100] The guidelines also provide information on unacceptable appraisal practices.[101]

116.     As stated in Wells Fargo's guidelines, "The underwriter's role is to determine that the appraisal report has been professionally completed and that it logically supports the indicated property value, condition, and marketability. The underwriter must analyze the information on the appraisal report for consistency and completeness. When the information on the appraisal report is inconsistent or incomplete, the underwriter should obtain clarification from the appraiser."[102]  Thus, Wells Fargo's role (and any mortgage lender's role) in the appraisal process is somewhat limited.

117.     Wells Fargo uses either external Appraisal Management Companies (AMCs) or Wells Fargo's internal Real Estate Valuation Services (REVS) to choose and engage an approved independent appraiser.  It requires all appraisers to be licensed and in good standing with Wells Fargo, Freddie Mac, Fannie Mae, and the regulatory agencies.  Wells Fargo, as lender, must obtain an independent appraisal in compliance with Regulation Z (implementing the Truth in Lending Act),[103] but will have a collateral underwriter review the appraisal prior to closing the loan.  Under Regulation Z, a lender would be prohibited from "seeking to influence a person that prepares a valuation to report minimum or maximum value for the consumer's principal dwelling."[104]  In considering an appraisal, a lender may only ask that an appraiser consider additional, appropriate property information (such as information about comparable properties) to support a valuation or correct errors in the

---

[100] See Wells Fargo's 2020 Agency / Conforming Underwriting Guidelines, WF-000033206 at 182-219.  Also see WF-00002270 for 2018 and WF-00002729 for 2019.

[101] *Ibid.*, at 228-229, WF-00003435 – WF-00003436.

[102] WF-000033206 at 184.

[103] Truth in Lending Act, ("Regulation Z"), 12 CFR § 1026.42, available at: https://www.law.cornell.edu/cfr/text/12/1026.42, last accessed 02/28/2024.

[104] *Ibid.*, § 1026.42(c)(1)(i).

Expert Report of Marsha J. Courchane
February 29, 2024

valuation (such as incorrect property characteristics), or to seek more than one appraisal in order to select the most reliable valuation.[105]  Wells Fargo adheres to the same sort of appraisal independence and appraisal review requirement for HELOCs as for mortgage loans.[106]

118.     Further, the GSE appraisal standards include requirements for reconsideration of appraised values in the case of conforming loans, which are intended to prevent lenders from "shopping" for a favorable appraisal.  For example, the standards state: "Any request for a change in the opinion of market value must be based on material and substantive issues and must not be made solely on the basis that the opinion of market value as indicated in the appraisal report does not support the proposed loan amount."[107]

119.     Fannie Mae and Freddie Mac both have Uniform Residential Appraisal Reports for single family home purchases – Form 1004 and Form 70, respectively.[108]  Additional forms are used for condominiums, cooperatives, multifamily dwellings and manufactured homes.  In some cases, automated valuation models (AVMs) can be used for assessments of single-family properties.  Freddie Mac also offers an LPA appraisal waiver and Fannie Mae offers a DU appraisal waiver for certain low risk purchase and refinance loans.[109]

120.     Appraisals are expected to include comments on the neighborhood (e.g., proximity to amenities), whether values in the neighborhood are stable or increasing, information regarding market supply and demand, marketing time and other characteristics impacting the property's value.  They should also include photographs and details on

---

[105] *Ibid.,* § 1026.42(c)(2)(iii).

[106] See HE Acquisitions First Lien guidelines as of 2020, WF-00031262, Section 114,at 165-72.

[107] Fannie Mae, *Selling Guide*, Section B4-1.3-12, "Quality Assurance," available at:  https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B4-Underwriting-Property/Chapter-B4-1-Appraisal-Requirements/Section-B4-1-3-Appraisal-Report-Assessment/1032992391/B4-1-3-12-Quality-Assurance-06-03-2020.htm, last accessed 02/28/2024.

[108] See Wells Fargo's 2020 Agency/Conforming Underwriting Guidelines, WF-00003206, at 185 (WF-00003392). See also the guidelines from 2018 (WF-00025604), 2019 (WF-00031039), and 2021 (WF-00031507).

[109] Fannie Mae Selling Guide, Section B4-1.4-10.  Freddie Mac Seller/Servicer Guide, Section 5602.3.

Expert Report of Marsha J. Courchane
February 29, 2024

comparable properties that are similar in appeal, age, design, room counts, location and other dimensions of the loan's collateral property.

121.    Due to the COVID-19 pandemic, in late March 2020, recognizing that interior appraisals may not be feasible and in order to limit face-to-face contact between homeowners and appraisers while maintaining stability of the mortgage market, the GSEs and government mortgage agencies implemented a temporary exception to requirements to obtain full interior and exterior appraisals, allowing exterior-only or desktop appraisals in certain situations when an interior appraisal was not feasible (e.g., due to local "lockdown" or "social distancing" directives).[110]  The temporary exception lasted until Wells Fargo resumed accepting interior appraisals effective July 25, 2020, but continued to allow some exterior-only and desktop appraisals through December 31, 2020.[111]

122.    Wells Fargo conducts fair lending review to evaluate any potential risks from appraisal bias.[112]

## 10.    Analysis of the Plaintiffs' Mortgage Loan Applications

123.    The Amended Complaint alleges that Plaintiffs Aaron Braxton, Paul Martin, Gia Gray, Bryan Brown, Elretha Perkins, Christopher Williams, Ifeoma Ebo and Terah Kuykendall-Montoya, and other members of the proposed class are "victims of Wells Fargo's pervasive misconduct" whose mortgage loan applications were systematically delayed or denied

---

[110] See Fannie Mae Lender, "Letter LL-2020-04," March 23, 2020 (and as subsequently revised), available at: https://singlefamily.fanniemae.com/media/22321/display; Freddie Mac, *Seller/Servicer Guide*, Bulletin 2020-5, "Selling Guidance Related to COVID-19," available at:  https://guide.freddiemac.com/app/guide/bulletin/2020-5; HUD "Mortgagee Letter 2020-05," March 27, 2020, available at: https://www.hud.gov/sites/dfiles/OCHCO/documents/20-05hsgml.pdf, all last accessed 02/28/2024.

[111] See, for example, Wells Fargo, Covid-19, 2021 Agency/Conforming Underwriting Guidelines, WF-00000637, at 7, and "COVID-19 Policy," Agency/Conforming Underwriting Guidelines, updated 11/30/2020, WF-00001073 at 19-21.

[112] See, for example, WF-03840084.

Expert Report of Marsha J. Courchane
February 29, 2024

because Wells Fargo discriminated against them.  The Amended Complaint alleges systematic race discrimination, disparate impact, and redlining.[113]

124.    As shown in the paragraphs below, the named Plaintiffs do not have common facts or circumstances regarding the outcome of their loan application and evaluating whether Wells Fargo discriminated against any of the Plaintiffs requires a separate analysis of the specific facts and circumstances present in each individual borrowing-lending decision for each loan at issue.

125.    I reviewed the loan application documents and other documentation produced for each of the named Plaintiffs, as well as their deposition testimonies, and concluded that the allegations of discriminatory treatment are not supported.  Each Plaintiff's application for a loan or (in the case of Mr. Braxton) a loan modification appears to have been processed consistently with applicable government-sponsored enterprise, government agency, and/or Wells Fargo underwriting guidelines and requirements.  Wells Fargo's requests to the Plaintiffs for documentation to verify information related to their applications were necessary and appropriate (including repeat requests when the applicant did not provide complete and correct documentation or when applicable guidelines required updates to documentation), and there is no information in the application files or related documentation to suggest that any of Wells Fargo's actions or decisions were affected by an applicant's race, ethnicity, or the demographic composition of the neighborhood in which their property was located.

126.    In the following paragraphs I summarize my conclusions regarding each of these Plaintiffs.  Appendix 3 provides relevant details and citations regarding each Plaintiff's application along with associated document references which support my opinions.

---

[113] Amended Complaint, ¶ 23.

Expert Report of Marsha J. Courchane
February 29, 2024

### 10.1. Aaron Braxton

127.     Plaintiffs alleged in their Complaint that Mr. Braxton was "financially successful and eminently creditworthy"[114] and was a Wells Fargo mortgage customer for two decades. He purchased a home in 2000 with a Wells Fargo FHA mortgage in a historically Black neighborhood and allegedly sought to refinance that loan in August 2019.  Plaintiffs allege that "Mr. Braxton always made his mortgage payments and paid his bills on time, and he had a good credit score."[115]  Plaintiffs further allege that "Mr. Braxton was given the runaround to such an extent that it took him over nine months to refinance his federally backed mortgage loan (and 12 months to refinance his home equity loan) at an above-market interest rate of around 4%. This was after various Wells Fargo representatives kept telling him they lost his paperwork, made incomplete inquiries, and needed to request more information, delayed their responses, and even placed him into an unsolicited debt-trap deferred payment program without his permission."[116]  Plaintiffs also allege that Wells Fargo approved a FHA refinance loan only after Mr. Braxton filed a complaint with HUD.[117]  In his deposition testimony, Mr. Braxton alleged that he, "called up Wells Fargo to do a refinance on my home. Wells Fargo steered me into a -- what is it – modification and then proceeded to discriminate against me by having me refile documents over documents over documents over documents, losing documents, missing documents." [sic][118]

128.     Contrary to the statements in the Complaint regarding a refinance, Mr. Braxton was evaluated by Wells Fargo for a payment assistance program starting in August 2019 and for a permanent loan modification starting in late 2019.[119]  Wells Fargo made multiple

---

[114] *Ibid.*, ¶ 28.

[115] *Ibid.,* ¶ 29.

[116] *Ibid.,* ¶ 31.

[117] *Ibid*.

[118] Braxton Deposition at 52:3-8.

[119] It appears that Braxton did not understand the difference between a modification and a refinance (at 55:18-19: "I'm thinking that a loan modification and a refinance are the same thing."). See also Braxton Deposition, at 54, where he states that he just wanted to keep his same loan terms and lower the rate.

Expert Report of Marsha J. Courchane
February 29, 2024

requests for additional documentation in connection with Mr. Braxton's application for assistance either because some of the documents Mr. Braxton submitted initially were incomplete or were incorrectly completed, or because the documents he submitted (particularly regarding his income) presented questions or discrepancies that required clarification.[120]  Mr. Braxton rectified those deficiencies, and he was approved for a short-term assistance program October 28, 2019, and then evaluated for a permanent loan modification in December 2019.  As of January 2020, Mr. Braxton still had not provided some required documents to Wells Fargo.[121]

129.      In April 2020, Wells Fargo proactively put Mr. Braxton's loan in a COVID-19 forbearance program because he was not current on the loan and was under active loss mitigation review at the time based on his stated financial hardship.[122]  The forbearance plan paused his payment obligations and suspended the reporting of his mortgage delinquency to the credit bureaus, but specified that "If you find you do not need the payment relief, you can continue to make the payments as normal and no further action is needed."  Mr. Braxton complained that he did not want the forbearance plan.  Ultimately, Wells Fargo removed him from the forbearance plan, resumed processing his modification request, requested

---

[120] As Mr. Braxton testified at deposition, he did not disclose all of his income on his loan modification application and that his hardship affidavit was not true and accurate.  He testified that he was not actually in financial hardship, had not depleted his savings, and that he was able to continue paying his mortgage. See Braxton Deposition, at 127:4-132:16, 117:18-19:25, and, 140:17-25.

[121] The Mortgage Assistance Application, for example, had been received by Wells Fargo by 1/22/2020 but was blank (WF-00125606).  In addition, he did not have proof of his disability income until January 2020.  Braxton Deposition at 242-43 and Transamerica benefit award letter WF-00125725 (Deposition Exhibit 188).

[122] Mr. Braxton testified that, in August 2019, he communicated to a Wells Fargo representative that "I'm about to have a hip replacement. I'm going out on disability."  Braxton Deposition, at 55:13-14.  He also testified that he was not actually in financial hardship at that time, although he claimed a financial hardship in his application for a loan modification because he thought that he needed to present a financial hardship to qualify for a modification. *Ibid.,* at 132:10-133:23 and 136:1-138:1. He testified that he was delinquent on his payments because Wells Fargo advised him that he needed to show a hardship to qualify for a loan modification. However, Mr. Braxton clearly stated that Wells Fargo "didn't say withhold [the payments] specifically. They said you needed to show -- in order to be in this program, you need to show a financial hardship. And so I inferred that to mean to withhold payments." *Ibid* at 70:9-12 and 170:3-19.

Expert Report of Marsha J. Courchane
February 29, 2024

additional documentation in May 2020, and approved him for a modification in June 2020 (first for an FHA trial plan and then a permanent FHA modification).

130.    Mr. Braxton submitted a complaint to Wells Fargo alleging discrimination in addition to complaining about the loss mitigation process and customer service experience. Based on my review, Wells Fargo's response to that complaint regarding the loss mitigation process accurately reflected the legitimate reasons for each follow-up documentation request made by Wells Fargo.

131.    Later Mr. Braxton also complained about Wells Fargo's reporting of his loan's status to the credit bureaus, but his complaints about inaccurate credit reporting were found to be incorrect (he was reported as delinquent when he was delinquent, except during the period April through October 2020 when the delinquency reporting was suppressed due to the COVID-19 forbearance plan).

132.    Nothing in Wells Fargo's control prevented Mr. Braxton from bringing his loan current or continuing to make regular mortgage payments during the forbearance period. Further, given his actual delinquency, not having his delinquency reported to credit bureaus during the forbearance period was beneficial to Mr. Braxton.

133.    I found nothing in the loan files to suggest that discrimination based on race played any role in the handling of Mr. Braxton's loan modification process.

## 10.2.  Bryan Brown

134.    Plaintiffs allege in their Complaint that Bryan Brown originally purchased his multi-unit home in December 2010 with a mortgage from Wells Fargo and that he sought to refinance the loan and convert his conventional 30-year loan to a 15-year fixed mortgage to obtain a lower interest rate.  Mr. Brown alleges that "Wells Fargo subjected him to long periods of non-responsiveness, arbitrary requests for additional documents, and multiple calls to his employer requesting verification of his employment. Despite favorable LTV metrics and his personal history with the institution, Wells Fargo denied Mr. Brown's application to

Expert Report of Marsha J. Courchane
February 29, 2024

refinance after a four-month runaround. Wells Fargo did this even though, having paid his loan for more than ten years, Mr. Brown had equity in his home that was almost equal to the amount remaining on his loan."[123]

135.     Based on my review, I found that Mr. Brown's refinance application was declined based on an excessive DTI ratio.  Wells Fargo evaluated Mr. Brown for a conventional agency refinance loan.  While the application process extended from October 2020 to February 2021, the delays in the process were attributable to Mr. Brown's failure to satisfy requirements for documenting the income derived from his three rental properties – the verification of which is required by Wells Fargo and agency guidelines.[124]  The loan record demonstrates Wells Fargo's multiple requests for documentation to verify Mr. Brown's income, assets and bank transactions, which requests Mr. Brown did not satisfy in a timely manner.  The record demonstrates regular follow-ups by Wells Fargo attempting to obtain the required documentation from Mr. Brown and Mr. Brown's failure to provide documents or to provide complete documents.  Although the delays were not caused by Wells Fargo's actions, Wells Fargo extended Mr. Brown's rate lock at no cost to him each time the lock would have expired to a delayed closing - a favorable outcome for Mr. Brown.

136.     Due to the passage of time since original underwriting, which was caused by Mr. Brown's untimely fulfillment of the loan income and asset verification conditions, agency guidelines required that a new credit report needed to be obtained and updates of certain income documents and bank statements need to be provided by Mr. Brown, and the application had to be re-underwritten based on the updated information.  Ultimately, based on the updated and verified information regarding Mr. Brown's income, Wells Fargo determined that his DTI ratio was too high for approval in light of his declining income, even

---

[123] Amended Complaint, ¶ 43.

[124] See Wells Fargo Agency / Conforming Underwriting Guidelines, at 118=19 (WF-00003325 – WF-00003326).  The documentation matrix on page 119 (WF-00003326) identifies the appropriate Freddie Mac and Fannie Mae forms required for documenting rental income, depending on the rental income source.

Expert Report of Marsha J. Courchane
February 29, 2024

with the most favorable consideration of his income allowed under the applicable underwriting guidelines.[125]

137.   There is nothing in the documents I reviewed to suggest that Wells Fargo subjected Mr. Brown to "long periods of non-responsiveness" or "arbitrary requests for additional documents," or that discrimination based on race played any role in the processing of his application.  Indeed, the record suggests that Wells Fargo made reasonable efforts to accommodate Mr. Brown and provide the most favorable consideration allowed under applicable underwriting guidelines.

## 10.3.  Gia Gray

138.   Plaintiffs allege in their Complaint that Gia Gray is "in the top quintile of income earners" and that she had a FICO credit score greater than 800 when she sought to refinance multiple loans with Wells Fargo, which she and her husband, Carl, had previously financed with Wells Fargo.[126]  Dr. Gray had investment properties in Stockton, CA and Chicago, IL in addition to her primary residence in Danville, CA.  Wells Fargo had previously provided mortgage financing for the property in Danville, CA.  Plaintiffs allege that when Dr. Gray began the refinancing process for her properties in February 2020, Wells Fargo denied outright the request to refinance her two investment properties and "refused to even accept an application for these homes. Wells Fargo would not return their calls with inquiries on refinancing these two properties."[127]  The Complaint alleges that the Wells Fargo loan officer told her "that the Stockton, California property was in a bad area, and that the Chicago, Illinois property, although in a good area, was high risk, and that Wells Fargo was not looking to refinance high-risk areas."[128] Ultimately, Dr. Gray and her husband allegedly "gave up on

---

[125] His DTI ratio was found to be 56.913%, even after using Mr. Brown's 2020 income, which was higher than his more recent 2021 income. Wells Fargo found that his DTI ratio would still exceed 50% even under the favorable assumption that all of the historical rental income claimed by Mr. Brown on his three rental properties could be verified (which it apparently could not be).  See entries for 2/24/2021 in WF-00019007.

[126] See Amended Complaint, ¶¶ 35-38.

[127] *Ibid.*, ¶ 38.

[128] *Ibid.*

Expert Report of Marsha J. Courchane
February 29, 2024

refinancing" the investment properties in December 2020.  However, "Wells Fargo did refinance Dr. Gray's California property, which is in a predominantly white area of California."[129]

139.    Based on the documentation I reviewed, I confirmed that Wells Fargo approved Dr. Gray's March 2020 application to refinance the existing Wells Fargo loan on her Danville primary residence and the loan was closed in June 2020.  There appear to have been no issues with that loan approval, which was based on Wells Fargo's determination that Dr. Gray had good credit history, income, and assets.  It seems (based on email correspondence between Dr. Gray and a Wells Fargo loan officer) that Dr. Gray became frustrated by documentation requests associated with employment verification, which were necessitated by her job change less than two years earlier and the requirement to verify two years of employment.  That verification step was required by the applicable underwriting guidelines and the matter was resolved.  Dr. Gray's frustration appears to have derived, at least in part, from not understanding the verification requirements that the mortgage application process involved.[130]

140.    In terms of refinancing the two investment properties, e-mail correspondence between Dr. Gray and Wells Fargo's loan officer suggests that Dr. Gray was initially confused about whether Wells Fargo was still originating home equity loans for investment properties during the COVID-19 pandemic, which the Wells Fargo loan officer explained to her.  The Wells Fargo loan officer explained that Wells Fargo was offering those loans but that the interest rates on investment property loans, in general, had increased because they were

---

[129] *Ibid.*

[130] I infer this in part from her suggestion in e-mail correspondence with a Wells Fargo loan officer that Wells Fargo rely on information from her 2018 home purchase transaction (i.e., information from two years earlier – see GRAY0000082), which would not have been permissible under the applicable underwriting guidelines, which required verification of current employment and two years of employment history. See Wells Fargo's 2020 Agency/Conforming Underwriting Guidelines, at 89, WF-00003296 ("The customer must provide a detailed two-year employment history.").  In addition, Dr. Gray testified in deposition that she considered it unnecessary for Wells Fargo to contact her employer in order to verbally verify her employment, feeling that the pay stubs were sufficient.  Gray Deposition, at 173:2-176:25.

Expert Report of Marsha J. Courchane
February 29, 2024

considered to be higher risk early in the pandemic.  Indeed, the loan officer quoted rates to
Dr. Gray for her investment properties.  There is no indication in any of the documents
provided to me that Wells Fargo characterized Dr. Gray's investment properties in particular
as being in "high-risk" or "bad" areas or that Wells Fargo was not originating mortgage loans
in the areas where her properties were located.  Further, Dr. Gray's deposition testimony
confirms her recollection that the loan officer verbally characterized investment properties,
*not* the locations of her properties, as "high risk."[131]  Dr. Gray also testified that she did not
understand that considerations were different for non-owner-occupied rental properties or
investment properties than for owner-occupied properties.[132]

141.     There is no evidence in the documents produced that the Grays ever applied to
refinance either investment property (these do not show up in the HMDA LAR nor do any
applications appear in the data or documentation provided), only that Dr. Gray inquired by
email about refinancing them and that the Wells Fargo loan officer quoted pricing for those
loans.[133]  There is nothing in the documents produced that characterizes the property
locations in any manner, let alone in a negative manner.

142.     Finally, I analyzed demographic data and Wells Fargo lending data to determine
the demographic composition of the census tract neighborhoods in which Dr. Gray's two
investment properties are located.  As shown in Table 1, the Chicago property is located in a
census tract where only 1.7% of the population is Black and 20.1% is of a non-White race or of
Hispanic ethnicity.[134]  The Stockton property is located in a census tract where 52.1% of the

---

[131] Gray Deposition at 132:10133:8 and 151:16152:10. Also see Figone Deposition at 90:497:25, which describes
how investment properties have higher rates than owner-occupied properties and that Gia Gray made the decision
not to move forward.  Also see Figone Deposition at 177:3179:19. Mr. Figone testified that he reviewed the rate
with Gia Gray and she determined it did not make sense to refinance.

[132] *Op. Cit. Gray Deposition*, at 157:3-8.

[133] See, *e.g.*, GRAY0000077 and GRAY0000003.

[134] This analysis is based on 2020 Decennial Census population data from the U.S. Census Bureau.  U.S. Census
Bureau, "HISPANIC OR LATINO, AND NOT HISPANIC OR LATINO BY RACE," 2020. Decennial Census, DEC
Demographic and Housing Characteristics, Table P9, 2020, accessed on February 9, 2024,
https://data.census.gov/table/DECENNIALDHC2020.P9?q=race ethnicity&g=010XX00US$1400000&y=2020&d=DEC
Demographic and Housing Characteristics.

Expert Report of Marsha J. Courchane
February 29, 2024

population is of a non-White race or of Hispanic ethnicity, but about one-half of that minority population is Asian.  Therefore, the notion that Wells Fargo would have considered those neighborhoods to be "bad" or "high risk" based on a concentration of Black or Hispanic population seems implausible.

| Table 1.  Census Tract Population Demographics for Gray Investment Properties | | | | | |
|---|---|---|---|---|---|
| Address | Tract | Minority % | Black % | Hispanic % | Asian % |
| ▮▮▮▮▮ Chicago, Illinois, 60610 | 17031080202 | 20.1% | 1.7% | 7.3% | 7.6% |
| ▮▮▮▮▮ Stockton, California, 95219 | 06077003117 | 52.1% | 4.2% | 15.4% | 26.4% |

143.     Further, based on my review of Wells Fargo's HMDA data for calendar years 2018 through 2022, I confirmed that it originated a substantial number of loans in the census tracts where Dr. Gray's investment properties were located.  Table 2 shows that Wells Fargo originated 83 loans (including 36 refinance loans) in the census tract of the Chicago property and 37 loans in the census tract of the Stockton property (the purchase of which Wells Fargo had previously financed for Dr. Gray).  This data contradicts any allegation that Wells Fargo refused to originate loans in those two neighborhoods.[135]

---

[135] WF-00000001_CONFIDENTIAL, WF-00000002_CONFIDENTIAL, and WF-00035411. The Stockton property is shown as being associated with two different census tracts because the U.S. Census Bureau redefined census tract boundaries in connection with the 2020 Decennial Census, and the revised tract definitions are reflected in the 2022 HMDA data.

Expert Report of Marsha J. Courchane
February 29, 2024

| Table 2. Wells Fargo Loan Originations in Census Tracts of Gray Investment Properties, 2018 - 2022[136] | | | | | | |
|---|---|---|---|---|---|---|
| | | | Loan Count | | | |
| Address | Tract | Year | All | Closed-End Purchase | Closed-End Refinance | HELOC[137] |
| | Combined Tracts | All | 83 | 39 | 36 | 8 |
| ▬▬ ▬▬▬▬ California, 95219 | 06077003114 | 2018 | 18 | 10 | 2 | 6 |
| | | 2019 | 17 | 11 | 5 | 1 |
| | | 2020 | 24 | 8 | 15 | 1 |
| | | 2021 | 21 | 8 | 13 | 0 |
| | 06077003117 | 2022 | 3 | 2 | 1 | 0 |
| | Combined Tracts | All | 37 | 9 | 26 | 2 |
| ▬ Chicago, Illinois, 60610 | 17031080202 | 2018 | 5 | 3 | 2 | 0 |
| | | 2019 | 7 | 2 | 3 | 2 |
| | | 2020 | 8 | 4 | 4 | 0 |
| | | 2021 | 14 | 0 | 14 | 0 |
| | | 2022 | 3 | 0 | 3 | 0 |

## 10.4.  Ifeoma Ebo

144.     In the Complaint, Plaintiffs allege that Ifeoma Ebo had a credit score of approximately 800, an annual income of approximately $178,000, and no significant debt, and was seeking to purchase a home for $900,000.[138] The Complaint further alleges that Ms. Ebo received preapproval for a loan from Wells Fargo on November 1, 2021.[139]  The Complaint alleges that, "Per Wells Fargo's requests, Ms. Ebo submitted all necessary documentation to verify her qualifications for the Loan. Ms. Ebo timely provided Wells Fargo with documentation such as W-2 forms, paystubs, bank account statements, and similar

---

[136] "HELOC" here includes HELOCs for any loan purpose, including those with a purchase or refinance loan purpose. "Purchase" and "refinance" counts exclude HELOCs.

[137] There are two HELOCs with a "home purchase" purpose and one with a "refinance" purpose in the Stockton tract. To avoid double-counting I include them only in the HELOC column.

[138] Amended Complaint, ¶ 54.

[139] *Ibid.*, ¶ 55.

Expert Report of Marsha J. Courchane
February 29, 2024

documents."[140] Plaintiffs allege that Ms. Ebo received a "Commitment Letter from Wells Fargo" on December 29, 2021 "and she only needed to submit some additional documentation in order to complete the final underwriting and funding of her Loan."[141] Plaintiffs allege that Wells Fargo made documentation requests in January, February, and March 2022 to complete the underwriting process, but allege that the additional documentation requested had already been submitted or was unnecessary, unduly burdensome or irrelevant to her qualifications for the loan.[142] Because the underwriting of the loan was delayed, the seller of the property allegedly cancelled the sales contract on or about March 22, 2022.[143]

145.     Based on my review of the documentation related to Ms. Ebo's loan application, I concluded that Wells Fargo's documentation requests to verify Ms. Ebo's employment and income history were necessary and proper, and the delays in the underwriting process were outside of Wells Fargo's control.  There were substantial challenges with the verification process for Ms. Ebo's FHA home purchase application which arose because (1) Ms. Ebo had temporary contract employment at multiple employers over the prior two years,[144] which made it difficult to document two years of work history and income as required by FHA guidelines; (2) Ms. Ebo sought to keep her existing residence while purchasing a new home which required obtaining additional information about the existing residence;[145] (3) she was relying in part on prospective rental income from one or more units unit in the new home to qualify for the mortgage when there was no previous rental history or existing lease related to the property;[146] and (4) there were concerns about the verification of the filing of her 2020

---

[140] *Ibid.*, ¶ 57.

[141] *Ibid.*, ¶ 58. Internal quotation marks omitted.

[142] *Ibid.*, ¶ 61-63.

[143] *Ibid.*, ¶ 65.

[144] See Uniform Residential Loan Application, WF-00026967, and Ebo Deposition at 81:20-85:22, and entries in WF-00018716 related to employment verification referenced in Appendix 3.

[145] See, for example, WF-00018716 entry on 12/30/2021, 08:54:05.678000.

[146] Ebo Deposition at 67:11-17 and EBO0000276 (at EBO0000283).

Expert Report of Marsha J. Courchane
February 29, 2024

federal tax return, among other issues.[147]  In addition, a title issue was discovered on the
subject property (the property had previously been subject to a foreclosure and a *lis pendens*
was still showing on the title), which needed to be cleared up by Ms. Ebo.  The title issue was
not cleared until on or about March 25, 2022.[148]

146.      Notwithstanding Ms. Ebo's apparently good credit history, approval of her
application was subject to various conditions regarding employment and income verifications,
and other documentation conditions (such as bank statements to verify a large funds
transfer).[149]  Ms. Ebo did not satisfy the documentation conditions in a timely manner and
provided incomplete or incorrect documentation.[150]  Delays in the process that resulted from
her failure to provide required documentation in a timely manner necessitated multiple
rounds of employment re-verification due to FHA requirements.[151] The application process
started on October 27, 2021,[152] but the scheduled closing was continually delayed due to Ms.
Ebo's inability to satisfy all approval conditions, and was ultimately cancelled, at her request,
on April 4, 2022.  All the verification and documentation requirements were standard for an
FHA home purchase loan and the records show that Wells Fargo regularly followed up to
obtain the missing documentation, including signed tax forms, and to verify employment and
income.[153]  In its processing of Ms. Ebo's application, it appears that Wells Fargo was lenient

---

[147] See email chain in EBO0000554.

[148] See WF-00018716, entries for March 8, 9, 10 and 25, 2022.  EBO0000394 lists remaining documents required by Wells Fargo as of 12/1/2021.

[149] WF-00018716, entry for 11/29/2021 cites "great credit history" and "low DTI at 23%" based on stated income.

[150] See HUD, "Section D. Borrower Employment and Employment Related Income," *HUD 4155.1*,available at: https://www.hud.gov/sites/documents/4155-1_4_SECD.PDF, last accessed 2/28/2024.  Also see "Section B. Documentation Requirements," HUD's general documentation standards, which note that all documents must be no more than 120 days old at closing, available at:  https://www.hud.gov/sites/documents/4155-1_1_SECB.PDF, last accessed 2/28/2024.

[151] See WF-00012446 at 4 (WF-00012449): "Re-verification of employment must be completed within 10 Days prior to the date of the Note. … Electronic re-verification employment data must be current within 30 days of the date of the verification."

[152] EBO0000276 and entries in WF-00018716 dated 10/27/2021.

[153] In the email chain in EBO0000637, Wells Fargo reached out directly to Ms. Ebo's accountant in order to get the 2020 tax return issue resolved and worked to find a way to expedite getting the tax return information needed while still adhering to FHA guidelines.

Expert Report of Marsha J. Courchane
February 29, 2024

in considering her somewhat irregular employment/income history in its underwriting evaluation.  Based on the documentation I reviewed, I found no indication that Ms. Ebo's race played any role in Wells Fargo's processing of her mortgage loan application.

## 10.5.  Terah Kuykendall-Montoya

147.       Plaintiffs allege in their Complaint that named Plaintiff Ms. Kuykendall-Montoya and her husband (the "Montoyas") applied for a cash-out refinance of an existing Wells Fargo mortgage loan.  Plaintiffs allege that when Ms. Kuykendall-Montoya "completed the mortgage refinance application with Wells Fargo, her FICO score as reported through Equifax substantially exceeded the minimum 620 needed to obtain a conventional mortgage loan, and the family had more than adequate income to repay the increased loan amount" but that Wells Fargo denied the application "on a pretextual basis."  Subsequently, in mid-August 2021, the Plaintiff allegedly "obtained a mortgage prequalification with another lender. That mortgage was later approved and closed, repaying her prior Wells Fargo mortgage."[154]

148.       In my review of the documents for Ms. Kuykendall-Montoya's mortgage application to Wells Fargo, I found that she requested a cash-out refinance loan.  As is clear from her deposition transcript and other documents, Ms. Kuykendall-Montoya and her husband erred and answered "NO" to the following question on her mortgage application: "Have you declared bankruptcy within the past 7 years?"[155]

149.       Upon review of the applicants' credit histories, Wells Fargo found that the Montoyas had had a Chapter 7 bankruptcy discharged in December 2017, which was less than four years prior to the subject loan application (July 27, 2021) and therefore was not permitted under Fannie Mae or Freddie Mac underwriting guidelines.[156]  Further, during

---

[154] Amended Complaint ¶¶ 67-68.

[155] WF-00017713.

[156] Fannie Mae Selling Guide, Section B3-5.3-07 and Freddie Mac Seller/Servicer Guide Section 5202.5, last accessed 02/20/2024.  The four-year time period is measured from the discharge or dismissal date of the bankruptcy action.  See also the bankruptcy notations on the Montoya's credit report, WF-00017737.

Expert Report of Marsha J. Courchane
February 29, 2024

those bankruptcy proceedings, Wells Fargo asked the Montoyas (through their attorney) to reaffirm their existing mortgage loan, but they never executed the reaffirmation agreement, and Wells Fargo's record listed their loan as "Bankruptcy Discharged Non-Reaffirmed."[157]

150.     In addition, the co-borrower (Plaintiff's husband, Donny Montoya) had insufficient credit history to generate a credit score, so the application could not be evaluated by Fannie Mae's AUS.  Wells Fargo also found that the loan would have exceeded the fee limit to be a "Qualified Mortgage Loan" under the "Ability to Repay" requirements of Regulation Z,[158] making it ineligible for sale to Fannie Mae or Freddie Mac.[159]  Wells Fargo therefore denied the conventional loan application for $25,000 and provided an adverse action notice (AAN) to the borrower and co-borrower, with "Bankruptcy on record" cited as a reason for denial. The AAN for Terah Kuykendall-Montoya indicated a Transunion credit score of 697, obtained on July 27, 2021, and the AAN for co-borrower Donny Montoya showed that a credit score was unavailable for him from Experian "because they may not have enough information about your credit history to calculate a score."[160]

151.     Therefore, the denial of Ms. Kuykendall-Montoya's application was not "pretextual."  It was justified even though the loan had a low LTV ratio and low DTI ratio.  The fact that Ms. Kuykendall-Montoya was able to obtain a mortgage at a later date (seven

---

[157] WF-00131875, WF-00132031 and WF-00018616.  See also related testimony in Kuykendall-Montoya Deposition 41:25-42:25, 94:1-95:9, 99:1-22, and 101:9-112:19.

[158] 12 CFR 1026.43(e)(3), available at: https://www.law.cornell.edu/cfr/text/12/1026.43, last accessed 02/28/2024. See WF-00017790: "This transaction has failed the Qualified Mortgage Federal Loan Tier Threshold Test."  The "Ability to Repay" rule under Regulation Z requires that a mortgage lender make a good-faith effort to determine that a borrower has the ability to repay the loan before approving the loan.  A "Qualified Mortgage" is a category of loans defined under the Ability to Repay rule that have certain lower-risk features that help to make it more likely that the borrower will be able to repay (including, but not limited to an APR and upfront fees below specified thresholds, verification of the borrower's income or assets and debts, a term of no more than 30 years, and certain non-amortizing features).

[159] Fannie Mae, *Selling Guide*, Section B2-1.5-02, "Loan Eligibility," available at: https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B2-Eligibility/Chapter-B2-1-Mortgage-Eligibility/Section-B2-1-5-Other-Loan-Attributes-and-Related-Policies/1032996881/B2-1-5-02-Loan-Eligibility-07-05-2023.htm, last accessed 02/28/2024.  Freddie Mac, *Seller/Servicer Guide*, Section 4202.6, "ATR/QM Rule Eligibility and Compliance," last accessed 02/28/2024.

[160] See WF-00018582 for Terah Montoya and WF-00018584 for Donny Montoya.

Expert Report of Marsha J. Courchane
February 29, 2024

months later) from another lender is not dispositive regarding the appropriateness of Wells Fargo's credit decision in July 2021.

152.    The Montoyas went to an alternative lender in August 2021 to apply for a refinance of their VA loan.  In an email to Popi Winters, a loan officer at Network Funding, LP dated August 8, 2021, Ms. Montoya stated "*We have paid 10-years of a 30-year VA mortgage and should have $55K-$65K in equity. We are hoping to refinance for a 20-year term with a cash out of $25K-ish but are waiting on some home repair cost estimates to better determine that amount.*"[161]  On September 2, 2021, Popi Winters notified Ms. Montoya that "*As we discussed over the phone I can only do a VA refinance for you due to the bankruptcy. That being said, if we keep the loan in place we can flip to a cashout refinance in December and close in December on a cashout refinance for you. The bankruptcy has to be discharged for 4 years in order to do a conventional loan. Cashouts are only allowed on conventional loans. The state of Texas doesn't allow cashouts on a VA loan*."[162]  These comments from Network Funding LP are entirely consistent with the Wells Fargo response that a conventional loan was not available with a recent bankruptcy. Ultimately, the Montoyas did receive funding for a cash out refinance in February 2022 from Network Funding, LP after they had reached a point more than four years after their bankruptcy discharge; however, it is possible they could also have received a loan from Wells Fargo if they had waited until December 2021 to apply.[163] Therefore, the fact that she was declined by Wells Fargo in July 2021 but approved by another lender seven months later (and more than four years after the bankruptcy had been discharged) does not prove that Wells Fargo discriminated against the Montoyas, only that Wells Fargo was applying the exact same neutral underwriting requirement with respect to bankruptcies that their alternative lender applied.

---

[161] See WR3418390_000000001.

[162] See WR3418390_000000191.

[163] WF-00018584 for Donny Montoya.

Expert Report of Marsha J. Courchane
February 29, 2024

153.     There is nothing in the loan record to suggest Ms. Kuykendall-Montoya's race

was a factor in Wells Fargo's processing of her application.

## 10.6.  Paul Martin

154.     According to the Complaint, Mr. Martin allegedly sought to refinance his multi-

million-dollar home in a neighborhood with a relatively high percentage of affluent Black

residents.[164]  Plaintiffs allege that, "Wells Fargo demanded that Mr. Martin first apply for

aHELOC, before they would consider him for a loan refinance. Ultimately, Wells Fargo refused

to provide Mr. Martin with the HELOC or refinance Mr. Martin's loan. The bank would not do

either unless he could get his home appraised for $2 million. Wells Fargo's appraiser refused

to come inside Mr. Martin's home and appraised it at just shy of $2 million based on

comparisons with homes in less affluent, Black-populated neighborhoods, apparently

conflating all areas with a high concentration of Black residents. Mr. Martin went to another

lender, who appraised the home at $2.4 million and promptly refinanced his loan."[165]

155.     Based on my review of the documents produced in relation to Mr. Martin's loan

application, he applied for a HELOC from Wells Fargo in late March 2020.  I found that,

contrary to Plaintiffs' allegations, Wells Fargo did not refuse to provide a loan to Mr. Martin.

Instead, Wells Fargo actually conditionally approved Mr. Martin's application on April 29,

2020, for a $180,000 HELOC (the credit line amount he requested) and reapproved it after

each review of the documentation that Mr. Martin submitted.  However, a third-party

appraiser estimated the property value at $1.9 million as of May 6, 2020,[166] which Mr. Martin

disputed because he allegedly had a full appraisal performed three months earlier, which

estimated the property value to be $2.4 million (in connection with refinancing of his first and

second mortgages with Kinecta Federal Credit Union in March 2020).  Based on Mr. Martin's

dispute, Wells Fargo re-reviewed the appraisal on June 4, 2020, and concluded that the

---

[164] Amended Complaint ¶ 33.

[165] *Ibid.*, ¶ 34.

[166] WF-00120137.

Expert Report of Marsha J. Courchane
February 29, 2024

appraised value was supported and based on reasonable comparables.[167]  Because of federal rules mandating the independence of appraisals, Wells Fargo had no power to overrule or revise the appraisal (see Section 10 above).  The Wells Fargo appraisal for Mr. Martin was based on the property exterior only because COVID-19 pandemic protocols prevented the appraiser from reviewing the interior of the home.[168]

156.     When a reconsideration of the appraisal was requested, a full appraisal was still not possible due to the COVID-19 protocols.  Nevertheless, Wells Fargo approved Mr. Martin's HELOC application based on the value estimate it received.  In other words, the disputed appraised value was not an obstacle to approval of a HELOC in the amount that Mr. Martin applied for, and Mr. Martin's allegation that Wells Fargo "refused to provide Mr. Martin with the HELOC" is unfounded.  Mr. Martin decided to cancel his application of his own accord.

157.     Mr. Martin subsequently refinanced his home in July 2020 with Kinecta Federal Credit Union and obtained a HELOC from that same lender in September 2020, both of which appear to have been underwritten based on a recertification of the appraisal Kinecta had obtained February 2020 in connection with a previous refinance.[169]  Mr. Martin states that he also subsequently obtained a more favorable appraisal through another lender (loanDepot).  That appraisal occurred approximately a year after his request for a HELOC from Wells Fargo.[170]  There is nothing in the loan record to suggest Mr. Martin's race was a factor in Wells Fargo's processing of his application.

---

[167] MARTIN0000346.

[168] Wells Fargo resumed allowance of interior appraisals for HELOCs effective July 25, 2020.  See HE Acquisitions First Lien guidelines as of 2021, WF-00031507, Section 114.05, at 156.

[169] Martin Deposition at 72-74 and 207-209, and MARTIN0000360.

[170] See Martin Deposition, 169:5-178:6.

Expert Report of Marsha J. Courchane
February 29, 2024

### 10.7.  Elretha Perkins

158.     Plaintiffs allege in the Complaint that Elretha Perkins had a credit score of 720, was a Wells Fargo customer for 20 years, and owned two homes, one of which was financed through Wells Fargo.[171] Plaintiffs allege that, "Despite Ms. Perkins consistently making payments on her home loan and her exemplary credit score and creditworthiness, her refinance application was subjected to delay, pretextual excuses and overt acts of discrimination by Wells Fargo, including mandating that in order for her to refinance her HELOC, she would have to apply for and be granted a modification under a "hardship" program as if the loan was distress - even though she was not facing any financial hardship or need to modify the loan under a loss mitigation program."[172]  Plaintiffs also allege that Wells Fargo required her to submit the same tax and income documents multiple times.

159.     Contrary to the allegations that Ms. Perkins consistently made payments on her existing home loans and had an "exemplary" credit score, I found in reviewing the documents associated with her loan application that her existing HELOC with Wells Fargo was not in good standing at the time she applied for a refinance loan in mid-September 2021, and her credit score (682 or 667 depending on the date of the Equifax credit report, not 720 as was alleged) was adversely affected by a series of delinquencies on her Wells Fargo HELOC loan during the first half of 2020.[173]  More specifically, Ms. Perkins had four instances of 30-day delinquency and two instances of 60-day delinquency, with the most recent delinquency being in May 2020.  Ms. Perkins sought to refinance a first mortgage on her primary residence from another lender, plus the HELOC from Wells Fargo.  In addition, she had a mortgage on another property.  The documentation from Wells Fargo's underwriting process indicates that her refinance application was denied because her existing HELOC had reached maturity in

---

[171] Amended Complaint, ¶ 45.

[172] *Ibid.*, ¶ 45-47.

[173] Ms. Perkins had two applications. The first one (application date 9/14/2021) was denied on 10/4/2021 due to an incomplete credit application and her Equifax credit score was 682 at that time. The second was applied for on 12/13/2021, at which time Equifax reported her score was as 667 and was denied for credit history on 12/15/2021. Both reports show late payments (see WF-00014667 and WF-00015009).

Expert Report of Marsha J. Courchane
February 29, 2024

August 2021 and the full balance of $47,473.87 was due and unpaid.[174]  At the time, Ms. Perkins was working with Wells Fargo's Home Preservation department to do a payment plan for the HELOC. As a result, the HELOC would not have been eligible for a refinance.

160.     Also, contrary to Ms. Perkins' allegation that Wells Fargo gave her "the runaround to such an extent that she has had to submit the same tax and income documents multiple times …" she actually was responsible for the delays in the process.  She failed to respond Wells Fargo's initial request for documentation regarding income, assets, and debts until after the initial response deadline of October 4, 2020, resulting in a declination due to an incomplete application.  After that time, Wells Fargo received requested documentation and proceeded to underwrite the loan, rendering a credit decision in mid-December 2020 (denied for late payments on credit accounts and insufficient benefit to the borrower of a refinance compared to her existing financing).[175]  I found no indications that Wells Fargo's actions with respect to the application were untimely, incorrect, or had anything to do with Ms. Perkin's race.

## 10.8.  Christopher Williams

161.     Plaintiffs allege that Mr. Williams was subjected to discrimination when he applied for a HELOC with Wells Fargo.  Plaintiffs allege that, "Mr. Williams believed he should have qualified for Wells Fargo's prime interest rate, which would have saved him substantial money over time on his home mortgage. However, consistent with Wells Fargo's pattern of discrimination against Black applicants, Wells Fargo offered him an interest rate nearly three points higher than the prime interest rate offered by Wells Fargo, which is disproportionately and discriminatorily offered to white applicants."[176]  Plaintiffs further allege that, "Mr. Williams spoke to Wells Fargo's home lending department to have his credit report rechecked and for his interest rate to be lowered. Instead, Wells Fargo refused to reconsider his credit

---

[174] See entries for 12/13/2021 in WF-00014392 and Perkins Deposition, at 98:1-10.

[175] See Notice of Action, WF-00014987.

[176] Amended Complaint, ¶ 49.

Expert Report of Marsha J. Courchane
February 29, 2024

score or his interest rate. Wells Fargo agreed to revisit its refusal to extend the loan to Mr.
Williams on favorable terms. However, in a letter dated September 5, 2019, Wells Fargo
articulated for the first time, that it did not use solely FICO credit scores to determine home
interest rates, but instead used a unique scoring model, which considers more than credit
scores to evaluate applications."[177]

162.     However, the September 15, 2019 letter actually explains that the FICO score
available on Wells Fargo Online is for education purposes only, and that when applying for
credit, the score used might not be the same "type/bureau" as that FICO score.[178] The letter
goes on to explain that for home equity applications, the Equifax credit score is used. My
review of the Wells Fargo HELOC rate sheets demonstrated that they use a grid for the loan
product type, whether the interest rate is fixed or adjustable, a grid using FICO and LTV
interactions and some additional loan pricing adjustments for relationship status, non-owner-
occupancy and loan amount.  I provide more detail below.[179]

163.     Based on my review of the loan application documents produced regarding Mr.
Williams' loan, I found that Wells Fargo conditionally approved him for his requested credit
line amount of $180,000, with an initial fixed-rate advance of $86,000 to pay off his existing
first-lien mortgage.  Contrary to Plaintiffs' allegations, Mr. Williams did not have a credit score
of "over 750" at that time.  The credit report Wells Fargo obtained from the credit reporting
bureaus showed his Equifax BEACON FICO credit score as 686 as of May 30, 2019, which was
influenced by an unpaid medical collection account.  Mr. Williams has testified that he
learned of the collection record based on the credit report information Wells Fargo disclosed
to him, and he subsequently disputed that collection record with the credit bureau and
succeeded in having it removed.[180]  However, the collection record was present at the time
Wells Fargo underwrote and priced Mr. Williams' HELOC application, and Mr. Williams has

---

[177] *Ibid.*, ¶ 50, internal quotation marks omitted.

[178] WF-00150736.

[179] See HELOC rate sheets -- WF-05171814, WF-05171815, and WF-05171816.xlsm.

[180] Williams Deposition at 162:10-11 and 169:5-11.

Expert Report of Marsha J. Courchane
February 29, 2024

not produced any documentation showing that he had an Equifax FICO credit score greater than 750 at the time Wells Fargo underwrote and priced his HELOC application.  Given the credit score of 686, Wells Fargo conditionally approved Mr. Williams' application based on his relatively low DTI ratio, low revolving debt utilization, good employment history, and acceptable LTV ratio, and offered him an interest rate of 8.50%, which included a 0.25% discount based on his status as a deposit customer.   However, because Mr. Williams disputed the credit score Equifax reported and was not satisfied with the pricing that Wells Fargo offered based on that credit score, he decided to cancel his application.

164.     I also found that Mr. Williams' allegation that he was adversely affected by a "unique scoring model" is unfounded.  The only credit score Wells Fargo used in pricing Mr. Williams HELOC was a standard credit bureau FICO score.  I reviewed the Wells Fargo HELOC rate sheet applicable at the time Mr. Williams' application was approved.  I confirmed that the variable interest rate for a Wells Fargo HELOC is calculated as the Prime Rate index plus a margin.[181]  The margin is determined based only on the combination of the borrower's Equifax FICO credit score, the combined LTV ratio, the loan amount, certain bank relationship discounts, and product adjustments for investment properties and second homes.  Based on the rate sheet for a Georgia property, I found that the variable interest rate quoted to Mr. Williams was correctly determined as 8.500% (Prime Rate of 5.500% plus a margin of 3.000%) based on his Equifax FICO credit score of 686, his LTV ratio between 75% and 80%, his approved credit line amount of $180,000, and his deposit customer discount.

165.     If Mr. Williams' Equifax FICO credit score at the time had instead been greater than 750, as he alleges, he would have received a lower variable interest rate based on Wells Fargo's rate sheet – between 6.000% and 6.625% depending on his actual credit score.  The rate quoted by Wells Fargo for a fixed-rate advance similarly would have been lower if Mr. Williams' credit score had been substantially greater than the 686 reported by Equifax.  Therefore, there is no basis for Mr. Williams' allegation that Wells Fargo discriminated against

---

[181] WF-05171815.

Expert Report of Marsha J. Courchane
February 29, 2024

him based on his race in the pricing of the HELOC.  He received the same standard pricing than any other Georgia borrower with the same loan parameters, Equifax FICO score, and customer relationship status would have received during the period that rate sheet was in effect.

166.     The fact that Mr. Williams subsequently obtained a HELOC from another bank with more favorable pricing after having the collection record removed from his credit report, or based on data from a different credit bureau that may have not had the collection record,[182] is not a basis for inferring that Wells Fargo's pricing decision was discriminatory. Wells Fargo's pricing was based on a third-party credit bureau score over which Wells Fargo had no control.  Further, the fact that Mr. Williams may have subsequently obtained a retrospective credit report showing a more favorable credit score after having had the disputed collection record removed has no bearing on the credit score that was available to Wells Fargo at the time it underwrote and priced Mr. Williams' application.[183]

I declare that the foregoing is true and correct to the best of my knowledge.

Signed this 29th day of February 2024, at Washington, DC.

*Marsha J. Courchane*

Dr. Marsha J. Courchane

---

[182] Mr. Williams testified that he does not know whether the disputed collection account was on an Experian credit report obtained by PNC Bank (Williams Deposition at 207:9-17) and that he does not know when the collection was removed from his credit bureau record (*ibid*., at 163:18-23 and 208:11-12).

[183] In his deposition testimony, Mr. Williams agreed that the credit score trend report Mr. Williams obtained from Credit Karma was produced at least three months after he submitted his HELOC application to Wells Fargo.  *Ibid*. at 165:20-166:4.

Expert Report of Marsha J. Courchane
February 29, 2024

# Appendix 1.  Documents Considered

**Case Documents**

Amended and Consolidated Class Action Complaint, March 24, 2023 ("Amended Complaint")

**Case Data**

**CRA_DATA_EXPORT001, 01/19/2024**

- WF-00035411_pipe delimited, 01/23/2024
- WF-00035411.dat
- WF-05163082.txt

**CRA_DATA_EXPORT002, 01/19/2024**

| Bates Number | Description |
|---|---|
| WF-00000637 – WF-00007233 | Underwriting Guidelines |
| WF-00007287 – WF-00008053 | Underwriting Guidelines |
| WF-00008106 – WF-00009496 | Underwriting Guidelines |
| WF-00014392 – WF-00015027 | Documents related to Plaintiff Elretha Perkins' loan |
| WF-00015028 – WF-00015140 | Documents related to Plaintiff Christopher Williams' loan (ending 8533) |
| WF-00017704 – WF-00018631 | Documents related to Terah Kuykendall-Montoya's loan (ending 1364) |
| WF-00018632 – WF-00018971 | Documents related to Ebo Ifeoma's loan (ending 5066) |
| WF-00018972 – WF-00019006 | Additional Christopher Williams' loan documents (ending 8533) |
| WF-00019007 WF-00026955 – WF-00026978 | Loan documents related to Bryan Brown (loan ending 3194) |
| WF-00018717 – WF-00018971 WF-00019009 – WF-00019253 | Loan documents related to Paul Martin loan (loan ending 5066) |
| WF-01276996 – WF-01277144 | Fair Lending Analyses (2016-2018 Geographic Credit Policy analysis); 2Q2019 Retail All-In-Price (AIP) WFHL Analysis); Appendix to All-In-Price Analysis – 2Q2019; Appendix to AIP Analysis 3Q2019; Analysis of 1/1/2018-12/31/2018 WFHM Lending Penetration; 4Q2019-1Q2020 Retail All-in-Price Appendix; February 21, 2020 – Re-evaluation of WFHM Fair Lending Re-pricing Approach.) |
| WF-03227920 – WF-03227929 | HMDA Peer Pricing Analysis |
| WF-04814307 – WF-04814336 | Fair Lending Testing and Monitoring Manual |
| WF-04814365 – WF-04814385 | Fair Lending Analytics Manual |
| WF-00030904 – WF-05148228 WF-DATA-00000005 | Fair Lending Analyses |

**CRA_DATA_EXPORT003, 01/22/2024**

| Bates Number | Description |
|---|---|
| WF-00030904 – 30923 | Home Lending Denial Rate Analysis – 2022 |
| WF-00035281 – 35308 | 1H 2018 Credit Decision Monitoring |

Expert Report of Marsha J. Courchane
February 29, 2024

| WF-00035309 – 35340 | FL Analysis of WFHM 2019 Credit Decisions |
|---|---|
| WF-00035341 – 35377 | FL Analysis of WFHM 2020 Credit Decisions |
| WF-00035378 – 35407 | FL Analysis of WFHM 2018 Q3-Q4 Credit Decisions |
| WF-00035408 – 35410 | FL Analysis of WFHM 2022 Q1 Credit Decisions |
| WF-00076050 – 76075 | FL Analysis of WFHM 1H 2018 Credit Decisions |
| WF-00076180 – 76205 | FL Analysis of WFHM 1H 2019 Credit Decisions |
| WF-00076207 – 76233 | FL Analysis of WFHM 2018 Q3 – Q4 Credit Decisions |
| WF-00076290 – 76292 | FL Analysis of WFHM Q1 2022 Credit Decisions |
| WF-00076293 – 76296 | FL Analysis of WFHM 2Q 2022 Credit Decisions |
| WF-00076297 – 76301 | FL Analysis of WFHM 3Q 2022 Credit Decisions |
| WF-00079663 – 79738 | HL Government Orig Custom ECS Score (Model ID 11419) |
| WF-00143265 – 43289 | FL Analyses of HL Conventional Orig. Custom Enhanced Credit Score (ECS) Model – MN11960 |
| WF-00150785 – 50879 | Model Development HL ECS – HL Govt QTM 11419 2018-02-06 |
| WF-00150886 – 50983 | Model Development HL ECS – HL Govt QTM 11419 2018-05-31 |
| WF-00151331 – 51335 | The State of the Mortgage Market March 2023 |
| WF-00209247 – 09253 | FL Analysis of WFHE (Home Equity) 2H 2019 – 2020 |
| WF-00632434 – 32454 | HL Conventional Orig Custom ECS Score Model 11960 Business Justification |
| WF-03773582 – 73648 | Annual Review Report HL Govt Orig Custom ECS Score Q3 2021 Model 11419 v 1.0 |
| WF-03774125 – 74153 | RFI – Annual Review – HL Govt Orig Custom ECS Score 08/2022 Model 11419 v 1.0 |
| WF-03774612 – 74651 | Annual Review Report HL ECS Govt August 2018 Model 11419 v 1.0 |
| WF-03774652 – 74696 | General Model Annual Review HL Govt Orig Custom ECS Score August 2018 Model 11419 v 1.0 |
| WF-03774697 – 74793 | Model Development HL Govt Orig Custom ECS Score 2019.07.12 Model 11419 v 1.0 |
| WF-03774860 – 74956 | Model Development HL Govt Orig Custom ECS Score 2020.06.08 Model 11419 v 1.0 |
| WF-03775099 – 75166 | Annual Review Report HL Conventional Orig Custom ECS Score Q1 2022 Model 11960 v 1.0 |
| WF-03775187 – 75213 | RFI – Annual Review – HL Conv. Orig Custom ECS Score 02.2022  2021.12.20 Model 11960 v 1.0 |
| WF-03775624 – 75704 | Annual Review Report HL Conv. Orig Custom ECS Score Q1 2023 03.06.2023 Model 11960 v 1.0 |
| WF-03775706 – 75733 | RFI – Annual Review – HL Conv. Orig Custom ECS Score 02.2023  2021.12.8 Model 11960 v 2.0 |
| WF-03775943 – 75963 | General Model Annual Review HL ECS Score (1st Lien Conv. And SIMO (HE Simultaneous)) Feb 2019 2019.02.28 Model 114960 v 1.0 |
| WF-03775964 – 76020 | General Model Annual Review HL Conv. Orig. Custom ECS Score January 2020 1.23.2020 Model 11960 v 1.0 |
| WF-03776021 – 76124 | Model Development HL Conv. Orig Custom ECS Score 2020.12.11 Model 11960 v.1.0 |
| WF-03776191 – 76294 | Model Development HL Conv. Orig Custom ECS Score 2021.08.16 Model 11960 v.1.0 |
| WF-03776566 – 76573 | Model Performance Monitoring Review 2020 Q1 04.17.2020 |

Expert Report of Marsha J. Courchane
February 29, 2024

| WF-03780890 – 80969 | HL Conventional Orig Custom ECS Score Jan-Feb 2021 Model 11960 v 1.0 |
|---|---|
| WF-03835612 – 35625 | FL analysis of WFHM ECS Decision Model 10.10.2023 |
| WF-04350119 – 50124 | Business Response to FL Analysis of WFHM ECS on Non-Conform. 1H 2018 11.01.2019 |
| WF-04879333 – 79344 | FL analysis of WFHM ECS Decision Model 1H 2018 11.08.2019 |
| WF-05148028 – 48124 | Model Development HL Govt. Orig Custom ECS Score 2021.08.16 Model 11419 v.1.0 |
| WF-05148125 – 48228 | HL Conventional Orig Custom ECS Score 2022.12.08 Model 11960 v 1.0 |

**WF HMDA Data Export, 01/24/2024**

WF-00000001_CONFIDENTIAL.dat
WF-00000002_CONFIDENTIAL.dat

**CRA_DATA_EXPORT004, 01/25/2024**

**NATIVES**
**Rate Sheets (Ranges on Dates by Year)**
Representative rate sheets for 01/02/2018 (WF-00200001) 01/02/2019 (WF-00020260.xls), 01/02/2020 (WF-00020534), 01/04/2021 (WF-000220786), 01/03, 2022 (WF-0021076) and 01/03/2023 (WF-0021421), 09/01/2020 (WF-00020702), 11/23/2020 (WF-00020759) and 08/02/2021 (WF-0020963).

**IMAGES**

| WF-00012446 – WF-00012485 | Underwriting the Borrower using TOTAL Scorecard |
|---|---|
| WF-00012530 – WF-00012632 | Manual Underwriting of the Borrower |
| WF-00015141 - WF-00016271<br>WF-00017700 - WF-00017703<br>WF-00019807 - WF-00020000 | Documents related to Gia Gray's loan (ending 7906) |
| WF-00016272 - WF-00017699<br>WF-00019623 - WF-00019806 | Documents related to Gia Gray's loan (ending 6635) |
| WF-00022673 - WF-00022680 | Fair Lending Policies |
| WF-00027462 - WF-00027542 | ECOA Reg B Manual |
| WF-00027543 - WF-00027552 | Risk Engine-GRD Overview April 2022 |
| WF-00030806 - WF-00030846 | Quantitative Analyses |
| WF-00030849 - WF-00030943 | Bloomberg Analysis Data |
| WF-00035253 - WF-00035279 | CAP 2020-228 and CAP 2021-106 |

Expert Report of Marsha J. Courchane
February 29, 2024

| WF-00035449 - WF-00043099 | ECS Models |
|---|---|
| WF-00121738 - WF-00127984<br>WF-00120183 - WF-00120328 | Documents Related to Plaintiff Brian Braxton's loan (ending in 9384) |
| WF-00131874 | Documents Related to Plaintiff Brian Braxton's loan (ending in 1998) |
| WF-00130545 - WF-00133078 | Brian Braxton Complaint Data |
| WF-00208446 - WF-00208848 | One Right Answer Policies and Procedures |
| WF-03768685 - WF-03769098 | History of Media Contacts Regarding Bloomberg Article |
| WF-03924275 - WF-03924310 | Underwriting Guidelines from Ncylopedia |
| WF-03792516 - WF-03792775 | Fair Lending Documents |

**CRA_DATA_EXPORT005, 01/26/2023**

| BRAXTON0000001 - BRAXTON0000468 | Plaintiff's Production for Aaron Braxton |
|---|---|
| EBO0000001 - EBO0000215 | Plaintiff's Production for Ifeoma Ebo |
| GRAY0000001 - GRAY0000085 | Plaintiff's Production for Gia Gray |
| MARTIN0000001 - MARTIN0000362 | Plaintiff's Production for Paul Martin |

**Agency Underwriting Guidance**

2018:  WF-00002270

2019:  WF-00002729

2020:  WF-00003206

2021:  WF-00001073

2022:  WF-00013855

**Plaintiff Rate Sheets**

WF-05171814 – Martin

WF-05171815 - Williams - 2nd rate

WF-05171816 - Williams - 1st rate

WF-00020578.xlsx - Gray - primary res

WF-00020777.xlsx - Gray - investment props

Expert Report of Marsha J. Courchane
February 29, 2024

WF-00020734.xlsx – Brown

WF-00020945.xlsx – Montoya

WF-00021008.xlsx - Perkins - 1st app - 10-4-2021

WF-00021063.xlsx - Perkins - 2nd app - 12-15-2021

WF-00021043.xlsx – Ebo

WF-00020703.xlsx - Braxton - 1st mod - 9-2-2020

WF-00020766 - Braxton - 2nd mod - 12-3-2020

**Wells Fargo Underwriting Process**

WF-00026980.pdf

WF-00026980

WF-00035253

WF-00035267

WF-04846664 - Risk Engine External Strategies.pdf

WF-00143317 – ECS Fair Lending Analyses of Home Lending Conventional Origination Custom Enhanced Credit Score (ECS) Model — MN 11960 – October 31, 2022

**HELOC Policies**

WF-00025604 – 25816 (2018)

WF-00031039 – 31261 (2019)

WF-00031262 – 31506 (2020)

WF-00031507 – 31716 (2021)

**Wells Fargo Appraisal Bias Reviews**

WF-03837493 - Draft Appraisal Bias Review.pdf

WF-03837493 - Draft Appraisal Bias Review.pdf

**Plaintiff Depositions**

2023-11-21 - WF Mortgage Discrim - Deposition of Paul Martin_FULL(182236065.1).pdf (Martin Deposition)

2024-01-10 - Paul Martin Depo - Errata(184081385.1).pdf

2023-12-01 - WF Mortgage Discrim - Deposition of Dr Gia Gray_FULL(182637172.1).pdf (Gia Deposition)

2024-01-18 - Gia Gray Depo - Errata.docx(184376405.1).pdf

BryanABrown_PDFTran(180687814.1).pdf (Brown Deposition)

ElrethaPerkins_PDFTran(181864986.1).pdf (Perkins Deposition)

Expert Report of Marsha J. Courchane
February 29, 2024

IfeomaEbo_PDFTran(181711472.1).pdf (Ebo Deposition)

TerahKuykendall-Montoya_PDFTran(185134856.1).pdf (Kuykendall-Montoya Deposition)

AaronBraxton_PDFTran(182190915.1).pdf (Braxton Deposition)

2024-01-08 - Aaron Braxton Depo Errata Sheet(184292473.1).pdf

ChristopherWilliams_COND.pdf (Williams Deposition)

**Wells Fargo Court Decisions**

City of Oakland v. Wells Fargo Bank N.A. 315-cv-04321 (N.D. Cal.) August 15, 2017 (First Amended Complaint).pdf

City of Oakland v. Wells Fargo Bank N.A. 315-cv-04321 (N.D. Cal.) September 28 2021 En Banc Opinion.pdf

City of Oakland v. Wells Fargo Bank, N.A., 315-cv-04321 (N.D. Cal.), Dkt. 195, March 16, 2022 Judgment.pdf

Cty. of Cook Illinois v. Wells Fargo Co. 114-cv-09548 (N.D. Ill.) Dkt. 729 December 19 2022 MSJ Order.pdf

Cty. of Cook Illinois v. Wells Fargo Co. 114-cv-09548 (N.D. Ill.) Dkt. 730 December 19 2022 Judgment.pdf

**Christopher Williams Additional Documents**

WF-00150736 Sept5 letter to Williams.pdf

**Paul Martin Additional Documents**

PaulMartin_303(182331521.1).pdf

PaulMartin_312(182331562.1).pdf

PaulMartin_314(182331569.1).pdf

PaulMartin_316(182331573.1).pdf

PaulMartin_318(182331575.1).pdf

PaulMartin_322(182331498.1).pdf

PaulMartin_325(182331508.1).pdf

**Montoyas Additional Documents**

WF-00127985- Montoya Notes.pdf

KUYKENDALL-MONTOYA0000062.pdf

WF-00017713.pdf

WF-00018580.pdf

WF-00018581.pdf

WF-00018582.pdf

WF-00018584.pdf

WF-00131904.pdf

WR3418390_000000001.pdf

Expert Report of Marsha J. Courchane
February 29, 2024

WR3418390_000000006.pdf

WR3418390_000000018.pdf

WR3418390_000000139.pdf

WR3418390_000000140.pdf

WR3418390_000000142.pdf

WR3418390_000000143.pdf

WR3418390_000000149.pdf

WR3418390_000000191.pdf

WR3418390_000000192.pdf

WR3418390_000000278.pdf

WR3418390_000000362.pdf

WR3418390_000000411.pdf

WR3418390_000000456.pdf

WR3418390_000000466.pdf

WR3418390_000000467.pdf

**Depositions Taken by Plaintiffs' Counsel**

Brodsky, Joel - Quantitative Analytics Manager of the Risk Modeling Group

Brooks, Eric - Fair Lending Compliance Director

Figone, Phillip - Mortgage Originator

Kelley, Derek - VP Compliance Manager

LeMaire, Mary Dee - SVP Fair Lending Analytics Compliance Director

Strawser, Peter - SVP Head of Underwriting and Credit Admin

Sudjianto, Agus - Executive VP Head of Corporate Model Risk

Expert Report of Marsha J. Courchane
February 29, 2024

## Independently Obtained Documents

- Avery, Robert B., Brevoort, Kenneth P. and Glenn B. Canner, 2006, "Higher-Priced Home Lending and the 2005 HMDA Data," *Federal Reserve Bulletin*, vol. 92, A123-66, available at: https://www.federalreserve.gov/pubs/bulletin/2006/hmda/default.htm, last accessed 02/07/2024.

- Avery, Robert B., Paul S. Calem, and Glenn B. Canner, "An Overview of Consumer Data and Credit Reporting," Federal Reserve Bulletin, February 2003, 47 – 78,available at: http://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf , last accessed 01/25/2024

- Avery, Robert B., Glenn B. Canner, and Robert E. Cook, 2005, "New Information Reported under HMDA and Its Application in Fair Lending Enforcement," *Federal Reserve Bulletin,* vol. 91 (Summer), available at: https://www.federalreserve.gov/pubs/bulletin/2005/3-05hmda.pdf, last accessed 01/25/2024

- Braunstein, Sandra, *Statement of Sandra F. Braunstein*, Director, Division of Consumer and Community Affairs, Board of Governors of the Federal Reserve System, before the Subcommittee on Oversight and Investigations, U.S. House of Representatives, July 25, 2007, at 7, available at: https://www.federalreserve.gov/newsevents/testimony/braunstein20070725a.htm, last accessed 01/25/2024

- City of Oakland v. Wells Fargo Bank, N.A., 315-cv-04321 (N.D. Cal.), Dkt. 195, Judgment filed March 16, 2022

- Consumer Financial Protection Bureau, Data Point:  2022, Mortgage Market Activity and Trends, September 2023, available at:  https://files.consumerfinance.gov/f/documents/cfpb_data-point-mortgage-market-activity-trends_report_2023-09.pdf, last accessed 01/24/2024.

- Consumer Financial Protection Bureau, "Analysis of Differences in Consumer- and Creditor-Purchased Credit Scores," September 2012, available at: https://files.consumerfinance.gov/f/201209_Analysis_Differences_Consumer_Credit.pdf, last accessed 01/25/2024

- Consumer Financial Protection Bureau, Examination Procedures:  *ECOA Baseline Review*, available at: https://files.consumerfinance.gov/f/documents/cfpb_supervision-and-examination-manual_ecoa-baseline-exam-procedures_2019-04.pdf, last accessed 01/30/2024.

- Consumer Financial Protection Bureau, "Rate Spread Calculator," available at: https://ffiec.cfpb.gov/tools/rate-spread#:~:text=The%20rate%20spread%20calculator%20generates,%2Din%20date%2C%20APR%2C%20fixed, last accessed 02/20/2024.

- Consumer Financial Protection Bureau, *Conventional Loans*, available at: https://www.consumerfinance.gov/owning-a-home/loan-options/conventional-loans/, last accessed 01/24/2024

- Cty. of Cook Illinois v. Wells Fargo  Co. 114-cv-09548 (N.D. Ill.) Dkt. 730, Judgement, December 19, 2022

- Courchane, Marsha J. and Stephen L. Ross, "Evidence and Actions on Mortgage Market Disparities:  Research, Fair Lending Enforcement, and Consumer Protection, *Housing Policy Debate*, 2018, DOI: 10.1080/10511482.2018.1524446.

- Equal Credit Opportunity Act ("ECOA"), available at:  https://www.justice.gov/crt/equal-credit-opportunity-act-3, last accessed 02/09/2024.

- ECOA, available at:  https://www.govinfo.gov/content/pkg/USCODE-2011-title15/html/USCODE-2011-title15-chap41-subchapIV.htm, last accessed 02/09/2024.

- Experian, "What are the Different Credit Scoring Ranges," available at:  https://www.experian.com/blogs/ask-experian/infographic-what-are-the-different-scoring-ranges/, last accessed 01/25/2024.

Page 76

Expert Report of Marsha J. Courchane
February 29, 2024

- Experian, "What is a Good Credit Score," https://www.experian.com/blogs/ask-experian/credit-education/score-basics/what-is-a-good-credit-score/, last accessed 02/20/2024.

- Fair Housing Act, 42.U.S.C. 3601-3619, was enacted as Title VIII of the Civil Rights Act of 1968.  The complete text is available at:  https://www.law.cornell,edu/uscode/text/42/chapter-45/subchapter-I, last accessed 01/30/2024.

- Fannie Mae Single-Family Selling Guide, available at: https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/, last accessed 002/02/2024.

- Fannie Mae Single-Family Selling Guide, available at: https://selling-guide.fanniemae.com/Selling-Guide/Origination-through-Closing/Subpart-B3-Underwriting-Borrowers/Chapter-B3-2-Desktop-Underwriter-DU-/1032994121/B3-2-03-Risk-Factors-Evaluated-by-DU-12-13-2023.htm#Risk.20Factors.20Evaluated.20by.20DU, last accessed 01/25/2024.

- Fannie Mae, Single-Family Seller/Servicer Guide, Section B3-5.4-02-Number-and-Types-of-Nontraditional-Credit, last accessed 02/01/2024; last accessed 02/01/2024; Sections B3-2-06, last accessed 02/01/2024; Sections B3-5.1-01 and B3-5.2-01, last accessed 02/20/2024; Fannie Mae Selling Guide, Section B4-1.3-12.; last accessed 02/20/2024; Section B4-1.4-10;  Section B3-5.3-07; Fannie Mae Selling Guide, section B2-1.5-02 ("Loan Eligibility"), last accessed 02/20/2024.

- Fannie Mae, Matrix Loan Level Price Adjustments, are available at: https://selling-guide.fanniemae.com/Selling-Guide/Selling-Securitizing-Delivering-Loans/Subpart-C1-General-Info-Execution-Options-Loan-Delivery/Chapter-C1-1-Execution-Options-Overview/2590399191/Matrix-Loan-Level-Price-Adjustment-May-2023.htm

- See Fannie Mae Lender Letter LL-2020-04, March 23, 2020 (and as subsequently revised), available at: https://singlefamily.fanniemae.com/media/22321/display, last accessed 02/02/2024;

- Federal Finance Housing Agency, Conforming Loan Limit Values, available at: https://www.fhfa.gov/DataTools/Downloads/Pages/Conforming-Loan-Limit.aspx, last accessed 02/22/2024.

- See Federal Housing Finance Agency, Representation and Warranty Framework, https://www.fhfa.gov/PolicyProgramsResearch/Policy/Pages/Representation-and-Warranty-Framework.aspx, last accessed 02/25/2024

- Federal Financial Institutions Examination Council (FFIEC), Home Mortgage Disclosure Act (HMDA) data, available at: www.ffiec.gov/hmda, last accessed 01/30/2024.

- FFIEC, "A Guide to HMDA Reporting," 2004 Edition, available at https://www.ffiec.gov/hmda/pdf/2004guide.pdf, last accessed 02/28/2024.

- FFIEC, "A Guide to HMDA Reporting," 2013 Edition, available at https://www.ffiec.gov/hmda/pdf/2013guide.pdf, last accessed 02/28/2024.

- FFIEC, "A Guide to HMDA Reporting," 2018 Edition, available at https://www.ffiec.gov/hmda/pdf/2018guide.pdf, last accessed 02/28/2024.

- FFIEC, "A Guide to HMDA Reporting," 2023 Edition, available at https://www.ffiec.gov/hmda/pdf/2023Guide.pdf, last accessed 02/28/2024.

- FFIEC, *Interagency Fair Lending Examination Procedures*, August 2009, available at: https://www.ffiec.gov/PDF/fairlend.pdf, last accessed 01/30/2024.

- FFIEC, *Interagency Fair Lending Appendix*, available at:  https://www.ffiec.gov/pdf/fairappx.pdf, last accessed 01/30/2024.

- FFIEC, 2022 Census Flat File and 2022 Income Categories File, available at: https://www.ffiec.gov/censusapp.htm, last accessed 2/9/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

- Federal Reserve Bank of St. Louis, FRED Economic Data, Housing and Homeownership:  Homeownership Rate, available at: https://fred.stlouisfed.org/release/tables?rid=296&eid=784188#snid=784189, last accessed 01/24/2024

- FICO, available at:  https://www.experian.com/help/fico-score-disclosure.html, last accessed 01/25/2024.

- FICO History, available at:  https://www.fico.com/en/history, last accessed 02/07/2024.

- Freddie Mac Seller/Servicer Guide, section 5101.1, available at:  https://guide.freddiemac.com/app/guide/section/5101.1, last accessed 01/24/2024; Freddie Mac Seller/Servicer Guide, Section 5101.8, last accessed 02/28/2024; Freddie Mac Seller/Servicer Guide, Section 5203.1, last accessed 02/25/2024; Freddie Mac Seller/Servicer Guide, Section 5602.3, last accessed 02/20/2024; Freddie Mac Seller/Servicer Guide Section 5202.5, last accessed 02/20/2024.

- Freddie Mac, Single-Family Seller/Servicer Guide, section 4202.6 "ATR/QM Rule eligibility and compliance"; last accessed 02/20/2024.

- Freddie Mac Single Family Seller/Servicer Guide, Bulletin 2020-5, March 23, 2020, available at:  https://guide.freddiemac.com/app/guide/bulletin/2020-5, last accessed 02/02/2024.

- Freddie Mac, Representation and Warranty Relief and Additional Requirements, available at:  https://guide.freddiemac.com/app/guide/section/5903.5, last accessed 02/27/2024.

- Freddie Mac, "Selling Representation and Warranty Framework," available at:  https://sf.freddiemac.com/working-with-us/selling-delivery/delivery-options-pricing/selling-representation-and-warranty-framework, last accessed 02/28/2024.

- Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), available at:  https://www.congress.gov/bill/101st-congress/house-bill/1278/text, last accessed 01/30/2024.

- Freddie Mac Single-Family Seller Servicer Guide, available at:  https://guide.freddiemac.com/app/guide/browse, last accessed 02/02/2024

- Freddie Mac, Exhibit 19, available at:  https://guide.freddiemac.com/ci/okcsFattach/get/1001717_5, last accessed on 01/23/2024

- Freddie Mac, Exhibit 25, available at:  https://guide.freddiemac.com/app/guide/exhibit/25, last accessed 01/24/2024.

- Furletti, Mark, "An Overview and History of Credit Reporting," Federal Reserve Bank of Philadelphia, June 2002, available at:  https://www.philadelphiafed.org/-/media/frbp/assets/consumer-finance/discussion-papers/CreditReportingHistory_062002.pdf, last accessed February 7, 2024.

- Inside Mortgage Finance Publications, *Inside Mortgage Finance*, January 5, 2024, at 3.

- Office of the Comptroller of the Currency, "Credit Scoring Models:  Examination Guidance," available at:  https://www.occ.treas.gov/news-issuances/bulletins/1997/bulletin-1997-24.html, last accessed 01/29/2024.

- Office of the Comptroller of the Currency, *Comptroller's Handbook: Consumer Compliance, Fair Lending*, Version 1.0, January 2023 available at:  https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/fair-lending/pub-ch-fair-lending.pdf

- The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice* (USPAP*), available at:  https://www.appraisalfoundation.org/imis/TAF/Standards/Appraisal_Standards/Uniform_Standards_of_Professional_Appraisal_Practice/TAF/USPAP.aspx?hkey=a6420a67-dbfa-41b3-9878-fac35923d2af, last accessed 02/27/2024.

- Truth in Lending Act ("Regulation Z"), available at:  12 CFR § 1026.42, Valuation Independence, available at:  https://www.law.cornell.edu/cfr/text/12/1026.42,  and 12 CFR § 1026.42(c)(1)(i). last accessed 02/07/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

- Urban Institute, "Reps and Warrants:  Lessons from the GSEs Experience," available at: https://www.urban.org/sites/default/files/publication/24096/412934-Reps-and-Warrants-Lessons-from-the-GSEs-Experience.PDF, last accessed 02/27/2024.

- U.S. Census Bureau, available at: https://www.census.gov/library/stories/2023/07/younger-householders-drove-rebound-in-homeownership.html, last accessed 01/24/2024

- U.S. Census Bureau, 2020, "HISPANIC OR LATINO, AND NOT HISPANIC OR LATINO BY RACE," Decennial Census, DEC Demographic and Housing Characteristics, Table P9, 2020, accessed on February 9, 2024, available at: https://data.census.gov/table/DECENNIALDHC2020.P9?q=race ethnicity&g=010XX00US$1400000&y=2020&d=DEC Demographic and Housing Characteristics.

- U.S. Department of Housing and Urban Development Single Family Housing Policy Handbook 4000.1, available at: https://www.hud.gov/program_offices/housing/sfh/handbook_4000-1, last accessed 02/02/2024

- U.S. Department of Housing and Urban Development, HUD, FHA Single Family Housing Policy Handbook, HUD Handbook 4000.1, Section II.A.4.c.xii.I(2)(c)(i)., available at: https://www.hud.gov/program_offices/housing/sfh/handbook_4000-1, last accessed 02/14/2024.

- U.S. Department of Housing and Urban Development, 4155.1, Section B. Documentation Requirements, available at:  https://www.hud.gov/sites/documents/4155-1_1_SECB.PDF, last accessed 2/13/2024.

- U.S. Department of Housing and Urban Development, HUD, 4155.1, Section D.  Borrower Employment and Employment Related Income, available at:  https://www.hud.gov/sites/documents/4155-1_4_SECD.PDF, last accessed 2/13/2024.

- U.S. Department of Housing and Urban Development Mortgagee Letter 2020-05, March 27, 2020, available at: https://www.hud.gov/sites/dfiles/OCHCO/documents/20-05hsgml.pdf, all last accessed 02/02/2024.

- U.S. Department of Veterans' Affairs, VA Lenders Handbook – VA Pamphlet 26-7, available at https://www.benefits.va.gov/warms/pam26_7.asp, all last accessed 02/02/2024.

Expert Report of Marsha J. Courchane
February 29, 2024

## Appendix 2:  Plaintiff Loan Application Information

| Table A2.1  Plaintiff Loan Application Information at Decision / Withdrawal | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Plaintiff | Address | App. Date | Action Date | Action Taken / Reason for Denial | Loan Product | Loan Purpose | Loan Amount | Decision Credit Score | DTI | CLTV | Occ. Type |
| Aaron Braxton | ▉▉▉ Los Angeles CA 90037 | 8/2019 | 9/2/2020 | Approved | HAMP Loan Modification of Mortgage | | $66,160 | | | | Owner Occ. |
| Aaron Braxton | ▉▉▉ Los Angeles CA 90037 | 8/2019 | 12/3/2020 | Approved | HAMP Loan Modification of Home Equity Loan | | $83,422 | | | | Owner Occ. |
| Paul Martin | ▉▉, Los Angeles, CA 90056 | 3/26/2020 | 6/19/2020 | Withdrawn | Conv. HELOC 30 year | Other Purpose: HELOC | $180,000 | 760 | NA | NA | Owner Occ. |
| Gia Gray | Danville, CA 94506 | 3/4/2020 | 6/23/2020 | Originated | Conv. 30 year fixed | Rate/Term Refinance | $1,443,000 | 778 | 36.58% | 69.54% | Owner Occ. |
| Gia Gray | Danville, CA 94506 | 2/4/2020 | 2/27/2020 | Withdrawn | Conv. 30 year fixed | Rate/Term Refinance | $1,444,000 | NA | NA | NA | Owner Occ. |
| Gia Gray | ▉▉, Stockton, CA 95219 | | | N/A (Not in HMDA Data) | | | | | | | |
| Gia Gray | ▉▉ Chicago, IL 60610 | | | N/A (Not in HMDA Data) | | | | | | | |
| Bryan Brown | ▉▉ Bristol, CT 06010 | 10/17/2020 | 2/25/2021 | Denied - Debt-to-income ratio | Conv. 15 year fixed | Rate/Term Refinance | $165,000 | 752 | 56.91% | 75.00% | Owner Occ. |

Expert Report of Marsha J. Courchane
February 29, 2024

| Plaintiff | Address | App. Date | Action Date | Action Taken / Reason for Denial | Loan Product | Loan Purpose | Loan Amount | Decision Credit Score | DTI | CLTV | Occ. Type |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Elretha Perkins | Dacula, GA, 30019 | 9/14/2021 | 10/4/2021 | Denied - Credit Application Incomplete | Conv. 15 year fixed | Rate/Term Refinance | $330,100 | 682 | 21.00% | 62.88% | Owner Occ. |
| Elretha Perkins | Dacula, GA, 30019 | 12/13/2021 | 12/15/2021 | Denied - Late Payments; No Benefit to Borrower | Conv. 330 months fixed | Cash Out Refinance | $332,700 | 667 | 43.32% | 53.92% | Owner Occ. |
| Christopher Williams | Snellville GA 30039 | 5/30/2019 | 7/22/2019 | Withdrawn | Conv. HELOC, 30 year | Cash Out Refinance | $180,000 | 686 | NA | 76.60% | Owner Occ. |
| Ifeoma Ebo | Brooklyn, NY 11203 | 10/27/2021 | 4/29/2022 | Withdrawn | FHA, 30 year fixed | Home Purchase | $868,970 | 788 | 43.17% | 96.50% | Owner Occ. |
| Terah Kuykendall-Montoya | Converse, TX 78109 | 7/27/2021 | 7/30/2021 | Denied - Program not available; Recent Bankruptcy | Conv. 30 year fixed | Cash Out Refinance | $25,000 | 697 | 6.10% | 16.67% | Owner Occ. |

Expert Report of Marsha J. Courchane
February 29, 2024

## Appendix 3:  References for Analysis of Plaintiffs' Credit Applications

**AARON BRAXTON**

| Application History Details - BRAXTON | Starting Bates # |
|---|---|
| 8/29/2019 letter regarding request for assistance and document needs:  received IRS 4506-T but is not complete and contains incorrect information, received Mortgage Assistance Application but it is missing a signature.  Indicates bank statements, hardship letter and rental agreement received and complete.   "We must receive the additional information requested in the table below by September 28, 2019."  Also lists the documents "Received and complete." | WF-00123619 BRAXTON0000106 |
| 10/1/2019 letter regarding request for assistance document requested but not yet received: "Please provide current bank statement showing rent deposit or copy or rental check front & back." "Please provide disability award letter stating when disability will start. Please confirm if pension income listed on 2018 tax return is ongoing income or lx withdraw; if ongoing will need award letter." "Please confirm is Specloans mortgage 807 is for your rental property and is the taxes & Insurance escrowed. Please confirm if wage income on 2018 tax return has ended." "Please provide current profit and loss for Writer business listed on 2018 tax return schedule c. Please provide current profit and loss for Acting business listed on 2018 tax return schedule c." Also lists documents that have been "Received and complete." | BRAXTON0000041 |
| 10/1/2019 letter confirming "We've received your information and can review you for assistance." "As of September 27, 2019, your application is complete. Now we can determine if you're eligible for assistance. We may need up to 30 days to review your information, but rest assured that it's a priority for us." "You may still need to provide additional documents, like updated income information. If you do, we'll let you know in a separate letter. You'll receive a list of what we need and the date we'll need to receive it by. Please make sure to respond to these requests by the date required, or foreclosure proceedings may continue." | BRAXTON0000164 |
| 10/21/2019: "Please provide 3 months bank statements to support Writer and Actor profit and loss income; since income is so much higher than stated on 2018 tax return Schedule C."  Also lists documents that were received and complete, with expiration dates where applicable. | WF-00123627 BRAXTON0000045 |
| 10/28/2019:  Approval for "short-term mortgage assistance." | WF-00123583 BRAXTON0000127 |
| 12/9/2019 letter to Mr. Braxton indicating documents needed for loss mitigation process: Mortgage Assistance Application. "We must receive the additional information requested in the table below by January 8, 2020." | WF-00123575 BRAXTON0000058 |
| 1/8/2020 Transamerica disability benefits award letter. | WF-00125725 |
| 1/22/2020 Letter, similar to the 12/9/2019 letter, noting that the Mortgage Assistance Application requested previously had been received but was blank, and requesting outstanding documents by February 21, 2020. | WF-00123579, WF-00125606 BRAXTON0000062 |
| Fax cover sheet dated 2/19/2020 and completed Mortgage Assistance Application form signed and dated 2/10/2020. | BRAXTON0000181 |
| 2/21/2020 letter stating that rental income documentation still not received, and Mortgage Assistance Application was received but was blank. Also lists documents that were "Received and complete." | BRAXTON0000196 |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - BRAXTON | Starting Bates # |
|---|---|
| 3/26/2020 letter from Wells Fargo regarding COVID-19 short-term relief program:  "We're confirming short-term payment relief for this account." "Thank you for letting us know about a financial hardship you're facing." "You may not know how you'll be affected by the spread of coronavirus, COVID-19, so we want to help by providing you with time to assess your situation." "For this reason, we're confirming the following short-term payment relief for your account. If you find you do not need the payment relief, you can continue to make the payments as normal and no further action is needed." | Exhibit 187, referenced in Deposition of Aaron Braxton |
| 4/1/2020:  Letter to Mr. Braxton regarding "Resolution to your inquiry" in relation to concerns about documents need for modification, account status, and customer service experience.  "We've determined that your account was handled properly, and no corrections are needed as no error has occurred."  Also states, "As of the date of this letter, we are still in need of the proof of rental income." | BRAXTON0000100 |
| 4/2/2020:  Letter to Braxton confirming receipt of (unspecified) documentation and that it will be reviewed. | BRAXTON0000099 |
| Intake Summary for Case#10183384 - Call notes:  "Customer is trying to get answer from Wells Fargo for 9 months- filled out paperwork multiple times, at least 3-4 applications – bank statements and leases – asking for same thing over and over – doesn't have any other explanation than discrimination – stated has submitted documents over when asked, should be easy to figure out a YES OR NO to loan modification instead of asking for multiple documents …" | WF-00123483 |
| Internal Wells Fargo email, May 6, 2020: "Customer is asking to have a new SPOC assigned to his review, as he feels he has been discriminated against and abandoned by his current SPOC." | WF-00123479 |
| 5/7/2020 internal email (executive office case specialist): "Customer is stating that he was removed from his most recent review and placed in the COVID-19 FB plan without ever being asked if that's what he wanted to do …"  Indicates that in-process loss mitigation reviews were automatically added to COVID forbearance "to ensure the account received protections" but the customer can opt out and continue with the normal loss mitigation review. | WF-00123488 |
| 5/19/2020 letter from Wells Faro "Confirming your request to opt out of home equity payment suspension" in relation to the COVID-19 crisis. | BRAXTON0000169 |
| 5/20/2020 Letter "We've received your information and can review your for assistance."  "As of May 13, 2020, your application is complete. Now we can determine if you're eligible for assistance. We may need up to 30 days to review your information, but rest assured that it's a priority for us."<br>"You may still need to provide additional documents, like updated income information. If you do, we'll let you know in a separate letter. You'll receive a list of what we need and the date we'll need to receive it by. Please make sure to respond to these requests by the date required, or foreclosure proceedings may continue. | BRAXTON0000152 |
| 5/20/2020 letter to Braxton stating "We wanted to let you know that you've been removed from the mortgage assistance review process.  This is because: You did not accept the offer for assistance." | BRAXTON0000167 |
| 5/21/2020 Letter requesting outstanding documents – benefits letter, financial statement. | WF-00123590<br>BRAXTON0000066 |
| Signed profit and loss statement form, signed, and dated 5/21/2020.  Document does not indicate whether it was sent to Wells Fargo. | BRAXTON0000172 |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - BRAXTON | Starting Bates # |
|---|---|
| 5/21/2020 complaint letter from Braxton to Wells Fargo.  Confirms that "up until August/2019, I had never miss one single payment" [sic] But he "became disabled, thus missed a few payments and reached out to your mortgage branch for help regarding the modification of my loan." | BRAXTON0000171 |
| 5/27/2020 Letter from Wells Fargo confirming receipt of (unspecified) documentation and that it will be reviewed. | BRAXTON0000097 |
| 6/1/2020 Letter from Wells Fargo confirming receipt of (unspecified) documentation and that it will be reviewed. | BRAXTON0000093 |
| 6/2/2020:  Approval for FHA HAMP trial period plan. | WF-00123554 BRAXTON0000089 |
| 6/2/2020 letter: "Resolution to your inquiry …" referencing complaints about payment assistance review, allegations of discrimination and customer service experience. "We determined the account was handled property and no corrections are needed as no errors have occurred." It goes on to detail the reasons for the follow-up documentation requests (incorrect 4506-T, unsigned application, tax returns missing signature.  Indicates that corrected 4506-T and signed tax returns were received 9/25/2019 and 9/27/2019, respectively.  When submitted to underwriting on 9/30/2019, it was determined that additional documentation was needed. Those documents were received 10/15/19, but underwriting review then determined that 3 months bank statements were required to support Writer and Actor profit and loss income. Received that on 10/22/2019.  Based on that information, approved for a one-month short-term assistance plan because he was expected to start receiving disability income in Nov. 2019.  In addition, his 2nd lien was place on a 6-month unemployment program with a reduced payment.  Upon completion of the short-term plan, a new review of his current situation needed to be completed – in Dec. 9, 2019 correspondence requested an updated MAA by Jan. 8, 2020.  Then not able to reach him by phone until 1/15/2020, and then advised of new docs needed for review.  "We received the MAA application on January 22, 2020; however, it was blank and we sent the enclosed correspondence dated January 22, 2020, requesting an updated copy … you sent in an updated MAA on February 19, 2020." Then acknowledges putting borrower on COVID plan and that borrower advised on May 5 that he did not want that.  On May 7, began discussing docs needed for payment assistance review.  On May 14, COVID-19 forbearance was removed and transitioned to regular review for payment assistance.  Goes on to detail additional documentation requested and received, and June 2 approval for a 3-month trial plan. | WF-00123623 |
| Signed mortgage assistance application.  Signature line dated 8/22/2020 but fax cover sheet dated 1/22/2020. | BRAXTON0000195 |
| 9/2/2020 FHA HAMP modification agreement, signed and notarized 9/11/2020.  First payment due 11/1/2020. . | WF-00124466 |
| 11/9/2020:  Letter from Wells Fargo communicating successful completion of the short-term assistance plan. "We're pleased to let you know that you have successfully completed the payment assistance process. We've enclosed a copy of your agreement to keep for your records." | WF-00124272 BRAXTON0000023 |
| 12/7/2020 letter to Braxton communicating approval of loan modification, enclosing agreement and instructions to sign, date and return a copy by 12/22/2020. | WF-00124237 BRAXTON0000019 |
| 1/25/2021:  Loan modification approval letter with modification agreement and indicating that he needs to sign and return by Feb. 9, 2021. | WF-00124269 |
| 3/3/2021 letter to Braxton communicating approval of loan modification, enclosing agreement and instructions to sign, date and return a copy by March 18, 2021. | BRAXTON0000009 |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - BRAXTON | Starting Bates # |
|---|---|
| 4/5/2021 letter to Braxton communicating completion of the home equity modification process: "We're pleased to let you know that you have successfully completed the payment assistance process. We've received your signed agreement and are pleased to let you know your home equity account has been updated to reflect the terms of your agreement. Your copy of this document is enclosed; please keep it for your records." | BRAXTON0000001 |
| 1/22/2022 complaint report alleging discriminatory practices during the loss mitigation process based on the process taking longer than it should have and WF putting him in COVID forbearance without his consent. | WF-00123549 |
| 1/26/2022 letter responding to request for adjustment to his credit report, stating that information reported was correct. | WF-00123739 |
| Summary of executive complain process.  Notes regarding credit dispute: "The loan was not current while on forbearance 4/2020 – 10/2020.  No changes are warranted, the credit reporting was correctly suppressed 4/2020-10/2020 due to the delinquency of the loan when the Covid forbearance was accepted." | WF-00123766 |
| Internal e-mails from Feb. 2021 indicate that final modification docs were received 2/4/2021 but had been assigned to the wrong loan number during intake, so it initially appeared as though WF had not received the documents. | WF-00121752 |
| 2/8/2022:  Similar to 6/2/2020 letter responding to his complaints, confirming COVID FB was cancelled and mentioning implications for reporting account status to credit bureaus.  Includes account activity statement and other supporting documentation. | WF-00123667 |
| 1/31/2022 internal email indicating unwanted FB period was 4/2020 -5/2020 and that there were no payments during that period that would have brought the account current. | WF-00123772 |
| Signed, notarized modification agreement deed of trust, dated March 8, 2021, but effective 12/3/2020. | WF-00124212 |
| 1/22/2023 letter referencing borrower's complaint to HUD. | WF-00123571 |

Expert Report of Marsha J. Courchane
February 29, 2024

**BRYAN BROWN**

| Application History Details- BROWN | Starting Bates # |
|---|---|
| First entry in loan log is 10/17/2020 | WF-00019007.xlsx |
| Adverse Action reason:  "Amounts owed are too high relative to your income (We look at the amounts you owe and compare it to your income)" | WF-00019007.xlsx |
| As of 10/19/2020, note rate shown as 2.875% with 0.630 discount points (compared to existing loan's 4.75% cited in Complaint), apparently for an agency loan, 15-year fixed, LTV = 75%, loan amount $165,000 with lien to be paid of $157,005.81. | WF-00019007.xlsx |
| Notes on 10/22/2020 indicating "no gaps in income and employment," "lowering rate and term" (benefit to borrower), "owner occupied multi family," "good credit scores and history, "VERY GOOD CREDIT AND DTI. LOWERING RATE AND TERM," and "LIQUID ASSETS, WELLS FARGO ACCOUNTS." | WF-00019007.xlsx |
| 10/27/2020: "application indicates cust will occupy the property as a primary - Discrepancy between Subject property address and mailing address/mailing address   after closing has not been addressed."  Note on 11/2 indicates discrepancy is ██████████ versus ██████████ | WF-00019007.xlsx |
| 11/2/2020 asset review indicates no issues. | WF-00019007.xlsx |
| Credit history review on 11/2/2020 identifies no issues. | WF-00019007.xlsx |
| Note on 11/2/2020 indicates need for explanation of various bank transactions (Zelle and CashApp payments) and a large deposit of $47,914.96 on 7/24/2020. | WF-00019007.xlsx |
| Also, need signed and dated 2019 tax return – missing "statements" that go with the return. | WF-00019007.xlsx |
| Also on 11/2/2020: | WF-00019007.xlsx |
| • "Unable to use income service document to validate income due to hours worked or frequency of pay not stated also large variance between base ytd and base pay and large decrease between current income and 2019 income." | WF-00019007.xlsx |
| • "Need most recent pay stub." | WF-00019007.xlsx |
| • "Citicards/cbna shows 08/20 card shows 7/20 balance was 18806 then no balance or payment reported for 8/20 either need source of funds of 18806 to pay this card down or need statement to validate the payment and balance information" | WF-00019007.xlsx |
| • "For the properties listed at ██████████ and ██████████ there is mortgage interest and other interest reporting filed on the 2019 tax returns need explanation on the mortgage interest claimed on taxes as per application received the properties are owned free and clear Also the property at 209 Main st shows as a mixed used need explanation for use?" | WF-00019007.xlsx |
| • "Need insurance and tax statements for the rental properties also need the HOA statement for property at 2019 Main st as amounts claimed on taxes are different from amounts stated on application" | WF-00019007.xlsx |
| • "For the rental income being received for all 3 rentals I need bank statements showing the rental income being received for the last" | WF-00019007.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details- BROWN | Starting Bates # |
|---|---|
| 11/4/2020 noting unsuccessful attempt to contact borrower by phone regarding outstanding conditions listed above. Left voicemail and email. Same on 11/12. | WF-00019007.xlsx |
| 11/16/2020: "We received Rental Agreement. The document(s) did not satisfy the request because it is outdated. Please provide current Signed and dated 12-month Lease Agreement to fulfill the requirement." | WF-00019007.xlsx |
| Additional unsuccessful attempts to contact borrower on 11/23 and 11/30. | WF-00019007.xlsx |
| 11/30/2020: "Per Customer: ▮▮▮▮▮▮▮ currently only has one tenant on month to month, which is why lease is expired. Of the remaining (3) empty units, (1) unit is currently listed for rent and the other (2) are set to be listed and/or shown for rent starting December and January, respectively. The 5th unit (business space) will likely not be ready unitl late Q1, early Q2 of 2021. The rental numbers originally given were pro forma and I explained that to Brian Coughlin." [*sic*] | WF-00019007.xlsx |
| 12/4/2020: "We received September and October bank statements for Webster accounts ending #0763 and #0745. Please provide bank statements for each of those accounts for November 11/1-11/30/20. Thank you" | WF-00019007.xlsx |
| List of documents still outstanding as of 12/11 | WF-00019007.xlsx |
| 12/12/2020: "client states that payments were made from the Thomaston savings account and the entire balance was also paid off from this account." (This appears to relate to the payoff of the Citi card balance.) | WF-00019007.xlsx |
| 12/15/2020: | WF-00019007.xlsx |
| • "Reviewed Greater Watertown FCU dated 10/31/20 #0409, address on bank stm is 116 Sills Dr, per LOX this is parents home no ownership, balance $1296.17, no NSF/overdraft fees //Reviewed stm dated 11/30/20 balance $1296.17, address is showing ▮▮▮▮▮▮▮ , no NSF/overdraft fees.  What is address ▮▮▮▮▮▮▮?" [Based on Google map search, it seems likely that the property is a large house subdivided into apartments, which might have different address designations. ▮▮▮▮▮▮▮ do not show up in a Google search.] | WF-00019007.xlsx |
| • "Need insurance and tax statements for the rental properties also need the HOA statement for property at 2019 Main st as amounts claimed on taxes are different from amounts stated on application. Does borrower own Real Estate Investment Nationwide, LLC. Reviewed HOI for 209 Main st, prem $3984, property insured is Real Estate Investment Nationwide" | WF-00019007.xlsx |
| • "Reviewed rental agreement dated 11/1/2018 - 2/28/2020, 16-month lease, landlord is Real Estate Investment Nationwide LLC, monthly rent $700/mo for tenant Rick Demora, B1 signed as the landlord. As of today, for the unit that's occupied is the monthly rent $700/month?" | WF-00019007.xlsx |
| • "Reviewed HOI for 58 Prospect dated 7/19/20 prem $881/yr., mtg showing with BSI Financial services, need addtl info. Reviewed lease agreement for ▮▮▮▮▮▮▮ dated 11/1/20 - 11/30/20, monthly rent $650/mo , is only 1 unit being occupied?  Is lease month to month, lease rcvd is only for 1 month? Insurance statement is missing section showing mortgagees. not using to qualif. Reviewed mtg stm from BSI Financial dated 11/9/20, listed in Prospect 58 LLC 's name address, balance $72676.41, rate 7.3%, pmt $771.28 includes escrow. Reviewed tax stm, taxes $7667.70/yr or $638.98/mo." | WF-00019007.xlsx |
| • "Signature missing | WF-00019007.xlsx |
| • "Reviewed tax stm , taxes $7667.70/yr" | WF-00019007.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details- BROWN | Starting Bates # |
|---|---|
| • "See below still need explanation on ███████████████████" | WF-00019007.xlsx |
| • "Is there a mortgage on ███████████████ why was mortgage interest claimed?" | WF-00019007.xlsx |
| • "Reviewed stm from thomaston Savings bank, Home Depot pmts were made $50 on 9/11, 10/5, but stm is in the name of Fix and Flip LLC" | WF-00019007.xlsx |
| • "Does borrower own Fix and Flip LLC" | WF-00019007.xlsx |
| • "need the HOA statement for property at 209 Main st" | WF-00019007.xlsx |
| • "Bwr has advise Birchwood rate shopping no new credit and HD was credit line increase for current acct showing on CBR went from $6500 to $13000 no new large purchases just increase debt to income ratio per lox" | WF-00019007.xlsx |
| 12/19/2020:  documents still incomplete. | WF-00019007.xlsx |
| 12/31/2020: | WF-00019007.xlsx |
| • We received bank statement for account number ending with #8907. The document(s) did not satisfy the request because it is missing current month history. Please provide updated bank statement(s) including most recent 2 months history to fulfill the requirement. | WF-00019007.xlsx |
| • Received November month statement. Required one more month's statement. | WF-00019007.xlsx |
| • We received 4506T document(s). The document(s) did not satisfy the request as photocopy document is scanned. Please provide an updated document(s). | WF-00019007.xlsx |
| • We received insurance statement(s) bill. The document(s) did not satisfy the request because it is missing insurance statement. Please provide an updated insurance statement(s) to fulfill the requirement. | WF-00019007.xlsx |
| • We received loan statement for account number ending with #3291. The document(s) did not satisfy the request because it is missing current month history. Please provide updated loan statement(s) including most recent 3 months history to fulfill the requirement. | WF-00019007.xlsx |
| • Received Loan statements in which borrower name is missing and October months statement is also missing. Required most recent 3 months Loan statements with borrower names. | WF-00019007.xlsx |
| Additional notations on 1/1/2021 regarding continuation of unresolved documentation/verification issues. | WF-00019007.xlsx |
| Received acceptable Form 4506T on 1/2/2021. | WF-00019007.xlsx |
| 1/4/2021: | WF-00019007.xlsx |
| • We received recent statement for The Investment Center, but we still need statement showing you received $3,559.50 from the sale or liquidation of Retirement Fund. Include all pages, even if blank. Thank you | WF-00019007.xlsx |
| • The client states that ███████ 3rd Floor is his residence and that ███████████ are rented out | WF-00019007.xlsx |
| • client states that means it is part rental and part personal use | WF-00019007.xlsx |
| • Client states that he owns Real Estate Investment Nationwide, LLC?. I asked why it was not on Schedule E and he said he was not sure, but it was pass through income | WF-00019007.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details- BROWN | Starting Bates # |
|---|---|
| 1/5/2021:  borrower states he does own Fix and Flip, LLC. but we are still pending. The stipulation has been updated from eUpload to Requested as a result of no document being identified that is applicable.  Citicards/cbna shows 08/20 card shows 7/20 balance was 18806 then no balance or payment reported for 8/20 either need source of funds of 18806 to pay this card down or need statement to validate the payment and balance information 12/3/20 The stipulation has been updated from eUpload to Requested as a result of no document being identified that is applicable. Reviewed stm from thomaston Savings bank, Home Depot pmts were made $50 on 9/11, 10/5, but stm is in the name of Fix and Flip LLC | WF-00019007.xlsx |
| On 1/8/2021, lock extension to 2/18/2021 apparently at no cost to borrower – lock was due to expire on 1/19. | WF-00019007.xlsx |
| On 2/2/2021, still awaiting explanation for large bank deposits plus sufficiently current bank statements.  Other financial documents needed updating because of the passage of time – previous documents expired. | WF-00019007.xlsx |
| Explanation of large deposit received 2/2. | WF-00019007.xlsx |
| 2/16/2021:  Issue with verifying hazard insurance – policy expires within 30 days of loan disbursement date | WF-00019007.xlsx |
| 2/18/2021:  Updated credit pulled and re-underwritten due to the passage of time. | WF-00019007.xlsx |
| • Lock extended to 3/22/2021. | WF-00019007.xlsx |
| 2/24/2021: | WF-00019007.xlsx |
| • "Recommending decline as after correcting the application the DTI is still over with no counter offer available dti is at 56.913 even after using 2020 income which is slightly higher than 2021 income" | WF-00019007.xlsx |
| • "Source of Decline: Documentation provided by customer" | WF-00019007.xlsx |
| • Extensive underwriting notes relating to income and declining income trend.  Ratios would still exceed 50% under the favorable assumption that all of the historical rental income claimed by the applicant on his three rental properties could be verified. | WF-00019007.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

**IFEOMA EBO**

| Application History Details - EBO | Starting Bates # |
|---|---|
| 10/27/2021 email from Ebo to a Wells Fargo mortgage banker stating interest in mortgage pre-approval process and asking what information is needed. | EBO0000276 |
| 11/1/2021 email from Wells Fargo Home Mortgage to Ebo communicating pre-approval.  Pre-approval letter was attached to email but not included in PDF document. | EBO0000290 |
| 11/18/2021 email from Wells Fargo to Ebo confirming rate lock. | EBO0000347 |
| 11/24/2021 email from Fargo mortgage banker listing documentation needed for FHA mortgage loan application:  pay stubs for most 30 day from all current employers, two years of W2/1099/K-1 statements, most recent two months or quarterly bank and investment account statements, insurance policy for 1073 36th St. home and confirmation of whether it is owned or mortgaged, confirmation of whether an identified credit inquiry resulted in new debt, fully executed gift letter with proof of funds transfer, fully executed home purchase contract, proof of down payment. | EBO0000376 |
| Owner occupied FHA home purchase | WF-00018716.xlsx |
| Relying on $16,000 gift funds for down-payment | WF-00018716.xlsx |
| 11/29/2021: Originally shows purchase price of $900,000, loan amount $702,000 and LTV 78%, but changed to price of $700,000, loan amount $560,000 and LTV 80%; then price $700,000, loan amount $595,000 and LTV 85%.  And various other changes. Likely running alternative loan scenarios. | WF-00018716.xlsx |
| On 11/1/2021, price back to $900,000 and loan amount $868,500 with 98.189% LTV.  Decision FICO 798. | WF-00018716.xlsx |
| On 11/17/2021, price changed to $885,000 and loan amount $706,228, LTV 79.80%.  Later settles at $885,000.00 price and $854,025 base loan amount | WF-00018716.xlsx |
| 11/24/21:  notes indicating information missing from purchase agreement – real estate commissions. | WF-00018716.xlsx |
| 11/29/2021:  Underwriting notes indicating "great credit history" and "low DTI at 23%.  Approx. $100k in savings. | WF-00018716.xlsx |
| 11/29/2021:  W-2(s) received do not cover most recent 2 years.  Also need 2020 pay stubs from two employers.  Certain disclosure, application, and other documents needed to be signed and dated by applicant. | WF-00018716.xlsx |
| 12/1/2021:  "THE FOLLOWING RED FLAGS  Occupancy is not supporting since Borrower's current primary will be converted as investment and it is higher valued property when compare to subject. Borrower is downgrading the property in terms of value. Hence UW to review.  UW TO REVIEW ALL RED FLAGS, DOCUMENT THE RESOLUTION IN LOAN STIPULATION AND NOTIFY THE ANALYST WHEN COMPLETED" | WF-00018716.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - EBO | Starting Bates # |
|---|---|
| 12/1/2021 email from Wells Fargo to Ebo listing remaining documents needed:<br>1. Please provide paystubs covering most recent 30 days from all current employers<br>a. For Syracuse, please provide Pay Period 11-01-21 to 11-15-21 (We require 30 consecutive days)<br>b. For City of NY (Employee #1525354), please provide the pay period ending 11-06-21, and indicate whether the paystub from 11-26-21 is the income from NYC Dep of Housing P&D, or NYC Mayors Office of Criminal Justice? Please provide paystubs covering the most recent 30 days for the other employer as well.<br>2. Please provide; a. For City of NY W2s, please indicate whether this is from NYC Dep of Housing P&D, or NYC Mayors Office of Criminal Justice? Please provide the W2s for 2019 and 2020 as applicable 30 days for the other<br>3. Most recent two months or quarterly statements for all bank, brokerage and retirement accounts. Please note all pages of each statement, even if blank, are needed.<br>a. We have only received a single statement for Chase #0979 for $71 k at this time, please provide 2 months statements for all accounts<br>4. For 1073 36th St, please provide your insurance policy/bill listing premium, and confirm whether or not you own the property free and clear. If not, please provide a copy of your most recent mortgage statement.<br>5. In a separate email, please advise if any of the following credit inquiries resulted in any new debt: a. JPMCB HL 06-16-21<br>6. Please let us know when you plan on receiving the gift, we will request documents accordingly<br>Once available, please also provide:<br>1. Copy of your fully executed contract, once available<br>2. Copy of the wire receipt or canceled check for your down payment and include corresponding full statement showing debit, once available. If a statement is not yet available, please send us transaction detail from end of last bank statement through day of debit. This document must include your name, account number or portions thereof, as well as a daily running balance. PDF preferred, however a screenshot will suffice provided it covers all of the aforementioned and also includes a visible URL. | EBO0000394 |
| 12/7/2021:  New purchase agreement or addendum received. | WF-00018716.xlsx |
| 12/7/2021, 3:17 pm, email from Wells Fargo to Ebo requesting personal federal tax returns for 2019 and 2020 along with business federal tax returns for those years if applicable.<br>The email chain includes an 8:02 pm email on the same day listing documents remaining outstanding:  tax returns (as listed above), business profit and loss statement, NYC HPD paystub ("we only have 11-07 through 11-20, and we require 30 days' worth"). | EBO0000427 |
| 12/8/2021: "HMA says not a current job so no paystub. I asked for end date for this employment" | WF-00018716.xlsx |
| Uniform Residential Loan Application DocuSigned 12/15 | WF-00018716.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - EBO | Starting Bates # |
|---|---|
| 12/17/2021: "Received Sept, Oct & NOV Chase savings #0979 1. Borrower & address to current 2. Large transfer out to savings #5602 a. 08/19 10000 3. Large transfer to checking #0813 (not account we have) a. 11/16 32000 4. Large transfer from Savings #5602 a. 08/20 9790 5. Balance as of 11/17/21 71002.47 ** ** will need the following - Need to address reason for large transfer to 2nd Checking account #0813 11/16 32000 - Need to Need  chase statements from Savings #5602  Aug & Sept Statements" | WF-00018716.xlsx |
| 12/17/2021, 11:53 am email from Wells Fargo requesting the letter of explanation and source of funds for large deposits referenced above.<br>The email chain includes a 2:30 pm email on the same day stating, "All that remains at this time is a profit & loss statement for Creative Urban Alchemy from end date of last business return filed through today for your self-employed business (This is required for FHA loans, any entity you have over 25% ownership must be documented in full). This P&L does not need to be audited and you are able to complete, it should be ink signed and dated by preparer. Feel free to create your own, or click here to use a Wells Fargo template." | EBO 0000444 |
| 12/17/2021:  Received Nov & Oct Chase statements | WF-00018716.xlsx |
| 12/17/2021: | WF-00018716.xlsx |
| • Previous 2 years W2s submitted, plus 1099 for non-employer | WF-00018716.xlsx |
| • Need written VOE to validate start date, current income, contract status and 2020 income as non-employment | WF-00018716.xlsx |
| • Issues with verifying current and past income.  Prior 1099 income from Syracuse University was $30,000, apparently decreased to $10,000.  Current annual income from Columbia University $12,000. | WF-00018716.xlsx |
| 12/20/2021: | WF-00018716.xlsx |
| • "Employee disclaimer on WVOE holds a position which as specific appointment & end dates, the contract salary for the current period of appointments  is provided  *** this income is contract income  & borrower has an end date for the contract  cannot guarantee future employment , not able use this as effective income  part time contract work **" | WF-00018716.xlsx |
| • "Need to address No Record & requires the following  W-2 Wage Earner:   Request 2019 transcript through CORE to verify borrower has history of filing; and receiving either a 'Pass' result or the actual transcripts**   2020 and 2021 W-2's transcripts from CORE (if 2021 is not yet available please request 2021 W-2 from the borrower)**   Current paystubs   LOX for not filing 2020 returns   Verification 2020 returns have been filed   Verify any back taxes or penalties associated with late filing have been paid in full  3. Self Employed Borrower- Using 2020 income for qualifying   2019 Transcripts**   Copy of signed and dated 2020 returns prepared by CPA   Proof of filing 2020 returns   LOX from borrower for not filing 2020 returns on time   2021 YTD Profit and Loss prepared by CPA and signed and dated by borrower   2021 YTD P&L should support the income used for qualifying   Verify any back taxes or penalties associated with late filing have been paid in full" | WF-00018716.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - EBO | Starting Bates # |
|---|---|
| 12/21/2021:<br>• "Previous 2 years return are showing different self-employment each year -- 2020 consult was 1099 thru Syracuse University & does match up to her current Self-employment with Creative Urban Alchemy , not using this income inconsistent & new under 2 years current self-employment* ************************************** 1. Borrower 4506C audit results came back no record & appears taxes have not been filed yet, this needs to be address & validation   paid in full, with validation 2020 filed as conditioned"<br>• ** need acceptable sign/date from borrower, cannot accept electronic signature ** | WF-00018716.xlsx |
| 12/21/2021 Underwriting notes:<br>• **Risk** - 2nd Home no selling free & clear departure -no current housing 50% payment shock -limit recent credit -ratios exceeding program **Off Sets**  - borrower own asset<br>• Cannot use expected rental income for either departure or new property because there is no rental history or lease pending.<br>• Credit review indicates no negative history, but "limited credit overall with no installment or MTG history showing previous" and large payment shock.<br>• Evaluation of "Cash/Capital" indicates they still have not received Chase bank statements for Aug & September<br>• "**Risk**  - 2nd Home no selling free & clear departure  -no current housing 50% payment shock  -limit recent credit  -ratios exceeding program **Off Sets**  - borrower own asset  **ability for repayment**  -  based on overall review file profile for credit, income , asset along with limited credit history recent , no current housing along with  ratios exceeding program over 50 front  & back end on 500% payment shock as file not showing the ability or willingness for payment ATR not met"<br>• "file re-decision fires 4f GOVT manual refer G1 ratios 50.306 / 58.198 outside program  -file was reviewed LO Molla with income validate  & noted as is,  no rental income departure or lined up with new unit no qualifying rental income to be used  borrower ratios exceed & we have no counteroffer at this time for borrower  file to be sent to POA 2nd level review  -contract HMA Cameron Varnish  HMA on file wen to over file  & understand income with ratios exceeding with over 500% payment shock for borrower on 2nd home file cannot proceed & will be sent to POA 2nd level for decline review  with no counteroffer  -task completed file to POA  "<br>• Source of Decline: Direct verifications on: credit, assets, income/employment, housing, Documentation provided by customer<br>• Primary: Amount of credit requested is too high relative to your income | WF-00018716.xlsx |
| 12/22/2021: Cancelled recommended decline, sent back for re-review | WF-00018716.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - EBO | Starting Bates # |
|---|---|
| 12/29/2021:  Reconsidering estimated rental and self-employment income based on applicable FHA guidelines:  "To calculate the Effective Income from the subject Property where the Borrower does not have a history of Rental Income from the subject Property since the previous tax filing, the Mortgagee must use the lesser of:   the monthly operating income reported on Fannie Mae Form 216/Freddie Mac Form 998; or   75 percent of the lesser of: o fair market rent reported by the Appraiser; or o the rent reflected in the lease or other rental agreement. 2. no current lease but will be using Fannie Mae Form 216 income appraisal 3. Operating income statement for subject 2-unit a. borrower will be living in one unit & renting out other b. market rent both units are 2100 each 4. have email borrower that is showing estimate rent of 2500 but not lease as of yet, working to approve file which 75% was 1875 5. required to use lesser amount from income appraisal 2100 x 75%= 1575 used on core for effective income ****** ** self-employed income ** 1. review with HMC/HMA with speaking to borrower by HMC/HMA borrower self-employed was the same over the previous 2 years with developing it into a growing business of teaching & consulting we can work borrower self-employed income into this file for income to qualifying based on the previous 2 years borrower business was start up but has been for over 2 year growing it  2. 2019 1040's (2 schedule C's) a. Schedule C teaching  - Gross income 2948 - Total expense 1757 - Net profit 1191 b. 2nd sch" | WF-00018716.xlsx |
| Note:  The approach to determining effective income from a rental property with no rental history follows HUD requirements, as stated in FHA Single Family Housing Policy Handbook, HUD Handbook 4000.1, Section II.A.4.c.xii.I(2)(c)(i). | n/a |
| 12/29/2021:  Regarding "capacity" evaluation – treatment of income history, "Reviewed with 2nd level 4 HLU confirming income correct on core & eligible to be used" | WF-00018716.xlsx |
| 12/29/2021:  "1.  need seller to both sign & date contract & addendums 2. Need Sellers Iceland Properties LLC Articles of incorporation validating authorized signers for seller" | WF-00018716.xlsx |
| 12/29/2021: | WF-00018716.xlsx |
| • "Underwriter Decision 1st – FHA: Approve" | WF-00018716.xlsx |
| • "Borrower is to rent 2nd unit with appraisal received for market rent  -Borrower self employed schedule C business is the same as last 2 years borrower contract teaching & consulting  , borrower web page for the business does show all parties of her business  -all docs submitted reviewed & noted with correct conditions remaining outstanding  -file re-decision fires 4F GOVT Accept Total G1 ratios 40.436 / 46.810 -WF B2B purchase benefit 1  - after re-review file for updated documentation & revalidation &  re-review income has file acceptable with borrower has ability for the payment with validation effective income for qualifying for file with file acceptable for approval  -sent email to HMC, HMA & HLP file approved for commitment with conditions to address , to review all outstanding conditions & HLU Notes  -task completed file approved commitment" | WF-00018716.xlsx |
| 12/30/2021:  "reviewed concern of occupancy with UW from RLP team . He is confident in the occupancy - he called the borrower and went over concerns and has addressed in his file. He his confident the borrower will occupy the property as a primary and is promoting this file to move forward." | WF-00018716.xlsx |
| 1/4/2022 email from Wells Fargo to Ebo communicating conditional approval of loan, including a detailed list of documentation required to clear the loan for closing. | EBO0000490 |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - EBO | Starting Bates # |
|---|---|
| 1/4/2022:  "We received your  IRS W9 Request for Taxpayer Identification Number and Certification  Document(s). The document(s) did not satisfy the request because it is Missing WELLS FARGO BANK NA  . Please provide an updated document(s) with the appropriate Requestor Name as applicable in order to move your loan forward."  (originally requested on or about 11/29/2021) | WF-00018716.xlsx |
| 1/11/2022:  Unacceptable signatures on 1040s and letter of explanation for large bank account transfer for down-payment – needs to be signed and dated in ink or acceptable electronic signature, not typed name. | WF-00018716.xlsx |
| 1/11/2022 email from Wells Fargo to Ebo listing items remaining outstanding after underwriting review: <br>     1. Nov / Dec Urban Alchemy bank statements <br>     2. Oct / Nov Chase #0813 bank statements (evidencing earnest money deposit — thank you for the cancelled check) <br>     3. Aug / Sep Chase #5602 bank statements (evidencing large transfer on 08-20-21) <br>     4. Please sign and date your 2019 and 2020 Personal Federal Tax Return Signature Pages (page 2 of your tax returns, next to the "Sign Here") must be hand-signed, not electronically signed <br>     5. Please advise if you filed your 2020 Returns? If not, why was there a delay in filing? Depending on the answers, we will need a 4506-C update. <br>     6. Please print, sign, date, and return the attached Important Notice to Homebuyers must be hand-signed, not electronically signed <br>     7. Please print, complete, and return the attached W9 Form must be hand-signed, not electronically signed | EBO0000517 |
| 1/13/2022 email from Wells Fargo to Ebo:  "Please advise if you filed your 2020 Returns at this time? If not, why was there a delay in filing? Depending on the answers, we will need a 4506-C update." <br> Response on the same day:  "I filed my 2020 however my accountant sent a copy of my tax returns without original signatures. IRS then returned it to me to sign in August. Unfortunately I did not get a copy of the tax return with my original signature." | EBO0000517 |
| 1/13/2022:  "Received VOE is Expired, Fast team to provide updated Document" – Completed on 1/19. | WF-00018716.xlsx |
| 1/21/2022:  Still showing the following <br> •  need correctly signed/dated 2019 & 2020 1040's docs submitted typed signature not signed/.date need acceptable signed & dated 1040's <br> •  "unacceptable signed & dated LOX for large transfer, unacceptable signature not acceptable ink or electronic signature is type signature need lox with acceptable signed & dated 1. stated was to transfer from savings to checking for the down payment on this home" – However, on 2/1/2022 notes indicate full validation of acceptable source of funds and transfer based on bank statements. | WF-00018716.xlsx |
| 1/25/2022:  "4506 Stipulation Review Completed: ****4506 Stipulation Review Update**** Work completed, and action(s) taken: Request for Copy of Tax return document was already associated and stipulation was satisfied." | WF-00018716.xlsx |
| 1/26/2022:  "Document met the required requirements thus satisfied the stipulation" | WF-00018716.xlsx |
| 1/28/2022:  Title work completed and identified transfer of ownership in last 12 months, which required review for possible FHA flip issue, but this was cleared on 2/1/2022. | WF-00018716.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - EBO | Starting Bates # |
|---|---|
| 2/1/2022:  Borrower has signed/dated 2019 & 2020 1040's have all pages & schedules | WF-00018716.xlsx |
| 2/1/2022:  Incorrect lead paint disclosure submitted doc submitted was included with purchase agreement – issue with signatures | WF-00018716.xlsx |
| 2/1/2022: Underwriter Decision 1st - FHA: Approve | WF-00018716.xlsx |
| 2/3/2022, 3:54 pm email from Wells Fargo to Ebo listing items remaining outstanding:<br>1. Please provide a letter from Nkeonyelu Ebo, signed, and dated in pen, confirming you have 100% access to Chase Checking #0813<br>2. Please provide a separate email explaining the payments we see to Chase Card ending in #4504 on your Chase #0813 account<br>      a. 10/20 $290<br>      b. 10/29 $1,096.94<br>      c. 11/12 $1,275.09<br>3. Please provide the most recent #4505 statement so we can confirm balance and payment information<br>4. Please provide the following, as we have not received your 2020 filed returns:<br>      a. Any/All 2021 W2s you received.<br>      b. Most recent paystub<br>      c. Separate email detailing why 2020 is yet to be filed, or verification 2020 has in fact been filed<br>      d. Please verify any back taxes or penalties associated with the late filing have been paid & source the funds used to pay them<br>      e. Please provide a copy of your 2020 returns signed/dated by your CPA<br>7:51 pm response from Ebo the same day provides an explanation for the Chase Card payments.  States that 2020 tax return was filed and asking what form of verification is needed – does not have a copy with accountant's signature. | EBO0000543 |
| 2/5/2022 email from Ebo to Wells Fargo conveying 2021 W2 forms for three employers and last two bank statements.  Also confirming that neither she nor her accountant have signed copies of her 2020 federal tax returns.  Only provided a post office receipt indicating | EBO0000543 |
| 2/7/2022 email from Ebo to Wells Fargo conveying letter attachment described as "Letter from my mother confirming my access to Checking account #0813." | EBO0000543 |
| 2/14/2022:  Issue of 2020 tax returns still outstanding – "We have borrowers signed/dated 2020 1040's copy that she re-submitted to IRS per borrower in OCT, 4506C result were pulled 12/10/21 & came back no record not filed (2 months after borrower stated she resubmitted to IRS. We need to address this per 4506C guidelines, below is what is remaining that is needed to validate 4506C.  We cannot overlook this & is required to validate you can reach out to me if needed.   *Items still needed *  - Current income stubs all employers (still need from Columbia University & Syracuse University) -   Letter of explanation why 2020 returns have not been filed (filed late) I can take email from email on core from borrower reason for late or no file.  -  Verification 2020 returns have been filed with IRS -  Verify any back taxes or penalties associated with the late filing have been paid & source funds to pay them ( Borrower paid in $10203)" | WF-00018716.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - EBO | Starting Bates # |
|---|---|
| 2/14/2022:  issue of incorrectly signed FHA lead paint disclosure still outstanding.  Borrower resubmitted the original, incorrect disclosure that was attached to the purchase contract. | WF-00018716.xlsx |
| 2/14/2022 email from Wells Fargo to Ebo:<br>"So that you have a clear and concise list of items remaining at this time, here is what we need:<br>    1. Please provide a separate email letting us know why your returns are indicated as late by the IRS (Regardless of the end result, we do need this via directly from your email — a simple explanation as you told me over the phone works well — how you originally sent in April, IRS sent back and requested a hand-signed and dated copy, you sent back end of October/early November, you were under the impression they were filed, etc.)<br>    2. Please provide your most recent Syracuse and Columbia paystubs<br>    3. Please obtain verification that your 2020 Returns have now been filed — please consult with your CPA / Accountant for instructions on verifying this — a delivery receipt is not confirmation they have been filed<br>    4. Please obtain confirmation that there are no outstanding back taxes or penalties associated with the late filing (and let us know if you had any penalties, as we will need to evidence) — please consult with your CPA / Accountant for instructions on verifying this" | EBO0000551 |
| 2/15/2022 email response from Ebo: "In May 2021 My CPA mailed my 2020 Taxes to IRS. My taxes were mailed before the extended national due date of July 2021. In October 2021 the IRS sent the taxes forms back to me requesting that I sign them in ink. I signed the forms and mailed back to the IRS in November 2021. I have receipts proving that at both times the forms were delivered to the IRS. I do not have copies of the signed forms that I mailed to the IRS in November. I also paid my taxes in May 2021. Please find attached the proof from the IRS website of receipt of my tax payment in May 2021.<br>I have been trying to call the IRS to find out why they have not reviewed my tax returns yet without success. They are experiencing high volume at this time and do not have live customer service representatives available.<br>I have attached my most recent paystub from syracuse which was in December 2021. I have not received payment for this semester yet at syracuse. I will not receive payment from Columbia until the summer since I am not teaching at Columbia this semester. | EBO0000551 |
| 2/16/2022 email from Wells Fargo to Ebo's accountant (Hays CPA) asking for their assistance in filing Ebo's 2020 federal tax return. "Ifeoma was under the impression that they were filed (she had sent them early 2021, IRS came back and asked her to hand-sign; she did so and sent back) – however, the IRS relayed to us that Ifeoma has not filed 2020."<br>Response from Hays on same day references IRS backlog and asks that the requirement for a signed tax return be waived. Cites additional cost to Ebo of an expedited refiling.<br>Response from Wells Fargo on the same day stating, "With regret this is NOT a Wells Fargo requirement.  Rather, an FHA requirement."  Suggests that "expediting an E-Filing is the best path."<br>Subsequent emails between the parties on the same day refer to the issue of IRS transcripts not being immediately available after e-filing and the impact of the delay on the home purchase agreement.<br>2/17/2022 email from Wells Fargo suggests the possibility of requesting an exception from FHA to proceed with only confirmation of the returns being filed and that any back taxes or penalties have been paid ("this is not guaranteed"). | EBO0000554 |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - EBO | Starting Bates # |
|---|---|
| 2/28/2022: "The Closing/Signing Date has been updated from 03/04/22 to 03/11/22; Customer, Delay in providing credit/vendor documents/information, Ifeoma Ebo, Currently waiting on paystubs, verification of 2020 tax filing and LOX, also still needing fully executed lead based paint disclosure" | WF-00018716.xlsx |
| 3/1-2/2022:  Verification of employment issue remains outstanding – over the course of the process there have been multiple employment verifications/reverifications due to the passage of time. | WF-00018716.xlsx |
| 3/3/2022 email from Ebo to Wells Fargo attaching "newly completed 2020 taxes with ink signature from myself and accountant: as well as e-filing receipts. | EBO0000554 |
| 3/9/2022:  Title issue related to previous owner of the subject property, the subject of foreclosure, still showing on title.  Lis Pendens or lawsuit showing.  Need validation that person is not current owner or buyer. | WF-00018716.xlsx |
| 3/9/2022:  Confirmation of 2020 1040 filing still not resolved | WF-00018716.xlsx |
| 3/14/2022: borrower needs to contact insurer to update effective date of homeowner's policy due to delay in closing. | WF-00018716.xlsx |
| 3/15/2022: "The Closing/Signing Date has been updated from 03/25/22 to 04/01/22; Customer, Delay in providing credit/vendor documents/information, Ifeoma Ebo, needing customer self-employment docs, borrower has gone on vacation and is unable to provide what is needed."  Then on 3/22: "change in policy eff. date not necessary close date updated to reflect that of the HOI" | WF-00018716.xlsx |
| Email correspondence between Ebo and Wells Fargo, 3/15-17/2022 regarding outstanding documents and verification of employment, including FHA requirement to verify self-employment with a disinterested third party. | EBO0000637 |
| 3/25/2022: "Incorrect Lead paint  form  completed & signed, doc is for rental & not purchase , need correct lead paint disclosure completed correct sign/dated all parties"  Also, title issue still outstanding as of 3/25 | WF-00018716.xlsx |
| 3/25/2022:  Revalidation of approval UW decision subject to outstanding conditions. | WF-00018716.xlsx |
| Copy of IRS Tax Return Transcript for 2020, listing response date as 3/27/2022, but not clear if this came from Ebo or Wells Fargo. | EBO0000643 |
| 3/28/2022: "The Closing/Signing Date has been updated from 04/01/22 to 04/15/22; Customer, Delay in providing credit/vendor documents/information, Ifeoma Ebo, currently pending CCRG due to requests for documentation, have not yet received the additional documentation required, unable to proceed until CCRG closed out." | WF-00018716.xlsx |
| 4/5/2022:  application suspended – states loan is being cancelled (May 3 letter from WF to borrowers states that the loan was cancelled at the borrower's request - WF-00018680.pdf).  HMDA data is coded as "withdrawn" with cancellation date 4/29/2022. | WF-00018716.xlsx |

Expert Report of Marsha J. Courchane
February 29, 2024

## GIA GRAY

| Application History Details - GRAY | Starting Bates # |
|---|---|
| Uniform Residential Loan Application shows application for a fixed-rate conventional refinance loan on primary residence (Danville), with loan amount $1,443,000. No cash out. Unsigned version: WF-00015302. Signed photocopy, dated 6/17/2020: Shows net rental income of the two investment properties as negative $3,815.65. | WF-00015298 |
| March 7, 2020 lock agreement for Danville property. | WF-00015188 |
| June 17, 2020 lock agreement for Danville property – confirming same information as March 7 document. | WF-00015194 |
| Transactional Closing Cost Instructions for Danville property referencing "The following terms have been approved by the Lender." Not dated. Provides closing date as June 17, 2020. Appears to indicate that the loan was at least conditionally approved. | WF-00015207 |
| Estimated ALTA Settlement Statement signed by applicants and escrow agent, printed 6/16/2020 and settled 6/23/2020. | WF-00015326 |
| Another Settlement Statement dated 6/23/2020 signed by escrow agent ("I hereby certify that this is a true and correct copy of the original" signed by First American Title Company). | WF-00015324 |
| Closing disclosure dated 6/17/2020 signed by applicants. Closing Disclosure dated 6/10/2020, unsigned. Another CD dated 8/11/2020 but still showing same 6/17/2020 closing date as the earlier ones | WF-00015349, 379, & 339 |
| Copy of Note, signed by applicants 6/17/2020. Reflects loan amount $1,443,000 and fixed rate 3.750%. | WF-00015455 |
| Signed and notarized Deed of Trust, 6/17/2020. Recorded copy of the Deed of Trust. | WF-00015501 & 482 |
| Numerous copies of "WFHM Feedback Certificate" indicating "AUS Complete," Risk Class A1, requiring full income and asset documentation and non-agency loan. Example: WF-00015569. Under "Credit Information" states "Customer is not eligible for a Priority Buyer Letter due to exception process. Submit to underwriter for further review." Lists various standard types of required documentation and verification tasks and stipulations. E.g., VVOE, tax transcript request, title report, appraisal, LOE for inquiries on credit report, W-2s, etc. | |
| Uniform Underwriting and Transmittal Summary shows LTV/CLTV 69.542, PTI 25.316, DTI 36.580. | WF-00015633 |
| Underwriter Decision Summary. Notes no unresolved credit or income issues. "All mortgages paid 0x30. -All total (13) Trade lines paid as agreed. No mortgage late, -Super conservative credit user. -No Public Record found." Appraised value used for Decisioning: $2,075,000 (exterior only appraisal). Passes QM status and Ability to Repay test. "Loan is approved." | WF-00015645 |
| May 13, 2020 Commitment Letter from WF to the Grays: "Congratulations! We're happy to tell you that your loan application has been approved based on the terms and conditions included in this Commitment Letter …" Expiration date is June 20. Another dated June 17, 2020 with expiration date June 20. | WF-00015897 & 903 |
| Email correspondence on June 15, 2020 with WF following up on employment verification | GRAY0000082 |
| From WF: "Hi Gia once you verification came back and dates were updated there is now a gap in employment history we have you at Axis Community since 10/1/2018 to current makes us just short of a 2 year history, can you provide the information for the previous employer? Name, address, position, number, employment dates" | GRAY0000082 |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - GRAY | Starting Bates # |
|---|---|
| Response from Gia Gray expressing frustration with the documentation process – why they are still asking for verifications when they previously communicated that the loan was cleared to close.  Suggests that she does not understand the process in that she is suggesting that WF use information from their 2018 home purchase: "All of my emails state that my application was approved so I am confused. This process has really been quite grueling for us. We have had you guys since the beginning of time. Nothing new has changed since we purchased our home here in Danville. Do you have those records of what I turned in when we bought this house? It's the same. I feel like this is really a privacy concern when I have to provide emails and phone number of my current employer and previous employer outside of my pay stubs. I no longer work for Kaiser, and I quit right before we moved into this house. I didn't work for I believe a month during the transition. When we moved here, shortly after, I started working for Axis. I've been with them almost two years. Nothing has changed. Please let us know the next step because we are starting to feel dissatisfied with this process." | GRAY0000082 |
| Email correspondence between the Plaintiffs and WF loan officer Phillip Figone has some information regarding the refinance of investment properties.  All of the e-mails are friendly and courteous and contain no derogatory statements regarding property locations. | GRAY0000001-56 & 77 |
| • 12/6/2020 email from Gia Gray: "Hi Phil- We wanted to look at refinancing the other two properties. Are you able to use documents we just turned in for this home's refinance? If so, can you please let me know by Tuesday as we want to get a low rate locked in soon." | GRAY0000001-56 & 77 |
| • 12/9/2020 email from Figone: "Good Morning Gia, Do you have a few minutes today to review the rate options for the rentals and your primary residence. I will be available from 10:00am to 5:00pm. Please let me know what works for you." | GRAY0000001-56 & 77 |
| • 12/18/2020 9:42 AM email from Gia Gray: "Can you please email me again that information on why Wells Fargo is no longer accepting any refinancing for rental properties again or can you explain again? You mentioned the WF Home Equity office was shut down? I'd like to show Carl. He asked." | GRAY0000001-56 & 77 |
| • 12/18/2020 9:42 AM email from Gia Gray: "Hi Phillip. I will talk to Carl today about the refinance opportunity for 8 Mapleglen. Can you please email me again that information on why Wells Fargo is no longer accepting any refinancing for rental properties again or can you explain again? You mentioned the WF Home Equity office was shut down? I'd like to show Carl. He asked." | GRAY0000001-56 & 77 |
| • 12/18/2020 9:47 AM: "Hi Phil, Can you please email me again with the reason why you are telling us that Wells Fargo cannot refinance our two rental properties again? I don't think my previous email went through. We prefer response in writing." | GRAY0000001-56 & 77 |
| • 12/18/2020, 5:42 PM response from Figone indicating that investment properties in general were considered higher risk during COVID lockdown, which increased rates: "Hello Gia, Wells Fargo is accepting non-owner-occupied refinances it's just that the rates were pushed up during the early covid lockdown. Investment properties were considered a higher risk. Rates on Investments property loans have come down with the recent decline. Below are today's rates for both of your investment properties. Please let me know your thoughts and I'm around all weekend." [rates quoted in message] | GRAY0000001-56 & 77 |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - GRAY | Starting Bates # |
|---|---|
| • 12/22/2020 email to Gia Gray: "Hello Gia, I wanted to circle back to see if you want to take advantage of the current refinance opportunities. Get you primary residence rate lowered is an easy one and the most significant savings. Hope this note finds you doing well." | GRAY0000001-56 & 77 |
| • 12/30/2020 response from Gia Gray: "Carl says that he will pass on refi for the home here at ███████, but we are interested in exploring refi for the other two properties -the rentals. We would be interested in 15 year fixed for two rentals and we are comparing rates. Are you able to send me current rates ?" | GRAY0000001-56 & 77 |

Expert Report of Marsha J. Courchane
February 29, 2024

## TERAH KUYKENDALL-MONTOYA

| Application History Details - KUYKENDALL-MONTOYA | Starting Bates # |
|---|---|
| Uniform Residential Loan Application shows fixed-rate conventional cash-out refi, first lien, 30 year, at 3.625%, with $25,000 loan amount, but does not indicate a lien being paid off. Liability section shows one revolving account, no mortgage.  In section 3a., the property is listed with value $150,000 and "Does not apply" is checked for "Mortgage Loans on the Property." | WF-00017709, 17711, 17713 & 17725 |
| Underwriting summary shows DU result as "out of scope because at least one of the borrowers lacks sufficient credit information, and the loan does not meet the guidelines in DU for underwriting loans that include borrowers without traditional credit.  An alternative method must be used for evaluating the credit history of the borrower and its impact on the credit risk of the case." | WF-00017756 |
| Tri-merge credit report shows scores for one of the applicants: Equifax score 687, Experian 710, TU 697, so representative score would be 697. Co-applicant not scored because of insufficient credit. Chapter 7 bankruptcy discharged 12/2017 (i.e., not within past 4 years).  Their previous loans with Wells Fargo include a "Note Loan" that was paid and closed in 2013 and an auto loan that was paid and closed in 2012.  They previously obtained a VA mortgage loan from CitiMortgage, which was transferred to Midland Mortgage in 2011 and which was paid and closed in 2012. | WF-00017737 |
| WFHM Feedback Certificate indicates that loan fails federal Qualified Mortgage test due to fees exceeding the maximum allowable. | WF-00017790 |
| Payoff quote for Wells Fargo GNMA loan with principal balance $84,365.60, dated July 29, 2021. | WF-00018616 |
| Notice of Action Taken states reasons as "We do not offer the product or program requested" and "Bankruptcy on record." July 30, 2021.  Cover letter communicating decision on July 30, 2021 (referencing application date July 27). | WF-00018581, 582 & 584 |
| July 20, 2012 30-year fixed-rate Note in the amount of $108,238.00 for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Converse, Texas 78109, from Gardner Financial Services, Ltd. (VA loan) | WF-00018616 |
| Email to Network Funding ("NFLP") from the Plaintiffs, discussing their denied WF application and for help with applying for a refinance loan. | WR3418390_000000001 |
| On August 14, 2021, Plaintiffs submitted their application with NFLP. | WR3418390_000000006 |
| Rate locked on 8/30/2021 at 3.125% and 1.375% points. Lock expires 9/28/2021. Loan was over QM with the locked terms, Loan amount lowered to $93,600, and loan was relocked at 3.25% because the price worsened at the lower loan amount. | WR3418390_000000140, WR3418390_000000142, WR3418390_000000143, WR3418390_000000149 |
| 9/2/2021: Plaintiffs ask for more information about the loan application, and explain they want $25,000 cash-out, so loan amount would be $120k-$125k. NFLP loan officer explains that cash-out refinance loans are not allowed on VA loans, and that the applicants need to wait until December for a conventional refinance so that four years have passed since the bankruptcy. 9/5/2021: Plaintiffs ask to pause until December. | WR3418390_000000191, WR3418390_000000192 |
| Application to resume with a credit pull on December 21, 2021. | WR3418390_000000278 |
| Appraisal came in at $175,000 on 1/24/2022 | WR3418390_000000362 |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - KUYKENDALL-MONTOYA | Starting Bates # |
|---|---|
| Loan approved on 2/2/2022 by NFLP. Funded on 2/11/2022. | WR3418390_000000411, WR3418390_000000466, WR3418390_000000467 |

Expert Report of Marsha J. Courchane
February 29, 2024

**PAUL MARTIN**

| Application History Details - MARTIN | Starting Bates # |
|---|---|
| Loan notes: | WF-00019009.xlsx |
| 3/26/2020 – first record, "pre-application." Record indicates HELOC application. | |
| 4/29/20 underwriting approval | |
| 4/29/20 conditional approval letter indicated HELOC approved for $180,000 with an initial variable rate of 3.875%. (also WF-00018961) | |
| 5/12/20:  approval again after evaluating documents and stipulations | |
| Ditto on 6/1/20 | |
| 6/8/20: appraisal order placed | |
| 6/22/20: "Cancellation Reason: Withdrawn;Cancellation Notes: Client requested to withdraw due to low appraisal on home and no longer wants to proceed per HMC Darryl Stagger communication notes" | |
| 6/24/2020: "While the appraisal came in low, the loan was still approved at original terms. UW notes logic provides this reasoning that the value was supported." Likely this is because of the relatively low LTV:  LTV: 61.731; CLTV: 68.654 | |
| Cancelled on 6/24/20 | |
| Underwriting notes: | WF-00019009.xlsx |
| 5/13/2020:  Appraisal came in at $1,900,000, same value as prior sale 4/11/2018. | |
| 5/16/2020:  Appraisal reconsideration request initiated | |
| 5/21/2020: "Review of VRT completed due to value reconsideration. The VRT decision recommends an upgrade. Credit underwriter to determine if upgrade is necessary or if the transaction can move forward with the current valuation." | |
| 5/22/2020: "Property is Suspended to Fulfillment for the following: 2. UER has completed their review resulting in a recommendation for an RVS Exterior Field Review. CRT has placed an order for the additional review product. CRT review of the additional review product is required." | |
| 6/10/2020:  "Review of driveby report at $1.9mm, borrowers had a full appraisal completed 3 months ago for $2.4mm. value disputed however rvs review found appraised value as supported. Parcel number matches title report, fee simple, no hoa dues, neighborhood values are stable 3-6 months marketing time. modern style home built in 1961, 4 bed 4.2 baths, 5422 square feet. Subject was rebuilt in 2009, no physical deficiencies, conforms to neighborhood. Sales are within 1.68 miles and range from 1.9mm to 1.635mm. Subject has more square footage than sales. I am unable to upgrade to full due to covid 19 and must use this report." | |
| Final underwriting decision on 6/10/2020 remains "approve." | |
| Conditional Approval Letter dated 4/29/2020 | WF-00019122 |
| Appraisal Report dated 5/11/2020 (as of 5/6/2020) | WF-00120137 |
| Wells Fargo Appraisal Review Report dated 6/4/2020 | MARTIN0000346 |
| Wells Fargo Review Worksheet for ████████████ | MARTIN0000362 |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - MARTIN | Starting Bates # |
|---|---|
| 6/24/2020 letter from WF acknowledging that the application has been cancelled at the borrower's request. | WF-00018961 |
| Deed of Trust for Home Equity Line of Credit from Kinecta Federal Credit Union dated September 10, 2020. | Martin Deposition Exhibit 312 |
| Settlement statement for refinance loan from Kinecta Federal Credit Union, dated July 23, 2020, and showing closing date July 8, 2020. | MARTIN0000395, Martin Deposition Exhibit 322 |
| Appraisal Report dated 2/4/2020 for Kinecta Federal Credit Union | MARTIN0000308 |
| Appraisal Update and/or Completion Report for Kinecta Federal Credit Union, 7/1/2020 | MARTIN0000360 |
| Appraisal Report dated 1/6/2021 for loanDepot | MARTIN0000205 |
| Appraisal Report dated 2/28/2021 for loanDepot | MARTIN0000241 |

Expert Report of Marsha J. Courchane
February 29, 2024

**ELRETHA PERKINS**

| Application History Details - PERKINS | Starting Bates # |
|---|---|
| Uniform Residential Loan Application:  Applied for fixed rate no cash out conventional loan | WF-00014400-41 |
| Credco fraud risk report flags fraud risk as "high", due to "value of second home higher than and close to borrower current address," "Borrower(s) income is high compared to subject property's neighborhood income," and other factors.  Recommends comprehensive fraud review. | WF-00014426-27 and WF-00014428-46 |
| Freddie LPA AUS reports (multiple run on different days) all show "Streamlined Accept."  Contrary to Complaint, Equifax mid score shown as 682.  Includes messages related to verification of self-employment income, rental income if used to qualify, assets, and debt if new debt was obtained. Reports dated 9/14 – 10/4/2021 | WF-00014447 -56 |
| DU findings show Approve/Eligible.  9/14 – 10/4/2021 | WF-00014459-96 |
| Equifax credit report dated 9/14/2021, showing Equifax BEACON credit score of 682. | WF-00014667 |
| Equifax credit disclosure reflects 682 score.  Negative factors include serious delinquency, high proportion of balances to limits on revolving accounts, number of accounts with delinquency, length of time revolving accounts have been established. | WF-00014524 |
| Oct. 4, 2021 Notice of Action Taken reflecting denial for incomplete application – "We didn't received information we requested, so we're no longer able to consider your application for home financing." | WF-00014627 & 29 |
| Dec. 15, 2021 letter:  Notice of action taken. Denial reasons stated as "Credit review shows late payments on past or present credit accounts" and "A refinance would not provide enough of a benefit compared to your current financing."  Credit score reported on this notice is 667, indicating drop since application. | WF-0014986-87 |
| 12/13/2021 CoreLogic Credco Credit Report shows 4x30 and 2x60 on real estate trade with last delinquency on 5/2020 – Mortgage with Specialized Loan Services.  Previously in dispute, now resolved, affected by natural/declared disaster.  Similar delinquency on Blue Ridge Bank mortgage, resolved, current for 23 months.  Ditto for WF second mortgage. Shows Equifax BEACON credit score of 667.  Credit report pulled about two hours earlier shows frozen file. | WF- 00015009 and WF-00015024 |
| Loan Notes 0581207099 | WF-00014392.xlsx |
| 9/14/2021 indicates the Specialized Loan Services and WF second mortgage will be paid off with the refinance. | |
| 10/4/2021: | |
| • Indicating cancellation "Fast Path : No ; Appear Customer may not qualify : No ; Cancellation Reason: Inactive Customer;Cancellation Notes: bwr missed deadlines - no ITP - please cancel."  However, there are no notes regard the nature of the non-response – such as failing to respond to the initial disclosure package and documentation request. | |
| • Additional notes indicating cancellation was premature – deadline provided to borrower was 10/4 and should give her the full day to reply, not cancelling until after due date.  Refers to "Contact Strategy for Unresponsive Customers Training." | |
| 10/5/2021: Reg B Docs Distributed Date Completed | |

Expert Report of Marsha J. Courchane
February 29, 2024

| Application History Details - PERKINS | Starting Bates # |
|---|---|
| Loan Notes 0583128319 | WF-00014392.xlsx |
| 12/13/2021: | |
| • "bwr is looking to combine HELOC and 1st mortgage to have one payment. Her HELOC expired and has to pay off whole balance so she wants to use the equity in her home to pay it off and bundle in." | |
| • "Fast Path : Yes ;  Path of Assistance Reasons : Credit review shows late payments on past or present credit accounts (We look for a history of on-time payments) , We do not offer the product or program requested., ; Cancellation Reason: Path of Assistance Review; Cancellation Notes: her HELOC is not in good standing, it reached maturity on august and all 49k is due now. She is already working with home pres to do a payment plan. home pres said the HELOC wouldn't be eligible for a refi" | |
| • Cancellation request submitted. | |
| 12/14/2021: Cancellation review confirmed the underwriting decline: "CANCELLATION REVIEW DECISION:  DECLINE  The above loan has been reviewed by a Path of Assistance Underwriter and the loan request is denied.  HMC/PMB can view the reason(s) for denial by reviewing the Underwriting Decision History in CORE.    The Disposition Support Team will issue the Notice of Action Taken.  Please contact the cancellation review underwriter or the disposition support team if additional information is needed.  REVIEW DECISION LOGIC: Loan is firing a B2B fail. This is a Wells to Wells, OO, cash-out refi, using a 330 term. Review of credit shows that WFHM went past due and reported 2X60 days on 5/20 and 4/20. Blue Ridge Mortgage also reported 1X30 on 1/20. Specialized loan servicing mortgage also reported 2X30 on 2/20 and 1/20. Per notes, HELOC is not in good standing, it reached maturity on August and all $49k is due. Borrower is working with Home pres to do a payment plan. Customer stating that home pres would not be eligible for a refinance. Not submitting to loan moderator due to credit not paid as agreed. NDS supports denial; credit review shows late payments on past or present credit accounts (we look for a history of on time payments) & a refinance would not provide enough benefit compared to the existing financing (we run a financial benefits test to ensure there is a benefit to the borrower)." | |

Expert Report of Marsha J. Courchane
February 29, 2024

**CHRISTOPHER WILLIAMS**

| Application History Details - WILLIAMS | Starting Bates # |
|---|---|
| Application on about 5/30/2019 | WF-00019005.xls |
| Final disposition about end of July 2019:  7/22/2019, "APPROVED FOR 40AF, CUSTOMER NOT HAPPY WITH RATE AND CCRG HAS ADVISED HE WISHES TO CANCEL AT THIS TIME." | WF-00019005.xls |
| Home equity loan for the purpose of refinancing an existing first lien mortgage.  Initial application shows loan amount of $180,000 requested. | WF-00019005.xls |
| Credit score issue arose:  The score WF received from the credit bureau was considerably lower than the applicant purportedly was seeing in his online WF bank account (allegedly greater than 800, see note on 6/11/2019).  As a result, borrower was dissatisfied with the rate offered. | WF-00019005.xls |
| FICO score used in underwriting & pricing was 686 (6/18/2019) | WF-00019005.xls |
| Credit score disclosure shows Equifax Beacon score 686, with reasons<br>• Derogatory public record or collection filed<br>• Time since derogatory public record or collection<br>• Length of credit history too short<br>• Too many inquiries last 12 months | WF-00015032.pdf |
| Rate was locked at 8.750 on 5/30/2019 for "Estimated variable line rate" and at 6.365% on 6/21/2019 for "Initial fixed rate advance rate". | WF-00019005.xls |
| 0.250% rate discount based on deposit customer status | WF-00018995.pdf |
| The initial fixed rate advance was set at $86,000 to pay off the existing conventional loan (UPB at time of application was $86,155.00) | WF-00018977.pdf<br>WF-00018993.pdf |
| However, was conditionally approved on 6/19/2019 for $180,000 (approval letter) | WF-00015085.pdf |
| Conditional approval at 8.50% APR | WF-00019005.xls |
| The only documentation conditions were returning a signed IRS Form 4506T (request for transcript of tax returns) and verification of debts not showing on the credit report. | WF-00019005.xls |
| The credit bureau score was apparently adversely affected by a disputed medical collection.  Nevertheless, this was not considered by WF to be an issue in the credit decision: | WF-00019005.xls |
| Note on 6/18/2019: "STRENGTHS: LOW DSR AT 31.33/43, LOW RBTI AT 3.33 WITH RDU AT 6.70, PWE 3/3 YRS ON JOB/IN FIELD, 19 YRS IN COLL: CBR ISSUE -- 1  MEDICAL COLLECTION IN DISPUTE -- RISKS: CLTV IS ON THE MARGIN AT  76.60/80- CONCLUSION, SUFFICIENT STRENGTHS FOR CONDITIONAL  APPROVAL AT REQUESTED AMOUNT - RECOMMENDING APPROVAL" | WF-00019005.xls |
| Williams receives a letter from WF (Sept 5) explaining why the FICO score seen online is not necessarily the one used for his HELOC, which is an Equifax score | WF-00150736 |

Expert Report of Marsha J. Courchane
February 29, 2024

## Appendix 4:  Courchane CV

Marsha J. Courchane, Ph.D., CRE

Vice President and Practice Leader

PhD Economics
Northwestern University

MA Economics
Northwestern University

BA Economics
Northwestern University

Dr. Marsha J. Courchane, Vice President and Practice Leader, Charles River Associates, heads the Financial Economics Practice. She specializes financial regulatory reviews and litigation involving financial institutions. Dr. Courchane is a leading expert in the areas of mortgage and consumer lending, engaging in research and analyses with respect to mortgage markets, discrimination in lending, consumer credit, automobile finance, securitization, credit risk, and redlining issues. She has published in several journals, including the *Atlantic Economic Journal, Journal of Real Estate Research, Journal of Economics and Business, Housing Policy Debate, Applied Economics, Journal of Housing Research, Journal of Real Estate Finance and Economics, Canadian Journal of Economics, Property Management, International Real Estate Review and Real Estate Economics*. She serves or has served on the editorial boards for the *Journal of Housing Research*, the *Journal of Real Estate Research*, and for the *International Journal of Housing Markets and Analysis* and referees for several journals. Dr. Courchane is a Fellow of the Weimer School of Advanced Studies in Real Estate and Land Economics. She was a member of Counselors in Real Estate (CRE).  She was the Executive Vice President of the American Real Estate and Urban Economics Association (2008–2019) and served on the Board of Directors of the American Real Estate Society (2008–2014).

## Professional positions

| | |
|---|---|
| 2007–Present | *Vice President and Practice Lea*der, Financial Economics Practice, Charles River Associates, Washington, DC |
| 2005–2007 | *Principal*, ERS Group, Washington, DC |
| | Responsibilities included research in housing finance; including recent papers on subprime lending, fair lending, and yield spread premiums; and conducting analyses of subprime and predatory lending, redlining, fair lending, GSE housing goals, and financial literacy. |
| 2003–2005 | *Senior Economist*, Welch Consulting, Washington, DC |
| 2002–2003 | *Director*, *Financial Strategy and Policy Analysis*, Housing Economics and Financial Research, Freddie Mac, Washington, DC |
| 1999–2002 | *Principal Economist*, Freddie Mac, Washington, DC |

Expert Report of Marsha J. Courchane
February 29, 2024

| 1999–2000 | *Senior Economist*, Freddie Mac, Washington, DC |
| 1994–1999 | *Senior Financial Economist*, Economics, Risk Analysis Division Office of the Comptroller of the Currency, Washington, DC |

**Professional experience**

Responsibilities have included:

- expert witness reports and testimony (see pages 13 - 25 of this vita);
- analysis of loan level mortgage data for review of compliance with fair lending laws;
- analysis of mortgage and consumer data with respect to underwriting, pricing, credit scoring, servicing and securitization;
- analysis of loan servicing data under HAMP and non-HAMP loss mitigation programs;
- policy analysis for government sponsored enterprises, including research on consumer credit, subprime lending, competitiveness, and RESPA issues;
- housing economics research;
- affordable housing goals analyses, including analysis of HMDA data; and
- anti-predatory and subprime lending reviews

**Professional activities**

**Executive Vice President**

American Real Estate and Urban Economics Association, 2008–2019

**Board of Directors**

American Real Estate Society, 2008–2014

**Chair**

Women's Real Estate Network, AREUEA committee, 2006–2009

**Fellow**

Homer Hoyt Institute, Weimar Advanced Studies Institute, 2003 – Present

**Professional designations**

**Counselor of Real Estate, appointed 2012 (CRE) – Present**

**Member or former member**

Expert Report of Marsha J. Courchane
February 29, 2024

American Economic Association, Association of Real Estate and Urban Economists, American Real Estate Association, Canadian Economic Association, Chief, Commercial Real Estate Women (CREW), Women in Housing Finance, Committee on the Status of Women in the Economics Profession, National Association of Female Executives, Cambridge Who's Who, National Association of Professional Women

**Editorial and advisory boards (current and past)**

- Editorial Board, *Journal of Housing Research*

- Editorial Board, *International Journal of Housing Markets and Analysis*

- Editorial Board, *Journal of Real Estate Research*

- Editorial Board, *Journal of Real Estate Literature*

- Community Development Research Advisory Council, Federal Reserve Bank of Boston, 2011 - 2015

- Advisory Board, Federal Reserve System Research Conference, 2011, "The Changing Landscape of Community Development:  Linking Research with Policy and Practice in Low-Income Communities," 2011

- Advisory Board, Tomás Rivera Institute, University of Southern California, 2002–2005

- Advisory Board, Lusk Center for Real Estate Finance, 2003–2005

- Advisory Board, Colorado State University, Department of Finance and Real Estate, 2000–2003

- Advisory Board, SUNY, Binghamton, 1997–1999

**Referee**

*Housing Policy Debate*, *Journal of Housing Economics*, *Journal of Housing Research*, *Journal of Economic and Business Statistics*, *Canadian Journal of Economics*, *Journal of Real Estate Finance*, *Real Estate Economics*, *Journal of Housing Economics*, *Journal of Financial Services Research, Journal of Real Estate Research, International Journal of Housing Markets and Analysis, Southern Economic Journal*

**Academic positions**

| | |
|---|---|
| 2015 – 2017 | *Visiting Professor*, Ulster University, School of the Built Environment |
| 2004 | *Adjunct Professor*, Department of Finance, George Mason University, Fairfax, VA, US |
| 1997–2002 | *Adjunct Associate Professor*, Department of Finance, American University, Washington, DC, US |
| 1992–1994 | *Visiting Professor*, University of Victoria, Department of Economics, Victoria, BC, Canada |

Expert Report of Marsha J. Courchane
February 29, 2024

| | |
|---|---|
| 1993 | *Associate Professor* (with tenure), University of Canterbury, Christchurch, New Zealand |
| 1990–1992 | *Visiting Assistant Professor*, Department of Economics, University of British Columbia, Vancouver, BC, Canada |
| 1986–1990 | *Visiting Assistant*, Faculty of Commerce, University of British Columbia, Vancouver, BC, Canada |
| 1985–1986 | *Assistant Professor*, Department of Economics & Business, North Carolina State University, Raleigh, NC, US |
| 1983–1985 | *Visiting Assistant Professor*, Department of Economics, University of British Columbia, Vancouver, BC, Canada |
| 1980–1983 | *Assistant Professor*, North Carolina State University, Department of Economics & Business, Raleigh, NC, US |
| 1979–1980 | *Assistant Professor*, University of Wyoming, Department of Economics, Laramie, WY, US |
| 1978–1980 | *Lecturer*, Northwestern University, Department of Economics, Evanston, IL, US |
| 1977–1979 | *Lecturer*, Loyola University, Department of Economics, Chicago, IL, US |

Courses taught

Real Estate Finance, Regulation and Management of Financial Institutions, Honors Microeconomics, Macroeconomics, Labor Economics, Applied Econometrics and Statistics, Marketing Research, Strategic Management, Government and Business, Industrial Organization, Money and Banking

**Presentations since 2005**

- American Bar Association, Consumer Financial Services Committee, 1071 and Risks to Small Business Lending, January 8, 2024

- Asurity, Fair Lending Forum, Redlining, May 15 – 17, 2023

- Consumer Bankers Association, Trends in Redlining, March 27, 2023

- American Bankers Association, Avoiding Fair Lending and UDAAP Risks in Digital Marketing, November 2, 2022

- Consumer Bankers Association, Avoiding Trouble in the Digital Age, Part I:  Wait, What? Artificial Intelligence Tools and Black Box Models Can Discriminate, Too? with Andrea Mitchell, March 8, 2022

Expert Report of Marsha J. Courchane
February 29, 2024

- Consumer Bankers Association, Avoiding Trouble in the Digital Age, Part II: CFPB's Compliance Management System – Information Technology (CMS-IT) Examination Procedures Explained, with Andrea Mitchell, March 8, 2022

- American Bar Association, Discussion of the Initiative to Combat Redlining and the Trustmark Settlement, January 19, 2022.

- Federal Reserve Banks of Cleveland and Philadelphia, "Artificial Intelligence in Consumer Finance: Defining and Insuring Fairness," November 9 – 10, 2021

- Webinar, "Helping You See Around the Corner: Regulatory and Enforcement Update on Fair Lending and Fintech," with Michelle Alt, Klaros Group and Andrea Mitchell, MitchellSandler LLC, October 2021

- Women in Housing Finance, "Fair Lending Outlook," with Austin Brown, DLA Piper, September 2021

- Webinar, "Fair Lending Deep Dive: Emerging Issues and Tips for Navigating the Renewed Regulatory Emphasis on Fair Lending Compliance," with Austin Brown, Isabelle Ord, and Noah Schottenstein, DLA Piper, June 2021

- Fair Lending Workshop, Buckley LLP, March 2019

- Federal Reserve Bank of Philadelphia, Research Symposium on Fair Lending, "Fair Lending from Perspectives of Lenders, Regulators, and Consumers," May 2018.

- Annual Consumer Financial Services Conference, Updates to Fair Lending, May 2017.

- American Real Estate Association, The Crisis and the Housing Curriculum, April 2017.

- American Bar Association, The Future of Financial Consumer Protection Regulation, March 2017.

- UNC Law Banking Institute, Changing Regulatory Expectations in Redlining/Fairlending Compliance, March 2017.

- American Bankers Association, Fair Lending & CRA (Community Reinvestment Act): A Holistic Approach for Reviewing and Monitoring Risk, June, 2016.

- American Bankers Association, Taking Your Fair Lending Program to the Next Level: Statistical Analyses – Mortgage and Non-Mortgage – Key Performance Issues to Consider, June, 2016.

- Consumer Data Industry Association, "Fair Lending Teleseminar," with Jean Veta, Covington Burling, April, 2016.

- American Bar Association, 2016 Fisher Memorial Program, Business Law Section Spring Meeting, "Is Fair lending Fair for All?" April, 2016.

- American Bar Association, Consumer Financial Services Committee, "Fair Lending and UDAAP Risks in Credit and Marketing Models," January, 2016.

- McGlinchey Stafford, 2015 Complisource Conference, "Fair Lending Strategies for Remediating Risk: Auto Finance and Redlining, October, 2015.

Expert Report of Marsha J. Courchane
February 29, 2024

- Asian American Real Estate Association, "Borrowers from a Different Shore," May, 2015.

- Consumer Financial Services Association, "Economic Impact on Small Lenders of the Payday Lending Rules under Consideration by the CFPB," May, 2015.

- Inside Mortgage Finance Webinar, "Defusing Fair Lending Risk and the HMDA Data Expansion," December, 2014.

- Mortgage Bankers Association Compliance Conference 2014, "Fair Lending and New HMDA," September, 2014.

- American Bankers Association, "Disparate Impact:  Indirect Automotive," June, 2014.

- Mortgage Bankers Association, "Fair Lending: Legal Issues and Regulatory Compliance," May, 2014.

- Alabama Banking Law Seminar, "Washington Hot Topics and Update, January, 2014.

- American Real Estate and Urban Economics International Conference, Jerusalem, Israel, "Underwriting Standards, Loan Products and Performance," with Len Kiefer and Peter Zorn, July, 2013.

- Harvard University, Joint Center for Housing, "Underwriting Standards, Loan Products and Performance," with Len Kiefer and Peter Zorn, April, 2013.

- Inside Mortgage Finance Webinar, Fair Lending Challenges, April, 2013 (with Joseph T. Lynyak, Melanie Brody and Jon Seward).

- Law Seminars International, "Best Practices for Complying with Fair Lending Laws," December, 2012 (with Michael Mierzewski and Joseph T. Lynyak).

- European Real Estate Society, "Broker Compensation Patterns and Trends:  2005 - 2009," June, 2012.

- American Real Estate Society, "Broker Compensation Patterns and Trends:  2005 - 2009," April, 2012.

- Consumer Bankers' Association, "Fair Lending and Loss Mitigation/Servicing," March, 2012.

- Alabama Banking Law Seminar, "The Future of Banking," February, 2012.

- MBAA, A Campus MBA Workshop, "Risk Assessment and Mitigation (Data Analysis)," Washington, DC, January, 2012.

- FDIC, "The Differential Access to and Pricing of Mortgages:  2004-2009" and "Broker Compensation Patterns," November, 2011.

- Clemson University, Ph.D. Colloquium, "The Differential Access to and Pricing of Mortgages:  2004 – 2009," November, 2011.

- International Atlantic Economic Conference, "Broker Compensation Patterns and Trends: 2005 – 2009," October, 2011.

- Consumer Financial Protection Bureau, New Research on Sustainable Mortgages and Access to Credit, "The Differential Access to and Pricing of Mortgages," with Peter M. Zorn, Freddie Mac, 2011.

Expert Report of Marsha J. Courchane
February 29, 2024

- Harland Financial Services, Network of State & Federal Counsel 2011 Conference, "Putting it All Together:  A Forward Looking Discussion about how the Dodd-Frank Act is Shaping the Business of Banking," October, 2011 with Joseph T. Lynyak, Pillsbury Winthrop Shaw Pittman LLP.

- Harland Financial Services, Credit Risk Consortium: "The Changing Financial Services Landscape," August, 2011 with Joseph T. Lynyak, Venable LLP.

- Asian Real Estate Society Meetings, Jeju Korea, "Differential Access to and Pricing of Home Mortgages," July, 2011.

- Consumer Bankers Association, CBA Live 2011, Redlining, June, 2011.

- Federal Reserve Board of Chicago, Testimony on HMDA, September, 2010.

- Department of Justice and Federal Reserve Board, Presentation on Loss Mitigation and Servicing, July, 2010.

- Consumer Bankers Association, Fair Lending Panel on "Discretionary Pricing," June, 2010.

- University of Cincinnati, Real Estate Roundtable, "Real Estate After the Fall," November, 2009.

- Consumer Bankers Association, "Redlining," October, 2009.

- Federal Reserve Board of Cleveland, "Foundations of Homeownership," June, 2009.

- Federal Reserve Board, Revisiting the CRA: Perspectives on the Future of the Community Reinvestment Act, "The CRA within a Changing Financial Landscape" with Robert B. Avery and Peter M. Zorn, March, 2009.

- University of California, Irvine, "Housing after the Fall: Reassessing the Future of the American Dream" February, 2009.

  - "Mortgage Players and Products" with Peter M. Zorn

  - "Sustainable Homeownership" with Paul Calem and Susan Wachter

- American Bankers Association, Webinar, "What Your Institution Needs to Know about What Lies Ahead," November, 2008.

- Mortgage Bankers Association, Summit on the Future of the Secondary Mortgage Market and the GSEs, November, 2008.

- University of Connecticut, Law School Symposium on Subprime Issues, November, 2008.

- Consumer Bankers Association, "FHA Lending Patterns," November, 2008.

- CRA Colloquium, Orlando, Analysis of HMDA Data, October, 2008.

- Workshop for 3rd Securities Litigation Conference, IQPC New York, November, 2007.

- Subprime Lending Litigation & Regulatory Enforcement, American Conference Institute, September, 2007.

- Fair Lending Summit, KL Gates, March 2007.

- Federal Reserve System Conference, "Financing Community Development," March 2007.

Expert Report of Marsha J. Courchane
February 29, 2024

- National Fair Housing Alliance, October, 2006.
- Federal Reserve System Conference, "Closing the Wealth Gap," September, 2006.
- ACI Conference on Fair Lending and Compliance Best Practices, November, 2006.
- American Real Estate and Urban Economics, July, 2006, January, 2007, May, 2007, January, 2008.
- American Bar Association, April, 2006.
- San Francisco Bank Attorneys, February, 2006.
- Consumer Bankers Association, November, 2005.
- Fannie Mae Fair Lending Conference, September, 2005.
- ACI Conference on HMDA, June, 2005.
- Federal Reserve Board System Conference (Consumer Credit), April, 2005.
- FMA, ASSA, Georgetown Credit Research Center, ARES, 2005.
- Wharton's Distinguished Mortgage Bankers Series, Speaker, 2004, 2005, 2006.

**Publications**

Refereed publications

"Evidence and Actions on Mortgage Market Disparities:  Research, Fair lending Enforcement and Consumer Protection," *Housing Policy Debate*, DOI: 10.1080/10511482.2018.1524446 with Stephen L. Ross, 2018

 "A Tale of Two Tensions:  Balancing Access to Credit and Credit Risk," *Real Estate Economics*, with Leonard Kiefer and Peter Zorn, 2015, V. 43, No. 4, 993 – 1034.

 "Borrowers from a Different Shore: Asian Outcomes in the US Mortgage Market," *Journal of Housing Economics*, with Rajeev Darolia and Adam H. Gailey, Vol. 28, 2015, pp. 76 – 90.

 "Underwriting Standards, Loan Products, and Performance:  What Have We Learned?" in *Homeownership Built to Last:  Balancing Access, Affordability, and Risk after the Housing Crisis*, E. Belsky, C. Herbert and J. Molinsky, Washington:  Brookings Institution Press, 2014, pp. 231 – 266.

"The Downs and Ups of FHA Lending: The Government Mortgage Roller Coaster Ride," with Rajeev Darolia and Peter Zorn, *Journal of Housing Economics*, Volume 24, June 2014, pp. 39–56

"Bubble Bubble – Is there House Price Trouble? – in Canada," with Cynthia Holmes, *International Real Estate Review*, Vol. 17, No. 1, pp.109 – 135,  2014.

"Broker Compensation Trends:  2005 – 2009." With Rajeev Darolia and Peter M. Zorn, *Atlantic Economic Journal*, Vol. 40, No.3, September 2012, 229-251.

Expert Report of Marsha J. Courchane
February 29, 2024

"The Differential Access and Pricing of Home Mortgages: 2004–2009." With Peter M. Zorn. *Real Estate Economics*, Vol. 40, S.1, pp. 115 – 158, 2012.

 "A Changing Credit Environment and Its Impact on Low-Income and Minority Borrowers and Communities." *Moving Forward: The Future of Consumer Credit and Mortgage Finance*, N. Retsinas and E. Belsky (eds.), Washington: Brookings Institution Press. February, 2011, pp. 86–117.

"Industry Changes in the Market for Mortgage Loans." With Rajeev Darolia and Peter M. Zorn. *Connecticut Law Review*, Vol. 41, No. 4, May 2009, pp. 493–526.

"On the Robustness of Racial Discrimination Findings in Mortgage Lending Studies." With J.A. Clarke and N. Roy. *Applied Economics*, Vol. 41, Issue 18, 2009, pp. 2279–2297.

 "Dawning of a New Age:  Examination for Discrimination in Lending." With Peter M. Zorn. *Banking and Financial Services Policy Report*, Vol. 27, Issue 10, October 2008, pp. 1–9.

"Consumer Credit Literacy: What Price Perception?  With Peter M. Zorn and Adam H. Gailey, *Journal of Economics and Business*, Vol. 60, Issues 1–2, January/February 2008, pp.125–138.

"The Pricing of Home Mortgage Loans to Minority Borrowers: How Much of the APR Differential Can We Explain." *Journal of Real Estate Research*, Vol. 29, No. 4, November 2007, pp. 399–439.

"Comment on Donald R. Haurin and Hazel A. Morrow-Jones's 'The Impact of Real Estate Market Knowledge on Tenure Choice: A Comparison of Black and White Households.' " With Peter M. Zorn. *Housing Policy Debate*, Vol. 17, Issue 4, 2007.

"Implications of Stratified Sampling for Fair Lending Binary Logit Models." With J.A. Clarke. *Journal of Real Estate Finance and Economics*, Vol. 30, 2005, pp. 5–31.

"Subprime Borrowers: Transitions and Outcomes." With Peter M. Zorn and Brian Surette. *Journal of Real Estate Finance and Economics*, Vol. 29, No. 4, 2004, pp. 365–392.

"Mission Accomplished?" With Peter M. Zorn, 2002. (*https://pdfs.semanticscholar.org/4882/f74f2857a73c9a99803a594658030f3ddd0b.pdf*)

"A Comparison of US and Canadian Mortgage Markets." With J. Giles. *Property Management*, Vol. 20, No. 5, 2002, pp. 326–368.

"Real Options and Internet Banking: Theory and Tests." With David Nickerson and Rick Sullivan. *Journal of Multinational Financial Management*, Vol. 12, Nos. 4–5, Oct.–Dec. 2002, pp. 347–363.

"Lessons Learned: Applications of Statistical Techniques to Fair Lending Compliance Examinations." With David Nickerson and David Nebhut. *Journal of Housing Research*, Vol. 11, No. 2, 2000, pp. 277–295.

Expert Report of Marsha J. Courchane
February 29, 2024

"Estimation and Evaluation of Loan Discrimination—An Informational Approach." With Amos Golan and David Nickerson. *Journal of Housing Research*, Vol. 11, No. 1, 2000, pp. 67–90.

"Strategic Investment and Endogenous Market Structure in Electronic Banking." With D. Nickerson and V. Sadanand. *Proceedings of the Eleventh IFAC Meetings on Control Applications of Optimization*, V. Zakharov (ed.), International Federation of Automatic Control, Elsevier North-Holland Press, 2000, pp. 104–109.

"Comment on the Enforcement of CRA and Changes in Bank Lending Behavior." *Research in Financial Services: Private and Public Policy*, JAI Press, Vol. 11, 1999, pp. 197–200.

"Discrimination Resulting from Overage Practices." With David Nickerson. *Journal of Financial Services Research*, Vol. 11, Nos. 1–2, February/April 1997, pp. 133–151.

"Endogenous Competition and Strategic Foreign Investment." With David Nickerson and V. Sadanand. *Canadian Journal of Economics*, Vol. 29, No. 0, April 1996, pp. S483–S489.

"Using Statistical Models to Identify Unfair Lending Behavior." With Dennis Glennon, William Lang, and Mitchell Stengel. *Fair Lending Analysis: A Compendium of Essays on the Use of Statistics*, A. Yezer, ed., pp. 57–64, Washington, DC, American Bankers Association, 1995.

"Aggregate Consumption and Allocation of Time," *Economics Letters*, Volume 17, Issues 1-2, 1985, pp. 161–165

"A Conditional Logit Model for Executive Incentives," *Economics Letters*, Volume 13, Issues 2-3, 1983, pp. 283–289

**Other publications and white papers**

*CRA Insights, "*Fair Lending Considerations for Auto Finance Payment Deferrals Related to COVID-19," June 2020, available at: *http://www.crai.com/sites/default/files/publications/FE-Insights-FL%20Considerations%20for%20COVID-19%20Related%20Payment%20Deferrals%20Auto-June-2020.pdf*

*CRA Insights*, "Fair Lending Considerations When Tightening Credit Requirements in Response to the COVID-19 Crisis," available at: *May 2020, http://www.crai.com/sites/default/files/publications/Insights-COVID-Fair%20Lending%20Considerations%20When%20Tightening%20Credit%20Requirements%20in%20Response%20to%20the%20COVID-19%20Crisis-May2020%20FINAL.pdf*

ABA Bank Compliance, "Fair Lending in the Brave New World of Big Data," with David Skanderson, May/June 2017, available at: http://www.aba.com/Products/bankcompliance/Pages/default.aspx, last accessed May 2, 2017.

"The Creation of the National Mortgage Database," in *What Counts: Harnessing Data for America's Communities*, edited by the San Francisco Federal Reserve Board and the Urban

Expert Report of Marsha J. Courchane
February 29, 2024

Institute, 2014. With Robert Avery and Peter M. Zorn, available at:
http://www.whatcountsforamerica.org/.

"Fair Lending:  Implications for the Indirect Auto Finance Market," with Arthur P. Baines,
November 19, 2014, Report for AFSA, available at:
https://www.crai.com/sites/default/files/publications/Fair-Lending-Implications-for-the-
Indirect-Auto-Finance-Market.pdf, last accessed May 2, 2017.

ABA Bank Compliance, "Compliance in the Indirect Automotive Market:  Key Issues in Fair
Lending Analysis," with Arthur P. Baines, September/October 2013, available at:
http://www.aba.com/Products/bankcompliance/Pages/default.aspx, last accessed May 2,
2017.

"Automotive Finance:  Will Dealership finance reserve go the way of mortgage yield spread
premiums? With Arthur P. Baines, CRA White Paper, March 2013, available here:
http://www.crai.com/sites/default/files/automotive-finance.pdf, last accessed May 2, 2017.

"Fair Lending Testing of Mortgage Loan Modifications and Default Servicing," with Anand S.
Raman, September, 2010.

"A Changing Credit Environment and Its Impact on Low-Income and Minority Borrowers and
Communities." With Peter M. Zorn, Presented, Harvard University, February, 2010.

W. Kolb (ed.), *Lessons from the Financial Crisis: Causes, Consequences, and Our Economic
Future*, Hoboken, NJ: John Wiley & Sons, Inc. 2010, Chapter 21, "FHA Loans and Policy
Responses to Credit Availability." With R. Darolia and Peter M. Zorn.

"Subprime Mortgages," with David Kogut, in: Susan J. Smith, Marja Elsinga, Lorna Fox
O'Mahony, Ong Seow Eng, Susan Wachter, editors. *International Encyclopedia of Housing and
Home*, Vol 7, Oxford: Elsevier; 2012. pp. 51 – 59.

"The CRA within a Changing Financial Landscape." With Robert B. Avery and Peter M. Zorn.  In
*Revisiting the CRA: Perspectives on the Future of the Community Reinvestment Act,* February,
2009.

"A Test of Discrimination Robust to Functional Misspecification." With Douglas McManus.
*Proceedings of the Joint Statistical Meetings*, 2003.

Comment on "The Development of Internal Models Approaches to Bank Regulation and
Supervision: Lessons Learned from the Market Risk Perspective," by J. Lopez and M.
Saidenberg, in *Bank Fragility and Regulation: Evidence from Different Countries*, G. Kaufman
(ed.), 2000.

"Using Statistical Techniques to Evaluate Fair Lending Practices at National Banks." With
MariGloria Cobas. *Quarterly Journal,* Office of the Comptroller of the Currency, Vol. 14, No. 2,
1995.

Expert Report of Marsha J. Courchane
February 29, 2024

"Using Statistics to Evaluate Fair Lending: Have Statistics, Will Travel." *SuperVisions*, OCC, Vol. 10, No. 7, 1995.

Shazam: Econometrics Computer Program, Chapters 2, 7, 22, 24 (Intro., OLS, Logit, Probit, Tobit), McGraw-Hill, New York, NY, 1993.

**Working papers**

 "The Evolution of FHA over the Decade of Disorder." With Rajeev Darolia and Peter Zorn, July 2012.

"Differences in the Movements of U.S. and Canadian House Prices." With Cynthia Holmes, June 2012 (Presented at ASAC, St. John's, Newfoundland)

"Risk-Based Pricing: Problems, Possibilities, and Prospects." With Peter M. Zorn, Presented at Harvard University, Joint Center on Housing, February 2010.

"Current and Expected Evolution of the Canadian Mortgage Market," Report for the Canadian Mortgage Housing Corporation, Report C.R. File No. 6626-24, November 12, 2008.

Consumer Literacy and Credit Worthiness." Presented at ASSA, January 2005, Hoyer Hoyt Institute, January 2005; and Federal Reserve System Conference, April 2005.

"Consumer Borrowing Costs." Presented at ASSA, January 2005, Pacific Rim Real Estate Meetings, January 2005, and American Real Estate Society meetings, April 2005.

"Evolution of the Housing Finance System in America." With David Nickerson and Frank Nothaft. For the Millennial Housing Commission, 2001.

**Grants and awards**

- Fair Lending "All-Star" award, presented at Asurity Fair Lending conference, May 2022
- George Bloom award for service to the American Real Estate and Urban Economics Association, January 2019
- American Real Estate Society, Best Paper Award, 2007–2009, *Journal of Real Estate Research*
- Office of the Comptroller of the Currency, Outstanding Performance Bonus, 1998
- Office of the Comptroller of the Currency, Outstanding Performance Merit Award, 1996–1998
- Office of the Comptroller of the Currency, Special Act Awards: Training Seminars, 1998, Credit Scoring 1997, Discrimination in Lending 1996, Fair Lending Analysis 1995
- University of Canterbury, "Direct Foreign Investment," grant for Econometric Society meetings, 1993

Expert Report of Marsha J. Courchane
February 29, 2024

- UBC-HSS grants 1992, 1991, 1990, 1989, 1988; UBC-SSHRC grants 1983, 1984; UBC-CGA 1988

- Faculty Research and Professional Development grant, North Carolina State University, 1985

Expert Report of Marsha J. Courchane
February 29, 2024

**Expert testimony**

Depositions

- Deposition of Marsha J. Courchane, Ph.D. In the Matter of *James M. Smith and Cathlene Y. Banker, Plaintiffs v. CitiMortgage, Inc.; Investors Bank; XYZ Corporation 1-5 and John Does 1-10, Defendants*, United States District Court, District of New Jersey, 2:15-cv-07629 (JLL-JAD), January 18, 2023.

- Deposition of Marsha J. Courchane, Ph.D. In the Matter of *Albert Pickett, Jr., Keyonna Johnson, Jarome Montgomery, Odessa Parks, and Tiniya Shepherd (f/k/a Tiniya Hall) on behalf of themselves and all others similarly situated, Plaintiffs, v. City of Cleveland, Defendant*, United States District Court, Northern District of Ohio, Eastern Division, 1:19-cv-02911-SO, July 19, 2022

- Deposition of Marsha J. Courchane, Ph.D. In the Matter of *Fair Housing Center of Central Indiana, Inc., et al., Plaintiff v. Rainbow Realty Group, Empire Holding Corp., Shore Waters Development. LLC, Alley Cat Trust, Sporting Trust, Sunflower Trust, Redskins Trust, and James R. Hotka, Defendants,* United States District Court, Southern District of Indiana, Indianapolis Division, Case No. 1:17-cv-1782-RLM-TAB, September 27, 2021

- Deposition of Marsha J. Courchane, Ph.D. In the Matter of *S&A Capital Partners, Inc., Mortgage Resolution Servicing, LLC; and 1st Fidelity Loan Servicing, LLC, Plaintiffs v. JPMorgan Chase Bank, N.A., JP Morgan Chase & Company, and Chase Home Finance, LLC, Defendants,* United States District Court, Southern District of New York, Case 1:15-cv-00293-LTS-RWL, February 5, 2019

- Deposition of Marsha J. Courchane, Ph.D. In the Matter of *Louis A. Cardinali, and all similarly situated individuals, Plaintiffs, v. Experian Information Services, Inc.*, Case 2:16-cv-02046-JAD-NJK, United States District Court, District of Nevada, January 29, 2019

- Deposition of Marsha J. Courchane, Ph.D. In the Matter *United States of America, Plaintiff v. Quicken Loans Inc., Defendant,* United States District Court, Eastern District of Michigan, Case No. 2:16-cv-14050 (MAG)(RSW), October 30, 2018

- Deposition of Marsha J. Courchane, Ph.D In the Matter of *SunTrust Banks, Inc. et al., Plaintiffs v. Certain Underwriters at Lloyds London et al., Defendants*, Superior Court of Fulton County, State of Georgia, Case Number: 2014-CV-249230, July 21, 2017

- Deposition of Marsha J. Courchane, Ph.D. In the Matter of *Westlake Services, LLC d/b/a Westlake Financial Services, Plaintiffs, v. Credit Acceptance Corporation, Defendant*, Case No. 2:15-cv-07490 SJO (MRWx), United States District Court, Central District of California, Western District, July 13, 2017

Expert Report of Marsha J. Courchane
February 29, 2024

- Deposition of Dr. Marsha J. Courchane, Ph.D. In the Matter of *United States of America ex rel., Victor E. Bibby and Brian J. Donnelly, Relators/Plaintiffs v. Wells Fargo Bank, N.A. individually as s/b/m with Wells Fargo Home Mortgage, Inc., et al., Defendant,* United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:06-cv-547-AT, June 15, 2016.

- Deposition of Dr. Marsha J. Courchane in the matter *Jean-Robert Saint-Jean, Edith Saint-Jean, Felex Saintil, Yanick Saintil, Linda Commodore, Beverley Small, Jeanette Small and Felipe Howell, Plaintiffs, v. Emigrant Mortgage Company, Emigrant Savings Bank-Manhattan, Emigrant Bank and Emigrant Bancorp., Inc.,* Civil Action. No. 11-cv-2122 (SJ) (RLM), ECF Filing, Hon. Sterling Johnson, Jr.,United States District Court, Eastern District of New York, March 22, 2016.

- Deposition of Dr. Marsha J. Courchane in the matter of *United States of America, Plaintiff v. Wells Fargo Bank, N.A. and Kurt Lofrano, Defendants*, United States District Court, Southern District of New York, Case No. 1:12-cv-07527 (JMF) (JCF), October 27, 2015.

- Deposition of Marsha J. Courchane in the matter of *John T. Shaw; Kenneth Coke; and Raymond Rydman, on behalf of themselves and all others similarly situated, Plaintiffs, v. Experian Information Solutions, Inc., Wells Fargo Bank, NA and Citimortgage, Inc., Defendants*, United States District Court, Southern District of California, Case No. 3:13-cv-01295-JLS-BLM, August 11, 2015.

- Deposition of Marsha J. Courchane in the matters of *Lisa and Scott Cave, on behalf of themselves and all others similarly situated, Plaintiffs, v. Saxon Mortgage Services, Inc., Defendants*, Case No. 2:11-cv-04586-JP, and *William D. Cave, on behalf of himself and all others similarly situated, Plaintiff v. Saxon Mortgage Services, Inc., Defendant*, Case No. 2:12-cv-05366-JP, United States District Court, Eastern District of Pennsylvania, December 15, 2014.

- Deposition of Marsha J. Courchane in the matter of *Beverly Adkins, Charmaine Williams, Rebecca Pettway, Rubie McCoy, William Young, on behalf of themselves and all others similarly situated, and Michigan Legal services, Plaintiffs, v. Morgan Stanley, Morgan Stanley & Co. LLC, Morgan Stanley ABS Capital I Inc., Morgan Stanley Mortgage Capital Inc., and Morgan Stanley Mortgage Capital Holdings, LLC, Defendants*, Case No. 12: cv 7667, United States District Court, Southern District of New York, November 13, 2014.

- Deposition of Marsha J. Courchane in the matter of *Felton A. Spears, Jr., and Sidney Scholl, on behalf of themselves and all others similarly situated, Plaintiffs, v. First American eAppraiseIT (a/k/a eAppraiseIT, LLC), Defendant,* United States District Court, Northern District of California, San Jose Division, Case No. 5:08-CV-00868-RMW, July 29, 2014.

- Deposition of Marsha J. Courchane in the matter of *Hemisphere Resorts, LLC, Claimant v. IMG Worldwide, Inc. et al., Respondents*, JAMS Arbitration Panel, Reference Number 1340009696**,** January 28, 2014.

Expert Report of Marsha J. Courchane
February 29, 2024

- Deposition of Marsha J. Courchane in the matter of *Gail Greene, Plaintiff v. Emigrant Mortgage Company, Defendant*, United States District Court, Eastern District of New York; Case No. 1:10-cv-02653-KAM-MDG, August 15, 2013.

- Deposition of Marsha J. Courchane in the matter of *In RE: Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, U.S. District Court, District of Massachusetts, Case 1:10-md-02193-RWZ, July 24, 2013.

- Deposition of Marsha J. Courchane in the matter of *Denise Minter and Jason and Rachel Alborough and Lizbeth T. Binks, Individually and on behalf of a class of consumers similarly situated, Plaintiffs v. Wells Fargo Bank, N.A., Long & Foster Real Estate, Inc., Prosperity Mortgage Company, Walker Jackson Mortgage Corporation f/d/b/a Prosperity Mortgage Corporation, and Wells Fargo Ventures, LLC, Defendants,* U.S. District Court, District of Maryland, Northern Division; Case No. 07-CV-03442-WMN, July 20, 2012.

- Deposition of Marsha J. Courchane in the matter of *Melinda Smith, Plaintiffs Melinda Smith, Plaintiff v. United Residential Services & Real Estate, Inc.; Mark S. Diamond; Urban Financial Group, Inc.; and John Does 1-5; Defendants*, U.S. District Court, Northern District of Illinois, Eastern Division; Case No. 10-cv-05540, March 29, 2012.

- Deposition of Marsha J. Courchane in the matter of *The People of the State of New York by Andrew M. Cuomo, Attorney General for the State of New York, Plaintiff v. First American Corporation and First American eAppraiseIT, Defendants,* Index No. 406796/07 (Ramos, J.), October 7, 2010.

- Deposition of Marsha J. Courchane in the matter of *Ana Ramirez, Ismael Ramirez and Jorge Salazar, on behalf of themselves and all others similarly situated, Plaintiffs v. GreenPoint Mortgage Funding, Inc., Defendants*, US District Court for the Northern District of California; 08-cv-00369-TEH, May 26, 2010.

- Deposition of Marsha J. Courchane in the matter of *Francisco Rodriguez, Claudia P. Sierra and Emma J. Allen on behalf of themselves and all others similarly situated, Plaintiffs v. Merrill Lynch & Co., Inc.; Merrill Lynch Bank & Trust Co., FSB; Merrill Lynch Mortgage Services Corporation; First Franklin Mortgage Corporation; First Franklin Financial Corporation and Home Loan Services, Inc., Defendants,* US District Court for the Northern District of California; Docket No. C 08-1515-JW (HRL), March 22, 2010.

- Deposition of Marsha J. Courchane in *Terri N. White, et al., Plaintiff v. Experian Information Solutions, Inc., Defendant*. Case No. SA CV05-1070 DOC (MLGx) (Lead Case) for Defendants, US District Court, Central District of California, Southern Division, August 20, 2007.

- Deposition of Marsha J. Courchane in *Dewitt Mathis, et al., Plaintiff v. United Homes, LLC. et al. Defendants*. Case 05CV 4386 (KAM) (RLM), US District Court, Eastern District of New York, October 27, 2009.

Expert Report of Marsha J. Courchane
February 29, 2024

## Declarations

- Declaration of Marsha J. Courchane, Ph.D. In the Matter of *Cobb County, DeKalb County, and Fulton County, Georgia, Plaintiffs v. Bank of America Corporation, Bank of America, N.A., Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB, Countrywide Warehouse Lending, LLC, BAC Home Loans Servicing, LP, Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Capital Inc., and Merrill Lynch Mortgage Lending, Inc., Defendants,* United States District Court, Northern District of Georgia, Atlanta Division,1:15-cv-04081-LMM,June 3, 2022

- Declaration of Marsha. J. Courchane, Ph.D., In the Matter of *United States of America, Plaintiff, v. Quicken Loans Inc*., Defendant, Case No. 2:16-cv-14050-MAG-RSW, United States District Court, Eastern District of Michigan, Southern Division, February 7, 2019.

- Declaration of Marsha J. Courchane, Ph.D., In the Matter of *Ibrahim Barakat, Plaintiff, v. Equifax Information Services, LLC, Experian Information Services, Inc., Trans Union, LLC, and Capital One Bank USA, N.A*., Case No. 2:16-cv-10718-AJT-MKM, United States District Court, Eastern District of Michigan, Southern Division, November 3, 2016.

- Declaration of Marsha J. Courchane, Ph.D. In the Matter of *United States of America ex rel., Victor E. Bibby and Brian J. Donnelly, Relators/Plaintiffs v. Wells Fargo Bank, N.A. individually as s/b/m with Wells Fargo Home Mortgage, Inc., et al., Defendant,* United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:06-cv-547-AT, October 31, 2016.

- Declaration of Marsha J. Courchane in the matter of *Jean-Robert Saint-Jean, Edith Saint-Jean, Felex Saintil, Yanick Saintil, Linda Commodore, Beverley Small, Jeanette Small and Felipe Howell, Plaintiffs, v. Emigrant Mortgage Company, Emigrant Savings Bank-Manhattan, Emigrant Bank and Emigrant Bancorp., Inc.,* Civil Action. No. 11-cv-2122 (SJ) (RLM), ECF Filing, Hon. Sterling Johnson, Jr.,United States District Court, Eastern District of New York, July 31, 2015.

- Declaration of Marsha J. Courchane in the matter of *Melinda Smith, Plaintiffs Melinda Smith, Plaintiff v. United Residential Services & Real Estate, Inc.; Mark S. Diamond; Urban Financial Group, Inc.; and John Does 1-5; Defendants,* U.S. District Court, Northern District of Illinois, Eastern Division; Case No. 10-cv-05540, March 28, 2012.

- Affidavit of Marsha J. Courchane in opposition to Motion for Summary Judgment in *The People of the State of New York by Andrew M. Cuomo, Attorney General for the State of New York, Plaintiff v. First American Corporation and First American eAppraiseIT, Defendants,* Index No. 406796/07 (Ramos, J.), August 12, 2010.

- Declaration of Marsha J. Courchane in support of Experian's Opposition to Plaintiff's Motion for Class Certification and Motion of Partial Summary Judgment, in *Terri N. White, et al., Plaintiff, v. Experian Information Solutions, Inc., Defendant,* Case No. SA CV05-1070 DOC (MLGx) (Lead Case) for Defendants, US District Court, Central District of California, Southern Division, August 6, 2007.

Expert Report of Marsha J. Courchane
February 29, 2024

- Declaration of Marsha J. Courchane in support of Experian's Opposition to Plaintiff's Motion for Class Certification, in *William A. Harris, Plaintiff, v. Experian Information Solutions, Inc., Defendant,* Case No. Case No.: 6:06-CV-01808-GRA, for Defendants, US District Court, District of South Carolina, Greenville Division, December 13, 2007.

**Expert reports**

- Expert Report of Marsha J. Courchane, Ph.D. *In the Matter of Albert Pickett, Jr., Keyonna Johnson, Jarome Montgomery, Odessa Parks, and Tiniya Shepherd (f/k/a Tiniya Hall) on behalf of themselves and all others similarly situated, Plaintiffs v. City of Cleveland, Defendant*, United States District Court, Northern District of Ohio, Eastern Division, 1:19-cv-02911-SO, May 2, 2022

- Expert Report of Marsha J. Courchane, Ph.D. *In the Matter of County of Cook, Plaintiff, v. Bank of America Corporation, Bank of America, N.A., Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB, Countrywide Warehouse Lending, LLC, BAC Home Loans Servicing, LP, Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Capital Inc., and Merrill Lynch Mortgage Lending, Inc., Defendants,* United States District Court, Northern District of Illinois, Eastern Division, Case No. 1:14-cv-2280, December 18, 2020

- Expert Report of Expert Report of Marsha J. Courchane, Ph.D. *In the Matter of James Douglas, Individually, President of the National Association for the Advancement of Colored People (Houston Branch), Yolanda Smith, Individually, Executive Director of the National Association for the Advancement of Colored People (Houston Branch), League of United Latin American Citizens, District VIII ("LULAC"), Laurie Vignaud, Individually, Shamika Bell, Elisabeth Johnson, Craig Anthony Thomas, Staci Childs, Belinda Everette, Charlesley Watt, Alane Lillie, Raymond Stephney, Krystle Pleasant, Eric Goodwine, Dwight Osborne, Tanya Douglas, Reuben Brown, J. Allen Provost, Carol Galloway, Andre Smith and Richard Young, Jacquelyn Malone, Terry Mills, Jose Leal and Mary Ramos, Plaintiffs, v. Capital One, N.A., Defendant,* United States District Court, Southern District of Texas, Houston Division, Case No. 4:18-cv-00603, July 27, 2020

- Expert Report of Marsha J. Courchane, Ph.D. *In the Matter of Manuel Blanco and Lixis Quintosa, Plaintiffs v. Bank of America, N.A., Defendant,* United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02626-MSS-MAP, May 10, 2019

- Expert Report of Marsha J. Courchane, Ph.D. *In the Matter of Fernando R. Calderon and Sandra Cristina Bravo, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02601-MSS-CPT, May 10, 2019

- Expert Report of Marsha J. Courchane, Ph.D. *In the Matter of Pedro Pablo Collazo Cruz and Odalys Rodriguez, Plaintiffs v. Bank of America, N.A.*, Defendant, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02627-CEH-MAP, May 10, 2019

Expert Report of Marsha J. Courchane
February 29, 2024

- Expert Report of Marsha J. Courchane, Ph.D. *In the Matter of Pablo A. Zenteno and Maria J. Zenteno, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02591-MSS-TGW, May 10, 2019

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Marie Coles, Plaintiff v. Bank of America, N.A., Defendant,* United States District Court, Southern District of Florida, Miami Division, Case No. 1:17-cv-24153-DPG, April 26, 2019

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Carmen Brexendorf, Plaintiff v. Bank of America, N.A., Defendant,* United States District Court, Middle District of Florida, Orlando Division, Case No. 6:17-cv-02065-RBD-GJK, January 4, 2019

- Expert Report of Marsha J. Courchane, Ph.D.in the Matter of In the Matter of *S&A Capital Partners, Inc., Mortgage Resolution Servicing, LLC; and 1st Fidelity Loan Servicing, LLC, Plaintiffs v.JPMorgan Chase Bank, N.A., JP Morgan Chase & Company, and Chase Home Finance, LLC, Defendants,* United States District Court, Southern District of New York, Case 1:15-cv-00293-LTS-RWL, October 29, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *United States of America, Plaintiff v. Quicken Loans Inc., Defendant,* United States District Court, Eastern District of Michigan, Case No. 2:16-cv-14050 (MAG)(RSW), October 1, 2018

- Expert Report of Marsha J. Courchane, Ph.D. *In the Matter of Noelia Ramirez, Plaintiff v. Bank of America, N.A*.,  Defendant, Circuit Court of the Thirteenth Judicial Circuit, Hillsborough County, Florida, Circuit Civil Division, Case No. 16-CA-722, September 17, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Louis A. Cardinali, and all similarly situated individuals, Plaintiffs, v. Experian Information Services, Inc*., Case 2:16-cv-02046-JAD-NJK, United States District Court, District of Nevada. September 10, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Ronald J. Captain and Sharon P. Captain, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Southern District of Florida, Fort Lauderdale Division, Case No.0:18-cv-60130-CMA, July 17, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Abelardo Alonso and Ariela Sollet, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02547-VMC-MAP, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Rene Aranzola and Belqui Diaz, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02540-VMC-CPT, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Francisco and Elisa Cardenas, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02629-VMC-AEP, June 22, 2018

Expert Report of Marsha J. Courchane
February 29, 2024

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Gaspar Colon and Guadalupe Celi, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02549-VMC-JSS, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *David Figueroa and Lazara Sosa, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02637-VMC-TGW, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Liubert Machado and Ileana Acosta, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02531-VMC-AAS, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Elier Martinez and Marisol Lopez, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02596-VMC-TGW, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Gustavo Morales and Marelys Hernandez, Plaintiffs v. Bank of America,, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02638-VMC-CPT, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Rafael Paz, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02622-VMC-AEP, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Kelvin Sanchez, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02533-VMC-CPT, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Farida Santos, Plaintiff v. Bank of America,  N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02585-VMC-AEP, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Ruben and Betty Spitaleri, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Ocala Division, Case No. 5:17-cv-00518-VMC-PRL, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Rafael Uribe, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02589-VMC-AEP, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Hosmert Vergara, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02642-VMC-MAP, June 22, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Jose G. Zuluaga, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02543-VMC-TGW, June 22, 2018

Expert Report of Marsha J. Courchane
February 29, 2024

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Juan Jesus Acosta, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02592-JSM-AAS, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Rodolfo Bejerano Blanco and Loraine Arenal Moreno, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02593-JSM-JSS, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Edelso Carmenates and Irania Llago, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02635-SDM-JSS, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Wilson A. Diaz, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02537-SDM-MAP, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Jose and Luisa Espinel, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02628-SDM-JSS, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of Norberto Garcia*, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02602-SDM-AAS, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Maria and Jorge Gonzalez, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Ocala Division, Case No. 5:17-cv-00519-JSM-PRL, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Jose Moncada and Evelyn Molina, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02625-SDM-AEP, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Gil A. Mosquea and Digna M. Mosquea, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02551-SDM-TGWP, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Lidicis Ocampo and Alberto Gonzalez, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02631-SDM-JSS, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *J Gabino C. Peralta and Arely M. Ramirez, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02580-EAK-MAP, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Carlos Perez, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02623-EAK-JSS, April 16, 2018

Expert Report of Marsha J. Courchane
February 29, 2024

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Adonis Rodriguez, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02583-EAK-TGW, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Carlos M. and Aimee Rostgaard, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02538-SDM-JSS, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *John Ruiz, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02586-JSM-TGW, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Moises Salazar, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02535-SDM-AEP, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Plutarco and Ramona Santos, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02588-SDM-MAP, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Andres Varela-Pietri and Migdalia Bonilla, Plaintiffs v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv-02534-SDM-TGW, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Carolina Zalazar, Plaintiff v. Bank of America, N.A., Defendant*, United States District Court, Middle District of Florida, Tampa Division, Case No. 8:17-cv- 02603-EAK-TBM, April 16, 2018

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *SunTrust Banks, Inc. et al., Plaintiffs v. Certain Underwriters at Lloyds London et al., Defendants*, Superior Court of Fulton County, State of Georgia, Case Number: 2014-CV-249230, June 5, 2017

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *Karin Meyer, Plaintiff v. Healthcare Revenue Recovery Group, d/b/a ARS Account Resolution Services, LLC and Equifax Information Services, LLC,* United States District Court, District of New Jersey, Case Number: 1:16-cv-02454-NLH-JS, May 26, 2017

- Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *In Re Orrin S. Anderson, Debtor and Orinn S. Anderson, A/K/A Orinn Anderson, A/K/A Orinn Scott Anderson, Debtor and Plaintiff, on behalf of himself and all others similarly situated Plaintiff v. Credit One Bank, N.A., Defendant*, United States Bankruptcy Court, Southern District of New York, Chapter 7, Case No. 14-22147 (RDD), Adv. Pro. No. 15-08214 (RDD), May 18, 2017

- Expert Report of Marsha J. Courchane, Ph.D. in the Matter of *Leslie Belsanti Plaintiff, v.* Equifax Information Services, LLC, TransUnion, LLC, and Capital One Bank, USA, N.A. and Chase Bank, USA, N.A., Case No. 3:16-08001-DGC, United States District Court, District of Arizona, October 17, 2016.

Expert Report of Marsha J. Courchane
February 29, 2024

- Expert Report of Marsha J. Courchane, Ph.D., In the Matter of *Wayne Ader, Plaintiff*, v. *Equifax Information Services, LLC, Experian Information Services, Inc., TransUnion, LLC, and The Swiss Colony, LLC*, Case No. 1:16-cv-10143-TLL-PTM, United States District Court, Eastern District of Michigan, Northern Division, September 8, 2016.

- Expert Report of Marsha J. Courchane, Ph.D., In the Matter of *Ibrahim Barakat, Plaintiff, v. Equifax Information Services, LLC, Experian Information Services, Inc., Trans Union, LLC, and Capital One Bank USA, N.A.*, Case No. 2:16-cv-10718-AJT-MKM, United States District Court, Eastern District of Michigan, Southern Division, September 1, 2016.

- Expert Report of Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *United States of America ex rel., Victor E. Bibby and Brian J. Donnelly, Relators/Plaintiffs v. Wells Fargo Bank, N.A. individually as s/b/m with Wells Fargo Home Mortgage, Inc., et al., Defendant*, United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:06-cv-547-AT, June 15, 2016.

- Expert Report of Dr. Marsha J. Courchane in the matter of *Colleen Healey and Paul Healey, Plaintiffs, v. Wells Fargo, N.A.*, The Court of Common Pleas of Lackawanna County, Pennsylvania, Case No. 11-cv-3340, March 18, 2016.

- Expert Report of Dr. Marsha J. Courchane in the matter of *United States of America, Plaintiff v. Wells Fargo Bank, N.A. and Kurt Lofrano, Defendants*, United States District Court, Southern District of New York, Case No. 1:12-cv-07527 (JMF) (JCF), September 27, 2015.

- Expert Report of Marsha J. Courchane in the matter of Expert Report of Marsha J. Courchane in the matter of *US Bank National Association, as Trustee, successor in interest to Bank of America, National Association, as Trustee (s/b/m to LaSalle Bank National Association) as Trustee for Wells Fargo Home Equity Trust Mortgage Pass-Through Certificates, Series 2004-1, Plaintiff v.Bonnie Breer, CitiFinancial, Inc., and Occupants residing at 86 Porter Road in Cabot, Vermont, Defendants*, State of Vermont, Superior Court, Washington Unit, Civil Division Docket No. 717-10012 Wncv, August 24, 2015.

- Expert Report of Marsha J. Courchane in Support of Defendants in: *Karen Lucia, Jeffrey Lucia, and Gail Caplan, on behalf of themselves and all others similarly situated, Plaintiffs, vs. Wells Fargo Bank, N.A. d/b/a Wells Fargo Home Mortgage, Defendants*, Case 3:10-cv-05072-JSW and *Phillip R. Corvello, on behalf of himself and all others similarly situated, Plaintiff, v. Wells Fargo Bank, N.A. d/b/a Wells Fargo Home Mortgage d/b/a America's Servicing Company, Defendant*, Case 3:10-cv-04749-VC; and *Amira Jackmon, individually, and on behalf of others similarly situated, Plaintiff, v. America's Servicing Company and Wells Fargo Bank, N.A., Defendants*, Case 3:11-cv--3884-CRB, United States District Court,Northern District of California, San Francisco Division, August 14, 2015.

- Expert Report of David J. Kogut and Marsha J. Courchane in the matter of *The People of the State of New York, by Eric Schneiderman, vs. Evans Bancorp, Inc. & Evans Bank, N.A.*, United States District Court, Western District of New York, No. 1:14-cv-00726 RJA, July 23, 2015.

- Expert Report of Marsha J. Courchane in the matter of *John T. Shaw; Kenneth Coke; and Raymond Rydman, on behalf of themselves and all others similarly situated, Plaintiffs, v.*

Expert Report of Marsha J. Courchane
February 29, 2024

*Experian Information Solutions, Inc., Wells Fargo Bank, NA and Citimortgage, Inc., Defendants*, United States District Court, Southern District of California, Case No. 3:13-cv-01295-JLS-BLM, June 18, 2015.

- Expert Report of Marsha J. Courchane in the matter of *David Hart, Plaintiff, v. Equifax Information Services LLC, Defendants*, U.S.D.C. Northern District of Texas, Case 4:14-cv-00570-Y, May 14, 2015.

- Expert Report of Marsha J. Courchane in the matter of *City of Los Angeles, Plaintiff, v. Bank of America and Countrywide, Defendants*, U.S.D.C., Central District of California, Case 2:13-cv-09046-PA (AGRx), March 27, 2015.

- Expert Report of Marsha J. Courchane in the matters *of Lisa and Scott Cave, on behalf of themselves and all others similarly situated, Plaintiffs, v. Saxon Mortgage Services, Inc., Defendants*, Case No. 2:11-cv-04586-JP, and *William D. Cave, on behalf of himself and all others similarly situated, Plaintiff v. Saxon Mortgage Services, Inc., Defendant*, Case No. 2:12-cv-05366-JP, United States District Court, Eastern District of Pennsylvania, October 13, 2014.

- Expert Report of Marsha J. Courchane in the matter of *Beverly Adkins, Charmaine Williams, Rebecca Pettway, Rubie McCoy, William Young, on behalf of themselves and all others similarly situated, and Michigan Legal services, Plaintiffs, v. Morgan Stanley, Morgan Stanley & Co. LLC, Morgan Stanley ABS Capital I Inc., Morgan Stanley Mortgage Capital Inc., and Morgan Stanley Mortgage Capital Holdings, LLC, Defendants*, Case No. 12: cv 7667, United States District Court, Southern District of New York, September 11, 2014.

- Expert Report of Marsha J. Courchane in the matter of *City of Miami Gardens, Plaintiff, v. Bank of American Corporation, et al., Defendants*, U.S. District Court, Southern District of Florida, Case Number: 1:14-cv-22202-KMW, August 28, 2014.

- Expert Report of Marsha J. Courchane in the matter of *Rockwell L. Scharer, III, Plaintiff v. OneWest Bank, FSB, Experian Information Solutions, Inc., Equifax, Inc., Equifax Information Services, Inc., and Transunion Corp., Defendants*, United States District Court, Central District of California, Western Division, Case No. 2:13-cv-00080 DSF (AGRx), April 24, 2014.

- Expert Report of Marsha J. Courchane in the matter of *City of Miami, Plaintiff, v. Bank of America, et al, Defendants*, United States District Court, Southern District of Florida, Case No. 1:13-cv-245060-Rosenbaum/Hunt, February 28, 2014.

- Expert Report of Marsha J. Courchane in the matter of *City of Los Angeles, Plaintiff, v. Bank of America and Countrywide, Defendants*,  United States District Court, Central District of California, Case No. 2:13-cv-09046-PA (AGRx), February 19, 2014.

Expert Report of Marsha J. Courchane
February 29, 2024

- Expert Report of Marsha J. Courchane in the matter of *Felton A. Spears, Jr., and Sidney Scholl, on behalf of themselves and all others similarly situated, Plaintiffs, v. First American eAppraiseIT (a/k/a eAppraiseIT, LLC), Defendant,* United States District Court, Northern District of California, San Jose Division, Case No. 5:08-CV-00868-RMW, January 31, 2014.

- Expert Report of Marsha J. Courchane in the matter of *Felton A. Spears, Jr., and Sidney Scholl, on behalf of themselves and all others similarly situated, Plaintiffs, v. First American eAppraiseIT (a/k/a eAppraiseIT, LLC), Defendant***,** United States District Court**,** Northern District of California, San Jose Division**,** Case No. 5:08-CV-00868-RMW, January 31, 2014.

- Expert Report of Marsha J. Courchane in the matter of *Hemisphere Resorts, LLC, Claimant v. IMG Worldwide, Inc. et al., Respondents*, JAMS Arbitration Panel, Reference Number 1340009696**,** December 12, 2013.

- Expert Report of Marsha J. Courchane in the matter of *U.S. Bank National Association, as Trustee, Plaintiff v. Gail Padilla, Francisco Padilla, et al., Defendants v. Wells Fargo & Company, Wells Fargo Bank N.A. a/k/a, Wells Fargo Home Mortgage a/k/a, America's Home Servicing, Counterclaim Defendant*, District Court of Tulsa County, State of Oklahoma, Case. No. CJ-2010-5331, August 19, 2013.

- Expert Report of Marsha J. Courchane in the matter of *In RE: Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, U.S. District Court, District of Massachusetts, Case 1:10-md-02193-RWZ, June 21, 2013.

- Expert Report of Marsha J. Courchane in the matter of *Gail Greene, Plaintiff v. Emigrant Mortgage Company, Defendant*, United States District Court, Eastern District of New York; Case No. 1:10-cv-02653-KAM-MDG, May 23, 2013.

- Expert Report of Marsha J. Courchane in the matter *of Helen Haymer, Plaintiff v. Countrywide Bank, FSB; Bank of America, N.A.; BAC Home Loans Servicing, LP; f/ka/ Countrywide Home Loans Servicing, LP; Valor Financial Services, LLC; Marilyn J. Cieslak; and John Does 1-5*; *Defendants*, U.S. District Court, Northern District of Illinois, Eastern Division; Case No. 1:10-cv-05910, April 5, 2013.

- Expert Report of Marsha J. Courchane in the matter of *Melinda Smith, Plaintiffs Melinda Smith, Plaintiff v. United Residential Services & Real Estate, Inc.; Mark S. Diamond; Urban Financial Group, Inc.; and John Does 1-5*; Defendants, U.S. District Court, Northern District of Illinois, Eastern Division; Case No. 10-cv-05540, March 20, 2012.

- Expert Report of Marsha J. Courchane in the matter of *Timothy R. Peel and Cheryl G. Peel, Russ Bebout, Michael Sanford and Marilyn Sanford and Desiree McIlrath, on behalf of themselves and others similarly situated, Plaintiffs, v. BrooksAmerica Mortgage Corporation, a California Corporation; Washington Mutual Securities Corp., formerly sued as Doe 1; WAMU Asset Acceptance Corp., formerly sued as Doe 2; Residential Funding Corp., LLC, formerly sued as Doe 3; and Does 4 through 200 inclusive,* Defendants, United States District Court, Central District of California – Southern Division, Case No. 8:11-cv-0079-JST(RNBx), May 9, 2012.

Expert Report of Marsha J. Courchane
February 29, 2024

- CRA Defendants' Joint Expert Report of Marsha J. Courchane in the matter of *William G. Stewart and Nancy Stewart, Plaintiffs v. BAC Home Loans Servicing, LP; Equifax information Services, LLC; Experian Information Solutions, Inc.; and Transunion, LLC, Defendants*, U.S. District Court, Northern District of California; Case No. 10-01225SI, February 1, 2012.

- Expert Report of Marsha J. Courchane in the matter of *David McAnaney, Carolyn McAnaney, John Reilly, Constance Reilly, Philip Russo, and Cynthia Russo individually and on behalf of all others similarly situated, Plaintiffs v. Astoria Financial Corporation, Astoria Federal Savings and Loan Association, Astoria Federal Mortgage Corporation, Loan Island Bancorp, Inc. and Long Island Savings Bank, FSB, Defendants*, US District Court for the Eastern District of New York, Civil Action No. cv-04-1101, January 10, 2010 (Joint with David J. Kogut).

- Expert Report of Marsha J. Courchane in the matter of in *The People of the State of New York by Andrew M. Cuomo, Attorney General of the State of New York, Plaintiffs v. First American Corporation and First American eAppraiseIT, Defendants,* Supreme Court for the State of New York; Index No. 07/406796, September 15, 2010.

- Expert Report of Marsha J. Courchane in the matter of *Ana Ramirez, Ismael Ramirez and Jorge Salazar, on behalf of themselves and all others similarly situated, Plaintiffs v. GreenPoint Mortgage Funding, Inc., Defendants*, US District Court for the Northern District of California; 08-cv-00369-TEH, May 26, 2010.

- Expert Report of Marsha J. Courchane in the matter of *Francisco Rodriguez, Claudia P. Sierra and Emma J. Allen on behalf of themselves and all others similarly situated, Plaintiffs v. Merrill Lynch & Co., Inc.; Merrill Lynch Bank & Trust Co., FSB; Merrill Lynch Mortgage Services Corporation; First Franklin Mortgage Corporation; First Franklin Financial Corporation and Home Loan Services, Inc., Defendants*, US District Court for the Northern District of California; Docket No. C 08-1515-JW (HRL), January 19, 2010.

- Expert Report of Marsha J. Courchane in the matter of *Patrick and Claudia Ansah, Plaintiffs v. Wells Fargo Bank, Defendant,* United States District Court, District of Maryland, Case 8:09-cv-01011-RJM, October 12, 2009.

- Expert Report of Marsha J. Courchane in the matter of *Dewitt Mathis (Civil Action No.1:05-cv-04386-RJD-KAM); Miles McDale and Lisa McDale (Civil Action No.1:05-cv-05362-RJD-KAM); and Charlene Washington (Civil Action No.1:05-cv-05679-RJC-KAM) Plaintiffs v. United Homes, LLC, United; Property Group, LLC, Yaron Herscho, Galitnetwork, LLC, Alliance Mortgage Banking Corp., Joseph D. Gaeta, Marios Sfantos, US Bank, N.A., and XYZ Corporation (said name being fictitious, it being the intention of Plaintiff to designate any Corporation having a legal interest in Plaintiff's mortgages), Defendants,* New York District Court for the Eastern District of New York, April 10, 2009.

- Expert Report of Marsha J. Courchane in the matter of *William A. Harris, Plaintiff, v. Experian Information Solutions, Inc., Defendant*, Case No. Case No.: 6:06-CV-01808-GRA, for Defendants, US District Court, District of South Carolina, Greenville Division, January 5, 2009.

Expert Report of Marsha J. Courchane
February 29, 2024

- Expert Report of Marsha J. Courchane in the matter of *Sylvia C. Cohen, on behalf of herself and all other similarly situated applicants v. JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A., Defendants-Appellees*, US Court for the Eastern District of New York (Docket No. 04-CV-4098 (CPS/RLM), August 28, 2008.

- Expert Report of Marsha J. Courchane in the matter of *Taylor, Bean and Whitaker Mortgage Corporation, Plaintiff, v. GMAC Mortgage Corporation, Defendant*, May 9, 2008, Case No.: 5:05-CV-00260-WTH-GRJ, US District Court, Middle District of Florida, Ocala Division (including Supplemental Report, May 30, 2008, and Supplemental Report in Response to Interrogatories, June 18, 2008).

**Rebuttal reports**

- Expert Rebuttal Report of Marsha J. Courchane, Ph.D. In the Matter of *James M. Smith and Cathlene Y. Banker, Plaintiffs v. CitiMortgage, Inc.; Investors Bank; XYZ Corporation 1-5 and John Does 1-10, Defendants*, United States District Court, District of New Jersey, 2:15-cv-07629 (JLL-JAD), April 18, 2022.

- Expert Rebuttal Report of Marsha J. Courchane, Ph.D., In the Matter of *Fair Housing Center of Central Indiana, Inc., et al., Plaintiff v. Rainbow Realty Group, Empire Holding Corp., Shore Waters Development. LLC, Alley Cat Trust, Sporting Trust, Sunflower Trust, Redskins Trust, and James R. Hotka, Defendants,* United States District Court, Southern District of Indiana, Indianapolis Division, Case No. 1:17-cv-1782-RLM-TAB, May 3, 2019

- Expert Rebuttal Report of Marsha J. Courchane, Ph.D. In the Matter of *In Re Orrin S. Anderson, Debtor and Orinn S. Anderson, A/K/A Orinn Anderson, A/K/A Orinn Scott Anderson, Debtor and Plaintiff, on behalf of himself and all others similarly situated Plaintiff v. Credit One Bank, N.A., Defendant*, United States Bankruptcy Court, Southern District of New York, Chapter 7, Case No. 14-22147 (RDD), Adv. Pro. No. 15-08214 (RDD), September 12, 2017

- Expert Rebuttal Report of Marsha J. Courchane, Ph.D. In the Matter of *Westlake Services, LLC d/b/a Westlake Financial Services, Plaintiffs, v. Credit Acceptance Corporation, Defendant*, Case No. 2:15-cv-07490 SJO (MRWx), United States District Court, Central District of California, Western District, May 5, 2017

- Expert Report of Expert Report of Marsha J. Courchane, Ph.D. In the Matter of *United States of America ex rel., Victor E. Bibby and Brian J. Donnelly, Relators/Plaintiffs v. Wells Fargo Bank, N.A. individually as s/b/m with Wells Fargo Home Mortgage, Inc., et al., Defendant,* United States District Court, Northern District of Georgia, Atlanta Division, Case No. 1:06-cv-547-AT, June 15, 2016.

- Expert Rebuttal Report of Dr. Marsha J. Courchane in the matter of *United States of America, Plaintiff v. Wells Fargo Bank, N.A. and Kurt Lofrano, Defendants*, United States District Court, Southern District of New York, Case No. 1:12-cv-07527 (JMF) (JCF), November 17, 2015.

Expert Report of Marsha J. Courchane
February 29, 2024

- Expert Rebuttal Report of Marsha J. Courchane in the matter of *Jean Robert Saint-Jean, Edith Saint-Jean, Felex Saintil, Yanick Saintil, Linda Commodore, Beverley Small, Jeanette Small and Felipe Howell, Plaintiffs v. Emigrant Mortgage Company, Emigrant Savings Bank-Manhattan, Emigrant Bank, and Emigrant Bancorp, Inc., Defendants*, Case No. 1:11-cv-02122-(SJ)(JO), United States District Court, Eastern District of New York, March 2, 2015.

- Second Rebuttal Report of Marsha J. Courchane in the matter of *Jean-Robert Saint Jean and Edith Saint Jean, Plaintiffs v. Emigrant Mortgage Company, Defendant*, U.S. District Court, Eastern District of New York, Case No. 1:11-cv-02122-SJ, December 21, 2013.

- Expert Rebuttal Report of Marsha J. Courchane in the matter of *Jean-Robert Saint Jean and Edith Saint Jean, Plaintiffs v. Emigrant Mortgage Company, Defendant*, U.S. District Court, Eastern District of New York, Case No. 1:11-cv-02122-SJ, December 10, 2013.

- Expert Rebuttal Report of Marsha J. Courchane in the matter of U.S. Bank National Association, as Trustee, Plaintiff v. Gail Padilla, Francisco Padilla, et al., Defendants v. Wells Fargo & Company, Wells Fargo Bank N.A. a/k/a, Wells Fargo Home Mortgage a/k/a, America's Home Servicing, Counterclaim Defendant, District Court of Tulsa County, State of Oklahoma, Case. No. CJ-2010-5331, September 3, 2013.

- Supplemental Rebuttal Report of Marsha J. Courchane in the Matter of *Denise Minter and Jason and Rachel Alborough and Lizbeth T. Binks, Individually and on behalf of a class of consumers similarly situated, Plaintiffs v. Wells Fargo Bank, N.A., Long & Foster Real Estate, Inc., Prosperity Mortgage Company, Walker Jackson Mortgage Corporation f/d/b/a Prosperity Mortgage Corporation, and Wells Fargo Ventures, LLC, Defendants*, U.S. District Court, District of Maryland, Northern Division; Case No. 07-CV-03442-WMN, June 14, 2012.

- Rebuttal Report of Marsha J. Courchane in the Matter of *Denise Minter and Jason and Rachel Alborough and Lizbeth T. Binks, Individually and on behalf of a class of consumers similarly situated, Plaintiffs v. Wells Fargo Bank, N.A., Long & Foster Real Estate, Inc., Prosperity Mortgage Company, Walker Jackson Mortgage Corporation f/d/b/a Prosperity Mortgage Corporation, and Wells Fargo Ventures, LLC, Defendants*, U.S. District Court, District of Maryland, Northern Division; Case No. 07-CV-03442-WMN, May 31, 2012.

- Rebuttal Report of Marsha J. Courchane in the Matter of *Melinda Smith, Plaintiffs Melinda Smith, Plaintiff v. United Residential Services & Real Estate, Inc.; Mark S. Diamond; Urban Financial Group, Inc.; and John Does 1-5; Defendants*, U.S. District Court, Northern District of Illinois, Eastern Division; Case No. 10-cv-05540, May 10, 2012.

- Expert Rebuttal Report of Marsha J. Courchane in the matter of *Francisco Rodriguez, Claudia P. Sierra and Emma J. Allen on behalf of themselves and all others similarly situated, Plaintiffs v. Merrill Lynch & Co., Inc.; Merrill Lynch Bank & Trust Co., FSB; Merrill Lynch Mortgage Services Corporation; First Franklin Mortgage Corporation; First Franklin Financial Corporation and Home Loan Services, Inc., Defendants*, US District Court for the Northern District of California; Docket No. C 08-1515-JW (HRL), February 10, 2010.

Expert Report of Marsha J. Courchane
February 29, 2024

- Rebuttal Report of Marsha J. Courchane *in Sandra A. Walker a/k/a Sandra Carlisle v. Wells Fargo Bank, N.A., et al.*, US District Court, Eastern District of Pennsylvania (Philadelphia), Case No. 2:05-cv-06666-MAM in support of Wells Fargo Bank, N.A., March 2, 2007.

- Supplemental Rebuttal Report of Marsha J. Courchane in response to Affidavit of Ira J. Goldstein, PhD in *Sandra A. Walker a/k/a Sandra Carlisle v. Wells Fargo Bank, N.A., et. al.,* US District Court, Eastern District of Pennsylvania (Philadelphia), Case No. 2:05-cv-06666-MAM in support of Wells Fargo Bank, N.A., 2007.

**Trial testimony**

- Provided expert testimony in the matter of *Jean Robert Saint-Jean, Edith Saint-Jean, Felex Saintil, Yanick Saintil, Linda Commodore, Beverley Small, Jeanette Small and Felipe Howell, Plaintiffs v. Emigrant Mortgage Company, Emigrant Savings Bank-Manhattan, Emigrant Bank, and Emigrant Bancorp, Inc., Defendants*, Case No. 1:11-cv-02122-(SJ)(JO), United States District Court, Eastern District of New York, May 16, 2019.

- Provided expert testimony (non-binding arbitration) *In the Matter of Noelia Ramirez, Plaintiff v. Bank of America, N.A*.,  Defendant, Circuit Court of the Thirteenth Judicial Circuit, Hillsborough County, Florida, Circuit Civil Division, Case No. 16-CA-722, November 6, 2018

- Provided expert testimony in the matter of *Jean Robert Saint-Jean, Edith Saint-Jean, Felex Saintil, Yanick Saintil, Linda Commodore, Beverley Small, Jeanette Small and Felipe Howell, Plaintiffs v. Emigrant Mortgage Company, Emigrant Savings Bank-Manhattan, Emigrant Bank, and Emigrant Bancorp, Inc., Defendants*, Case No. 1:11-cv-02122-(SJ)(JO), United States District Court, Eastern District of New York, June 23, 2016.

- Provided expert testimony (arbitration) in matter of *Hemisphere Resorts, LLC, Claimant v. IMG Worldwide, Inc. et al., Respondents*, JAMS Arbitration Panel, Reference Number 1340009696**,** February 20, 2014.

- Provided expert testimony in *The People of the State of New York v. First American Corp., New York State Supreme Court, New York County, No. 07-406796 (Ramos, J.),* June/July 2012.

**Other testimony**

Testimony to the US Commission on Civil Rights, on the subject of "The Examination of Civil Rights Issues with respect to the Mortgage Crisis," March 20, 2009.

# EXHIBIT B



**Expert Rebuttal Report**

**Marsha J. Courchane, Ph.D.**

In the Matter of

*In re Wells Fargo Mortgage Discrimination Litigation*

United States District Court, Northern District of California, San Francisco Division

Case No. 3:22-cv-00990-JD

March 22, 2024

*Confidential; Subject to a Protective Order*

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

# Table of Contents

1. Qualifications ................................................................................................... 2

2. Subject of this Expert Rebuttal Report ........................................................... 2

3. Summary of Opinions ...................................................................................... 3

4. Dr. Kurzendoefer's Treatment of the Proposed Classes ................................ 6
   4.1. The Class and Subclasses Proposed in the Amended Complaint ...................... 6
   4.2. The Classes or Subclasses Defined in Dr. Kurzendoerfer's Report ..................... 7
   4.3. Numerosity, Typicality and Commonality ........................................................ 12

5. Dr. Kurzendoerfer's Treatment of the Mortgage Approval Process at Wells Fargo.... 15

6. Dr. Kurzendoerfer's Reliance on HMDA Data ................................................ 19

7. Rebuttal of Dr. Kurzendoerfer's Statistical Analyses .................................... 21
   7.1. Dr. Kurzendoerfer's Underwriting Analysis ..................................................... 21
   7.2. Dr. Kurzendoerfer's Pricing Model ................................................................. 38
   7.3. Quantification of the Class or Sub-Classes Proposed by Dr. Kurzendoerfer .................. 41

8. Rebuttal of Dr. Golubchik ............................................................................. 44
   8.1. Performance of the ECS Model ....................................................................... 46
   8.2. Disparate Impact and Business Justification .................................................... 49

Appendix 1. Documents Considered ..................................................................... 54

Appendix 2: Plaintiff Loan Application Information .............................................. 59

Appendix 3: AUS and HMDA Actions ..................................................................... 61

Appendix 4: National HMDA Denial Rates ............................................................. 64

Appendix 5: Modeled Underwriting Results ......................................................... 65

Appendix 6: Modeled Pricing Results: Examples .................................................. 70

Appendix 7. Reasons for Denial for HMDA Applications with Action Code 3 .................. 72

Appendix 8. Class Counts, Using Dr. Kurzendoerfer's Subclasses ........................ 74

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

## 1.      Qualifications

1.        My name is Marsha J. Courchane.  I am a Vice President at Charles River Associates and the Practice Leader of the Financial Economics Practice.  I have been retained by McGuire Woods, LLP, counsel for Defendants in this action.  I understand that Winston & Strawn LLP is co-counsel to McGuire Woods.

2.        My qualifications were provided in my Affirmative Report in this case, which was filed February 29, 2024.  My current CV was provided in my Affirmative Report.

3.        In forming my opinions for this report, I relied on the sources and documents listed in Appendix 1.  I also relied upon my education, training, academic research, and professional industry experience in the fields of mortgage lending and consumer finance.  I reserve the right to supplement and/or amend this report if additional information or data become available to me.

4.        Charles River Associates bills my time at $985 an hour in 2024.  My compensation is not contingent on the outcome of this matter or my opinions.  Staff in the Financial Economics Practice of Charles River Associates assisted me, at my direction, with this report.

## 2.      Subject of this Expert Rebuttal Report

5.        I submit this rebuttal report in response to the reports filed by Plaintiffs' experts in this matter, at the request of counsel for Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant").  I focus on the reports filed by Dr. Amanda R. Kurzendoerfer and Dr. Leana Golubchik.

6.        The Amended and Consolidated Class Action Complaint ("Amended Complaint") alleges that Plaintiffs Aaron Braxton, Paul Martin, Gia Gray, Bryan Brown, Elretha Perkins, Christopher Williams, Ifeoma Ebo and Terah Kuykendall-Montoya, and other members of the proposed class are "victims of Wells Fargo's pervasive misconduct" in that their mortgage

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

loan applications were systematically delayed or denied because Wells Fargo discriminated against them.  The Plaintiffs allege systematic race discrimination, disparate impact, and redlining.[1]

## 3.      Summary of Opinions

7.       In my opinion, given the classes proposed in the Amended Complaint,[2] neither Dr. Kurzendoerfer nor Dr. Golubchik have demonstrated that Wells Fargo's policies have a discriminatory impact or that Plaintiffs' class claims can be resolved with common answers. The Plaintiffs did not apply for similar products, they did not receive similar responses from Wells Fargo, they were not all evaluated with an AUS system, they were not all denied, and, among those denied, the denial reasons differed among the Plaintiffs.  To determine if any individual Plaintiff in a proposed class was denied unfairly would require individualized analysis.  If unfairly denied, the damages would need to be calculated individually depending on how Plaintiffs compared to similarly situated non-Minority applicants.

8.       I do not find anything in Dr. Kurzendoerfer's report that demonstrates that issues are common among members of either the classes and subclasses defined in the Amended Complaint, or among the alternative classes or subclasses defined in her report, let alone predominate over individual issues, or that Plaintiffs are typical of those classes. Nor is her statistical analysis capable of demonstrating whether any purported class member was harmed.  Rather, it is my opinion that an individualized analysis would be required to resolve each class member's claim, as I explain later in this report.

9.       Dr. Kurzendoerfer's report introduces new class and subclass definitions that were not proposed in the Amended Complaint.  As such, her empirical analyses do not support the allegations for the classes proposed in the Amended Complaint.  For example, the Amended Complaint, ¶160, defines the "Denial Subclass" by aggregating all minority denials

---

[1] Amended Complaint, ¶23.

[2] See *Op. Cit.*, ¶160 (The Denial Subclass) and ¶161 (The Delayed, Higher Rate or Less Favorable Terms Subclass).

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

in the time period who were denied and would have been approved if submitted by a similarly situated non-minority.  Dr. Kurzendoerfer focuses her alternative class definitions only on minority applicants who received what she refers to as an "approve" from an external automated underwriting system or were run through Wells Fargo's internal ECS model and "approved."[3]  The external AUS systems from which she considers "approvals" include Fannie Mae's Desktop Underwriting ("DU") model, Freddie Mac's Loan Prospector model ("LP" or "LPA"), the Federal Housing Administration's ("FHA's") TOTAL Scorecard model, and the USDA's Guaranteed Underwriting System ("GUS").[4]  All of these systems produce a recommendation to a lender, depending on which type of loan product is applied for, but none of them provide automatic approval decisions.  All require additional steps, including but not limited to, meeting documentation and verification requirements.  Hence, in my opinion, Dr. Kurzendoerfer fails to correctly identify loans that were appropriately actioned as approvals or as denials.

10.     While I will discuss other shortcomings of her analysis later in this report, I find that Dr. Kurzendoerfer, when using the alternative class definitions proposed in her report with her most complete statistical model including HMDA and Wells Fargo controls, finds that the disparities for any protected class amount to less than 5.8 percentage points.[5]  Thus, she finds that more than 94% of the AUS "approves" that are ultimately denied were not affected by alleged discrimination.  She does not examine any outliers from her analyses, and she does not engage in any file review, as would be recommended by the financial regulatory agencies to understand why any minorities that were predicted to be approved were denied.[6]

---

[3] While Dr. Kurzendoerfer clearly quotes from documents identifying the purpose of the Enhanced Credit Score as assigning Risk Classes, and determining risk-related messages, she treats applications run through ECS as though ECS made approval decisions at ¶19.  It does not. See also ¶¶85-86.

[4] In her analyses, she states that 45.4% of actioned loans use DU, 35.5% use LP or LPA, 0.5% use TOTAL Scorecard, 0.1% use GUS, and 52.6% use Other or Internal Proprietary System.  See Kurzendoerfer Report, Figure 4, at ¶28.

[5] Kurzendoerfer Report, Figure 34, at 44.

[6] Her underwriting models using HMDA and Wells Fargo variables have Pseudo R-squared values of 0.32 for government, .46 for conventional home purchase, 0.49 for conventional refinance, and 0.44 for conventional,

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

11.     She provides no method for the determination of which of these borrowers were
or were not harmed on the basis of her analysis.  As a result, Dr. Kurzendoerfer's analysis
does not permit the inference that there are issues common to the putative class, issues that
predominate over individual issues, or that Plaintiffs are typical of the putative class.

12.     I also find that Dr. Kurzendoerfer's pricing regression fails to establish any pricing
disparities that would, in my experience, meet a regulatory standard for materiality based on
a violation of the Fair Housing Act or the Equal Credit Opportunity Act ("ECOA").  In addition, I
find that there are significant flaws to her methodology.  These include a lack of reliance of
Wells Fargo's own underwriting guidance for specific loan products and her lack of reliance on
the many explicit rate sheets provided to her by Wells Fargo for the individual years and loan
products she analyzes.  When I modeled more closely Wells Fargo's underwriting processes, I
found very few materially different outcomes among minority and non-minority applicants.
Even these few would require individualized analysis to determine whether the outcomes
were justifiable.  When I used Wells Fargo's rate sheets to conduct a more careful pricing
comparison for conventional, conforming refinance loans or FHA loans in 2022, I found no
statistically significant disparities.

13.     The numerous flaws in both Dr. Kurzendoerfer's underwriting and pricing
analyses highlight her lack of experience with fair lending models and analyses.

14.     I also reviewed the report filed by Dr. Leana Golubchik.  Dr. Golubchik appears to
have a very impressive curriculum vita in her chosen field, but, in my opinion, her report does
not demonstrate that she has sufficient knowledge of mortgage markets, mortgage
underwriting or the standards for evaluating credit scoring models for any evaluation of
alleged disparate impact.  She does not show that the underwriting process at Wells Fargo
suffers from algorithmic bias.  She simply states, in the abstract, that *some* machine learning
models *may* suffer from algorithmic bias.  She fails to mention anything about the business

---

nonconforming.  All of these indicate that less than half of the variance in underwriting outcomes is explained by
her models.  This is exactly why regulators stress the importance of file review.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

justifications that can be raised to mitigate disparate impact risk.  She fails to mention that the HLECSV1Conv model is not used to make any underwriting or pricing decisions at Wells Fargo, a point which Dr. Sudjianto repeatedly states.

## 4.      Dr. Kurzendoefer's Treatment of the Proposed Classes

### 4.1.    The Class and Subclasses Proposed in the Amended Complaint

15.      I understand that the minority groups at issue in this case are Hispanic and non-white applicants for Wells Fargo's mortgage products.  Specifically, the Amended Complaint proposes a class of "similarly situated Wells Fargo residential original purchase mortgage, refinance and other home mortgage loan applicants falling within any one of the ethnic or racial aggregate categories and subcategories set forth in Regulation C (12 C.F.R. 1003), other than White, Not Hispanic or Latino," which they refer to as "Minority Applicants."[7]  The Amended Complaint defines the class as including "all Minority Applicants in the United States who, from January 1, 2018 through the present," meet certain criteria.[8]  The Plaintiffs' focus is on three outcomes comparing Minority Applicants to similarly situated non-Minority Applicants: (1) those denied but who would have been approved if non-Minority; (2) those approved with less favorable terms or at higher interest rates than non-Minorities; (3) those processed at a slower rate than the non-Minority average.[9]

16.      To summarize, Plaintiffs proposed the following class and subclasses in the Amended Complaint:[10]

>    **Class:**  All Minority Applicants in the United States who, from January 1, 2018 through the present (the "Class Period"), submitted an application for a original purchase or other home mortgage loan or to refinance or modify a home mortgage loan through Defendants that was (i) denied; (ii) approved at higher interest rates or subject to less favorable terms as compared to similarly situated non-Minority Applicants; or (iii)

---

[7] Amended Complaint, ¶153. Internal quotation marks omitted.

[8] *Ibid.,* ¶155.

[9] *Ibid*.

[10] Amended Complaint at ¶¶155, and 160-161.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

processed at a rate slower than the average processing time of applications submitted by similarly situated non-Minority Applicants.

**Denial Subclass:** All Members of the Class whose applications were denied but would have been approved had such applications been submitted by similarly situated non-Minority Applicants.

**The Delayed, Higher Rate or Less Favorable Terms Subclass:** All Members of the Class whose applications were (a) processed at a rate slower than that of the average processing time of applications submitted by non-Minority Applicants; or (b) whose applications were eventually approved, but at higher interest rates or subject to less favorable terms than similarly situated non-Minority Applicants.

17.     As defined, identifying members of the Class and two subclasses would require not only a method for re-underwriting and re-pricing the denied applications from and originated loans to minority applicants but also a method for identifying whether there are any non-minority applicants who were both similarly situated in relevant respects related to mortgage underwriting and pricing to each potential class member and received a more favorable outcome than that class member.  As I discuss below, the identification of members of the classes defined in the Amended Complaint and the determination of any harm they may have suffered would, in my opinion, require individualized analysis of each application from minorities and the associated similarly situated non-minorities.  Dr. Kurzendoerfer provides no method for doing so, nor could her regression analyses be the basis for doing so, because the determination of whether a denial was fair, and any harm caused by an unfair denial, would require individualized analysis.

## 4.2.   The Classes or Subclasses Defined in Dr. Kurzendoerfer's Report

18.     Dr. Kurzendoerfer did not conduct any of her analyses in accordance with the proposed classes articulated in the Amended Complaint.  Rather, she states her understanding that the Plaintiffs seek to represent three other classes or subclasses of minority applicants who applied for a Wells Fargo mortgage loan product between January 1, 2018, and December 31, 2022, and her analysis focuses on the newly defined alternative classes or subclasses.  She states that "Plaintiffs allege that Wells Fargo disproportionately

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

denied minority applicants on account of their race or ethnicity."[11] The classes or subclasses she defined are:[12]

**Refinance:** All refinance minority applicants approved by an external automated underwriting system (AUS) or Wells Fargo's Enhanced Credit Score (ECS) model, but who were ultimately denied.

**Home purchase:** All home purchase minority applicants approved by an external AUS or Wells Fargo's ECS model, but who were ultimately denied.

**Home equity line of credit (HELOC)**: All home equity line of credit minority applicants approved by Wells Fargo's AUS for home equity products, but who were ultimately denied.

19.     The three newly defined alternative subclasses each require that an applicant was "approved" by an external AUS system or by Wells Fargo's ECS model, and then was ultimately denied (regardless of the reason for denial or validity of that underwriting decision).  Compared to the classes proposed in the Amended Complaint, these alternative classes or subclasses exclude any minorities whose applications were approved (among other differences), rendering moot Plaintiffs' allegations regarding loan pricing and Dr. Kurzendoerfer's pricing regression analysis.  The alternative class and subclasses also exclude the "Delayed, Higher Rate, and Less Favorable Terms subclass" entirely.

20.     While Dr. Kurzendoerfer also states her understanding that "Plaintiffs may seek to represent classes pursuant to Federal Rule of Civil Procedure 23(b)(2) (injunctive and restitutionary relief) and/or 23(c)(4) (liability),"[13] her report includes no analysis of any such hypothetical additional classes.

21.     As defined, the alternative classes would include only three of the eight named Plaintiffs referenced in the Amended Complaint:  Bryan Brown, Elretha Perkins, and Terah Kuykendall-Montoya.  As shown in Table 1 below, none of the named Plaintiffs who had

---

[11] Kurzendoerfer Report, ¶6, at 2.

[12] *Ibid*.

[13] *Ibid*., ¶7.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

withdrawn or had incomplete applications would be part of any one of her defined subclasses (thereby excluding Ifeoma Ebo, Paul Martin, and Christopher Williams).  In addition, Aaron Braxton would not be a member of the alternative classes because he was evaluated for a loan modification and was not evaluated by an AUS.  Gia Gray would not be a class member because she received her requested primary residence refinance loan from Wells Fargo and never submitted applications to refinance her investment properties.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| Table 1. Action Taken and AUS Results for Named Plaintiffs' Applications | | | | | | | |
|---|---|---|---|---|---|---|---|
| Name / Application Date | Action Taken | Reason(s) for Denial | AUS System 1 - Result 1 | AUS System 2 -Result 2 | AUS System 3 -Result 3 | AUS Result Other | Risk Class |
| Braxton | Not Applicable: Loan Modification Approved | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | N/A |
| Brown 10/17/2020 | Denied | Debt-to-Income Ratio | Other - Internal | DU - Approve/ Ineligible | LP or LPA - Caution | OTHER-A2 | A2 |
| Ebo 10/27/2021 | Withdrawn | Not Applicable | TOTAL - Accept | Not Applicable | Not Applicable | Not Applicable | G1 |
| Gray 2/4/2020 | Withdrawn | Not Applicable | Other | Not Applicable | Not Applicable | OTHER-A1 | A1 |
| Gray 3/4/2020 | Originated | Not Applicable | Other | Not Applicable | Not Applicable | OTHER-A1 | A1 |
| Gray | Not Applicable: No Application | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | N/A |
| Gray | Not Applicable: No Application | Not Applicable | Not Applicable | Not Applicable | Not Applicable | Not Applicable | N/A |
| Kuykendall-Montoya 7/27/2021 | Denied | Product/ Program Not Available; Credit History | Other - Internal | DU - Out of Scope | Not Applicable | OTHER-C2 | A2 |
| Martin 3/26/2020 | Withdrawn | Not Applicable | Internal AUS-HEQ | Not Applicable | Not Applicable | OTHER-MANUAL REVIEW | |
| Perkins 9/14/2021 | Denied | Credit Application Incomplete | Other - Internal AUS | DU - Approve/ Eligible | LP or LPA - Accept | OTHER-A2 | A2 |
| Perkins 12/13/2021 | Denied | Credit History; No Benefit to Borrower | Other – Internal AUS | DU - Approve/ Eligible | LP or LPA - Accept | OTHER-A2 | C1 |
| Williams 5/30/2019 | Withdrawn | Not Applicable | Other – Other HE | Not Applicable | Not Applicable | APPROVAL RECOMMENDED | G45[14] |

---

[14] This value is from Dr. Kurzendoerfer's use of cr_grade_cd, from the home equity model.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

22.　　　With respect to the other three named Plaintiffs (Brown, Perkins, or Montoya), as I stated in my Affirmative Report, neither an AUS "accept" or "approve" recommendation nor a risk class assignment of "A1" or "A2" from Wells Fargo's ECS model is sufficient for a loan to be approved.[15]  AUS decisions merely represent one step in a detailed underwriting process.  There are substantial additional requirements for approval, including verifications of income and employment and complete documentation that meet the standards of the secondary mortgage market, including Fannie Mae and Freddie Mac ("the GSEs") and FHA. Thus, an assumption that Plaintiffs were discriminated against because they received an AUS "accept" and were then denied, is completely without merit.  In fact, including all applicants regardless of race/ethnicity, for conventional, conforming refinance loan applications, only 60.5% of applications processed through DU received an approve/eligible recommendation and were ultimately approved, while only 55.7% of applications evaluated by LP/LPA received an approve/eligible recommendation and were approved.  For conventional, conforming, home purchase loan applications, 78.1% of applications evaluated by DU and 72.8% of applications evaluated by LP/LPA received recommendations of approve/eligible and were approved.

23.　　　The fact that non-minority borrowers with an AUS "accept" were denied necessarily means that the denial of an application with an AUS "accept" is not a sufficient basis either for concluding that discrimination occurred or for defining a class of applicants who suffered discrimination.

24.　　　Further, it is unclear how Dr. Kurzendoerfer would identify which minority borrowers would belong to a class or subclasses of allegedly harmed minority applicants.  In my opinion, they would have to engage in extensive individualized loan file reviews, as I conducted for the named Plaintiffs,[16] to determine whether the denials that did occur were justified or improperly denied.

---

[15] See Appendix 3, Tables A3.1 and A3.2.

[16] See Section 10 of my Affirmative Report.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

### 4.3.    Numerosity, Typicality and Commonality

25.      I analyzed whether Dr. Kurzendoerfer's analysis shows that the class is numerous, that issues common to the class are capable of generating common answers that are apt to drive the resolution of the litigation, whether these predominate over individual issues, and whether Plaintiffs are typical of the class.

26.      With respect to numerosity, given it is unclear which class definition would be employed, this cannot yet be quantified.  If the class proposed in the Amended Complaint includes all minorities who applied to Wells Fargo for mortgage loan products from 2018 to the present who were denied but would have been approved if non-minority or who received a mortgage loan with less favorable terms, or after longer processing times, the empirical work provided by Dr. Kurzendoerfer is insufficient to determine a class size as she does not consider these classes in the formulation of her models.  With respect to the alternative class definitions proposed in Dr. Kurzendoerfer's report, her class size estimates are insufficient to identify minority borrowers who were improperly denied or harmed in some way.  I discuss more fully her analyses later in this report.

27.      My detailed review of the individual named Plaintiffs' loan files emphasizes the significant dissimilarities in the proposed class that could not be resolved based on common evidence.  Rather, individual inquiry would be required to determine whether any Plaintiff or putative class member was improperly denied or harmed.  Even a review of the basic facts pertaining to the eight named Plaintiffs, as shown in Appendix 2, and discussed in my Affirmative Report[17] shows that the facts and circumstances varied considerably across the Plaintiffs, and I found no evidence that Wells Fargo's actions with respect to the named Plaintiffs resulted from discrimination or was based on a common policy.  Further, Dr. Kurzendoerfer provides no alternative way of assessing liability or damages without such individualized inquiries.

---

[17] Courchane, Affirmative Report, filed 02/29/2024.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

28.      Further, my analysis showed the important role of the borrower in determining the ultimate disposition of a mortgage application.  Aaron Braxton was approved for a permanent loan modification; Paul Martin withdrew his application because he wanted a higher appraisal value than obtained from Wells Fargo's third party appraiser, even though Wells Fargo conditionally approved his HELOC application and the appraisal obtained was sufficient to support his requested loan amount; Gia Gray's refinance application was approved[18] and she did not apply for the investment property loans as alleged in the Complaint; Bryan Brown had issues with income verification and was denied because of an excessive debt-to-income ("DTI") ratio based on the income that could be verified; Elretha Perkins' application did not meet the net tangible benefit test[19] and she had recent delinquencies, which led to a denial for credit history reasons; Christopher Williams was conditionally approved, but a disputed collection account on his Equifax credit report adversely affected his credit score, resulting in higher pricing on his HELOC than he wished, leading him to withdraw his application; Ifeoma Ebo could not fully provide the required income verifications in a timely manner, which resulted in her withdrawing her application when her home purchase contract was cancelled; and the Montoyas had a recent bankruptcy, which prevented them from obtaining a conventional refinance loan at the time they applied. Hence, some of the Plaintiffs were not even denied, and it is unclear how their claims could be settled with a common resolution.  Even for those who were denied, an individualized analysis was required to understand why the denial was proper.

29.      Dr. Kurzendoerfer does not suggest any common issues among the members of the subclasses presented in her report, nor does she show that common issues predominate

---

[18] See Complaint, at ¶38.

[19] See, for example, Department of Housing and Urban Development, Handbook 4000.1, available at: https://www.hud.gov/sites/dfiles/OCHCO/documents/4000.1hsgh-080923.pdf, at 455, describing net tangible benefit requirements on FHA streamline loans.  VA loans also have net tangible benefit tests, as do some states and lenders.  See, for example, Docutech, Net Tangible Benefit Matrix, February 2018, https://compliance.docutech.com/wp-content/uploads/sites/2/2018/03/Net-Tangible-Benefit-Matrix-2018.02.pdf, last accessed 03/20/2024.  Net tangible benefits may include lower monthly payments, lower interest rates, conversion of adjustable rate to fixed rate mortgages, removal of mortgage insurance payments, or cash out, for example.  Assessing net tangible benefits in mortgage lending arose from concerns that loans not be predatory.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

among the subclass members which could be resolved with a common methodology.  She does not restrict her subclasses to similarly situated applicants and includes many different loan products, which are subject to different underwriting guidelines, in each subclass.  For example, she aggregates conventional conforming loans, conventional non-conforming loans, and FHA and VA loans into a single home purchase class, and into a single refinance class, depending on loan purpose only.

30.    Plaintiffs assert that the facts underlying their claims are typical of the facts underlying the claims of all members of the proposed class.  I do not find Plaintiffs to be typical of the class even with respect to the loan origination decision.  Among the named Plaintiffs, two were approved or conditionally approved (Braxton and Williams).  Gia Gray was approved for a refinance loan she does not complain about and never applied for the two investment property loans she does complain about. Others withdrew (Martin, Williams, Ebo).  While three Plaintiffs were denied, they were denied for completely different reasons.  Mr. Brown was denied for an excessive "DTI" ratio, Ms. Perkins due to credit delinquency and not meeting the net tangible benefit test, and the Montoyas due to recent bankruptcy.  Dr. Kurzendoerfer does not show that the claims of the three denied Plaintiffs are typical of the classes or subclasses, however defined.  And, as I explained in my Affirmative Report, all those outcomes were legitimate and non-discriminatory, so they cannot be taken as typical of every minority applicant denied after receiving a favorable AUS result.

31.    In my opinion, to determine whether the actions with respect to the Plaintiffs were justified or unfairly discriminatory involves significant individualized inquiries, which predominate over any common issues that may be raised.  Dr. Kurzendoerfer fails to determine whether denials were justified for reasons other than discrimination.  There is no commonly applied Wells Fargo policy that Dr. Kurzendoerfer has shown to be discriminatory.

32.    Dr. Kurzendoerfer never analyzes any alleged processing delays, nor do any of the Plaintiffs' experts discuss how they could assess whether unreasonable delays occurred because of actions by Wells Fargo or due to failure of the Plaintiffs to provide documentation

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

such as income or employment verifications.  It is unclear how these claims could be examined with common evidence without individual issues predominating.

33.    With respect to the class action claims pertaining to pricing, among the eight named Plaintiffs, I observed applications for a purchase money loan (Ebo), refinances (Williams), an FHA loan (Ebo), conventional loans (Brown, Perkins, Montoya), home equity loans (Braxton, Martin, Williams) and a loan modification (Braxton), and most of the named Plaintiffs have not even asserted a pricing claim (nor could they unless their loan was approved and originated).  As I discussed in Section 5.2 of my Affirmative Report,[20] each different loan product has completely different pricing schedules and the analysis of all Plaintiffs using a single model specification, even when applied to different segments, as done by Dr. Kurzendoerfer, is completely misguided.  Given these results, I do not see how Dr. Kurzendoerfer's analyses meet a commonality or typicality requirement with respect to pricing.  Rather, she has shown that any pricing disparities, even using her flawed regression analysis, are so modest as to not meet a typical regulatory standard for proving pricing discrimination.[21]

34.    Further, only Gia Gray received an originated loan that was priced, and she did not allege pricing discrimination or anything else that was problematic with that loan.  The only pricing discrimination allegation is for Mr. Williams, and he did not accept Wells Fargo's loan offer.

## 5.    Dr. Kurzendoerfer's Treatment of the Mortgage Approval Process at Wells Fargo

35.    As I detailed in Section 5.1 of my Affirmative Report, the underwriting process for a mortgage loan is very detailed.  Even when AUS risk assessments are made, this is only

---

[20] Courchane Affirmative Report, at 24–29.

[21] While the federal financial regulators do not publicly disclose thresholds for pricing disparities that they consider to be actionable, in my experience they have not generally referred any pricing matters to the Department of Justice when the disparity is less than five basis points.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

one step in the process toward decisioning a loan application.  All three of Dr. Kurzendoerfer's subclasses depend on an applicant receiving an AUS "approval," whether external or internal, but being denied, regardless of whether this is any indication of a wrongful denial.  As Dr. Kurzendoerfer notes, Wells Fargo relies in part on a Risk Engine that houses several business services, including one referred to as the "Get Risk Decision" or GRD.[22]  For underwriting agency loans, for example, the GRD calls external AUS Engines - DU, LPA, TOTAL - and calculates an internal risk score (ECS).  The external AUS Engines deliver risk categories of Accept, Refer, or Ineligible.  The GRD uses the ECS model and converts the DU and LPA Response to a credit risk class ("CRC") of A1/A2, or C1/C2, for example, and also determines eligibility by assessing LTV, minimum credit score requirements, exceptions, and other items.  It then sends one of five types of messages to its CORE system:[23]  actionable risk, risk insight (*e.g.*, look at credit report), stipulations (*e.g.*, get a W2), informational (*e.g.*, escrow for taxes and insurance) or ineligible risk.  This accords with the deposition testimony of Dr. Sudjianto, who repeatedly noted that the ECS model (also referred to as HLECSV1Conv (Model 11960)) is used to rank order applications and to send messages to identify factors that the credit underwriter needs to look for.[24]

36.    Wells Fargo's Risk Engine uses the AUS agency risk assessments and the Wells Fargo risk view, along with agency policy eligibility rules to provide a consolidated findings result to an underwriter.[25]  In addition to that information, however, the underwriter also looks at eligibility rules for products and pricing, minimum credit score requirements, agency documentation requirements, agency stipulations, any negotiated terms in the DU or LP

---

[22] Kurzendoerfer Report, at ¶17.  See WF-00010680, at 8.

[23] I discussed the CORE system in my Affirmative Report, ¶57, stating that "CORE stands for "Common Opportunities, Results, and Experiences" and, per the glossary in the overview of the Wells Fargo underwriting process, CORE is a "[d]ynamic web-based system that allows Wells Fargo Home Lending team members to process a loan from origination to funding."

[24] Sudjianto Deposition, at 18:22-19:14; 42:5-7; 44:22-45:5; 47:15-48:7, among others.

[25] See WF-00010680, at 1-10, cited in Kurzendoerfer Report, at 7, for example.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

contracts with Wells Fargo, any policy overlays and additional seller/servicer requirements. All of this is detailed in the Risk Engine/GRD overview cited by Dr. Kurzendoerfer.[26]

37.     Dr. Kurzendoerfer provides several figures and conclusions concerning the classification of applicants to credit grades using Wells Fargo's proprietary ECS and home equity products.  She analyzes the classifications and "approval" rates by race and ethnicity, asserting that, "My analysis of Wells Fargo's classification of White and minority applicants in terms of credit risk using Wells Fargo's proprietary ECS and home equity models shows that minority applicants are more likely to be classified into credit risk classes or credit grades with lower approval rates.[27] When assigned to a lower credit risk class or credit grade, minority applicants are approved at lower rates than White applicants."[28]

38.     From this data, she provides distributions of the CRC classification and approval rates by race and ethnicity for applications for conventional home mortgages,[29] non-conventional home mortgages,[30] and home equity loans.[31] She concludes that "My analysis also shows that the Wells Fargo ECS models and AUS for home equity products are more likely to disproportionately assign minority applicants to credit grades associated with lower approval rates. Conditional on being assigned to lower credit grades, minority applicants are also less likely to be approved than White applicants."[32]  She does not provide any tests of statistical significance for any of these differences, nor does she report any differences after

---

[26] *Ibid.,* at 3.

[27] To determine her counts and credit grades, Dr. Kurzendoerfer uses the Wells Fargo variables ds_risk_class_o, (DS Risk Class) which pertains to the ECS model and cr_grade_cd (CR Credit CD), which pertains to the home equity product. (See WF-00010494: GAIP-GRD-RequestResponse– Row 558).

[28] Kurzendoerfer Report, at 5, ¶10.

[29] *Ibid.*, Figure 10, at 22, ¶¶48-49.

[30] *Ibid.*, Figures 14, 15, at 24, ¶¶52-53

[31] Figures 16, 17, at 25, ¶¶54-55

[32] *Ibid.*, 46, ¶89.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

attempting to control for the effects of legitimate, non-discriminatory considerations in the underwriting processes at Wells Fargo.

39.     As with her analyses that include disparities that control for no borrower or loan characteristics, or for HMDA only borrower or loan characteristics, these conclusions based on the raw ECS and Home Equity AUS data do not and cannot support any finding of discrimination.[33]

40.     The ECS score information is not used by Wells Fargo to automatically decision loans.  In its ECS model Annual Review Report, Q1 2022, Wells Fargo clarifies that "The HL-ECS score is not displayed to underwriter.  The HL-ECS score is not used to disqualify an applicant; it is used to establish the associated credit risk and the underwriter level required to evaluate the application.  No automatic approval or denial are done using the HL-ECS score."[34]

41.     As I discussed in Section 4.5 of my Affirmative Report, even when an AUS is used, the mortgage underwriting decision is not automated, nor determined by only the AUS recommendations and results.  Part of what the AUS system provides to the lender is a list of various conditions that an approval is subject to, such as satisfactory verification of income, employment, funds to close and aspects of credit history, among others.  The alternative class/subclass definitions Dr. Kurzendoerfer employs ignore all these conditions, treating an AUS result of Approve or Accept or an ECS Risk Class of A1 or A2, as though it is eligible to be an originated loan.  This is erroneous.

42.     Furthermore, she explicitly includes applications with Fannie Mae's Approve/Ineligible and Freddie Mac's Accept/Ineligible recommendations as though they are

---

[33] I use the term "raw" to indicate an absence of any explanatory controls.

[34] See Annual Review Report, HL Conventional Orig Custom ECS Score, Q1 2022, WF-03775099, at 6.  Also see WF-03775112 (annual report at 14), when discussing reliance for business use – "The score is not used for automatic accept/decline decisions and is not displayed to the underwriter.  The risk class (mapping of the score) and the Risk Insight Messages are displayed to assist underwriters in their process."

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

"approvals" for the purpose of her class definitions when those AUS results indicate that the loan would be ineligible for purchase by those GSEs.

43.　　　Moreover, the criteria Dr. Kurzendoerfer uses to define the newly proposed subclasses apply to an even larger set of non-minority applicants than to minority applicants. As shown in Appendix 8, Table A8.2, a large number of applications that Dr. Kurzendoerfer treats as having an AUS "approve" or "accept" decision were declined.  This included both non-Hispanic whites and minorities.  For each category of loan product, as shown in this table, the count of non-Hispanic whites with an AUS "approved" recommendation who were denied exceeds that of the minorities with an AUS "approved" recommendation, who were denied.

## 6.　　Dr. Kurzendoerfer's Reliance on HMDA Data

44.　　　Since 2004, when pricing data became available in the HMDA data, the Federal Reserve Board (until 2011) and then the CFPB provided annual reports discussing any observed racial disparities in underwriting and pricing based on the HMDA data.  The data was much more limited in the period before 2018 (the start of the proposed class period) but reviewing the findings over time can shed light on why HMDA data alone cannot be used to reach a finding of discrimination in either underwriting or pricing.

45.　　　The HMDA data contain various information on mortgage loan applications and originations.  However, not all information collected and reported by the financial institution for the purposes of either underwriting or pricing is publicly available.  For example, application date, action taken date, credit score, and automated underwriting system results are not made publicly available to protect the privacy of individual mortgage applicants and borrowers.[35]  Similarly, debt-to-income ratio is partially redacted to limit disclosure of

---

[35] These data are, however, in the datasets provided to Plaintiffs by Wells Fargo.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

personal information.  Those fields are typically requested, however, when examining an institution for fair lending compliance.

46.      While HMDA data can be used to examine outcomes for individual lenders with respect to denial rates, average pricing, types of products, and many other related characteristics in general terms, because the HMDA data provides only a limited set of factors related to underwriting and pricing of residential loans and does not include many of the detailed loan and borrower characteristics that are factored into lender, GSE, or agency underwriting and pricing guidelines, the HMDA data alone cannot be used to draw conclusions regarding lending discrimination.  As stated in a 2006 Federal Reserve Board article, "The unexplained differences may stem from credit related factors not available in the HMDA data, such as measures of credit history, LTV and DTI ratios, and differences in loan products.  Differential costs of loan originations may also bear on the differences in pricing."[36] Because a finding of discrimination requires comparisons of similarly situated individuals, the lack of complete information about the loan product or the borrower prevents such conclusions from being drawn.

47.      The same conclusions are found with respect to other HMDA years.  Disparities in national HMDA-based denial rates among African Americans, Hispanics, and non-Hispanic Whites are summarized in Appendix 4.  These disparities persist over every year, and because the HMDA data lacks explanatory variables that might explain the observed disparities, the HMDA results alone cannot be used to infer discrimination.  Thus, the models which Dr. Kurzendoerfer offers that are based only on Wells Fargo's HMDA data are insufficient for demonstrating discrimination on the part of Wells Fargo.  As shown in Appendix Table A4.1, the examination of HMDA data in any given year indicates disparate outcomes between non-Hispanic whites and minority groups.

---

[36] Avery, Robert, Kenneth P. Brevoort and Glenn B. Canner, "Higher Priced Home Lending and the 2005 HMDA Data," Revised September 18, 2006, *Federal Reserve Bulletin*, A123 – A166, at 164.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

## 7.    Rebuttal of Dr. Kurzendoerfer's Statistical Analyses

48.      As discussed in my Affirmative Report,[37] fair lending statistical analyses rely on regulatory guidance issued by the Federal Financial Examination Council members.  The Federal Financial Institutions Examination Council ("FFIEC") published revised interagency fair lending examination procedures in 2009.[38]  The OCC published the most recent version of its Comptroller's Handbook for Consumer Compliance, focusing on fair lending supervision of national banks, in January 2023.[39] With these supervisory guidance manuals, the regulatory agencies also discuss the appropriate methodologies to use for the evaluation of potential discrimination risk in underwriting and pricing decisions by mortgage originators.

49.      Dr. Kurzendoerfer seems to ignore completely fair lending regulatory guidance. There are myriad issues with Dr. Kurzendoerfer's analyses.  I first discuss issues with her underwriting model and then turn to her pricing model. I then discuss Dr. Kurzendoerfer's method for quantifying class size.

### 7.1.    Dr. Kurzendoerfer's Underwriting Analysis

50.      As mentioned in my Affirmative Report, the OCC, FRB, and other regulatory agencies rely, in part, on statistical analysis of the HMDA data and additional data (often referred to as "HMDA+" data) to evaluate the extent to which any observed underwriting disparities are attributable to legitimate factors observable in available data.[40]  Typically, underwriting analyses will employ a logistic analysis to estimate the likelihood that a

---

[37] Courchane Affirmative Report, at ¶¶92-93.  See also Bhutta, *et. al.*, 2017.

[38] FFIEC, *Interagency Fair Lending Examination Procedures*, August 2009, available at: https://www.ffiec.gov/pdf/fairlend.pdf , last accessed 02/28/2024 and Appendix, available at: https://www.ffiec.gov/pdf/fairappx.pdf, last accessed 02/28/2024.  These guidelines applied to financial institutions regulated by the OCC, the Federal Deposit Insurance Corporation, the FRB, the Office of Thrift Supervision (which was merged into the OCC), and the National Credit Union Association.  Unless updated by the individual agency, they still apply.

[39] OCC, *Comptroller's Handbook: Consumer Compliance: Fair Lending (Version 1.0)*, January 2023, available at: https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/fair-lending/pub-ch-fair-lending.pdf, last accessed 02/28/2024.

[40] Courchane Affirmative Report, at ¶95.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

borrower is accepted or denied for a particular loan product given the loan product requested and their relevant credit and loan characteristics.  In addition, they will customarily conduct file reviews among matched applicants who appear to be similarly situated based on the available data when underwriting or pricing outcomes may differ from statistical model predictions.[41]  The statistical analyses used by the regulatory agencies will be developed for each financial institution based on its own internal underwriting and pricing guidelines.

51.     The *FFIEC Fair Lending Examination Procedures*, August 2009, also state that: "Scoping may disclose the existence of circumstances -- such as the use of credit scoring or a large volume of residential lending -- which, under an agency's policy, call for the use of regression analysis or other statistical methods of identifying potential discrimination with respect to one or more loan products."[42]

52.     To analyze underwriting outcomes for a lender's mortgage lending activity, regulators typically develop standard logistic models with a binary dependent variable taking the value of 1 for a denied application and the value of 0 for an approved application.  Approved applications include both originated loans and applications approved but not accepted by the applicant.  The objective of such statistical analysis is to evaluate whether a disparity in denial rates in the raw HMDA data can be explained by differences in credit qualifying characteristics and loan parameters among applicants that are readily available in the lender's data. This analysis typically excludes applications that were withdrawn by the applicant or closed due to being incomplete because such applications did not receive a credit decision and generally were cancelled because of the credit applicant's action or failure to act.

53.     The explanatory variables included in these denial rate regressions include various categorical variables representing applicant and loan characteristics considered by the lender during the underwriting process and recorded in the lender's electronic data.  As

---

[41] *Op. Cit., Interagency Fair Lending Examination Procedures: Appendix*, at 12.

[42] *Op. Cit.*, at 1.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

stated in the CFPB's Mortgage Market Activity Trends Report for 2018, "When examiners for the federal banking agencies evaluate an institution's fair lending risk, they analyze HMDA price data, loan application outcomes, and explanatory factors, in conjunction with other information and risk factors which can be drawn directly from loan files or electronic records maintained by lenders, as directed by the *Interagency Fair Lending Examination Procedures* (available at https://www.ffiec.gov/PDF/fairlend.pdf)."[43]  The explanatory variables are selected based upon a review of a given lender's specific underwriting guidelines, along with typical investor guidelines.  For example, whether loans are ineligible to be sold to the GSEs or will provide a net benefit to borrowers will have an impact on underwriting decisions.

54.      Dr. Kurzendoerfer bases her class definitions on the outcomes from AUS systems.  For conventional, conforming home purchase or refinance loans, she focuses on Fannie Mae's DU, Freddie Mac's LP or LPA, and Wells Fargo's ECS.  I have described the DU and LP AUS systems in my Affirmative Report.[44]  Dr. Kurzendoerfer describes Wells Fargo's Conventional Model – HLECSV1 CON (model number 11960) as the "internal" AUS model.[45]  This model generates an acquisition credit risk score for borrowers applying for both a conventional first-lien loan and, when needed, a simultaneous 2nd home equity loan.[46]  The model provides an objective and numerical evaluation of the applicant's credit risk, with higher scores indicating lower risk.  The score determines a Wells Fargo Risk Class (CRC) with four categories:  A1 (250 – 333), A2 (220 – 249), C1 (200 – 219) and C2 (76 – 199).[47]  The score

---

[43] CFPB, Data Point: 2018 Mortgage Market Activity Trends, August 2019, available at: https://www.consumerfinance.gov/data-research/research-reports/data-point-2018-mortgage-market-activity-and-trends/, last accessed 03/12/2024, at footnote 44, at 40-41.

[44] Courchane Report, at 13.

[45] Kurzendoerfer Report, at 46.

[46] See HL Conventional Orig Custom ECS Score (Model Number 11960), Fair Lending Business Justification, WF-00632434 – WF-00632454.  This was sent from the Business to FLA on 9/21/2022.  The ECS model is not used to make an approval decision, but only to assign a risk score.

[47] An update in policy (CAP 11719290) no longer sent applications with C1 and C2 classes to manual underwriting after 09/19/2020 (WF-00035253).  In addition, loan applications received after 07/17/2021 that had recommendations based only on ECS credit risk class, with Cautions or Refers from DU and LPA, were no longer saleable to Fannie Mae (WF-00035367).

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

is not and was not, over the time period of the Amended Complaint, the sole basis used for approvals, as all underwriting decisioning must go through an underwriter.  It is "one of many factors used when underwriting a loan such as the customer's credit score (FICO), payment history, income/employment, assets, collateral, loan terms, etc."[48]  As I have noted, the CRC results in risk messages that assist the underwriter in focusing their underwriting evaluation.

55.      For government loans, such as FHA loans, Dr. Kurzendoerfer depended on the outcomes from FHA's TOTAL scorecard.  For USDA loans (although very few in number), she used the USDA's GUS outcome.

56.      The HMDA data allow mortgage lenders to list multiple AUS systems and results used for underwriting a loan application.  In Wells Fargo's HMDA data, up to three of these would be specified.[49]  The determination of the "hybrid CRC," which is used in underwriting an application, and the determination of the Decision Engine Name of Record follows a "hybridization" process described in Wells Fargo's Risk Engine External Strategies.[50]

57.      None of the AUS results used by Dr. Kurzendoerfer to define the alternative class or subclasses are sufficient to determine the ultimate approval or denial of any individual loan.  As I discussed in my Affirmative Report,[51] these AUS results offer information to a mortgage lender relating to whether the sale of the loan, for example, to the government sponsored enterprises (or "GSEs") would relieve the lender of the requirement to provide the secondary market with representations and warranties about the underlying credit quality of the loan.  There are many other conditions that also must be met to sell the loan, including meeting all the documentation requirements set by the secondary market.  Regardless of

---

[48] *Op. Cit.* HL Conventional Orig Custom ECS Score (Model Number 11960), Fair Lending Business Justification, at 1, WF-00632436.

[49] See Appendix Table A8.2 for the listing of AUS systems reported in Wells Fargo's HMDA data.

[50] Risk Engine External Strategies, September 2022, WF-04846664-04846681, at WF-04846675.  It notes that "DU is favored over LPA when both are approve/eligible."  If DU is not eligible, but LPA is, then LPA is chosen.  If DU and LPA are both ineligible, then Wells Fargo sets the hybridized CRC to C2.

[51] Courchane Affirmative Report, at 13.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

whether a loan receives an "accept," if the documentation required is not provided, the loan is not eligible for sale.  Dr. Kurzendoerfer fails to correctly model the actual approval or denial process implemented for mortgage loan originations at Wells Fargo.  Further, AUS are not automatic decision systems for loan approvals.  As I stated in my Affirmative Report, regardless of whether the loans are agency mortgages, government mortgages (FHA or VA) or non-conforming mortgage products, ***there is no automated underwriting system used by Wells Fargo, or, in my experience, in the rest of the industry, that provides an automatic approval or denial to a mortgage loan application.***

58.      The applications with an Accept/Ineligible or Approve/Ineligible AUS result reflect the failure of the applications to meet the many other underwriting requirements, such as documentation, or collateral, or reserves, or employment and income verification that must be met for the loan to be saleable to a GSE.  Without meeting these requirements, the loan will be denied, and these denials are not reflective of discrimination.  Several examples of GSE Ineligible messages returned from DU/LPA are provided in Wells Fargo's Risk Engine External Strategies document.[52]

59.      The vast majority of applications that received an ineligible or out of scope message were denied.  The categorizations of outcomes from AUS systems, with HMDA action codes (Approved, Approved but not Accepted, or Denied) are shown in Appendix 3, Table A3.1.[53]

60.      Dr. Kurzendoerfer models her underwriting analysis in terms of White approval rates compared to each minority approval rate, reversing the typical denial analyses conducted by fair lending examiners.   She uses a standard binary logistic model, which takes on zero values for denials and values of "1" for approvals (based on HMDA action codes).  As

---

[52] *Op. Cit.*, Risk Engine External Strategies, September 2022, WF-04846672.  The document asserts there are approximately 160 such messages from DU.

[53] While Dr. Kurzendoerfer excludes loans with HMDA action codes indicating incomplete applications or withdrawals, she does include loans with denial reasons indicating incompleteness of the application (see Appendix Table A7.1).

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

well understood by regulatory agencies, neither models using only protected class controls, nor models using only HMDA controls are sufficient for inferring discriminatory outcomes.[54] As stated by Julie Stackhouse, executive vice president and officer-in-charge of supervision at the St. Louis Federal Reserve,

> "HMDA Data Just a Starting Point:  While HMDA data provide a useful start in assessing lending practices, the data alone do not prove discrimination. If HMDA data trigger concern, bank examiners conduct a comprehensive review, including an in-depth statistical analysis. The statistical analysis looks for legitimate credit underwriting factors, such as minimum credit scores and maximum debt-to-income ratios. If statistically meaningful disparities exist after these data are considered, the examiner will then complete a detailed and exhaustive investigation. ***The investigation includes lender interviews, physical loan file reviews and data verification and validation. It is rare for examiners to find discrimination after this exhaustive analysis***."[55] [emphasis added]

61.     This approach is echoed in an FRB Bulletin article by Bhutta et.al, 2017,[56]

> "When examiners for the federal banking agencies evaluate an institution's fair lending risk, they analyze HMDA price data and loan application outcomes in conjunction with other information and risk factors that can be drawn directly from loan files or electronic records maintained by lenders, as directed by the Interagency Fair Lending Examination Procedures. The availability of broader

---

[54] See, for example, FFIEC, *Interagency Fair Lending Examination Procedures*, August 2009, available at: https://www.ffiec.gov/pdf/fairlend.pdf, last accessed 02/28/2024 and Appendix, available at: https://www.ffiec.gov/pdf/fairappx.pdf, last accessed 02/28/2024.

[55] See Stackhouse, Julie L., "Do Home Mortgage Disclosure Act Data Prove Lending Discrimination?" March 21, 2018, available at:  https://www.stlouisfed.org/on-the-economy/2018/march/do-hmda-data-prove-lending-discrimination#, last accessed 03/08/2024.

[56] See Bhutta, *et. al.*, 2017.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

information allows the examiners to draw stronger conclusions about institution compliance with the fair lending laws."

62.     Dr. Kurzendoerfer develops several approval models, using logistic analyses to assess any indication of approval disparities.  While she provides and discusses models using only raw approval rates, or approval rates adjusted for HMDA data, as I discussed earlier, these results cannot be a basis for drawing conclusions about discrimination because they do not account for the many legitimate, nondiscriminatory credit risk and other factors that affect underwriting outcomes (including factors outside of a lender's control).

63.     In its discussion of a particular fair lending statistical examination finding, the CFPB notes that "examiners conducted file reviews to gain a better understanding of the disparities identified in the statistical analysis. They observed legitimate, non-discriminatory factors unrelated to race or national origin that explained many of the differences in outcome, but not the disparities associated with applicants in one of the prohibited basis groups. Those disparities remained unexplained after the comparative file review."[57]  It is only after the comparative file review that the CFPB sent the institution a Fair Lending Potential Action and Request for Response ("PARR-FL") letter.

64.     Similarly, HMDA data alone cannot be used to draw conclusions about pricing discrimination, as it does not contain all the specific details of any institution's rate sheets. Thus, my rebuttal will focus on Dr. Kurzendoerfer's broader model, which incorporates HMDA and Wells Fargo data.

65.     The HMDA action decisions include originated, approved but not accepted, withdrawn, incomplete, or denied loan applications.[58]  The rates at which mortgages are

---

[57] CFPB, Supervisory Highlights, Issue 9, Fall 2015, available at:
https://files.consumerfinance.gov/f/201510_cfpb_supervisory-highlights.pdf, last accessed 03/20/2024, at 28.

[58] See FFIEC, "A Guide to HMDA Reporting," 2023 Edition, available at
https://www.ffiec.gov/hmda/pdf/2023Guide.pdf, last accessed 02/28/2024.  Guides for previous years are available at https://www.ffiec.gov/hmda/guide.htm; there is no difference in how actions are categorized for the

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

approved and/or originated will be impacted by the overall credit standards and other policies required by a given mortgage lender, the credit characteristics of applicants, and the types of mortgage products offered, and the policies and guidelines of secondary market investors (*e.g.*, the GSEs) among other factors.

66.     Dr. Kurzendoerfer categorizes race and ethnicity in a slightly different manner than that historically used by the fair lending regulatory agencies, but consistent with reporting by the CFPB.[59]  While she considers non-Hispanic white as the control group and includes all race and ethnicities in her single logistic model, it is not usually the case that the "joint" category is included as she has done.  Usually, if any applicant is a minority, the application will be assigned to the minority class.  Coding as she has done would move some minorities from the race/ethnicity protected classes if one of the applicants is a minority to the "joint" category.  This may impact the size of the disparity for any non-joint category.

67.     Dr. Kurzendoerfer does not provide, nor does she discuss, any of the model fit statistics that pertain to the logistic models, opting to provide only the marginal effects for the included protected class variables.

68.     Dr. Kurzendoerfer also did not disclose in her report her full model specification, which could provide insights into the magnitudes of the impacts of the variables other than protected classes in the models.[60]  Rather, she implicitly assumes that any statistically significant disparity is of concern, regardless of magnitude.  Statistical significance alone is not adequate for assessing the "importance" of one variable in affecting another: With a large

---

2018 through 2023 time period. Dr. Kurzendoerfer's analyses omit all withdrawn applications and applications closed for incompleteness.  See Kurzendoerfer Report at ¶24.

[59] See CFPB, Data Point: 2022, at 18 – "The application is designated as "joint" if one applicant was reported as white and the other was reported as one or more minority races or if the application is designated as white with one Hispanic applicant and one non-Hispanic applicant."

[60] Dr. Kurzendoerfer presents the input file for her variables, the scripts that run the models and the Figures produced.  Full model output would include the coefficients and statistical significance for each of the explanatory variables included, as well as goodness-of-fit measures, among other statistics.  While I can replicate her models, her report does not provide sufficient information to a layman to understand, for examples, the correlations among or significance of the variables she included.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

enough sample size, such as that provided here, even small differences can be statistically significant, yet they may not be meaningful in a practical sense.

69.     One of the key statistics typically presented in the analysis of underwriting is the "Odds Ratio."  The odds that an event occurs are equal to the probability the event occurs divided by the probability the event does not occur.  The odds ratios compare the odds that an event will occur for one group to the odds the same event will occur for another group.[61] An odds ratio less than 1 in the underwriting analyses modeled as approvals (rather than denials) indicates that a protected group loan application is less likely to be approved than a comparison group loan application.  It is a ratio that provides the relative likelihood of an outcome.

70.     CFPB economists also consider marginal effects, *in addition to* odds ratios, to measure differences in denials in underwriting analyses.[62]  Approval or denial rate differences estimated based on a given statistical model can also be presented in terms of "marginal effects."  This is the statistic Dr. Kurzendoerfer presents. The marginal effect is based on the same statistical model estimation as the approval odds ratio but expresses approval rate differences in terms of different units of measure.  Specifically, the marginal effect represents the estimated absolute differences in approval rates expressed in percentage points after controlling for (or netting out) the effects of differences in applicant credit and loan characteristics.  This alternative measure of approval rate differences can be helpful for understanding the magnitude or materiality of a difference when a statistically significant difference is found.

71.     The "p-value" that can be produced with respect to coefficient values for both the underwriting and pricing analyses provides a measure of statistical significance.

---

[61] If $p^M$ represents the probability that a minority group loan application is denied and $p^{NHW}$ represents the probability that a non-Hispanic white loan application is denied, then the odds ratio is given by $(p^M/(1- p^M))/(p^{NHW}/(1- p^{NHW}))$.

[62] *Op. Cit.*, CFPB, Supervisory Highlights, Issue 9, Fall 2015, available at: https://files.consumerfinance.gov/f/201510_cfpb_supervisory-highlights.pdf, last accessed 03/20/2024 at 29.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

Intuitively, the p-value represents the probability that the difference observed between groups has occurred only by chance.[63]  The lower the p-value, the more confident one can be that the difference observed between groups is not a result of random chance.  I generally report statistically significant results at a 95 percent level of confidence (*i.e.*, with p-value less than or equal to 0.05, corresponding to a 5% significance level) in regulatory reports.[64]  The level of statistical significance is often referred to as a "confidence level" which is equal to one minus the significance level.  For example, a 95 percent confidence level corresponds to a five percent significance level.

72.     The R-squared statistic summarizes the "goodness of fit" of an ordinary least squares regression and represents the share of the variability in the dependent variable explained by the model's explanatory variables.  As a matter of theory, this value is bounded between zero and one, with zero signifying that none of the variability is explained and one indicating that all the variability is explained.  In practice, no regression model can explain all of the variability in outcomes, so this measure is typically below one.  I typically present an "adjusted" R-squared statistic that adjusts for the number of explanatory variables in the model.

73.     For each logistic model, statistics for the "Pseudo R-squared" and the "AUC" (Area Under the Receiver Operating Characteristic Curve) can easily be produced, although Dr. Kurzendoerfer chose to omit them.  The "Pseudo R-squared" statistic provides a comparison of the "goodness of fit" for alternative specifications of a logistic model for a given data sample.  In this case, it provides an indication of the additional explanatory power of a model including credit controls relative to the corresponding raw model with only race/ethnicity controls. In my experience, the Pseudo-R-squared from underwriting models typically falls between 0.30 and 0.7, but rarely higher than that, because many of the required

---

[63] More rigorously, the p-value is an estimate of the probability of obtaining an estimated marginal effect at least as far from zero as the observed estimate under the hypothesis that the true value of the effect is zero.

[64] Typically, federal regulators have relied on a 5 percent threshold for statistical significance.  Dr. Kurzendoerfer adopts this threshold.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

underwriting characteristics cannot be obtained easily from the electronic data.  It is exactly this reason that leads regulators to look at outliers to the model and matched pairs that are used in underwriting file reviews to shed light on why denials took place.

74.     The AUC statistic is a measure of how well the logistic model predicts underwriting outcomes (*i.e.*, how well it distinguishes between approvals and denials in the present context).[65]  A model that performs no better than random chance would have an AUC statistic of 0.5, and a model that performs perfectly in predicting outcomes would have an AUC of 1.0.  The AUC shows how well the logistic model predicts the outcomes and it is typically above 0.5, but less than 1.0.

75.     It is not surprising to see statistically significant odds ratio or marginal effects disparities or poor levels of Pseudo R-squared statistics when modeling mortgage underwriting decisions.  As discussed earlier in this report, the analysis of denial rates using only HMDA controls generally will find minority disparities regardless of lender.  It is because of the complexity of the process that additional care must be taken to consider elements of the process beyond the statistical models.  Underwriting models are not perfect predictors of outcomes.  Dr. Kurzendoerfer does not consider the comprehensiveness needed to evaluate fully why underwriting decisions are made.

76.     Dr. Kurzendoerfer does not control appropriately for the AUS findings, treating all AUS decisions that reference the word "accept" or "approve" as if they are equal and have the same likelihood of approval.  As AUS ineligible loans cannot be sold to the GSEs, it is to be expected that such loans will have a lower likelihood of approval than loans eligible for sale to the GSEs.  Failing to account for this results in model misspecification.  Controlling for AUS ineligible applications directly in the model means the decision not to approve would be reflected in the coefficient on the ineligibility variables and not as a race/ethnicity disparity,

---

[65] More formally, this is the Area Under the Receiver Operation Characteristic (ROC) Curve.  The ROC curve graphically illustrates the performance of a binary classifier model at various score thresholds.  The score is given by the model predicted probability of being in the class analyzed.  It plots the true positive rate against the false positive rate at each threshold.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

which may be correlated with the AUS decision – something omitted from Dr. Kurzendoerfer's model specifications.

77.      In terms of her attempt to model the underwriting that is specific to Wells Fargo, and not simply a function of reported HMDA variables, Dr. Kurzendoerfer includes very few Wells Fargo-specific variables.  She adds (in addition to HMDA controls) some controls for data obtained from Wells Fargo for PITI reserves[66], qualifying housing ratio, 90 days past due in last 24 months, bankruptcy, housing derogatories (*e.g.,* foreclosure, deed-in-lieu or prior short sale), and an indicator for self-employed.[67]

78.      She also provides a model she calls the "Wells Fargo Fair Lending Controls" specification, which adds in some of the Wells Fargo Home Mortgage Credit Decision Monitoring ("WFHM CDM") variables, although she notes she was "unable to identify all model variables across all years of the Wells Fargo internal fair lending data" and only included the variables for some years.[68]  While she discusses the bias that can result from omitted variables, she does not include or model appropriately variables that should be included, and does not acknowledge that her own model estimates may suffer from such bias.  She states,[69]

> "In addition to assessing the statistical significance of an estimate, a researcher must also consider whether the omission of important control variables affects the estimate. Omitted variable bias occurs when a relevant variable (i.e., a determinant of the outcome variable) correlated with a regressor is excluded from the model. For example, in this setting, if an applicant's credit score is an important determinant of mortgage approval and is also correlated with race and ethnicity, then excluding it from the model will bias the estimate of the effect of race and ethnicity on mortgage approval. The estimated

---

[66] PITI is an acronym for principal, interest, taxes, and insurance—the components of a mortgage payment.

[67] Kurzendoerfer Report, ¶72 at 33

[68] Kurzendoerfer Report, footnote 104, at 37.

[69] Kurzendoerfer Report, ¶38 at 16.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

effect of race on approval will absorb the effect of credit score on approval via its correlation with race and ethnicity. The inclusion of relevant control factors is needed to isolate the effect of race and ethnicity on approval."

79.　　While Dr. Kurzendoerfer uses a list of WFHM CDM controls in her Wells Fargo Fair Lending Controls specification, she does not acknowledge the information provided by Wells Fargo about the interpretation of the CDM results:  "Even though all of these coefficients are reasonable, they are not intended to be interpreted for any fair lending purpose other than their ability to estimate the underwriting process."[70]  Further, the document she cites notes that the CDM analysis is intended to identify areas for drill-downs that "may yield specific applications and their details for credit-file review"[71] and that the file reviews "are intended to discover factors that may have been left out of the CDM model and could explain root causes for the fair lending risks suggested."[72]

80.　　The CDM analysis not only looks at indicator variables derived from underlying continuous variables, but classifies those into bins that consider, among other things, policy cutoff values which may vary by type of loan application.  Dr. Kurzendoerfer's model explanatory variables do not reflect specific Wells Fargo policy guidelines.

81.　　Dr. Kurzendoerfer also specifies three models using the WFHM CDM controls, selectively choosing which ones to include.  She specifies a "Full" model using all *available* CDM variables, a "Reduced – without credit risk class" model, which excludes all indicators related to ECS model score, and a "Reduced without credit risk class and property condition" model, which removes all indicators related to property condition as well as those related to ECS model score.[73]  She concludes from her analysis of this three models that "ECS outcome

---

[70] WF-00207701.

[71] WF-00207668

[72] WF-00207669

[73] Kurzendoerfer Report, ¶78, at 36.

and property condition explain some of the difference in approval rates."[74]  She fails, again, to provide any of the model output showing coefficients on either the included or excluded variables, so it is impossible to see what correlations among the variables may have impacted the results she claims to find.  Nor can one determine, from what she presents, whether the variations in marginal effects she claims to observe are material.  Statistical significance alone is insufficient to determine if there is any material economic impact on approval rates.  Further, she draws no conclusion from her observation about the changes in marginal effects with respect to Plaintiffs' disparate impact claims.

82.     Dr. Kurzendoerfer observes that the magnitudes of her estimated approval rate disparities increase when variables related to the ECS risk class and property condition are removed from her models[75] and observes "this analysis shows that ECS outcome and property condition explain some of the difference in approval rates."  In my opinion, this empirical observation does not imply that either the ECS model or the consideration of property condition in mortgage underwriting is discriminatory.

83.     With respect to the ECS model, as I discuss in Section 8.2 of this report, there is substantial evidence in Wells Fargo's model review document to support the model's business justification and to support the conclusion that the model does not have an unjustified disparate impact on a prohibited basis and none of the model predictor variables acts as a proxy for protected class.  The model includes 12 neutral variables to predict mortgage borrower performance, 11 of which are standard credit history variables that are commonly used to predict credit performance throughout the consumer credit industry plus a debt-to-income ratio which is required to be considered in underwriting under GSE and government agency guidelines.[76]  The fact that estimated disparities increase somewhat

---

[74] Kurzendoerfer Report, ¶81, at 40.

[75] Kurzendoerfer Report at ¶¶78-81.

[76] The 12 predictor variables in the ECS model are Average Months in File, Number of Open Bankcard Trades, Number of Trade Lines 90+ Ever and/or Derog Public Records or Collections, Months Since Most Recent Delinquency, Worst Rating from the Credit Bureau, Number of Inquiries 0-5 Months Excluding Last 30 Days, Net

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

when the ECS risk classes are excluded from the model simply implies that the neutral credit variables used in the ECS model represent credit risk indicators considered in underwriting that are not accounted for elsewhere in Dr. Kurzendoerfer's model.  Given that Dr. Kurzendoerfer offers no evidence that those neutral credit risk indicators are discriminatory, her observation that estimated disparities increase when the ECS risk classes are excluded from her model cannot be taken as evidence that the ECS model has an unjustified disparate impact.

84.     Similarly, the fact that her estimated disparities increase somewhat the controls for property condition are excluded from her model is simply indicative of the fact that property condition is a relevant consideration in mortgage underwriting, as required by the applicable GSE and government agency guidelines.[77]  Therefore, indicators of property condition are entirely relevant to explaining approval rate disparities on a non-discriminatory basis.

85.     As a point of comparison to Dr. Kurzendoerfer's underwriting models, I modeled underwriting decisions using the same basic controls Dr. Kurzendoerfer used, but with the addition of variables that correctly modeled AUS decisions and additional credit report variables. I offer these results only in rebuttal to her models.  If I were analyzing directly the underwriting practices of Wells Fargo, I would review more carefully the specific guidelines for each detailed loan product and use those for the models.  I have provided a model for

---

Fraction Revolving Burden, Number of Bank/Nat'l Trade Lines with Balance >= 75% of High Credit, Total Balance/Credit Ratio of Oldest Open Mortgage or Home Equity Trade — Installment, Maximum Balance/ Credit Ratio on All Trades, Total Balance/Credit Ratio on Oldest Open Home Equity Trade, and Total Debt Ratio.  "Home Lending ECS V1.0, Conventional Scorecard Attributes," WF-00041148.

[77] Fannie Mae guidelines require that a property be "safe, sound, and structurally secure."  Fannie Mae Selling Guide, Chapter B2-3-01, , available at: https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B2-3-Eligibility/Chapter-B2-3-Property-Eligibility/1032991721/B2-3-01-General-Property-Eligibility-06-01-2022.htm, last accessed 03/22/2024.  Similarly, Freddie Mac guidelines have mortgage eligibility requirements related to property condition.  Freddie Mac Seller/Servicer Guide, section 5605.5, available at: https://guide.freddiemac.com/app/guide/section/5605.5, last accessed 03/22/2024.  For FHA requirements, see FHA Single Family Housing Policy Handbook, Section II.A.3., "Underwriting the Property," at 181, available at: https://www.hud.gov/sites/dfiles/OCHCO/documents/4000.1hsgh-112021.pdf, last accessed 03/22/2024.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

each target group, as done internally by Wells Fargo, and consistent with regulatory guidance, rather than aggregating all applicants in one equation, as done by Dr. Kurzendoerfer.  I also modified her categories for DTI and CLTV to better approximate those in the Wells Fargo policies.  The summary of these results for conventional loans, government loans and HELOCs are found in Appendix 5, Table A5.1.

86.    The "CRA" models I present in Appendix 5 use Dr. Kurzendoerfer's model as a starting point, but make the following changes, based on my regulatory examination experiences, the data available and Wells Fargo's underwriting guidelines:[78]

a.  Simplified the credit score bins to use 20 points intervals.

b.  Combined CLTV bins below 80% in the conventional and HELOC models.  In the FHA/VA model, I control for whether an application's CLTV is above or below the CLTV threshold set by FHA or VA guidelines and Wells Fargo policy documents.

c.  Added DTI bins at 50% and 60% for FHA/VA loans and added controls for Streamline Refinance or Interest Rate Reducing Refinance Loan ("IRRRL") products.  Moved DTI of 0% into its own bin and added a bin for DTI greater than 43% & less than or equal to 45%.

d.  Combined loan term to control for 120 months or less, 121-180 months, or 181 months or more.

e.  Combined the months of PITI reserves bins above 2 months.

f.  Added a control for multifamily homes (> 4 units).[79]

g.  Split the control for non-owner occupied into second home and investment property.

h.  In the FHA/VA model, I include an indicator for FHA applications.

i.  Added detailed controls for the AUS decision:  for conventional applications, I control for DU Approve/Eligible or LPA Accept, DU Approve/Ineligible, other DU or LPA results (*e.g.*, Refer, Caution, etc.), and no DU or LPA result.  For FHA applications, I control for TOTAL Accept or Approve results, TOTAL Refer or other non-Approve results, and no TOTAL result for FHA applications.  Only one VA loan application was evaluated by an

---

[78] See, for example, WF-00003206 and WF-00005952 for conventional agency and non-agency guidelines, respectively.

[79] Multifamily loans (more than 4 units) and commercial and business purpose loans were included in many of Dr. Kurzendoerfer's analyses.  Some of her model specifications added controls for commercial or business purpose. This is completely inappropriate given the allegations in this case.  Plaintiffs had no applications for any loans of those types, and underwriting standards for them are completely different from those for owner-occupied single-family homes.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

agency AUS (LPA), so I include VA applications among the FHA applications that were not evaluated by TOTAL.  I excluded USDA applications.

j.  I control separately for each of the negative credit history factors that Dr. Kurzendoerfer combines into one control: at least one 90 days past due mortgage trade in the past 24 months, prior short sale, and prior foreclosure.  Additionally, I use the "age of bankruptcy" field from WF-DATA-00010978 to control for both the presence and timing of the prior bankruptcy, with bins of 48 months or less, 49 to 84 months, or 85 months or more.

k.  I add control for products that have different underwriting guidelines and that are present in the Wells Fargo data:  housing finance agency bond or down-payment assistance program ("DAP") loans, home affordable refinance program ("HARP") loans, and Dream Plan Home Mortgage loans.

l.  Finally, I add controls for applicant credit report history from WF-DATA-00010977. These include number of inquiries, months of credit history, number of bank trades with high balance, net revolving debt ratio, balance to credit ratios on mortgage trades and all trades, number of public record items, collections and 90 days or more past due trades, and number of bank card trades.

In all respects, I try to model more closely the actual underwriting standards at Wells Fargo than was done by Dr. Kurzendoerfer.

87.     In nearly every single year, for each protected class, my models have denial odds ratios closer to 1.0, smaller marginal effects, and a better goodness-of-fit (using the Pseudo R-squared and AUC measures) than Dr. Kurzendoerfer's models.  In the conventional models, I find only three instances where the odds ratio exceeds 1.50 and/or where marginal effect exceeds 5%.  These are the thresholds I have generally used in the regulatory examinations in which I have advised clients.  The odds ratio is 1.53 for African Americans in 2019, with marginal effect at 3.4%: in 2021, the odds ratio is 1.53 for Hispanics, with marginal effect of 3.5%; and in 2022, the odds ratio is 1.67 for Hispanics, with marginal effect of 4.9%.  The Pseudo R-squared values for all the conventional underwriting models range from 0.413 to 0.538 for my models.  While an improvement over Dr. Kurzendoerfer's models, these values still reflect that much of the underwriting decision remains unexplained.  It is exactly in this situation (odds ratios over 1.5 and low R-squared values) that file review can prove so valuable.  This step was not taken by Dr. Kurzendoerfer, and, without it, no finding of discrimination can be supported given the inherent limitations of the statistical analysis.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

88.     Similar results are found with the FHA and HELOC models.  The CRA models outperform Dr. Kurzendoerfer's models and identify only a few instances of odds ratios in excess of 1.50 or marginal effects in excess of 5%.

### 7.2.    Dr. Kurzendoerfer's Pricing Model

89.     To analyze pricing outcomes, FFIEC's procedures state that: "Depending on the intensity of the examination and the size of the borrower population to be reviewed, the analysis of decisions on pricing and other terms and conditions may involve a comparative file review, statistical analysis, a combination of the two, or other specialized technique used by an agency."[80]  Typically, the analysis of pricing differences follows a generally similar procedure to the underwriting analysis, using multivariate linear regression to evaluate whether there is evidence of differences in average pricing among borrower demographic groups after attempting to account for the impact on pricing of differences among loans in the myriad loan-level pricing adjustment factors discussed in my Affirmative Report.  If disparities are identified, a file review of the pricing outliers and matches to borrowers with similar pricing-related characteristics will often be conducted.[81]

90.     As I discussed in my Affirmative Report, to determine the offered price on a given mortgage loan at Wells Fargo, the loan officer and underwriter would access daily rate sheets for the loan product under consideration.  These rate sheets clearly describe the factors that would be used to price any of the loan products described in Dr. Kurzendoerfer's analyses.  She does not appear to have considered them in developing her generic pricing model, which she applied across all loan types, purposes, and programs notwithstanding their very different rate sheets.

---

[80] *Op. Cit.*, *Interagency Fair Lending Examination Procedures*, at 22.

[81] While the fair lending regulatory agencies do not disclose thresholds for underwriting or pricing disparities that necessitate a referral to the Department of Justice, in my experience they evaluate marginal effects and odds ratios and file reviews for underwriting determinations and pricing differences in excess of five basis points to determine outlier reviews.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

91.      Wells Fargo produced pricing rate sheets for business days from January 2, 2018, through April 19, 2023, excluding holidays.  Generally, Wells Fargo had different rate sheets for conventional, conforming loans, non-conforming loans, government loans, HARP loans, high-balance loans, jumbo loans and HELOC loans.  These rate sheets are explained in more detail below.  Each rate sheet type could also be subject to loan-level pricing adjustments – typically adjustments based on credit score, loan term, loan program, and interactions with categories of LTV and other pricing factors.[82]

92.      Several factors contribute to observed variations in a mortgage loan's price, and regulators understand that these must be accounted for to appropriately analyze pricing across borrowers.[83]  For example, credit risk, loan parameters, down payment levels, prepayment risk, the cost of funds and sale of mortgage loans to the secondary market, and servicing costs can all impact mortgage loan prices.  Furthermore, pricing tends to change on a daily basis.  If any of these factors are ignored, any measured disparity between groups of borrowers could simply result from the omitted variable bias rather than from disparate pricing based on protected class.  That is why the Federal Reserve Board has stressed that when examining differences across racial or ethnic groups, the comparison of average outcomes requires adjustments for borrower- and loan-related factors plus the specific lending institution used by the borrower.  It is not sufficient to rely only on racial disparities found in public HMDA data to infer discriminatory outcomes.  I have provided citations to regulatory guidance on evaluating price differentials in my Affirmative Report.[84]

93.      In the analysis of pricing, model results indicating differences are typically measured in basis points ("bps") in the level of interest rate or Annual Percentage Rate ("APR") paid by borrowers in the protected class as compared with that paid by borrowers in

---

[82] Courchane Report at ¶66-80.

[83] Robert B. Avery, Glenn B. Canner, and Robert E. Cook, 2005, "New Information Reported under HMDA and Its Application in Fair Lending Enforcement," *Federal Reserve Bulletin,* vol. 91, at 368 - 370, available at: https://www.federalreserve.gov/pubs/bulletin/2005/3-05hmda.pdf, last accessed 02/28/2024.

[84] Courchane Report, ¶198.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

the comparison group. A positive value indicates that the difference is disadvantageous to the protected class, while a negative value indicates that the difference is advantageous to the protected class. The modest interest rate differentials from Dr. Kurzendoerfer's models that were disadvantageous to African Americans or Hispanics[85] (2.0 to 3.7 basis points, or 0.020% to 0.037%) and that were statistically significant (p-value < 0.05) do not indicate the presence of discriminatory pricing.

94.        Primarily, the results should be seen as incomplete due to her use of a generic regression model across a broad range of loan products and her lack of inclusion of all relevant pricing variables in use at the time for the individual detailed loan products, including, for example, the specific detailed rate sheets in place at the time. This information is very important in pricing loans, and its absence is notable for that reason. I believe that the small differences she found would likely be even lower had she incorporated information from the rate sheets for each year and each product. In all of my decades of doing fair lending analyses, I nearly always observe that potential pricing differences decrease when the detailed rate sheet information is added to the model.

95.        As an example, I produce (see Appendix 6) pricing models for conventional, conforming refinance loans for 2022, based on the factors in the specific rate sheets for that product (Tables A6.1 and A6.2). I also produce a pricing model for FHA loan originations, based on the Wells Fargo FHA rate sheets (Table A6.3). As shown, none of the pricing disparity results are statistically significant.

96.        Further, and independent of the misspecification or incomplete specification of the pricing models she used, the potential disparities are all relatively modest and inconsistent with a theory of pervasive lending discrimination or even disparate impact. It is generally recognized that even the highest quality regression modeling cannot account for all possible factors that may be related to pricing due to the complexity of mortgage pricing. As a

---

[85] Kurzendoerfer Report, Figure 32, at 42.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

result, a modest level of disparities, standing alone, cannot be said to be indicative of discriminatory pricing.

### 7.3. Quantification of the Class or Sub-Classes Proposed by Dr. Kurzendoerfer

97.     Dr. Kurzendoerfer finds that, after controlling for her "key underwriting factors" found in the HMDA data, the differences in approval rates between non-Hispanic white applicants and a given minority group were just 3.3 to 4.4 percentage points for Black applicants and 3.0 to 7.1 percentage points for Hispanic applicants.[86]  When controlling for HMDA key variables and Wells Fargo key underwriting factors, these estimates range from 3.3 to 4.3 for Black Applicants and from 2.9 to 6.7 for Hispanic applicants.[87]  In other words, at a minimum, over 95% of the Black and 93% of the Hispanic applicants were <u>not</u> affected by the alleged lending discrimination.

98.     In Figure 35, Dr. Kurzendoerfer supplies her estimates of the proposed class or subclasses of refinance, home purchase, and HELOC borrowers defined in her report.[88]  She identifies these as applications decisioned before 2023 that received at least one "approval" from an External AUS system (DU, LP, or TOTAL (FHA)) or Wells Fargo's ECS model.  I reproduce that table here (Table 2).  She includes all Approval codes, including those that clearly state they are Approve/Ineligible or Accept/Ineligible, even though it is clear from the DU and LP guides that these loans cannot be sold to the GSEs without corrections and a complete status,[89] and even though (as shown in Appendix 3) most "ineligible" applications were denied.  For example, 91.6% of conventional, conforming refinance loans receiving DU's "approve/ineligible" recommendation were denied.[90]

---

[86] Kurzendoerfer Report, Figure 23, at 31.

[87] Kurzendoerfer Report, Figure 24, at 34.

[88] Kurzendoerfer Report, Figure 35, at 44.

[89] Kurzendoerfer Report, footnote 109, at 44.

[90] See Appendix Table A3.1.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| Table 2.  Dr. Kurzendoerfer's Figure 35.  Proposed Classes or Sub-class Count | |
|---|---|
| Class or Sub-class category | Count |
| Refinance | 77,937 |
| Home Purchase | 23,286 |
| HELOC | 17,877 |
| Total | 119,100 |

99.     Dr. Kurzendoerfer's enumeration of proposed class members is entirely unrelated to, and ignores, the results of her own statistical regression analysis, which predicts that a large percentage of both minority and non-minority applicants with "approve" AUS decisions would be denied.  The counts in Table 2 must be reconciled with the disparity percentages Dr. Kurzendoerfer alleges to have identified.  Using her most complete model, as shown in her Figure 34, there is no racial or ethnic protected class with an approval disparity of more than negative 5.8% for her refinance subclass.  This means that at least 94.2% of the loans in her in the refinance subclass were treated similarly to the non-Hispanic white applicants.  For her home purchase subclass, the marginal effect estimates indicate no racial or ethnic protected class with an approval disparity of more than negative 3.6%.  Thus, at least 96.4% of minorities were treated similarly to non-Hispanic whites with respect to home purchase applications.  Finally, for the HELOC applicants, the marginal effects range from negative 4.3% to positive 0.1%, indicating similar treatment to non-Hispanic whites among at least 95.7% of minority applicants.

100.     The class counts proposed in Dr. Kurzendoerfer's Figure 35, cannot support her claim that they were "approved" by an AUS and should not have been denied.  I provide Appendix Table A3.2, which summarizes, across loan products, the counts and percentages of AUS recommendations that were approve/eligible as a fraction of the total loans processed through the AUS.  From these counts, given the classes she defines, one would need to determine only those declined who received a HMDA action code 3.  Even then, it is impossible to determine whether the denial was wrongful.  To illustrate this point, I examined the outliers to the underwriting logistic model, focusing only on those that had an estimated probability of approval greater than or equal to 50% (*i.e.*, more likely to be approved than

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

denied).  I then categorized those who were denied by denial reasons.  These results are found in Appendix 7.[91]

101.     As expected, the vast majority of these were denied for reasons that could not be captured in electronic data and, thus, are not accounted for in Dr. Kurzendoerfer's statistical model.  The most frequent reason for denial, at 35.8%, was denials because of incomplete credit applications.  Another 13.1% of denied applications had insufficient collateral.[92]  Credit history reasons led to another 12.5% being denied.  While the underwriting models could control for credit score and some mortgage derogatories and public record items such as bankruptcy, there can be many other reasons why credit history may lead to loan denials such as too high a revolving credit balance, too many recent late payments, collection items, and others not captured by Dr. Kurzendoerfer's model.  Approximately 10,500 applications were denied because they had insufficient cash to close, which also is not accounted for by Dr. Kurzendoerfer's model.  DTI ratios led to an additional 4.9% of the denials.  Again, while Dr. Kurzendoerfer's model includes DTI controls, lender, agency, and government entity guidelines may specify different DTI limits for different loan programs, and that is not accounted for in Dr. Kurzendoerfer's models.  Unverifiable information (*e.g.*, income, employment) totaled 4.3% of these denial reasons, while employment history (such as not having at least two years at current job) led to another 1,600-plus denials.  In total, these reasons, including "Other," summed to 147,983.[93]  Loan file review is necessary to understand these reasons and determine the justification for denial of each purported class member's application.

102.     More specific denial reasons for the "Other" denial reasons are found in text notes in the data.  Nearly 13,000 of these (43.1%) were denied because the product or

---

[91] The only Plaintiff that was an "outlier" was Elretha Perkins.  Both of her loans were outliers.  The refinance application of 09/14/2021 had a predicted probability of approval of 74.0% and was denied due to an incomplete credit application.  The refinance application dated 12/13/2021 had a predicted probability of approval of 77.2% and was denied for credit history and no benefit to borrower.

[92] This could be an indication of a problem with the property that requires repair or maintenance.
[93] Applications could receive more than one denial reason.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

program was not available on the terms requested by the borrower.  Nearly 20% were denied

because the loan (a refinance, for example) did not offer a net benefit to the borrower.  Other

reasons include title issues, temporary residence, income or assets not meeting product

requirements, or cash out exceeding guidelines, among other reasons.

103.     To conclude, Dr. Kurzendoerfer's class counts, which simply enumerate those

with any "approve" or "accept" from an AUS system and which were denied, do not account

for many legitimate reasons for denial.  Nor do these counts reflect or relate in any way to

her underwriting disparity estimates.  I provide Table A8.1 in Appendix 8 detailing the class

counts of the subclasses defined by Dr. Kurzendoerfer by specific AUS result and year.

## 8.      Rebuttal of Dr. Golubchik

104.     Dr. Golubchik's report contains no analysis of the racial or ethnic impacts of

Wells Fargo's ECS model (referred to as "HLECSV1 CON model 11960" in her report).  She

mentions theoretical possibilities, but she has nothing to say and no analysis to present

regarding the actual racial or ethnic impacts of the ECS model, or any other Wells Fargo

model.  Her report refers only to the theoretical possibility of bias while providing no

evidence of bias.  While it is true that biased training data can, theoretically, result in model

bias, she provides no evidence to suggest that the ECS training data or model was biased.

While it is true that a model may, theoretically, embed bias, she provides no evidence to

suggest that the model is biased.  While it is true that a model may result in disparate effects,

that is insufficient to establish evidence of an unjustified disparate impact, and she provides

no such evidence.

105.     Dr. Golubchik's report refers to the ECS model as a "supervised learning type of

machine learning model,"[94] which has no relevance to evaluating the model's racial or ethnic

impacts.  "Machine learning" is a broad class of models which includes ordinary linear

---

[94] Golubchik Report, at 4.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

regression and logistic models.  Both types of models have been used for regulatory examinations by the federal financial regulators for decades.

106.     The ECS model is also merely a logistic model, which is an entirely conventional type of credit scoring model which has been commonly used across the consumer finance industry since the 1980s.[95]  Indeed, Dr. Golubchik herself quotes Wells Fargo testimony indicating that ECS is a "traditional statistical model" and not "artificial intelligence."[96]  Such widely used credit scoring models are transparent and are not difficult to understand. Further, research has shown that traditional credit scoring models using a logit model and commonly used in credit decisioning, do not have an unjustified disparate impact.[97]  Thus, there is nothing exotic or mysterious about Wells Fargo's ECS model.

107.     Her overall opinion appears to be summed up as, "Given Wells Fargo's use of HLECSV1 CON model 11960 and results of Wells Fargo's internal fair lending analyses, it is reasonable to conclude that the model's disparate risk classification of protected class applicants could contribute to some disparities observed in Wells Fargo's approval rates based on race."[98]  However, this vague and noncommittal conclusion falls far short of demonstrating the Wells Fargo's model has an unjustified disparate impact, or that Wells Fargo's legitimate business objectives could be achieved with less of a disparate impact, as I explain below.  Further, based on my extensive experience in evaluating the fair lending

---

[95] Lyn C. Thomas, David B. Edelman and Jonathan N. Crook, *Credit Scoring and Its Applications*, Society for Industrial and Applied Mathematics, Monographs on Mathematical Modeling and Computation, 2002, at 3-4 ("In the 1980s, logistic regression and linear programming, the two main stalwarts of today's [credit score] card builders, were introduced").  Board of Governors of the Federal Reserve System, "Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit," August 2007 (See "The statistical model typically used in predicting loan performance takes the form of a so-called logistic regression," at 19), available at https://www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf, last accessed 03/11/2024.

[96] Golubchik Report at 4.

[97] See Avery, R., K. Brevoort, and G. Canner, "Does Credit Scoring Product Disparate Impact?" *Real Estate Economics*, 2012, vol. 40, S65-S114. "We estimate a logit model…(at S79)."

[98] Golubchik Report, at 12-13.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

impacts of scoring models and the evidence provided by Wells Fargo's internal reviews of the ECS model, I find no basis for a fair lending concern regarding the model.

## 8.1.    Performance of the ECS Model

108.    Deterioration in scoring model performance over time is normal and expected as such things as market conditions, borrower populations, consumer behavior, and government interventions in credit markets cause the relationship between credit scoring model inputs and credit performance to change over time.  The relationship between credit scores and consumer delinquency or default tends to change over time, as it did during the unprecedented COVID-19 pandemic – a situation not reflected in historical credit data and which, therefore, could not be well accounted for by extant credit scoring models.[99] However, the annual review report noted that "the model performed at least similar or better than the benchmarked FICO in terms of KS and ROC."[100]

109.    The potential for changes in model performance is precisely why, consistent with regulatory model risk management guidelines,[101] Wells Fargo regularly monitors the performance of its credit scoring models and takes steps to analyze signs of model performance degradation and mitigate them when appropriate (such as by adjusting, recalibrating, or replacing the model).  The ECS model is monitored quarterly.[102]

---

[99] See, for example, "Consumer Credit: During COVID-19 and Beyond," VantageScore Fact Sheet, October 28, 2020, available at https://www.vantagescore.com/consumer-credit-during-covid-19-and-beyond/, last accessed 03/09/2024.  See also Ethan Dornhelm, "FICO Drift: What Is It, and What Causes It?", FICO Blog, available at https://www.fico.com/blogs/fico-drift-what-it-and-what-causes-it, last accessed 03/09/2024.  Alyssa Brown and Siobhán McAlister, "Credit score transitions during the COVID-19 pandemic," Office of Research Blog, Consumer Financial Protection Bureau, January 25, 2023, available at https://www.consumerfinance.gov/about-us/blog/office-of-research-blog-credit-score-transitions-during-the-covid-19-pandemic/, last accessed 03/09/2024.

[100] See WF-03775109 (at 11 of annual report).  KS and ROC refer to two statistical measures that are commonly used in the industry for evaluating the predictive ability of a credit scoring model.

[101] See Office of the Comptroller of Currency, Supervisory Guidance on Model Risk Management, OCC Bulletin 2011-12, section V.2 and *Comptroller's Handbook*, Model Risk Management, v.1.0, pp. 42-45.

[102] See WF-03775115.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

110.      The monitoring of the ECS model performance is based on two key performance indicators ("KPIs"):  the Population Stability Index ("PSI"), which measures shifts in the applicant population within each score range, and the "KS" statistic, which is a standard measure of model predictive performance. [103]  A range of values for each of those indicators is used to rate the model's performance as "Green," "Yellow," or "Red."  In my experience, this is a fairly standard approach to monitoring scoring model performance.  For this model, "Green" indicates a PSI value less than 0.10 and a reduction in the KS statistic relative to a baseline model of less than 15%.[104]  This is rated "satisfactory."  "Marginal" performance receives a "Yellow" or "Watch" status, which is defined as a reduction in the model's KS statistic relative to a baseline value model of 15% to 20% or a PSI statistic between 0.10 and 0.25.  Based on the performance monitoring procedures for the ECS model, "Watch" status does not necessitate any action (whereas "Red" status, indicated by a KS reduction of more than 20% or a PSI statistic greater than 0.25 is defined as "Action Required").  In other words, "Yellow" status can be understood as a modest reduction in predictive performance or shift in the applicant population that is not deemed large enough to affect the model's validity to such an extent that corrective action is required.  A deeper reading of the available Wells Fargo model review documentation reveals that consumer credit performance was turning out to be better than predicted by the ECS model – as well as better than predicted by the standard FICO score – during the pandemic period.

111.      Models predicting credit risk generally experienced shifts in their predictive performance during the COVID-19 pandemic period.  As Dr. Sudjianto testified, this was not unique to Wells Fargo at that time because of the unprecedented situation that no model could have accounted for:[105]

> Q.· ·Have you found that the FICO model has ·deteriorated as well?
> A.· ·Oh, yes.
> Q.· ·Since the start of COVID?

---

[103] *Ibid.*, Conventional Orig Custom ECS Score: Number 11960, Annual Review, 2-25-2022, WF-03775099, at 17-18.

[104] The change is defined as (currently observed baseline)/baseline.  See WF-03775116.

[105] Sudjianto Deposition, at 212:1-12.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

> A.· ·Oh, yes.· FICO inflated.· Everybody FICO's up.
> Q.· ·So everybody's FICO score is higher --
> A.· ·Yes.
> Q.· ·-- after COVID, because --
> A.· ·Yes.
> Q.· ·-- it's not capturing delinquencies?
> A.· ·Absolutely.

112.     Recent analysis by the CFPB corroborated Dr. Sudjianto's testimony concerning pandemic era changes in creditworthiness.[106]  The analysis found that "Many households found that their financial fortunes changed during the pandemic, and these changes were often reflected in their credit scores."  The CFPB analysis found that the distribution of credit scores shifted upward during the pandemic, suggesting that pandemic-era mortgage forbearances (i.e., deferrals), the federal student loan repayment pauses, and federal cash transfers that improved some consumers' financial wellbeing drove the overall increases in credit scores.

113.     Consistent with those findings, Wells Fargo's own reviews of the ECS model during the pandemic period found that the evidence of a reduction in the model's predictive performance was largely attributable to mortgage accounts that were in deferral status,[107] and that the model continued to show strong rank-ordering of risk in terms of the score bins used to assign Credit Risk Classes (A1, A2, C1, C2), which is its intended purpose.[108]  Wells Fargo's internal model review also found that "HLECSV1 CON outperforms FICO3/FICO9 model under current and historical populations. This is the case at the overall population, conforming accounts, and non-conforming accounts."[109]  The overall finding of the internal model review as of the first quarter of 2022 was that "No targeted scope validation,

---

[106] Alyssa Brown and Siobhán McAlister, *Op. Cit.*

[107] "Annual Review Report, HL Conventional Orig Custom ECS Score," Validation Date Q1 2022, 2/25/2022, WF-03775099, at 31: "Log odds curve flattens as odds for higher score bins drop more than lower score bins since customer behavior in high score bins changed due to deferral option, thus reducing differentiation power."

[108] *Ibid.*, at 32-34.  For example, "The validator considers that the model continues to rank order appropriately for the overall non — deferral portfolio" and "The validator considers that the model continues to rank order appropriately for the conforming non - deferral portfolio."  See also detail at 10-11.

[109] *Ibid.*, at 37.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

revalidation, or redevelopment of the model is needed at this time" and "The validator finds that the model demonstrates fair performance for its intended use …"[110]

## 8.2.   Disparate Impact and Business Justification

114.      It may be useful for understanding disparate impact with respect to fair lending if some background is presented.  While I am an economist, and not a lawyer, I am familiar, from industry experience and my experience with regulatory supervisory examinations, with the three-step approach taken to assess disparate impact and have extensive experience applying this approach to evaluate scoring models for disparate impact risk.

115.      The Supreme Court has outlined a three-step process for assessing disparate impact and for assigning the burden of proof to disparate impact cases under federal civil rights statutes, such as the Fair Housing Act, as discussed in *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642 (1989),[111] and *Texas Department of Housing & Community Affairs v. Inclusive Communities Project Inc.,* 135 S. Ct. 2507 (2015).[112]  The first step requires the party bringing the claim to present evidence of a "substantial disparate impact" resulting from an identifiable policy or practice. If that burden is met, the second step shifts the burden of proof and requires the defendant (as it applies to fair lending, the creditor) to explain the legitimate business justification for the credit policy or practice that led to the disparate

---

[110] *Ibid.*, pp. 7-8.  See also p. 11: "As a conclusion, the custom models are expected to behave similarly to FICO models such that the risk rank will be retained but the odds to score relationship can shift. Furthermore, [Line of Business] custom scores may do better than the FICO score since a large contribution to many of the models is from non-bureau data."

[111] See U.S. Supreme Court Opinion, available at:  https://supreme.justia.com/cases/federal/us/490/642/, last accessed 03/11/2024.

[112] See Department of Justice, Supreme Court Opinion available at: https://www.justice.gov/sites/default/files/crt/legacy/2015/06/25/tdhcainclusiveopinion.pdf, last accessed 03/11/2024.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

impact.[113],[114] The third step shifts the burden back to the party bringing the claim to show that there is an equally effective but less discriminatory option available to meet the credit issuer's legitimate business objective. If the third step is reached and an equally effective but less discriminatory alternative is identified, there could be a finding of illegal discrimination.[115]  Nothing in Dr. Golubchik's report addresses either whether a business justification exists for the ECS model, or whether Wells Fargo has explored less discriminatory alternatives.

116.    Dr. Golubchik brings no evidence that the ECS model has a disproportionate adverse impact on a prohibited basis.  She merely refers to an internal Wells Fargo report that found disparities in approval rates based on race: "I also reviewed internal fair lending analyses of credit decisions finding approval rate disparities by race. I noted, in particular, 'practically significant' disparities in Wells Fargo's 2020 refinancing approval rates for NH Black and White applicants."[116]  However, an observation of "practically significant" disparities in approval rates for one loan purpose category in one year, which she does not even show was caused by the ECS model, is not sufficient to show that the model has an

---

[113] Such a justification must be based on substantial evidence, and the burden remains with the party bringing the claim to refute the business justification that is proffered by the creditor. As stated in the *Wards Cove* decision, "A mere insubstantial justification in this regard will not suffice, because such a low standard of review would permit discrimination to be practiced through the use of spurious, seemingly neutral employment practices. At the same time, though, there is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster: this degree of scrutiny would be almost impossible for most employers to meet. … In this phase, the employer carries the burden of producing evidence of a business justification for his employment practice. The burden of persuasion, however, remains with the disparate impact plaintiff." — *Wards Cove*, 490 U.S. 642 at 659-660.

[114] See Avery, Brevoort, and Canner, *Real Estate Economics*, v. 40, 2012, at S111, "A second possible response is to allow the use of such credit characteristics despite the disparate impact they generate. Under Regulation B, which implements the Equal Credit Opportunity Act (ECOA), business practices that result in a disparate impact against a protected class may be permissible if the practice meets a legitimate business need that cannot be met through other means. Because better assessments of creditworthiness should qualify as a legitimate business need, as long as no other credit characteristics are available that could predict equally well with less disparate impact, then the use of such characteristics would arguably be permissible."

[115] "If respondents, having established a prima facie case, come forward with alternatives to petitioners' hiring practices that reduce the racially disparate impact of practices currently being used, and petitioners refuse to adopt these alternatives, such a refusal would belie a claim by petitioners that their incumbent practices are being employed for nondiscriminatory reasons." — *Wards Cove*, 490 U.S. 642 at 660-661.

[116] Golubchik Report, at 11.

unjustified disparate impact.  Nor does Dr. Golubchik proffer any evidence to refute the ECS's model's business justification or to show that an equally effective but less discriminatory option is available to meet Wells Fargo's legitimate business objectives.  Indeed, the ECS model development report that Dr. Golubchik cited in Section IV of her report contains the key evidence of the model's business justification.[117]

117.     In the development of a model or with respect to its monitoring over time, lenders will assess the models they use for disparate treatment and disparate impact.  When a disparate impact is identified, the financial institution may provide a non-discriminatory business justification for the use of the model leading to the disparate impact.  Wells Fargo has performed statistical validations and re-validations of the ECS model[118] which support its business justification in rating mortgage borrower credit risk and has proactively evaluated whether less discriminatory alternative variables ("LDAs") exist that would not sacrifice legitimate business objectives.[119]  Sections 5.1 and 6 of the "Fair Lending Business Justification" for Model 11960 explain the variables that were considered as potential LDAs and the testing performed to evaluate potential alternative model formulations.  For example, the use of oldest trade line was replaced with average months on file and the number of inquiries in the last six month was replaced to exclude the most recent 30 days, rather than just 7 days in order to reduce the potential for disparate effects.[120]  In addition, Wells Fargo's internal analysis of potential disparate impact risk of the ECS model found that

---

[117] "Model Development – HL Conventional Orig Custom ECS Score," WF-00079826.

[118] See "Annual Review Report, HL Conventional Orig Custom ECS Score," Validation Date Q1 2022, 2/25/2022, WF-03775099, pp. 15-16, showing that the model was originally independently validated 10/19/2015, revalidated on 2/27/2018 and 2/24/2021, and subjected to annual reviews 2/28/2017, 3/1/2019, and 1/29/2020, in addition to 2/25/2022, evidencing the validation, revalidation, and regular monitoring of the model.  See also the model development documentation, Ibid., WF-00079826

[119] See, for example, WF-00632434-54, "HL Conventional Org Custom ECS Score (Model Number 11960), Fair Lending Business Justification."  See also, "Initial Fair Lending Analyses of Home Lending Conventional Origination Custom Enhanced Credit Score (ECS) Model – MN 11960," September 22, 2022, WF-00043028.

[120] Ibid., WF-00632444.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

none of the variables in the model had a potential risk of acting as a statistical proxy (*i.e.*, a stand-in) for race or ethnicity.[121]

118.     Based on this information, it is my opinion that Wells Fargo has substantial evidence of the business justification for its model and has proactively performed reasonable fair lending due diligence to search for a viable alternative model with less of a disparate impact.  Dr. Golubchik has provided no evidence that Wells Fargo could have achieved the same business objectives as achieved by the ECS model with less of a disparate impact based on race or ethnicity.  Therefore, her broad and general opinions about the possibility of model bias are not reliable for evaluating the actual fairness of the model.

[121] *Ibid.*, WF-00043028 and "Fair Lending Analysis of Home Lending Conventional Origination Custom Enhanced Credit Score (ECS) Model – MN 11960," March 24, 2022, WF-00042410.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

I declare that the foregoing is true and correct to the best of my knowledge.

Signed this 22nd day of March 2024, at Washington, DC.

*Marsha J. Courchane*

Dr. Marsha J. Courchane

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

## Appendix 1.  Documents Considered

**Case Documents**

- Amended and Consolidated Class Action Complaint, March 24, 2023 ("Amended Complaint")
- Expert Report of Marsha J. Courchane, Ph.D., February 29, 2024 ("Courchane (or my) Affirmative Report")
- Ex. A - Expert report of Amanda R Kurzendoerfer PhD_.pdf, February 29, 2024 ("Kurzendoerfer Report")
- Ex. B - Expert Report of Michael J. Wallace - February 29, 2024_.pdf ("Wallace Report")
- Ex. C - Expert Report of Leana Golubchik.pdf, February 29, 2024 ("Golubchik Report")
- Deposition of Agus Sudjianto - Executive VP Head of Corporate Model Risk, September 25, 2023
- Deposition of Peter Strawser - SVP Head of UW and Credit Admin., August 25, 2023
- Risk Engine/GRD Overview, WF-00010680
- WFHM Retail Results, 2020, WF-00035358
- Risk Engine External Strategies, September 2022, WF-04846664-04846681.
- Annual Review Report, HL Conventional Orig Custom ECS Score, Q1 2022, WF-03775099
- Wells Fargo Home Mortgage Credit Decision Monitoring ("WFHM CDM"), May 2023, WF-00207655
- Wells Fargo Home Equity Credit Decision Monitoring ("WFHE CDM"), December 2021, WF-00151085
- WF-00003206 - conventional, agency underwriting guidelines
- WF-00005952 – non-agency underwriting guidelines
- WF-DATA-00010977
- WF-00632434 – WF-00632454 – HL Conventional Orig Custom ECS Score (Model Number 11960), Fair Lending Business Justification (export 4, images)
- WF-00035253 – change in CAP – Wells Fargo discontinues C1/C2 (export 4, images)
- WF-00035267 – change in salability of ECS to Fannie Mae (export 4, images)
- WF-00041148 – Home Lending Credit Risk – Home Lending ECS V1.0 – Conv. Scorecard Attributes (export 4, images)
- WF-00042410 –Fair Lending Analysis of Home Lending Conventional Origination Custom Enhanced Credit Score (ECS) Model – MN 11960," March 24, 2022
- WF-00043028 – Initial Fair Lending Analyses of HL Conv. Orig Custom ECS (export 4, images)

**Case Data Obtained from Wells Fargo**

WF-DATA-00010977.csv
WF-DATA-00010978.csv
WF-DATA-00010979.csv
WF-DATA-00010980.csv
WF-DATA-00010981.csv
WF-DATA-00010982.csv
WF-DATA-00010983.csv
WF-DATA-00010984.csv
WF-DATA-00010985.csv
WF-DATA-00010988.csv

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

**HMDA, FHFA and WF Data Used by Dr. Kurzendoerfer and in CRA Replications**
WF-00000001-CONFIDENTIAL.dat
WF-00000002-CONFIDENTIAL.dat
WF-00035411.dat
WF-DATA-00000005.txt
WF-DATA-00010974.txt
WF-DATA-00010977.csv
model_spec.xlsx
2018 FullCountyLoanLimitList2018_HERA-BASED_FINAL_FLAT.xlsx
2019 FullCountyLoanLimitList2018_HERA-BASED_FINAL_FLAT.xlsx
2020 FullCountyLoanLimitList2018_HERA-BASED_FINAL_FLAT.xlsx
2021 FullCountyLoanLimitList2018_HERA-BASED_FINAL_FLAT.xlsx
2022 FullCountyLoanLimitList2018_HERA-BASED_FINAL_FLAT.xlsx
2023 FullCountyLoanLimitList2018_HERA-BASED_FINAL_FLAT.xlsx
WF-00010494: GAIP-GRD-RequestResponse– Row 558
WF-DATA-00000001_CONFIDENTIAL.txt
WF-DATA-00000002_CONFIDENTIAL.txt
WF-DATA-00000003_CONFIDENTIAL.txt
WF-DATA-00000005_CONFIDENTIAL.txt
WF-DATA-00000007.csv
WF-DATA-000000014.csv
WF-DATA-00000016.sas7bdat
WF-DATA-00000017.sas7bdat
WF-DATA-00000018.sas7bdat
WF-DATA-00000019.sas7bdat
WF-DATA-00000020.sas7bdat
WF-DATA-00010970.txt
WF-DATA-00010971.txt
WF-DATA-00010973.txt
WF-DATA-00010975.txt
WF-DATA-00010976.txt
WF-DATA-00010978 – confidential.csv
WF-DATA-00010984 – confidential.csv

**Independently Obtained Documents**

Avery, Robert B., Glenn B. Canner, and Robert E. Cook, 2005, "New Information Reported under HMDA and Its Application in Fair Lending Enforcement," *Federal Reserve Bulletin,* vol. 91, at 368 - 370, available at: https://www.federalreserve.gov/pubs/bulletin/2005/3-05hmda.pdf, last accessed 02/28/2024.

Avery, Robert B., Kenneth P. Brevoort and Glenn B. Canner, "Higher Priced Home Lending and the 2005 HMDA Data," Revised September 18, 2006, *Federal Reserve Bulletin*, A123 – A166, available at: https://www.federalreserve.gov/pubs/bulletin/2006/hmda/default.htm, last accessed 03/12/2024.

Avery, Robert B., Kenneth P. Brevoort and Glenn B. Canner, "The 2006 HMDA Data," *Federal Reserve Bulletin*, December 2007, A73 – A109, available at: https://www.federalreserve.gov/pubs/bulletin/2007/pdf/hmda06final.pdf, last accessed 03/12/2024.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

Avery, Robert B., Kenneth P. Brevoort and Glenn B. Canner, "The 2007 HMDA Data," *Federal Reserve Bulletin*, December 2008, A107 – A146, available at: https://www.federalreserve.gov/pubs/bulletin/2008/articles/hmda/default.htm, last accessed 03/12/2024.

Avery, Robert B., Neil Bhutta, Kenneth P. Brevoort and Glenn B. Canner, The 2009 HMDA Data," *Federal Reserve Bulletin*, December 2010, A39 – A77, available at: https://www.federalreserve.gov/pubs/bulletin/2010/pdf/2009_HMDA_final.pdf, last accessed 03/12/2024.

Avery, Robert B., Neil Bhutta, Kenneth P. Brevoort and Glenn B. Canner, "The Mortgage Market in 2010: Highlights from the Data Reported under the Home Mortgage Disclosure Act," *Federal Reserve Bulletin*, December 2011, 1 – 60, available at: https://www.federalreserve.gov/pubs/bulletin/2011/pdf/2010_HMDA_final.pdf, last accessed 03/12/2024.

Avery, Robert B., Neil Bhutta, Kenneth P. Brevoort and Glenn B. Canner, "The Mortgage Market in 2011: Highlights from the Data Reported under the Home Mortgage Disclosure Act," *Federal Reserve Bulletin*, December 2012, 1 – 46, available at: https://www.federalreserve.gov/pubs/bulletin/2012/pdf/2011_hmda.pdf, last accessed 03/12/2024.

Board of Governors of the Federal Reserve System, "Report to the Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit," August 2007, available at https://www.federalreserve.gov/boarddocs/rptcongress/creditscore/creditscore.pdf, last accessed 03/11/2024.

Board of Governors of the Federal Reserve System, SR-11-7, *Guidance on Model Risk Managemen*t, available at: https://www.federalreserve.gov/supervisionreg/srletters/sr1107.pdf, last accessed 03/11/2024.

Bhutta Neil, Steven Laufer, and Daniel R. Ringo, "Residential Mortgage Lending in 2016: Evidence from the Home Mortgage Disclosure Act Data," *Federal Reserve Bulletin,* November 2017, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3132404, last accessed 03/13/2024.

Consumer Financial Protection Bureau, Brown, Alyssa and Siobhán McAlister, "Credit score transitions during the COVID-19 pandemic," Office of Research Blog, January 25, 2023, available at https://www.consumerfinance.gov/about-us/blog/office-of-research-blog-credit-score-transitions-during-the-covid-19-pandemic/, last accessed 03/09/2024.

CFPB, Data Point: 2018 Mortgage Market Activity Trends, August 30, 2019, available at: https://www.consumerfinance.gov/data-research/research-reports/data-point-2018-mortgage-market-activity-and-trends/, last accessed 03/12/2024.

CFPB, Data Point: 2019 Mortgage Market Activity Trends, June 24, 2020, available at: https://www.consumerfinance.gov/data-research/research-reports/data-point-2019-mortgage-market-activity-and-trends/ , last accessed 03/12/2024.

CFPB, Data Point: 2020 Mortgage Market Activity Trends, August 19, 2021, available at: https://www.consumerfinance.gov/data-research/research-reports/data-point-2020-mortgage-market-activity-and-trends/ , last accessed 03/12/2024.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

CFPB, Data Point: 2021 Mortgage Market Activity Trends, September 19, 2022 available at: https://www.consumerfinance.gov/data-research/research-reports/data-point-2021-mortgage-market-activity-trends/ , last accessed 03/12/2024.

CFPB, Data Point: 2022 Mortgage Market Activity Trends, August 2019, available at: https://www.consumerfinance.gov/data-research/research-reports/data-point-2022-mortgage-market-activity-trends/ , last accessed 03/12/2024.

CFPB, "Consumer Reporting and the CARES Act," June 16, 2020, available at: https://www.consumerfinance.gov/about-us/blog/consumer-reporting-and-cares-act/, last accessed 03/14/2024.

CFPB, Supervisory Highlights, Issue 9, Fall 2015, available at: https://files.consumerfinance.gov/f/201510_cfpb_supervisory-highlights.pdf, last accessed 03/20/2024.

Department of Housing and Urban Development, Handbook 4000.1, available at: https://www.hud.gov/sites/dfiles/OCHCO/documents/4000.1hsgh-080923.pdf

Department of Housing and Urban Development, Handbook 4000.1, FHA Single Family Housing Policy Handbook, Section II.A.3., "Underwriting the Property," at 181, available at: https://www.hud.gov/sites/dfiles/OCHCO/documents/4000.1hsgh-112021.pdf, last accessed 03/22/2024.

Docutech, Net Tangible Benefit Matrix, February 2018, https://compliance.docutech.com/wp-content/uploads/sites/2/2018/03/Net-Tangible-Benefit-Matrix-2018.02.pdf, last accessed 03/20/2024

Dornhelm, Ethan, "FICO Drift: What Is It, and What Causes It?", FICO Blog, available at https://www.fico.com/blogs/fico-drift-what-it-and-what-causes-it, last accessed 03/9/2024.

Fannie Mae Selling Guide, Chapter B2-3-01, available at: https://selling-guide.fanniemae.com/Selling-Guide/Origination-thru-Closing/Subpart-B2-Eligibility/Chapter-B2-3-Property-Eligibility/1032991721/B2-3-01-General-Property-Eligibility-06-01-2022.htm, last accessed 03/22/2024.

FFIEC, "A Guide to HMDA Reporting," 2023 Edition, available at https://www.ffiec.gov/hmda/pdf/2023Guide.pdf, last accessed 03/11/2024.  Guides for previous years are available at https://www.ffiec.gov/hmda/guide.htm

FFIEC, Interagency Fair Lending Examination Procedures, August 2009, available at: https://www.ffiec.gov/pdf/fairlend.pdf , last accessed 03/11/2024 and Appendix, available at: https://www.ffiec.gov/pdf/fairappx.pdf, last accessed 03/11/2024.

FFIEC, Request for Information and Comment on Financial Institutions' Use of Artificial Intelligence, including Machine Learning, February 25, 2021, available at: https://files.consumerfinance.gov/f/documents/cfpb_ai-rfi_frn_2021-03.pdf, last accessed 03/11/2024.

Freddie Mac Seller/Servicer Guide, section 5605.5, available at: https://guide.freddiemac.com/app/guide/section/5605.5, last accessed 03/22/2024.

Legal Information Institute, Federal Rules of Civil Procedure, Rule 23. Class Actions, available at: https://www.law.cornell.edu/rules/frcp/rule_23, last accessed 03/11/2024.

Legal Information Institute, Supreme Court of the United States, Wal-Mart Stores, Inc. v. Dukes et. Al., No.10-277, decided 6/20/2011, available at: https://www.law.cornell.edu/supct/html/10-277.ZS.html, last accessed 03/11/2024.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

OCC, *Comptroller's Handbook: Consumer Compliance: Fair Lending (Version 1.0)*, January 2023, available at: https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/fair-lending/pub-ch-fair-lending.pdf, last accessed 02/28/2024.

OCC, *Supervisory Guidance on Model Risk Management*, OCC Bulletin 2011-12, section V.2.

OCC, *Comptroller's Handbook*, Model Risk Management, v.1.0.

Stackhouse, Julie L., "Do Home Mortgage Disclosure Act Data Prove Lending Discrimination?" March 21, 2018, available at: https://www.stlouisfed.org/on-the-economy/2018/march/do-hmda-data-prove-lending-discrimination#, last accessed 03/08/2024.

Texas Department of Housing & Community Affairs v. Inclusive Communities Project Inc., 135 S. Ct. 2507 (2015), available at: https://www.justice.gov/sites/default/files/crt/legacy/2015/06/25/tdhcainclusiveopinion.pdf, last accessed 03/11/2024.

Thomas, Lyn C., David B. Edelman and Jonathan N. Crook, *Credit Scoring and Its Applications*, Society for Industrial and Applied Mathematics Monographs on Mathematical Modeling and Computation, 2002.

VantageScore, "Consumer Credit: During COVID-19 and Beyond," VantageScore Fact Sheet, October 28, 2020, available at https://www.vantagescore.com/consumer-credit-during-covid-19-and-beyond/, last accessed 3/9/2024.

Wards Cove Packing Co. v. Atonio, 490 U.S. 642 (1989), available at: https://supreme.justia.com/cases/federal/us/490/642/, last accessed 03/11/2024.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

## Appendix 2:  Plaintiff Loan Application Information[122]

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |

| Plaintiff | Address | Action Date | Action Taken / Reason for Denial | Loan Product | Loan Purpose | Loan Amount | Decision Credit Score | DTI | CLTV | AUS 1 | AUS 2 | AUS 3 | AUS Result 1 | AUS Result 2 | AUS Result 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Aaron Braxton | ██ Los Angeles CA 90037 | 9/2/2020 | Approved | HAMP Mod | | $66,160 | | | | | | | N/A | N/A | N/A |
| Aaron Braxton | Los Angeles CA 90037 | 12/3/2020 | Approved | HAMP Mod | | $83,422 | | | | | | | N/A | N/A | N/A |
| Paul Martin | ██ Los Angeles, CA 90056 | 6/19/2020 | Withdrawn | Conv. HELOC 30 year | Other Purpose: HELOC | $180,000 | 760 | NA | NA | INTERNAL AUS-HEQ | | | Other - Manual Review | | |
| Gia Gray | ██ Danville, CA 94506 | 6/23/2020 | Originated | Conv. 30 year fixed | Rate/Term Refinance | $1,443,000 | 778 | 36.58% | 69.54% | Internal AUS | | | Other - A1 | | |
| Gia Gray | ██ Danville, CA 94506 | 2/27/2020 | Withdrawn | Conv. 30 year fixed | Rate/Term Refinance | $1,444,000 | NA | NA | NA | Internal AUS | | | Other - A1 | | |
| Bryan Brown | ██ Bristol, CT 06010 ██ | 2/25/2021 | Denied - Debt-to-income ratio | Conv. 15 year fixed | Rate/Term Refinance | $165,000 | 752 | 56.91% | 75.00% | Internal AUS | DU | LP or LPA | Other - A2 | Approve / Ineligible | Caution |
| Elretha Perkins | Dacula, GA, 30019 | 10/4/2021 | Denied - Credit Application Incomplete | Conv. 15 year fixed | Rate/Term Refinance | $330,100 | 682 | 21.00% | 62.88% | Internal AUS | DU | LP or LPA | Other - A2 | Approve / Eligible | Accept |

---

[122] Based on HMDA data.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Table A2.1.  Plaintiffs' Loan Application Information at Decision / Withdrawal | | | | | | | | |
| Plaintiff | Address | Action Date | Action Taken / Reason for Denial | Loan Product | Loan Purpose | Loan Amount | Decision Credit Score | DTI | CLTV | AUS 1 | AUS 2 | AUS 3 | AUS Result 1 | AUS Result 2 | AUS Result 3 |
| Elretha Perkins | Dacula, GA, 30019 | 12/15/2021 | Denied - Late Payments; No Benefit to Borrower | Conv. 330 months fixed | Cash Out Refinance | $332,700 | 667 | 43.32% | 53.92% | Internal AUS | DU | LP or LPA | Other - A2 | Approve / Eligible | Accept |
| Christopher Williams | Snellville GA 30039 | 7/22/2019 | Withdrawn | Conv. HELOC, 30 year | Cash Out Refinance | $180,000 | 686 | NA | 76.60% | Internal AUS | | | Other - Approval Recom. | | |
| Ifeoma Ebo | Brooklyn, NY 11203 | 4/29/2022 | Withdrawn | FHA, 30 year fixed | Home Purchase | $868,970 | 788 | 43.17% | 96.50% | TOTAL | | | Accept | | |
| Terah Kuykendall-Montoya | Converse, TX 78109 | 7/30/2021 | Denied - Program not available; Recent Bankruptcy | Conv. 30 year fixed | Cash Out Refinance | $25,000 | 697 | 6.10% | 16.67% | Internal AUS | DU | | Other - C2 | Out of Scope | |

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

## Appendix 3:  AUS and HMDA Actions

| Table A3.1. Wells Fargo Decisioned Application Outcomes by Product and AU System and Result | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **Wells Fargo Decision – HMDA Action** | **Conv. Conforming Refinance** | | **Conv. Conforming Purchase** | | **HELOC** | | **Conv. Non-Conforming** | | **Government** | | **Conv. Home Improvement / Other** | |
| **AU System** | **AU Result** | | # | % | # | % | # | % | # | % | # | % | # | % |
| DU | Approve / Eligible | Approved | 354,185 | 80.4% | 244,151 | 91.4% | 0 | . | 26 | 23.9% | 0 | 0.0% | 10,385 | 71.1% |
| | | Denied | 86,087 | 19.6% | 23,109 | 8.6% | 0 | . | 83 | 76.1% | 38 | 100.0% | 4,219 | 28.9% |
| | Approve / Ineligible | Approved | 6,214 | 8.4% | 11,986 | 48.7% | 0 | . | 4 | 4.3% | 0 | 0.0% | 347 | 7.7% |
| | | Denied | 67,976 | 91.6% | 12,637 | 51.3% | 0 | . | 90 | 95.7% | 8 | 100.0% | 4,175 | 92.3% |
| | Refer/Eligible, Refer/Ineligible, Refer with Caution | Approved | 1,520 | 2.2% | 2,631 | 13.3% | 0 | . | 1 | 2.3% | 0 | 0.0% | 102 | 1.5% |
| | | Denied | 67,180 | 97.8% | 17,194 | 86.7% | 0 | . | 42 | 97.7% | 9 | 100.0% | 6,527 | 98.5% |
| | Out of Scope, Error | Approved | 65 | 3.1% | 225 | 27.7% | 0 | . | 0 | 0.0% | 0 | 0.0% | 5 | 0.4% |
| | | Denied | 2,003 | 96.9% | 588 | 72.3% | 0 | . | 2 | 100.0% | 1 | 100.0% | 1,335 | 99.6% |
| LP/LPA | Accept | Approved | 268,412 | 73.8% | 138,706 | 86.2% | 0 | . | 27 | 16.4% | 24,036 | 92.7% | 6,215 | 54.7% |
| | | Denied | 95,316 | 26.2% | 22,171 | 13.8% | 0 | . | 138 | 83.6% | 1,895 | 7.3% | 5,145 | 45.3% |
| | Caution | Approved | 2,912 | 2.5% | 3,233 | 10.9% | 0 | . | 2 | 2.7% | 0 | 0.0% | 136 | 1.5% |
| | | Denied | 115,333 | 97.5% | 26,421 | 89.1% | 0 | . | 71 | 97.3% | 14 | 100.0% | 9,193 | 98.5% |
| | Refer | Approved | 0 | . | 0 | 0.0% | 0 | . | 0 | . | 1,143 | 42.3% | 0 | . |
| | | Denied | 0 | . | 1 | 100.0% | 0 | . | 0 | . | 1,557 | 57.7% | 0 | . |
| TOTAL | Accept | Approved | 0 | 0.0% | 0 | 0.0% | 0 | . | 0 | . | 4,269 | 57.0% | 0 | . |
| | | Denied | 3 | 100.0% | 3 | 100.0% | 0 | . | 0 | . | 3,222 | 43.0% | 0 | . |
| | Refer | Approved | 0 | 0.0% | 0 | 0.0% | 0 | . | 0 | . | 137 | 6.4% | 0 | 0.0% |
| | | Denied | 1 | 100.0% | 3 | 100.0% | 0 | . | 0 | . | 2,016 | 93.6% | 1 | 100.0% |
| | Other | Approved | 0 | . | 0 | . | 0 | . | 0 | . | 1 | 0.3% | 0 | 0.0% |
| | | Denied | 0 | . | 0 | . | 0 | . | 0 | . | 349 | 99.7% | 1 | 100.0% |

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| | | | Conv. Conforming Refinance | | Conv. Conforming Purchase | | HELOC | | Conv. Non-Conforming | | Government | | Conv. Home Improvement / Other | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Table A3.1. Wells Fargo Decisioned Application Outcomes by Product and AU System and Result** | | | | | | | | | | | | | | |
| **AU System** | **AU Result** | **Wells Fargo Decision – HMDA Action** | **#** | **%** | **#** | **%** | **#** | **%** | **#** | **%** | **#** | **%** | **#** | **%** |
| Wells Fargo Internal Proprietary System ("IPS") | Approval | Approved | 477,810 | 76.7% | 308,808 | 89.0% | 84,209 | 59.4% | 168,682 | 86.9% | 36,013 | 80.2% | 16,644 | 64.0% |
| | | Denied | 145,143 | 23.3% | 38,196 | 11.0% | 57,479 | 40.6% | 25,399 | 13.1% | 8,910 | 19.8% | 9,366 | 36.0% |
| | Decline | Approved | 88,121 | 48.7% | 62,066 | 75.8% | 7,477 | 5.6% | 5,855 | 43.4% | 1,884 | 37.4% | 3,488 | 26.8% |
| | | Denied | 92,911 | 51.3% | 19,863 | 24.2% | 125,746 | 94.4% | 7,637 | 56.6% | 3,158 | 62.6% | 9,512 | 73.2% |
| | Other / Manual | Approved | 26,078 | 35.8% | 16,564 | 67.1% | 31,278 | 38.4% | 20 | 1.2% | 24,899 | 71.1% | 5,779 | 36.2% |
| | | Denied | 46,682 | 64.2% | 8,105 | 32.9% | 50,202 | 61.6% | 1,634 | 98.8% | 10,138 | 28.9% | 10,174 | 63.8% |

- This section includes the AUS result reported in the HMDA data under "other" or "internal proprietary," as well as the DS Risk Class and CR Grade CD fields that Dr. Kurzendoerfer uses as the source for the ECS and Home Equity AUS risk classes.
- Dr. Kurzendoerfer definition of "Approve" includes any AUS Other result of "Approval Recommended," "A1," "A2," "G1," "G2," or "Accept;" any DS Risk Class O value of "A1," "A2, "G1," or "G2;" or any CR Grade CD of "G70," "G80," or "G90."  Note that the Home Equity credit grades (CR Grade CD) are FICO buckets.
- Dr. Kurzendoerfer's definition of "Decline" includes any application that is not approved as defined above, and has an AUS Other result of "Decline," "C1," "C2," "G3," "G4," "Inaccurate Credit," "Insufficient Credit," "Invalid Credit," or "Refer;" a DS Risk Class of "C1," "C2," "G3," or "G4;" or a CR Grade CD of "G60," "G50," "G45," "G40," "G35," "G30," or "G00."
- "Other/Manual" includes any application that is neither "approved" nor "declined" per the above definitions and has an AUS Other result of "Exception Review," "Manual," "Manual Review," or "Unavailable;" a DS Risk Class of "Manual;" or a CR Grade CD of "No Result" or "Other."

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| Table A3.2.  Approve/Eligible as a Percent of Total AUS System Recommendations | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AUS | Conv. Conforming Refinance | | Conv. Conforming Purchase | | HELOC | | Conv. Non-Conforming | | Government | | Conv. Home Improvement / Other | |
| | # | % | # | % | # | % | # | % | # | % | # | % |
| DU | 354,185 | 60.52% | 244,151 | 78.12% | | | 26 | 11.71% | | | 10,385 | 54.30% |
| LP/LPA | 268,412 | 55.69% | 138,706 | 72.80% | | | 27 | 12.80% | 24,036 | 83.91% | 6,215 | 30.04% |
| TOTAL (FHA) | | | | | | | | | 4,269 | 42.72% | | |
| IPS (WF) | 477,810 | 54.50% | 308,808 | 68.08% | 84,209 | 23.63% | 168,682 | 80.62% | 36,013 | 42.37% | 16,644 | 30.28% |

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

## Appendix 4:  National HMDA Denial Rates

Table A4.1 provides the modified denial rates made available by the FRB, controlling for borrower characteristics and lender.  Modified denial rates have not been made available by the CFPB after it assumed the role for HMDA reporting collection and analysis formerly held by the FRB.  This makes the results in Table A4.1 more "controlled," while those in Table A4.2 are "raw" denial rates.  However, similar patterns occur over the years from 2005 to 2011 and 2018 to 2022, with African American applicants always having higher denial rates than Hispanics, who have higher denial rates than non-Hispanic whites.  To fully understand the underwriting decisions requires formulating models to account for each lender's policies, and the review of electronically available lender data, and loan file review.

| Table A4.1.  Modified (Borrower-Related plus Lender) Denial Rates, by Race and Ethnicity | | | | | | |
|---|---|---|---|---|---|---|
| Year | Conventional Home Purchase | | | Conventional Refi | | |
| Race/Ethnicity | African American | Hispanic | Non-Hispanic White | African American | Hispanic | Non-Hispanic White |
| 2005[123] | 19.3 | 16.0 | 12.3 | 35.2 | 31.6 | 27.2 |
| 2006[124] | 21.5 | 17.5 | 13.1 | 37.5 | 35.8 | 30.6 |
| 2007[125] H1 | 23.9 | 19.7 | 13.3 | 42.2 | 39.8 | 32.7 |
| 2007  H2 | 22.9 | 19.7 | 13.2 | 44.9 | 43.4 | 35.7 |
| 2008[126] | 25.4 | 22.0 | 13.6 | 44.9 | 41.3 | 31.7 |
| 2009[127] | 24.1 | 19.0 | 13.1 | 38.3 | 30.1 | 21.0 |
| 2010[128] | 21.5 | 16.5 | 12.3 | 31.1 | 25.0 | 19.0 |
| 2011[129] | 21.3 | 15.7 | 11.9 | 32.1 | 26.6 | 20.0 |
| Table A4.2 Conventional, Conforming Denial Rates, by Race and Ethnicity[130] | | | | | | |
| 2018 | 16.9 | 11.9 | 6.5 | 39.8 | 30.0 | 20.9 |
| 2019 | 15.9 | 10.6 | 5.8 | 33.5 | 22.5 | 13.8 |
| 2020 | 17.0 | 11.0 | 5.8 | 25.4 | 17.2 | 9.9 |
| 2021 | 15.7 | 9.7 | 5.4 | 23.9 | 17.1 | 10.5 |
| 2022 | 16.2 | 10.9 | 5.6 | 32.2 | 25.5 | 16.9 |

---

[123] See Avery, Brevoort, and Canner, 2006, Table 15, at A164.

[124] See Avery, Brevoort, and Canner, 2007, Table 13, at A98.

[125] See Avery, Brevoort, and Canner, 2008, Table 20, 2007 H1 and H2, at A144.

[126] See Avery, Bhutta, Brevoort, and Canner, Table 14, at A74 and A75.

[127] *Ibid.*

[128] See Avery, Bhutta, Brevoort, and Canner, 2010, Table 19, at 56.

[129] See Avery, Bhutta, Brevoort, and Canner, 2011, Table 18, at 38.

[130] See CFPB Data Point, by year.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

## Appendix 5:  Modeled Underwriting Results

119.       I analyze loan applications, by year, based on loan type: conventional, FHA/VA, or HELOC. The "Kurz." model controls include the controls used by Dr. Kurzendoerfer in her "HMDA and Wells Fargo Controls" model, with additional controls for loan purpose and conforming or non-conforming.

120.       A total of 3,181 USDA loans were excluded because the underwriting guidelines are different for those compared to other government loans, and once the models were produced by year and target group, there was only limited volume of USDA loans for analysis.

121.       The "CRA" model uses Dr. Kurzendoerfer's model as a starting point, but makes the following changes, based on the data available, and Wells Fargo's underwriting guidelines (see, for example, WF-00003206 and WF-00005952 for conventional agency and non-agency guidelines, respectively):

a. Simplified the credit score bins to use 20 points intervals.

b. Combined CLTV bins below 80% in the conventional and HELOC models.  In the FHA/VA model, I control for whether an application's CLTV is above or below the CLTV threshold set by FHA or VA guidelines and Wells Fargo policy documents.

c. Added DTI bins at 50% and 60% for FHA/VA loans and added controls for Streamline Refinance or Interest Rate Reducing Refinance Loan ("IRRRL") products.  Moved DTI of 0% into its own bin and added a bin for DTI greater than 43% and less than or equal to 45%.

d. Combined loan term to control for 120 months or less, 121-180 months, or 181 months or more.

e. Combined the months of PITI reserves bins above 2 months.

f. Added a control for multifamily homes (> 4 units).[131]

g. Split the control for non-owner occupied into second home and investment property.

h. In the FHA/VA model, I include an indicator for FHA applications.

---

[131] Multifamily loans (more than 4 units) and commercial and business purpose loans were all included in many of Dr. Kurzendoerfer's analyses.  In some models she adds controls for commercial or business purpose loans. This is completely inappropriate given the allegations in this case.  Plaintiffs had no applications for any loans of those types, and underwriting standards for them are completely different from those for owner-occupied single-family homes.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

i.   Added detailed controls for the AUS decision:  for conventional applications, I control for DU Approve/Eligible or LPA Accept, DU Approve/Ineligible, other DU or LPA results (*e.g.*, Refer, Caution, etc.), and no DU or LPA result.  For FHA applications, I control for TOTAL Accept or Approve results, TOTAL Refer or other non-Approve results, and no TOTAL result for FHA applications.  Only one VA loan application was evaluated by an agency AUS (LPA), so I include VA applications among the FHA applications that were not evaluated by TOTAL.  I excluded USDA applications.

j.   I control separately for each of the negative credit history factors that Dr. Kurzendoerfer combines into one control: at least one 90 days past due mortgage trade in the past 24 months, prior short sale, and prior foreclosure.  Additionally, I use the "age of bankruptcy" field from WF-DATA-00010978 to control for both the presence and timing of the prior bankruptcy, with bins of 48 months or less, 49 to 84 months, or 85 months or more.

k.   I add control for products that have different underwriting guidelines and that are present in the Wells Fargo data:  housing finance agency bond or down-payment assistance program ("DAP") loans, home affordable refinance program ("HARP") loans, and Dream Plan Home Mortgage loans.

l.   Finally, I add controls for applicant credit report history from WF-DATA-00010977.  These include number of inquiries, months of credit history, number of bank trades with high balance, net revolving debt ratio, balance to credit ratios on mortgage trades and all trades, number of public record items, collections and 90 days or more past due trades, and number of bank card trades.

122.   The table below reports the denial odds ratios and differences in average marginal effects for Hispanic, African American, and Asian applicants compared to non-Hispanic white applicants.  I also ran the model on American Indian applicants and Native Hawaiian and other Pacific Islander applicants and found similar results.

123.   Yellow highlighting indicates statistically significant odds ratios and/or marginal effects.  Blue highlighting indicates those results with odds ratios in excess of 1.50 or marginal effects in excess of 5% using Dr. Kurzendoerfer's models.  Green highlighting indicates those results with odds ratios in excess of 1.50 or marginal effects in excess of 5% using CRA models.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| Table A5.1.  Underwriting Model Results | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Comp. Group | | Target Group | | | | | | | |
| App. Year | Target Group | Model | Total Apps. | Denied | Total Apps. | Denied | Odds Ratio | OR P-Value | MFX | MFX P-Value | Pseudo R-Squared | AUC |
| *Conventional* | | | | | | | | | | | | |
| 2018 | Hispanic | Kurz. Model | 150,048 | 28,299 | 31,338 | 10,695 | 1.42 | 0.000 | 2.8% | 0.000 | 0.497 | 0.910 |
| | | CRA Model | 150,047 | 28,298 | 31,338 | 10,695 | 1.34 | 0.000 | 2.1% | 0.000 | 0.531 | 0.913 |
| | Black | Kurz. Model | 150,048 | 28,299 | 15,760 | 6,422 | 1.47 | 0.000 | 3.0% | 0.000 | 0.496 | 0.911 |
| | | CRA Model | 150,039 | 28,290 | 15,760 | 6,422 | 1.44 | 0.000 | 2.7% | 0.000 | 0.530 | 0.913 |
| | Asian | Kurz. Model | 150,048 | 28,299 | 26,666 | 4,972 | 1.44 | 0.000 | 2.7% | 0.000 | 0.479 | 0.903 |
| | | CRA Model | 150,040 | 28,291 | 26,665 | 4,971 | 1.31 | 0.000 | 1.9% | 0.000 | 0.512 | 0.905 |
| 2019 | Hispanic | Kurz. Model | 195,078 | 38,946 | 40,755 | 14,078 | 1.37 | 0.000 | 2.5% | 0.000 | 0.514 | 0.903 |
| | | CRA Model | 195,065 | 38,935 | 40,749 | 14,074 | 1.33 | 0.000 | 2.1% | 0.000 | 0.529 | 0.906 |
| | Black | Kurz. Model | 195,078 | 38,946 | 19,347 | 8,682 | 1.58 | 0.000 | 3.8% | 0.000 | 0.515 | 0.904 |
| | | CRA Model | 195,065 | 38,935 | 19,341 | 8,676 | 1.53 | 0.000 | 3.4% | 0.000 | 0.529 | 0.906 |
| | Asian | Kurz. Model | 195,078 | 38,946 | 39,761 | 7,442 | 1.21 | 0.000 | 1.4% | 0.000 | 0.486 | 0.891 |
| | | CRA Model | 195,065 | 38,935 | 39,761 | 7,442 | 1.15 | 0.000 | 1.0% | 0.000 | 0.501 | 0.894 |
| 2020 | Hispanic | Kurz. Model | 251,116 | 52,928 | 53,114 | 18,754 | 1.44 | 0.000 | 3.6% | 0.000 | 0.421 | 0.872 |
| | | CRA Model | 251,110 | 52,922 | 53,111 | 18,751 | 1.39 | 0.000 | 3.2% | 0.000 | 0.437 | 0.876 |
| | Black | Kurz. Model | 251,116 | 52,928 | 23,995 | 9,701 | 1.50 | 0.000 | 4.2% | 0.000 | 0.413 | 0.869 |
| | | CRA Model | 251,110 | 52,922 | 23,994 | 9,700 | 1.44 | 0.000 | 3.6% | 0.000 | 0.428 | 0.873 |
| | Asian | Kurz. Model | 251,116 | 52,928 | 54,080 | 12,239 | 1.27 | 0.000 | 2.3% | 0.000 | 0.399 | 0.861 |
| | | CRA Model | 251,110 | 52,922 | 54,076 | 12,235 | 1.20 | 0.000 | 1.7% | 0.000 | 0.413 | 0.865 |
| 2021 | Hispanic | Kurz. Model | 255,416 | 50,427 | 59,967 | 21,246 | 1.60 | 0.000 | 4.1% | 0.000 | 0.478 | 0.883 |
| | | CRA Model | 255,411 | 50,422 | 59,966 | 21,245 | 1.53 | 0.000 | 3.5% | 0.000 | 0.503 | 0.890 |
| | Black | Kurz. Model | 255,416 | 50,427 | 34,358 | 13,630 | 1.49 | 0.000 | 3.5% | 0.000 | 0.475 | 0.882 |
| | | CRA Model[132] | 258,803 | 53,814 | 35,953 | 15,225 | . | | . | | . | . |
| | Asian | Kurz. Model | 255,416 | 50,427 | 46,100 | 9,489 | 1.29 | 0.000 | 2.1% | 0.000 | 0.455 | 0.871 |
| | | CRA Model[133] | 258,803 | 53,814 | 46,400 | 9,789 | . | | . | | . | . |
| 2022 | Hispanic | Kurz. Model | 83,988 | 24,157 | 24,795 | 12,211 | 1.76 | 0.000 | 5.8% | 0.000 | 0.511 | 0.906 |
| | | CRA Model | 83,983 | 24,153 | 24,786 | 12,202 | 1.67 | 0.000 | 4.9% | 0.000 | 0.539 | 0.912 |
| | Black | Kurz. Model | 83,979 | 24,157 | 15,998 | 8,520 | 1.52 | 0.000 | 4.2% | 0.000 | 0.509 | 0.904 |
| | | CRA Model | 83,973 | 24,151 | 15,991 | 8,515 | 1.45 | 0.000 | 3.5% | 0.000 | 0.538 | 0.911 |
| | Asian | Kurz. Model | 83,979 | 24,157 | 18,312 | 4,938 | 1.52 | 0.000 | 4.1% | 0.000 | 0.483 | 0.891 |
| | | CRA Model | 83,974 | 24,153 | 18,302 | 4,933 | 1.37 | 0.000 | 2.9% | 0.000 | 0.510 | 0.899 |

[132] Model did not converge.
[133] Model did not converge.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| | | | Comp. Group | | Target Group | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **App. Year** | **Target Group** | **Model** | **Total Apps.** | **Denied** | **Total Apps.** | **Denied** | **Odds Ratio** | **OR P-Value** | **MFX** | **MFX P-Value** | **Pseudo R-Squared** | **AUC** |
| | | | | | | *FHA/VA* | | | | | | |
| 2018 | Hispanic | Kurz. Model | 10,246 | 2,637 | 2,031 | 730 | 1.53 | 0.000 | 4.9% | 0.000 | 0.403 | 0.878 |
| | | CRA Model | 10,246 | 2,635 | 2,030 | 729 | 1.38 | 0.000 | 3.4% | 0.000 | 0.444 | 0.891 |
| | Black | Kurz. Model | 10,246 | 2,637 | 2,164 | 822 | 1.29 | 0.000 | 2.8% | 0.001 | 0.408 | 0.878 |
| | | CRA Model | 10,246 | 2,635 | 2,166 | 823 | 1.31 | 0.000 | 2.8% | 0.000 | 0.451 | 0.893 |
| | Asian | Kurz. Model | 10,246 | 2,637 | 610 | 196 | 1.40 | 0.007 | 3.7% | 0.011 | 0.405 | 0.877 |
| | | CRA Model | 10,246 | 2,635 | 610 | 196 | 1.45 | 0.005 | 3.8% | 0.008 | 0.452 | 0.893 |
| 2019 | Hispanic | Kurz. Model | 10,080 | 2,026 | 2,185 | 699 | 1.74 | 0.000 | 6.3% | 0.000 | 0.345 | 0.854 |
| | | CRA Model | 9,749 | 1,694 | 2,051 | 565 | 1.61 | 0.000 | 5.1% | 0.000 | 0.320 | 0.847 |
| | Black | Kurz. Model | 10,081 | 2,027 | 2,304 | 730 | 1.53 | 0.000 | 4.8% | 0.000 | 0.342 | 0.853 |
| | | CRA Model | 9,750 | 1,695 | 2,180 | 605 | 1.64 | 0.000 | 5.3% | 0.000 | 0.315 | 0.846 |
| | Asian | Kurz. Model | 10,080 | 2,026 | 676 | 177 | 1.76 | 0.000 | 6.3% | 0.000 | 0.343 | 0.852 |
| | | CRA Model | 10,045 | 1,990 | 675 | 176 | 1.85 | 0.000 | 6.4% | 0.000 | 0.384 | 0.869 |
| 2020 | Hispanic | Kurz. Model | 14,434 | 2,648 | 3,225 | 899 | 1.64 | 0.000 | 6.0% | 0.000 | 0.265 | 0.804 |
| | | CRA Model | 14,185 | 2,399 | 3,115 | 789 | 1.59 | 0.000 | 5.6% | 0.000 | 0.228 | 0.793 |
| | Black | Kurz. Model | 14,435 | 2,648 | 3,546 | 1,028 | 1.49 | 0.000 | 4.8% | 0.000 | 0.258 | 0.803 |
| | | CRA Model | 14,185 | 2,399 | 3,445 | 927 | 1.51 | 0.000 | 5.0% | 0.000 | 0.223 | 0.791 |
| | Asian | Kurz. Model | 14,434 | 2,648 | 1,318 | 288 | 1.35 | 0.000 | 3.5% | 0.001 | 0.259 | 0.800 |
| | | CRA Model | 14,175 | 2,398 | 1,296 | 266 | 1.35 | 0.000 | 3.4% | 0.001 | 0.223 | 0.789 |
| 2021 | Hispanic | Kurz. Model | 8,957 | 1,858 | 2,087 | 616 | 1.40 | 0.000 | 4.1% | 0.000 | 0.278 | 0.810 |
| | | CRA Model | 8,926 | 1,827 | 2,077 | 607 | 1.35 | 0.000 | 3.6% | 0.000 | 0.290 | 0.816 |
| | Black | Kurz. Model | 8,956 | 1,858 | 2,581 | 776 | 1.47 | 0.000 | 5.0% | 0.000 | 0.251 | 0.795 |
| | | CRA Model | 8,926 | 1,827 | 2,572 | 767 | 1.47 | 0.000 | 4.9% | 0.000 | 0.266 | 0.802 |
| | Asian | Kurz. Model | 8,936 | 1,858 | 697 | 165 | 1.35 | 0.007 | 3.7% | 0.011 | 0.262 | 0.800 |
| | | CRA Model | 8,906 | 1,827 | 694 | 162 | 1.31 | 0.021 | 3.2% | 0.030 | 0.276 | 0.807 |
| 2022 | Hispanic | Kurz. Model | 4,061 | 1,574 | 1,302 | 647 | 1.39 | 0.000 | 4.4% | 0.000 | 0.397 | 0.883 |
| | | CRA Model | 4,041 | 1,554 | 1,294 | 639 | 1.21 | 0.053 | 2.3% | 0.056 | 0.453 | 0.902 |
| | Black | Kurz. Model | 4,058 | 1,571 | 1,871 | 827 | 1.15 | 0.099 | 2.0% | 0.100 | 0.353 | 0.859 |
| | | CRA Model | 4,041 | 1,554 | 1,873 | 829 | 1.07 | 0.450 | 0.9% | 0.450 | 0.401 | 0.878 |
| | Asian | Kurz. Model | 4,058 | 1,571 | 360 | 130 | 1.08 | 0.616 | 1.0% | 0.618 | 0.396 | 0.882 |
| | | CRA Model | 4,041 | 1,554 | 358 | 128 | 0.94 | 0.725 | -0.7% | 0.723 | 0.459 | 0.905 |

**Table A5.1.  Underwriting Model Results**

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| | | | Comp. Group | | Target Group | | | | | MFX | Pseudo | |
| App. Year | Target Group | Model | Total Apps. | Denied | Total Apps. | Denied | Odds Ratio | OR P-Value | MFX | P-Value | R-Squared | AUC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Table A5.1.  Underwriting Model Results** | | | | | | | | | | | | |
| *HELOC* | | | | | | | | | | | | |
| 2018 | Hispanic | Kurz. Model | 83,373 | 44,792 | 18,534 | 14,014 | 1.47 | 0.000 | 2.9% | 0.000 | 0.657 | 0.960 |
| | | CRA Model | 83,374 | 44,797 | 18,534 | 14,015 | 1.44 | 0.000 | 2.6% | 0.000 | 0.674 | 0.963 |
| | Black | Kurz. Model | 83,373 | 44,792 | 7,834 | 6,271 | 1.45 | 0.000 | 2.8% | 0.000 | 0.653 | 0.959 |
| | | CRA Model | 83,374 | 44,797 | 7,836 | 6,274 | 1.44 | 0.000 | 2.7% | 0.000 | 0.671 | 0.962 |
| | Asian | Kurz. Model | 83,373 | 44,792 | 13,738 | 8,327 | 1.03 | 0.460 | 0.2% | 0.461 | 0.653 | 0.958 |
| | | CRA Model | 83,374 | 44,797 | 13,737 | 8,327 | 0.99 | 0.753 | -0.1% | 0.753 | 0.670 | 0.961 |
| 2019 | Hispanic | Kurz. Model | 81,036 | 41,986 | 17,257 | 12,891 | 1.47 | 0.000 | 3.0% | 0.000 | 0.649 | 0.956 |
| | | CRA Model | 82,220 | 43,170 | 17,784 | 13,418 | 1.45 | 0.000 | 2.7% | 0.000 | 0.669 | 0.960 |
| | Black | Kurz. Model | 81,036 | 41,986 | 7,515 | 6,069 | 1.66 | 0.000 | 4.2% | 0.000 | 0.642 | 0.954 |
| | | CRA Model | 82,219 | 43,170 | 7,872 | 6,426 | 1.62 | 0.000 | 3.7% | 0.000 | 0.663 | 0.958 |
| | Asian | Kurz. Model | 81,036 | 41,986 | 12,664 | 7,547 | 1.10 | 0.007 | 0.8% | 0.008 | 0.639 | 0.953 |
| | | CRA Model | 82,227 | 43,178 | 12,831 | 7,714 | 1.08 | 0.050 | 0.5% | 0.052 | 0.659 | 0.957 |
| 2020 | Hispanic | Kurz. Model | 21,924 | 10,540 | 3,335 | 2,261 | 1.37 | 0.000 | 3.5% | 0.000 | 0.519 | 0.918 |
| | | CRA Model | 21,565 | 10,181 | 3,287 | 2,213 | 1.33 | 0.000 | 3.1% | 0.000 | 0.529 | 0.921 |
| | Black | Kurz. Model | 21,870 | 10,486 | 1,268 | 910 | 1.52 | 0.000 | 4.9% | 0.000 | 0.510 | 0.915 |
| | | CRA Model | 21,431 | 10,047 | 1,216 | 858 | 1.49 | 0.000 | 4.5% | 0.000 | 0.518 | 0.917 |
| | Asian | Kurz. Model | 21,842 | 10,458 | 3,358 | 1,975 | 1.25 | 0.000 | 2.4% | 0.000 | 0.509 | 0.914 |
| | | CRA Model | 21,405 | 10,021 | 3,299 | 1,916 | 1.16 | 0.017 | 1.6% | 0.019 | 0.519 | 0.917 |

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

## Appendix 6:  Modeled Pricing Results:  Examples

124.     The model controls include interacted credit score, loan purpose, and CLTV controls, loan amount controls, lock period controls, lock week controls, state controls, a Dream Plan Home Buyer program control, a continuous discount point control, and (in Table A6.1 only) a continuous lender credit control.

125.     To determine variables used in the pricing models, see Rate Sheets:  WF-00021076 – WF-00021420.  I produced Table A6.1 using some of the controls Dr. Kurzendoerfer included.  However, lender credits generally impact closing costs and not the interest rate directly, so I also included Table A6.2 to show results if that variable was not included.  Discount points can impact interest rates directly.

126.     For the FHA pricing model, I reviewed the FHA rate sheets.  I included as controls individual MSAs if there were more than 30 loans in an MSA, or used the state control if that threshold was not met.  For MSAs that had sufficient counts, the state control includes the remainder of the state.

127.     None of the comparisons of the target group to the control group result in statistically significant differences.

| Table A6.1 Wells Fargo Pricing Results, Conventional, Conforming Refinance: Application Year 2022 | | | | | | |
|---|---|---|---|---|---|---|
| **Target Group** | **Total Origs.** | **Target Group Origs.** | **Coef. (bps)** | **Standard Error** | **P-value** | **Adjusted R-Squared** |
| Hispanic | 14,832 | 2,777 | 0.29 | 0.65 | 0.657 | 0.93 |
| Black | 14,149 | 2,094 | 0.61 | 0.71 | 0.391 | 0.93 |
| Asian | 12,871 | 816 | -0.52 | 1.18 | 0.656 | 0.93 |
| American Indian | 12,324 | 269 | 0.21 | 1.71 | 0.901 | 0.93 |
| Pacific Islander | 12,133 | 78 | 5.59 | 2.95 | 0.058 | 0.93 |

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| Table A6.2 Wells Fargo Conventional, Conforming, Refinance Pricing Results, Application Year 2022 – No Lender Credit Control | | | | | | |
|---|---|---|---|---|---|---|
| **Target Group** | **Total Origs.** | **Target Group Origs.** | **Coef. (bps)** | **Standard Error** | **p-Value** | **Adjusted R-Squared** |
| Hispanic | 14,832 | 2,777 | 0.29 | 0.65 | 0.659 | 0.93 |
| Black | 14,149 | 2,094 | 0.60 | 0.71 | 0.398 | 0.93 |
| Asian | 12,871 | 816 | -0.56 | 1.18 | 0.636 | 0.93 |
| American Indian | 12,324 | 269 | 0.18 | 1.70 | 0.916 | 0.93 |
| Pacific Islander | 12,133 | 78 | 5.58 | 2.95 | 0.059 | 0.93 |

| Table A6.3 Wells Fargo FHA Pricing Results, Action Year 2022 | | | | | | |
|---|---|---|---|---|---|---|
| **Target Group** | **Total Origs.** | **Target Group Origs.** | **Coef. (bps)** | **Standard Error** | **p-Value** | **Adjusted R-Squared** |
| Hispanic | 1,101 | 287 | -4.31 | 4.25 | 0.311 | 0.75 |
| Black | 1,279 | 465 | -0.20 | 4.61 | 0.966 | 0.77 |
| Asian | 871 | 57 | -11.90 | 7.87 | 0.131 | 0.76 |
| American Indian | 852 | 38 | -16.18 | 7.71 | 0.036 | 0.76 |
| Pacific Islander | 823 | 9 | . | . | . | . |

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

## Appendix 7.  Reasons for Denial for HMDA Applications with Action Code 3

| Table A7.1.  Reasons for Denial<br>Conventional Conforming Purchase and Refinance Loan Applications<br>for Denied Applications with a Predicted Probability of Approval > 50% | | |
|---|---|---|
| **Reason for Denial** | **Count** | **Percent** |
| Credit application incomplete | 52,997 | 35.8% |
| Other | 31,410 | 21.2% |
| Insufficient collateral | 19,373 | 13.1% |
| Credit history | 18,539 | 12.5% |
| Insufficient cash (downpayment, closing costs) | 10,543 | 7.1% |
| Debt-to-income ratio | 7,181 | 4.9% |
| Unverifiable information | 6,332 | 4.3% |
| Employment history | 1,607 | 1.1% |
| Mortgage insurance denied | 1 | 0.0% |
| **"Other" Denial Reasons** | | |
| **Reason for Denial: "Other" Text Field** | **Count** | **Percent** |
| Product or Program Not Available | 13,600 | 43.3% |
| No Benefit to Borrower | 6,125 | 19.5% |
| Title Issues | 3,950 | 12.6% |
| Fees, APR, or Terms Exceed State, Federal, or Lender Limits | 2,149 | 6.8% |
| Unacceptable Party to Transaction | 678 | 2.2% |
| Credit Score Does Not Meet Program's Minimum Requirement | 638 | 2.0% |
| Temporary Residence | 472 | 1.5% |
| Product or Program Not Available & No Benefit to Borrower | 318 | 1.0% |
| Cash-Out Request Exceeds State or Program Guidelines | 318 | 1.0% |
| Product or Program Not Available & Fees, APR, or Terms Exceed State, Federal, or Lender Limits | 298 | 0.9% |
| Income, Assets, or Employment Do Not Meet Requirements | 277 | 0.9% |
| Previously Terminated Accounts | 154 | 0.5% |
| Maximum Number of Properties or Loan Amount Exceeded | 129 | 0.4% |

**Notes:**

- Applications can have more than one reason for denial.

- Only "other" reasons with counts of at least 100 are shown.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Table A7.2. Plaintiffs Included in Dr. Kurzendoerfer's Regressions For Figures 24 and 34** | | | | | | | | |
| Plaintiff Name | Analysis Group | Application Date | Action Taken | Predicted Probability of Approval | Outlier? | Reason for Denial #1 | Reason for Denial #2 | Reason for Denial: "Other" Text Field |
| Brown | Refinance (Fig. 34) | 2020-10-17 | 3 - Denied | 1.5% | N | Debt-to-income ratio | . | . |
| Perkins | Refinance (Fig. 34) | 2021-12-13 | 3 - Denied | 77.2% | Y | Credit history | Other | No Benefit to Borrower |
| Perkins | Refinance (Fig. 34) | 2021-09-14 | 3 - Denied | 74.0% | Y | Credit application incomplete | . | . |
| Gray | Refinance (Fig. 34) | 2020-03-04 | 1 - Originated | 91.3% | N | . | . | . |
| Kuykendall-Montoya | Refinance (Fig. 34) | 2021-07-27 | 3 - Denied | 13.4% | N | Other | Credit history | Product or Program Not Available |
| Brown | Conventional Conforming Refinance (Fig. 24) | 2020-10-17 | 3 - Denied | 1.1% | N | Debt-to-income ratio | . | . |
| Perkins | Conventional Conforming Refinance (Fig. 24) | 2021-12-13 | 3 - Denied | 77.3% | Y | Credit history | Other | No Benefit to Borrower |
| Perkins | Conventional Conforming Refinance (Fig. 24) | 2021-09-14 | 3 - Denied | 71.1% | Y | Credit application incomplete | . | . |
| *Other Plaintiffs* | | | | | | | | |
| Name | Reason Not Listed Above | | | | | | | |
| Braxton | Applied for loan modification | | | | | | | |
| Martin | Withdrew application | | | | | | | |
| Williams | Withdrew application | | | | | | | |
| Ebo | Withdrew application | | | | | | | |

The predicted probability is the probability of approval as if the applicant were non-Hispanic white, based on Dr. Kurzendoerfer's regression in Figure 24 or Figure 34, as noted in the "Analysis Group" column.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

## Appendix 8.  Class Counts, Using Dr. Kurzendoerfer's Subclasses

| Table A8.1.  Counts by AUS Outcome by Purpose and Year for Denied Minority Applicants with any AUS "Approval" Outcome | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Agency AUS or ECS** | **Eligibility** | **Year** | **Home Purchase** | **Refinance: Cash-Out Refinance** | **Refinance: Home Improvement** | **Refinance: Other Purpose** | **Refinance: Rate/Term Refinance** | **Refinance (Any Non-Purchase)** | **HELOC** | **All Applications** |
| Agency Approval Only | Eligible | 2018 | 271 | 130 | 2 | 7 | 42 | 181 | 0 | 452 |
| | | 2019 | 191 | 132 | 0 | 12 | 62 | 206 | 0 | 397 |
| | | 2020 | 156 | 68 | 0 | 3 | 164 | 235 | 0 | 391 |
| | | 2021, On or Before 7/17 | 91 | 40 | 1 | 2 | 57 | 100 | 0 | 191 |
| | | 2021, After 7/17 | 86 | 68 | 1 | 3 | 34 | 106 | 0 | 192 |
| | | 2022 | 123 | 144 | 9 | 14 | 22 | 189 | 0 | 312 |
| | | 2018-2022 | 918 | 582 | 13 | 41 | 381 | 1,017 | 0 | 1,935 |
| | Ineligible | 2018 | 290 | 1,187 | 72 | 142 | 488 | 1,889 | 0 | 2,179 |
| | | 2019 | 197 | 1,069 | 50 | 108 | 684 | 1,911 | 0 | 2,108 |
| | | 2020 | 373 | 327 | 12 | 33 | 2,146 | 2,518 | 0 | 2,891 |
| | | 2021, On or Before 7/17 | 235 | 844 | 47 | 36 | 1,716 | 2,643 | 0 | 2,878 |
| | | 2021, After 7/17 | 232 | 1,066 | 59 | 47 | 1,044 | 2,216 | 0 | 2,448 |
| | | 2022 | 409 | 1,598 | 129 | 140 | 593 | 2,460 | 0 | 2,869 |
| | | 2018-2022 | 1,736 | 6,091 | 369 | 506 | 6,671 | 13,637 | 0 | 15,373 |

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| Table A8.1.  Counts by AUS Outcome by Purpose and Year for Denied Minority Applicants with any AUS "Approval" Outcome | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Agency AUS or ECS | Eligibility | Year | Home Purchase | Refinance: Cash-Out Refinance | Refinance: Home Improvement | Refinance: Other Purpose | Refinance: Rate/Term Refinance | Refinance (Any Non-Purchase) | HELOC | All Applications |
| Agency and ECS Approval | Eligible | 2018 | 2,268 | 2,009 | 121 | 240 | 1,158 | 3,528 | 0 | 5,796 |
| | | 2019 | 2,015 | 2,681 | 128 | 291 | 2,743 | 5,843 | 0 | 7,858 |
| | | 2020 | 2,554 | 1,555 | 69 | 215 | 12,243 | 14,082 | 0 | 16,636 |
| | | 2021, On or Before 7/17 | 1,388 | 1,819 | 92 | 87 | 5,186 | 7,184 | 0 | 8,572 |
| | | 2021, After 7/17 | 951 | 2,487 | 139 | 124 | 2,844 | 5,594 | 0 | 6,545 |
| | | 2022 | 1,997 | 3,626 | 382 | 380 | 1,594 | 5,982 | 0 | 7,979 |
| | | 2018-2022 | 11,173 | 14,177 | 931 | 1,337 | 25,768 | 42,213 | 0 | 53,386 |
| | Ineligible | 2018 | 472 | 437 | 22 | 49 | 354 | 862 | 0 | 1,334 |
| | | 2019 | 464 | 470 | 33 | 54 | 698 | 1,255 | 0 | 1,719 |
| | | 2020 | 465 | 170 | 9 | 33 | 2,585 | 2,797 | 0 | 3,262 |
| | | 2021, On or Before 7/17 | 255 | 459 | 22 | 24 | 1,913 | 2,418 | 0 | 2,673 |
| | | 2021, After 7/17 | 204 | 488 | 29 | 26 | 1,070 | 1,613 | 0 | 1,817 |
| | | 2022 | 356 | 505 | 54 | 40 | 374 | 973 | 0 | 1,329 |
| | | 2018-2022 | 2,216 | 2,529 | 169 | 226 | 6,994 | 9,918 | 0 | 12,134 |

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| Table A8.1.  Counts by AUS Outcome by Purpose and Year for Denied Minority Applicants with any AUS "Approval" Outcome | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Agency AUS or ECS | Eligibility | Year | Home Purchase | Refinance: Cash-Out Refinance | Refinance: Home Improvement | Refinance: Other Purpose | Refinance: Rate/Term Refinance | Refinance (Any Non-Purchase) | HELOC | All Applications |
| ECS Approval Only | NA | 2018 | 1,394 | 729 | 43 | 87 | 542 | 1,401 | 9,841 | 12,636 |
| | | 2019 | 1,677 | 945 | 44 | 117 | 1,261 | 2,367 | 7,928 | 11,972 |
| | | 2020 | 1,584 | 414 | 10 | 73 | 2,729 | 3,226 | 108 | 4,918 |
| | | 2021, On or Before 7/17 | 816 | 475 | 21 | 44 | 1,078 | 1,618 | 0 | 2,434 |
| | | 2021, After 7/17 | 552 | 612 | 39 | 63 | 587 | 1,301 | 0 | 1,853 |
| | | 2022 | 1,220 | 735 | 90 | 88 | 326 | 1,239 | 0 | 2,459 |
| | | 2018-2022 | 7,243 | 3,910 | 247 | 472 | 6,523 | 11,152 | 17,877 | 36,272 |
| Grand Total | | 2018-2022 | 23,286 | 27,289 | 1,729 | 2,582 | 46,337 | 77,937 | 17,877 | 119,100 |
| Grand Total | Less Ineligible | 2018-2022 | 19,334 | | | | | 54,382 | 17,877 | 91,593 |

128.     Simply accounting for the AUS loans ineligible for sale reduces Dr. Kurzendoerfer's class size by 23% to 91,593.   Of those denied, she makes no attempt to determine reasons for denial.  While Dr. Kurzendoerfer refers to these as AUS "approvals," as I have mentioned throughout both this and my Affirmative Report, the AUS systems make recommendations and do not approve or deny loans.

Note:  The totals for the columns "Home Purchase," "Refinance (Any Non-Purchase)," and "HELOC" correspond to those subclasses displayed in Dr. Kurzendoerfer's Figure 35.  Note that she includes all four columns (including home improvement loans and "other" in her Refinance subclass.

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| Table A8.2. Wells Fargo Decisioned Application Outcomes by Product and AUS - Proposed Class (Denied Applications with an AUS Result of "Approve" and Decisioned Prior to 2023) | | |
|---|---|---|
| **Automated Underwriting Systems Used** | **Minority Applicants** | **Non-Hispanic White Applicants** |
| *Conventional, Conforming Refinance* | | |
| DU, LP/LPA, IPS | 61,321 | 80,196 |
| IPS, DU | 4,185 | 4,585 |
| IPS | 1,749 | 2,720 |
| IPS, LP/LPA | 660 | 848 |
| N/A | 375 | 478 |
| DU | 311 | 738 |
| LP/LPA | 56 | 102 |
| TOTAL | 2 | 2 |
| SUM | 68,659 | 89,669 |
| *Conventional, Conforming Purchase* | | |
| DU, LP/LPA, IPS | 14,532 | 17,913 |
| IPS, DU | 1,278 | 1,095 |
| IPS | 966 | 1,036 |
| DU | 482 | 742 |
| N/A | 333 | 199 |
| IPS, LP/LPA | 135 | 177 |
| LP/LPA | 57 | 94 |
| GUS | 1 | 0 |
| TOTAL | 1 | 4 |
| SUM | 17,785 | 21,260 |
| *HELOC* | | |
| IPS | 17,835 | 35,351 |
| N/A | 42 | 147 |
| SUM | 17,877 | 35,598 |
| *Conventional, Non-Conforming* | | |
| IPS | 6,740 | 14,858 |
| DU, LP/LPA, IPS | 55 | 96 |
| IPS, DU | 3 | 1 |
| N/A | 2 | 3 |
| LP/LPA | 1 | 0 |
| IPS, LP/LPA | 0 | 1 |
| SUM | 6,801 | 14,959 |

Expert Rebuttal Report of Marsha J. Courchane
March 22, 2024

| Government | | |
|---|---:|---:|
| TOTAL | 1,759 | 2,235 |
| IPS, LP/LPA | 933 | 1,696 |
| IPS | 902 | 1,344 |
| GUS | 124 | 280 |
| N/A | 18 | 13 |
| DU, LP/LPA, IPS | 17 | 27 |
| SUM | 3,753 | 5,595 |
| Conventional, Home Improvement / Other | | |
| DU, LP/LPA, IPS | 3,504 | 4,494 |
| IPS, DU | 353 | 340 |
| IPS | 311 | 1,018 |
| IPS, LP/LPA | 25 | 34 |
| N/A | 16 | 22 |
| DU | 13 | 23 |
| LP/LPA | 3 | 2 |
| SUM | 4,225 | 5,933 |

The analysis sample is restricted to Dr. Kurzendoerfer's proposed class (Figure 35): denied (HMDA Action = 3) applicants who have at least one AUS Approve or Accept result, with an action taken date between 2018 and 2022. The "minority" applicants include all minority race/ethnicity groups, while the non-Hispanic white applicants include only non-Hispanic whites.

Table 8.2 provides the listing of AUS systems used, reported to HMDA, sorted by frequency of type(s).  Note that up to three systems may be reported for a given application.