# EXHIBIT 44

CONFIDENTIAL

1          UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF CALIFORNIA
2           SAN FRANCISCO DIVISION

3

4   In re: Wells Fargo Mortgage    ) Case No.
    Discrimination Litigation      ) 3:22-cv-00990-JD
5                                   )

    _____ )
6

7

8

9
                 Videotaped 30(b)(6) Deposition of

10
                     WELLS FARGO

11
              by its designee ERIC BROOKS

12
                  (Taken by Plaintiffs)

13
             Charlotte, North Carolina

14
           Tuesday, November 14, 2023

15

16

17

18

19

20

21

22

23   Reported by:  Christine A. Taylor, RPR

24

25   Job No. CA 6150836


                                        Page 1

CONFIDENTIAL

1    agree?

2         A.    Yes.

3         Q.    And can you tell me why there is?

4         A.    Yes.

5         Q.    Go ahead.

6         A.    So we -- the model has limitations.

7    When we apply the model, we -- say conforming

8    loans, for example.  We may have 12 to 15 inputs

9    that we would have for that model, and so things

10   like title issues or documentation issues or

11   pieces that are not part of the model can factor

12   in.  What we use is a -- when you're comparing

13   those once you've applied those factors, if you

14   have greater than 90 percent, we're comfortable

15   that that's parity.  So consider consistent

16   versus -- versus the government regulators using

17   numbers like 80 percent.

18            So we use a higher percentage trying

19   to -- trying to get comfortable, are they close

20   enough to where we feel like we have parity.

21   If -- so that's back to your model question is

22   there's -- there's limitation to the model.

23        Q.    All right.  Let me try to unpack some

24   of that, make sure that our record is clear.

25            You mentioned this 90 percent

                                            Page 46

CONFIDENTIAL

```
 1      figure --

 2              MR. ARLEDGE:  Right now?  Let's take a

 3          break.

 4              THE VIDEOGRAPHER:  The time is

 5          approximately 11:09:19 a.m.  We are now off

 6          the record.

 7      (Recess taken from 11:09 a.m. until 11:26 a.m.)

 8              THE VIDEOGRAPHER:  The time is

 9          approximately 11:26:16 a.m.  We are now on

10          the record.

11      BY MR. ARLEDGE:

12          Q.   Okay.  Sorry about the long break, but

13      we've had some technical difficulties.

14              We were talking about this 90 percent

15      disparity figure just before we went off the

16      record.  So I want to ask you about that so that

17      we all understand what we're talking about.

18              First of all, this is what Wells Fargo

19      refers to as practical significance; is that

20      right?

21          A.   Yes.

22          Q.   So -- and what Wells Fargo means by

23      that is if Wells Fargo's calculations show that

24      there's a 10 percent disparity or less between,

25      say, white applicants and black applicants, then
```

Page 47

CONFIDENTIAL

1    Wells Fargo's perspective is that there is no

2    practically significant difference between the two

3    groups; yes?

4         A.   Yes.  Approval rates, yes.

5         Q.   Okay.  Now, Wells Fargo doesn't mean

6    by that it would be okay to discriminate against

7    10 percent of its black applicants; right?

8         A.   Yes.

9         Q.   In fact, if what we found out was that

10   Wells Fargo was, in fact, discriminating against

11   10 percent of black applicants, we can agree that

12   would be the problem; yes?

13        A.   Yes.

14        Q.   What Wells Fargo is saying is that if

15   there's a 10 percent disparity or less, Wells

16   Fargo doesn't think that it is discriminating

17   against its black applicants; true?

18             MS. BRINSON:  Objection.  Foundation.

19             THE WITNESS:  That's an incomplete

20        statement.

21   BY MR. ARLEDGE:

22        Q.   In what way?

23        A.   So the ideal for the 10 percent is

24   what we call an adverse impact ratio.  And so as

25   you've stated, we apply those credit factors, do

Page 48

CONFIDENTIAL

1    the calculation, and the 90 percent is not like a

2    perfect figure that if you're at 91 versus 89,

3    that you are or are not discriminating.  It's a

4    comparison of approval rates once you've similarly

5    situated, and what it does is it tells us if we're

6    above 90, we're comfortable that we have parity.

7    If we're below 90, we want to research to see if

8    there's any signs of disparate impact that would

9    not be based on the factors that we've talked

10   about.

11           Q.   If there's a 10 percent difference

12   between the way white applicants and black

13   applicants are treated at Wells Fargo, Wells Fargo

14   is comfortable that it has parity; is that right?

15               MS. BRINSON:  Objection.

16          Mischaracterizes testimony.

17               THE WITNESS:  So 10 percent, yes.  As

18          far as -- as far as modeling for those

19          statistical factors, yes.

20   BY MR. ARLEDGE:

21           Q.   Why --

22           A.   Those credit factors.

23           Q.   Why is Wells Fargo comfortable that --

24           A.   It's not --

25           Q.   -- it's treating minority applicants

Page 49

CONFIDENTIAL

```
 1    fairly if under its own calculations there's a

 2    10 percent difference between the way white

 3    applicants and black applicants are treated?

 4            A.    I should probably use the word

 5    confident versus comfortable.  But when we're

 6    talking about the numbers, the model has

 7    limitations as far as what you can put in the

 8    limitations as we discussed.

 9                 And so we're modeling for practical

10    significance.  And so if it's, you know, as I

11    mentioned, standard industry practice as far as

12    the -- where the regulators may use 80 percent, we

13    use even a higher threshold of 90 percent where

14    we're looking and saying here's what we can model,

15    but the modeling doesn't take into effect some of

16    things that we talked about, like title issues and

17    so there's pieces that we can't match.  And so

18    that's where we want to dive in and research to

19    see if we see any -- any potential disparate

20    treatment.

21            Q.    You say there's pieces we can't match.

22    What does that mean?

23            A.    Well, like title issues or

24    documentation issues, that's where the limitation

25    is in the models is that we don't have a field
```

Page 50