1    **WINSTON & STRAWN LLP**
     AMANDA L. GROVES (SBN 187216)
2    agroves@winston.com
     KOBI K. BRINSON (*Pro Hac Vice*)
3    kbrinson@winston.com
     STACIE C. KNIGHT (*Pro Hac Vice*)
4    sknight@winston.com
     333 S. Grand Avenue, 38th Floor
5    Los Angeles, CA 90071
     Telephone: 213.615.1700
6    Facsimile: 213.615.1750

7    **MCGUIREWOODS LLP**
     AVA E. LIAS-BOOKER (*Pro Hac Vice*)
8    alias-booker@mcguirewoods.com
     MELISSA O. MARTINEZ (*Pro Hac Vice*)
9    mmartinez@mcguirewoods.com
     ALICIA A. BAIARDO (SBN 254228)
10   abaiardo@mcguirewoods.com
     JASMINE K. GARDNER (*Pro Hac Vice*)
11   jgardner@mcguirewoods.com
     Two Embarcadero Center, Suite 1300
12   San Francisco, CA  94111-3821
     Telephone:  415.844.9944
13   Facsimile:  415.844.9922

14   *Attorneys for Defendant Wells Fargo Bank, N.A.*

15

16                        **UNITED STATES DISTRICT COURT**

17                        **NORTHERN DISTRICT OF CALIFORNIA**

18   *In re Wells Fargo Mortgage*          Case No. 3:22-cv-00990-JD
     *Discrimination Litigation*
19                                          The Hon. James Donato

20                                          **DECLARATION OF SALLY RELOVA
                                            IN SUPPORT OF DEFENDANT WELLS
21                                          FARGO BANK, N.A.'S OPPOSITION TO
                                            PLAINTIFFS' MOTION FOR CLASS
22                                          CERTIFICATION**

23

24

25

26

27

28

                                          1
     DECLARATION OF SALLY RELOVA IN SUPPORT OF DEFENDANT WELLS FARGO BANK, N.A.'S
     OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

DocuSign Envelope ID: 0631FA69-CC19-4E0B-A553-D06B847F652D

1  I, Sally Relova, declare:

2       1.      I am the Quantitative Analytics Director at Wells Fargo Bank, N.A. ("Wells

3  Fargo"). I have overseen model development, maintenance, and monitoring for quantitative

4  credit risk models that are used across the full credit lifecycle (origination, account management,

5  collections, and recovery) for all consumer products at Wells Fargo since 2014.

6       2.      I have personal knowledge of the facts stated in this declaration and, if called

7  upon, could and would testify to the same. I submit this declaration in support of Wells Fargo's

8  Opposition to Plaintiffs' Motion for Class Certification.

9       3.      The Enhanced Credit Score (ECS) actually refers to two separate models Wells

10  Fargo developed and uses in home lending: Model 11419 (used for government loans) and

11  Model 11960 (used for conventional loans).[1] The conventional model (Model 11960) was used

12  in conjunction with Fannie Mae's and Freddie Mac's automated underwriting systems (AUSs)

13  to determine the salability of conforming loan application when it was deployed in 2015. Fannie

14  Mae and Freddie Mac now require those determinations to be made using their own AUSs, so

15  Model 11960 is now used in conforming loans only to inform underwriters about information in

16  the applicants' credit bureau reports and debt-to-income ratio (DTI). Regardless of time and

17  product, however, none of the ECS models approve or deny a loan application.

18  **I.      The ECS Models' Scoring and Credit Risk Classes**

19       4.      Each of the ECS models is a simple scorecard whose logic can be fully stated on

20  2-3 sheets of paper. Neither utilizes artificial intelligence. Instead, the ECS models pull

21  numerical values from an applicant's credit report and DTI, and they assign points based on

22  those numerical values. For example, a DTI of >30% to 35% results in a specified number of

23  points being added to the final ECS score, while a DTI of >35% to 40% yields fewer points.

24  Both the points assigned and the thresholds at which they are assigned are static and have not

25  _____

26       [1] A third model was developed for home equity loans within the ECS suite of models,
    but it was never used. It is unrelated to what Dr. Kurzendoerfer calls the Wells Fargo Credit
27  Grade (which simply reflects FICO score) or the Wells Fargo home equity AUS reported in
    HMDA data.
28

DECLARATION OF SALLY RELOVA IN SUPPORT OF DEFENDANT WELLS FARGO BANK, N.A.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1  changed since the models were deployed in 2015, so the models do not "learn" over time. Each

2  applicant is scored individually, and if there is a co-applicant the two scores are averaged. The

3  ECS models are simple enough that an applicant's score could be calculated by hand.

4       5.     Model 11960, developed for use on conventional first-lien mortgage and second-

5  lien simultaneous home equity (SIMO) products, considers 11 credit bureau report attributes and

6  one loan attribute (namely, DTI). It results in a score between 76 and 333, which is not

7  displayed to underwriters, with higher scores indicating lower credit risks. That score is then

8  translated into one of four credit risk classes for conventional mortgages: A1, A2, C1, and C2,

9  with A1 representing the lowest risk of default and C2 the highest. In February 2015, Wells

10  Fargo stopped using Model 11960 to generate the credit risk class for SIMO products. Instead,

11  the SIMO credit risk class was based solely on FICO score.

