WINSTON & STRAWN LLP
Amanda L. Groves (SBN: 187216)
agroves@winston.com
333 S. Grand Ave.
Los Angeles, CA 90071-1543
Telephone: 213-615-1700

Kobi K. Brinson (*Admitted pro hac vice*)
kbrinson@winston.com
300 South Tryon Street
Charlotte, NC 28202
Telephone: 704-350-7700

WILMER CUTLER PICKERING
HALE AND DORR LLP
Seth P. Waxman (*Admitted pro hac vice*)
seth.waxman@wilmerhale.com
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: 202-663-6000

Alan Schoenfeld (*Admitted pro hac vice*)
alan.schoenfeld@wilmerhale.com
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: 212-230-8800

MCGUIREWOODS LLP
Alicia A. Baiardo (SBN: 254228)
abaiardo@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, CA 94111-3821
Telephone: 415-844-9944

Ava E. Lias-Booker (*Admitted pro hac vice*)
alias-booker@mcguirewoods.com
500 East Pratt Street, Suite 1000
Baltimore, MD 21202-3169
Telephone: 410-659-4430

*Attorneys for Defendant
Wells Fargo Bank, N.A.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

*In re Wells Fargo Mortgage
Discrimination Litigation*

**Case No. 3:22-CV-00990-JD**

**DEFENDANT WELLS FARGO BANK,
N.A.'S NOTICE OF MOTION AND
MOTION FOR SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT THEREOF**

Date:      October 10, 2024
Time:      10:00 a.m.
Place:     450 Golden Gate Avenue
           Courtroom 11
           San Francisco, CA 94103
Judge:     Hon. James Donato

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on October 10, 2024 at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 11 of the above-entitled court, located at 450 Golden Gate Avenue, San Francisco, California, Defendant Wells Fargo Bank, N.A. ("Wells Fargo") will and hereby does move, under Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on (1) Plaintiffs' individual claims under the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the California Unfair Competition Law, and the California Unruh Civil Rights Act; and (2) in the event Plaintiffs' Motion for Class Certification is granted in whole or in part, on Plaintiffs' class claims.

This Motion is based on this Notice of Motion, the Memorandum of Points and Authorities, concurrently filed declarations, the record, and any other written or oral submission that may be presented at or before the hearing on this Motion.

Dated: July 25, 2024

WINSTON & STRAWN LLP

By:    _/s/ Amanda L. Groves_
Amanda L. Groves (SBN 187216)
agroves@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
Telephone: 213-615-1700

Kobi K. Brinson (*Admitted pro hac vice*)
kbrinson@winston.com
300 South Tryon Street
Charlotte, NC 28202
Telephone: 704-350-7700

MCGUIRE WOODS LLP

By:    _/s/ Alicia A. Baiardo_
Alicia A. Baiardo (SBN: 254228)
abaiardo@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, CA 94111-3821
Telephone: 415-844-9944

Ava E. Lias-Booker (*Admitted pro hac vice*)
alias-booker@mcguirewoods.com
Baltimore, MD 21202-3169
Telephone: 410-659-4430

WILMER CUTLER PICKERING HALE AND DORR LLP

By:     */s/ Alan Schoenfeld*
        Alan Schoenfeld *(Admitted pro hac vice)*
        alan.schoenfeld@wilmerhale.com
        7 World Trade Center
        250 Greenwich Street
        New York, New York 10007
        Telephone: 212-230-8800

        Seth P. Waxman (*Admitted pro hac vice*)
        seth.waxman@wilmerhale.com
        2100 Pennsylvania Avenue NW
        Washington, DC 20037
        Telephone: 202-663-6000

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.  FACTS ................................................................................................................ 1

    A.   Overview of the Mortgage Market ........................................................... 1

    B.   Wells Fargo's Mortgage Lending Processes During the Class Period ............................. 2

        1.   CORE ............................................................................................ 2

        2.   The Risk Engine ........................................................................... 3

        3.   Automated underwriting systems and Wells Fargo's ECS models .................. 4

    C.   Wells Fargo's Fair Lending Analyses ....................................................... 5

    D.   The Named Plaintiffs ............................................................................... 6

    E.   Plaintiffs' Claims. .................................................................................... 8

III. LEGAL STANDARD ......................................................................................... 9

IV.  ARGUMENT ...................................................................................................... 9

    A.   Plaintiffs' Disparate Impact Theory Fails at Every Step. ........................ 9

        1.   Plaintiffs have not isolated and identified specific challenged policies. ............. 10

        2.   There is no evidence of "robust causality." ................................ 11

        3.   CORE, ECS, and the Risk Engine serve Wells Fargo's legitimate, race-neutral business interests, and Plaintiffs lack evidence of equally effective alternatives. 13

        4.   Plaintiffs cannot establish that damages class members were injured. ................ 15

        5.   Wells Fargo is entitled to summary judgment on *actual damages*. ..................... 17

        6.   Summary judgment for Wells Fargo is warranted on any pricing claims. .......... 17

    B.   The Undisputed Evidence Negates Plaintiffs' Disparate Treatment Claims. .................. 18

        1.   Plaintiffs cannot establish a prima facie case. ......................... 18

            a.   Braxton, Martin, Gray, Williams, and Ebo were not denied. .................. 18

            b.   Brown, Perkins, Williams, and Kuykendall-Montoya were not qualified for the loans they sought. ................................................................... 19

            c.   Plaintiffs have no evidence that Wells Fargo approved a similarly situated applicant who was not a member of their protected class. ..................... 19

        2.   Wells Fargo had legitimate, nondiscriminatory reasons for its actions. .............. 19

3.     Plaintiffs have no evidence of pretext................................................20

C.     No Evidence Supports Any Classwide Disparate Treatment Claims. ............................22

D.     Wells Fargo is Entitled to Summary Judgment on Plaintiffs' Unruh Act Claims. ..........22

E.     Wells Fargo is Entitled to Summary Judgment on Plaintiffs' UCL Claims. ..................23

1.     Plaintiffs have adequate legal remedies...............................................23

2.     Plaintiffs lack standing to seek prospective injunctive relief............................24

3.     ECOA's choice-of-remedies clause bars the UCL claims. ................................24

4.     The non-California Plaintiffs cannot pursue UCL claims. ................................24

V.    CONCLUSION.............................................................................25

DEFENDANT WELLS FARGO BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*1440 Sports Mgmt. Ltd. v. PGA Tour, Inc.*,
    2023 WL 7280444 (N.D. Cal. Oct. 6, 2023) ........................................................................ 16

*A.K.L. v. Moreno Valley Unified Sch. Dist.*,
    2021 WL 4352362 (C.D. Cal. May 21, 2021) ...................................................................... 25

*Abdul-Haqq v. Permanente Med. Grp., Inc.*,
    2022 WL 7127947 (N.D. Cal. Oct. 12, 2022),
    *aff'd*, 2024 WL 1155449 (9th Cir. Mar. 18, 2024) ......................................................... 9, 21

*Alsadi v. Intel Corp.*,
    2019 WL 4849482 (D. Ariz. Sept. 30, 2019) ...................................................................... 16

*Anderson v. Douglas & Lomason Co.*,
    26 F.3d 1277 (5th Cir. 1994) ............................................................................................... 10

*Anderson v. Wachovia Mortg. Corp.*,
    609 F. Supp. 2d 360 (D. Del. 2009) ............................................................................... 19, 20

*Aragon v. Rep. Silver State Disposal Inc.*,
    292 F.3d 654 (9th Cir. 2002) ............................................................................................... 22

*Asencio v. Miller Brewing Co.*,
    283 F. App'x 559 (9th Cir. 2008) ......................................................................................... 9

*Bank of Am. Corp. v. City of Miami*,
    581 U.S. 189 (2017) ............................................................................................................. 15

*Bates v. United Parcel Serv., Inc.*,
    511 F.3d 974 (9th Cir. 2007) ............................................................................................... 24

*Belyea v. GreenSky, Inc.*,
    2023 WL 8701311 (N.D. Cal. Dec. 15, 2023) .................................................................... 24

*Bordett v. CoxCom, Inc.*,
    366 F.3d 736 (9th Cir. 2004) ............................................................................................... 20

*Boykin v. Bank of Am. Corp.*,
    162 F. App'x 837 (11th Cir. 2005) ................................................................................. 19, 20

*Brnovich v. Dem. Nat'l Comm.*,
    594 U.S. 647 (2021) ............................................................................................................. 12

*Brown v. City Nat'l Bank*,
    2024 WL 201360 (N.D. Cal. Jan. 18, 2024) .................................................................... 9, 19

*Burley v. Nat'l Passenger R. Corp.*,
   801 F.3d 290 (D.C. Cir. 2015) ............................................................................... 20

*Cahill v. Nike, Inc.*,
   2022 WL 19226181 (D. Or. Nov. 22, 2022) ........................................................... 12

*Campbell v. Medtronic MiniMed, Inc.*,
   2016 WL 11498827 (C.D. Cal. Sept. 6, 2016) ....................................................... 23

*Canatella v. Reverse Mortg. Sols. Inc.*,
   2014 WL 7205146 (N.D. Cal. Dec. 17, 2014) ........................................................ 23

*Churchill Vill., LLC v. Gen. Elec. Co.*,
   169 F. Supp. 2d 1119 (N.D. Cal. 2000) .................................................................. 24

*City of Oakland v. Wells Fargo & Co.*,
   14 F.4th 1030 (9th Cir. 2021) ................................................................................. 15

*Cnty. of Cook v. Bank of Am. Corp.*,
   584 F. Supp. 3d 562 (N.D. Ill. 2022), *aff'd*, 78 F.4th 970 (7th Cir. 2023) ........... 15

*Coleman v. Quaker Oats Co.*,
   232 F.3d 1271 (9th Cir. 2000) ................................................................................ 22

*Cooley v. Sterling Bank*,
   280 F. Supp. 2d 1331 (M.D. Ala. 2003) ............................................................ 20, 21

*Cooper v. United Air Lines*,
   82 F. Supp. 3d 1084 (N.D. Cal. 2015) .................................................................... 21

*Crawford v. Uber Techs., Inc.*,
   2018 WL 1116725 (N.D. Cal. Mar. 1, 2018) .......................................................... 25

*Daggett v. United States*,
   2010 WL 11553196 (S.D. Fla. Feb. 4, 2010) .......................................................... 16

*Doe v. State Farm Gen. Ins.*,
   2023 WL 7440203 (N.D. Cal. Nov. 8, 2023) .......................................................... 24

*Duarte v. Quality Loan Serv. Corp.*,
   2018 WL 2121800 (C.D. Cal. May 8, 2018) ........................................................... 10

