# EXHIBIT 3

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Dennis S. Ellis (State Bar No. 178196)
  dellis@egcfirm.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

*Interim Lead Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Wells Fargo Mortgage Discrimination Litigation.* | Case No. 3:22-cv-00990-JD |
| | Honorable James Donato |
| | **PLAINTIFF AARON BRAXTON'S RESPONSES AND OBJECTIONS TO WELLS FARGO BANK, N.A.'S INTERROGATORIES, SET NO. ONE** |

PROPOUNDING PARTY:      **DEFENDANT, WELLS FARGO BANK, N.A.**

RESPONDING PARTY:       **PLAINTIFF, AARON BRAXTON**

SET NO.:                **ONE**

1  obligations under the Rules.

2  **INTERROGATORY NO. 6:**

3   Identify all facts, Documents, and witnesses supporting Your contention in paragraph 17 of
4  the Complaint that "Wells Fargo systematically jettisoned or otherwise ignored well established
5  internal fair lending checks and balances in favor of implementing a centralized 'pioneering
6  automated underwriting' system—sometimes referred to as CORE—without sufficient, or
7  sometimes any, human supervision or involvement."

8  **RESPONSE TO INTERROGATORY NO. 6:**

9   Plaintiff objects to this interrogatory because it seeks information that is obtainable from
10 some other source that is more convenient, less burdensome, or expensive, since Wells Fargo
11 already has possession, custody, control, and/or access to the requested information.  Plaintiff also
12 objects on the grounds that this request seeks information outside of the scope of discovery and is
13 not reasonably calculated to lead to the discovery of admissible evidence.  Fed. R. Civ. P. 26(b).
14 Plaintiff further objects on the grounds that this request is vague and ambiguous as to the term
15 "supporting."  Plaintiff further objects on the grounds that this request seeks information,
16 communications, or other material that is protected by the attorney-client privilege and/or work-
17 product doctrine.  Plaintiff further objects on the grounds that this request is not proportional to the
18 needs of the case as it is overly expansive in time and imposes a burden on Plaintiff that outweighs
19 any benefit to the parties.

20  Plaintiff further objects that this interrogatory is overbroad and unduly burdensome in that
21 it impermissibly seeks "all facts, Documents, and witnesses" supporting a given contention. *See*
22 *Kilby v. CVS Pharmacy, Inc.*, No. 09CV2051-MMA(KSC), 2019 WL 977874, at *3 (S.D. Cal.
23 Feb. 28, 2019) (S.D. Cal. Feb. 28, 2019) ("Courts will generally find [contention interrogatories]
24 overly broad and unduly burdensome on their face to the extent they ask for 'every fact' [or 'all
25 facts'] which support[ ] identified allegations or defenses."); *Jacobs v. Scribner*, No. 106CV-
26 01280AWI-GSAPC, 2009 WL 3241540, at *1 (E.D. Cal. Sept. 24, 2009) (Court found that an
27 interrogatory requested: "State all facts you have in support of your affirmative defense" was
28 overly broad and vague, and sustained Defendants' objections); *NN. Am. Co. for Life & Health*

1  *Ins. v. Philpot*, No. 08CV270-BEN (NLS), 2009 WL 10672468, at *2 (S.D. Cal. June 1, 2009)
2  ("Contention interrogatories are often overly broad and unduly burdensome when they require a
3  party to state 'every fact' or 'all facts' supporting identified allegations or defenses."); *In re*
4  *Williams Companies Erisa Litig.*, No. 02-CV-153-K (M), 2005 WL 8159600, at *2 (N.D. Okla.
5  June 10, 2005) (describing contention interrogatories which require the opponent to "identify
6  every document" as problematic); *Allianz Ins. Co.*, 2005 WL 44534 (D. Kan. Jan. 2005); *Hiskett v.*
7  *Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 405 (D. Kan. 1998); *see also In re Qualcomm Litig.*, No.
8  17-CV-0108-GPC-MDD, 2018 WL 1306406, at *2 (S.D. Cal. Mar. 13, 2018) ("Except in a very
9  simple transaction, it may be impossible to "state all facts" surrounding a given event.  It is
10 unenforceable.").

