# EXHIBIT 27

```
 1            UNITED STATES DISTRICT COURT

 2        FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3    - - - - - - - - - - - -x

 4      IN RE: WELLS FARGO     :

 5      MORTGAGE               :

 6      DISCRIMINATION         :   Civil Action No.

 7      LITIGATION.            :   3:22-cv-00990-JD

 8                             :

 9    - - - - - - - - - - - -x

                              Tuesday, April 9, 2024

10                              Washington, D.C.

11

12

13  Videotaped Deposition of:

14          AMANDA KURZENDOERFER, Ph.D.,

15  called for oral examination by counsel for Wells

16  Fargo, pursuant to notice, at the law offices of

17  McGuire Woods, LLP, 888 16th Street, Northwest, Suite

18  500, Washington, D.C. 20036, before Christina S.

19  Hotsko, RPR, CRR, of Veritext Legal Solutions, a

20  Notary Public in and for the District of Columbia,

21  beginning at 10:06 a.m., when were present on behalf

22  of the respective parties:
```

                                                    Page 1

```
1    opinion about?

2           MR. BLISS:  Objection to form.

3    BY MS. LIAS-BOOKER:

4        Q.  Do you want me to repeat the --

5        A.  I took an approach that aligns with the        10:47:05

6    literature.  I took a more -- a different approach

7    in the rebuttal report by looking at the rate

8    sheets, and I found larger differences.

9        Q.  And then you completed your analysis in

10   your affirmative report after it was criticized by    10:47:18

11   Dr. Courchane, and you actually looked at the rate

12   sheets; is that correct?

13       A.  She hadn't seen my --

14          MR. BLISS:  Objection.  Mischaracterizes

15   the record.                                            10:47:31

16          THE WITNESS:  Could you please repeat the

17   question?

18   BY MS. LIAS-BOOKER:

19       Q.  Why did you look at the rate sheets in

20   forming your rebuttal analysis?                        10:47:35

21       A.  Dr. Courchane discussed rate sheets and

22   discussed specifically that they were used at
```

Page 43

1    Wells Fargo.  I knew of the rate sheets and I now

2    had the opportunity to look at the rate sheets.

3         Q.  You had an opportunity to look at them in

4    doing your affirmative report, too, correct, but

5    you chose not to, right?                         10:47:53

6         A.  There were 1500 rate sheets and there is

7    a methodology accepted in academia, and I limited

8    to the set of loans that were salable to GSEs.

9         Q.  So you chose not to look at 1500 rate

10   sheets because there were too many of them?       10:48:07

11        A.  It was a big exercise.  As far as I know,

12   Dr. Courchane hasn't done this either.

13        Q.  She's not rendering an opinion on

14   interest rates in this case.  You are.

15            So you chose not to look at the 1500      10:48:21

16   because there were too many?

17        A.  There were -- there was a reasonable

18   alternative to doing so, and so that's what I

19   used.

20            MS. LIAS-BOOKER:  Let's take a small      10:49:00

21   break.

22            MR. BLISS:  Okay.

                                              Page 44

```
 1              MS. LIAS-BOOKER:  Five minutes?

 2              MR. BLISS:  Okay.  How small is small?

 3              MS. LIAS-BOOKER:  Five minutes or less.

 4              MR. BLISS:  Okay.

 5              VIDEO TECHNICIAN:  The time is 10:48 a.m.    10:49:09

 6     We are going off the record.

 7              (A recess was taken.)

 8              VIDEO TECHNICIAN:  The time is 10:57 a.m.

 9     We're going back on the record.

10              Please proceed, Counsel.                     10:58:57

11              MS. LIAS-BOOKER:  Thank you.

12     BY MS. LIAS-BOOKER:

13         Q.  Dr. Kurzendoerfer, if you can turn to the

14     discussion of what you call Wells Fargo internal

15     AUS outcomes in paragraph 46 of your affirmative       10:59:10

16     report, please.

17         A.  I'm there.

18         Q.  Okay.  Now, when you refer to internal

19     AUS outcomes, are you referring to credit risk

20     class and credit grade that you say are assigned       10:59:29

21     by Wells Fargo's ECS models?

22         A.  Yes, that's correct.
```

