1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

*In re Wells Fargo Mortgage Discrimination Litigation*

**Case No. 3:22-cv-00990-JD**

**DECLARATION OF PETER STRAWSER**

I, Peter Strawser, declare:

1.      I am the Senior Vice President Head of Underwriting and Credit Administration for Wells Fargo Home Lending. I have worked in the residential home lending industry since 1993. I was first employed by Wells Fargo in November 2021. I have held my current position since that time. In this capacity, I have responsibility for Wells Fargo's underwriting operations and credit administration teams.

2.      I am over the age of eighteen (18) and am competent to execute this Declaration. If called to testify to any of the matters set forth in this Declaration, I could and would testify competently thereto.

3.      This Declaration is given on the basis of my personal knowledge and review of records that were made and kept in the regular course of Wells Fargo's business, including the documents attached hereto. The records were made at or near the time of the information recorded, and it was Wells Fargo's regular practice to record the information set forth therein. I am familiar with the records and the circumstances under which they were made.

### General Background

4.      Fannie Mae and Freddie Mac (the "GSEs") are the largest investors in the secondary mortgage market. With oversight from their regulator, the FHFA, they set their own underwriting guidelines and maximum loan amounts. A loan that complies with Fannie Mae and/or Freddie Mac guidelines is known as a "conforming loan" that is eligible for purchase by that GSE. Loans that do not conform to those guidelines cannot be sold to the GSEs.

5.      A "non-conforming loan" is any conventional mortgage loan that does not conform to GSE requirements. These commonly include "jumbo" loans, which are loans above the GSE's maximum loan amounts. Wells Fargo also originates government-insured loans, such as VA and FHA loans, which must comply with separate underwriting guidelines set by the relevant agency.

6.      Automated underwriting systems are used to determine whether an applicant is eligible— *not* approved—for the loan applied for and whether the loan can be sold to or insured by a particular investor/agency (GSEs, FHA, VA, etc.). If so, the application proceeds to credit underwriting and documentation verification, including verification of income, employment, assets, and liabilities; analysis of credit history; and evaluation of collateral via an appraisal or other valuation. Automated underwriting

systems do not provide automatic approval or denial decisions. Underwriting is done by human underwriters.

7.    Fannie Mae and Freddie Mac have their own automated underwriting systems, which are utilized by loan originators prior to delivering their loans to Fannie Mae and Freddie Mac. Fannie Mae's automated underwriting system is "Desktop Underwriter," and Freddie Mac's is "Loan Product Advisor."

8.    Wells Fargo uses CORE (Common Opportunities, Results, Experiences) to process loan applications. During the class period, Wells Fargo processed approximately 2.7 million mortgage loan applications. An interactive system—like CORE—that stores customer data from loan applications, makes that data readily available for use throughout the loan origination process, and helps loan processors and underwriters ensure that they are completing all necessary steps of the loan origination process, is essential to the efficient and accurate processing of those applications.

**Aaron Braxton**

9.    On February 4, 2003, Aaron Braxton executed a note pursuant to which he borrowed the sum of $139,015.00 at the rate of 6% per annum. The note was secured by a deed of trust on the property located at 4306 South Budlong Avenue, Los Angeles, CA 90037 (together with the note, the "loan"). True and correct copies of the note and deed of trust are attached at Appendix pages 001 – 012.

10.    Wells Fargo services the loan.

11.    In August 2019, Mr. Braxton sent a letter to Wells Fargo in which he stated that he became disabled in August 2015 due to serious degenerative arthritis in his left hip. Mr. Braxton stated that he had been living off his savings since 2017 but his savings were now depleted. Mr. Braxton asked Wells Fargo to modify the loan and a separate home equity line of credit for 90 days. A true and correct copy of the letter is attached at Appendix page 013.

12.    Mr. Braxton's loan is an FHA loan. The applicable FHA guideline[1] did not require a borrower to be delinquent on his mortgage in order to be considered for a loan modification. Instead, if the borrower was not delinquent or in default, the guideline required Wells Fargo to consider whether the borrower was in "imminent default," which FHA defined as a borrower "who is current or less than 30

---

[1] FHA Handbook 4000.1, Section III.A.2.g.i. (Effective Date Mar. 3, 3016; Last Revised Aug. 14, 2019). A true and correct copy of the guideline is attached at Appendix page 018.

Days past due on their Mortgage Payment and is experiencing a significant, documented reduction in income or some other hardship that will prevent them from making the next required Mortgage Payment during the month that it is due."[2] Loss mitigation options available to borrowers in imminent default included a forbearance agreement, the FHA-Home Affordable Modification Program (FHA-HAMP); the Pre-Foreclosure Sale (PFS) Program; and Deed-in-Lieu of Foreclosure, in that order.[3]

13.     On or about August 23, 2019, Mr. Braxton submitted a Mortgage Assistance Application to Wells Fargo. The "Acknowledgement and agreement" section was illegible. A true and correct copy of the application is attached at Appendix pages 020 – 026.

14.     On or about August 26, 2019, Wells Fargo sent a letter to Mr. Braxton listing the documents needed by September 26, 2019 to complete his payment assistance application, including documentation of his income and expenses for purposes of determining an affordable monthly payment amount. Oftentimes, the underwriter's review of documentation might raise questions that necessitate the need for additional documentation. Moreover, if any documentation expires during the process, updated documentation is required in order to move forward. For those reasons, the August 26, 2019 letter (as well as the other letters referenced herein) indicated that additional documentation might be required. A true and correct copy of the letter is attached at Appendix pages 027 – 040.

15.     Mr. Braxton provided documents in response to Wells Fargo's August 26, 2019 letter, but those documents were incomplete. On or about August 29, 2019, Wells Fargo sent a letter to Mr. Braxton listing the documents needed by September 28, 2019. A true and correct copy of the letter is attached at Appendix pages 041 – 044.

