1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re Wells Fargo Mortgage Discrimination Litigation* | **Case No. 3:22-cv-00990-JD**<br><br><br>**DECLARATION OF JOHN R. KELLER** |

I, John R. Keller, declare:

1.     I am a Senior Vice President, Business Execution Director for Wells Fargo Home Lending, a division of Wells Fargo Bank, N.A. I have worked at Wells Fargo for more than 18 years. I have personal knowledge of the matters set forth below and could and would testify competently thereto.

2.     CORE is an interactive front-end workflow tool that guides the flow of the loan origination process.  It retrieves, stores, and displays information and data (including data from the loan application, certain outputs from the Risk Engine, and final lending decisions).  CORE is not an automated underwriting system and it does not make lending decisions. It does not utilize artificial intelligence.

3.     The Risk Engine is a technology application that provides information and guidance for credit and operational risk items during the loan underwriting process. It uses data from the applicant's loan application and credit report (which are stored in CORE) to help analyze (based on underwriting policies and guidelines) the applicant's creditworthiness. It also helps team members understand tasks that may be necessary to underwrite the loan and assesses the underwriting authority level required to complete them. Finally, the Risk Engine compares the loan characteristics to the thousands of Wells Fargo-, GSE-, and federal agency-approved eligibility, documentation, and underwriting requirements to help determine if the transaction is within guidelines. It does not utilize artificial intelligence.

4.     The Risk Engine performs tasks using three general components: (a) business rules; (b) business services; and (c) data attributes.

5.     The Risk Engine's "business rules" are discrete pieces of objective, if-then logic that can answer business questions. They are based on the Wells Fargo-, GSE-, and federal agency-approved eligibility, documentation, and underwriting requirements. For example, Wells Fargo's credit policies set a minimum credit score of 700 for retail, non-conforming, fixed-rate, purchase loans up to $3,000,000. Accordingly, there is a business rule that checks whether that requirement is satisfied (if the customer is applying for that type of loan). As additional examples, there are business rules that implement maximum loan amounts, maximum debt-to-income ratio amounts, and the amount of cash reserves required for particular loan transactions. The Risk Engine currently executes tens of thousands of separately identifiable business rules.

6.      The Risk Engine's business rules are grouped into 16 different "business services" that are used in the loan origination process, including the Get Risk Decision business service, which is the largest business service within the Risk Engine and contains about 10,000 business rules. Get Risk Decision performs several functions within the Risk Engine.  It performs various calculations (e.g., loan-to-value ratio). It  determines when a proposed transaction should be sent to the GSEs' or federal agencies' automated underwriting systems (Fannie Mae's Desktop Underwriter ("DU"), Freddie Mac's Loan Product Advisor ("LP" or "LPA"), and HUD's TOTAL Scorecard) based on the type of product applied for, communicates with those systems, and receives their responses. Get Risk Decision also applies the existing credit policy and underwriting guidelines that are embedded within the Risk Engine, via the business rules, to the applicant's data (as reflected in CORE), which helps determine the applicant's loan eligibility.

7.      In addition, Get Risk Decision creates detailed messaging for underwriters and loan processors to view in CORE based on the business rules (e.g., "escrow for flood insurance is required" or "Mortgage lates are indicated on the credit report.  Loan is not eligible for conventional financing.").

8.      Other business services within the Risk Engine include (but are not limited to): (a) the "Get All in Price" business service, which prices the loan; (b) the "Preferred Product Offering" business service, which identifies loan products that may be appropriate for the customer and provides easy-to-understand information about the terms, conditions, and costs involved with the transaction so that the customer can make an informed decision about how to move forward; and (c) the "Qualified Mortgage" business service, which is designed to support compliance with the federal Dodd-Frank Act's "ability to repay" requirements.

9.      To perform its functions, the Risk Engine uses data stored in CORE, including data from the loan application and credit report. Although the Risk Engine and CORE are distinct technology applications, they do communicate with each other, and some of the outputs provided by the Risk Engine are displayed in CORE for use by the underwriter during the decisioning process.

10.     As stated above, CORE is not an underwriting system or an automated underwriting system. It does not underwrite or evaluate applications, make final lending decisions, or place applicants

into Credit Risk Classes.  Instead, CORE is the front-end tool that guides the "flow" of the loan origination process. Employees access CORE via computer using their unique log-in information. When a customer decides to move forward with an application, they can complete it online, or a Home Mortgage Consultant ("HMC") can complete the application on the customer's behalf in CORE, using information that is provided by the customer during a face-to-face or telephone interview. CORE contains data fields that correspond to the information that is requested on the paper loan application, also known as the "Form 1003." The images below accurately reflect some of the application data fields that are present in CORE:

**Image 1: Start Application**



**Image 2: Customer and Account Summaries**



DECLARATION OF JOHN R. KELLER
CASE No. 3:22-cv-00990-JD

Docusign Envelope ID: 79346279-F88D-481E-9585-D9250B2E8067

**Image 3: Property Details**



**Image 4: Credit Report**



11.     Data from the application fields, along with other data that is collected during the loan application process, are stored in CORE. CORE pushes the appropriate data and sends it to the requisite business service (e.g., Get All in Price, Preferred Product Offering, Qualified Mortgage, Get Risk Decision), where it is applied to applicable business rules and transformed into outputs, or "answers." Those outputs are sent to CORE for use during the underwriting process.

12.     An interactive workflow tool—like CORE—that stores customer data from loan applications, makes that data readily available for use throughout the loan origination process, and helps loan processors and underwriters ensure that they are completing all necessary steps of the loan origination process, is essential to the efficient and accurate processing of those applications.

