1  ELLIS GEORGE LLP
   Dennis S. Ellis (State Bar No. 178196)
2    dellis@ellisgeorge.com
   2121 Avenue of the Stars, 30th Floor
3  Los Angeles, California 90067
   Telephone: (310) 274-7100
4  Facsimile: (310) 275-5697

5  *Interim Lead Class Counsel*

6

7

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10                                          Case No. 3:22-cv-00990-JD

11  *In re Wells Fargo Mortgage Discrimination*    Honorable James Donato
    *Litigation.*
12                                          **PLAINTIFFS' OPPOSITION TO WELLS**
                                            **FARGO'S MOTION FOR SUMMARY**
13                                          **JUDGMENT**

14                                          Date:  December 12, 2024
                                            Time: 10:00 a.m.
15                                          Courtroom:  11

16                                          [Declarations of Dennis S. Ellis with
                                            supporting evidence, Amanda Kurzendoerfer,
17                                          Dante Jackson, Aaron Braxton, and Elretha
                                            Perkins filed concurrently herewith]
18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

I.    STATEMENT OF ISSUES TO BE DECIDED....................................................................1

II.    PRELIMINARY STATEMENT .........................................................................................1

III.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND.....................................5

    A.    Wells Fargo's CORE/ECS Underwriting System is an Extension of its Discriminatory Business Practices that Have Adversely Affected Minorities. .................................................................................................................5

    B.    The COVID-19 Pandemic Exacerbated the Discriminatory Effects of Wells Fargo's CORE/ECS Underwriting System. .............................................................6

    C.    Wells Fargo Ignored Internal Concerns about its Approval Rates...........................8

    D.    Wells Fargo's Public Response to the Bloomberg Article Was Misleading..............9

    E.    Wells Fargo's Government Partners Questioned Its Policies and Motives. ............10

    F.    Wells Fargo's Data Reveals the Disparate Impact of its CORE/ECS Underwriting System.............................................................................................11

    G.    Wells Fargo's Discrimination was Intentional........................................................11

    H.    Wells Fargo's Failure to Provide Critical Discovery Should Not Be Ignored.........12

IV.    LEGAL STANDARD ........................................................................................................12

V.    WELLS FARGO'S MOTION SHOULD BE DENIED. ....................................................13

    A.    Plaintiffs Adduced Evidence to Support a Prima Facie Case of Discrimination. .......................................................................................................13

        1.    Plaintiffs adduced evidence of discriminatory policies................................13

        2.    At a minimum, there is a triable issue of fact on robust causation...............15

        3.    Wells Fargo has not adduced any evidence of a business justification. .................................................................................................16

        4.    Wells Fargo ignored equally effective and less discriminatory alternatives. ..................................................................................................19

    B.    Plaintiffs Have Established a Prima Facie Claim of Disparate Treatment..............20

    C.    Plaintiffs Have Established that the Damages Class Was Injured. ..........................21

    D.    Plaintiffs' Compensatory Damages and Pricing Claims Present Triable Issues. ......................................................................................................................22

1

**TABLE OF CONTENTS**
(Continued)

2

Page

3

E.    Plaintiffs are Entitled to Pursue Their UCL Claims.................................................22

4

VI.    OBJECTIONS TO EVIDENCE...........................................................................................25

5

VII.    CONCLUSION ...................................................................................................................25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO WELLS FARGO'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Anderson v. Apple Inc.*,
   500 F. Supp. 3d 993 (N.D. Cal. 2020) ....................................................................23

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..........................................................................................5, 12, 16

*Bazemore v. Friday*,
   478 U.S. 385 (1986) ....................................................................................................16

*Boyd v. City of Oakland*,
   458 F. Supp. 2d 1015 (N.D. Cal. 2006) ...................................................................25

*Brown v. Google LLC*,
   685 F. Supp. 3d 909 (N.D. Cal. 2023) .....................................................................23

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...........................................................................................12, 13

*Clark v. City of L.A.*,
   650 F.2d 1033 (9th Cir. 1981) ...................................................................................25

*Cnty. of Cook v. Bank of Am. Corp.*,
   2018 WL 1561725 (N.D. Ill. Mar. 30, 2018) ..........................................................14

*Cobb Cnty. v. Bank of Am. Corp.*,
   2020 WL 13200158 (N.D. Ga. Sept. 18, 2020) .......................................................14

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ......................................................................................................22

*Currie v. McDowell*,
   825 F.3d 603 (9th Cir. 2016) .......................................................................................2

*Diaz v. Am. Tel. & Tel.*,
   752 F.2d 1356 (9th Cir. 1985) .....................................................................................3

*Diaz v. Bank of Am. Home Loan Serv.*,
   2010 WL 5313417 (C.D. Cal. Dec. 16, 2010) ..........................................................24

*Elgindy v. AGA Serv. Co.*,
   2021 WL 1176535 (N.D. Cal. Mar. 29, 2021) .........................................................23

*Freeman v. Indochino Apparel, Inc.*,
   443 F. Supp. 3d 1107 (N.D. Cal. 2020) ...................................................................23

1

2

## <u>TABLE OF AUTHORITIES</u>
### (Continued)

<u>Page</u>

3

4

*Fulton Cnty. v. Wells Fargo & Co.*,
2022 WL 846903 (N.D. Ga. Mar. 22, 2022) ........................................................................14

5

*Gomez v. Quicken Loans, Inc.*,
629 F. App'x 799 (9th Cir. 2015).........................................................................................20

6

7

*Grace v. Apple, Inc.*,
2019 WL 3944988 (N.D. Cal. Aug. 21, 2019) ......................................................................22

8

9

*Green v. Mercy Hous., Inc.*,
2018 WL 6704185 (N.D. Cal. Dec. 20, 2018) ......................................................................24

10

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971) ..............................................................................................................2

11

12

*Guerrero v. Cal. Dep't of Corr. & Rehab.*,
2015 WL 13672467 (N.D. Cal. Apr. 16, 2015) ....................................................................19

13

*Haro v. Sebelius*,
747 F.3d 1099 (9th Cir. 2014)...............................................................................................13

14

15

*Harris v. Itzhaki*,
183 F.3d 1043 (9th Cir. 1999)...............................................................................................14

16

17

*Hazelwood Sch. Dist. v. U.S.*,
433 U.S. 299 (1977) ..............................................................................................................3

18

*Humboldt Baykeeper v. Union Pac. R.R. Co.*,
2010 WL 2179900 (N.D. Cal. May 27, 2010) ......................................................................25

19

20

*In re Toyota Motor Corp.*,
785 F. Supp. 2d 883 (C.D. Cal. 2011)...................................................................................24

21

22

*Int'l Bh'd of Teamsters v. U.S.*,
431 U.S. 324 (1977) ..............................................................................................................3

23

*Jones v. City of Faribault*,
2021 WL 1192466 (D. Minn. Feb. 18, 2021) ........................................................................2

24

25

*Lillge v. Verity*,
2007 WL 2900568 (N.D. Cal. Oct. 2, 2007).........................................................................24

26

27

*Lockwood v. Wolf Corp.*,
629 F.2d 603 (9th Cir. 1980).................................................................................................24

28

## <u>TABLE OF AUTHORITIES</u>
### (Continued)

**Page**

*Lyons v. England*,
  307 F.3d 1092 (9th Cir. 2002)..........................................................................20

*Minority Emps. at NASA (MEAN) v. Beggs*,
  723 F.2d 958 (D.C. Cir. 1983) ...........................................................................3

*Nat'l Fair Hous. All. v. Bank of Am., N.A.*,
  2023 WL 2633636 (D. Md. Mar. 24, 2023) ................................................15, 16, 22

*Nigro v. Sears, Roebuck & Co.*,
  784 F.3d 495 (9th Cir. 2015)..........................................................................13

*O'Neal v. City of New Albany*,
  293 F.3d 998 (7th Cir. 2002)..........................................................................14

*Pac. Shores Props., LLC v. City of Newport Beach*,
  730 F.3d 1142 (9th Cir. 2013).........................................................................20

*Peacock v. 21st Amend. Brewery Cafe, LLC*,
  2018 WL 452153 (N.D. Cal. Jan. 17, 2018) ..............................................................23

*Plaintiffs #1-21 v. Cnty. of Suffolk*,
  2021 WL 11629176 (E.D.N.Y. Aug. 5, 2021) .......................................................3, 20

*Renati v. Wal-Mart Stores, Inc.*,
  2019 WL 5536206 (N.D. Cal. Oct. 25, 2019) ............................................................14

*Riley v. Bd. of Trs.*,
  2015 WL 2198247 (N.D. Cal. May 11, 2015) ..........................................................20

*Rudebusch v. Hughes*,
  313 F.3d 506 (9th Cir. 2002)..........................................................................16

*Sarlo v. Wells Fargo Bank, N.A.*,
  175 F. Supp. 3d 412 (D.N.J. 2015) .....................................................................22

*SoCal Recovery, LLC v. City of Costa Mesa*,
  2023 WL 8263377 (C.D. Cal. Aug. 17, 2023) ..........................................................17

*Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*,
  17 F.4th 950 (9th Cir. 2021)........................................................... *passim*

*Sweat v. Miller Brewing Co.*,
  708 F.2d 655 (11th Cir. 1983)..........................................................................3

# TABLE OF AUTHORITIES
### (Continued)

**Page**

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
   576 U.S. 519 (2015) ...................................................................................13, 14, 15

*U.S. v. Figueroa-Lopez*,
   125 F.3d 1241 (9th Cir. 1997)..................................................................................25

*Wallis v. J.R. Simplot Co.*,
   26 F.3d 885 (9th Cir. 1994).....................................................................................15

