UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE WELLS FARGO MORTGAGE DISCRIMINATION LITIGATION | Case No. 22-cv-00990-JD<br><br>**ORDER RE CLASS CERTIFICATION** |

Plaintiffs allege that defendant Wells Fargo Bank, N.A. illegally discriminated against non-White home loan applicants. They ask for class certification under Federal Rule of Civil Procedure 23. Dkt. No. 204. The record before the Court does not establish the element of commonality required by Rule 23(a), and so certification is denied.

## BACKGROUND

Although the parties' familiarity with the facts is assumed, a summary of plaintiffs' claims is useful for context. The operative complaint is the Amended and Consolidated Class Action Complaint. Dkt. No. 114. Plaintiffs are Aaron Braxton, Paul Martin, Gia Gray, Bryan Brown, Elretha Perkins, Christopher Williams, Ifeoma Ebo, and Terah Kuykendall-Montoya, all of whom are Black or Latino/Hispanic American. *Id*. ¶¶ 27, 32, 35, 39, 45, 48, 52, 66. The named plaintiffs allege claims "individually and as representatives of a nationwide class of similarly situated applicants for original purchase mortgage, refinance and other home mortgage loans." *Id*. at 2. The only remaining defendant in the case is Wells Fargo Bank, N.A. (Wells Fargo). *See* Dkt. No. 119.

The amended complaint says that Wells Fargo intentionally and disproportionately denied applications from minority applicants; imposed unjustified delays in processing their applications; and extended less favorable terms to them than were extended to similarly qualified White

applicants. *See id*. ¶ 5. In plaintiffs' view, Wells Fargo was "systematically engaging in a new form of redlining that harmed Plaintiffs and the Class based on their race and ethnicity." *Id*. Plaintiffs emphasize the bank's "decision to employ centralized, universal, race-infected lending algorithms to differentially assess, delay and ultimately reject residential lending applications." *Id*. ¶ 15. This "digital redlining," *id*., was implemented, they say, via a "centralized 'pioneering automated underwriting' system -- sometimes referred to as CORE -- without sufficient, or sometimes any, human supervision or involvement." *Id*. ¶ 17.

Plaintiffs' legal claims are: (1) a violation of the Equal Credit Opportunity Act, 15 U.S.C. § 16901 et seq., which "makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race"; (2) race discrimination in violation of the Fair Housing Act of 1968, 42 U.S.C. § 3601 et seq., which prohibits discrimination "against designated classes of individuals in residential real estate transactions, including residential lending"; (3) race discrimination in violation of 42 U.S.C. § 1981, which "guarantee[s] the same right to make and enforce contracts, regardless of race"; (4) a violation of the Unruh Civil Rights Act, Cal. Civil Code § 51, which "provides that all persons within the State of California are free and equal no matter their race and are entitled to full and equal treatment in all business establishments"; and (5) violations of the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, under its unlawful, fraudulent, and unfair prongs. *Id*. ¶¶ 175-210.

This order resolves the class certification proceedings, which included a concurrent expert evidentiary hearing with respect to the expert opinions submitted in conjunction with the parties' Rule 23 arguments. *See* Dkt. Nos. 305, 323, 324. Plaintiffs have narrowed the scope of their case in some important ways for purposes of class certification. In the amended complaint, they proposed various classes of "all Minority Applicants in the United States who, from January 1, 2018, through the present (the 'Class Period'), submitted an application for an original purchase or other home mortgage loan or to refinance or modify a home mortgage loan through Defendants that was (i) denied; (ii) approved at higher interest rates or subject to less favorable terms as compared to similarly situated non-Minority Applicants; or (iii) processed at a rate slower than the average processing time of applications submitted by similarly situated non-Minority Applicants."