12       6.     Model 11419, developed for use on government loans, considers DTI and 10

13  credit bureau report attributes (7 of which are also considered by Model 11960, but weighted

14  differently). It results in a score between 25 and 237, which is not displayed to underwriters.

15  That score is translated into credit risk classes of G1, G2, and G3, representing increasing levels

16  of default risk.

17       7.     None of the models considers demographic characteristics like race, ethnicity,

18  sex, or age. As described below concerning model development, some facially neutral variables

19  with predictive power were also excluded out of fair lending concerns. As a result, for example,

20  none of the models considers where the borrower or subject property is located or

21  unemployment.

22  **II.**    **Risk Insight Messages**

23       8.     The ECS models are also used to generate risk insight messages that are

24  displayed to underwriters. The top six risk insight messages are displayed to the underwriter,

25  ranked in order of importance (or fewer if six messages are not generated). If an ECS model fails

26  to generate a valid score at all (e.g., due to data issues), no risk insight messages are displayed.

27       9.     I understand that Dr. Kurzendoerfer testified at her deposition that she thought

28  that ECS credit risk class might determine the risk insight messages displayed to underwriters,

DECLARATION OF SALLY RELOVA IN SUPPORT OF DEFENDANT WELLS FARGO BANK, N.A.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   but that is incorrect. Risk insight messages are not based on the ECS credit risk class or total

2   score, but instead reflect the underlying credit report and transaction attributes, ranked by how

3   far they each deviate from neutral. For example, one of the items reported by the credit bureaus

4   is the number of months since an applicant's most recent delinquency. That credit attribute

5   results in a certain number of points being assigned in both Model 11960 and Model 11419,

6   depending on the number of months reported. But, independent of the final ECS score and

7   related credit risk class, if it has been less than six months since the most recent delinquency and

8   recency of delinquency is one of the top 6 characteristics whose attribute falls below neutral, for

9   example, ECS will trigger a risk insight message that reads, "Credit Report: Account(s) have 30

10  plus days past due within the last 6 months." Risk insight messages carry priorities determined

11  by deviation of the associated attribute from neutral, and only the top six are displayed to

12  underwriters. Consequently, that particular message may or may not be displayed, depending on

13  what other messages are triggered and how far their associated attributes deviate from neutral,

14  but the total ECS score does not factor into that decision. The only impact that the total ECS

15  score has on the risk insight messages is that, where there are co-applicants, the risk insight

16  messages of the applicant with the lower score are displayed.

17  **III.    ECS Model Development**

18          10.     The development of the ECS models is described in a number of Model

19  Development documents created for Wells Fargo Corporate Risk and updated from time to time,

20  some of which were updated under my supervision. These documents are kept in the ordinary

21  course of business. I am familiar with these documents, and my understanding of the

22  development of the ECS models draws from them.

23          11.     All ECS models were developed using logistic regression with a dependent

24  variable of whether a mortgage account became 90 or more days past due or worse within the

25  first 36 months of the loan. Model 11960 was developed using historical data about Home

26  Mortgage Conventional and Home Equity SIMO applications and performance. Model 11419

27  was developed using a different data set concerning Home Mortgage Government applications

28  and performance.

DECLARATION OF SALLY RELOVA IN SUPPORT OF DEFENDANT WELLS FARGO BANK, N.A.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

12.     The model development team examined the Information Value (IV) and marginal contribution of various potential variables to rank their ability to predict default in selecting possible candidate variables, and looked at different combinations of variables and how they interacted with other variables. The team also used their business knowledge and expertise to exclude variables that did not make sense, that were likely to be highly correlated with each other, to have low predicting power, or that may cause fair lending concerns. The model development team consulted with fair lending compliance officers in selecting which variables to include in the ECS models. Some variables were excluded because their predictive power could vary with changes in the lending environment and economic climate, and so they were better utilized in policies instead of in the models. In addition, geographic variables (regions, state, metropolitan statistical area, etc.) and macroeconomic variables (e.g., unemployment) were excluded from the models due to their potential for disparate impact, even though they had predictive power.

13.     The model development team evaluated the performance of each ECS model using conventional model performance metrics. These metrics were also used to compare the ECS models to other models, including a predecessor model no longer in use and FICO. Model 11960 and Model 11419 both showed a better ability to predict default in the sample data than FICO.