*Elliott v. QF Circa 37, LLC*,
   2018 WL 2933467 (S.D. Cal. June 12, 2018) ......................................................... 18

*Elrod v. Sears, Roebuck & Co.*,
   939 F.2d 1466 (11th Cir. 1991) .............................................................................. 21

*Gamble v. City of Escondido*,
   104 F.3d 300 (9th Cir. 1997) .................................................................................. 18

*Gay v. Waiters' & Dairy Lunchmen's Union*,
   694 F.2d 531 (9th Cir. 1982) ................................................................. 9

*Hafiz v. Greenpoint Mortg. Funding, Inc.*,
   652 F. Supp. 2d 1039 (N.D. Cal. 2009) ................................................. 18

*Harrison v. Wells Fargo Bank*,
   2020 WL 1322921 (N.D. Cal. Mar. 20, 2020) ..................................... 20

*Herskowitz v. Apple, Inc.*,
   301 F.R.D. 460 (N.D. Cal. 2014) ......................................................... 23

*Inclusive Cmtys. v. Tex. Dep't of Hous.*,
   2016 WL 4494322 (N.D. Tex. Aug. 26, 2016) ..................................... 10

*Joint Stock Co. v. Riveria Travel & Tours, Inc.*,
   2012 WL 13201666 (C.D. Cal. Aug. 23, 2012) ................................... 17

*Joshua v. City & Cnty. of S.F.*,
   2017 U.S. Dist. LEXIS 48405 (N.D. Cal. Mar. 30, 2017) (Donato, J.) ........................... 13

*Lawler v. Montblanc N. Am., LLC*,
   704 F.3d 1235 (9th Cir. 2013) ............................................................. 19

*Lindsey v. SLT Los Angeles, LLC*,
   447 F.3d 1138 (9th Cir. 2006) ............................................................. 18

*Local 3621 v. City of N.Y.*,
   2022 WL 17175798 (S.D.N.Y. Nov. 22, 2022) ................................... 12

*Mackey v. Bd. of Trs.*,
   31 Cal. App. 5th 640 (2019) ................................................................... 9

*Martin v. Long & Foster Real Est. Inc.*,
   2012 WL 3991900 (E.D. Va. Sept. 11, 2012) ........................... 18, 20, 21

*Meacham v. Knolls Atomic Power Lab.*,
   554 U.S. 84 (2008) ............................................................................... 10

*Merritt v. Countrywide Fin. Corp.*,
   2016 WL 6573989 (N.D. Cal. Jun. 29, 2016) ........................................ 9

*Moore v. Greyhound Bus Lines, Inc.*,
   2018 WL 3361395 (S.D. Cal. July 10, 2018) ....................................... 23

*Moran v. Selig*,
   447 F.3d 748 (9th Cir. 2006) ............................................................... 19

*Mosby v. Bd. of Educ.*,
   754 F. App'x 34 (2d Cir. 2018) ........................................................... 13

v

*Redd-Oyedele v. Santa Clara Cnty. Off. of Educ.*,
 2022 WL 1443253 (N.D. Cal. May 6, 2022) ................................................................. 21

*Rhynes v. Stryker Corp.*,
 2011 WL 2149095 (N.D. Cal. May 31, 2011) .............................................................. 23

*Roberts v. United Food & Com. Workers*,
 2019 WL 7020218 (N.D. Cal. Dec. 20, 2019) ............................................................ 21

*Rodriguez v. Bear Stearns Cos.*,
 2009 WL 5184702 (D. Conn. Dec. 22, 2009) ............................................................. 15

*Rose v. Wells Fargo & Co.*,
 902 F.2d 1417 (9th Cir. 1990) ..................................................................................... 14

*Sallion v. Suntrust Bank, Atlanta*,
 87 F. Supp. 2d 1323 (N.D. Ga. 2000) .......................................................................... 20

*Schechner v. CBS Broad., Inc.*,
 2010 WL 2794374 (N.D. Cal. July 15, 2010) ............................................................. 22

*Schiff v. City & Cnty. of S.F.*,
 816 F. Supp. 2d 798 (N.D. Cal. 2011) ......................................................................... 20

*Shiplet v. Veneman*,
 383 F. App'x 667 (9th Cir. 2010) ................................................................................. 20

*Silva v. Money Network Fin., LLC*,
 2024 WL 2107722 (C.D. Cal. Apr. 1, 2024) ............................................................... 23

*Sonner v. Premier Nutrition Corp.*,
 971 F.3d 834 (9th Cir. 2020) ........................................................................................ 23

*St. Mary's v. Hicks*,
 509 U.S. 502 (2004) ............................................................................................... 20, 21

*Stockwell v. City & Cnty. of S.F.*,
 749 F.3d 1107 (9th Cir. 2014) ...................................................................................... 10

*Sw. Fair Hous. Council, Inc. v. Maricopa Dom. Water Improv. Dist.*,
 17 F.4th 950 (9th Cir. 2021) ................................................................................. passim

*Tex. Dep't of Hous. v. Inclusive Cmtys.*,
 576 U.S. 519 (2015) ...................................................................................................... 11

*Theodora Rescue Comm. v. Volunteers of Am.*,
 2014 WL 5782328 (W.D. Wash. Nov. 6, 2014) ......................................................... 14

*In re Toyota Motor Co.*,
 785 F. Supp. 2d 883 (C.D. Cal. 2011) ......................................................................... 24

*Wards Cove Packing Co. v. Atonio*,
    490 U.S. 642 (1989) ..................................................................................................... 10, 12

*Warner v. Tinder*,
    105 F. Supp. 3d 1083 (C.D. Cal. 2015) ............................................................................ 24

*Welch v. Eli Lilly & Co.*,
    2009 WL 734711 (S.D. Ind. Mar. 18, 2009) .................................................................... 10

*Zapata Fonseca v. Goya Foods Inc.*,
    2016 WL 4698942 (N.D. Cal. Sept. 8, 2016) ................................................................... 23

**Statutes**

12 U.S.C. § 1716 ........................................................................................................................ 2

15 U.S.C. § 1691 ............................................................................................................... *passim*

15 U.S.C. § 1691d ..................................................................................................................... 22

42 U.S.C. § 1981 ....................................................................................................... 8, 9, 18, 19

42 U.S.C. § 3601 ......................................................................................................................... 8

Cal. Bus. & Prof. Code § 17200 ................................................................................................ 8

Cal. Civ. Code § 51 ........................................................................................................... *passim*

**Other Authorities**

12 C.F.R. § 1003.4 ..................................................................................................................... 4

Fed. R. Civ. P. 23 ............................................................................................................. 1, 6, 22

Fed. R. Evid. 702 ..................................................................................................................... 11

DEFENDANT WELLS FARGO BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT

CASE NO. 3:22-CV-00990-JD

# GLOSSARY

Wells Fargo provides this Glossary for the Court's convenience, as the acronyms below appear in Wells Fargo's brief. Where practicable, this brief will use the full term (or a self-explanatory shorthand), rather than the acronym.

| ACRONYM | DEFINITION |
| --- | --- |
| AUS | Automated underwriting system |
| CORE | Common Opportunities, Results, Experiences |
| CRC | Credit Risk Class |
| DTI | Debt-to-income |
| ECOA | Equal Credit Opportunity Act |
| ECS | Enhanced Credit Score |
| FHA | Fair Housing Administration |
| FLA | Wells Fargo's Fair Lending Analytics team |
| GSE | Government-sponsored enterprise (Fannie Mae and/or Freddie Mac) |
| HELOC | Home equity line of credit |
| HMC | Home Mortgage Consultant |
| HMDA | Home Mortgage Disclosure Act |
| UCL | California Unfair Competition Law |
| VA | United States Department of Veterans Affairs |

## I.     INTRODUCTION

Plaintiffs assert that statistical differences in loan-approval rates between white and minority applicants show that Wells Fargo discriminated against both Plaintiffs and sweeping proposed classes of minority loan applicants. They assert disparate-impact and disparate-treatment theories of liability under multiple causes of action. But the undisputed facts show that both theories fail—there is no evidence that approval-rate differences resulted from discrimination by Wells Fargo rather than widespread and well-known credit gaps flowing from our country's historical inequities. The Court should thus grant summary judgment to Wells Fargo, both on Plaintiffs' individual claims and, in the event the Court grants class certification (which it should not), on the class claims as well.

Plaintiffs' disparate-impact theory fails for several reasons. First, Plaintiffs cannot make the required "robust" showing that a specific Wells Fargo policy caused a practically significant difference in loan-approval rates. Indeed, Plaintiffs' expert admits her regression analysis—the lynchpin of Plaintiffs' case—is *not* tied to any Wells Fargo policy. Second, the Wells Fargo "policies" Plaintiffs have identified serve legitimate, race-neutral business purposes, and Plaintiffs have no evidence of alternative policies that would serve those business purposes equally well. Third, several Plaintiffs' loans were not denied, and those that were denied were for legitimate, race-neutral reasons unrelated to the "policies" Plaintiffs challenge. Plaintiffs thus have no injury proximately caused by the challenged conduct. Finally, even if Plaintiffs could establish *liability*, the Court should grant Wells Fargo summary judgment on *actual damages* because Plaintiffs lack evidence of the damages suffered by any putative class members.

Plaintiffs' disparate-treatment theory fails because there is no genuine dispute that Plaintiffs' loan applications were either (1) approved; (2) withdrawn by Plaintiffs without being denied; or (3) denied by Wells Fargo for legitimate, race-neutral reasons. And if the Court certifies a disparate-treatment class (even though Plaintiffs made no attempt to prove Rule 23's requirements for that disparate treatment), that claim fails for several reasons, including that it is derivative of Plaintiffs' baseless disparate-impact claims.

## II.     FACTS

### A.     Overview of the Mortgage Market

The home mortgage loan market includes a primary and a secondary market. In the primary market, potential borrowers apply for loans with originators (like Wells Fargo), including home-purchase

1

loans, refinances, and home equity lines of credit. Courchane Decl.,[1] Ex. A, ¶ 29. In the secondary market, originators sell their loans to investors—who themselves may sell or securitize the loans—providing a stream of funding back into the primary market that allows originators to make more loans. *Id*. ¶¶ 31-32.