11         Plaintiff further objects that this contention interrogatory is premature.  Discovery remains
12 ongoing and Plaintiff's response may change as additional facts are discovered through party and
13 non-party discovery.  This is particularly true as Wells Fargo has still not completed its document
14 production.  It is in precisely these factual circumstances that courts have criticized the use of
15 early contention interrogatories.  *See In re Convergent Techs. Sec. Litig.*, 108 F.R.D. at 338-39
16 (requiring a party propounding early contention interrogatories to provide specific justifications
17 explaining how early answers will materially advance the goals of the FRCP, and noting that the
18 Court will "be especially vigilant in its evaluation of proffered justifications when a complaint is
19 not facially infirm and when defendants appear to have control over or adequate access to much of
20 the evidence relevant to their alleged misconduct"); *B. Braun Med. Inc.*, 155 F.R.D. at 527
21 (recognizing that "there is considerable support for deferring contention interrogatories until the
22 end of the discovery period" and denying motion to compel on contention interrogatories as
23 moving party failed to satisfy its burden to show early answers would assist the goals of
24 discovery); *see also* Fed. R. Civ. P. 33(a)(2) ("the court may order that the interrogatory need not
25 be answered until designated discovery is complete, or until a pretrial conference or some other
26 time").  Accordingly, Plaintiff expressly reserves the right to amend/supplement his response up
27 until after discovery has been completed, and/or to rely upon legal and factual bases not set forth
28 herein.

Without waiving such objections, Plaintiff responds as follows:

Racism, racial inequality, and discrimination are deeply rooted in American history, embedded in longstanding systems, policies, practices, and beliefs that perpetuate the unfair treatment and oppression of Black Americans and other non-white Americans. From overt racism in the form of slavery, to covert systemic, and structural racism, Black Americans have been denied fairness and equality in all forms.

Beginning as early as the 16th century, Africans were taken against their will to the Americas as slaves during the transatlantic slave trade. The Middle Passage, also known as the Atlantic Passage, was infamously known for its inhumane, unsanitary, and brutal conditions where over 12 million enslaved Africans were transported to the Americas between the 16th and 19th centuries. Bound together by chains, these enslaved Africans were crowded into tight tiers below the ship's deck that restricted movement, including the ability to sit upright for a voyage that often lasted several months. By any standards, the conditions on these slave ships were appalling—low oxygen levels from hundreds of people being crowded together, excruciating heat, starvation and the pervasive stench of death, and human excrements. As a result, millions of enslaved Africans died during the forced and treacherous voyage across sea. Unfortunately, for the enslaved that survived, this was just the beginning of their persecution and oppression. They were seen as mere commodities, sold and forced into unrelenting labor, condemned to impoverishment, inequality, and cruelty by the law.

Slavery in America continued for centuries before it was abolished by the Thirteenth Amendment in 1865. Slavery, however, simply changed its odious form and continued generational disparity with laws intended to degrade Black Americans, including Black codes, and Jim Crow laws. Black codes restricted the freedom of Black Americans in the form of labor and activities, which effectively perpetuated the enslavement of Black Americans. In the 1890s, expanding upon Black codes, Jim Crow laws, named after a blackface minstrel character, codified a collection of laws, customs, and policies that legalized racial segregation and demeaned Black Americans.

In 1896, the United States Supreme Court in *Plessy v. Ferguson*, 163 U.S. 537 (1896),

established the doctrine of "separate but equal."  The "separate but equal" doctrine was a legal theory that differentiated from actuality.  Black Americans were not treated equally.  In most, if not all cases, Black facilities and opportunities were inferior to those for whites.