Page 45

```
1          Q.   And in figure 9, you present the approval

2     rates for various credit risk classes; is that

3     correct?

4          A.   Yes.  For conventional home mortgage.

5          Q.   Thank you.                              10:59:53

6               And all of your approval rates are over

7     35 percent; is that right?

8          A.   Yes.

9          Q.   And the only ones below 50 percent are

10    C2, inaccurate credit, and no result; is that      11:00:09

11    correct?

12         A.   Yes.

13         Q.   And do you understand what C2 stands for?

14         A.   C is caution, as I understand.  Same for

15    C1.  And C2 is a higher-risk credit caution         11:00:22

16    designation.

17         Q.   And the same questions go for the

18    approval rates by credit risk class and race and

19    ethnicity that you show in figure 11 as well,

20    correct?                                            11:00:40

21         A.   Yes.

22         Q.   And if I am correct, you're not opining
```

Page 46

1    that the ECS credit risk classes are automatic

2    approvals or automatic denials, right?

3         A.   Correct.

4         Q.   Something else has to go into the

5    approval or denial of a loan application other          11:01:01

6    than the ECS credit risk class, correct?

7         A.   Correct.  The ECS credit risk class is an

8    input.  Yes.

9         Q.   Thank you.

10            Now, in figure 10 -- you say that it           11:01:18

11   shows the proportion of applicants of each race

12   and ethnicity that fall into each credit risk

13   class for conventional mortgages, right?

14        A.   Correct.

15        Q.   And figure 10 is not the result of any         11:01:32

16   sort of regression analysis, correct?

17        A.   Figure 10 is just a portrayal of the raw

18   data.  It's a distribution.

19        Q.   It does not control for any applicant's

20   credit characteristics, correct?                        11:01:50

21        A.   No, it doesn't.  But that wasn't the

22   purpose of this analysis.

Page 47

1     Q.  Understood.  But it's just a count,

2  right, of how many applicants fall into which

3  credit risk class expressed as a percentage of the

4  whole, right?

5     A.  Yes, that's correct.                    11:02:03

6     Q.  And figure 10 does not express the

7  proportion of similarly situated applicants that

8  fall into each credit risk class, correct?

9     A.  Could you explain what you mean by

10  similarly situated?                            11:02:18

11     Q.  Do you understand the term "similarly

12  situated"?

13     A.  I -- yes, general.  Just to be sure we're

14  on the same page.

15     Q.  What do you --                          11:02:25

16     A.  I understand you mean similar credit

17  characteristics, similar loan characteristics.

18  That was just to clarify.

19         But the answer is no.

20     Q.  Okay.  And figure 14 is also just the   11:02:34

21  proportion of how many applicants of each race and

22  ethnicity fall into each credit risk class for

1   non-conventional mortgages, right?

2        A.   Yes.

3        Q.   And figure 14 is, likewise, not based on

4   any sort of regression analysis, correct?

5        A.   That's correct.                              11:02:55

6        Q.   And figure 14 does not express the

7   proportion of similarly situated applicants that

8   fall into each credit risk class, correct?

9        A.   That's correct.

10        Q.   And indeed, nowhere in your affirmative    11:03:05

11   report do you express an opinion on the proportion

12   of similarly situated applicants that fall into

13   each credit risk class; isn't that right?

14        A.   I'm not sure how I would have done that,

15   so my --                                             11:03:24

16        Q.   So is that a no to my question?

17        A.   I think I should clarify.  So my

18   understanding --

19        Q.   Well, you first need to answer my

20   question, which is, did you do it?  Did you do a     11:03:32

21   similarly situated analysis?

22        A.   I did not do a similarly situated

1    analysis --

2         Q.  Okay.

3         A.  -- of ECS as they fall into the

4    categories.  But my understanding of the model is

5    that it takes into consideration certain credit          11:03:43

6    factors of the applicant and then in -- by doing

7    -- by doing that, it would assign a score and a

8    risk class.

9              So by that procedure, the white, black,

10   Hispanic, Asian, et cetera, applicants who are in        11:03:59

11   a given credit risk class should be similarly

12   situated by the ECS model.

13        Q.  Is it your testimony that ECS provides a

14   similarly situated analysis of loan applicants?

15             MR. BLISS:  Objection.  Vague.                  11:04:15

16   BY MS. LIAS-BOOKER:

17        Q.  Let me repeat it.

18             Is it your testimony that ECS provides a

19   similarly situated analysis of loan applicants?

20        A.  ECS model is looking at certain               11:04:28

21   credit-related factors, and it's going to make an

22   assignment based on those factors.  It's going to

Page 50

1    give a score and assign to a certain class.