16.     On or about October 1, 2019, Wells Fargo sent another letter to Mr. Braxton listing additional documents needed by October 31, 2019, including a copy of his disability award letter. A true and correct copy of the letter is attached at Appendix pages 045 – 048.

17.     In response to Wells Fargo's October 1, 2019 letter, Mr. Braxton sent copies of correspondence from his disability insurance provider, but they were illegible. Mr. Braxton also submitted

---

[2] *Id.*
[3] *Id.*, Section III.A.2.g.iv. (attached at Appendix pages 018 – 019).

a letter indicating that he expected to begin receiving disability payments in November 2019. True and correct copies of the documents Mr. Braxton submitted are attached at Appendix pages 049 – 051.

18.    On October 21, 2019, Wells Fargo sent another letter to Mr. Braxton listing the documents needed by November 20, 2019. In particular, additional bank statements were needed due to income discrepancies between a profit and loss statement Mr. Braxton submitted and his 2018 tax return. A true and correct copy of the letter is attached at Appendix pages 052 – 056.

19.    On October 28, 2019, Mr. Braxton was approved for a one-month, short-term mortgage assistance on the loan with a payment of $715.30 due on December 1, 2019, as Mr. Braxton had previously indicated he was projected to start receiving disability income in November 2019. A separate home equity loan (owned and serviced by Wells Fargo) was placed on a 6-month unemployment program which required him to pay only $115.37 a month. True and correct copies of the short-term assistance offers are attached at Appendix pages 057 – 068.

20.    Upon completion of the one-month mortgage assistance on the loan, a new review of Mr. Braxton's circumstances was needed. Accordingly, on December 9, 2019, Wells Fargo requested an updated Mortgage Assistance Application by January 8, 2020. A true and correct copy of the letter is attached at Appendix 069 – 072.

21.    Mr. Braxton submitted a Mortgage Assistance Application on January 22, 2020, but it was incomplete. For example, it listed only rental income. A true and correct copy of the application is attached at Appendix pages 073 – 079.

22.    Mr. Braxton did not have proof of disability income until January 2020. A true and correct copy of the disability award letter he submitted is attached at Appendix pages 080 – 081.

23.    On January 22, 2020, Wells Fargo again requested an updated Mortgage Assistance Application.  A true and correct copy of the letter is attached at Appendix pages 082 – 085.

24.    Mr. Braxton submitted a completed Mortgage Assistance Application on or about February 19, 2020. A true and correct copy of the application is attached at Appendix pages 086 - 091.

25.    On March 26, 2020, Wells Fargo removed Mr. Braxton from his loss mitigation review and into the COVID-19 forbearance plan, which eliminated the need for him to make the monthly payments

on the loan. Mr. Braxton was not current on the loan and was under active loss mitigation review at the time based on his stated financial hardship. COVID-19 assistance ensured that Mr. Braxton's account received protections, including suspension of his payment obligations and the loan not being reported as delinquent to the credit bureaus. The letter advised Mr. Braxton that if he did not need the COVID-19 forbearance assistance, then he could continue making payments as normal and no further action was needed. A true and correct copy of the letter that was sent to Mr. Braxton regarding the COVID-19 forbearance plan is attached at Appendix pages 092 – 094. On May 14, 2020, Mr. Braxton was removed from the COVID-19 forbearance plan at his request and returned to a regular payment assistance review.

26.     On June 2, 2020, after completing underwriting, Wells Fargo approved Mr. Braxton for a three-month trial plan on the loan. Mr. Braxton completed the trial plan and his loan permanently modified. The modification reduced his interest rate from 6% to 3.375%. True and correct copies of Mr. Braxton's trial payment plan and executed loan modification agreement are attached at Appendix pages 095 – 115.

27.     Mr. Braxton did not pay any fees in connection with his loan modification application or agreement. He was never run through Loan Product Advisor, Desktop Underwriter, or ECS, as those systems are not used in connection with loan modification applications. He was not scored by ECS and he was not assigned to a Credit Risk Class by ECS. CORE also was not used in connection with Mr. Braxton's loan modification application.

28.     Mr. Braxton was not asked to identify his race or ethnicity during the loan modification process, nor did any of the documents he was required to submit ask him to identify his race or ethnicity.

29.     Mr. Braxton's file contains no evidence that he asked to refinance his existing mortgage loan.

### Bryan Brown

30.     Bryan Brown obtained an FHA mortgage loan from Envoy Mortgage LTD on the multi-unit property located at 16 Elm Street, Bristol, CT 06010 on or about December 14, 2010. Wells Fargo and its predecessor entities have serviced that mortgage loan since January 2011. A true and correct copy of the mortgage is attached at Appendix pages 116 – 125.

31.     In October 2020, Mr. Brown applied to Wells Fargo for a conventional conforming refinancing loan (not an FHA refinance), and the interest rate and other terms were locked until January 19, 2021.

32.     On November 2, 2020, the underwriter requested additional information from Mr. Brown. As required by Fannie Mae and Freddie Mac underwriting guidelines, the underwriter requested a complete, signed and dated copy of Mr. Brown's 2019 federal tax return for use in verifying his income, including rental income.[4] The underwriter also noted a large variance between Mr. Brown's verified base pay and the amount he had been paid to date, as well as a large decrease in his income since 2019 (more than a 35% decrease).[5] Part of the income Mr. Brown used to support his application derived from rental properties, so the underwriter also had questions about rental properties listed on Mr. Brown's tax return, including proof of rental income.[6] The underwriter requested follow-up documentation from Mr. Brown, including a copy of his most recent paystub[7] and mortgage, hazard insurance, property tax, and rental income documentation for the rental properties. The loan notes for Mr. Brown's application indicate that on November 4, 2020, a loan processor made an unsuccessful attempt to contact Mr. Brown by phone regarding these requests, and that the processor left a voicemail and sent a follow-up email that same day. On November 12, 2020, a loan processor made another unsuccessful attempt to contact Mr. Brown by phone, and the processor left a voicemail and sent a follow-up email that same day. Additional, unsuccessful attempts to reach Mr. Brown were made on November 23, 2020 and November 30, 2020.