13.     The Risk Engine cannot, and is not designed to, identify and evaluate all risk factors or perform every step in the loan origination process. Accordingly, underwriters are instructed that the Risk Engine never supersedes the judgment of the underwriter. Because underwriting is done by human underwriters, the Risk Engine does not eliminate the human component of mortgage lending.

14.     Nonetheless, the Risk Engine substantially aids the underwriter (and other Wells Fargo employees involved in the loan origination process) by eliminating the need to conduct certain necessary tasks manually, thereby eliminating the need to either (a) memorize the tens of thousands of business rules necessary to conduct those tasks or (b) separately consult applicable credit policies, pricing sheets, underwriting guidelines, and procedures for each loan application. This includes (1) the identification of loan products that might be appropriate for the customer; (2) pricing the loan; (3) calculating income, loan-to-value ratios, debt-to-income ratios, housing-to-income ratios; (4) identifying, from the thousands of eligibility, documentation, and underwriting requirements, the applicable credit policies and underwriting policies to help determine if the transaction is within guidelines; and (5) determining whether a refinancing transaction provides a financial benefit to the borrower.

I declare under penalty of perjury that the foregoing is true and correct.

*John Keller*

John R. Keller

7/24/2024

Executed on July ___, 2024

**DocuSign®**

## Certificate Of Completion

Envelope Id: 79346279F88D481E9E8FD9259D2E8067       Status: Completed
Subject: Complete with Docusign: CORE and Risk Engine Business Justification Declaration_(20115088)_(2).DOCX
Source Envelope:
Document Pages: 8      Signatures: 1      Envelope Originator:
Certificate Pages: 3      Initials: 0      Tina Mitchell
AutoNav: Enabled      420 Montgomery St.
EnvelopeId Stamping: Enabled      San Francisco, CA  94104
Time Zone: (UTC-08:00) Pacific Time (US & Canada)      Tina.M.Mitchell@wellsfargo.com
IP Address: 159.45.22.23

## Record Tracking

Status: Original      Holder: Tina Mitchell      Location: DocuSign
     7/24/2024 12:53:01 PM      Tina.M.Mitchell@wellsfargo.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| John Keller<br>john.r.keller@wellsfargo.com<br>Security Level: Email, Account Authentication<br>(None) | *John Keller*<br>41C67EB87AC04C9... | Sent: 7/24/2024 12:59:01 PM<br>Viewed: 7/24/2024 1:00:18 PM<br>Signed: 7/24/2024 1:01:08 PM |
| | Signature Adoption: Pre-selected Style<br>Using IP Address: 159.45.186.43 | |
| **Electronic Record and Signature Disclosure:**<br>   Accepted: 7/24/2024 1:00:18 PM<br>   ID: f36ec6bc-46dd-42d7-825e-56ae12d61962 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/24/2024 12:59:01 PM |
| Certified Delivered | Security Checked | 7/24/2024 1:00:18 PM |
| Signing Complete | Security Checked | 7/24/2024 1:01:08 PM |
| Completed | Security Checked | 7/24/2024 1:01:08 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

# Electronic Record and Signature Disclosure

**Last updated:** April 26, 2021

You are entitled by law to receive certain information "in writing." However, we may instead provide this information to you electronically with your prior consent. We also need your consent to use electronic signatures. In this consent (the "Consent"), "we," "us," "our," and "Wells Fargo" refer to Wells Fargo Bank, N.A. and any affiliate or subsidiary of Wells Fargo Bank, N.A. "You" and "your" refer to the person agreeing to this Consent.

1. **Scope.** In our sole discretion, we may provide to you, or you may sign, submit, or agree to at our request, certain documents, records, disclosures, notices, communications, agreements, fee schedules, statements, and other information in electronic form through the DocuSign system ("Electronic Records"). We may also use electronic signatures and obtain them from you through the DocuSign system ("Electronic Signatures"). You may receive emails related to the Electronic Records and Electronic Signatures. This Consent applies to any Electronic Records or Electronic Signatures in connection with the signing event on the DocuSign system associated with this Consent (the "Signing Event").

2. **Paper Copies.** We will not send you paper copies of any Electronic Records unless we, in our sole discretion, deem it appropriate to do so. If you desire a paper copy of an Electronic Record, you may: (a) download or print the Electronic Record after the Signing Event; or (b) contact the appropriate customer service unit and request a paper copy, for which we may charge you a fee unless prohibited by law. Any such fee will be disclosed at the time of request.

3. **Your Email Address.** To update your email address before completing the Signing Event: (a) if you arrived at the Signing Event through Wells Fargo Online® or a similar online system, follow the appropriate procedure for that system to update your email address; or (b) if you arrived at the Signing Event through a link in an email you received, please contact the Wells Fargo representative associated with that email.

4. **Withdrawal.** This Consent only applies to the Signing Event, and you will not be able to withdraw this Consent after you have completed the Signing Event. If you do not wish to agree to this Consent, you may decline to continue with the Signing Event.

5. **Software and Hardware Requirements.** To use Electronic Records and Electronic Signatures, you must meet the current minimum DocuSign system requirements, which can be found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements. In addition, you must have:
   - A web browser listed on the Wells Fargo Supported Browsers and Operating Systems page (https://www.wellsfargo.com/help/online-banking/browser-supported);
   - An Internet connection;
   - An active email account;
   - A currently supported version of a program that accurately displays PDF files;
   - A computer or other device and an operating system capable of supporting all of the above;
   - A printer, if you wish to print out paper copies of Electronic Records; and
   - Electronic storage, if you wish to retain Electronic Records in electronic form.

Please indicate you have read, understand, and agree to this Consent by selecting the checkbox next to "I agree to use electronic records and signatures" before clicking "CONTINUE" within the Signing Event.