*Wolph v. Acer Am. Corp.*,
   272 F.R.D. 477 (N.D. Cal. 2011) ............................................................................24

**STATE CASES**

*Day v. AT&T Corp.*,
   63 Cal. App. 4th 325 (1998).....................................................................................23

*Kwikset Corp. v. Super. Ct. (Benson)*,
   51 Cal. 4th 310 (2011).............................................................................................23

**FEDERAL STATUTES**

15 U.S.C. § 1691 ...........................................................................................1, 13, 20

15 U.S.C. § 1691e ...................................................................................................22

42 U.S.C. § 1981 ........................................................................................................1

42 U.S.C. § 1981a ...................................................................................................22

42 U.S.C. § 3601 ...........................................................................................1, 13, 14, 24

42 U.S.C. § 3613(c)(1) ............................................................................................22

**STATE STATUTES**

Cal. Bus. & Prof. Code § 17200........................................................................ *passim*

Cal. Bus. & Prof. Code § 17204.............................................................................23

Cal. Civ. Code. § 51 .....................................................................................1, 14, 20

**RULES**

Fed. R. Civ. P. 8(b)(3)............................................................................................24

Fed. R. Civ. P. 23(b)(2).................................................................................5, 22, 23

1

## <u>TABLE OF AUTHORITIES</u>
### (Continued)

2
<u>**Page**</u>

3    Fed. R. Civ. P. 23(b)(3) ....................................................................................................1, 5, 21, 23

4    Fed. R. Civ. P. 33(d).....................................................................................................................12, 17

5    Fed. R. Civ. P. 37(c) .............................................................................................................................18

6    Fed. R. Civ. P. 56(a).............................................................................................................................12

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. STATEMENT OF ISSUES TO BE DECIDED

Whether Wells Fargo Bank, N.A. ("Wells Fargo") has successfully adduced evidence or identified the absence of evidence to establish that there are no triable issues of material fact with respect to Plaintiffs' claims.

## II. PRELIMINARY STATEMENT

Plaintiffs have adduced ***undisputed facts*** in support of their claims for violation of the Equal Credit Opportunity Act ("ECOA"), the Fair Housing Act ("FHA"), 42 U.S.C. § 1981, California's Unruh Civil Rights Act, and California's Unfair Competition Law ("UCL"), which, ***at a minimum***, entitle them to present this case to a jury:

1. Wells Fargo was an "outlier" in the mortgage industry for denials of Minority Applicants during the relevant period; even after making certain "never before" self-serving adjustments having an "adjusted denial rate [that was] twice that of the industry." (Declaration of Dennis S. Ellis ("Ellis Decl."), Ex. 26, pp. 77; Ex. L, p. 1204; Ex. M, p. 1209-10.)[1]

2. Wells Fargo's approval disparities fell below its acceptable standards beginning in 2020, finding adverse impact ratios ("AIRs") below .90 for protected classes, after controlling for key underwriting variables. (*Id.*, Ex. WF-00030816, pp. 859-72; Ex. 23, pp. 22-59.)

3. Plaintiffs' expert, Dr. Kurzendoerfer, determined that after controlling for key underwriting factors, an approval disparity exists between Wells Fargo's similarly situated White loan applicants and Plaintiffs proposed Rule 23(b)(3) damages classes of 119,100 Minority Applicants who were approved by an external automated underwriting ("AUS") system or Wells Fargo's Enhanced Credit Scoring ("ECS") model and yet still denied. (Declaration of Dr. Amanda Kurzendoerfer (" Kurzendoerfer Decl."), Ex. A ¶¶ 46-52.)

4. Wells Fargo's "business justification" for its reliance on its own unique ECS model, is a six-page document from 2019 that failed to consider alternative models, compare the ECS model to any other alternative credit scoring model other than FICO, and was prepared before the onset of the pandemic that undisputedly impacted its effectiveness. (Ellis Decl., Ex. WF-03748177, pp. 966-72.)

5. Wells Fargo intentionally employed policies that adversely affected Minority Applicants by, *inter alia*, (1) continuing to use its CORE/ECS underwriting system to process every loan despite knowing that compressing the ECS range of scores from 76-333 to an output of just four categories (A1, A2, C1 and C2) was disproportionately adversely affecting minorities; (2) using policies that led to "disparate treatment within the reconsideration of value (ROV) process"; (3) prioritizing loan programs for affluent customers; (4) circumventing otherwise statistically significant approval rate disparities based on its internal policy of only recognizing an AIR of .90 or greater; and (5) discontinuing manual underwriting of C1 and C2 loan files when it knew Minority Applicants were disproportionally arranged to "bad"

---

[1] "p." refers to the supporting evidence page consecutively numbered as part of the Ellis Decl.

Credit Risk Classes ("CRCs").  (*Id.*, Ex. 49, pp. 206-23; Kurzendoerfer Decl., Ex. A ¶ 60.)

Wells Fargo's reliance on its CORE/ECS underwriting system is an extension of its policies that disproportionately affected its Minority Applicants.  The evidence shows that Wells Fargo did not just "freeze" the status quo of past discriminatory practices, it actively perpetuated those racially and ethnically biased policies for, at least, the past 20 years.  *Griggs v. Duke Power Co.*, 401 U.S. 424, 430 (1971).  Prior to the issues in this case, Wells Fargo was fined $2 billion for its role in the subprime mortgage lending crisis, $3 billion for the 3.5 million fake accounts scandal, and ordered to pay $3.7 billion dollars in restitution and fines by the Consumer Financial Protection Bureau ("CFPB") for legal violations across several of its largest product lines, each of which was targeted towards and/or disproportionally affected racial and ethnic minorities.  The Court can and should consider Wells Fargo's history and culture of discrimination.  *Currie v. McDowell*, 825 F.3d 603, 607-08 (9th Cir. 2016) (noting that it is appropriate to consider "prior history . . . for purposes of determining whether there was a prima facie case of racial discrimination").  Where, as here, Wells Fargo's discriminatory policies "intersect[] with a pre-existing, known racial disparity in a way that creates a similar racial disparity," then it is possible that its policy indeed created the current disparity.  *Jones v. City of Faribault*, 2021 WL 1192466, at *19 (D. Minn. Feb. 18, 2021).

Wells Fargo continued to rely on its CORE/ECS underwriting system, even after its ECS model "went crazy," deteriorated, and was placed in a Yellow (Watch) category for its failure to distinguish between "good" and "bad" loan applicants.  (Ellis Decl., Ex. 54, pp. 224-305; Ex. K, p. 1192; Ex. 48, p. 195.)  Incredibly, although Wells Fargo's business justification document is silent on alternative scoring models the record does contain evidence that Wells Fargo tested alternative credit scoring models that eliminated these disparities and were still capable of producing successful credit risk rating results, but it not only declined to deploy them, it buried the evidence of their existence.  (*Id.*, Ex. 20, pp. 11-21; WF-00142657, pp. 873-87.)  Wells Fargo to this day processes every loan through its CORE/ECS system.

Wells Fargo's purported business justification for its continued reliance on its ECS model is a lone six-page document from *2019*, which claims that the ECS model was able to capture "approximately 46.8% of the Bads, while decision FICO was only able to capture approximately

38.0 percent of the Bads…." (*Id.*, Ex. WF-03748177, p. 970.)  But this 2019 business justification cannot survive a post-COVID world where Wells Fargo's documents show that its ECS model began to cause disparate impact in 2020.  (*Id.*, Ex. 49, pp. 206-23.)  Yet, the only other business justification document, **which Wells Fargo did not rely on during discovery**, is a September 2022, document that cuts and pastes the same 106-word paragraph from its 2019 business justification.[2]

Wells Fargo makes light of Plaintiffs' statistical analysis, as it cannot and does not dispute its accuracy, claiming it should be ignored and merely reflects the "widespread and well-known credit gaps flowing from our country's historical inequities." (ECF No. 272 at 1.)  However, despite its perhaps more familiar use to show disparate impact, statistical analysis can also be used to prove disparate treatment claims.  *Int'l Bh'd of Teamsters v. U.S.*, 431 U.S. 324, 336 (1977) ("*Teamsters*"); *Hazelwood Sch. Dist. v. U.S.*, 433 U.S. 299, 307-08 (1977).  And a disparate treatment plaintiff may rely on statistics to rebut explanatory defenses as pretextual.  *See*, *e.g.*, *Minority Emps. at NASA (MEAN) v. Beggs*, 723 F.2d 958, 962 (D.C. Cir. 1983); *Sweat v. Miller Brewing Co.*, 708 F.2d 655, 658 (11th Cir. 1983); *Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1362 (9th Cir. 1985).  Make no mistake, Plaintiffs follow *Teamsters* to certify a class of creditworthy Minority Applicants who were improperly denied home loans at a disproportionally higher rate compared to similarly situated White applicants.  However, Plaintiffs have also adduced evidence of intentional discrimination and seek punitive damages based on Wells Fargo willfully maintaining its discriminatory policies, *Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 11629176, at *5-6 (E.D.N.Y. Aug. 5, 2021), and its active and intentional discrimination against Minority Applicants.  Through both statistics (Kurzendoerfer Decl., Ex. A ¶¶ 47-50) and expert analysis (*id.* ¶ 45), Plaintiffs establish that Wells Fargo favored and approved its White applicants over its Minority Applicants.  (Ellis Decl., Ex. 96, pp. 327-36; Ex. M, pp. 1214-24; Ex. L, p. 1202-04).[3]

---

[2] Although undated and not relied upon by Wells Fargo in discovery, (*id.*, Ex. WF-00632434, p. 947), its expert identifies this document as its 2022 business justification, (*id.*, Ex. 708, p. 679).