Dkt. No. 204 at 10-11 (quoting Am. Compl. ¶ 155). "These classes were referred to as the 'denial class,' 'higher rate class,' 'less favorable terms class,' and 'delayed class.'" *Id*. at 11 (quoting Am. Compl. ¶¶ 161-62). Plaintiffs now "seek to focus their damages classes on those Minority Applicants who objectively demonstrated their creditworthiness by an agency (Fannie Mae or Freddie Mac) or government AUS [automated underwriting system] or Wells Fargo's own ECS [Enhanced Credit Score] model." *Id*. To that end, they ask for certification of the following "damages subclasses pursuant to Rule 23(b)(3)"[1]:

- Minority Applicants who applied for a refinance and were approved by an external AUS or Wells Fargo's ECS, but who were ultimately denied during the Class Period.

- Minority Applicants who applied for a home purchase and were approved by an external AUS or Wells Fargo's ECS, but who were ultimately denied during the Class Period.

- Minority Applicants who applied for a HELOC, were approved by Wells Fargo's AUS for home equity products, but ultimately denied during the Class Period.

*Id*.

Plaintiffs also ask to certify this injunction/restitution class under Rule 23(b)(2):

- Minority Applicants who paid fees to process their mortgage loan applications with Wells Fargo during the Class Period, who had their applications denied.

*Id*. at 11-12.

Plaintiffs propose two additional "subclasses on the issue of liability under Rule 23(c)(4)":

- Whether Wells Fargo is liable to Minority Applicants who were discriminated against based on Wells Fargo's use of its CORE/ECS policy to process their home mortgage loans.

- Whether Wells Fargo is liable to minority borrowers who received mortgage loans from Wells Fargo, during the Class Period, who were discriminated against by receiving higher interest rates compared to similarly situated White borrowers.

*Id*. at 12.

Plaintiffs say that the "crux" of their claims is that "Wells Fargo discriminated against the Minority Applicants by subjecting them to its discriminatory loan policies; primarily the uniform

---

[1] It is not clear what class these proposed classes are "subclasses" of, but the Court will use plaintiffs' nomenclature for present purposes.

3

and consistent processing of their mortgage loans through its CORE/ECS underwriting system, which was disproportionally assigning them to lower credit risk classes leading to lower approvals." *Id*. at 10.

**DISCUSSION**

**I.   LEGAL STANDARDS**

The standards governing class certification are well established. The overall goal is "to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (cleaned up). "The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). To obtain certification, plaintiffs must prove by a preponderance of the evidence that their proposed classes satisfy all four requirements of Rule 23(a) and at least one of the subsections of Rule 23(b). *Id*.; *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001); *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664-65 (9th Cir. 2022) (en banc), *cert. denied*, 143 S. Ct. 424 (2022).

The Court's class certification analysis "must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," but the merits questions may be considered to the extent, and only to the extent, that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 465-66 (internal quotations and citations omitted). The class certification procedure is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits. *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015). The decision of whether to certify a class is entrusted to the sound discretion of the district court. *Zinser*, 253 F.3d at 1186.

**II.   UNDISPUTED FACTS**

The salient facts for the question of class certification are not in dispute. Plaintiffs say that the "CORE/ECS underwriting system is the primary policy that [they] challenge," Dkt. No. 204 at 17 (emphasis omitted), so the Court starts there. The Court draws primarily from the declarations submitted by Wells Fargo explaining its underwriting system and component tools and

4

applications. *See* Dkt. No. 232-53 (Declaration of John R. Keller); Dkt. No. 232-54 (Declaration of Sally Relova). Plaintiffs did not take issue with these underlying facts. *See* Dkt. No. 252.

### A.   The "CORE / ECS Underwriting System"

"CORE," which is short for "Common Opportunities Results Experiences," is a "front-end workflow tool that guides the loan origination process." Dkt. No. 232 at viii (Glossary); Dkt. No. 232-53 (Keller Decl.) ¶ 3. CORE is "not an automated underwriting system and it does not make lending decisions or calculate or assign Credit Risk Classes." Keller Decl. ¶ 3. It "guides the 'flow' of the loan origination process," and also "retrieves, stores, and displays information and data (including data from the loan application, certain outputs from the Risk Engine, and final lending decisions)." *Id.* ¶ 9.