## IV.     Testing of ECS by Fair Lending Analytics

14.     Wells Fargo's Fair Lending Analytics team examined Model 11960 for potential disparate impact or use of proxy variables, and they conveyed the results to me. They identified no proxy variables within the attributes considered by Model 11960, meaning that none of the variables could be used to identify an individual's membership in a protected class. They identified some practically significant differences in Model 11960's score distributions for four of the five protected classes and in the resulting credit risk classes for three of the five classes. (The report I received masked which protected classes were affected.) Fair Lending Analytics identified three variables as the likely drivers of those disparities, and they requested that my

DECLARATION OF SALLY RELOVA IN SUPPORT OF DEFENDANT WELLS FARGO BANK, N.A.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1   team describe the business justifications for the variables used in Model 11960 and consider

2   alternatives.

3        15.     My team did this work in a written report that I understand was produced in this

4   litigation. The report explained which variables made the greatest marginal contribution to the

5   model's ability to predict default and which variables were the main drivers of the model. The

6   model's variables rendered it both more predictive and stable. Moreover, as noted above, Model

7   11960 was better able to predict default than both its predecessor model and FICO. The business

8   justification document explained how variables were chosen for inclusion in the model and why

9   other variables were not chosen for inclusion. To explore potential alternatives, my team

10  dropped the variables identified in the Fair Lending Analytics report as likely drivers of the

11  disparities, both one by one and altogether. Fair Lending Analytics incorporated that business

12  justification document into an updated report on Model 11960.

13  **V.      ECS Model Usage**

14       16.     How each ECS model is used in underwriting mortgage applications depends on

15  both the loan product type and the time period.

16       **A.      Conventional Conforming Loans**

17       17.     At present, Model 11960 scores and credit risk classes are not used for

18  conforming mortgage applications. The model is used only to generate risk insight messages.

19  Neither the ECS score nor credit risk class are displayed to underwriters.

20       18.     Prior to July 2021, Model 11960 could contribute to the hybrid credit risk class

21  used in underwriting conforming mortgage applications, because at that time Fannie Mae would

22  accept the Model 11960 credit risk class in determining a loan's eligibility for sale. In particular,

23  it would treat an ECS credit risk class of A1 or A2 as the equivalent of an Approve/Eligible

24  from its own automated underwriting system, Desktop Underwriter (DU), with respect to

25  salability considerations. Until 2016, Freddie Mac would also treat an ECS credit risk class of

26  A1 or A2 as the equivalent of an Accept result from its automated underwriting system, Loan

27  Prospector (later replaced by Loan Product Advisor) (LP/LPA). As a result, the hybrid credit

28  risk class would be based on DU if it returned a Approve/Eligible result, on LP/LPA if it

DECLARATION OF SALLY RELOVA IN SUPPORT OF DEFENDANT WELLS FARGO BANK, N.A.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    returned an Accept result, and on ECS only if neither DU nor LP/LPA returned a favorable

2    result. As a consequence, Model 11960 could only ever help an applicant, potentially raising the

3    hybrid credit risk class if both DU and LP/LPA rated the application poorly. The ECS credit risk

4    class was only used as the hybrid risk class if the result was favorable to the customer. The

5    hybrid credit risk class is currently based on only DU and LP/LPA, and ECS plays no role.

6       19.  Prior to July 2021, Model 11960 could play a role in underwriter routing for retail

7    conforming applications. Applications with worse credit risk classes were routed to underwriters

8    with higher levels of approval authority, but the underwriting requirements remained the same.

9    It is no longer used for underwriter routing, either.

10       **B.**  **Conventional Non-Conforming Loans**

11       20.  Model 11960 plays a limited role in underwriting conventional non-conforming

12    loan applications. The underwriter can see the risk insight messages generated when the ECS

13    score is calculated. The credit risk classes of A1, A2, C1, and C2 can be viewed by the

14    underwriter as well, but do not determine eligibility. If an applicant wants a letter saying that he

15    or she is prequalified (not preapproved) for a mortgage in order to bid on a home, the Model

16    11960 credit risk class must be A1 or A2, but there is no such restriction when it comes time to

17    approving a full mortgage application.

18       **C.**  **Government Loans**

19       21.  Model 11419 plays a limited role in underwriting government loan applications,

20    similar to conventional non-conforming loan applications. It is used to generate risk insight

21    messages, in determining eligibility for prequalification letters, and for underwriter routing. The

22    credit risk classes of G1, G2, and G3 can be viewed by the underwriter to gain a sense of the

23    credit risk of an application, but they do not determine eligibility.