Fannie Mae and Freddie Mac (the "GSEs") are the largest secondary-market investors. They buy loans from originators, providing liquidity, stability, and affordability in the mortgage market. *E.g.*, 12 U.S.C. § 1716. The GSE's loan programs are subject to underwriting guidelines[2] and maximum loan amounts, which are set by the GSEs or federal regulations. Courchane Decl., Ex. A, ¶¶ 16, 27-28, 32-33, 36; Strawser Decl. ¶ 4. A loan that complies with GSE guidelines is called a "conforming loan" and is eligible for purchase by that GSE. Courchane Decl. ¶¶ 27, 32; Strawser Decl. ¶ 4. GSEs will not buy loans that do not meet their guidelines. Strawser Decl. ¶ 4; *see* Courchane Decl., Ex. A, ¶¶ 32-36. A "non-conforming loan" does not conform to GSE requirements. Strawser Decl. ¶ 5; *see* Courchane Decl., Ex. A, ¶¶ 27, 32. Wells Fargo also originates government-insured loans, such as VA and FHA loans, which must comply with the relevant agency's guidelines. Courchane Decl. ¶¶ 16, 28, 58; Strawser Decl. ¶ 5.

### B. Wells Fargo's Mortgage Lending Processes During the Class Period

Plaintiffs refused in discovery to identify Wells Fargo policies they were challenging. *See* ECF Nos. 178, 194 (moving to compel responses on this issue). But at class certification, Plaintiffs asserted they are challenging an amalgamation of multiple Wells Fargo tools, models, and credit policies they call the "conjoined CORE and ECS and Risk Engine underwriting policy." ECF No. 252 at 2.

#### 1. CORE

CORE is an interactive, front-end tool[3] that guides the "flow" of the loan origination process. Keller Decl. ¶ 2. An applicant can complete a loan application online (in which case the application data is imported into CORE), or a Wells Fargo Home Mortgage Consultant ("HMC") can complete the application directly in CORE during a face-to-face or telephone interview with the customer. *Id*. ¶ 10. CORE contains data fields that correspond to the information requested on a paper loan application. *Id*.

---

[1] Citations to the declarations of Dr. Marsha Courchane, Dr. Manuel Adelino, and Carolyn Irwin refer to ECF Nos. 232-56, 232-57, and 232-58, filed in support of Wells Fargo's opposition to class certification.
[2] Underwriting guidelines are guidelines that institutions use to determine if someone is eligible for credit. *See* Courchane Decl., Ex. A, ¶¶ 58-62.
[3] A "front-end" tool is what users see and includes visual elements like buttons, checkboxes, graphics, and messages. It allows users to interact with the application. *See* Keller Decl. ¶ 10 & Images 1-4.

Data collected during the application process are stored in CORE. CORE provides that data to the Risk Engine, a technology application that performs a different function than CORE (described below). *Id.* ¶ 9. Information about applicants' race and ethnicity are collected (as required by regulation), but those data fields are accessible only to Wells Fargo's fair lending team (*not* underwriters). Ex.[4] 1 (Brodsky Dep. 68:16-25).

### 2.    The Risk Engine

The Risk Engine is a technology application that helps Wells Fargo assess credit and operational risk during the loan underwriting process. Keller Decl. ¶ 3. It uses data from loan applications and credit reports (data stored in CORE) to help analyze creditworthiness. *Id.* It also helps team members understand tasks necessary to underwrite the loan and the required underwriting authority level. *Id.* Finally, it compares the loan characteristics to the *thousands* of Wells Fargo-, GSE-, and federal agency-approved eligibility, documentation, and underwriting policies to help determine whether the transaction is within guidelines. *Id.* ¶¶ 3, 5. CORE does not perform any of these tasks. *See id.* ¶¶ 9-12. Instead, as explained above, it provides data to the Risk Engine, and, where appropriate, it displays information provided by the Risk Engine for use by underwriters and loan processors during the origination process.

The Risk Engine uses "business rules," which are discrete pieces of objective, "if-then" logic that can answer questions. *Id.* ¶ 5. The business rules are based on eligibility, documentation, and underwriting policies. *Id.* For example, one business rule checks whether an applicant for a retail, non-conforming, fixed-rate purchase loan up to $3,000,000 meets the required minimum credit score. *Id.* The Risk Engine currently executes tens of thousands of separately identifiable business rules. *Id.* The business rules are grouped into "business services," the largest of which is "Get Risk Decision" or "GRD," containing about 10,000 separate business rules. *Id.* ¶ 6. GRD performs various calculations (e.g., loan-to-value ratio). *Id.* It also determines when a proposed loan should be sent to the GSEs' or federal agencies' automated underwriting systems ("AUSs"), communicates with those AUSs, and receives responses. *Id.* And it applies credit and underwriting guidelines to applicants' data to help determine loan eligibility. *Id.* Finally, it creates detailed messaging based on the business rules for underwriters and loan processors (e.g.,

---

[4] Unless otherwise indicated, citations to "Ex." refer to exhibits to the concurrently filed declaration of Amanda Groves.

3

"escrow for flood insurance is required"). *Id.* ¶ 7.

Other business services in the Risk Engine include, e.g., (1) "Get All in Price," which prices the loan; (2) "Preferred Product Offering," which identifies potential loan products and provides complete, accurate, and easy-to-understand information about terms, conditions, and costs so that the customer can make an informed decision about how to move forward; and (3) "Qualified Mortgage," which supports compliance with the federal Dodd-Frank Act's "ability to repay" requirements. *Id.* ¶ 8.

### 3.     Automated underwriting systems and Wells Fargo's ECS models

Automated underwriting systems provide an initial determination of whether an applicant is eligible (rather than approved) for the loan applied for and whether the loan can be sold to or insured by a particular investor (GSEs, FHA, VA, etc.). Strawser Decl. ¶ 6; *see* 12 C.F.R. § 1003.4(a)(35)(ii). If so, the application proceeds to credit underwriting and documentation verification, including verification of income, employment, assets, and liabilities stated in the application; analysis of credit history; and collateral evaluation via an appraisal or other valuation. Strawser Decl. ¶ 6. AUSs do *not* provide automatic approval or denial decisions. *Id.* Underwriting is done by human underwriters. *Id.*; Keller Decl. ¶ 13.

The GSEs have their own AUSs. Strawser Decl. ¶ 7. Fannie Mae's is "DU" and Freddie Mac's is "LPA." Keller Decl. ¶ 13. Wells Fargo also has an internal AUS, generally known as "ECS," though ECS includes different models: (1) the Conventional Model, Model 11960, for conforming and non-conforming loan applications; and (2) the Government Model, Model 11419, for FHA and VA applications. Relova Decl. ¶ 3. The ECS models are implemented by business rules within the GRD business service, but they can be run independently of the Risk Engine. Indeed, each model uses a simple, race-neutral scoring logic that can be fully stated on two to three sheets of paper. *Id.* ¶¶ 4, 7. Neither uses artificial intelligence. *Id.* ¶ 4.

ECS's race-neutral scoring models are used to evaluate the risk of mortgage applications. They are designed to give an objective, numerical evaluation, or score, of the credit risk of each applicant so that underwriters can make better credit decisions, reducing losses to Wells Fargo (and the customer), and, in some cases, as described below, increasing acceptance rates. *Id.* ¶ 15. The score quantifies the expected future performance of the loan: the higher the score, the more likely that applicant is to pay as promised;

the lower the score the less likely. *Id*. ¶ 14. Both ECS models show a better ability to distinguish between low-credit risk and high-credit risk applicants than FICO, which is a well-accepted credit score in the lending industry. *Id*. ¶ 14.

ECS scores are translated into Credit Risk Classes ("CRCs"): A1, A2, C1, or C2 for conforming and non-conforming loan applications, and G1, G2, and G3 for FHA and VA loan applications. *Id*. ¶¶ 5-6. The favorable A1, A2, G1, and G2 CRCs reflect the lowest risk of default, while the C1, C2, and G3 CRCs reflect higher risk of default. *See id*. ¶¶ 5-6, 14; Courchane Decl. at 13. CRCs do not replace human underwriting; instead, they indicate the associated credit risk. Keller Decl. ¶ 13; Relova Decl. ¶¶ 3, 15.

ECS also generates risk messages that point the underwriter to specific information on the applicant's credit report. Relova Decl. ¶¶ 8-9. For example: "Credit Report: Account(s) have 30 plus days past due within the last 6 months." *Id*. ¶ 9. This is similar to the GSEs' AUSs, but ECS points to more specific information (the GSEs' AUSs simply say to review the credit report).

During the relevant time, Model 11960 could only *help* conforming loan applicants obtain approval. Applicants were run through the GSEs' AUSs and through Wells Fargo's ECS Model 11960. *Id*. ¶ 3. The *best* result of the three was used to generate a "hybrid" CRC, which determined salability to the GSEs. *Id*. ¶ 20. Model 11960 thus allowed some applicants to be approved even if the GSEs' AUSs determined they were ineligible. *See id*. Fannie Mae and Freddie Mac now require all eligibility determinations to be made using their own AUSs, so as of July 2021, ECS Model 11960 scores and CRCs are no longer used for conforming loans. *Id*. ¶¶ 3, 19-21.

### C.    Wells Fargo's Fair Lending Analyses

There are many reasons for the so-called "approval gap" between applicant pools, including historical and systemic issues impacting various groups. For example, African Americans' FICO scores are, on average, 40 points lower than their white counterparts'. Adelino Decl. ¶ 4 & Ex. A, ¶ 40 n.58. To ensure that differences in loan approvals are not attributable to unlawful discrimination, Wells Fargo's Fair Lending Analytics ("FLA") team conducts several types of fair lending analyses. Ex. 2 (LeMaire Dep. 7:1-8:18); Ex. 1 (Brodsky Dep. 15:16-22); Courchane Decl., Ex. A, ¶¶ 100-05. This process is robust, and it complies with industry standards and with the requirements of Wells Fargo's federal regulators. Courchane Decl., Ex. A, ¶¶ 14, 16-17. Those analyses have consistently confirmed that

minority applicants were denied for legitimate credit-related reasons. *See, e.g.*, ECF No. 204-15 at 25.

Without robust fair lending processes, it is difficult to determine whether differences in outcomes stem from historical and systemic issues, or from discrimination. Indeed, studies show that, as more legitimate, race-neutral factors are considered, purported "gaps" between white and minority applicants shrink. *See* Adelino Decl., Ex. A, ¶¶ 68-78.

### D.    The Named Plaintiffs

A prime example of failing to consider all relevant data is Bloomberg News's March 11, 2022 article, *Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom*. That article was based on Wells Fargo's public HMDA data, which contains only a fraction of the data reviewed by Wells Fargo's FLA team. *See* Ex. 2. (LeMaire Dep. 32:18-23, 43:20-45:9). Thus, it did not account for many race-neutral factors affecting loan-approval rates. Even so, plaintiffs began filing lawsuits just seven days after that article was published. The lead plaintiff in the first such lawsuit, Aaron Braxton,[5] did not even apply for a refinance (the only loan type the article addressed). Four more lawsuits were filed before June 2022, with each relying almost exclusively on the article. In one pre-Bloomberg lawsuit, *Williams v. Wells Fargo Bank, N.A.*, the plaintiffs amended their complaint to reference the article.