With this country's shameful history of racial discrimination, housing discrimination has always been a central and profoundly damaging component.  Black Americans have been repeatedly and systematically denied access to the financial benefits of homeownership through pernicious and pervasive race-based policies and practices.  For example, legislation introduced during the New Deal purporting to help homeowners nationwide, in fact, codified racism into housing.  The Home Owners Loan Corporation ("HOLC"), founded in 1933 for the purpose of refinancing mortgages in default to prevent foreclosures as the nation recovered from the Great Depression, supported and codified racial segregation.  The HOLC created the system known today as "redlining"—a system of segregating and ranking neighborhoods by grade and color: Green "best;" Blue "still desirable;" Yellow "definitely declining;" and Red "hazardous."  Unsurprisingly, the neighborhoods with predominately Black or non-white populations were considered to be risky to lenders and were often labeled "hazardous."  As a result, residents in those redlined neighborhoods—mostly people of color—could not secure loans.  The few loans that were available in the redlined neighborhoods were very expensive, which made it even more difficult for non-white minorities to purchase homes and build wealth.  Redlining catalyzed racial and social inequities affecting Black, Hispanic, and Asian communities today.

Black Americans and other minority ethnic groups were also restricted from homeownership as a result of racial restrictive covenants that were written into property deeds to prevent non-white people from purchasing or occupying the land.  The Federal Housing Administration underwriting manuals issued in 1938 sought to prevent the "infiltration of inharmonious racial groups" and directed underwriters to refuse to insure mortgages that would lead to "a change in social or racial occupancy."  These restrictive covenants were essentially legally binding contracts to both keep property in possession of white people and promote and maintain race-based segregation.

The "separate but equal" doctrine and Jim Crow laws were not challenged successfully

until *Brown v. Board of Education* in 1954.  In *Brown v. Board of Education*, 347 U.S. 483 (1954), the United States Supreme Court held that separating children in public schools on the basis of race was unconstitutional, thereby overruling the "separate but equal" doctrine.  This seminal case was the cornerstone of the civil rights movement that lead to the passage of the Civil Rights Act of 1964.  The passage of civil rights legislation in the 1960s, together with amendments to that legislation in the ensuing decades, the enactment of the FHA in 1968, and the passage of the ECO in 1974, were intended to remedy the historical injustices by eliminating race-based gatekeeping practices like redlining and restrictive covenants, among many other pernicious forms of overt and covert racism.  It is through the prism of the history leading to *Brown*, the purposes behind 42 U.S.C. § 1981 (which codified relevant provisions of the Civil Rights Act of 1964), the FHA, and ECOA that any alleged present day claim of discrimination must be viewed.

The enactment of the fair lending laws prohibiting discrimination based on a protected class did little to shield minority applicants from the discriminatory practices of lenders or eradicate the racial wealth gaps that were exacerbated by policies that hinder people of color from building wealth.  In fact, the discriminatory practices of lenders and the byproduct of those practices has created a vicious cycle that keeps non-white Americans from achieving home ownership.

The disproportionate wealth gap, caused in large part by the historical racist systems of redlining and restrictive covenants, has resulted in lack of access to down payments for prospective Black home buyers.  White families who owned houses without restrictive covenants were able to pass down the value for generations to follow.  Black and Hispanic Americans, however, were prevented this opportunity, which continues to drive the wage gap and lack of access to wealth for Black and Hispanic Americans today.  Further, Black and Hispanic applicants are generally charged a higher interest rate compared to white borrowers, making it even more challenging for prospective minority buyers.

Racial and ethnic backgrounds have also long played a role in driving down house values in America, including appraisal bias and discrimination regarding property owned by Black homeowners or located in predominately Black neighborhoods.  Homes in majority Black

neighborhoods are worth an average of 23% less than homes in neighborhoods with very few or no Black residents and of similar home quality.  It has been determined that the devaluation of homes in majority Black neighborhoods "costs Black homeowners $156 billion in cumulative losses."  In September 2021, the Federal Home Loan Mortgage Corporation released the results of a five-year study based on more than 12 million appraisals.  The study found that an appraiser's opinion of value is more likely to fall below the contract price in Black and Hispanic census tracts, and the extent of the gap increases as the percentage of Black or Hispanic people in the tract increases.  Consequently, Black applicants have historically received below market appraisals.

The structural racism embedded in the housing system is no more apparent than the subprime mortgage crisis that contributed to the global financial crisis in 2007-2008.  During the housing boom of the early 2000s, banks began issuing subprime mortgages—home loans traditionally lent to borrowers whose credit histories are insufficient for standard mortgages.  While these loans, which have less favorable terms than standard mortgages, were virtually non-existent before 2000, the sustained rise in housing prices along with financial innovations made subprime borrowers suddenly attractive customers for mortgage lenders.  And for those previously shut out of the housing market, the banks' newfound interest in issuing subprime loans provided borrowers an opportunity to finally become homeowners.