2          And so, based on those input factors, it

3    stands to reason that people in the same class

4    would have similar factors, which --

5          Q.  But --                                    11:04:49

6          A.  -- is why --

7          Q.  I'm sorry.  Go ahead.

8          A.  Which is why, as I show in figure 11, the

9    approval rates within a given category by race and

10   show that, even conditional on being a C1 or C2,     11:05:09

11   white approval rates are higher than minority

12   approval rates.

13         Q.  That's not my question.  My question is,

14   I think, more simple than that.

15         ECS doesn't do similarly situated              11:05:18

16   analysis; isn't that correct?

17         A.  ECS --

18         MR. BLISS:  Objection.  Vague.

19         THE WITNESS:  ECS is a scoring model.

20   BY MS. LIAS-BOOKER:                                   11:05:29

21         Q.  Thank you.

22         Now, figures 16 through 18 provide

                                                          Page 51

1    information about home equity credit grade in

2    terms of approval rates and distribution by race

3    and ethnicity; is that right?

4        A.  Yes.

5        Q.  And again, those figures, 16 through 18,      11:05:40

6    do not express an opinion on the proportion of

7    similarly situated applicants that fall into each

8    home equity credit grade, correct?

9        A.  I think you're asking --

10        MR. BLISS:  Objection to form.      11:05:56

11        THE WITNESS:  There's no regression

12   analysis underlying this.  It's just reporting the

13   proportion of applicants that fall within each

14   class by race and then reporting outcomes for

15   applicants by race within those categories.      11:06:11

16   BY MS. LIAS-BOOKER:

17        Q.  And so the answer to my question that

18   figures 16 through 18 do not express an opinion on

19   the proportion of similarly situated applicants

20   that fall into each home equity credit grade is --      11:06:22

21   that's correct?

22        MR. BLISS:  Objection to form.

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1            THE WITNESS:  I haven't controlled for

 2    any factors, any factors that would align -- align

 3    applicants here because that was not the purpose

 4    of this analysis.

 5    BY MS. LIAS-BOOKER:                           11:06:44

 6        Q.  Okay.  So you didn't do a similarly

 7    situated analysis, correct?

 8            MR. BLISS:  Objection to form.

 9            THE WITNESS:  As I previously stated, I

10    don't know what the purpose of that would be      11:07:00

11    because ECS is a scoring model that already

12    incorporates factors of the applicants.

13    BY MS. LIAS-BOOKER:

14        Q.  So, no, you did not do a similarly

15    situated analysis, correct?                   11:07:09

16        A.  I did not do a regression analysis here.

17        Q.  Or a similarly situated analysis either,

18    correct?

19            MR. BLISS:  Objection to form.  Vague.

20    BY MS. LIAS-BOOKER:                           11:07:26

21        Q.  And in fact -- let me add to that -- you

22    don't express an opinion anywhere in the report
```

Page 53

1      Q.   Okay.  And if someone applies for a

2   government loan, whether or not these government

3   agencies actually will insure the loans is going

4   to be very important when it comes to

5   underwriting.                                    14:01:25

6          Do you agree with that?

7          MR. BLISS:  Objection.  Lack of

8   foundation.

9          THE WITNESS:  I did not consider

10  salability or insurability of the loans in this    14:01:36

11  analysis.

12  BY MS. LIAS-BOOKER:

13     Q.   So to follow up on something -- so your

14  regression analysis, then, does not control for

15  whether an agency loan application is actually    14:01:45

16  eligible to be sold to Fannie Mae or Freddie Mac,

17  correct?

18     A.   It controls for an approve recommendation

19  but not -- does not distinguish between eligible

20  or ineligible.                                    14:02:01

21     Q.   And your regression analysis does not

22  control for whether a government loan application

Page 167

```
 1    analysis that minority applicants are more likely

 2    to be assigned to a lower credit risk class, and,

 3    conditional on that, are likely to have lower

 4    approval rates.

 5            So that is a policy that I've analyzed.      14:48:00

 6    I've analyzed overlays in my rebuttal report.

 7    Those two things are separate and distinct from

 8    the regression analysis, which is simply to

 9    attribute -- which is to look at key underwriting

10    factors and to understand whether they can explain    14:48:15

11    the disparities in approval rates, and they can't.