33.     Mr. Brown thereafter provided additional documentation to Wells Fargo, which raised additional questions for the underwriter. For example, the documentation disclosed that Mr. Brown owned several companies, which could have impacted his assets and liabilities. The underwriter requested additional information on December 15, 2020, but as of January 8, 2021, the documentation was still

---

[4] Appendix pages 408 - 419 (Agency/Conforming Underwriting Guidelines, "Rental Income").
[5] Appendix page 406 (Agency/Conforming Underwriting Guidelines, "Stability of Income") ("Any income to be considered in the loan qualification analysis must be stable, regular, and recurring with evidence that a high probability exists for continued receipt at current or increasing levels.").
[6] *See* n.4, *infra*.
[7] Appendix page 407 (Agency/Conforming Underwriting Guidelines, "Salaried Income – Base Pay") (required documentation for salaried income includes (but is not limited to) "Most recent YTD paystub(s) documenting at least one month of income.").

incomplete. Accordingly, Wells Fargo extended Mr. Brown's interest rate lock period to February 18, 2021 at no cost to him.

34. By February 9, 2021, Mr. Brown still had not provided the documentation requested by the underwriter. Wells Fargo again extended Mr. Brown's interest rate lock period at no cost to him. However, due to the passage of time, applicable agency guidelines required Wells Fargo to obtain a new credit report and to update certain income documents and bank statements, and the application had to be underwritten based on the new information.[8]

35. Ultimately, based on the updated and verified information regarding Mr. Brown's wage income, Wells Fargo determined that his debt-to-income ratio was 56.913%, which exceeded Fannie Mae and Freddie Mac underwriting guidelines. The declination decision was reviewed by National Decisioning Support, a second-level review team, which agreed with the decision.

36. The debts listed on Mr. Brown's credit report were listed as debts belonging to him, not any business he owned.[9] Accordingly, those debts were properly included in the debt-to-income calculation because at no time did Mr. Brown provide documentation or other information showing that those were actually business debts for which he was not personally liable, nor did Mr. Brown also provide the required documentation that would allowed those debts to be excluded from the calculation.[10]

37. Mr. Brown was never able to substantiate rental income for all of his rental properties, most of which he said were vacant at the time of the application. However, the underwriter performed a debt-to-income calculation using the rental income for the subject property, as shown on Mr. Brown's 2019 tax return. Even using that income, his debt-to-income ratio still exceeded 50%, which exceeded Fannie Mae and Freddie Mac's guidelines.

38. On February 25, 2021, Wells Fargo sent Mr. Brown a Notice of Action Taken and Statement of Reasons, which is commonly known as an "adverse action notice." The letter listed as the reason for

---

[8] Appendix page 420 – 421 (Agency/Conforming Underwriting Guidelines, "Documentation requirements") (the maximum age for credit reports and credit documents is 120 days old and bank statements cannot be more than two months old); Appendix page 407 (paystubs must cover the most recent pay period).

[9] Appendix pages 126 – 139.

[10] Appendix pages 404 – 405 (Agency/Conforming Underwriting Guidelines, "Business debt").

1   denial "Amounts owed are too high relative to your income (We look at the amounts you owe and compare

2   it to your income)". A true and correct copy of the letter is attached at Appendix pages 140 – 141.

3       39.    True and correct copies of the loan notes from Mr. Brown's loan application are attached

4   at Appendix page 142.

5   **Ifeoma Ebo**

6       40.    On October 27, 2021, Ifeoma Ebo contacted Wells Fargo Private Mortgage Banker Yossi

7   Notik about getting pre-approved for a mortgage loan. Mr. Notik responded the same day and suggested

8   that Ms. Ebo begin filling out the information in Wells Fargo's online Pre-Approval portal. Mr. Notik

9   stated that if Ms. Ebo was self-employed (and she was), then 2019 and 2020 tax returns would be helpful

10  to review (they were not required at that juncture as she had not proceeded to underwriting). A true and

11  correct copy of the email exchange is attached at Appendix pages 144 -147.

12      41.    Ms. Ebo later indicated that she was interested in purchasing a 2-unit building in Brooklyn,

13  New York that was listed for $900,000 and that she would be seeking financing for almost 100% of the

14  purchase price. Ms. Ebo indicated that she planned to rent out both units in her existing residence for

15  $2,500 a month each, and that she planned to rent one of the units in the new property for $2,500 a month.

16  A true and correct copy of Ms. Ebo's email is attached at Appendix page 143.

17      42.    On November 1, 2021, Wells Fargo issued a PriorityBuyer letter to Ms. Ebo. The

18  preapproval letter explained that it was not a commitment to lend and that Ms. Ebo would need to finalize

19  her application and Wells Fargo would need to verify her information and review her financial

20  documentation before it could make a decision on her application. A true and correct copy of the

21  preapproval letter is attached at Appendix pages 148 – 151.

22      43.    On November 24, 2021, Wells Fargo sent Ms. Ebo a list of items needed for her FHA

23  mortgage loan application. *See* Appendix pages 152 – 153. Wells Fargo followed up with Ms. Ebo on

24  November 29, 2021. *See* Appendix pages 154 – 155.

25      44.    On December 1, 2021, Wells Fargo sent Ms. Ebo a list of documents that were needed to

26  continue with her application. *See* Appendix pages 157 – 158. Ms. Ebo still had not provided all of the

27

28

1    documents Wells Fargo had requested. An additional follow-up request was sent on December 2, 2021.

2    *See* Appendix page 156.

3         45.    In addition to wage income, Ms. Ebo claimed income from self-employment. On December

4    7, 2021, Wells Fargo requested Ms. Ebo's personal federal tax returns for the years 2019 and 2020, along

5    with any business federal tax returns for those years, if applicable, in accordance with the applicable FHA

6    underwriting guideline.[11] *See* Appendix page 159.