[3] Plaintiffs' statistical analysis is sufficient to demonstrate disparate impact and is more reliable than the file-by-file review prepared by Wells Fargo, which it performed incorrectly.  Regulators require a lender to compare marginal files that have been approved with other marginal files that have been denied, just as Dr. Courchane agreed was proper (*id.*, Ex. 706, p. 1392; Ex. 708, pp. 665-68), but Wells Fargo only looked at "extreme" cases, (*id.*, Ex. O, pp. 1268-72).

While the CORE/ECS underwriting system is the lynchpin of Plaintiffs' case, it is not the only policy challenged as Wells Fargo had multiple policies that knowingly favored White applicants over Minority Applicants. (*Id.*, Ex. 49, pp. 206-23; Ex. 261, pp. 362-75; Ex. 686, pp. 610-36.) Wells Fargo engaged in the centuries-old practice of redlining—even when it knew and acknowledged that using property location to underwrite loans created such a risk. (*Id.*, Ex. 20, pp. 11-21; WF-03837493, pp. 973-84.) Plaintiffs' expert found that when a regression analysis is performed against approval rates, property location is a statistically significant driver of approval rate disparities based on census tract data. (Kurzendoerfer Decl., Ex. A ¶ 82.) Wells Fargo admits that it utilized discriminatory policies in its reconsideration of value process that led to the "disparate treatment" of minorities. And its decision to stop manually underwriting C1 and C2 loan applications disproportionately affected minorities who were more likely to be assigned those credit risk ratings than similarly situated White Applicants. (*Id.*, Ex. B ¶¶ 25-27; Ellis Decl., Ex. 49, pp. 206-23; Ex. 686, p. 613.) Further, even government authorities criticized Wells Fargo's policy of not providing other loan products that would assist minorities and concluded, just as its employees said in internal emails, that Wells Fargo prioritized loan programs for affluent customers over those that needed them most. (Ellis Decl., Ex. K, p. 1179-80; Ex. 686, pp. 610-36, Ex. 49, pp. 206-23.) Plaintiffs' expert also found that Wells Fargo's mortgage loan pricing shows statistically significant differences in interest rates for Black, Hispanic, and Asian borrowers compared to White borrowers, which, after controlling for credit risk factors, reveals differences that span 1.3-6.8 basis points. (Kurzendoerfer Decl., Ex. B ¶ 17.)

Wells Fargo ties itself in knots trying to justify its "outlier" denial rates and discriminatory policies, but it cannot, just like it could not answer the question of its head of mortgage lending as to why it was not approving loans for Minority Applicants seeking to reduce monthly payments during the historically low interest rate period. (Ellis Decl., Ex. 96, pp. 327-35; Ex. 657, p. 401.) Plaintiffs dispute Wells Fargo's account of their loan processes, as does their expert who, unlike Wells Fargo's expert, is qualified to review and underwrite loan files and is not doing it for the very first time here. (*Compare id.*, Ex. 708, pp. 749-61; *with* Declaration of Dante Jackson ("Jackson Decl.") ¶ 1.) Wells Fargo's cannot supplant its expert's challenged opinions with those of its head

1  of underwriting.  *Cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).

2  **III.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**
3      **A.    Wells Fargo's CORE/ECS Underwriting System is an Extension of its Discriminatory Business Practices that Have Adversely Affected Minorities.**

4      Wells Fargo's legal woes are well documented and too numerous to list here.  Of particular

5  relevance to this case is that during the 2007 subprime mortgage crisis, Wells Fargo admitted that it

6  developed strategies and marketing materials aimed at identifying Black and Hispanic borrowers as

7  subprime lending marks.  (*See* Ellis Decl. Ex. C, pp. 1084-1105.)  It was its practice "to target

8  African Americans for subprime loans" because "[i]t was generally assumed that African-American

9  customers were less sophisticated and intelligent and could be manipulated more easily into a

10  subprime loan with more expensive terms than white customers."  (*Id.*, Ex. D, pp. 1106-27.)  The

11  United States government fined Wells Fargo over $2 billion for its role in the crisis.  (*Id.*, Ex. E, pp.

12  1128-33.)  Between 2009 and 2016, Wells Fargo utilized an internal program to incentivize its

13  employees to open as many bank accounts as possible to meet sales quotas.  (*Id.*, Ex. F, pp. 1134-

14  40.)  As a result, Wells Fargo employees secretly opened as many as 3.5 million fraudulent customer

15  accounts in order to qualify for bonuses.  (*Id.*)  More recently, in late 2022, the CFPB ordered Wells

16  Fargo to pay $3.7 billion in restitution and fines as a result of its deceptive practices related to its

17  loan products, including mortgages.  (*Id.*, Ex. H, pp. 1146-51.)  As a result of its many prior bad

18  acts, the asset cap placed on Wells Fargo by the Federal Reserve remains, and Wells Fargo's current

19  CEO, who inherited these problems, acknowledges he does not expect to see any lifting thereof in

20  the near future.  (*Id.*, Ex. U, pp. 1360-64.)

21      Despite its promises to discontinue such practices, and its pledge to stamp out discrimination

22  and take steps to increase homeownership for minorities, in 2018, Wells Fargo knew its CORE/ECS

23  underwriting system, the policies embedded therein, and its practices were adversely impacting

24  certain protected classes in "practically significant ways."  (*Id.*, Ex. 18, pp. 1-10; WF-00030816, pp.

25  859-72; Ex. 23, pp. 22-59.)  Wells Fargo's quarterly fair lending reviews showed abysmal AIRs

26  consistently through the Class Period.  (*Id.*, Ex. 20, pp. 11-21, Ex. 23, pp. 22-59, Ex. 49, pp. 206-

27  23.)  Then, Wells Fargo adopted a policy moving away from individual underwriters making

determinations.  (Ellis Decl., Ex. WF-00030816, pp. 859-72; Ex. 23, pp. 22-59.)  It chose to rely on the controls of its CORE/ECS underwriting system.  (*Id.*)  During the Class Period, Wells Fargo claims it relied on its ECS model only to approve applications for conforming loans that would otherwise be denied.  (*Id.*, Ex. J, p. 1168.).  This purported "beneficial" use of the ECS model disproportionately helped White applicants, but not minorities, and ended when Fannie Mae terminated the program under which it purchased loans on the basis of an ECS approval.  (*Id.*)  Yet, Wells Fargo continued to use its CORE/ECS system as part of its decisioning process for conforming and non-conforming loans, to separate those that allegedly posed a credit risk, despite this alleged prior benefit no longer even being available.  (*Id.*, Ex. K, pp. 1177-78.)

### B.    The COVID-19 Pandemic Exacerbated the Discriminatory Effects of Wells Fargo's CORE/ECS Underwriting System.

In its January 11, 2023, annual review of its ECS model, Wells Fargo reported that the ECS model's performance had been placed in a "Yellow (Watch)" status since at least Q2 of 2020, because of the "expect[ed] volatility in model inputs and model performance during the COVID-19 outbreak and lingering impacts thereafter due to any economic changes."  (Ellis Decl., Ex. 54, p. 235; Ex. K, p. 1188-89.)  And it remained under "Yellow (Watch)" status at least through 2023 "considering the vastly different economic environment today due to COVID-19 as compared to the model development data periods."  (*Id.*, Ex. 54, p. 235.)  Unpacking how Wells Fargo handled its ECS model's deterioration reveals its willful maintenance of a known discriminatory policy:

- After the first lawsuit in this consolidated action was filed, on ***February 25, 2022***, Wells Fargo's Fair Lending Model Development team ("FLMD"), a group within Wells Fargo's Risk Management Group ("RMG") and Fair Lending Analytics ("FLA") analyzed data from 2020 and "determined that disparities existed in various classes in the ECS Conventional model." (*Id.*, Ex. 686, p. 613.)  The FLMD had modelled four alternatives to its ECS, finding three of them that reduced disparities after removing race proxies.  (*Id.*)  In its "***next step***," FLMD and FLA requested that "[b]usiness model owners [] provide justification for implementation of [the ECS] model."  (*Id.*)

- On ***March 3, 2022***, the FLMD and FLA again "determined that disparities existed in various classes in the ECS conventional model," but seemingly tried to make the task easier by failing to identify race proxies.  (*Id.*, Ex. WF-00142688, p. 891.)  In its "***next step***," FLA merely "request[ed] the business to provide evidence of prior alternative analysis utilized to arrive at the final set of model variables."  (*Id.*, Ex. 686, p. 613.)

- On ***March 24, 2022***, the FLMD and FLA again "identified disparate impact for various protected classes."  (*Id.*, Ex. 49, p. 208)  The FLMD and FLA had determined that the

"[l]ikely drivers of the disparities with the most potential to affect practically significant results" were "Average months in file," "Recent inquiries," and "Major derogatories."  (*Id.*)  As a "***next step***" Wells Fargo stated:

Due to the disparate impact identified in the ECS Score, FLA/RMG will work with the business on an alternatives analysis to determine if there are less disparate variables that could be used in the ECS scoring model that do not impact model predictiveness.  In doing so, the business will be able to show the quantitative support/business justification if no alternatives are viable.  (*Id.*)

- On ***August 11, 2022***, the FLMD and FLA reported the following:



(*Id.*, Ex. 412, p. 378.)  Wells Fargo thus recognized the need to dive deeper into its own statistical analyses to determine whether the ECS model was able to accurately forecast applicants' "life of loan default rates or losses."  (*Id.*)

- On ***October 31, 2022***, Wells Fargo's RMG and FLA claim they received an alleged business justification for its ECS model on ***September 22, 2022***, and attempted to create alternative models, which it rejected.  (*Id.*, Ex. WF-00143317, pp. 906-21.)  Wells Fargo had thus abandoned the "next steps" its FLA department identified.  (*See id.*, Ex. 412, pp. 376-93.)  Hence, after identifying precisely what it needed to do to resolve the model's disparate impact, Wells Fargo failed to show "quantitative support" or any analysis "*commensurate with the material level of potential disproportionate impact* that remains," for its analysis of "loan default rates or losses" to support any business justification.  (*See id.*, Ex. 49, p. 208; Ex. 412, p. 378 (emphasis in original)).  To be clear, Wells Fargo never determined the root cause for the ECS model's failures.  (*Id.*, Ex. 665, p. 481.)