"Credit Risk Classes are assigned by business rules residing within a separate technology application referred to as the Risk Engine." *Id.* ¶ 4. The Risk Engine is a "technology application" that "uses data from the applicant's loan application and credit report to help analyze (based on underwriting policies and guidelines) the applicant's creditworthiness." *Id.* ¶ 6. The Risk Engine "uses data stored in CORE, including data from the loan application and credit report." *Id.* ¶ 8. It "performs tasks using three general components: (a) business rules; (b) business services; and (c) data attributes." *Id.* ¶ 10. "The Risk Engine's 'business rules' are discrete pieces of logic that can answer business questions." *Id.* ¶ 11. For example, "Wells Fargo's minimum credit score for retail, non-conforming, fixed-rate, purchase loans up to $3,000,000 is 700," and so "there is a business rule that implements that requirement." *Id.* "The Risk Engine currently executes tens of thousands of separately identifiable business rules." *Id.*

The business rules are "grouped into 16 different 'business services,' including the Get Risk Decision business service." *Id.* ¶ 12. An exhibit submitted and highlighted by plaintiffs explains that "GRD [Get Risk Decision] is the largest business service within the Wells Fargo Risk Engine," and GRD "contains 14,000 rules" and "1,300+ data attributes." Dkt. No. 252 at 7; Dkt. No. 204-16 at ECF p. 276. During the relevant time period, the "Get Risk Decision business service" determined, "based on the policies, strategies, and guidelines within it, the applicable Credit Risk Class for the proposed transaction." Keller Decl. ¶ 15.

5

The Risk Engine and CORE are "distinct applications" that "communicate with each other." *Id.* ¶ 8. "[S]ome of the outputs provided by the Risk Engine are displayed in CORE for use by the underwriting during the decisioning process." *Id.* Wells Fargo's Senior Vice President and Business Execution Director for its Home Lending division declares that "underwriters are instructed that the Risk Engine never supersedes the judgment of the underwriter," and "[u]nderwriting is done by human underwriters." *Id.* ¶¶ 1, 7. Plaintiffs do not dispute that human underwriters make the ultimate decision. *See* Dkt. No. 252 at 5 ("Wells Fargo makes much ado of its claim that its underwriting 'is done by human underwriters'" but case law supports "that disparate impact may be found even where there is some discretion in the process.").

"ECS" or "Enhanced Credit Score" refers to "two separate models Wells Fargo developed and uses in home lending: Model 11419 (used for government loans) and Model 11960 (used for conventional loans)." Dkt. No. 232-54 (Relova Decl.) ¶ 3. "Each of the ECS models is a simple scorecard whose logic can be fully stated on 2-3 sheets of paper," and "[n]either utilizes artificial intelligence." *Id.* ¶ 4. The models are "simple enough that an applicant's score could be calculated by hand." *Id.* The ECS models consider inputs such as certain credit bureau report attributes, and results in a numerical score which is then translated into a credit risk class, representing differentiated levels of default risk. *Id.* ¶¶ 5-6. The "ECS models are also used to generate risk insight messages that are displayed to underwriters." *Id.* ¶ 8.

Plaintiffs contend that "[t]he Risk Engine, ECS and CORE" are "inseparable," and that "Wells Fargo's CORE/ECS policy arranges Minority Applicants into 'unfavorable' risk classifications" which "lead[s] to lower approval rates for minorities." Dkt. No. 252 at 8. Although Wells Fargo says that "there is no such thing as 'CORE/ECS'" and there is no such "policy," Dkt. No. 232 at 3 (emphasis omitted), it offered detailed explanations about the Risk Engine, ECS, and CORE, and how they are applied to loan applications.