24

25

26

27

28

DECLARATION OF SALLY RELOVA IN SUPPORT OF DEFENDANT WELLS FARGO BANK, N.A.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

DocuSign Envelope ID: 0631FA69-CC19-4E0B-A553-D06B847F652D

1    I declare under penalty of perjury that the foregoing is true and correct.

2        Executed this __23th__ day of May, 2024.

3

4
                                            DocuSigned by:

                        By: ___Sally Relova_____
5                                       1F90D3B65A8F49E...
                            Sally Relova

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF SALLY RELOVA IN SUPPORT OF DEFENDANT WELLS FARGO BANK, N.A.'S
OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**DocuSign**

## Certificate Of Completion

Envelope Id: 0631FA69CC194F0BA553D96B847F652D                    Status: Completed
Subject: Complete with DocuSign: WF HL - Class Cert Opp'n - Decl. of Sally Relova_(19856813)_(6) SFR.docx
Source Envelope:
Document Pages: 8                  Signatures: 1                  Envelope Originator:
Certificate Pages: 3              Initials: 0                    Bethany Schemmel
AutoNav: Enabled                                                 420 Montgomery St.
EnvelopeId Stamping: Enabled                                     San Francisco, CA  94104
Time Zone: (UTC-06:00) Central Time (US & Canada)                Bethany.Schemmel@wellsfargo.com
                                                                 IP Address: 159.45.22.17

## Record Tracking

Status: Original                   Holder: Bethany Schemmel           Location: DocuSign
       5/23/2024 3:36:32 PM               Bethany.Schemmel@wellsfargo.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Sally Relova<br>sally.relova@wellsfargo.com<br>Security Level: Email, Account Authentication (None) | *Sally Relova*<br>1F90D3B65A8F49E...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 159.45.129.23 | Sent: 5/23/2024 3:38:29 PM<br>Viewed: 5/23/2024 3:47:25 PM<br>Signed: 5/23/2024 3:49:01 PM |

**Electronic Record and Signature Disclosure:**
   Accepted: 5/23/2024 3:47:25 PM
   ID: 346ca6d7-ae79-4dc8-9bcb-59d942867443

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 5/23/2024 3:38:29 PM |
| Certified Delivered | Security Checked | 5/23/2024 3:47:25 PM |
| Signing Complete | Security Checked | 5/23/2024 3:49:01 PM |
| Completed | Security Checked | 5/23/2024 3:49:01 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

# Electronic Record and Signature Disclosure

**Last updated:** April 26, 2021

You are entitled by law to receive certain information "in writing." However, we may instead provide this information to you electronically with your prior consent. We also need your consent to use electronic signatures. In this consent (the "Consent"), "we," "us," "our," and "Wells Fargo" refer to Wells Fargo Bank, N.A. and any affiliate or subsidiary of Wells Fargo Bank, N.A. "You" and "your" refer to the person agreeing to this Consent.

1. **Scope.** In our sole discretion, we may provide to you, or you may sign, submit, or agree to at our request, certain documents, records, disclosures, notices, communications, agreements, fee schedules, statements, and other information in electronic form through the DocuSign system ("Electronic Records"). We may also use electronic signatures and obtain them from you through the DocuSign system ("Electronic Signatures"). You may receive emails related to the Electronic Records and Electronic Signatures. This Consent applies to any Electronic Records or Electronic Signatures in connection with the signing event on the DocuSign system associated with this Consent (the "Signing Event").

2. **Paper Copies.** We will not send you paper copies of any Electronic Records unless we, in our sole discretion, deem it appropriate to do so. If you desire a paper copy of an Electronic Record, you may: (a) download or print the Electronic Record after the Signing Event; or (b) contact the appropriate customer service unit and request a paper copy, for which we may charge you a fee unless prohibited by law. Any such fee will be disclosed at the time of request.

3. **Your Email Address.** To update your email address before completing the Signing Event: (a) if you arrived at the Signing Event through Wells Fargo Online® or a similar online system, follow the appropriate procedure for that system to update your email address; or (b) if you arrived at the Signing Event through a link in an email you received, please contact the Wells Fargo representative associated with that email.

4. **Withdrawal.** This Consent only applies to the Signing Event, and you will not be able to withdraw this Consent after you have completed the Signing Event. If you do not wish to agree to this Consent, you may decline to continue with the Signing Event.

5. **Software and Hardware Requirements.** To use Electronic Records and Electronic Signatures, you must meet the current minimum DocuSign system requirements, which can be found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements. In addition, you must have:
   o A web browser listed on the Wells Fargo Supported Browsers and Operating Systems page (https://www.wellsfargo.com/help/online-banking/browser-supported);
   o An Internet connection;
   o An active email account;
   o A currently supported version of a program that accurately displays PDF files;
   o A computer or other device and an operating system capable of supporting all of the above;
   o A printer, if you wish to print out paper copies of Electronic Records; and
   o Electronic storage, if you wish to retain Electronic Records in electronic form.

Please indicate you have read, understand, and agree to this Consent by selecting the checkbox next to "I agree to use electronic records and signatures" before clicking "CONTINUE" within the Signing Event.