In January 2023, all six actions were consolidated, and Plaintiffs filed an amended complaint in March 2023. Plaintiffs made almost no new allegations, but instead doubled down on the Bloomberg article. The few facts they alleged outside of the Bloomberg article have been easily disproven.[6] Discovery has shown that *none* of these plaintiffs was discriminated against.

**Aaron Braxton** did not apply for a loan and was not denied. Instead, he sought and received a modification of his existing FHA mortgage after he claimed a hardship due to medical disability. Strawser Decl. ¶¶ 11, 13, 19, 29. The process took longer than anticipated because Braxton submitted illegible and incomplete documents and there were discrepancies in his stated income. *Id.* ¶¶ 13-19. Wells Fargo ultimately modified Braxton's loan, reducing his interest rate from 6% to 3.375%. *Id.* ¶ 26.

---

[5] Despite having not applied to refinance his loan, having no data input into CORE, and never being run through an ECS model or any other AUS, Braxton remains a named plaintiff and seeks to represent "issue" classes under Rule 23(c)(4). *See* ECF No. 204 at 12.

[6] For example, Plaintiffs allege that Wells Fargo made "an internal announcement that it would place increasing … reliance on machine learning processes in an automated underwriting system." ECF No. 114 ¶ 104. Deposition and document discovery quickly confirmed that no such announcement was ever made.

**Paul Martin's** loan application was not denied. He sought, and was conditionally approved for, a $180,000 home equity loan, but he disputed the $1,900,000 property value assigned by a third-party appraiser. *Id.* ¶¶ 72-77. The appraised value had no impact on the loan terms for which Martin was approved, but he nonetheless withdrew his application. *Id.* ¶¶ 78-79.

**Christopher Williams** was conditionally approved for a $180,000 HELOC. *Id.* ¶ 94. Wells Fargo offered Williams the same interest rate it would have offered to any Georgia applicant with his Equifax credit score, his loan-to-value ratio, and his approved credit line, subject to a discount of .25% because Williams was a Wells Fargo deposit customer. *Id.* ¶¶ 94-95. But Williams disagreed with the credit score reported by Equifax and withdrew his application. *Id.* ¶¶ 96-98.

**Gia Gray** applied for, and received, a non-conforming refinance loan from Wells Fargo on her primary residence. *Id.* ¶ 59. Her claims focus on two rental properties, but Gray did not apply to refinance her loans on those properties. *Id.* ¶ 62. Instead, after Gray's HMC provided her with likely interest rates in early 2020, which were higher because those properties were not owner-occupied, Gray decided not to move forward. Ex. 11 (Figone Dep. 88:3-93:12). The HMC was disappointed; he was "looking forward to originating another loan" for Gray because "[i]t's how [he] get[s] compensated." *Id.*

**Bryan Brown** applied for a conventional, conforming loan to refinance the existing mortgage loan on his multi-unit property in October 2020. Strawser Decl. ¶¶ 30-31. Wells Fargo denied Brown's application in February 2021 because he did not meet the applicable GSE underwriting guidelines. *Id.* ¶¶ 35, 38. His verified debt-to-income ("DTI") ratio (monthly debt payments divided by gross monthly income) was 56.913%—higher than either GSE would accept. *Id.* ¶¶ 32-37; Strawser App'x at 142 (entries for 2/24/2021). The underwriter also noted that Brown's annual income had declined by more than 35%— a trend Brown acknowledged continues "to this day." Strawser Decl. ¶ 32; Ex. 5 (Brown Dep. 21:20-22:14, 78:18-79:10). Brown had rental properties, but most were vacant and he could not provide proof of rental income. Strawser Decl. ¶¶ 32, 37.

**Elretha Perkins** submitted two applications for a conventional conforming refinance, both after Wells Fargo stopped using ECS CRCs for such loans. Strawser Decl. ¶¶ 86, 89, 92; *see* Relova Decl. ¶¶ 19-20. Wells Fargo denied the first application because Perkins did not sign the Intent to Proceed form and did not provide the information required to complete the application. Strawser Decl. ¶ 87. It denied

7

the second application because Perkins' credit report showed significant late payments on her first mortgage loan, which disqualified her under applicable GSE guidelines. *Id.* ¶¶ 83-85, 88-90. Perkins's application also did not pass the anti-predatory-lending "Benefit to Borrower" test. *Id.* ¶ 90; Ex. Strawser App'x at 364 (entries for 12/15/2021).

**Ifeoma Ebo** sought an FHA loan of almost $900,000 to buy a multi-unit property. Strawser Decl. ¶ 41. FHA underwriting guidelines required her to submit signed, as-filed copies of her 2019 and 2020 tax returns to verify her income. *Id.* ¶ 45. In January 2022, Ebo informed Wells Fargo that the IRS had rejected her 2020 tax return because it was not signed. *Id.* ¶ 50. Wells Fargo tried to salvage the loan, including plans to request an underwriting exception from FHA, but Ebo did not provide confirmation that her tax return had been filed until March 2022. *Id.* ¶¶ 52-55. Due to Ebo's repeated delays, her loan closing was pushed back and the seller canceled the purchase contract. *Id.* ¶¶ 44, 46, 50-53, 55-56; Ex. 6 (Ebo Dep. 211:24-212:3). Ebo then withdrew her application. Strawser Decl. ¶ 57; Ex. 6 (Ebo Dep. 214:12-14, 215:16-216:13).

**Terah Kuykendall-Montoya** applied for a conventional, conforming cash-out refinance in July 2021, less than four years after receiving a bankruptcy discharge. Strawser Decl. ¶¶ 65-66; Ex. 16; Ex. 17 (Kuykendall-Montoya Dep. 62:7-23). Wells Fargo denied the application because her bankruptcy discharge was too recent under GSE guidelines. Strawser Decl. ¶¶ 68-69, 71.[7] Another lender reached the same conclusion. Ex. 17 (Kuykendall-Montoya Dep. 150:5-13, 152:18-24); Ex. 20. The next year—after the required time from bankruptcy had passed—she refinanced with the other lender. Ex. 17 (Kuykendall-Montoya Dep. 154:6-14); Ex. 19.

## E.    Plaintiffs' Claims.

Plaintiffs have pleaded five causes of action: (1) violation of ECOA, 15 U.S.C. § 1691, *et seq.*; (2) violation of the FHA, 42 U.S.C. § 3601, *et seq.*; (3) violation of 42 U.S.C. § 1981; (4) violation of California's Unruh Act, Cal. Civ. Code § 51; and (5) violation of California's UCL, Cal. Bus. & Prof. Code § 17200. ECF No. 114 ¶¶ 175-210. The complaint asserts both disparate-impact and disparate-treatment theories of liability. *E.g.*, *id.*, ¶¶ 23, 123, 126-38, 166. Neither the complaint nor Plaintiffs' pending motion for class certification states plainly for which causes of action they are asserting a

---

[7] Another GSE guideline also barred approval of Kuykendall-Montoya's application. Strawser Decl. ¶ 67.

disparate-impact theory, a disparate-treatment theory, or both. But disparate-impact liability is not cognizable under § 1981 or the Unruh Act. *See Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 536 (9th Cir. 1982); *Mackey v. Bd. of Trs.*, 31 Cal. App. 5th 640, 660 (2019).

### III.   LEGAL STANDARD

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Abdul-Haqq v. Permanente Med. Grp., Inc.*, 2022 WL 7127947, at *1 (N.D. Cal. Oct. 12, 2022) (Donato, J.), *aff'd*, 2024 WL 1155449 (9th Cir. Mar. 18, 2024) (quoting Fed. R. Civ. P. 56(a)). "A fact is material if it could affect the outcome of the suit under the governing law." *Id.* When the burden of proof is born by the nonmoving party (as in this case), the movant may initially establish the absence of a genuine issue of material fact by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

### IV.   ARGUMENT

#### A.   Plaintiffs' Disparate Impact Theory Fails at Every Step.

Plaintiffs' disparate-impact theory, whether asserted under ECOA, the FHA, or the UCL, is subject to a three-part legal framework. *See Sw. Fair Hous. Council, Inc. v. Maricopa Dom. Water Improv. Dist.*, 17 F.4th 950, 960 (9th Cir. 2021) (disparate-impact theory is "available pursuant to a number of federal antidiscrimination statutes" and legal framework applies "[i]n general terms").[8] First, to make out a prima facie case, Plaintiffs must identify a specific policy and provide "robust" proof "that the challenged policy, and not some other factor or policy," causes a significant, adverse, and disproportionate effect on a protected class. *Id.* at 962. Second, if the plaintiff does so, the defendant can avoid liability if it shows that "the challenged policy significantly serves a legitimate business interest." *Id.* at 966. Third, if the defendant makes that showing, then the plaintiff must prove that an alternative practice or policy (a) "would serve the defendant's legitimate interests," and (b) "would not have a similarly undesirable effect on members of protected groups." *Id.* at 970 (noting that this must take "into account factors such

---

[8] *See also Brown v. City Nat'l Bank*, 2024 WL 201360, at *4 (N.D. Cal. Jan. 18, 2024) (noting FHA and ECOA claims are analyzed similarly); *Merritt v. Countrywide Fin. Corp.*, 2016 WL 6573989, at *12-13 (N.D. Cal. Jun. 29, 2016) (applying same test to FHA and ECOA disparate-impact claims); *Asencio v. Miller Brewing Co.*, 283 F. App'x 559, 561 (9th Cir. 2008) (UCL claim derivative of statutory discrimination claim fails if statutory claim fails).

9

as the cost or other burdens that alternative policies would impose") (cleaned up). Plaintiffs' disparate-impact theory cannot pass any of these three steps.

### 1. Plaintiffs have not isolated and identified specific challenged policies.

Instead of identifying a specific policy, Plaintiffs seek to amalgamate Wells Fargo's front-end loan-origination workflow tool (CORE), its internal credit scoring models (ECS), and the Risk Engine (which applies *thousands* of separate credit and underwriting policies) by referring to a "conjoined CORE and ECS and Risk Engine underwriting policy." *See* ECF No. 252 at 2; *see also, e.g.*, ECF No. 204 at 17 (referring to this as the "CORE/ECS underwriting system"). Plaintiffs admit they "do not seek separately to define each discriminating policy." ECF No. 204 at 24. Indeed, they define their conjoined "system" to include all "policies embedded therein" and even Wells Fargo's "underwriting practices." *Id.* at 4.