With the housing market booming and banks issuing mortgages at a staggering rate, racial minorities, however, were still disproportionally denied mortgages compared to similarly situated white borrowers.  One study found that Black and Hispanic mortgage applicants were twice as likely to be denied a mortgage than comparable white applicants were.  And banks rejected many minority applicants in superior financial and credit-worthy positions than lower-income white applicants while approving the white applicants.  When they were approved, Black borrowers were five times more likely to be issued subprime mortgages than white borrowers, and Hispanic borrowers were nearly twice as likely than white borrowers to be issued subprime mortgages.

In fact, banks (especially Wells Fargo as discussed below) intentionally targeted racial minorities and steered them toward subprime mortgages.  Taking advantage of residential segregation, lenders developed specialized strategies and marketing materials aimed at identifying

1  Black and Hispanic borrowers as subprime lending marks.  Banks found that Hispanic immigrant
2  households seeking to purchase a home were more susceptible, via Spanish-speaking
3  intermediaries, to high-risk loans and subsequent foreclosures.  Banks capitalized on the
4  immigrants' vulnerability and, in many cases, their lack of knowledge of the American banking
5  system to push subprime mortgages on them.  Thus, these institutions' predatory practices
6  shattered their dreams of achieving the "American dream" and becoming homeowners.

7  Once the housing bubble burst and the Federal Reserve raised interest rates, new
8  homeowners holding subprime adjustable-rate mortgages faced monthly payments they could no
9  longer afford and were paying more than their homes were worth.  With no other options,
10 homeowners began defaulting on their subprime mortgages en masse.  The unprecedented number
11 of mortgage defaults caused investment products backed by these mortgages to become worthless.
12 The rapid devaluation of these securities ultimately led to the housing market crashing and the
13 decline of the United States economy.  Virtually all major subprime mortgage lenders went out of
14 business, and many companies, such as Lehman Brothers, one of this country's oldest and largest
15 investment firms, filed for bankruptcy and ceased operations.  The stock market lost trillions of
16 dollars, real estate wealth decreased by billions, unemployment skyrocketed, and American
17 households—particularly many racial minorities—lost more than a quarter of their wealth.

18 ==The Great Recession lasted over 18 months and resulted in numerous investigations into its==
19 ==causes and many regulatory changes.  One such change was the Dodd-Frank Act passed by==
20 ==Congress in 2010.  The Act aimed to regulate the types of mortgages lenders could issue and==
21 ==increased the qualification standards for mortgages.  However, the consequence of these==
22 ==regulations is that racial minorities now find it more difficult to obtain mortgages as their wealth==
23 ==has disproportionately decreased compared to white Americans due to the racist and predatory==
24 ==practices of lenders==.  Thus, while the Subprime Mortgage Crisis may have ended for many, racial
25 minorities still suffer from its effects.  Wells Fargo was particularly aggressive in pushing these
26 subprime mortgages in vulnerable, minority communities.

27 Wells Fargo & Company ("WFC") is a multinational financial institution with its banking
28 subsidiary, defendant Wells Fargo Bank, N.A., serving as one of the largest banks in the United

**VERIFICATION**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am a party to this action. I have read the foregoing PLAINTIFF AARON BRAXTON'S RESPONSES AND OBJECTIONS TO WELLS FARGO BANK, N.A.'S INTERROGATORIES, SET NO. ONE and know its contents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that statements set forth in the responses related directly to my personal circumstances are true and correct to the best of my knowledge, recollection, and belief. I further state that the responses were prepared with the assistance of counsel, and I did not participate in the investigation of the class claims with Class Counsel, and thus I am without personal knowledge as to the statements in the Response to Interrogatories regarding the claims of other representative plaintiffs, putative class members or the remainder of the class allegations, but I do believe them to be true.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July **5**, 2023, at Los Angeles, California.

**Aaron Braxton**
Aaron Braxton                                              Signature