12    BY MS. LIAS-BOOKER:

13        Q.  So your regression analysis is not tied

14    to a particular Wells Fargo policy; isn't that

15    correct?                                              14:48:27

16        A.  Correct.

17            MR. BLISS:  Objection to form.  Vague.

18    BY MS. LIAS-BOOKER:

19        Q.  You mentioned several times today about

20    the C1/C2 policy.  And in footnote 92 in your         14:49:46

21    report you noted the existence of two policy --

22    oh, sorry.
```

Page 193

1    Q.   Right.   Because there's limitations to

2  every model, correct?

3    A.   Correct.

4    Q.   No model is perfect.

5    A.   Correct.                                    15:23:45

6    Q.   Okay.   And your models don't take into

7  account problems in verifying income, correct?

8    A.   Correct.

9    Q.   They don't take into account problems

10  with clouded title, correct?                      15:23:57

11    A.   Correct.

12    Q.   And your models don't take into account

13  whether an external AUS said an application was

14  ineligible for the program applied for, correct?

15    A.   Correct.                                    15:24:13

16        MR. BLISS:   Objection.   Asked and

17  answered.

18  BY MS. LIAS-BOOKER:

19    Q.   Now, if you can please turn to table --

20  let's go to table A5.1 of Dr. Courchane's rebuttal    15:24:26

21  report, which I'm going to hand you in a moment.

22

Page  225

```
 1    in your report yield a predicted probability of

 2    approval for each application based on the factors

 3    controlled for by that model, correct?

 4         A.  Correct.

 5         Q.  Did you limit inclusion in your list of        16:40:02

 6    proposed class members to applications that your

 7    models predicted had a better than 50 percent

 8    probability of approval?

 9         A.  No.

10         Q.  So your list of proposed class members        16:40:15

11    includes applications that your own models predict

12    would -- likely would have been denied, regardless

13    of race, correct?

14         MR. BLISS:  Objection to form.

15         THE WITNESS:  That's not the purpose of           16:40:28

16    the model.  It's not -- the purpose of the model

17    is not to predict.  It's to identify marginal

18    effects for race.

19    BY MS. LIAS-BOOKER:

20         Q.  But my question to you that I need an         16:40:41

21    answer to is, your list of proposed class members

22    includes applications that your own models predict
```

                                                   Page 274

1    would likely have been denied, regardless of their

2    race, correct?

3           MR. BLISS:  Objection to form -- form.

4           THE WITNESS:  Yes.  And --

5           MR. BLISS:  Mischaracterizes -- sorry, go      16:41:05

6    ahead.

7           THE WITNESS:  Yes.  And the reason that I

8    did that is because it's not a predictive model.

9    BY MS. LIAS-BOOKER:

10          Q.  But the logic [sic] regression report you    16:41:18

11   did yielded a predicted probability of approval

12   for each application, correct?

13          A.  It does.

14          Q.  Okay.  Please turn to table A7.2 of

15   Dr. Courchane's rebuttal report.  And looking        16:41:33

16   at -- I think it's at page 73.

17          Do you see the predicted probabilities of

18   approval for named plaintiff Bryan Brown?

19          A.  I do.

20          Q.  Okay.  And depending on whether the         16:42:06

21   number is based on figure 24 or figure 34 of your

22   report, Dr. Courchane says that the probability of

                                                  Page 275

1    approval predicted by your model is either

2    1.1 percent or 1.5 percent, correct?

3         A.   That's what Dr. Courchane says.  Yes.

4         Q.   Do you have any reason to doubt that the

5    numbers reflected in Dr. Courchane's report about      16:42:24

6    your model's prediction are inaccurate?

7         A.   I do not.

8         Q.   Is Mr. Brown included in your list of

9    proposed class members?

10        A.   I believe so.  Yes.                           16:42:52

11        Q.   Does your report disclose how many of the

12   119,000 proposed class members had less than a

13   50 percent probability of approval, according to

14   your models?

15        A.   No.                                           16:43:04

16        Q.   Is it listed anywhere in your work

17   papers?

18        A.   You could get that from the backup

19   production, from my affirmative report.

20            MS. LIAS-BOOKER:  And has that been           16:43:25

21   produced?

22            THE WITNESS:  Yes.

Page 276

```
1              MR. BLISS:  Yes.

2              MS. LIAS-BOOKER:  Thank you.

3    BY MS. LIAS-BOOKER:

4         Q.  In figure 34 of your affirmative report,

5    you list the marginal effects for the proposed      16:43:31

6    class based on your HMDA and Wells Fargo controls

7    model, correct?