7         46.    On December 8, 2021, Ms. Ebo provided an unsigned copy of her 2019 personal federal

8    tax return and an unsigned copy of a 2020 personal federal tax return that was stamped "DO NOT FILE"

9    on every page. True and correct copies of excerpts from the 2020 tax return are attached at Appendix pages

10   163 – 171.

11        47.    On December 20, 2021, after reviewing all of the documentation Ms. Ebo had submitted,

12   the underwriter noted discrepancies in the income Ms. Ebo claimed on her application versus what was

13   substantiated by her supporting documentation. Ms. Ebo also sought to keep her existing residence, which

14   was not rented or listed for sale. During a follow-up call with the underwriter, Ms. Ebo said she had

15   changed her mind and would not be renting any of the units, either at her existing residence or the new

16   property she was purchasing. Based on the income documentation Ms. Ebo had provided to date, her debt-

17   to-income ratio was 58% with no compensating factors, which did not meet FHA guidelines,[12] and the

18   underwriter recommended that her application be declined. However, Wells Fargo's second-level review

19   team sent her file back for re-review.

20        48.    Wells Fargo thereafter worked with Ms. Ebo in order to get her loan approved. Ms. Ebo

21   provided updated income documentation and indicated that she would in fact rent the second unit in the

22   home she planned to purchase. The underwriter calculated income from the proposed rental property using

23   the applicable guideline for determining effective income for a rental property with no rental history.[13]

24   Using the rental income and Ms. Ebo's verified income, the underwriter recommended an approval.

25

26

27   ───────────────
     [11] Appendix page 429 (FHA Guidelines, "Self-Employment Income, Required Documentation, Individual and Business Tax Returns").

     [12] Appendix pages 436 – 437 (FHA Guidelines, "Maximum Qualifying Ratios").

28   [13] Appendix pages 430 – 441 (FHA Guidelines, "Limited or No History of Rental Income").

49. A commitment letter was issued on December 29, 2021. The letter listed the documents required to move forward with the loan, including the most recent two years of filed and signed federal tax returns, including all schedules, in order to document Ms. Ebo's income. A true and correct copy of the commitment letter is attached at Appendix pages 172 – 179.

50. On January 11, 2022, Wells Fargo sent Ms. Ebo an email requesting (among other things) that she hand-sign sign and date her 2019 and 2020 personal federal tax returns. If her 2020 tax returns had not been filed, Ms. Ebo was to provide an explanation. On January 13, 2022, Ms. Ebo advised Wells Fargo, for the first time, that her 2020 personal federal tax return had been returned by the IRS in August 2021 because it was not signed. Ms. Ebo attached a copy of the 2020 personal federal tax return, but it was not signed. A true and correct copy of the email exchange is attached at Appendix pages 181 – 185.

51. Ms. Ebo later provided another copy of the 2020 personal federal tax return that was stamped "DO NOT FILE."

52. By February 3, 2022, Ms. Ebo still had not provided a signed, filed 2020 personal federal tax return. Wells Fargo requested a letter of explanation for why the return had not been filed or verification that it had been filed. If the return had been filed, Ms. Ebo was to provide a signed and dated return. Ms. Ebo responded that she had filed the return but did not have a copy. A true and correct copy of the email exchange is attached at Appendix pages 187 – 188.

53. Wells Fargo followed up with Ms. Ebo about the 2020 federal tax return (along with other outstanding items) on February 14, 2022. A true and correct copy of the email is attached at Appendix page 190.

54. On February 16, 2022, Wells Fargo contacted Ms. Ebo's CPA in an attempt to address the issues surrounding the 2020 federal tax return and wrote that a signed, filed return was required because Wells Fargo had based its income calculations on the unsigned returns Ms. Ebo had provided. The CPA responded that there was a backlog at the IRS and asked Wells Fargo to consider waiving the tax return requirement. Wells Fargo responded that the requirement was not Wells Fargo's, but FHA's. Ms. Ebo's CPA reported that it would take at least 21 days for the IRS to process a newly-filed return. On February 17, 2022, Wells Fargo responded that it would request an underwriting exception from FHA, which was

1   not guaranteed to be approved, if Ms. Ebo could provide confirmation that the return had been filed and

2   verification that any back taxes and penalties had been paid. A true and correct copy of the email exchange

3   is attached at Appendix pages 191 – 197.

4         55.     Ms. Ebo did not provide confirmation that her 2020 personal federal tax return had been

5   filed until March 3, 2022.

6         56.     Because of delays caused by Ms. Ebo's inability to timely supply required documentation,

7   Wells Fargo was required to reschedule her closing date several times. It was also required to obtain

8   updated employment and financial documentation.[14] Wells Fargo requested those documents on March

9   14, 2022. Ms. Ebo responded that she was on vacation overseas until March 26, 2022 and would not be

10   able to supply the documents until she returned. On March 22, 2022, Ms. Ebo informed Wells Fargo that

11   the seller had canceled the contract.

12         57.     On or about May 3, 2022, Wells Fargo canceled Ms. Ebo's application at her request. A

13   true and correct copy of the cancellation letter is attached at Appendix page 198

14         58.     True and correct copies of the loan notes from Ms. Ebo's loan application are attached at

15   page 199.

16                               **Gia Gray**

17         59.     Gia Gray and Carl Gray purchased the property located at 8 Mapleglen Court, Danville,

18   CA 94506 on June 30, 2018 with a non-conforming loan from Wells Fargo in the amount of $1,480,000

19   at an interest rate of 4.25% per annum. Ms. Gray and Mr. Gray applied to refinance that loan in March

20   2020, and that transaction closed on June 17, 2020 with a non-conforming loan from Wells Fargo in the

21   amount of $1,443,000 with an interest rate of 3.75% per annum. That application was assigned to the A1

22   Credit Risk Class by ECS.

23         60.     A stable work history is relevant to the applicant's ability to repay the loan. Accordingly,

24   the applicable underwriting guideline required documentation of a 2-year work history.[15] When she

25   applied to refinance her loan in March 2020, Ms. Gray had been employed by her current employer for

26   less than 24 months and her employer thus could not provide a written verification of employment

27

28

---

[14] Appendix page 423 (FHA Guidelines, "Maximum Age of Mortgage Documents").