Presumably due to the lack of clarity as to exactly what FLMD and FLA did to justify Wells Fargo's continued use of its ECS model ***after the filing*** of the consolidated lawsuits, during discovery Wells Fargo took a step backwards and identified a single document from ***November 1, 2019***, that states that its application of the ECS model is justified because it was able to capture "approximately 46.8% of the Bads, while decision FICO was only able to capture approximately 38.0 percent of the Bads…."  (*Id.*, Ex. WF-03748177, p. 970.)  But a business justification from

2019 cannot survive the "volatility in model inputs and model performance during the COVID-19 outbreak and lingering impacts thereafter due to any economic changes." (*Id.*, Ex. 54, p. 235; Ex. K, p. 1189.)  Wells Fargo knew that the ECS model had lost its ability to distinguish between good and bad loan applicants.  (*Id.*, Ex. K, p. 1192.)  Yet, Wells Fargo's September 22, 2022, business justification, if it exists, is a word-for-word copy of the same 106-word business justification from November 2019.  (*Compare id.*, Ex. WF-03748177, pp. 968-69, *with* Ex. WF-00632434, p. 950.)

### C.    Wells Fargo Ignored Internal Concerns about its Approval Rates.

On October 5, 2021, Wells Fargo's executive vice president and head of risk modelling Agus Sudjianto was a guest on the FinRegLab podcast discussing interpretable machine learning models and their significance in the financial sector.  (Ellis Decl., Ex. 48, pp. 188-205.)  When asked what Mr. Sudjianto takes into consideration for an explainable model to fit a particular use, he responded that it is "fundamental [to] choose a framework, choose model framework that you know how the model will fail." (*Id.*, Ex. 48, p. 195.)  Mr. Sudjianto elaborated that Wells Fargo was "in the middle of this.  We are still in the COVID situation.  When the COVID hit, model went crazy.  It didn't do what we expect them to do because the data the model face off is not what the model was trained." (*Id.*)  When asked about this during his deposition, Mr. Sudjianto testified that he was talking about the "[l]oss forecasting and stress testing," not about the ECS model.  (*Id.*, Ex. K, pp. 1181-84.)  The record evidence, construed in favor of Plaintiffs as non-movants, belies this statement; he was in fact discussing the ECS model.  Regardless, Mr. Sudjianto never discussed reviewing the ECS model even knowing that its loss forecasting and stress testing was compromised.

In any event, shortly after Mr. Sudjianto's public admission about "a" Wells Fargo model going "crazy," Bloomberg notified Wells Fargo in December 2021 of its planned article on the outsized racial disparities in Wells Fargo's 2020 refinancing approval rates and shared its statistical findings based on publicly available data.  (*Id.*, Ex. 87, pp. 321-26; Ex. M, pp. 1212-13.)  Wells Fargo provided this information to its Business Insights & Analytics ("BIA") team, supervised by Saba Dossani, who confirmed that Bloomberg's statistical findings were accurate, which is why the article reported that Wells Fargo "didn't dispute Bloomberg's statistical findings" nor the methodology which was validated by its own internal data.  (*Id.*, Ex. 55, p. 308.)  Members of the

BIA team testified that before Bloomberg published the article, leadership was simply not "paying attention" to the fact that Wells Fargo was a stark outlier in denial and withdrawal rates. (*Id.*, Ex. L, pp. 1202-04.) Debbie Knutson-Smith, one of Ms. Dossani's direct reports on the BIA team and head of the bank's "Diverse Insights & Analytics," and Ms. Dossani "shared that viewpoint that [Wells Fargo's] leadership had not done enough to be prepared to deal with the reporting by Bloomberg of Wells Fargo's approval and denial rates." (*Id.*, Ex. M, p. 1219.) Mses. Dossani and Knutson-Smith told Kristy Fercho, then Wells Fargo's head of home lending, that Wells Fargo was not "helping customers at the same rate across race." (*Id.*, p. 1223.) To the question of whether this was the reality, Ms. Knutson-Smith responded to Ms. Dossani, "it is." (*Id.*, pp. 1223-24.)

Two days after the Bloomberg publication, another member of the BIA team, Tim Seagren, decided that he would "embrace candor." (*Id.*, Ex. 96, p. 331.) He confirmed that the BIA team had been "raising [their] hand" on this issue for a while but that they "all continue[d] to ignore [it]." (*Id.*) He acknowledged that Bloomberg's statistical findings were not the result of COVID-related disruptions. (*Id.*) Rather, statistical findings reflected a "long-term systemic issue at WF." (*Id.*, p. 333.) When Wells Fargo "only prioritize[s] nonconforming loans and the most affluent/profitable customers . . . [it] shouldn't be overly surprised by [its] results." (*Id.*, p. 332.) Unlike Ms. Knutson-Smith, Mr. Seagren was suddenly forgetful during his deposition, acknowledging that he needed to put the security of his family first. (*Id.*, Ex. Q, pp. 1300-02.)

### D. <u>Wells Fargo's Public Response to the Bloomberg Article Was Misleading.</u>

Following Bloomberg's reporting, Wells Fargo decided to advance the specious narrative that it originates more loans to Black Americans than any other bank lender. It did so knowing that publicly available data demonstrated it did not outpace mortgage companies like Rocket Mortgage and Loan Depot. (Ellis Decl. ¶¶ 2-3.) Wells Fargo proceeded to craft a "denial rate story" to counter the public condemnation resulting from the publication of the article. (*Id.*, Ex. 96, pp. 327-37; Ex. M, p. 1218.) Ms. Knutson-Smith testified that in the days leading up to the publication of the article, Wells Fargo overhauled its long-established analytics used to calculate approvals and denials. This new "methodology" was intended to hide the very clear disparities in approval rates that the bank

had intentionally ignored.  Prior to the Bloomberg article, such calculations to adjust for its disparities had never been done.  (*Id.*, Ex. M, pp. 1209-10.)

Wells Fargo then claimed publicly that the lending decisions it observed for refinances in 2020 "were consistent across racial and ethnic groups," and any racial disparities were the result of variables Wells Fargo does not control including credit scores.  (*Id.*, Ex. 55, pp. 306-20.)  First, Wells Fargo knew there was no consistency, having found statistically and practically significant AIRs prior to the Bloomberg Article.  (*Id.*, Ex. R, p. 1310.)  Second, Wells Fargo seemingly attempted to blame any disparities on FICO scores, knowing full well it was relying on its own ECS model for many of its underwriting decisions, and exclusively for its refinancing products that were the subject of the Bloomberg article.  (*Id.*, pp. 1308-09.)  Wells Fargo went even further, claiming that it was on pace to meet or exceed its commitment to increase Black homeownership by 250,000 homes by 2027, knowing full well it was not.  (*Id.*, Ex. P, p. 1295; Ex. M, pp. 1215-16.)  Ms. Knutson-Smith acknowledged that the bank and its senior leadership failed to provide legitimate and credible responses to the article's assertions when it was released, and that she has never heard of any legitimate justification for its appalling denial rates even now.  (*Id.*, Ex. M, pp. 1220-21.)

**E.      Wells Fargo's Government Partners Questioned Its Policies and Motives.**

Wells Fargo's "denial rate story" made its way to Wells Fargo's government partners.  Wells Fargo repackaged the same lies it told Bloomberg and gave them to its two top Black executives in its mortgage lending business, Kristy Fercho and Chuck Bishop, and had them visit the Federal Housing Finance Agency ("FHFA"), the Department of Housing and Urban Development ("HUD"), walk the halls of Congress, and meet with just about any Black leader who would give them time.  Ms. Fercho and Mr. Bishop perpetuated Wells Fargo's false claims that Bloomberg's analysis was incomplete or faulty.  (*Id.*, Ex. WF-04942195, pp. 985-94.)  But, as HUD Director Fudge told Wells Fargo, "perception is reality" and "unfortunately Wells Fargo has a history."  (*Id.*, Ex. WF-04942200, p. 991.)  FHFA Director Thompson also noted that despite the fact that the GSEs had launched products to accommodate higher debt-to-income ("DTIs"), loan-to-value ("LTVs"), etc. to drive more minority refinancing, ***as a matter of policy***, Wells Fargo declined to offer those products.  (*Id.*)  Wells Fargo's BIA department concluded that the bank was not helping its

customers equally across racial and ethnic lines.  (*Id.*, Ex. 97, pp. 338-56; Ex. 98, pp. 357-61.)