**B.    Dr. Kurzendoerfer's Opinions**

Plaintiffs' class certification motion relies heavily on the work and opinions of their expert, Dr. Amanda Kurzendoerfer. Dr. Kurzendoerfer opined that "Wells Fargo's home lending approval rate disparities between White and minority applicants are not explained by differences

6

in key underwriting factors." Dkt. No. 205-12 (Kurzendoerfer Decl.) ¶ 4. By "[u]sing a regression model to control for . . . key underwriting factors," she determined that "statistically significant disparities remain for both the overall applicant population and the proposed classes or subclasses." *Id*. ¶ 5.[2] Dr. Kurzendoerfer concluded that there was a "statistically significant difference in approval rates that favors White applicants," and "on average, there is a disparity that cannot be explained by legitimate underwriting factors" that were not related to race. Dkt. No. 323 at 44:18-45:13.

During the concurrent expert evidentiary proceeding, Wells Fargo's expert, Dr. Marsha J. Courchane, did not substantially disagree with the logistic analysis Dr. Kurzendoerfer performed, or with her findings of a statistical disparity along racial lines. *See*, *e.g.*, *id*. at 9:19-10:11. Rather, Dr. Courchane's main critique was that Dr. Kurzendoerfer's regression analyses could not demonstrate that the racially imbalanced denials were caused by race-related factors. Dr. Courchane opined that the "class-wide evidence" of Dr. Kurzendoerfer's analyses could not be used "to actually ensure why those borrowers were denied without looking further at at least a sample of files to see those you thought should have been approved were actually denied for reasonable reasons." *Id*. at 34:7-12.

While Dr. Courchane agreed that "you will almost always find an underwriting disparity, on average, for minorities," *id*. at 46:10-11, she stated that individual file reviews were essential to "understand how borrowers are truly similarly situated" and to understand "whether Wells Fargo actually made a proper denial of [a] loan or whether they wrongfully denied that loan" for reasons of race discrimination. *Id*. at 46:15-17, 48:21-49:1. In Dr. Courchane's opinion, because Dr. Kurzendoerfer did not take that additional step, her logistic analysis cannot be used to demonstrate that minority applicants were "improperly or wrongfully denied" and were overall "approved at lower rates than similarly situated non-Hispanic whites." Dkt. No. 317 at 2.

---

[2] For purposes of this order, the Court denies Wells Fargo's motions to exclude the testimony of plaintiffs' experts, Dkt. Nos. 243, 244, and sustains plaintiffs' objections to Wells Fargo's evidence in opposition to class certification, Dkt. No. 252 at 15. These determinations may be revisited as developments in the case warrant.

### III. CLASS CERTIFICATION

For each of the proposed classes and subclasses under Rules 23(b)(3), 23(b)(2), and 23(c)(4), plaintiffs must establish that all of the elements of Rule 23(a) are present. *See* Fed. R. Civ. P. 23(a)(1)-(4).

#### A. Numerosity

The first requirement under Rule 23(a) is numerosity. The class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs say that they "anticipate the defined classes will include at least 119,100 members." Dkt. No. 204 at 14. Wells Fargo did not dispute numerosity and that requirement is satisfied.

#### B. Commonality

For a class to be certified, Rule 23(a)(2) requires proof of "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As the Supreme Court has cautioned, this language is "easy to misread, since any competently crafted class complaint literally raises common questions." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (cleaned up). Simply positing common questions is not enough. Commonality "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id*. at 350. "This does not mean merely that they have all suffered a violation of the same provision of law." *Id*. Rather, "[t]heir claims must depend upon a common contention -- for example, the assertion of discriminatory bias on the part of the same supervisor." *Id*. The "common contention, moreover, must be of such a nature that it is capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id*.