This attempt to combine and conflate policies and practices cannot be squared with the law. Rather, Plaintiffs must "isolat[e] and identif[y] the *specific* … practices that are allegedly responsible for any observed statistical disparities." *Sw. Fair Hous.*, 17 F.4th at 965 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656 (1989)) (emphasis added).[9] This is no "trivial burden." *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 101 (2008). The failure to identify and isolate specific policies is sufficient to "reject[] the claim on the merits." *Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1114 (9th Cir. 2014) (citing *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) and noting the requirement to name specific policies "has bite"); *see also Duarte v. Quality Loan Serv. Corp.*, 2018 WL 2121800, at *5 (C.D. Cal. May 8, 2018) (plaintiffs "cannot attack an overall decisionmaking process," but must rather "identify the *particular* element or practice within the process that causes an adverse impact") (emphasis added).[10]

Plaintiffs have wrongly argued that they need not isolate and identify specific challenged policies if they can "demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis." ECF No. 204 at 23 (quoting 42 U.S.C. § 2000e-2(k)(1)(B)(i)). But setting aside that the statutory provision Plaintiffs cite is unique to Title VII, Plaintiffs cannot show that Wells Fargo's policies are "not capable of separation for analysis." *See Welch v. Eli Lilly & Co.*, 2009 WL

---

[9] Although *Wards Cove* was an employment rather than housing case, *Southwest Housing* recognized that its relevant holdings apply equally to the housing-discrimination context. 17 F.4th at 965.

[10] *See also Anderson v. Douglas & Lomason Co.*, 26 F.3d 1277, 1284 (5th Cir. 1994) (affirming dismissal where plaintiffs "identified no specific policy that allegedly caused a race-based imbalance"); *Inclusive Cmtys. v. Tex. Dep't of Hous.*, 2016 WL 4494322, at *6-7 (N.D. Tex. Aug. 26, 2016) (similar).

734711, at *8 (S.D. Ind. Mar. 18, 2009) ("[m]erely reciting" that the elements of a process cannot be separated for analysis is insufficient). CORE, the Risk Engine, and ECS are separate technology applications developed by separate teams. *Compare* Keller Decl. ¶¶ 2, 10, 12 (CORE), *with id.* ¶¶ 3, 14 (Risk Engine), *and* Relova Decl. ¶ 4, 10-15 (ECS). And Wells Fargo's credit and underwriting policies can surely be analyzed separately—indeed, Wells Fargo regularly does so for fair-lending compliance. *See* Courchane Decl., Ex. A, ¶¶ 101-03, 106; Ex. 2 (LeMaire Dep. 48:3-10). Plaintiffs' own expert separately identified and analyzed several such policies. *See, e.g.*, ECF No. 204-19 (Kurzendoerfer Decl. ¶ 22). In short, Plaintiffs' "system" includes distinct technology applications and thousands of identifiable policies that are *capable* of separate analysis. Plaintiffs just did not *conduct* any separate analysis. On that basis alone, the Court should grant summary judgment.

### 2.    There is no evidence of "robust causality."

Even if Plaintiffs' amalgamated "system" were a legally cognizable, specific policy (and it is not), Plaintiffs lack the required "robust" proof "that the policy itself, and not some other factor … created or exacerbated a disproportionate effect." *See Sw. Fair Hous.*, 17 F.4th at 962. This "robust causality" requirement is meant to ensure defendants are not liable for disparate outcomes caused by underlying "racial disparities they did not create." *Tex. Dep't of Hous. v. Inclusive Cmtys.*, 576 U.S. 519, 542 (2015).

Plaintiffs have asserted they will rely on Dr. Kurzendoerfer's regression analysis to prove that the so-called "CORE/ECS system" caused significant and adverse differences in loan approval rates for minority applicants.[11] *E.g.*, ECF No. 204 at 24, ECF No. 252 at 9. But that regression analysis is *not* tied to the "CORE/ECS system" or to any other purported Wells Fargo policy—it in no way controlled for the use of CORE, ECS, or the Risk Engine. *See* Ex. 27 (Kurzendoerfer Dep. 193:13-16) ("Q. So your regression analysis is not tied to a particular Wells Fargo policy, isn't that correct? A. Correct."). That dooms Plaintiffs' disparate-impact theory. *Sw. Fair Hous.*, 17 F.4th at 962 (plaintiffs must "prove with a preponderance of the evidence that the policy itself … created or exacerbated a disproportionate effect.").

Plaintiffs have previously defended Dr. Kurzendoerfer's regression in three ways—none hold water. First, Plaintiffs have suggested that the regression can prove robust causation because it shows

---

[11] Wells Fargo has moved to exclude several of Dr. Kurzendoerfer's opinions. ECF No. 244. If that motion is granted, it will provide an additional basis to grant summary judgment—Plaintiffs cannot prove their case with expert opinions that do not comport with Rule 702.

"inexplicable racial disparities" in loan-approval rates. *See, e.g.*, ECF No. 252 at 2. But Plaintiffs' burden is not to show "inexplicable" differences, but rather differences that are "explicable" by a specific challenged policy. *See Cahill v. Nike, Inc.*, 2022 WL 19226181, at *23 (D. Or. Nov. 22, 2022) (regression showing "a statistically significant difference" was insufficient because it did not show those differences "result[ed] from a common policy"); *Brnovich v. Dem. Nat'l Comm.*, 594 U.S. 647, 677 n.17 (2021) ("Statistical significance … does not necessarily determine causes ….."); *Local 3621 v. City of N.Y.*, 2022 WL 17175798, at *10 (S.D.N.Y. Nov. 22, 2022) (similar). Plaintiffs' claim that differences in approval rates are "inexplicable" is only an admission of a failure of proof.[12]

Second, Plaintiffs have argued that since they are challenging "the entire Wells Fargo CORE underwriting system," they need not "undertake the task" of proving which aspects of that system "drove the disparities." ECF No. 204 at 26. But when plaintiffs challenge more than one policy, they still must prove that "*each* challenged practice has a significantly disparate impact." *Sw. Fair Hous.*, 17 F.4th at 965 (emphasis added). They thus cannot avoid their burden to prove causation for each policy by lumping policies together. *See Wards Cove*, 490 U.S. at 657.

Finally, Plaintiffs have at times suggested that their claim is really focused solely on ECS and the supposed "scarlet letter" from unfavorable C1 and C2 CRCs. *See, e.g.*, ECF No. 252 at 8. But Plaintiffs' regression *cannot* show impacts from unfavorable CRCs, because their expert's regression did not control for use of ECS or any other Wells Fargo policy.[13] *See* Ex. 27 (Kurzendoerfer Dep. 193:13-16). And her separate analysis of ECS CRCs (which is distinct from her regression) does not control for creditworthiness or attempt to similarly situate applicants, and thus cannot show that any differences in distributions of CRCs for minority applicants are due to Wells Fargo's policy rather than, for example, differences in credit profiles. *Id.* (Kurzendoerfer Dep. 45:13-53:16); *see also* Courchane Decl., ¶¶ 6-10 & Ex. B, ¶¶ 37-39. Plaintiffs thus lack any evidence that differences in CRCs were not caused by "some other factor," such as underlying differences in creditworthiness resulting from historical and societal

---

[12] Indeed, Plaintiffs contend that disparities in lending outcomes are caused in part by federal regulations. Ex. 3 (Braxton's Resps. to Wells Fargo's Interrogs., Set 1) at 15:18-24. Yet Plaintiffs make no attempt to show that the differences they cite now resulted from Wells Fargo's policies rather than regulations.

[13] As Wells Fargo has previously shown, Plaintiffs' claim that they are focused on the "scarlet letter" of unfavorable CRCs renders their proposed class nonsensical. Plaintiffs defined their class as those who received *favorable* CRCs—excluding those applicants the CRCs allegedly impacted. ECF No. 204 at 11.

factors for which Wells Fargo is not responsible. *See Sw. Fair Hous.*, 17 F.4th at 962.

### 3. CORE, ECS, and the Risk Engine serve Wells Fargo's legitimate, race-neutral business interests, and Plaintiffs lack evidence of equally effective alternatives.

Even if Plaintiffs could prove their prima facie disparate-impact case, summary judgment is still warranted because Wells Fargo's policies serve legitimate business purposes, and Plaintiffs have no evidence of equally effective alternatives. *See Joshua v. City & Cnty. of S.F.*, 2017 U.S. Dist. LEXIS 48405, at *2-3 (N.D. Cal. Mar. 30, 2017) (Donato, J.) (granting summary judgment because "defendant has produced evidence that its decision … was based on legitimate business reasons"). The undisputed evidence shows that Wells Fargo's processes "'serve[], in a significant way,' its legitimate interests." *Sw. Fair Hous.*, 17 F.4th at 967 (quoting *Wards Cove*, 490 U.S. at 659); *Mosby v. Bd. of Educ.*, 754 F. App'x 34, 36 (2d Cir. 2018) (similar). And Plaintiffs have no evidence of any alternative policies that could equally serve these interests—much less any that are equally cost-effective and that would avoid the alleged disparate impacts at issue.

**CORE.** There is no genuine dispute that CORE—Wells Fargo's front-end loan origination workflow tool—serves several legitimate business interests. It provides a common portal to access customer data from loan applications and credit reports throughout the loan origination process, data that can be used by other applications—such as the Risk Engine—to apply Wells Fargo's product, credit, and underwriting policies. Keller Decl. ¶¶ 2, 10-12. And it stores loan-specific data for use by underwriters during the loan decisioning process. *Id.* ¶ 12. Given the massive volume of loan applications processed by Wells Fargo (2.7 million during the proposed class period), an interactive workflow tool like CORE is critical to efficient and accurate processing of applications. Strawser Decl. ¶ 8; *see* Keller Decl. ¶ 12.

Plaintiffs have no evidence of any alternative to using CORE or a similar front-end platform. Without such a tool, loan origination staff would have to work with paper files or scanned documents— less efficient, more expensive, and more error-prone. *See* Keller Decl. ¶ 12. Nor is there any evidence that such a manual process would lead to greater approval rates for minority applicants. Any claim based on CORE thus fails.

**The Risk Engine.** The Risk Engine likewise serves several legitimate business interests. Among other functions, it uses the application data stored in CORE to perform various loan- and borrower-level

calculations (e.g., loan-to-value ratio) and then applies thousands of credit and underwriting policies to applicants' data, which helps determine loan eligibility. *Id.* ¶ 6. Similarly, it creates detailed messaging for underwriters and loan processers based on these policies (e.g., "escrow for flood insurance is required"). *Id.* ¶ 7. These functions increase the efficiency and accuracy of application processing—eliminating the need to perform calculations manually and memorize or separately consult thousands of potentially applicable credit and underwriting policies, pricing sheets, and procedures for each loan application. *Id.* ¶ 14. This reduces human error, assists with legal and regulatory compliance, and improves customer service. *See id.* These are legitimate business interests. *See Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990) (quality and efficiency are legitimate business interests). The Risk Engine also serves legitimate business interests by sending data to the GSE's external AUSs. Keller Decl. ¶ 6. And since salability to GSEs is the heart of the conforming loan market, this is plainly a legitimate business interest. *See Theodora Rescue Comm. v. Volunteers of Am.*, 2014 WL 5782328, at *4 (W.D. Wash. Nov. 6, 2014) (making a profit is a legitimate business interest); Courchane Decl., Ex. A, ¶ 32.