8         A.  Yes.

9         Q.  So for example, the marginal effect for

10   black applicants for a refinance application is      16:43:45

11   4.2 percent; is that right?

12        A.  Yes.

13        Q.  Does that mean that, on average, the

14   predicted probability of approval for a black

15   application is 4.2 percent less than the predicted   16:43:58

16   probability of approval for that application had

17   he been white?

18        A.  That's the correct interpretation.

19        Q.  Overall, does the 4.2 percent reported in

20   figure 34 mean that, after controlling for the       16:44:14

21   underwriting variables in your model, the approval

22   rate for black applications is 4.2 percent lower
```

Page 277

```
 1    than it would have been had they been white

 2    applications?

 3              MR. BLISS:  Objection to form.

 4              THE WITNESS:  In aggregate, yes.

 5    BY MS. LIAS-BOOKER:                            16:44:38

 6        Q.  Based on the marginal effects you report

 7    in figure 34, are you able to say what percent of

 8    the black refinance applications in your proposed

 9    class would have been approved if they had been

10    white, according to your model?                16:44:50

11        A.  No.

12        Q.  Can you say confidently that at least

13    half of the proposed class would have been

14    approved had they been write based on these

15    marginal effects?                             16:45:05

16        A.  I can't say --

17              MR. BLISS:  Objection to form.

18    BY MS. LIAS-BOOKER:

19        Q.  Can you say that as to at least

20    25 percent?                                   16:45:11

21              MR. BLISS:  Objection to form.

22              THE WITNESS:  I cannot quantify that.
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    BY MS. LIAS-BOOKER:

 2        Q.  How about at least as to 15 percent?

 3            MR. BLISS:  Objection to form.

 4            THE WITNESS:  I don't think you can

 5    answer that question.  You would have to make        16:45:32

 6    assumptions about at what probability should a

 7    minority applicant have been approved.
```

```
 8    BY MS. LIAS-BOOKER:

 9        Q.  So you can't tell us today whether at

10    least 15 percent would have been approved?          16:45:43

11            MR. BLISS:  Objection to form.

12    BY MS. LIAS-BOOKER:

13        Q.  Is that your testimony?

14        A.  If we were to make certain assumptions

15    about what thresholds would -- should constitute     16:45:52

16    an approval, then I could do that calculation.

17        Q.  But you have not done that, correct?

18        A.  Correct.

19        Q.  Does your report identify which proposed

20    class members would have been approved if they had   16:46:03

21    been white?

22            MR. BLISS:  Objection to form.
```

Page 279

```
 1              THE WITNESS:  For the same -- same answer

 2     as before.

 3     BY MS. LIAS-BOOKER:

 4          Q.  No?

 5          A.  No.                                    16:46:17

 6          Q.  Okay.  And I presume it's also no that

 7     your report does not say how to identify which

 8     proposed class members would have been approved if

 9     they had been white.

10          A.  Under --                               16:46:35

11              MR. BLISS:  Objection to form.

12              THE WITNESS:  Under certain assumptions,

13     you could do that.  If you set a probability

14     threshold and that was the assumption at which the

15     applicant should have been approved, then yes,    16:46:44

16     that's quantifiable.

17     BY MS. LIAS-BOOKER:

18          Q.  But you did not do that analysis,

19     correct?

20          A.  Correct.                               16:46:50

21              MS. LIAS-BOOKER:  Let's take a break.

22              VIDEO TECHNICIAN:  The time is 4:46 p.m.
```

Page 280

```
1                  CERTIFICATE OF NOTARY PUBLIC
2              I, CHRISTINA S. HOTSKO, the officer before
3      whom the foregoing deposition was taken, do hereby
4      certify that the witness whose testimony appears in
5      the foregoing deposition was duly sworn by me; that
6      the testimony of said witness was taken by me in
7      stenotypy and thereafter reduced to typewriting under
8      my direction; that said statement is a true record of
9      the proceedings; that I am neither counsel for,
10     related to, nor employed by any of the parties to the
11     action in which this statement was taken; and,
12     further, that I am not a relative or employee of any
13     counsel or attorney employed by the parties hereto,
14     nor financially or otherwise interested in the
15     outcome of this action.
16     Dated: 4/12/2024
17
18
19              CHRISTINA S. HOTSKO
20          Notary Public in and for the
                District of Columbia
21
       My commission expires:
22     1 January 2027
```

Page 342