[15] Appendix page 443 (Non Agency Underwriting Guidelines, "Employment gaps").

covering a two-year history. The applicable underwriting guideline required Wells Fargo to obtain, among other things, a verbal verification of employment from Ms. Gray's current employer within twenty business days prior to closing.[16]

61.    Mr. Gray's verified gross monthly income was $25,638, and Ms. Gray's was $9,500, for a total of $35,138. The resulting debt-to-income ratio was 36.580%. If Ms. Gray's income had been removed, the debt-to-income ratio would have been over 50%, which would have exceeded the applicable guideline.[17] In any event, because Ms. Gray was an applicant and would become an obligor on the loan, her employment and income had to be verified.[18]

62.    Ms. Gray did not submit applications to refinance the loans on properties located in Stockton, CA or Chicago, IL and Ms. Gray never received a mortgage loan from Wells Fargo on those properties. Wells Fargo had no policy concerning those geographic areas and did not rate those areas as "high risk." Rather, a property that is not owner-occupied, regardless of location, is consider higher risk than a property that is owner occupied, because loans secured by non-owner occupied properties tend to experience a higher probability of default.

63.    Because Ms. Gray did not submit applications in connection with either the Stockton or Chicago properties, she was not run through Loan Prospect Advisor, Desktop Underwriter, or ECS in connection with those properties, and she was not assigned a Credit Risk Class by ECS in connection with either of those properties.

### Terah Kuykendall-Montoya

64.    Terah Kuykendall-Montoya and Danny Montoya obtained an VA mortgage loan from Gardner Financial Services, Ltd. on July 12, 2012. Wells Fargo has serviced the loan since September 2012. True and correct copies of the note and deed of trust are attached at Appendix pages 200 – 216.

65.    Ms. Kuykendall-Montoya and Mr. Montoya filed a Chapter 13 bankruptcy petition on February 26, 2014. Their bankruptcy case was later converted to a Chapter 7. During their bankruptcy, Ms. Kuykendall-Montoya and Mr. Montoya did not reaffirm their VA loan. Although Wells Fargo sent a

---

[16] Appendix page 446 (Non Agency Underwriting Guidelines, "Salaried income").

[17] Appendix page 441 (Non Agency Underwriting Guidelines, "Qualifying Ratios, All Non-conforming transactions up to $2 million loan amount").

[18] Appendix page 439 (Non 2020 Non-Agency Underwriting Guidelines, "Co-borrower").

1   reaffirmation agreement to their bankruptcy attorney, it was never signed. A true and correct copy of the

2   letters Wells Fargo sent to their attorney are attached at Appendix pages 217 – 229.  Ms. Kuykendall-

3   Montoya and Mr. Montoya's personal liability on the VA loan was discharged via the Chapter 7 bankruptcy

4   discharge Ms. Kuykendall-Montoya and Mr. Kuykendall Montoya obtained on December 28, 2017.

5       66.    Ms. Kuykendall-Montoya and Danny Montoya applied for a conventional, conforming

6   cash-out refinance on or about July 27, 2021. Ms. Kuykendall-Montoya's credit report, obtained on July

7   27, 2021, indicated that she and her husband had obtained a bankruptcy discharge in December 2017. A

8   true and correct copy of the credit report is attached at Appendix pages 230 – 242.

9       67.    The applicable underwriting guideline for agency loans provided that "in order to refinance

10  a Wells Fargo mortgage loan that existed prior to the filing of a Chapter 7 bankruptcy case, the customer

11  must have reaffirmed the loan while the customer's Chapter 7 case was open. A copy of the executed

12  reaffirmation agreement that was filed with the bankruptcy court is required to confirm that the loan was,

13  in fact, reaffirmed. Alternatively, if the customer did not reaffirm the loan while the Chapter 7 case was

14  open, then the customer may request an order from the bankruptcy court that confirms that the refinancing

15  of the discharged debt is allowed and would not violate the discharge injunction of Section 524 of the

16  Bankruptcy Code.  If the customer cannot produce either a valid reaffirmation agreement or a court order

17  approving the refinance, then the loan cannot be refinanced."[19] Under that guideline, Ms. Kuykendall-

18  Montoya and Mr. Montoya's refinancing application could not be approved because they did not sign a

19  reaffirmation agreement and they did not obtain an order from the bankruptcy court confirming that

20  refinancing of their discharged mortgage was allowed.

21      68.    Another agency guideline provided that in the case of bankruptcy due to "financial

22  mismanagement," "at least four years must have elapsed from the bankruptcy discharge or dismissal date

23  of the bankruptcy action to the note date of the new loan."[20] The waiting period for bankruptcy due to

24  "extenuating circumstances" is two years.[21] The guideline defines "extenuating circumstances" as

25

---

26  [19] Appendix pages 398 – 399 (Agency/Conforming Underwriting Guidelines, "Refinance of Wells Fargo mortgage discharged in bankruptcy").

27  [20] Appendix 399 – 400 (Agency/Conforming Guidelines, "Bankruptcy Chapter 7 and 11, The waiting periods to reestablish credit and other requirements").