### F.    Wells Fargo's Data Reveals the Disparate Impact of its CORE/ECS Underwriting System.

Dr. Kurzendoerfer ran regression models using appropriate controls to assess whether there are differences by race and ethnicity in Wells Fargo's approval of home loan applications processed through its proprietary CORE/ECS underwriting system.  (Kurzendoerfer Decl., Ex. A ¶ 73.)  This revealed statistically significant results throughout her review—across loan products and racial and ethnic lines.  (*Id.*)  She found that conditional on being assigned to a given credit risk class, Minority Applicants have lower approval rates compared to White applicants at Wells Fargo.  (*Id.* ¶¶ 47, 48.)  Thus, approval rates are lower for Minority Applicants as they are assigned to lower credit risk classes than White applicants even within the same FICO bins, DTIs, and LTVs, etc.[4]  Initially, Dr. Kurzendoerfer did not add the ECS CRC as a control in her regression model because the purpose of her regression analysis was to determine whether Wells Fargo's approval rate disparities could be explained by key, legitimate underwriting factors.  (*Id.* ¶¶ 2-4.)  Given Wells Fargo made this an issue, Dr. Kurzendoerfer added the ECS CRC as a control in her regression model and it had an impact on the marginal effects across Minority Applicants accounting for up to 21.7% of the otherwise unexplained disparities.  (*Id.* ¶ 5.)  This finding is consistent with the effect of ECS credit factors that Dr. Courchane included in her rebuttal, which accounted for up to 19.3% of the otherwise unexplained disparities she observed.  (Ellis Decl., Ex. 709, pp. 845-49.)

### G.    Wells Fargo's Discrimination was Intentional.

The CORE/ECS credit risk class rankings functioned as a gold star or scarlet letter for each loan applicant.  Loan officers and loan underwriters treated the applicants differently based on these rankings.  When an applicant was placed into a lower credit risk ranking relative to other loan applicants, the applicant receives higher levels of underwriting review, and their underwriters received a warning message related to their rankings.  (Ellis Decl., Ex. 45, pp. 83-187.)  To

---

[4] Depending on loan group, Minority Applicants experience statistically significant conditional approval rate differences compared to White applicants as follow: 3.3 to 4.3 percentage points for Black applicants; 2.9 to 6.7 percentage points for Hispanic applicants; 0.4 to 6.3 percentage points for Asian applicants; and 3.1 to 5.9 percentage points for Other applicants.  (*Id.*, Ex. A ¶ 88.)

circumvent what would otherwise be considered a statistically significant approval rate, Wells Fargo implemented an internal policy that an AIR of .90 or greater is not considered "practically significant." (*Id.*, Ex. WF-00030816, pp. 859-72; Ex. 23, pp. 22-59.)  Wells Fargo then instituted a policy discontinuing manual underwriting for C1 and C2 applicants, resulting in more minorities being denied where they may have otherwise been approved through manual underwriting. (Kurzendoerfer Decl., Ex. B ¶¶ 25-26.)  Wells Fargo also maintained a policy of using market classification (ECF No. 204-5, Ex. 16, pp. 250-51, 372), and property location was a driver of its approval rate disparities.  (Kurzendoerfer Decl., Ex. A ¶¶ 10, 82.)  And Wells Fargo's BIA team observed that it lacked the loan offerings that would best help minority home ownership, yet chose not to make any changes.  (Ellis Decl., Ex. Q, pp. 1300-02.)

### H.    Wells Fargo's Failure to Provide Critical Discovery Should Not Be Ignored.

During discovery, Plaintiffs served five different interrogatories requesting Wells Fargo's legitimate business justifications for its use of CORE and ECS, among other things.  (Ellis Decl., Ex. B, pp. 1074-76.)  Wells Fargo provided a single document under Rule 33(d) in response thereto. (*Id.*, Ex. WF-03748177, pp. 966-72.)  Accordingly, Wells Fargo cannot now seek to change its answer or supply new information to justify its CORE/ECS underwriting system.

### IV.    LEGAL STANDARD

"The court shall grant summary judgment only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248.  Material facts are those facts that could affect the outcome of the case under the relevant law.  *Id.*  Whether a genuine dispute regarding a material fact exists, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."  *Id.* at 255.  The movant must demonstrate "an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The moving party always bears the initial burden of demonstrating an absence of a genuine issue of material fact.  *See id.* at 324.  "The district court can disregard a self-serving declaration that states only conclusions and not facts that would be

admissible evidence." *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).  In a class action where a class has been certified, judgment or dismissal against a named plaintiff, specifically, does not affect the certified class.  *Haro v. Sebelius*, 747 F.3d 1099, 1110 (9th Cir. 2014).

## V.    WELLS FARGO'S MOTION SHOULD BE DENIED.

### A.    Plaintiffs Adduced Evidence to Support a Prima Facie Case of Discrimination.

The parties agree that Plaintiffs' claims under ECOA, the FHA, or the UCL to the extent they rely on a disparate impact theory are subject to a three-step burden-shifting framework.  *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539-40 (2015) ("*Inclusive Communities*").  "For a plaintiff to make out a prima facie case of disparate impact, he [or she] must demonstrate: (1) the existence of a policy, not a one-time decision, that is outwardly neutral; (2) a significant, adverse, and disproportionate effect on a protected class; and (3) robust causality that shows, beyond mere evidence of a statistical disparity, that the challenged policy, and not some other factor or policy, caused the disproportionate effect."  *Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 962 (9th Cir. 2021) (cleaned up).  "If the plaintiff is able to establish a prima facie case, 'the burden shifts to the defendant to either rebut the facts underpinning the prima facie case or to demonstrate a legally sufficient, nondiscriminatory reason for the practices causing the disparate impact.'"  *Id.* at 960-61 (cleaned up).  If the defendant satisfies this burden, then "the burden shifts back to the plaintiff to show the availability of an alternative practice that has less discriminatory impact yet is still equally effective in serving the defendant's legitimate goals."  *Id.* at 961.  Here, there is no dispute that the evidence reveals that Wells Fargo's CORE/ECS underwriting system had a significant, adverse, and disproportionate effect on a protected class.  (Ellis Decl., Ex. 49, pp. 206-23; Kurzendoerfer Decl., Ex. A ¶ 60.)

### 1.    Plaintiffs adduced evidence of discriminatory policies.

Wells Fargo's ECS model is such a complete and utter failure that it does not even attempt to rescue it in its Motion.  Instead, Wells Fargo argues that Plaintiffs may not point to more than one of its policies that is the cause of the discrimination.  (ECF No. 272 at 10.)  Not so.  The plaintiff must identify an "outwardly neutral policy" that "is not a one-time decision" and that "does not

explicitly treat customers differently based on their membership in any recognized protected class" but otherwise has a disproportionate effect on a recognized protected class. *Sw. Fair Hous.*, 17 F.4th at 962-64. Essentially, the plaintiff may point to "***policies*** causing disparate impact." *Inclusive Cmtys.*, 576 U.S. at 542 (emphasis added); *Cnty. of Cook v. Bank of Am. Corp.*, 2018 WL 1561725, at *9 (N.D. Ill. Mar. 30, 2018) ("[D]efendants offer no authority to suggest that the 'specific' practice challenged in a disparate-impact claim must be limited to a single component"); *Fulton Cnty. v. Wells Fargo & Co.*, 2022 WL 846903, at *14 (N.D. Ga. Mar. 22, 2022) ("*Inclusive Communities* also does not bar Plaintiffs from relying on a collective set of practices when asserting a sufficient specific policy."); *Cobb Cnty. v. Bank of Am. Corp.*, 2020 WL 13200158, at *4-6 (N.D. Ga. Sept. 18, 2020) (similar).

Wells Fargo argues that "CORE, the Risk Engine, and ECS are separate technology applications developed by separate teams" and are capable of being "analyzed separately." (ECF No. 272 at 11.) Wells Fargo's documents show otherwise. (Ellis Decl., Ex. 261, p. 368; ECF No. 252 at 7.) And Wells Fargo's corporate witnesses have also testified that these systems are inextricably interrelated. (*Id.*, Ex. I, p. 1155; Ex. J, pp. 1063-65, 1169-70; Ex. K, pp. 1185-87; Ex. N, pp. 1232-33.) And whether the inseparability exception applies is a question of fact.[5] Plaintiffs have thus adduced evidence of policies that disproportionately affected Minority Applicants and thereby made the necessary showing of disparate impact. (*Id.*, Ex. 49, p. 206-23; Ex. 686, p. 610-36.) Further, it is too late for Wells Fargo to rewrite claimed justifications for CORE and the Risk Engine when it refused to do so during discovery. (*Id.*, Ex. B, pp. 1074-76.) *Cf. O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002) ("[W]hen an employer gives one reason at the time of the adverse employment decision but later gives another which is unsupported by the documentary evidence, a jury could reasonably conclude that the new reason was a pretextual, after-

---

[5] Whether Plaintiffs can demonstrate that policies are not capable of separation for analysis "is a question of fact." *Renati v. Wal-Mart Stores, Inc.*, 2019 WL 5536206, at *7 (N.D. Cal. Oct. 25, 2019). And Wells Fargo's arguments that the inseparability doctrine do not apply because it is unique to Title VII and its policies are capable of separation are unavailing. (ECF No. 272 at 10.) Courts have long "appl[ied] Title VII discrimination analysis in examining Fair Housing Act discrimination claims." *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) (cleaned up).

1    the-fact justification").

2         Dr. Kurzendoerfer reported the effects of Wells Fargo's CORE/ECS underwriting policy

3    that arranged minorities into lower risk classifications, resulting in disproportionate approval rates

4    for the Minority Applicants.  (Kurzendoerfer Decl., Ex. A ¶ 89.)  Wells Fargo mischaracterizes Dr.

5    Kurzendoerfer's report and testimony, as she did in fact conduct a regression analysis that she tied

6    to all of the policies embedded within Wells Fargo's CORE/ECS system.  (*Id.* ¶ 10.)  But because

7    CORE, the Risk Engine, and ECS are intertwined with various policies and more than 20,000 inputs,

8    it is impossible to "control" for them all in a single regression model.  (*Id.* ¶ 8.)