What counts is the "capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id*. (quotations omitted, emphasis in original). This does not require total uniformity across a class. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998),

8

*overruled on other grounds by Dukes*, 564 U.S. 338. The commonality standard imposed by Rule 23(a)(2) is "rigorous." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).

### 1. Disparate Impact

To establish commonality, plaintiffs rely entirely on disparate impact, which they say is a viable way to prove their claims under the FHA and ECOA. *See* Dkt. No. 204 at 15-24; *id*. at 18 ("Violations of the FHA and ECOA may be proven both by a showing of intentional discrimination and under a disparate impact theory."). Wells Fargo does not dispute that a disparate impact theory is available for the FHA and ECOA claims. *See* Dkt. No. 232; *see also Tex. Dep't of Housing and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 545 (2015) ("disparate-impact claims are cognizable under the Fair Housing Act"); *Miller v. American Express Co.*, 688 F.2d 1235, 1239-40 (9th Cir. 1982) (disparate treatment and adverse impact tests, which are the "two traditional Title VII tests for employment discrimination," may both be used for ECOA claims).

The parties also agree on the three-step burden-shifting framework that applies to disparate impact theories in this context. Plaintiffs have the initial burden of demonstrating a prima facie case of disparate impact discrimination under the FHA (and in this case, the ECOA). *Sw. Fair Housing Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 960-61 (9th Cir. 2021). The burden shifts to the defendant to "either rebut the facts underpinning the prima facie case or to demonstrate a legally sufficient, nondiscriminatory reason for the practices causing the disparate impact." *Id*. (quotations omitted). "Third and finally, the burden shifts back to the plaintiff to show the availability of an alternative practice that has less discriminatory impact yet is still equally effective in serving the defendant's legitimate goals." *Id*. (citations omitted).

For plaintiffs to establish a prima face disparate impact claim under the FHA, they must demonstrate: "(1) the existence of a policy, not a one-time decision, that is outwardly neutral; (2) a significant, adverse, and disproportionate effect on a protected class; and (3) robust causality that shows, beyond mere evidence of a statistical disparity, that the challenged policy, and not some other factor or policy, caused the disproportionate effect." *Id*. at 962. The Supreme Court has emphasized that "a disparate-impact claim that relies on a statistical disparity must fail if the

9

plaintiff cannot point to a defendant's policy or policies causing that disparity." *Inclusive Cmmtys.*, 576 U.S. at 542. "A robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (cleaned up).

This is where plaintiffs' argument for class certification comes to naught. Plaintiffs did not present any classwide evidence whatsoever of "robust causality." Instead, they focused like a laser on the statistical disparity in application denial rates, without anything in the way of explanatory factors. For purposes of establishing commonality, plaintiffs say only that "every applicant is processed through Wells Fargo's CORE/ECS system," Dkt. No. 204 at 16, and that there were "statistically significant disparities in approval rates between Minority Applicants and White Applicants that cannot be explained by key underwriting factors." *Id.* at 21-22. Crucially, plaintiffs did not demonstrate any connection between the "CORE/ECS system" and the statistically significant disparities in approval rates. They have no evidence of how the CORE/ECS system might have caused racial disparities in approval rates on the basis of suspect factors.

This shortfall is evident in a number of ways. Plaintiffs say, for example, that Wells Fargo "could not itself identify what was driving the disparity," and that the bank "found that there were three potential proxies for race in its ECS Model -- major derogatories, average months in file, and recent inquiries -- which could be causing the disparity." Dkt. No. 252 at 8. This is a major misapprehension on plaintiffs' part of who bears the burden of offering classwide evidence of causation here. That burden is plaintiffs' to bear, not Wells Fargo's.