Plaintiffs have no evidence of any alternative to the Risk Engine, let alone one that would alter approval rates. They certainly cannot show any equally effective alternative when accounting for "[f]actors such as the cost or other burdens that alternative policies would impose." *See Sw. Fair Hous.*, 17 F.4th at 970 (quotations omitted). Applying thousands of credit and underwriting policies manually would plainly be arduous, expensive, and error-prone. Any claim based on the Risk Engine fails.

**ECS.** Finally, there is no genuine dispute that ECS substantially serves Wells Fargo's legitimate business interests. For part of the proposed class period, Fannie Mae permitted the use of ECS to determine salability of conforming loans, allowing Wells Fargo to originate salable loans it could not have without ECS. Relova Decl. ¶ 20. ECS thus served Wells Fargo's legitimate interest in lending to as many qualified applicants as possible. *See id.* ¶¶ 15, 20. ECS also serves Wells Fargo's interest in avoiding default—plainly a legitimate business interest. *See id.* ¶¶ 14-15. For example, ECS is used to generate specific risk insight messages for display to underwriters based on underlying loan and credit-report data (e.g., "Credit Report: Account(s) have 30 plus days past due within the last 6 months"), providing them with important guidance on key risk factors to consider during the underwriting process. *Id.* ¶¶ 8-9. And the race-neutral variables incorporated into ECS's scoring model were selected based on their demonstrated ability to

14

predict default—with testing showing that the ECS models were *better* at predicting default than FICO scores. *Id.* ¶¶ 7, 14; *see also Rodriguez v. Bear Stearns Cos.*, 2009 WL 5184702, at *17 (D. Conn. Dec. 22, 2009) ("timely receipt of payments" is an important business objective).

Again, Plaintiffs have no evidence of an equally effective alternative to ECS. Their only evidence even touching on the issue is Dr. Kurzendoerfer's claim in her *rebuttal* report that Wells Fargo's expert "failed to consider" alternatives. *See* ECF No. 204-19 (Kurzendoerfer Decl., Ex. B, ¶ 19). But proving effective alternatives is Plaintiffs' burden, not Wells Fargo's. *Sw. Fair Hous.*, 17 F.4th at 970. And Plaintiffs concede their expert "did not affirmatively opine on what Wells Fargo should have done." ECF No. 255 at 17. Since Plaintiffs have nothing else on this score, they fail to meet their burden.

### 4. Plaintiffs cannot establish that damages class members were injured.

Summary judgment is also warranted on the damages classes' disparate-impact claims because Plaintiffs cannot establish that class members' loans were denied as a direct result of the alleged discriminatory conduct. The right to sue for a statutory cause of action is limited to plaintiffs whose injuries are proximately caused by violations of the statute. *Sw. Fair Hous.*, 17 F.4th at 962 n.8. And proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged." *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 202-03 (2017); *see also, e.g.*, *Cnty. of Cook v. Bank of Am. Corp.*, 584 F. Supp. 3d 562, 588 (N.D. Ill. 2022), *aff'd*, 78 F.4th 970 (7th Cir. 2023) (granting summary judgment on FHA claims for lack of proximate cause). Here, Plaintiffs lack evidence the loan denials (the damages' classes injuries) were "attributable" to the "CORE/ECS" system and not to "other, independent factors." *See City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1040 (9th Cir. 2021) (harm must be "attributable to the [FHA] violation, as distinct from other, independent factors").

There is no genuine dispute Wells Fargo denied the loan applications of the three Plaintiffs purporting to represent the damages classes for legitimate reasons independent of the "CORE/ECS system." Brown had an excessive DTI ratio and declining income; Perkins had significant loan delinquencies on her credit report; and Kuykendall-Montoya had a disqualifying, recent bankruptcy discharge. *See* Strawser Decl. ¶¶ 32-37, 67-69, 83-85, 88-90; Courchane Decl., Ex. A, ¶¶ 135-36, 148-49, 159; *see also* Ex. 5 (Brown Dep. 78:18-79:10); Ex. 26 (Perkins Dep. 96:20-98:15); Ex. 17 (Kuykendall-Montoya Dep. 108:12-22); Ex. 27 (Kurzendoerfer Dep. 275:17-276:7) (based on Plaintiffs' expert's

model, Brown had a 1.5% probability of approval regardless of race).

Mr. Jackson's opinion that Brown, Perkins, and Kuykendall-Montoya's applications should have been approved does not create a genuine dispute for three reasons. *See* ECF No. 204-22 (Jackson Decl., Ex. A, at 11-12, 15-16, 17-19). First, Mr. Jackson's opinions are not admissible for the reasons set forth in Wells Fargo's pending motions. *See* ECF Nos. 198, 231. Second, Mr. Jackson's opinions cannot be used to support Plaintiffs' case-in-chief or defeat summary judgment because, as Plaintiffs have insisted, he is solely a rebuttal expert. *See* ECF No. 254 at 7; *Alsadi v. Intel Corp.*, 2019 WL 4849482, at *12-14 (D. Ariz. Sept. 30, 2019) (plaintiffs' rebuttal experts could not be used to defeat summary judgment) (collecting cases); *Daggett v. United States*, 2010 WL 11553196, at *1 (S.D. Fla. Feb. 4, 2010) (same). Third, Mr. Jackson's opinions that Brown, Perkins, and Kuykendall-Montoya's applications should have been approved are contradicted by the undisputed factual record, as shown above. *See 1440 Sports Mgmt. Ltd. v. PGA Tour, Inc.*, 2023 WL 7280444, at *5 (N.D. Cal. Oct. 6, 2023) ("[a]ssertions in expert declarations do not automatically create genuine issues of fact," and "cannot be relied upon" when contradicted by the record).

For two reasons, Plaintiffs also lack any evidence that absent class members were injured by the "CORE/ECS system." First, of the 119,100 members of the proposed damages class, 101,000 received *favorable* A1 and A2 CRCs. Courchane Decl., Ex. B, ¶ 43 & App'x 8; *see also* ECF No. 204 at 11 & n.11 (defining proposed damages classes consisting of minority applicants "approved by an external AUS or Wells Fargo's ECS … who were ultimately denied"). To use Plaintiffs' analogy, class members cannot have been harmed by a "scarlet letter" with which they were never marked.

Second, for the small fraction of damages class members who received C1 or C2 ECS CRCs, there is no evidence that their loans were denied *because of* a disparate impact of "CORE/ECS," rather than because of "some other factor or policy." *See Sw. Fair Hous.*, 17 F. 4th at 962. Plaintiffs' expert's own model predicted that many class members were likely to be denied regardless of race. *See* Ex. 27 (Kurzendoerfer Dep. 274:20-275:8); Irwin Decl., ¶ 8. And Dr. Courchane's analysis shows that class members were denied for myriad, legitimate reasons completely divorced from the "CORE/ECS system"—insufficient collateral, insufficient cash to close, high debt to income ratios, etc. Courchane Decl., Ex. B, App'x 7. Moreover, neither Dr. Kurzendoerfer nor Mr. Wallace has offered a way to identify

which (if any) class members were wrongfully denied. *See* Ex. 27 (Kurzendoerfer Dep. 280:6-20); Ex. 28 (Wallace Dep. 101:23-102:4). Indeed, Dr. Kurzendoerfer testified that she could not say even 15% of putative class members would have been approved "had they been white." Ex. 27 (Kurzendoerfer Dep. 277:4-279:7). Thus, Plaintiffs cannot show that it is more likely than not that any damages class member was injured under their theory of disparate impact.

### 5. Wells Fargo is entitled to summary judgment on *actual damages*.

Even if Plaintiffs could show that some damages class members' applications were wrongfully denied because of Wells Fargo's so-called "CORE/ECS system" (and they cannot), Plaintiffs have no evidence that such class members suffered losses for which they can claim compensatory damages, much less what amount. Even if Mr. Wallace's damages model were admissible (and it is not, *see* ECF No. 244 at 19-24), it does not create a genuine issue of fact as to class members' damages because it applies only to wrongfully denied applicants, and, as Mr. Wallace acknowledges, there is no evidence identifying such class members. *See* Ex. 28 (Wallace Dep. 40:12-41:1, 102:13-21).

Mr. Wallace's model also requires unknown information about individual class members, such as whether they received a loan from a different lender, and at what interest rate. ECF No. 244 at 19-22; Irwin Decl., Ex. A, ¶¶ 44-52. Plaintiffs *concede* this information is not in the record, but argue they can obtain it in a future, non-existent "remedial phase." *See* ECF No. 255 at 22; *see also* ECF No. 252 at 11. But this case has not been bifurcated, discovery has closed, and at the summary judgment stage it is Plaintiffs' burden to "put on proof from which the jury could ascertain damages with reasonable certainty." *Joint Stock Co. v. Riveria Travel & Tours, Inc.*, 2012 WL 13201666, at *8 (C.D. Cal. Aug. 23, 2012) (granting summary judgment on damages claims) (quoting *Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co.*, 153 F.3d 938, 947 (9th Cir. 1998)). There is no such evidence, and so Plaintiffs have nothing to create a factual dispute on actual damages.

### 6. Summary judgment for Wells Fargo is warranted on any pricing claims.

In their class certification motion, Plaintiffs seek an "issue" class based on Wells Fargo's loan pricing, which they claim was higher for minority applicants. ECF No. 204 at 30. No such class should be certified. *See* ECF No. 232 at 28-30. But even if it is, summary judgment should be granted to Wells Fargo to the extent Plaintiffs pursue any pricing claim. Plaintiffs have no evidence of any Wells Fargo policy

that caused price disparities. And in any event, Plaintiffs' expert analyzed pricing only for "conventional, conforming, fixed-rate, 30-year, primary residence, single-unit, non-manufactured housing loans." ECF No. 204-19 (Kurzendoerfer Decl., Ex. A, ¶ 83). **None of the Plaintiffs received such a loan**. And Plaintiffs cannot have been injured by pricing differentials for loans they did not receive. *See Sw. Fair Hous.*, 17 F.4th at 962 n.8 (requiring injury proximately caused by alleged violation).