28  [21] *Id.*

1   "financial difficulties [caused by] outside factors beyond the customer's control that is not ongoing and is

2   unlikely to recur."[22] An applicant claiming that extenuating circumstances caused her to file bankruptcy

3   must provide supporting documentation, and absent such documentation, "financial mismanagement

4   guidelines must be followed."[23] Wells Fargo did not have a copy of Ms. Kuykendall-Montoya's

5   bankruptcy petition, and she did not provide one. Nonetheless, a bankruptcy petition that lists unidentified

6   medical and dental expenses as part of the debtor's ongoing monthly expenses would not satisfy the

7   requirement that the applicant document extenuating circumstances. Similarly, being on disability, without

8   any indication about the nature of the disability (e.g., temporary, long-term, how long it persisted) is not

9   sufficient to support an extenuating circumstances exception.

10      69.    Because there was no documentation that Ms. Kuykendall-Montoya and Mr. Montoya's

11  bankruptcy was caused by extenuating circumstances, the four-year waiting period applied, and they did

12  not satisfy it.

13      70.    Whether an applicant has made their mortgage payments on time is not relevant to the

14  impact of a bankruptcy on the application, and an underwriter cannot disregard the bankruptcy guidelines

15  because the applicant made her mortgage payments on time.

16      71.    Wells Fargo denied Ms. Kuykendall-Montoya's application on July 29, 2021 due to the

17  bankruptcy. The statement "We do not offer the product or program requested" in her adverse action notice

18  means that Wells Fargo could not offer her the loan product for which she applied due to her bankruptcy

19  (i.e., failure to reaffirm the VA loan and not meeting the 4-year waiting period). A true and correct copy

20  of the adverse action notice sent to her is attached at Appendix pages 243 – 244.

**Paul Martin**

22      72.    On or about March 26, 2020, Paul Martin submitted an application to Wells Fargo for a

23  home equity line of credit ("HELOC") on the property located at 5200 Shenandoah Avenue, Los Angeles,

24  CA 90056. On March 17, 2020, Mr. Martin had refinanced a first and second mortgage on the property

25  with Kinecta Federal Credit Union with a loan in the amount of $1,605,000.

---

[22] Appendix page 399.
[23] *Id.*

DECLARATION OF PETER STRAWSER
CASE NO. 3:22-cv-00990-JD

73.    On April 29, 2020, Mr. Martin was conditionally approved for a HELOC in the amount of $180,000.  A true and correct copy of his conditional approval letter is attached at Appendix pages 245 – 249.

74.    On May 6, 2020, a third-party appraiser conducted an exterior-only appraisal of the property. Due to COVID-19 and associated distancing mandates, a credit policy at that time limited appraisals to exterior-only in connection with particular loan transactions, including Mr. Martin's. The appraiser assigned a value of $1,900,000 to the property.  A true and correct copy of the appraisal report is attached at Appendix pages 250 – 278.

75.    On or about May 13, 2020, Wells Fargo's Collateral Review Team reviewed the appraisal and concluded that the $1,900,000 value was supported.

76.    Mr. Martin disputed the appraisal. The dispute was assigned to Wells Fargo's Real Estate Valuation Services Valuation Resolution Team ("VRT"), which handles appraisal appeals. VRT concluded that a field review by a local, licensed appraiser was warranted. A staff appraiser in the Los Angeles market area reviewed the comparables selected by the appraiser,  completed an exterior inspection of the property, and reviewed additional comparables in the market area. The staff appraiser agreed with the original valuation.

77.    Mr. Martin then sent Wells Fargo a copy of an appraisal performed in February 2020 in connection with the Kinect refinancing transaction referenced in paragraph 72. That appraisal valued the property at $2,400,000. A true and correct copy of the appraisal Mr. Martin provided to Wells Fargo is attached at Appendix pages 279 – 307.

78.    Although Wells Fargo policy does not allow reliance on appraisals performed for another lender, Wells Fargo nonetheless reviewed the Kinecta appraisal for purposes of determining whether the $1,900,000 valuation was supported. Wells Fargo noted several concerns with the Kinecta appraisal, including substantial, unsupported upward adjustments that appraiser made to the comparable sales he selected in order to increase those properties' values (which, in turn, he used to support the $2,4000,000 valuation he assigned to the Martin property). Those upward adjustments would have violated Wells Fargo policy. The review team concluded that the $1,900,000 value was reasonable and supported, that the sales

1  utilized in that appraisal were most similar to the property, and that the adjustments were appropriate. A

2  true and correct copy of the Review Worksheet is attached at Appendix pages 317 – 318.

3      79.    The appraised value had no impact on the line of credit amount for which Mr. Martin was

4  approved, and Mr. Martin remained approved at the original terms set forth in the April 29, 2020

5  conditional approval letter. However, Mr. Martin elected to withdraw his application on or about June 22,

6  2020. A true and correct copy of the letter confirming Mr. Martin's decision to withdraw his application

7  is attached at Appendix page 319.

8      80.    True and correct copies of the loan and underwriting notes for Mr. Martin's application are

9  attached at Appendix page 320.

10     81.    Mr. Martin's application was never run through Loan Prospect Advisor, Desktop

11  Underwriter, or ECS, as those systems were not used for HELOC applications. His application was not

12  scored by ECS and he was not assigned to a Credit Risk Class by ECS.

13                                          **Elretha Perkins**

14     82.    Elretha Perkins purchased the property located at 2152 Bakers Mill Road, Dacula, GA

15  30019 on August 14, 2006 for $380,000. Ms. Perkins financed her purchase with a first-priority mortgage

16  loan, and a separate, subordinate home equity loan, both from Wells Fargo. Wells Fargo no longer owns

17  or services the first mortgage loan.

18     83.    The home equity loan agreement provided for monthly payments in the amount of $580.92

19  and a balloon payment due on August 20, 2021 (the "maturity date"). A true and correct copy of the Fixed

20  Rate Loan Note evidencing Ms. Perkins' home equity loan is attached at Appendix pages 321 – 326.

21     84.    Wells Fargo sent Ms. Perkins several notifications in advance of the home equity loan's

22  August 20, 2021 maturity date. True and correct copies of letters Wells Fargo sent to Ms. Perkins are

23  attached at Appendix pages 327 – 336.