9              **2.    At a minimum, there is a triable issue of fact on robust causation.**

10         To establish robust causality, a plaintiff can rely on statistical evidence while "point[ing] to

11   a defendant's policy ***or policies*** causing that disparity."  *Inclusive Cmtys.*, 576 U.S. at 542 (emphasis

12   added).  The plaintiff must merely "tender a genuine issue of material fact" on this issue.  *Wallis v.*

13   *J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).  In *Southwest Fair Housing*, 17 F.4th at 965, the

14   Ninth Circuit held that the plaintiffs had established robust causation to support their prima facie

15   case for disparate impact because the policy complained of created the requirement of two different

16   security deposit amounts that disproportionately and negatively affected protected-group members

17   who were subjected to an increased security deposit.  Likewise, in *National Fair Housing Alliance*

18   *v. Bank of America, N.A.*, 2023 WL 2633636, at *14 (D. Md. Mar. 24, 2023), the defendants moved

19   for summary judgment, in part, on the grounds that the plaintiffs failed to establish robust causation.

20   The defendants argued that the "disparities in property conditions that cut along racial lines [are] an

21   artifact of 'lamentable pre-existing social inequalities' and the 'shameful legacy' of 'mortgage

22   redlining'—not the defendants' specific property preservation policies."  *Id.*  The defendants also

23   argued that the plaintiffs' expert's regression analysis cannot "eliminate the effects of variables"

24   that he did not control for "[s]o it shows only that race has a stronger correlation with the alleged

25   disparity than the plaintiffs' other selected factors—not that race in fact *caused* the disparity when

26   considering all possible factors."  *Id.*  (emphasis in original).  The court denied the defendants'

27   motion because their argument that they cannot be liable for a condition they did not create is

28   "insufficient to warrant summary judgment on the causation prong" and that they "demand too much

of the regression analysis" because "'a regression analysis that includes less than 'all measurable variables' may serve to prove a plaintiff's case' so long as it 'accounts for the major factors.'" *Id.* at *15 (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)). "And whether a regression analysis accounts for the major factors is a question of material fact." *Id.* (cleaned up); *see also Rudebusch v. Hughes*, 313 F.3d 506, 517, n.2 (9th Cir. 2002).

Plaintiffs have identified Wells Fargo's discriminatory policies and can thus rely on statistical analysis of the class as a whole to establish robust causation. Dr. Kurzendoerfer reported that the explicable statistically significant differences in approval rates were not attributable to key underwriting factors, but were the result of Wells Fargo's policies that lead to Minority Applicants being classified in lower CRCs, leading to disparate impact. (Kurzendoerfer Decl., ¶¶ 2-3, 6-14, Ex. A ¶¶ 10, 45, 67-69, 83, 88.) Apart from what Wells Fargo's own internal analysis revealed (Ellis Decl., Ex. 49, pp. 206-23), Dr. Kurzendoerfer opines that "differences in distributions of CRCs for minority applicants" (ECF No. 272 at 12), are due solely to the factors in the ECS model, which drive its statistically significant CRC disparities, (Kurzendoerfer Decl., ¶ 11, Ex. A ¶¶ 19, 47-50). Still, Dr. Kurzendoerfer added the ECS CRC as a control in her regression model and it had an impact on the marginal effects across Minority Applicants. (*Id.* 5.) Along with finding an overall marginal effect to the proposed damages subclasses of up to 5.8%, Dr. Kurzendoerfer demonstrated that 21.7% of that discriminatory effect was related solely to the ECS Model's CRC, without accounting for the use of CORE and the Risk Engine to compress the raw ECS score from 257 ratings (i.e., 76-333) to just four (i.e., A1, A2, C1 and C2). These findings cannot be minimized, as Wells Fargo will surely try. Any criticisms of Dr. Kurzendoerfer's analyses are issues for the jury, not on this Motion. *Nat'l Fair Hous. All.*, 2023 WL 2633636, at *14; *Anderson*, 477 U.S. at 255.

### 3.    <u>Wells Fargo has not adduced any evidence of a business justification.</u>

Having shifted the burden to Wells Fargo by identifying its CORE/ECS underwriting system as the driver of disparate impact to its Minority Applicants, Wells Fargo must adduce evidence that it had legitimate business justifications for continuing to rely on its discriminatory CORE/ECS underwriting system. *Sw. Fair Hous. Council, Inc.*, 17 F.4th at 960-61. In the face of evidence that Wells Fargo's policies cause a demonstrable racial disparity, Wells Fargo is required to come forth

not just with rationalizations naming possible reasons why Wells Fargo adopted the policy. Wells Fargo instead must present "evidence that the challenged policy significantly serves a legitimate business interest." *Id.* at 967. Wells Fargo bears the burden of showing both legitimacy of the interest and significant advancement of that interest. *Id.* at 968. Wells Fargo has failed miserably to do so, rendering summary judgment inappropriate. *SoCal Recovery, LLC v. City of Costa Mesa*, 2023 WL 8263377, at *10 (C.D. Cal. Aug. 17, 2023), is instructive. There, the court denied the defendant's motion for summary judgment, in part, because there was a triable issue of fact as to whether it had a legitimate business justification to pass an ordinance that made it unlawful for sober living homes to operate without a special use permit. The defendant argued that the ordinance was intended to preserve the character of the neighborhood, safety, and to protect the disabled, among other things. *Id.* But the court noted that because there was evidence that the defendant passed the ordinance based on "stereotypes about sober living homes and their residents," there was a triable issue of material fact as to whether the defendant's business justifications were mere pretext. *Id.*

Here, Wells Fargo does not offer sufficient evidence of its purported legitimate business justification either for its CORE/ECS underwriting system collectively, or when its CORE, ECS or Risk Engine are examined as separate individual policies as it claims they should be. Wells Fargo provided a single document under Rule 33(d) in response to five different interrogatories requesting its legitimate business justifications for its own CORE/ECS underwriting system. (Ellis Decl., Ex. B, pp. 1074-76.)[6] The six-page document from ***November 2019*** that Wells Fargo identified during discovery that the ECS outperforms FICO in its ability to discriminate among good and bad applicants is contravened by the evidence indicating that beginning in 2020 that same model began to deteriorate, leading to its inability to determine good and bad applicants unlike FICO continued to do—not to mention the revelation that it was causing a disparate impact. (*Id.*, Ex. WF-03748177, p. 970; Ex. 49, pp. 208-11; Ex. K, p. 1192.) Indeed, Wells Fargo identified key areas to further analyze, like whether the model accurately identified "loan default rates or losses," yet did nothing.

---

[6] Curiously, Wells Fargo objected because the interrogatories "prematurely [sought] disclosure of expert testimony" (*id.*, Ex. B, p. 1075), but it could apparently find no expert willing to countenance its business justifications in this case, (*id.*, Ex. T, pp. 1345-48).

1    (*Id.*, Ex. 412, p. 378.)  Had it done so at least with respect to Mr. Brown, he may not have been

2    denied at all given his long history of good credit with Wells Fargo.  (*Id.*, Ex. G, p. 1144.)

3        Wells Fargo's self-serving declarations from its corporate witnesses Messrs. Strawser and

4    Keller and Ms. Relova do not change the result.  (ECF Nos. 272-30 ¶ 8; -23 ¶¶ 2, 6, 7, 10-12, 14; -

5    33 ¶¶ 7-9, 14, 15, 20.)  Wells Fargo claimed during discovery that it did not need to produce a

6    business justification for its use of CORE (Ellis Decl., Ex. B, pp. 1076-79). Its attempts to do so in

7    this Motion cannot be considered.  Fed. R. Civ. P. 37(c).  Wells Fargo for the first time argues that

8    CORE is a workflow tool that provides a common portal access promoting efficiency.  (ECF No.

9    272 at 13.)  This is the equivalent of Wells Fargo claiming it was justified in using computers to

10   process its loans, instead of having thousands of underwriters with green visors on doing them by

11   hand.  It is besides the point.  As discussed above, CORE is integrated with the Risk Engine and

12   ECS model, cannot be analyzed standing alone, was used to process nearly every loan during the

13   Class Period, and necessitated the limited A1, A2, C1, and C2 CRCs that were incapable of

14   distinguishing one type of applicant from the other.  Wells Fargo's argument that the ECS and Risk

15   Engine's predictive capabilities increase efficiency and accuracy in the application process fares

16   even worse.  (*Id.* at 14.)  This argument strains credulity and borders the cynical given that Wells

17   Fargo had identified other potential models that would have had less of a discriminatory effect on

18   Minority Applicants, but yet it decided not to use them.  (Ellis Decl., Ex. 686, p. 613.)  It follows

19   that despite the availability of less discriminatory policies, Wells Fargo chose one that it knew had

20   a disparate impact on Minority Applicants in the name of efficiency and predictive prowess.  If,

21   despite the fact that these "justifications" were never claimed during discovery, Wells Fargo is

22   allowed to pursue these arguments at trial, a jury could reject them.  Whatever happens ultimately,

23   and reasonable people can disagree on the likely outcome at trial, these justifications are worthless

24   on this Motion.  *Sw. Fair Hous.,* 17 F.4th at 971 (providing "*arguments* but fail[ing] to present

25   *evidence*" fails the burden on summary judgment).