The absence of classwide evidence of causation is also made evident in plaintiffs' contention that "Wells Fargo's own documents depict how CORE/ECS components combine to produce underwriting decision outputs." Dkt. No. 252 at 7. The document they cite is a Wells Fargo slide with the heading, "GRD Is The Largest Business Service Within The Wells Fargo Risk Engine." Dkt. No. 204-16 at ECF p. 276. The slide states that "GRD is 1 of 16 business services"; "GRD contains 14,000 rules"; and "GRD contains 1,300+ data attributes." *Id.* The problem for plaintiffs is that nothing in these data points, which are taken as true for present

10

purposes, provides evidence that GRD might have caused the racially disparate results. This falls far short of the "robust causality" plaintiffs must show. *Inclusive Cmmtys.*, 576 U.S. at 542. In addition, the fact that Wells Fargo potentially analyzed 1,300+ data attributes pursuant to 14,000 rules indicates that commonality with respect to denial of a mortgage is not at all obvious here.

In *Inclusive Communities*, the Supreme Court expressly cautioned against this results-focused approach pressed by plaintiffs. As the Court stated:

> Courts must therefore examine with care whether a plaintiff has made out a prima facie case of disparate impact . . . . A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact. For instance, a plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all. *It may also be difficult to establish causation because of the multiple factors that go into investment decisions about where to construct or renovate housing units.*

*Inclusive Cmtys.*, 576 U.S. at 543 (emphasis added).

So too here. As the record amply demonstrates, each underwriting decision was complex and involved many, many different factors. It is certainly true that complexity alone is not an inherent barrier to certification, but when the undisputed facts indicate the application of up to 14,000 rules in deciding whether to make a loan, plaintiffs needed a good explanation of commonality with respect to the cause or source of race discrimination. They did not present one. Racial imbalance, without more, cannot establish a prima facie case of disparate impact. *See id*. at 543. To find otherwise would unfairly hold defendants liable "for racial disparities they did not create." *Id*.

Plaintiffs' case citations do not lead to a different conclusion. Plaintiffs repeatedly urge the Court to follow the decisions reached by district judges in *Heath v. Google LLC*, 345 F. Supp. 3d 1152 (N.D. Cal. 2018), and *Ramirez v. Greenpoint Mortg. Funding, Inc.*, 268 F.R.D. 627 (N.D. Cal. 2010). *See* Dkt. No. 204 at 3 ("This Court should follow the other district courts in the Ninth Circuit to confront similar claims and certify the proposed classes.") (citing *Heath*, 345 F. Supp. 3d at 1174, and *Ramirez*, 268 F.R.D. at 643); *id*. at 20 ("As in *Ramirez* and *Heath*, a showing of

11

disparate impact is what is needed for certification, not satisfaction of the remedial phase showing precisely which Minority Applicants were discriminated against."); *id*. at 24 ("just like the Courts in *Ramirez* and *Heath*, this Court should also find that common questions predominate because both parties will rely on statistical data and Wells Fargo's policies and conduct are at the center of the dispute; namely, its inseparable uniform reliance on CORE and its embedded ECS model."); Dkt. No. 252 at 6 ("*Ramirez* supports Plaintiffs not Wells Fargo.").

But these cases are readily distinguishable and of little moment here. *Heath* was a collective action under the federal Age Discrimination in Employment Act (ADEA). The procedures for collective actions are entirely different from class actions under Rule 23. For ADEA collective actions, the courts first "apply a lenient standard to determine whether the ADEA proposed collective action should be conditionally certified and given notice." *Heath*, 345 F. Supp. 3d at 1164. In a second step, "the party opposing the certification may move to decertify the class once discovery is complete." *Id*. at 1165 (quotations omitted). "Plaintiffs need show only that their positions are similar, not identical, to the positions held by the putative collective action members," and even at the second stage, "the standard applied remains distinct from and easier to satisfy than the requirements for a class action certified under Federal Rule of Civil Procedure 23(b)(3)." *Id*. (cleaned up). Consequently, the denial of decertification of the collective action in *Heath* is of little help in deciding the question of Rule 23 certification here.