## B. The Undisputed Evidence Negates Plaintiffs' Disparate Treatment Claims.

Disparate treatment claims are analyzed under the three-stage *McDonnell Douglas* burden-shifting test. *Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997). The plaintiff must first establish a prima facie case. *Id*. If they do, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action." *Id*. If the defendants do that, the plaintiff must prove that the proffered reason is "mere pretext." *Id*. Plaintiffs' individual disparate-treatment claims fail at every step.

### 1. Plaintiffs cannot establish a prima facie case.

The elements of Plaintiffs' prima facie case vary slightly depending on the claim. Under ECOA, Plaintiffs must prove that (1) they are members of a protected class; (2) they applied for credit; (3) they were qualified for credit; and (4) they were denied credit. *Hafiz v. Greenpoint Mortg. Funding, Inc*., 652 F. Supp. 2d 1039, 1045 (N.D. Cal. 2009). The FHA, § 1981, and Unruh Act claims are similar to ECOA, but add an element: that the defendant approved a similarly situated individual who was not a member of Plaintiffs' protected class.[14] *See Gamble*, 104 F.3d at 305 (FHA); *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1145 (9th Cir. 2006) (§ 1981); *Elliott v. QF Circa 37, LLC*, 2018 WL 2933467, at *21 n.15 (S.D. Cal. June 12, 2018) (Unruh Act claim fails if FHA claim fails). Wells Fargo does not dispute Plaintiffs are members of a protected class, but they cannot prove other elements of their prima facie case.

#### a. Braxton, Martin, Gray, Williams, and Ebo were not denied.

Braxton, Martin, Williams, Ebo, and Gray were not denied any loan they sought. Braxton received the loan modification he sought. Strawser Decl. ¶¶ 13, 19. Martin withdrew his application based on an appraised value that did not affect the loan terms for which he was conditionally approved. *Id*. ¶ 79. Williams withdrew his application because he disputed the credit score provided by a third party, and Ebo

---

[14] As noted above, § 1981 and the Unruh Act permit claims *only* for disparate treatment, not for disparate impact. So if Plaintiffs' disparate-treatment theory fails, their § 1981 and the Unruh Act claims fail too.

because the seller canceled her contract. *Id.* ¶¶ 98, 56-57. Finally, Gray never applied to refinance the loans on the investment properties identified in the amended complaint. *Id.* ¶ 62.

                      b.    <u>Brown, Perkins, Williams, and Kuykendall-Montoya were not qualified for the loans they sought.</u>

Brown, Perkins, Kuykendall-Montoya, and Williams were not qualified for the loans they sought. Brown's DTI ratio, Perkins' late mortgage payments, and Kuykendall-Montoya's bankruptcy disqualified them under applicable GSE guidelines. *Id.* ¶¶ 35, 67-69, 71. And Williams' credit score, as reported by Equifax, disqualified him from a lower interest rate. *Id.* ¶ 95.[15]

                      c.    <u>Plaintiffs have no evidence that Wells Fargo approved a similarly situated applicant who was not a member of their protected class.</u>

Plaintiffs also have no evidence, as required for their FHA, § 1981, and Unruh Act claims, that Wells Fargo approved a similarly situated individual outside of their protected class. "Similarly situated" means "similarly situated in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). This means that a "comparator's credit qualifications and loan details must be *nearly identical* to the [p]laintiff's." *Boykin v. Bank of Am. Corp.*, 162 F. App'x 837, 839 (11th Cir. 2005) (emphasis added).

Plaintiffs have no evidence on this score. In response interrogatories asking them to identify a similarly situated non-minority applicant that was treated differently, Plaintiffs refused—providing virtually identical, multi-page, non-responsive answers.[16] Nor did their experts perform any such analysis. Because Plaintiffs have no evidence that Wells Fargo approved an applicant outside their protected class— similarly situated to them "in all material respects"—Wells Fargo is entitled to summary judgment on their disparate treatment claims under the FHA and § 1981. *See Anderson v. Wachovia Mortg. Corp.*, 609 F. Supp. 2d 360, 370 (D. Del. 2009) (granting summary judgment when plaintiffs did not "present[] any objective evidence" that "[s]imilarly situated whites were not required to meet all of the requirements imposed upon the Plaintiffs to be eligible for a mortgage").

        **2.**    **Wells Fargo had legitimate, nondiscriminatory reasons for its actions.**

Even if Plaintiffs could prove their prima facie case, the undisputed evidence shows legitimate,

---

[15] Again, Williams was not denied, but to the extent he argues he should have been approved at a lower interest rate, the undisputed evidence shows he did not qualify.

[16] Wells Fargo's motion to compel a further response to that interrogatory remains pending. ECF Nos. 178, 194.

nondiscriminatory reasons for Wells Fargo's actions. "Legitimate reasons … are reasons that are facially unrelated to prohibited bias, and which, if true, would thus preclude a finding of discrimination." *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1243 (9th Cir. 2013) (cleaned up). And Wells Fargo need only produce evidence which, "*taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Bordett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004) (quoting *St. Mary's v. Hicks*, 509 U.S. 502, 509 (2004)) (emphasis in original).

Here, as shown *supra* Sections II.D. and IV.B.1, Plaintiffs either did not apply for credit, were *approved* for credit, withdrew their applications in the course of legitimate and race-neutral underwriting, or were denied for legitimate reasons. Thus, Wells Fargo has evidence of legitimate reasons for its actions. *See Shiplet v. Veneman*, 383 F. App'x 667, 668 (9th Cir. 2010) (affirming judgment for defendant because "failure to meet loan application requirements" is a legitimate denial reason); *Harrison v. Wells Fargo Bank*, 2020 WL 1322921, at *3 (N.D. Cal. Mar. 20, 2020) (granting summary judgment because determination plaintiff could "not afford the loan she sought" was a legitimate denial reason); *Boykin*, 162 F. App'x at 840 (affirming summary judgment because following lender's written policies was a legitimate denial reason); *Cooley v. Sterling Bank*, 280 F. Supp. 2d 1331, 1341 (M.D. Ala. 2003) (granting summary judgment because "heavy debt to income ratio" is a legitimate denial reason); *Anderson*, 609 F. Supp. 2d at 370-71 (granting summary judgment because following applicable GSE guidelines is a legitimate denial reason); *Sallion v. Suntrust Bank, Atlanta*, 87 F. Supp. 2d 1323, 1329 (N.D. Ga. 2000) (insufficient verifiable income, DTI, and delinquent payments are legitimate denial reasons).

### 3. Plaintiffs have no evidence of pretext.

Because Wells Fargo has evidence of legitimate reasons for its actions, the burden shifts to Plaintiffs to prove "that the proffered reason was not the true reason for the … decision," and that "race was." *St. Mary's*, 509 U.S. at 507-08. But Plaintiffs have neither direct nor indirect evidence of pretext—there is no evidence that Wells Fargo's treatment of Plaintiffs was based on racial animus.

There is no direct evidence of pretext. *See Schiff v. City & Cnty. of S.F.*, 816 F. Supp. 2d 798, 818 (N.D. Cal. 2011) ("Direct evidence includes clearly sexist, racist, or similarly discriminatory statements

or actions by the [defendant].”). No one involved in underwriting decisions even knew Plaintiffs’ race,[17] and Plaintiffs have no evidence that anyone at Wells Fargo exhibited any racial bias towards them.

Nor do Plaintiffs have any indirect, or circumstantial, evidence of pretext—that is, evidence that Wells Fargo’s proffered reasons are “false, *and* that discrimination was the real reason.” *St. Mary’s*, 509 U.S. at 515 (emphasis in original). As to falsity, the relevant inquiry is “whether the [defendant’s] stated reason was honest, not whether it was accurate, wise, or well-considered.” *Cooper v. United Air Lines*, 82 F. Supp. 3d 1084, 1111 (N.D. Cal. 2015); *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (“[The court’s] inquiry is limited to whether the [defendant] gave an honest explanation of its behavior.”). Accordingly, to establish falsity, Plaintiffs “must meet [Wells Fargo’s] non-discriminatory reason head on and rebut it.” *Cooley*, 280 F. Supp. 2d at 1343 (quotations omitted).

Yet despite evidence that Wells Fargo applied race-neutral credit policies and underwriting guidelines, Plaintiffs have presented nothing but self-serving disagreements with how Wells Fargo handled their applications and their beliefs that they “should have” been approved. *See, e.g.*, ECF No. 252 at 6, 9, 14. Thus, “[r]ather than undermine [Wells Fargo’s] non-discriminatory reason[s] ‘head on,’” Plaintiffs have “‘side-stepped’ the issue by pointing to evidence of [their] positive credentials, which … cannot establish pretext.” *Cooley*, 280 F. Supp. 2d at 1343.[18]

Additionally, most Plaintiffs—Braxton, Gray, Brown, Perkins, Williams, and Kuykendall-Montoya—are long-term Wells Fargo customers who never before alleged any racially motivated conduct by Wells Fargo. *See* ECF No. 114 ¶¶ 29, 41, 45, 67; Ex. 7 (Gray Dep. 176:20-24); Ex. 26 (Williams Dep. 241:1-6). Their years-long relationship with Wells Fargo, “by itself, is strong evidence that [Wells Fargo’s actions] were not motivated by racial animus.” *Martin v. Long & Foster Real Est. Inc.*, 2012 WL 3991900, at *12 (E.D. Va. Sept. 11, 2012) (granting defendant’s motion for summary judgment).

---

[17] Ex. 1 (Brodsky Dep. 68:21-25); Strawser Decl. ¶ _; *see also Long*, 2012 WL 3991900, at *12 (property owner’s actions could not have been motivated by animus when he did not know plaintiffs’ race); *Burley v. Nat’l Passenger R. Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (affirming summary judgment when “[plaintiff’s] race could not have influenced” the challenged decisions because “neither [actor] knew [plaintiff’s] race”).

[18] *See also Abdul-Haqq*, 2022 WL 7127947, at *2 (plaintiff’s “disagreement” with how the defendant handled her case was insufficient to show pretext); *Redd-Oyedele v. Santa Clara Cnty. Off. of Educ.*, 2022 WL 1443253, at *7 (N.D. Cal. May 6, 2022) (granting summary judgment when plaintiff’s evidence of pretext “boil[ed] down to” her belief that she was more qualified for the position); *Roberts v. United Food & Com. Workers*, 2019 WL 7020218, at *6 (N.D. Cal. Dec. 20, 2019) (“unspecified assertions” of race-based conduct were insufficient to show pretext at summary judgment stage).

### C.      No Evidence Supports Any Classwide Disparate Treatment Claims.

To the extent that Plaintiffs pursue classwide disparate-treatment claims, they should never be certified. As Wells Fargo has shown, Plaintiffs' class-certification motion offers only a handful of stray, unexplained references to disparate treatment and makes no attempt to prove that Plaintiffs' disparate-treatment claims satisfy Rule 23's requirements. *See* ECF No. 232 at 9; ECF No. 204 at 18-24 (arguing only that disparate impact claims satisfy commonality and predominance).