24     85.    On August 20, 2021, Wells Fargo sent Ms. Perkins a letter stating that the home equity loan

25  had reached its maturity date and was due to be paid in full in the amount of $47,473.87. A true and correct

26  copy of the letter is attached at Appendix pages 337 – 344. Ms. Perkins did not make the payment.

27

28

Docusign Envelope ID: 99111D6-654A-4CB8-AED8-1BFFD895D9EC

86.     On September 14, 2021, Ms. Perkins applied for conventional conforming refinancing to refinance the home equity loan and the first-position mortgage loan referenced in paragraph 83.

87.     Ms. Perkins' September 14, 2021 application was denied for incompleteness on October 4, 2021. Ms. Perkins had not signed the Intent to Proceed form, and she had not submitted required documentation by the deadlines communicated to her.  A true and correct copy of the adverse action notice for that application is attached at Appendix page 345.

88.     On or about October 16, 2021, Ms. Perkins submitted a Mortgage Assistance Application, indicating that she did not have the ability to pay the balloon payment due on the home equity loan and that her income had decreased due to COVID-19. A true and correct copy of the application is attached at Appendix pages 346 – 349. Ultimately, Ms. Perkins did not provide the documents required to complete the loss mitigation review, and that review was closed.

89.     On December 13, 2021, Ms. Perkins again applied for conventional conforming refinancing to refinance the matured home equity loan and the first-position mortgage loan referenced in paragraph 82. Ms. Perkins still had not paid the balloon payment that was due on the home equity loan. A true and correct copy of the application is attached at Appendix pages 350 – 359.

90.     Ms. Perkins' December 13, 2021 application was denied on December 15, 2021 because late payments were showing on her credit report, including two 60-days past due payments on the home equity mortgage loan within the past 12 months. A true and correct copy of the credit report is attached at Appendix pages 449 – 463. Applicable GSE guidelines provided that conventional financing was not available when the credit report revealed at least one mortgage payment that was 60 or more days past due in the last 12 months from the date of the credit report.[24] The proposed loan also did not meet the "Benefit to Borrower" test, which measures whether the proposed loan is in the financial interest of the applicant because it would improve the applicant's financial circumstances. A true and correct copy of the adverse action notice that was sent to Ms. Perkins is attached at Appendix pages 362 – 363.

91.     True and correct copies of the loan notes for Ms. Perkins' December 13, 2021 application are attached at Appendix page 364.

---

[24] Appendix page 397 (Agency/Conforming Underwriting Guidelines, "Minor or significant adverse credit, Housing payment history").

92. Both of Ms. Perkins' refinancing applications were submitted after Wells Fargo stopped using ECS Credit Risk Classes in connection with conforming loan applications.

**Christoper Williams**

93. Christoper Williams applied for a home equity line of credit on May 30, 2019.

94. On June 19, 2019, Mr. Williams was conditionally approved for a HELOC in the amount of $180,000, with an initial fixed-rate advance of $86,000 to pay off his existing first-lien mortgage. Future advances from the line of credit would be subject to a variable rate. Wells Fargo offered Mr. Williams an interest rate of 8.5%, which included a .025% discount based on his status as a Wells Fargo deposit customer. A true and correct copy of the conditional approval letter is attached at Appendix pages 365 – 368.

95. The variable interest rate for a Wells Fargo HELOC was calculated as the Prime Rate index plus a margin. The margin was determined by more than just credit score. The margin was determined based only on the combination of the applicant's Equifax Beacon 5.0 FICO credit score, the combined loan-to-value ratio, the loan amount, certain bank relationship discounts, and product adjustments for investment properties and second homes. Based on the applicable rate sheet for a Georgia property, the variable interest rate quoted to Mr. Williams was determined as 8.500% (Prime Rate of 5.500% plus a margin of 3.000%) based on his Equifax Beacon 5.0 FICO credit score of 686,[25] his loan-to-value ratio between 75% and 80%, his approved credit line amount of $180,000, and his deposit customer discount. Wells Fargo offered Mr. Williams the same rate it would have offered any applicant meeting those criteria. The Beacon 5.0 score credit score reported by Equifax apparently was influenced by an unpaid medical account.

96. On June 21, 2019, a Wells Fargo employee spoke with Mr. Williams. Mr. Williams asked for clarification of the FICO credit score used to qualify and price his application. Mr. Williams stated that Wells Fargo's online banking website showed that his FICO score was over 800. Mr. Williams followed up with an email on June 25, 2019, a true and correct copy of which is attached at Appendix page 372.

---

[25] Appendix pages 369 -371.

97.    Mr. Williams' dispute was escalated to Wells Fargo's Customer Care and Recovery Group ("CCRG"), which investigated Mr. Williams' dispute, confirmed that no errors had occurred (including that the interest rate offered to him was based on the FICO score as reported by Equifax), and that a rate exception was not available because he was disputing his credit score. A true and correct copy of the letter Wells Fargo sent to Mr. Williams is attached at Appendix pages 373 – 376.

98.    In his June 25, 2019 email, Mr. Williams indicated that if a rate exception could not be provided, he wished to withdraw his application. Pursuant to Mr. Williams' instructions, Wells Fargo withdrew Mr. Williams' application on June 25, 2019.

99.    On August 21, 2019, Mr. Williams responded to a customer experience survey and stated that Wells Fargo "could not explain a discrepancy in my credit score and I feel it may have been discriminatory but I cannot say for sure." A true and correct copy of Mr. Williams' survey response is attached at Appendix page 377.

100.    On August 22, 2019, a Wells Fargo employee reached Mr. Williams by phone. Mr. Williams reported that before he submitted his application, the Wells Fargo website showed a FICO score, as reported by Experian, of 806.