26       In sum, Wells Fargo's only meager business justification produced in this case is its self-

27   serving analysis of its ECS model ***in late 2019***.  (Ellis Decl., Ex. WF-03748177, pp. 966-72.)  But

28   in 2020, as a result of the pandemic, the ECS model slipped into the Yellow (Watch) status and

could no longer distinguish between good and bad applicants.  (*Id.*, Ex. K, p. 1192.)  Wells Fargo knew what would "prove" its continued use of ECS was justified as reflected in the August 2022 document's next steps.  (*Id.*, Ex. 412, p. 378.)  But, it did not undertake those next steps.  The seminal question in this case, "Why not?"—which Wells Fargo has never answered in discovery or otherwise—must be decided by a jury.  Plaintiffs are entitled to a trial to determine why Wells Fargo continued to use its CORE/ECS underwriting system, which led to the denial of 119,100 Minority Applicants who had proved their creditworthiness.

### 4.  Wells Fargo ignored equally effective and less discriminatory alternatives.

Even assuming the Court accepts Wells Fargo's insufficient business justifications for its continued and knowing deployment of its discriminatory CORE/ECS underwriting system, that does not end the inquiry, if Plaintiffs can show that Wells Fargo had equally effective alternatives at its disposal that would not have carried with them the same level of discriminatory impact.  *Sw. Fair Hous.,* 17 F.4th at 970.  A plaintiff must merely "present[] evidence sufficient to create a material triable issue of fact that these alternatives would be equally effective."  *Id.* at 971; *see also Guerrero v. Cal. Dep't of Corr. & Rehab.*, 2015 WL 13672467, at *6 (N.D. Cal. Apr. 16, 2015) (denying summary judgment because whether less discriminatory alternatives exist was a triable issue).

Wells Fargo's own documents reveal that it had several other models that "reduced [discriminatory impact] compared to the original model."  (Ellis Decl., Ex. WF-00142657, pp. 873-88.)  Wells Fargo did not seriously consider those.  Instead, it developed a surreptitious plan to deny the existence of any alternative models. (*Id.*, Ex., WF-00142688, p. 891; Ex. 49, pp. 206-23; Ex. 412, pp. 376-93; Ex. 686, pp. 610-36; WF-00143317, pp. 906-31.)  Wells Fargo's own documents thus reveal that it had alternative models that would have provided the same benefits of its ECS model with less discriminatory effect.  (*Id.*, Ex. WF-00142657, pp. 873-88; Ex. 686, p. 613.) Further, Wells Fargo could have simply used FICO or the AUS of one of the GSEs to assess the creditworthiness of its loan applicants, and because Wells Fargo never performed the "next steps" it identified in August 2022 (*id.*, Ex. 412, pp. 378, 390), Plaintiffs are entitled to proceed to trial regarding whether FICO or another external AUS was a less discriminatory, effective alternative to

1  CORE/ECS.  *See Sw. Fair Hous.*, 17 F.4th at 971.

2       **B.**    **Plaintiffs Have Established a Prima Facie Claim of Disparate Treatment.**

3       The Ninth Circuit has consistently held that "[t]he burden of establishing a prima facie case

4  of disparate treatment is not onerous."  *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002)

5  (cleaned up).[7]  Under a disparate treatment theory relying on "the 'direct or circumstantial evidence'

6  approach," there is no need to engage in the burden-shifting analysis—"any indication of

7  discriminatory motive . . . may suffice to raise a question *that can only be resolved by a fact-finder*."

8  *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158-59 (9th Cir. 2013)

9  (emphasis added) (cleaned up).  In *Riley v. Board of Trustees*, 2015 WL 2198247, at *5 (N.D. Cal.

10  May 11, 2015) (J. Donato), an employment action, this Court denied the defendant's motion for

11  summary judgment with respect to the plaintiff's disparate treatment claim because the "facts in the

12  record are more than enough to make out the inference under the low threshold that governs."

13  *Plaintiffs #1-21*, 2021 WL 11629176, at *5-6, is also instructive.  There, the court granted, in part,

14  the plaintiffs' motion for a rebuttable presumption that the defendant's conduct amounted to

15  disparate treatment where it knew or should have known that its traffic stop policy

16  disproportionately resulted in higher traffic stops of Latino motorists.  *Id.* at *5-6.  The court

17  reasoned that this presumption was supported by rational and logical probabilities developed by the

18  facts based on the defendant's failure to change its discriminatory policy.  *Id.* at *6-8.

19       Wells Fargo's knowing and continued use of its CORE/ECS underwriting system that

20  disproportionately affected Minority Applicants as well as the statistical data showing the

21  disproportionate affect constitutes sufficient evidence of disparate treatment under *Plaintiffs #1-21*

22  and *Riley*.  Wells Fargo also discovered that its policies led to "disparate treatment within the

23  reconsideration of value (ROV) process," and its policy of prioritizing loan programs for affluent

24  customers compounded its discrimination and amounted to disparate treatment.  (Ellis Decl., WF-

25

26  ───────────────
[7] Plaintiffs' Unruh Act claim it is not barred by ECOA's election of remedies clause.  *See Gomez v.*

27  *Quicken Loans, Inc*., 629 F. App'x 799, 801 (9th Cir. 2015) (reversing dismissal of the plaintiff's disparate treatment claims under ECOA and Unruh Act).  Even if it applies only to California

28  residents, Aaron Braxton, Paul Martin, Dr. Gia Gray, and other California members can pursue this.

03837493, pp. 973-84; Ex. Q, p. 1303.)  Further, Wells Fargo sought to bury otherwise statistically significant approval rate disparities based on its internal policy that an AIR of .90 or greater was not "practically significant."  (*See* Kurzendoerfer Decl., Ex. A at C-18 to C-21; Ellis Decl., Ex. WF-00030816, pp. 859-72, Ex. 23, pp. 22-59.)  Wells Fargo then instructed its quantitative analytics department to shuffle around variables to arrive at an "acceptable" AIR to hide the discriminatory effect of its policies.  (*Id.*, Ex. O, pp. 1275-76.)  Wells Fargo also discontinued its manual underwriting of applicants classified as C1 and C2, which resulted in even more Minority Applicants being unable to be approved given Minority Applicants are disproportionately classified as C1 and C2.  (Kurzendoerfer Decl., Ex. B ¶¶ 26; Ellis Decl., Ex. 49, pp. 206-23; Ex. 686, p. 613.)  This policy alone likely caused at least 12,934 Minority Applicants to be denied.  (*See* Kurzendoerfer Decl., Ex. B ¶ 26.)  Plaintiffs are entitled to proceed to trial on a intentional discrimination theory, which was pled in their complaint, supported by facts in its discovery responses, and included in its notice of motion and motion for class certification.  (Ellis Decl., WF-03837493, pp. 973-84.)

### C.    Plaintiffs Have Established that the Damages Class Was Injured.

The proposed Rule 23(b)(3) representative Plaintiffs have adduced evidence and provided a robust damages model that demonstrates that they, along with over 100,000 Minority Applicants were indeed damaged as a result of Wells Fargo's CORE, Risk Engine, and ECS's discriminatory policies.  Bryan Brown was a longtime customer of Wells Fargo who was classified as A2.  (Ellis Decl., Ex. 709, p. 839.)  Yet, Wells Fargo argues that Mr. Brown was ineligible because he had "an excessive DTI ratio and a declining income."  (ECF No. 272 at 15.)  But Wells Fargo approved thousands of "ineligible" applicants.  (Ellis Decl., Ex. 668, p. 548.)  Wells Fargo argues that Elretha Perkins had delinquencies on her credit report.  (ECF No. 272 at 15.)  However, Wells Fargo claimed that during COVID, it routinely disregarded late payments, but not Ms. Perkins.  (ECF No. 232 at 6, 26-27.)  Wells Fargo argues that Terra Kuykendall-Montoya was ineligible because of a recent bankruptcy (ECF No. 272 at 15), but Wells Fargo told regulators that it was because the loan program (a cash-out refinance) was "not available."  (Ellis Decl., Ex. 709, p. 840.)  Despite Wells Fargo's factual assertions, whether each Plaintiff should have been approved is a question of fact reserved for the jury.  *See Sarlo v. Wells Fargo Bank, N.A.*, 175 F. Supp. 3d 412, 424 (D.N.J. 2015)

1  (it was for a jury to determine whether Wells Fargo "failed to properly assess whether Plaintiffs

2  qualified for a loan with a lower interest rate and monthly payment.").  And while not required to

3  do so, Plaintiffs have put forth expert testimony disputing Wells Fargo's factual assertions.  Mr.

4  Jackson opined in his rebuttal report, and in his current declaration, that, in fact, each Plaintiff should

5  have been approved by Wells Fargo for the loans that they sought.  (Jackson Decl. ¶¶ 4-23.)

6       **D.    Plaintiffs' Compensatory Damages and Pricing Claims Present Triable Issues.**

7       Plaintiffs have provided a damages model capable of determining their economic damages.

8  (ECF No. 204-20, Ex. A.)  A damages model must demonstrate that it is consistent with the theory

9  of liability and that "damages are capable of measurement on a class wide basis."  *Comcast Corp.*

10 *v. Behrend*, 569 U.S. 27, 33-35 (2013).  If a damages model survives the class certification stage, it

11 should also survive summary judgment.  *Grace v. Apple, Inc.*, 2019 WL 3944988, at \*12 (N.D. Cal.

12 Aug. 21, 2019) (denying defendant's motion for summary judgment as to plaintiffs' damages model

13 because there defendant "cites no case in which a district court has reconsidered its *Comcast* analysis

14 . . . for the first time on a motion for summary judgment").  Wells Fargo's recycled arguments from

15 its opposition to class certification likewise fail.  Wells Fargo failed to address that its own experts

16 agreed that the damages model works and is "correct."  (Ellis Decl., Ex. S, pp. 1314-18.)  The model

17 does not assume damages run for the life of the loan, and in fact the formulas cut-off damages if a

18 variable is known.  (*Id.*, p. 1325-26.)  The factfinder will determine which Plaintiffs Wells Fargo

19 discriminated against and the damages model will be applied to those Plaintiffs.  *See* 15 U.S.C.