Plaintiffs' heavy reliance on *Ramirez* is equally misplaced. The district court certified a class of "African-American and Hispanic borrowers who obtained wholesale mortgage loans through GreenPoint from 2004 through 2007." *Ramirez*, 268 F.R.D. at 629. The pricing of GreenPoint's mortgage loans consisted of an objective and a subjective component, and plaintiffs there challenged GreenPoint's "discretionary pricing policy, which governed brokers' compensation for their services." *Id*. at 630 (emphasis omitted). Plaintiffs contended that "the discretionary policy resulted in minority borrowers" -- defined to include "African Americans and Hispanics" -- receiving "less favorable loan pricing than similarly situated whites." *Id*. at 631. Plaintiffs brought claims under both the ECOA and the FHA. *Id*. In certifying the class, the district court found that "[p]laintiffs' reliance on statistical evidence to fulfill the commonality

12

requirement is well founded in Ninth Circuit precedent," relying on the circuit's "recent en banc ruling in *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571 (9th Cir. 2010)." *Id*. at 634.

*Ramirez* was decided in 2010, which bears mention because events have overtaken its holding. In 2011, the United States Supreme Court issued *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), which reversed the circuit court's en banc decision on which *Ramirez* depended. Since then, courts have declined to certify classes like the one certified in *Ramirez*, including in circumstances akin to those here. For example, *In re Wells Fargo Residential Mortgage Lending Discrimination Litigation*, No. 08-MD-01930-MMC, 2011 WL 3903117 (N.D. Cal. Sept. 6, 2011), *permission to appeal denied*, No. 11-80252 (9th Cir. Nov. 15, 2011), involved an allegation that Wells Fargo had "discriminated" against the "'Hispanic' or 'black'" plaintiffs, all of whom "obtained a mortgage loan from Wells Fargo," by "giving them mortgage loans with less favorable conditions than were given to similarly situated non-minority borrowers." *Id*. at *1. Plaintiffs alleged that "such discrimination was the result of Wells Fargo's 'discretionary loan pricing procedures'" which plaintiffs referred to as the "Discretionary Pricing Policy." *Id*. Plaintiffs' claims were stated, as here, under the FHA and ECOA. *Id*. at *2.

In declining to certify the proposed classes for plaintiffs' disparate impact discrimination claims, the district court cited the Supreme Court's ruling in *Dukes* that "'merely proving that the discretionary system has produced a racial or sexual disparity *is not enough*.'" *Id*. at *3 (quoting *Dukes*, 564 U.S. at 357 (emphasis in original)). The district court concluded that commonality was not satisfied because, "[a]s the Supreme Court held in *Dukes*, . . . , even if the statistical evidence offered therein had shown a pattern of disparity 'in *all* of Wal-Mart's 3,400 stores,' such statistical proof would fail, because '[m]erely showing that [a defendant's] policy of discretion has produced an overall [race]-based disparity does not suffice' to demonstrate commonality for purposes of Rule 23(a)." *Id*. at *4 (citing *Dukes*, 564 U.S. at 356-58 (emphasis in original)).

Other district courts are in agreement. *See In re Countrywide Fin. Mortg. Lending Practices Litig.*, No. 08-MD-1974, 2011 WL 4862174, at *4 (W.D. Ky. Oct. 13, 2011) (denying certification where plaintiffs alleged disparate impact discrimination based on policy of discretionary mortgage loan pricing; noting that "[a]lthough certification of this type of class was

13

more debatable pre-*Wal-Mart*, the Supreme Court has explained that Rule 23(a) commonality requires more than" the mere statistical analysis offered by plaintiffs); *Barrett v. Option One Mortg. Corp.*, No. 08-10157-RWZ, 2012 WL 4076465, at *3 (D. Mass. Sept. 18, 2012) (decertifying class of "all African-American borrowers who obtained a mortgage loan from one of the defendants" following Supreme Court's decision in *Dukes*; noting that "[a]s in *Wal-Mart*, plaintiffs here submit a statistical analysis to demonstrate that Option One's policy had a disparate impact" but "that is no longer sufficient to establish commonality").