If the Court certifies such claims, however, it should also grant summary judgment to Wells Fargo. When plaintiffs seek to establish a prima facie case of disparate treatment based on statistical evidence, they must show a "stark pattern of discrimination unexplainable on grounds other than [race]," which requires more than a showing of disproportionate impact. *Schechner v. CBS Broad., Inc.*, 2010 WL 2794374, at *7-10 (N.D. Cal. July 15, 2010); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1283, 1287 (9th Cir. 2000) (requiring "a stark pattern of discrimination unexplainable on grounds other than [race]" that would justify an inference of discriminatory motive).

Dr. Kurzendoerfer's flawed statistical analysis fails this test handily. She found differences in approval rates for minority applicants in the range of only 1-5%, and she did not control for many underwriting factors that provide legitimate reasons to deny a loan. For example, she did not control for a loan's ineligibility for sale to or insurance by the GSEs, an applicant's failure to verify income, or an applicant's ineligibility for the loan program applied for. Ex. 27 (Kurzendoerfer Dep. 167:9-20, 225:6-15). Nor did she conduct any matched-pair analysis for class members, *id.* (Kurzendoerfer Dep. 43:9-53:16), so there is no evidence that any class members would have been approved had they been white. Courchane Decl., Ex. B, ¶¶ 60-63, 75, 79, 87. Plaintiffs' statistical evidence thus does not show any "stark" difference, and certainly does not *exclude* nondiscriminatory reasons for loan denials, and Plaintiffs therefore cannot make a prima facie case for disparate treatment. *See Aragon v. Rep. Silver State Disposal Inc.*, 292 F.3d 654, 663 n.6 (9th Cir. 2002) ("[S]tatistical evidence in a disparate treatment case … rarely suffices to rebut [a defendant's] legitimate, nondiscriminatory rationale for its decision.").

### D.      Wells Fargo is Entitled to Summary Judgment on Plaintiffs' Unruh Act Claims.

For all the reasons discussed above, summary judgment should be granted for Wells Fargo on *all* Plaintiffs' claims—they lack evidence creating a genuine issue of fact on either disparate impact or

22

disparate treatment. Plaintiffs' Unruh Act claims also fail for additional, independent reasons.

First, ECOA's choice-of-remedies clause, 15 U.S.C. § 1691d(e), bars the Unruh Act claims. That provision bars state-law claims based on the same conduct alleged in support of ECOA claims—precisely Plaintiffs' approach. *See Canatella v. Reverse Mortg. Sols. Inc*., 2014 WL 7205146, at *10 (N.D. Cal. Dec. 17, 2014) ("ECOA bars pursuit of state law claims if the plaintiff also pursues relief under ECOA itself.").

Second, the non-California Plaintiffs—Brown, Perkins, Williams, Ebo, and Kuykendall-Montoya—cannot bring claims under the Unruh Act "because the jurisdiction of the Act is expressly limited to violations taking place in California." *See Moore v. Greyhound Bus Lines, Inc*., 2018 WL 3361395, at *2 (S.D. Cal. July 10, 2018). Any alleged discrimination against those plaintiffs necessarily occurred outside of California and is therefore outside the "reach of the statute." *See id.*

### E. Wells Fargo is Entitled to Summary Judgment on Plaintiffs' UCL Claims.

Wells Fargo is also entitled to summary judgment on Plaintiffs' UCL claims. Those claims fail on the merits, because they hinge on Plaintiffs' disparate-treatment and disparate-impact theories, which are deficient for all the reasons discussed above. *See Campbell v. Medtronic MiniMed, Inc*., 2016 WL 11498827, at *7 (C.D. Cal. Sept. 6, 2016) (granting summary judgment as to UCL claim when the plaintiff "failed to raise a triable issue of fact as to any of" his discrimination claims). And they also fail for the additional, independent reasons discussed below.

#### 1. Plaintiffs have adequate legal remedies.

Plaintiffs' UCL claims fail because they cannot establish that they lack an adequate remedy at law. *See Sonner v. Premier Nutrition Corp*., 971 F.3d 834, 844 (9th Cir. 2020). Indeed, Plaintiffs seek substantial monetary damages based on statutory claims challenging the same conduct they purport to challenge via the UCL. That alone compels summary judgment in Wells Fargo's favor. *See, e.g.*, *Rhynes v. Stryker Corp*., 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) (dismissing UCL claims because plaintiff also sought compensatory damages, which provides an adequate remedy at law); *Zapata Fonseca v. Goya Foods Inc*., 2016 WL 4698942, at *7 (N.D. Cal. Sept. 8, 2016) (similar).

Additionally, Plaintiffs' claim for restitution is no more than a claim for damages in disguise. Plaintiffs' claimed "equitable" relief is the return of fees they claim were improperly charged—lost money. ECF No. 114 ¶¶ 206-10. But Plaintiffs "cannot transform a claim for damages into an equitable action by

23

1  asking for an injunction that orders the payment of money." *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460,

2  482 (N.D. Cal. 2014); *see also Silva v. Money Network Fin., LLC*, 2024 WL 2107722, at *4 (C.D. Cal.

3  Apr. 1, 2024) (dismissing UCL claim based on defendant's failure to provide plaintiffs with tax refunds).

4  Plaintiffs cannot explain why an award of damages would not be an adequate substitute for the

5  retrospective injunctive relief they seek—an order compelling Wells Fargo to provide them refunds. Wells

6  Fargo is thus entitled to summary judgment on the UCL claims.

7  ### 2.    Plaintiffs lack standing to seek prospective injunctive relief.

8  Standing to pursue prospective injunctive relief under the UCL requires proof that the plaintiff

9  "has suffered or is threatened with a concrete and particularized legal harm" and faces a "real and

10  immediate threat of repeated injury." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007)

11  (quotations omitted). Plaintiffs have no such proof—there is no evidence they intend to seek loans from

12  Wells Fargo again. *See Belyea v. GreenSky, Inc.*, 2023 WL 8701311, at *8-9 (N.D. Cal. Dec. 15, 2023)

13  (plaintiff lacked standing for prospective injunctive relief because he did not allege that he planned to do

14  business with the defendant again); *Doe v. State Farm Gen. Ins.*, 2023 WL 7440203, at *4 (N.D. Cal. Nov.

15  8, 2023) (dismissing UCL claim because plaintiff did not "allege he has any existing policies with State

16  Farm that would be affected by State Farm's business practices").

17  ### 3.    ECOA's choice-of-remedies clause bars the UCL claims.

18  Like their Unruh Act claims, Plaintiffs' UCL claims are based on the same allegations underlying

19  their ECOA claim. For the reasons stated in Section IV.D., *supra*, ECOA's choice-of-remedies clause

20  requires summary judgment in Wells Fargo's favor.

21  ### 4.    The non-California Plaintiffs cannot pursue UCL claims.

22  The non-California Plaintiffs—Brown, Ebo, Kuykendall-Montoya, Perkins, and Williams—

23  cannot pursue UCL claims. California recognizes a "presumption against the extraterritorial applications

24  of its statutes." *Churchill Vill., LLC v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1126 (N.D. Cal. 2000); *see*

25  *also Warner v. Tinder*, 105 F. Supp. 3d 1083, 1096-97 (C.D. Cal. 2015) (presumption applies to UCL). "In

26  determining whether the UCL … appl[ies] to non-California residents, courts consider where the

27  defendant does business, whether the defendant's principal offices are located in California, where class

28  members are located, and the location from which [the relevant] decisions were made." *In re Toyota Motor*

24

*Co.*, 785 F. Supp. 2d 883, 917 (C.D. Cal. 2011).

Plaintiffs have previously identified three purported connections between their claims and California: the principal place of business of Wells Fargo's **parent company**; their allegation that Wells Fargo's "corporate decisions, policies, and actions complained of" were "ratified" in California; and two fact witnesses who live in California. ECF No. 204 at 29 n.21; ECF No. 252 at 13. Those contentions are not even remotely sufficient.

First, the location of Wells Fargo's parent is irrelevant. It is not a party to this lawsuit and Plaintiffs have articulated no basis by which it could be liable for the alleged conduct at issue.

Second, Plaintiffs have no evidence that any decisions, policies, and actions were "ratified in California." Plaintiffs have cited only *allegations*, which "are not evidence" and "carry no weight in summary judgment proceedings." *A.K.L. v. Moreno Valley Unified Sch. Dist.*, 2021 WL 4352362, at *3 (C.D. Cal. May 21, 2021) (citing Fed. R. Civ. P. 56(c)(1)).

Finally, Plaintiffs identify two fact witnesses in California (out of dozens they deposed): an analytics manager they say is "central to [their] allegations" without any explanation of why, and an employee who helped with the response to the Bloomberg article. *See* ECF No. 204 at 29 n.21. But the allegedly unlawful conduct here is not analytics or a response to a newspaper article. Instead, Plaintiffs allege that Wells Fargo unlawfully discriminated against them when they applied for mortgage loans. For the non-California plaintiffs, that alleged discrimination could not have occurred in California. *See Crawford v. Uber Techs., Inc.*, 2018 WL 1116725, at *5 (N.D. Cal. Mar. 1, 2018) ("Because plaintiffs' claims are rooted in Uber's alleged denial of reasonable accommodation, which took place in Mississippi, the challenged conduct is beyond the reach of the UCL."). They cannot pursue UCL claims.

## V.     CONCLUSION

Plaintiffs lack any evidence to prove essential elements of both their disparate-impact and disparate-treatment claims. And the undisputed evidence shows that, to the extent that Plaintiffs' loan applications were denied at all, those denials were for legitimate, race-neutral reasons—reasons having nothing to do with any supposed "CORE/ECS system" or with any racial animus. For these reasons, and all those discussed above, the Court should grant summary judgment to Wells Fargo on all of Plaintiffs' claims.

Dated:  July 25, 2024

WINSTON & STRAWN LLP


By: */s/ Amanda L. Groves*
  Amanda L. Groves
  Kobi K. Brinson


MCGUIREWOODS LLP


By: */s/ Alicia A. Baiardo*
  Alicia A. Baiardo
  Ava E. Lias-Booker


WILMER CUTLER PICKERING HALE AND DORR LLP


By: */s/ Alan Schoenfeld*
  Alan Schoenfeld
  Seth P. Waxman

*Attorneys for Defendant Wells Fargo Bank, N.A.*

DEFENDANT WELLS FARGO BANK, N.A.'S MOTION FOR SUMMARY JUDGMENT

CASE NO. 3:22-CV-00990-JD