101.    Wells Fargo investigated Mr. Williams' complaint and an employee spoke with him by phone on September 5, 2019. The employee explained that the FICO score on the Wells Fargo website is for educational purposes only and that it may not be the same score used in connection with an application for a specific product and that many different scores are available to consumers and lenders. The employee explained that for HELOCs, Wells Fargo uses only the Equifax score.[26] Wells Fargo followed up with Mr. Williams in writing. A true and correct copy of the letter is attached at Appendix pages 378 – 382.

102.    I understand that Mr. Williams disputes the accuracy of the information on the Equifax credit report that was used in determining the interest rate offered to him. As a matter of Wells Fargo policy, Mr. Williams needed to contest the disputed information with Equifax and the creditor needed to provide verification that the tradeline was reported in error and that corrective action had been taken by the creditor to remove the disputed item from the credit report. In the absence of such verification (which

---

[26] Appendix page 447 (Home Equity Acquisitions First Lien at 103.01) ("The preferred credit bureau source is Equifax. If a score is obtained from Equifax, that score must be used.").

DECLARATION OF PETER STRAWSER
CASE NO. 3:22-cv-00990-JD

20

was not provided), Wells Fargo employees must use the credit score obtained from Equifax and are not permitted to pull credit reports from other sources to obtain a higher credit bureau score.[27]

103.    Mr. Williams' application was never run through Loan Prospect Advisor, Desktop Underwriter, or ECS, as those systems were not used for HELOC applications. His application was not scored by ECS and he was not assigned to a Credit Risk Class by ECS.

---

[27] Appendix page 448 (Home Equity Acquisitions First Lien at 103.02) ("Disputed Credit History").

1    I declare under penalty of perjury that the foregoing is true and correct.

2    

3    Peter Strawser

4    

5    Executed on July ___, 2024

7/25/2024

**DocuSign**

## Certificate Of Completion

Envelope Id: 991111D6654A4CB8AEDB4BFFD895D9EC
Subject: Complete with Docusign: Strawser Declaration ISO Motion for Summary Judgment_(20108527)_(5).DOCX
Source Envelope:
Document Pages: 22
Certificate Pages: 3
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Status: Completed

Signatures: 1
Initials: 0

Envelope Originator:
Tina Mitchell
420 Montgomery St.
San Francisco, CA  94104
Tina.M.Mitchell@wellsfargo.com
IP Address: 159.45.22.18

## Record Tracking

Status: Original
        7/25/2024 8:44:00 AM

Holder: Tina Mitchell
        Tina.M.Mitchell@wellsfargo.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Peter Strawser<br>peter.strawser@wellsfargo.com<br>Senior Vice President<br>Security Level: Email, Account Authentication<br>(None) | *Peter Strawser*<br>DocuSigned by:<br>92F763678444484...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 159.45.71.20 | Sent: 7/25/2024 8:46:24 AM<br>Viewed: 7/25/2024 8:48:33 AM<br>Signed: 7/25/2024 8:49:12 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 7/25/2024 8:48:33 AM<br>    ID: 7fb0f2e1-bb56-4f99-bfaf-3e3402fdeb3d | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/25/2024 8:46:24 AM |
| Certified Delivered | Security Checked | 7/25/2024 8:48:33 AM |
| Signing Complete | Security Checked | 7/25/2024 8:49:12 AM |
| Completed | Security Checked | 7/25/2024 8:49:12 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

# Electronic Record and Signature Disclosure

**Last updated:** April 26, 2021

You are entitled by law to receive certain information "in writing." However, we may instead provide this information to you electronically with your prior consent. We also need your consent to use electronic signatures. In this consent (the "Consent"), "we," "us," "our," and "Wells Fargo" refer to Wells Fargo Bank, N.A. and any affiliate or subsidiary of Wells Fargo Bank, N.A. "You" and "your" refer to the person agreeing to this Consent.

1. **Scope.** In our sole discretion, we may provide to you, or you may sign, submit, or agree to at our request, certain documents, records, disclosures, notices, communications, agreements, fee schedules, statements, and other information in electronic form through the DocuSign system ("Electronic Records"). We may also use electronic signatures and obtain them from you through the DocuSign system ("Electronic Signatures"). You may receive emails related to the Electronic Records and Electronic Signatures. This Consent applies to any Electronic Records or Electronic Signatures in connection with the signing event on the DocuSign system associated with this Consent (the "Signing Event").

2. **Paper Copies.** We will not send you paper copies of any Electronic Records unless we, in our sole discretion, deem it appropriate to do so. If you desire a paper copy of an Electronic Record, you may: (a) download or print the Electronic Record after the Signing Event; or (b) contact the appropriate customer service unit and request a paper copy, for which we may charge you a fee unless prohibited by law. Any such fee will be disclosed at the time of request.

3. **Your Email Address.** To update your email address before completing the Signing Event: (a) if you arrived at the Signing Event through Wells Fargo Online® or a similar online system, follow the appropriate procedure for that system to update your email address; or (b) if you arrived at the Signing Event through a link in an email you received, please contact the Wells Fargo representative associated with that email.

4. **Withdrawal.** This Consent only applies to the Signing Event, and you will not be able to withdraw this Consent after you have completed the Signing Event. If you do not wish to agree to this Consent, you may decline to continue with the Signing Event.

5. **Software and Hardware Requirements.** To use Electronic Records and Electronic Signatures, you must meet the current minimum DocuSign system requirements, which can be found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements. In addition, you must have:
   - A web browser listed on the Wells Fargo Supported Browsers and Operating Systems page (https://www.wellsfargo.com/help/online-banking/browser-supported);
   - An Internet connection;
   - An active email account;
   - A currently supported version of a program that accurately displays PDF files;
   - A computer or other device and an operating system capable of supporting all of the above;
   - A printer, if you wish to print out paper copies of Electronic Records; and
   - Electronic storage, if you wish to retain Electronic Records in electronic form.

Please indicate you have read, understand, and agree to this Consent by selecting the checkbox next to "I agree to use electronic records and signatures" before clicking "CONTINUE" within the Signing Event.