20 1691e; 42 U.S.C. 3613(c)(1); 42 U.S.C. § 1981a.  Likewise, the jury is entitled to consider Dr.

21 Kurzendoerfer's discriminatory pricing analysis.  *Nat'l Fair Hous. All.*, 2023 WL 2633636, at \*14.

22      **E.    Plaintiffs are Entitled to Pursue Their UCL Claims.**

23      Plaintiffs seek restitution on behalf of the Rule 23(b)(2) class that paid upfront fees that were

24 effectively participating in a "rigged game," in which they had no chance or an unfair chance to be

25 approved for a loan as a result of Wells Fargo's discriminatory, unfair, unlawful and fraudulent use

26 of its CORE, Risk Engine, and ECS.  *See Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 338-39 (1998)

27 (explaining that the UCL operates to provide restitution to the victim of unfair competition, by

28 returning to that person those measurable amounts which are wrongfully taken by means of the

unfair practice).   The UCL provides that unfair competition includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  The plaintiff must show that he or she "suffered injury in fact" and "lost money or property as a result of their unfair competition."  *Id.* § 17204.  And "there are innumerable ways in which economic injury from unfair competition may be shown."  *Kwikset Corp. v. Super. Ct. (Benson)*, 51 Cal. 4th 310, 323 (2011).  To be sure, the "adequate remedy at law principle" "applies squarely to an award of restitution—an equitable remedy—under the UCL."  *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1009 (N.D. Cal. 2020) (cleaned up).  "The equitable remedies afforded by the UCL . . . are expressly stated to be in addition to other available remedies at law."  *Freeman v. Indochino Apparel, Inc.*, 443 F. Supp. 3d 1107, 1114 (N.D. Cal. 2020).

In *Brown v. Google LLC*, 685 F. Supp. 3d 909, 926 (N.D. Cal. 2023), the defendant moved for summary judgment on the class's UCL claim arguing that the plaintiffs lacked standing and had an adequate remedy at law.  The court denied the defendant's motion on the plaintiffs' claim for injunctive relief because the defendant's "conduct has not stopped," *id.* at 926, and that "money damages alone are not an adequate remedy at law" because of the nature of the defendant's conduct, *id.* at 942.  *Id.*  Here, the Rule 23(b)(2) Plaintiffs would have no other remedy because they do not necessarily fit into the proposed Rule 23(b)(3) classes and restitution would be "more certain, prompt, [and] efficient than the legal remedies [those classes] request."  *Cf. Anderson v. Apple Inc.*, 500 F. Supp. 3d at 1009; *see also Elgindy v. AGA Serv. Co.*, 2021 WL 1176535, at *15 (N.D. Cal. Mar. 29, 2021) ("Although rooted in the same theory, the elements of common-law fraud claim require proof of conduct beyond that which must be shown to establish liability under the UCL").[8] Like the plaintiffs in *Brown*, even for those Plaintiffs that might fall in both the Rule 23(b)(2) and (b)(3) classes, money damages alone are not an adequate remedy at law given Wells Fargo's continued reliance on the discriminatory ECS.  Wells Fargo argues that Plaintiffs do not allege that "they intend to seek loans from Wells Fargo again" (ECF No. 272 at 24), but many Plaintiffs remain

---

[8] If this Court grants Wells Fargo's Motion as to the other claims (which it should not), there would remain no adequate remedy at law.  *Peacock v. 21st Amend. Brewery Cafe, LLC*, 2018 WL 452153, at *10 (N.D. Cal. Jan. 17, 2018).

1   Wells Fargo customers and continue to be the subject of discriminatory practices—and this is to say

2   nothing of the several other financial institutions it has in its portfolio that average consumers do

3   not know are owned by Wells Fargo—that if an injunction is not issued it will continue to engage

4   in the same discriminatory practices affecting both the Plaintiffs as well as hundreds of thousands

5   of future Minority Applicants.  More importantly, Wells Fargo has acknowledged that it harmed at

6   least Plaintiffs Ms. Perkins and Mr. Braxton by charging them unnecessary (and unlawful) upfront

7   fees because they have attempted to reimburse them for those fees.  (Declaration of Elretha Perkins

8   ("Perkins Decl."), ¶ 3, Ex. A; Declaration of Aaron Braxton ("Braxton Decl.") ¶¶ 2-10, Exs. A-F.)

9   In fact, since the initiation of this lawsuit Wells Fargo has attempted to pay Mr. Braxton

10  approximately $2,482.15 in unlawfully collected upfront fees.  (Braxton Decl., Exs. A, C-E.)[9]

11       Despite Wells Fargo's arguments to the contrary, and as illustrated in a case it relies on, the

12  "UCL may be available to non-California residents if those persons are harmed by wrongful conduct

13  occurring in California."  *In re Toyota Motor Corp.*, 785 F. Supp. 2d 883, 916 (C.D. Cal. 2011)

14  (citation omitted).  "California's interest in having its consumer protection laws applied to claims

15  involving [California activity] outweigh any other particular state's interest . . ."  *Wolph v. Acer Am.*

16  *Corp.*, 272 F.R.D. 477, 486 (N.D. Cal. 2011) (certifying nationwide UCL class).  Here, "Wells Fargo

17  Bank admits that it transacts business in the State of California," "has employees located in the

18  Northern District of California," and is a "California based business establishment[]."  (ECF No.

19  122 ¶¶ 25, 70, 197.)  Fed. R. Civ. P. 8(b)(3); *Lockwood v. Wolf Corp.*, 629 F.2d 603, 611 (9th Cir.

20  1980); *Lillge v. Verity*, 2007 WL 2900568, at *4 (N.D. Cal. Oct. 2, 2007) ("Because the failure to

21  deny an allegation amounts to an admission, plaintiff may not be required to submit evidence to

22  prove the allegation[].").  Still, Plaintiffs have already adduced evidence that Wells Fargo's policies

23  emanate from California of which Wells Fargo does not attempt to rebut.  (ECF No. 204 at 29, n.21;

---

9.   Even if ECOA's election-of-remedies precludes it from serving as the predicate violation, the FHA or 42 U.S.C. § 1981 (ECF No. 114 ¶¶ 59-63, 69-74) can serve as the predicate violation.  *Green v. Mercy Hous., Inc.*, 2018 WL 6704185, at *5 (N.D. Cal. Dec. 20, 2018) (denying motion to dismiss UCL because plaintiff also sufficiently alleged violations of FHA and FEHA); *Diaz v. Bank of Am. Home Loan Serv.*, 2010 WL 5313417 at *6 (C.D. Cal. Dec. 16, 2010) ("Because Plaintiff has sufficiently stated an FHA claim, he has also stated a claim for unlawful practices under the UCL and the Court need not consider the other ways of alleging a UCL violation.").

1   ECF No. 232 at 24; ECF No. 204-18, Ellis Decl., Ex. F, pp. 2309, 2313-14.)

2   **VI.    OBJECTIONS TO EVIDENCE**

3          Plaintiffs object to the Declaration of Peter Strawser, a wells Fargo Executive, filed by Wells

4   Fargo in support of its Motion (ECF No. 272-30).   Mr. Strawser's declaration consists almost

5   entirely of (1) improper expert opinions disguised as lay witness testimony and (2) a purported

6   summary of supposed Wells Fargo business records.   Mr. Strawser's improper expert testimony

7   should be excluded.   Mr. Strawser purports to offer opinions regarding the supposed bases for Wells

8   Fargo's denials of Plaintiffs' loan applications.   (*See*, *e.g.*, *id.* ¶¶ 38, 56, 71, 90.)   But Mr. Strawser

9   was never identified by Wells Fargo as a potential expert witness, despite the fact that he purports

10  to provide technical, specialized knowledge.   *U.S. v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir.

11  1997) (holding opinion by lay witness was improper on observations that were not "common" but

12  required demonstrable expertise).   Wells Fargo seeks to evade the expert witness disclosure

13  requirements by presenting Mr. Strawser in the guise of a layperson. *Humboldt Baykeeper v. Union*

14  *Pac. R.R. Co.*, 2010 WL 2179900, at *1 (N.D. Cal. May 27, 2010) (excluding non-retained experts

15  from testifying).   Mr. Strawser does not explain how he selected the records to review; what analysis

16  he conducted; or the process by which he used these documents to reach the various opinions and

17  conclusions asserted in his declaration.   The exhibits to Mr. Strawser's declaration shows that many

18  of these documents (1) are not Wells Fargo records made in the normal course of business and (2)

19  indicate a lack of trustworthiness such that they are not subject to any hearsay exception. *Clark v.*

20  *City of L.A.*, 650 F.2d 1033, 1037 (9th Cir. 1981).   Likewise, the declarations of Mr. Keller and Ms.

21  Relova, still Wells Fargo executives  (ECF Nos. 272-32, -33), suffer from the same deficiencies,

22  and should be excluded. *Boyd v. City of Oakland*, 458 F. Supp. 2d 1015, 1038 (N.D. Cal. 2006).

23  **VII.    CONCLUSION**

24          For the foregoing reasons, Plaintiffs request that Wells Fargo's Motion be denied.

25

26

27

28

2451905.4

**PLAINTIFFS' OPPOSITION TO WELLS FARGO'S MOTION FOR SUMMARY JUDGMENT**

1

DATED:  August 29, 2024

ELLIS GEORGE LLP
Dennis S. Ellis

2

3

By:     /s/ Dennis S. Ellis

4

Dennis S. Ellis
Interim Lead Class Counsel

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28