Plaintiffs may say that this case does not involve a discretionary pricing policy, but they themselves were the vigorous proponents of *Ramirez* as a case presenting "similar claims." Dkt. No. 204 at 3. And the record leaves no doubt that the underwriting decisions at issue in this case involved the exercise of discretion. As plaintiffs acknowledge, a human underwriter ultimately exercises discretion to approve or deny an application, after taking into consideration the outputs from the CORE/Risk Engine/ECS models. *See* Dkt. No. 252 at 5 ("there is some discretion in the process").

Plaintiffs' suggestion that they seek to "follow" the approach in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), also does not help them. *See* Dkt. No. 204 at 19. Among other differences, that case was an employment discrimination case brought under Title VII of the Civil Rights Act of 1964 by the United States. It did not involve any class certified under Rule 23. Also, in *Dukes* too, the plaintiffs contended that Wal-Mart had engaged in a pattern or practice of discrimination as in *Teamsters*, but the Court still held that plaintiffs' statistical evidence showing that "the discretionary system has produced a racial or sexual disparity *is not enough*." *Dukes*, 564 U.S. at 352, 356-57 (emphasis in original).

Overall, plaintiffs' arguments with respect to commonality are stuck in a time before the Supreme Court decided *Dukes*. Plaintiffs' failure to account for *Dukes* and the current state of the law forecloses class certification. In *Dukes*, "respondents wish[ed] to sue about literally millions of employment decisions at once." *Dukes*, 564 U.S. at 352. The Court observed that "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say

14

that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*" *Id.* (emphases in original).

The same goes here. Plaintiffs wish to sue about hundreds of thousands of home loan decisions at once. Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I denied.* Plaintiffs did not identify any ties that bind for purposes of commonality.

### 2. Disparate Treatment

Wells Fargo says, with good reason, that plaintiffs' opening brief argued only a disparate impact theory for class certification. *See* Dkt. No. 232 at 9. Even so, plaintiffs say in their reply that they "allege both disparate impact and disparate treatment theories," and that they alleged in their motion that "Wells Fargo's knowing and continued use of its CORE/ECS system that adversely affected Minority Applicants 'constitutes disparate treatment under the law.'" Dkt. No. 252 at 2-3 (citation and emphasis omitted).

Plaintiffs are not on solid ground here, but the issue is of no moment. In *Dukes*, plaintiffs alleged that Wal-Mart's "local managers' discretion over pay and promotions is exercised disproportionately in favor of men, leading to an unlawful disparate impact on female employees." *Dukes*, 564 U.S. at 344. Plaintiffs said that "because Wal-Mart is aware of this effect, its refusal to cabin its managers' authority amounts to disparate treatment." *Id.* at 345.

Even so, the Court concluded that plaintiffs' statistical evidence alone was not enough and that "[m]erely showing that Wal-Mart's policy of discretion has produced an overall sex-based disparity does not suffice" for certification. *Id.* at 357. For the same reasons, and as discussed, plaintiffs' statistical evidence alone does not satisfy Rule 23(a)(2)'s commonality requirement here, and that is true even considering plaintiffs' cursory disparate treatment argument.

### CONCLUSION

Because plaintiffs have failed to satisfy Rule 23(a)(2) commonality, none of their proposed classes may be certified. The Court finds it unnecessary to reach the remaining Rule 23 requirements that are implicated by plaintiffs' certification requests.

Plaintiffs' motion for class certification, Dkt. No. 204, is denied. The Court will resolve Wells Fargo's summary judgment motion and the parties' merits FRE 702 motions in due course, and will set as warranted a pretrial conference and trial date for plaintiffs' claims to be tried on an individual basis.

**IT IS SO ORDERED.**

Dated: August 5, 2025

JAMES DONATO
United States District Judge